## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

Plaintiff,

v.

**HACKENSACK MERIDIAN HEALTH, INC.**
343 Thornall Street
Edison, NJ 08837

And

**ENGLEWOOD HEALTHCARE FOUNDATION**
350 Engle Street
Englewood, NJ 07631

Defendants.

Judge John Michael Vazquez

No. 2:20-cv-18140-JMV-

**REDACTED**

---

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION PURSUANT TO
## SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), petitions this Court,

pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b),

and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enter a stipulated temporary restraining

order and grant a preliminary injunction enjoining Defendant Hackensack Meridian *Health*, Inc.

("HMH") and Defendant Englewood Healthcare Foundation ("Englewood," and together with

HMH, "Defendants"), including their agents, divisions, parents, subsidiaries, affiliates,

1

partnerships, or joint ventures, from consummating their proposed merger.  HMH and

Englewood entered a Definitive Affiliation Agreement dated September 23, 2019, whereby

HMH will acquire Englewood (the "Proposed Transaction").  Absent this Court's action,

Defendants will be free to complete the Proposed Transaction after 11:59 pm EST on

December 7, 2020.

Plaintiff requires the aid of this Court to maintain the *status quo* and to prevent interim

harm to competition during the pendency of an administrative trial on the merits.  The

Commission has already initiated the administrative proceeding pursuant to Sections 7 and 11 of

the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45.  The

Commission filed its administrative complaint on December 3, 2020.  Pursuant to FTC

regulations, the administrative trial on the merits will begin five months from the date of the

filing (*i.e.*, on June 15, 2021).  The administrative trial will determine the legality of the

Proposed Transaction and will provide all parties with a full opportunity to conduct discovery

and present testimony and other evidence regarding the likely competitive effects of the

Proposed Transaction.

## I.

## NATURE OF THE CASE

1.      This is an action to preliminarily enjoin the anticompetitive merger between

HMH and Englewood.  HMH, the largest healthcare system in New Jersey, seeks to acquire

Englewood, an independent hospital and health system located in Bergen County, New Jersey

("Bergen County") less than ten miles away from two HMH hospitals, including HMH's flagship

hospital.

2

2.      The Proposed Transaction would enhance HMH's dominant position in Bergen County by giving it control of three of the six inpatient general acute care ("GAC") hospitals in Bergen County.  Englewood is the third-largest provider of inpatient GAC hospital services in Bergen County and competes head-to-head with HMH for patients and inclusion in insurer networks.  The Proposed Transaction would eliminate this competition, leading to higher healthcare prices and diminished incentives to compete on quality and access.

3.      According to HMH's Board minutes: "███████████████████████ ████████████████████████████████████████████████████ ████████████████████████" As HMH's Chief Executive Officer recognized, "███████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████" Another HMH executive shared that view: "████████████████████████ ████████████████████████████"

4.      The Proposed Transaction will substantially lessen competition in the market for inpatient GAC hospital services sold and provided to commercial insurers and their enrollees (including self-insured and fully insured employers and their covered lives).  The relevant geographic market for evaluating the Proposed Transaction is no broader than Bergen County.

5.      If the Proposed Transaction were allowed to consummate, Defendants would control approximately half of the inpatient GAC hospital services sold and provided in Bergen County to commercial insurers and their enrollees.  Only two meaningful competitors would serve the market post-transaction, Holy Name Medical Center ("Holy Name") and The Valley Hospital ("Valley"), both with significantly smaller market shares than Defendants.

3

6.     Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("2010 Merger Guidelines"), a post-acquisition market concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders an acquisition presumptively unlawful.  Based on inpatient admissions, the Proposed Transaction would significantly increase concentration and result in a highly concentrated market for inpatient GAC hospital services in Bergen County sold and provided to commercial insurers and their enrollees. The Proposed Transaction results in an increase in concentration that is well beyond the thresholds set forth in the 2010 Merger Guidelines and therefore is presumptively anticompetitive.

7.     HMH and Englewood compete to provide inpatient GAC hospital services to patients in Bergen County.  For HMH, Englewood is consistently identified as a top of competitor in Bergen County.  Both parties routinely track each other's market share, performance on quality, patient transfers to each other's hospitals, and other competitive metrics. Quantitative analysis also confirms that HMH and Englewood are close competitors.

8.     Today, HMH possesses significant bargaining leverage in negotiations with health insurers who are assembling health-plan networks for commercial customers.  HMH is able to secure high reimbursement rates and burdensome contract terms in network negotiations with insurers that other hospitals providing inpatient GAC hospital services in Bergen County are not able to obtain.

9.     Englewood is a high-quality, independent alternative to HMH in Bergen County because it is proximately located to both of HMH's Bergen County facilities—Hackensack University Medical Center ("HUMC") and Pascack Valley Medical Center ("PVMC")—and

4

offers very similar services as HMH's flagship facility, HUMC.  If HMH were to acquire Englewood, insurers would have few alternatives for inpatient GAC hospital services in Bergen County.  HMH would be able to demand higher rates from insurers for the combined entity's services, which, in turn, may lead to higher insurance premiums, co-pays, deductibles, or other out-of-pocket costs and/or fewer benefits for plan enrollees.

10.     HMH and Englewood also compete on non-price factors such as facility improvements and service line expansion, and the Proposed Transaction would eliminate competition between the Defendants on these non-price factors.

11.     Entry or expansion by other GAC hospitals will not be likely, timely, or sufficient to offset the adverse competitive effects that likely will result from the Proposed Transaction. New hospital construction or expansion is costly and takes many years to complete.  New Jersey's Certificate of Need ("CON") process also requires hospitals to seek regulatory approval before adding any new licensed beds.

12.     Defendants have not demonstrated cognizable, merger-specific efficiencies that would be sufficient to rebut the strong presumption of harm and evidence that the Proposed Transaction likely will lead to significant anticompetitive effects in the relevant market.

13.     Preliminary injunctive relief restraining Defendants from proceeding with the Proposed Transaction is necessary to prevent interim harm to competition during the Commission's ongoing administrative proceeding.  Absent preliminary relief, Defendants can close the Proposed Transaction and combine HMH's and Englewood's operations.  The Commission's ability to fashion effective relief would therefore be significantly impaired, or perhaps even precluded, if the Proposed Transaction is found to be unlawful after a full administrative trial on the merits and any subsequent appeals.

14.     The parties have stipulated to the Court's entry of a temporary restraining order preventing Defendants from consummating the acquisition until after 11:59 p.m. EST on the fifth business day after this Court rules on a motion for a preliminary injunction or until after a date set by the Court.  Such a temporary restraining order is necessary to preserve the *status quo* and protect competition while the Court considers Plaintiff's application for a preliminary injunction.

## II.

## BACKGROUND

## A.

## Jurisdiction and Venue

15.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.  HMH and Englewood, and their relevant operating entities and subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Defendants also are, and at all relevant times have been, engaged in commerce in the State of New Jersey.

16.     HMH and Englewood transact business in the District of New Jersey and are subject to personal jurisdiction therein.  Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

17.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b)     Whenever the Commission has reason to believe –

6

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice.  Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

18.     The Proposed Transaction constitutes a transaction subject to Section 7 of the Clayton Act, 15 U.S.C § 18.

## B.

### The Parties

19.     Plaintiff, the Commission, is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, DC 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

20.     Defendant HMH, a New Jersey non-profit corporation, operates the largest health system in New Jersey.  Headquartered in Edison, New Jersey, HMH is the largest employer in Bergen County and reported $5.9 billion in revenue in 2019.

21.     HMH is the largest health system in New Jersey as a result of a series of recent acquisitions.  On July 1, 2016, Hackensack University Health Network ("HUHN") merged with

Meridian Health to form HMH, which was at the time the second-largest health system in the state.  The merged system combined 11 GAC hospitals across seven counties.  Following the HUHN-Meridian Health transaction, on January 3, 2018, HMH merged with the JFK Health System expanding HMH to 16 hospitals and over 450 patient care locations and physician offices.  On January 3, 2019, HMH added yet another facility: the behavioral health provider Carrier Clinic.

22.     Today, HMH operates 12 GAC hospitals, two children's hospitals, two rehabilitation hospitals, and one behavioral health hospital spanning across eight counties in Northern and Central New Jersey.  It employs over 7,000 physicians.  In Bergen County, HMH operates HUMC, its 781-bed flagship academic medical center, and partially owns and operates as part of a joint venture PVMC.  Both HUMC and PVMC are GAC hospitals located within Bergen County.  HMH also operates Palisades Medical Center ("Palisades") and partially owns and operates as part of a joint venture Mountainside Medical Center ("Mountainside")—both located within fifteen miles of HUMC in counties adjacent to Bergen.  PVMC, Palisades, and Mountainside are community hospitals that provide primary and secondary inpatient GAC hospital services and generally refer patients to HUMC for more complex services.

23.     HMH Medical Group is a healthcare network consisting of over 1,000 physicians and advanced providers.  The HMH Medical Group offers primary and specialty care at over 300 locations spanning eight counties in New Jersey.  HMH Medical Group primary care physicians provide internal medicine, family medicine, pediatrics, and geriatrics among other services.  The HMH Medical Group also employs specialists that provide care in a variety of specialty fields including cardiology, oncology, breast surgery, vascular surgery, neurology, neurosurgery, OB/GYN care, and orthopedics, as well as more than 25 pediatric subspecialties.

24.     Defendant Englewood, a New Jersey non-profit corporation, is an independent hospital and healthcare network in Northern New Jersey.  It is headquartered in Englewood, New Jersey.  It is composed of Englewood Hospital and Medical Center, the Englewood Physician Network, and the Englewood Healthcare Foundation.  In 2019, Englewood accumulated approximately $768.9 million in revenue.

25.     Englewood Hospital is an inpatient GAC services hospital located in Bergen County.  Englewood's services include cardiac surgery and care, cancer care, orthopedic surgery, spine surgery, vascular surgery, women's health, and bloodless medicine and surgery. Englewood Hospital has 531 licensed beds and currently operates 318 beds.

26.     The Englewood Health Physician Network includes over 500 physicians who offer primary care and specialty services at more than 100 locations in six counties in New Jersey and New York.  Englewood also operates two outpatient imaging centers in Bergen County and one outpatient imaging center in Essex County.  Englewood has minority interests in two joint-venture outpatient surgical facilities.

## C.

### The Proposed Transaction and the Commission's Response

27.     Englewood initiated a search for a larger health system partner beginning in mid-2018.  Through its consultant, the Chartis Group, Englewood principally engaged with five potential health system partners, and after receiving initial bids, continued discussions with HMH, ███████████████████████████████.

28.     In February 2019, Englewood's Board of Trustees narrowed the pool of potential partners to HMH and ██████, both of which submitted final bids in early April 2019.

9

Englewood's Board selected HMH, and the parties ultimately entered into a definitive affiliation agreement on September 23, 2019 (*i.e.*, the Proposed Transaction).

29.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a modified timing agreement entered into between the Defendants and Commission staff, absent this Court's action, Defendants would be free to close the Proposed Transaction after 11:59 p.m. EST on December 7, 2020.

30.     Following a thorough investigation, the Commission, on December 3, 2020, and by a 5-0 vote, found reason to believe that the Proposed Transaction would violate Section 7 of the Clayton Act by substantially lessening competition.  That same day, the Commission initiated an administrative proceeding on the antitrust merits of the Proposed Transaction before an Administrative Law Judge, and a merits trial will begin on June 15, 2021.  The administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

31.     On December 3, 2020, the Commission also authorized its staff to pursue this federal court proceeding to obtain preliminary injunctive relief under Section 13(b) of the FTC Act.

### III.

### THE RELEVANT SERVICE MARKET

32.     Inpatient GAC hospital services sold and provided to insurers and their enrollees is a relevant service market in which to analyze the Proposed Transaction.  Inpatient GAC hospital services include a broad cluster of hospital services—medical, surgical, and diagnostic

services requiring an overnight hospital stay—for which competitive conditions are substantially similar.  Here, inpatient GAC hospital services cover all such services where both HMH and Englewood sell and provide to commercial insurers and their enrollees overlapping services. Non-overlapping services are not included in the relevant service market, as the Proposed Transaction will not substantially lessen competition.

33.    Although the Proposed Transaction's likely effect on competition could be analyzed separately for each individual inpatient GAC hospital service, it is appropriate to evaluate the Proposed Transaction's likely effects across this cluster of inpatient GAC hospital services because these services are offered in Bergen County under substantially similar competitive conditions.  Thus, grouping the hundreds of individual inpatient GAC hospital services into a cluster for analytical convenience enables the efficient evaluation of competitive effects without forfeiting the accuracy of the overall analysis.

34.    Outpatient services are not included in the inpatient GAC hospital services market because commercial insurers and their enrollees cannot substitute outpatient services for inpatient services in response to a price increase on inpatient GAC hospital services. Additionally, outpatient services are offered by a different set of competitors under different competitive conditions in Bergen County.

35.    The inpatient GAC hospital services market does not include services offered by a different set of competitors under different competitive conditions than, and which are not substitutes for, inpatient GAC hospital services.  For example, inpatient GAC hospital services do not include services related to psychiatric care, substance abuse, and rehabilitation services.

36.    The Proposed Transaction threatens significant harm to competition in a service market for inpatient GAC hospital services sold and provided to commercial insurers and their

enrollees.  As a result, this service market is a relevant market for analyzing the Proposed Transaction.

## THE RELEVANT GEOGRAPHIC MARKET

37.     The appropriate relevant geographic market to analyze the effects of the Proposed Transaction is no broader than Bergen County, New Jersey.

38.     Located in northeast New Jersey, Bergen County is the most populous county in the state with a population of just under one million people (between the populations of the 11th- and 12th-largest cities in the United States).  It is bordered by New York to the north and east, and is located just across the Hudson River from Manhattan, to which it is connected by the George Washington Bridge.

39.     The Bergen County market satisfies the hypothetical monopolist test.

40.     Insurers offering fully insured commercial plans must meet regulatory requirements that mandate a certain level of geographic access.  Insurers likely could not meet geographic access requirements that are required for marketing commercial plans in Bergen County if those insurers did not include any Bergen County hospitals in-network.

41.     Patients prefer to access inpatient GAC hospital services close to where they live. For this reason, even if an insurer could assemble a commercial plan that met the appropriate geographic access requirements, an insurer would face significant difficulty marketing a plan that did not include in network any Bergen County hospitals that provide inpatient GAC hospital services.

42.     Bergen County also is the main area of competition between HMH's Bergen County hospitals, HUMC and PVMC, and Englewood for inpatient GAC hospital services. HMH and Englewood each analyze competition within Bergen County.

## IV.

## MARKET STRUCTURE AND THE PROPOSED TRANSACTION'S PRESUMPTIVE ILLEGALITY

43.    The Proposed Transaction will significantly increase concentration in Bergen County for inpatient GAC hospital services sold and provided to commercial insurers and their enrollees.  Under the 2010 Merger Guidelines, a post-acquisition market concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders an acquisition presumptively unlawful.

44.    In a market no broader than Bergen County for inpatient GAC hospital services sold and provided to commercial insurers and their enrollees, the Proposed Transaction exceeds these thresholds and thus is presumptively unlawful.

45.    HMH's market share would increase to approximately half the inpatient GAC hospital services sold and provided to commercial insurers and their enrollees.  The Proposed Transaction would combine the first- and third-largest providers of these services and increase the HHI for Bergen County by approximately 900 for a post-merger HHI of almost 3,000.  The Proposed Transaction therefore is presumptively unlawful.

## V.

## ANTICOMPETITIVE EFFECTS

46.    HMH and Englewood compete closely today to the benefit of commercial insurers and their enrollees.  The Proposed Transaction would eliminate this important head-to-head competition.

13

**A.**

**Competition among Hospitals Benefits Consumers**

47.     Hospital competition for commercially insured patients occurs in two distinct but related stages.  First, hospitals compete for inclusion in commercial insurers' networks.  Second, in-network hospitals compete to attract patients, including commercial insurers' health-plan enrollees.

48.     In the first stage of hospital competition, hospitals compete to be included in commercial insurers' health networks.  To become an "in-network" provider, a hospital negotiates with an insurer and enters into a contract if it can agree with the insurer on terms.  The hospital's reimbursement terms for services rendered to a health plan's enrollees are a central component of those negotiations.

49.     Insurers attempt to contract with local hospitals (and other healthcare providers) that offer services that current or prospective enrollees of the health plan want.  In-network hospitals are typically significantly less expensive for health-plan members to seek care from than a hospital that is not included in the health plan's network (an "out-of-network provider").  Unsurprisingly, a hospital likely will attract more of a health plan's enrollees when it is in-network.  Hospitals therefore have an incentive to offer competitive terms and reimbursement rates to induce the insurer to include the hospital in its health-plan network.

50.     From the insurer's perspective, having hospitals in-network is beneficial because it enables the insurer to create a health-plan provider network in a particular geographic area that is attractive to current and prospective enrollees, typically local employers and their employees.

51.     A hospital has significant bargaining leverage if its absence would make the insurer's health-plan network substantially less attractive (and therefore less marketable) to its

14

current and prospective enrollees.  This relative attractiveness to the insurer depends largely on whether other nearby hospitals could serve as viable in-network substitutes in the eyes of the plan's enrollees.  The presence of alternative, conveniently located, high-quality competitors limits the bargaining leverage of a hospital in negotiations with the insurer.  Where there are fewer meaningful alternatives, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more onerous contract terms.

52.     A merger involving hospital facilities and services that are substitutes in the eyes of insurers and their health-plan enrollees increases the combined hospital's bargaining leverage. Such a merger in turn may lead to higher prices and/or poorer quality because the merger eliminates an available alternative that an insurer could otherwise offer (or threaten to offer) its health-plan enrollees.  Increases in reimbursement rates significantly impact insurers' health-plan enrollees, such as through higher cost-sharing payments and/or fewer benefits.  For fully insured employers, increased healthcare costs would come in the form of higher premiums.  Self-insured employers would fully bear those increased healthcare costs because they pay for claims directly. Individual consumers also could feel the burden of increased costs in the form of higher insurance premiums, co-pays, deductibles, or other out-of-pocket costs.

53.     In the second stage of competition, hospitals compete to attract patients to their facilities by offering convenient, high-quality healthcare services.  Patients often face similar out-of-pocket costs to access in-network providers.  As a result, in-network hospitals often compete on non-price features, such as location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, conveniences, and patient satisfaction.  Hospitals compete on these non-price dimensions to attract all patients, regardless of whether they are covered by insurance (including Medicare Advantage and Medicaid

Managed Care), traditional Medicare and Medicaid, or are patients without any insurance.  A merger of competing hospitals eliminates this form of non-price competition between the hospitals.

**B.**

**The Proposed Transaction Would Eliminate Close Competition Between HMH and Englewood**

54.     In Bergen County, HMH and Englewood are close competitors.  In analyzing whether to enter into an affiliation agreement with HMH, Englewood observed that a strategic benefit of such a relationship was that it "████████████████████████████████ ████████████████  Englewood also believed, in part, that "████████████████████ ████████████████████████████████████████"

55.     Quantitative evidence confirms the closeness of competition between HMH and Englewood.  It shows that, if Englewood were not available, a significant fraction of patients that previously went Englewood would seek care at a HMH hospital.  Likewise, if HUMC and PVMC were to become unavailable to patients for inpatient GAC hospital services, many patients that previously went to one of one of these HMH hospitals would receive care at Englewood.

56.     Today, this close head-to-head competition between Defendants incentivizes them to keep prices lower and quality of care higher than they would without this competition.

57.     HMH possesses significant bargaining leverage in negotiations with insurers, which it uses to demand high reimbursement rates and burdensome contractual terms.  Englewood and HMH are important alternatives for insurers constructing networks in Bergen County.  But if HMH were to acquire Englewood, HMH would own three out of the six hospitals

16

that provide inpatient GAC hospital services in Bergen County, and insurers would have few alternatives to turn to for inpatient GAC hospital services in Bergen County.  As a result, post-merger, HMH will likely be able to demand higher reimbursement rates and/or more onerous contractual terms than it does today, which, in turn, will harm consumers.

## C.

### The Proposed Transaction Would Eliminate Non-Price Competition

58.     HMH and Englewood compete with one another to attract patients, which incentivizes them to improve quality, technology, amenities, equipment, access to care, and service offerings.

59.     Defendants monitor each other's quality and brand recognition.  Defendants have invested in their physician networks and facilities to provide high quality services to patients in Bergen County and compete to attract Bergen County residents to their facilities.  Englewood has demonstrated an interest in and a track record of expanding its ability to handle more tertiary care.  And HMH is in the process of a $714 million expansion and modernization project to accommodate more complex tertiary and quaternary care.

60.     Patients benefit from this non-price competition.  The Proposed Transaction will diminish the combined firm's incentive to compete on these non-price dimensions, including on quality of care, facilities, and service offerings, to the detriment of all patients who use these hospitals.

## VI.

### ENTRY BARRIERS

61.     *De novo* entry into inpatient GAC hospital services in Bergen County will not be timely, likely, or sufficient enough to counteract the anticompetitive effects of the Proposed

Transaction.  Expansion by current market participants is also unlikely to deter or counteract the

Proposed Transaction's likely harm to competition for inpatient GAC hospital services in Bergen

County.

62.     Construction of a new hospital involves high costs and significant financial risks,

including the time and resources it would take to conduct studies, develop plans, acquire land or

repurpose a facility, garner community support, obtain regulatory approvals, and build and open

a facility.  New Jersey also is a Certificate of Need ("CON") state.  Building or expanding an

existing hospital in a CON state is expensive and time consuming.

## VII.

## EFFICIENCIES

63.     Defendants have not demonstrated cognizable, merger-specific efficiencies that

would be sufficient to rebut the strong presumption and evidence of the Proposed Transaction's

likely significant anticompetitive effects in the relevant market.

## VIII.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

64.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission,

whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary

injunctive relief to prevent consummation of the acquisition until the Commission has had an

opportunity to adjudicate the acquisition's legality in an administrative proceeding.  In deciding

whether to grant relief pursuant to 15 U.S.C. § 53(b), this Court should balance the likelihood of

the Commission's ultimate success on the merits and the equities, both of which weigh in favor

of granting the requested injunctive relief.  The principal public equity weighing in favor of

issuance of preliminary injunctive relief is the public's interest in effective enforcement of the antitrust laws.

65.     The Commission has reason to believe that the Proposed Transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  In particular, the Commission is likely to succeed in the administrative proceeding in demonstrating, among other things, that:

a.     The Proposed Transaction would have anticompetitive effects in an area no broader than Bergen County, New Jersey in the market for inpatient GAC hospital services sold and provided to commercial insurers and their enrollees;

b.     Substantial and effective entry or expansion into the relevant service and geographic markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Transaction; and

c.     The efficiencies that Defendants assert as resulting from the Proposed Transaction are speculative, not merger-specific, and are, in any event, insufficient as a matter of law to justify the Proposed Transaction.

66.     Preliminary relief is warranted and necessary.  The Commission voted 5-0 to issue an administrative complaint.  Should the Commission rule, after the full administrative trial, that the Proposed Transaction is unlawful, reestablishing the *status quo ante* of competition would be difficult, if not impossible, in the absence of preliminary injunctive relief from this Court.  The integration of HMH's and Englewood's operations, including the implementation of

higher prices and potential staff reductions, would substantially impair any attempt to restore competition to the level before the Proposed Transaction.

67.     Moreover, in the absence of relief from this Court, substantial harm to competition could occur immediately, including an increase in the costs that employers, their employees, and other individuals in Bergen County incur for their healthcare and a reduction in the quality of healthcare administered.  Because any meaningful pro-competitive benefits of the Proposed Transaction do not outweigh the significant interim harm to competition and consumers, the equities weigh strongly in favor of Plaintiff's request for preliminary injunctive relief.

68.     Accordingly, the equitable relief requested here is in the public interest. WHEREFORE, the Commission respectfully requests that the Court:

  a.  Enter the parties' stipulated temporary restraining order;

  b.  Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

  c.  Retain jurisdiction and maintain the *status quo* until the administrative proceeding, including all appeals, that the Commission has initiated concludes; and

  d.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: December 3, 2020                    Bureau of Competition

Of counsel:                                Respectfully submitted,

IAN CONNER                                 s/      Jonathan Lasken
Director                                   JONATHAN LASKEN
Federal Trade Commission                   Federal Trade Commission
                                           Bureau of Competition
DANIEL FRANCIS                             600 Pennsylvania Avenue, NW
Deputy Director                            Washington, DC 20580
Federal Trade Commission                   Telephone: (202) 326-2604
                                           Email: jlasken@ftc.gov
ALDEN ABBOTT
General Counsel
Federal Trade Commission

MARK SEIDMAN
Acting Assistant Director

EMILY BOWNE
Acting Deputy Assistant Director

LINDSEY BOHL
NATHAN BRENNER
CHRISTOPHER CAPUTO
SAMANTHA GORDON
JONATHAN LASKEN
NANDU MACHIRAJU
HARRIS ROTHMAN
ANTHONY SAUNDERS
CATHLEEN WILLIAMS
Attorneys
Federal Trade Commission

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 4th day of December, 2020, I served the foregoing on

the following counsel via electronic mail:

Paul Saint-Antoine, Esq.
One Logan Square, Ste. 2000
Philadelphia, PA 19103
Telephone: (215) 988-2990
Email:  paul.saint.antoine@faegredrinker.com

Kenneth Vorrasi, Esq.
Faegre Drinker Biddle & Reath LLP
1500 K Street, N.W.
Washington, DC 20005
Telephone: (202) 354-1361
Email:  kenneth.vorrasi@faegredrinker.com

*Counsel for Defendant Hackensack Meridian Health, Inc.*

Chong S. Park, Esq.
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 508-4631
Email:  Chong.Park@ropesgray.com

Jane E. Willis, Esq.
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7603
Email:  Jane.Willis@ropesgray.com

*Counsel for Defendant Englewood Healthcare Foundation*

s/        Lindsey Bohl
LINDSEY BOHL
Attorney for Plaintiff Federal Trade Commission

22