# EXHIBIT 4

**NEW ISSUE – BOOK-ENTRY ONLY**

**Moody's: "A1"**
**S&P: "A+"**
**(See "RATINGS" herein)**

**$179,220,000**
# HOSPITAL FOR SPECIAL SURGERY
**Taxable Bonds, Series 2018**

**$57,340,000 3.737% Bonds due April 1, 2028 Issue price: 100%, CUSIP± 44107HAC6**
**$59,668,000 4.081% Bonds due April 1, 2038 Issue price: 100%, CUSIP± 44107HAD4**
**$62,212,000 4.131% Bonds due April 1, 2048 Issue price: 100%, CUSIP± 44107HAE2**

**Interest Payable April 1 and October 1**
**Dated: Date of Delivery**

The Hospital for Special Surgery Taxable Bonds, Series 2018 (the "Bonds" or the "Series 2018 Bonds") will be issued pursuant to the terms of an Indenture of Trust, dated as of April 1, 2018 (the "Bond Indenture"), by and between the New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery ("HSS") and The Bank of New York Mellon, as bond trustee (the "Bond Trustee"). The proceeds of the Bonds will be used by HSS to (i) refinance outstanding HSS taxable and tax-exempt bonded indebtedness and for other lawful corporate purposes of HSS and its affiliates, and (ii) pay the costs of issuance of the Bonds.

The Bonds will be issued in fully registered form in denominations of $1,000 and any integral multiple thereof and, when issued, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Bonds. Individual purchases will be made in book-entry form only, in principal amounts of $1,000 and any integral multiple thereof. Purchasers of the Bonds will not receive physical certificates (except under certain circumstances described in the Bond Indenture) representing their ownership interests in the Bonds purchased.

Interest on the Bonds will be payable on April 1 and October 1 of each year, commencing on October 1, 2018. So long as the Bonds are held by DTC, the principal or redemption price of and interest on the Bonds will be payable by wire transfer to DTC, which in turn is required to remit such principal or redemption price and interest to the DTC Participants for subsequent disbursement to the Beneficial Owners of the Bonds, as more fully described in "BOOK-ENTRY ONLY SYSTEM" herein.

**The Bonds are subject to optional redemption in whole or in part prior to their stated maturity as described herein. See "THE BONDS – Redemption" herein.**

**Interest on the Bonds and gain, if any, on the sale of the Bonds are not excludable from gross income for federal, state or local income tax purposes. See "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS" herein.**

The obligations of HSS to make payments to the Bond Trustee under the Bond Indenture are evidenced and secured by an obligation ("Obligation No. 1") issued under a Master Trust Indenture (the "Master Indenture"), dated as of April 1, 2018, by and between HSS and The Bank of New York Mellon, as master trustee (in such capacity, the "Master Trustee"), and the Supplemental Indenture for Obligation No. 1, dated as of April 1, 2018 (the "Supplemental Indenture"), by and between HSS and the Master Trustee. Obligation No. 1 will be a joint and several obligation of HSS and any other entities that may in the future agree to become obligated on Obligation No. 1. (HSS and any such other entities, individually, a "Member" and, collectively, the "Obligated Group"). HSS is currently the sole Member of the Obligated Group. Obligation No. 1 will be an obligation issued under the Master Indenture secured by a pledge of the Obligated Group's Gross Receivables (as such term is defined herein). The Obligated Group may incur additional indebtedness and may grant liens on its property subject to the limitations contained in the Master Indenture. See "SOURCES OF PAYMENT FOR THE BONDS" and APPENDIX E – "FORM OF MASTER INDENTURE" attached hereto.

The Bonds are offered when, as and if issued by HSS and received by the Underwriters, subject to prior sale, withdrawal or modification of the offer without notice and subject to the approval of their legality by Harris Beach PLLC, New York, New York, transaction counsel to HSS, and certain other matters by General Counsel for HSS and Proskauer Rose LLP, New York, New York, special counsel to HSS. In addition, certain legal matters will be passed upon for the Underwriters by their counsel, Katten Muchin Rosenman LLP, New York, New York. It is expected that the Bonds will be available for delivery to DTC in New York, New York or to its custodial agent on or about April 3, 2018.

**Goldman Sachs & Co. LLC**                                                                 **J.P. Morgan**

**BofA Merrill Lynch**

March 23, 2018

---

± CUSIP is a registered trademark of the American Bankers Association ("ABA"). CUSIP data herein are provided by CUSIP Global Services, which is managed on behalf of the ABA by S&P Global Market Intelligence, a division of S&P Global Inc. CUSIP numbers have been assigned by an independent company not affiliated with HSS and are included solely for the convenience of the holders of the Bonds. HSS is not responsible for the selection or uses of these CUSIP numbers.

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

## TABLE OF CONTENTS

**Page**

GENERAL INFORMATION .................................................................................................................... i

SUMMARY OF THE OFFERING ......................................................................................................... iii

INTRODUCTION ..................................................................................................................................... 1
    Purpose of the Bonds and the Plan of Finance .................................................................................. 1
    HSS ..................................................................................................................................................... 1
    The Bonds ........................................................................................................................................... 1
    Master Indenture ................................................................................................................................ 1
    Optional Redemption ......................................................................................................................... 2
    Book-Entry Only System .................................................................................................................... 2
    Certain Information Related to this Offering Memorandum ............................................................... 3

SOURCES OF PAYMENT FOR THE BONDS ..................................................................................... 3
    Bond Indenture ................................................................................................................................... 3
    Master Indenture ................................................................................................................................ 4
    Outstanding Indebtedness ................................................................................................................... 7

ESTIMATED DEBT SERVICE REQUIREMENTS ON THE SERIES 2018 BONDS AND CERTAIN
OTHER INDEBTEDNESS ...................................................................................................................... 8

THE BONDS ............................................................................................................................................. 9
    Description of the Bonds .................................................................................................................... 9
    Redemption ......................................................................................................................................... 9
    Transfer of Bonds ............................................................................................................................. 13
    Exchange of Bonds ........................................................................................................................... 13
    Bond Register ................................................................................................................................... 13
    Acceleration ...................................................................................................................................... 14

BOOK-ENTRY ONLY SYSTEM .......................................................................................................... 14

BONDHOLDERS' RISKS ...................................................................................................................... 17

CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ................................ 41

CERTAIN ERISA CONSIDERATIONS ............................................................................................... 46

UNDERWRITING ................................................................................................................................... 48

FINANCIAL ADVISOR ......................................................................................................................... 49

CONTINUING DISCLOSURE ............................................................................................................... 49

APPROVAL OF LEGALITY .................................................................................................................. 51

ABSENCE OF MATERIAL LITIGATION ........................................................................................... 51

INDEPENDENT AUDITORS ................................................................................................................. 51

RATINGS ................................................................................................................................................. 51

MISCELLANEOUS ................................................................................................................................ 51

HOSPITAL FOR SPECIAL SURGERY ................................................................................ APPENDIX A

CONSOLIDATED FINANCIAL STATEMENTS OF HSS AS OF AND FOR
    THE YEARS ENDED DECEMBER 31, 2017 AND 2016
      WITH REPORT OF INDEPENDENT AUDITORS ................................................... APPENDIX B-1

CONSOLIDATED FINANCIAL STATEMENTS OF THE HOSPITAL FOR
    SPECIAL SURGERY FUND, INC. AND AFFILIATES
    AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2017 AND 2016
    WITH REPORT OF INDEPENDENT AUDITORS ................................................... APPENDIX B-2

SELECT INFORMATION REGARDING THE HSS ENTERPRISE ................................... APPENDIX C

FORM OF BOND INDENTURE ............................................................................................ APPENDIX D

FORM OF MASTER INDENTURE ....................................................................................... APPENDIX E

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

## GENERAL INFORMATION

This Offering Memorandum does not constitute an offer to sell the Bonds in any jurisdiction in which or to any person to whom it is unlawful to make such an offer. No dealer, salesperson or other person has been authorized by Goldman Sachs & Co. LLC, as representative of the underwriters (the "Underwriters") or HSS to give any information or to make any representations, other than those contained herein, in connection with the offering of the Bonds and, if given or made, such information or representations must not be relied upon.

THE SERIES 2018 BONDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), IN RELIANCE ON THE PROVISIONS OF SECTION (3)(a)(4) THEREOF. NO OTHER SECURITY RELATING TO THE BONDS HAS BEEN REGISTERED UNDER THE 1933 ACT, AND NEITHER THE BOND INDENTURE NOR THE MASTER INDENTURE NOR THE SUPPLEMENTAL INDENTURE HAS BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, AS AMENDED, IN RELIANCE UPON EXEMPTIONS IN SUCH ACTS. FURTHER, THE BONDS HAVE NOT BEEN REGISTERED UNDER THE LAWS OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. THE BONDS MAY NOT BE EXEMPT IN EVERY JURISDICTION IN THE UNITED STATES. THE SECURITIES LAWS (THE "BLUE SKY LAWS") OF SOME JURISDICTIONS MAY REQUIRE A FILING AND A FEE TO SECURE THE BONDS' EXEMPTION FROM REGISTRATION. THE EXEMPTIONS FROM REGISTRATION AND FROM QUALIFICATION IN ACCORDANCE WITH APPLICABLE PROVISIONS OF FEDERAL OR STATE LAWS CANNOT BE REGARDED AS A RECOMMENDATION THEREOF. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE BONDS OR ANY RELATED SECURITY, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

All information set forth herein has been obtained from HSS, DTC and other sources that are believed to be reliable. Estimates and opinions are included and should not be interpreted as statements of fact. Summaries of documents do not purport to be complete statements of the provisions of such summarized documents. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Offering Memorandum nor any sale made hereunder will, under any circumstances, create any implication that there has been no change in the affairs of HSS since the date hereof.

The distribution of this Offering Memorandum and the offer or sale of the Series 2018 Bonds may be restricted by law in certain jurisdictions. Neither HSS nor the Underwriters represent that this Offering Memorandum may be lawfully distributed, or that any Series 2018 Bonds may be lawfully offered, in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for facilitating any such distribution or offering. In particular, no action has been taken by HSS or the Underwriters which would permit a public offering of any of the Series 2018 Bonds or distribution of this Offering Memorandum in any jurisdiction where action for that purpose is required. Action may be required to secure exemptions from the blue sky registration requirements either for the primary distributions or any secondary sales that may occur. Accordingly, none of the Series 2018 Bonds may be offered or sold, directly or indirectly, and neither this Offering Memorandum nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations.

Certain statements included or incorporated by reference in this Offering Memorandum constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, Section 21E of the United States Securities Exchange Act of 1934, as amended, and Section 27A of the 1933 Act. Such statements are generally identifiable by the terminology used such as "pro-forma," "may," "believe," "plan," "expect," "estimate," "budget," "intend," "projection" or other similar words. Such forward-looking statements include, but are not limited to, certain statements contained in the information in APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY", attached hereto. A number of important factors, including factors affecting HSS's financial condition and factors which are otherwise unrelated thereto, could cause actual results to differ materially from those stated in such forward-looking statements. HSS DOES NOT PLAN TO ISSUE ANY UPDATES OR REVISIONS TO THOSE FORWARD-LOOKING STATEMENTS IF OR WHEN ITS EXPECTATIONS CHANGE, OR EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH SUCH STATEMENTS ARE BASED OCCUR.

The Underwriters have provided the following sentence for inclusion in this Offering Memorandum. The Underwriters have reviewed the information in this Offering Memorandum in accordance with, and as part of, its responsibility to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVERALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

The Bank of New York Mellon, as Bond Trustee and Master Trustee, has not reviewed, provided or undertaken to determine the accuracy of any of the information contained in this Offering Memorandum and makes no representation or warranty, express or implied, as to any matters contained in this Offering Memorandum, including, but not limited to, (i) the accuracy or completeness of such information, or (ii) the validity of the Bonds.

Statements in this Offering Memorandum are made as of the date hereof unless stated otherwise and neither delivery of this Offering Memorandum at any time, nor any sales thereunder, shall under any circumstances create an implication that the information contained herein is correct as of any time subsequent to the date hereof.

Any references to internet websites in this Offering Memorandum are shown for reference and convenience only; unless explicitly stated to the contrary, the information contained within the websites and any links contained within those websites are not incorporated herein by reference and do not constitute part of this Offering Memorandum.

In making an investment decision, investors must rely on their own examination of HSS and the terms of the offering, including the merits and risks involved. Prospective investors should not construe the contents of this Offering Memorandum as legal, tax or investment advice.

---

## SUMMARY OF THE OFFERING

| | |
|---|---|
| **Issuer** | New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery |
| **Securities Offered** | **Hospital for Special Surgery**<br>**Taxable Bonds, Series 2018**<br><br>$57,340,000 3.737% Bonds due April 1, 2028<br>$59,668,000 4.081% Bonds due April 1, 2038<br>$62,212,000 4.131% Bonds due April 1, 2048 |
| **Interest Accrual Date** | Interest will accrue from the Settlement Date |
| **Interest Payment Dates** | April 1 and October 1 of each year, commencing October 1, 2018 |
| **Optional Redemption** | The Bonds are subject to optional redemption in whole or in part by HSS prior to maturity, on any Business Day, in such order of maturity as directed by HSS, (a) with respect to the Bonds maturing April 1, 2028, (i) prior to January 1, 2028, at the Make-Whole Redemption Price (defined below), and (ii) on or after January 1, 2028, at a redemption price equal to the principal amount of such Bonds to be redeemed, (b) with respect to the Bonds maturing April 1, 2038, (i) prior to January 1, 2038, at the Make-Whole Redemption Price, and (ii) on or after January 1, 2038, at a redemption price equal to the principal amount of such Bonds to be redeemed, and (c) with respect to the Bonds maturing April 1, 2048, (i) prior to October 1, 2047, at the Make-Whole Redemption Price, and (ii) on or after October 1, 2047, at a redemption price equal to the principal amount of such Bonds to be redeemed, in each case, together with accrued interest to the date fixed for redemption, as further described herein. The Bonds are also subject to purchase in lieu of redemption. See "THE BONDS – Redemption" herein. |
| **Settlement Date** | April 3, 2018 |
| **Authorized Denominations** | $1,000 and any integral multiple thereof |
| **Form and Depository** | The Bonds will be delivered solely in book-entry form through the facilities of DTC. |
| **Use of Proceeds** | HSS will use proceeds of the Bonds to (i) refinance outstanding HSS taxable and tax-exempt bonded indebtedness and for other lawful corporate purposes of HSS and its affiliates, and (ii) pay costs of issuance of the Bonds. See "INTRODUCTION – Purpose of the Bonds and the Plan of Finance" herein. |
| **Ratings** | Moody's: "A1"<br>S&P:      "A+" |

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**OFFERING MEMORANDUM**

**RELATING TO**

**$179,220,000**

**HOSPITAL FOR SPECIAL SURGERY
TAXABLE BONDS, SERIES 2018**

**INTRODUCTION**

The purpose of this Offering Memorandum, which includes the cover page, the table of contents and appendices, is to provide certain information concerning the sale and delivery by the New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery ("HSS") of its $179,220,000 aggregate principal amount of Hospital for Special Surgery Taxable Bonds, Series 2018 (the "Bonds" or the "Series 2018 Bonds"). This Introduction contains only a brief summary of certain terms of the Bonds being offered and a brief description of the Offering Memorandum. All statements contained in this Introduction are qualified in their entirety by reference to the entire Offering Memorandum. Certain capitalized terms used herein are defined in Appendices A, C and D to this Offering Memorandum.

**Purpose of the Bonds and the Plan of Finance**

The proceeds of the Series 2018 Bonds will be used to (i) refinance outstanding HSS taxable and tax-exempt bonded indebtedness and for other lawful corporate purposes of HSS and its affiliates, and (ii) pay costs of issuance of the Series 2018 Bonds.

**HSS**

HSS is a not-for-profit, voluntary, acute care, teaching hospital located in Manhattan, New York, specializing in orthopedics, rheumatology, and their related disciplines.   See APPENDIX A — "HOSPITAL FOR SPECIAL SURGERY" for information about HSS.  Appendix B-1 contains the Consolidated Financial Statements of HSS as of and for the years ended December 31, 2017 and 2016 with Report of Independent Auditors. The Consolidated Financial Statements of HSS includes other entities that are not members of the Obligated Group.  HSS is currently the sole Member of the Obligated Group.

**The Bonds**

The Bonds are being issued pursuant to an Indenture of Trust, dated as of April 1, 2018 (the "Bond Indenture"), by and between HSS and The Bank of New York Mellon, as bond trustee (the "Bond Trustee"). Pursuant to the Bond Indenture, on each Payment Date, until the principal of and interest on the Bonds shall have been paid or provision for such payment shall have been made as provided in the Bond Indenture, HSS will pay the Bond Trustee a sum equal to the amount payable on such Payment Date as principal of or interest on the Bonds. See "THE BONDS" herein.

**Master Indenture**

Pursuant to the Master Trust Indenture, dated as of April 1, 2018 (the "Master Indenture"), by and between HSS and The Bank of New York Mellon, as master trustee (the "Master Trustee"), HSS formed

an Obligated Group (as defined in the Master Indenture). HSS is currently the sole Member of the Obligated Group under the Master Indenture.

To evidence and secure the obligation of HSS with respect to the Series 2018 Bonds, HSS will issue its Obligation No. 1, to be dated the date of the issuance of the Series 2018 Bonds, under and pursuant to the Master Indenture ("Obligation No. 1") and a Supplemental Indenture for Obligation No. 1, to be dated as of April 1, 2018 (the "Supplemental Indenture"), between HSS and the Master Trustee. Obligations issued under the Master Indenture are secured by a pledge of Gross Receivables (as hereinafter defined) of HSS.  See "SOURCES OF PAYMENT FOR THE BONDS - Master Indenture, Supplemental Indenture and Obligation No. 1 - *Security for Obligation No. 1*" herein.

Currently, HSS is the sole Member of the Obligated Group under the Master Indenture. However, the Master Indenture permits other entities, upon compliance with certain conditions, to become Members of the Obligated Group and to issue Obligations thereunder. Pursuant to the provisions of the Master Indenture, each Member of the Obligated Group is jointly and severally obligated (subject to the right of such Member to withdraw from the Obligated Group upon satisfying the applicable provisions of the Master Indenture) to make any and all payments promptly on all Obligations thereafter, and in certain cases, previously issued under the Master Indenture, including Obligation No. 1, according to the terms thereof. See APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Membership in Obligated Group" attached hereto.

**Optional Redemption**

The Bonds are subject to optional redemption in whole or in part by HSS prior to maturity, on any Business Day, in such order of maturity as directed by HSS, at the Make-Whole Redemption Price together with accrued interest to the date fixed for redemption, as further described herein. See "THE BONDS – Redemption" herein.

**Book-Entry Only System**

*The following information concerning DTC and DTC's book-entry system has been obtained from sources that HSS and the Underwriters believe to be reliable, but none of HSS or the Underwriters takes any responsibility for the accuracy thereof.*

When delivered, the Bonds will be registered in the name of Cede & Co., the nominee of The Depository Trust Company ("DTC"). DTC will act as the securities depository for the Bonds. Purchases of the Bonds may be made in book-entry form only, through brokers and dealers who are, or who act through, DTC Participants. Beneficial Owners of the Bonds will not receive physical delivery of certificated securities (except under certain circumstances described in the Bond Indenture). Payment of the principal or redemption price of and interest on the Bonds are payable by the Bond Trustee to DTC, which will in turn remit such payments to the DTC Participants, which will in turn remit such payments to the Beneficial Owners of the Bonds. In addition, so long as Cede & Co. is the registered owner of the Bonds, the right of any Beneficial Owner to receive payment for any Bond will be based only upon and subject to the procedures and limitations of the DTC book-entry system. See "BOOK-ENTRY ONLY SYSTEM" herein.

**Certain Information Related to this Offering Memorandum**

The descriptions herein of the Bond Indenture and other documents relating to the Bonds do not purport to be complete and are qualified in their entirety by reference to such documents, and the description herein of the Bonds is qualified in its entirety by the form thereof and the information with respect thereto included in such documents. See APPENDIX D – "FORM OF BOND INDENTURE" attached hereto for the proposed form of the Bond Indenture, and APPENDIX E – "FORM OF MASTER INDENTURE" attached hereto for the form of Master Indenture.

All capitalized terms used in this Offering Memorandum and not otherwise defined herein have the same meanings as in the Bond Indenture and the Master Indenture. See APPENDIX D – "FORM OF BOND INDENTURE" and APPENDIX E – "FORM OF MASTER INDENTURE" attached hereto for definitions of certain words and terms used but not otherwise defined herein.

Information concerning HSS and its affiliates is included in Appendix A attached hereto. For supplementary information concerning the financial operations of HSS and its affiliates, see Appendix B-1, which sets forth the consolidated financial statements of HSS as of and for the years ended December 31, 2017 and 2016 with Report of Independent Auditors, Appendix B-2, which sets forth the consolidated financial statements of The Hospital for Special Surgery Fund, Inc. and Affiliates as of and for the years ended December 31, 2017 and 2016 with Report of Independent Auditors and Appendix C which contains select information regarding the HSS Enterprise.  No affiliate of HSS will be obligated to make any payments under or with respect to Obligation No. 1 or the Bonds, unless such affiliate becomes and remains a Member of the Obligated Group.

Certain risk factors that should be considered by prospective investors in the Bonds are set forth below under "BONDHOLDERS' RISKS."

The information and expressions of opinion herein speak only as of their date and are subject to change without notice. Neither delivery of this Offering Memorandum nor any sale made hereunder nor any future use of this Offering Memorandum will, under any circumstances, create any implication that there has been no change in the affairs of HSS.

## SOURCES OF PAYMENT FOR THE BONDS

*Set forth below is a narrative description of certain contractual provisions relating to the source of payment of the Bonds and certain related covenants. These provisions have been summarized and this description does not purport to be complete. Reference should be made to the Bond Indenture, the Master Indenture and the Supplemental Indenture.*

*Definitions for defined terms used under this heading are contained in APPENDIX D – "FORM OF BOND INDENTURE" and APPENDIX E – "FORM OF MASTER INDENTURE" attached hereto. The summary set forth below does not purport to be complete. See also APPENDIX D – "FORM OF BOND INDENTURE" and APPENDIX E – "FORM OF MASTER INDENTURE" attached hereto for a more complete statement of the rights, duties and obligations of the parties thereto.*

**Bond Indenture**

The Bond Indenture provides that, on or before 9:30 A.M., New York City time, on each Payment Date, HSS will pay the Bond Trustee a sum equal to the amount payable on such Payment Date as principal of and interest on the Bonds. In addition, the Bond Indenture provides that each such payment made will at all times be sufficient to pay the total amount of interest and principal (whether at maturity

or upon acceleration) becoming due and payable on the Bonds on such Payment Date. If on any Payment Date, the amounts held by the Bond Trustee in the accounts within the Bond Fund (as described below) are insufficient to make any required payments of principal of (whether at maturity or upon acceleration) and interest on the Bonds as such payments become due, HSS is required to pay such deficiency to the Bond Trustee. In the event that HSS does not make up such deficiency the Bond Trustee is directed to request payment under Obligation No. 1 and deposit the amount of such payment into the Bond Fund. See APPENDIX D – "FORM OF BOND INDENTURE – Trustee Direction Regarding Obligation No. 1" attached hereto.

Additional Bonds may be issued pursuant to the Bond Indenture from time to time that are consolidated with the Bonds. Additional Bonds consolidated with the Bonds pursuant to the terms of the Bond Indenture are required to have the same interest rate, redemption provisions, maturity date and other terms (other than issue price) as the Bonds offered hereby, may have the same CUSIP number as the Bonds and shall be treated as a single series of Bonds for all purposes of the Bond Indenture.

**Master Indenture**

*Credit Group.* The Master Indenture creates the Credit Group, which is comprised of the Members of the Obligated Group and Designated Affiliates, including Limited Designated Affiliates. **It is anticipated that, initially, HSS will be the only Member of the Obligated Group, there will be no Designated Affiliates and there will be no Limited Designated Affiliates.**

All Members of the Obligated Group are jointly and severally obligated for the amounts due on Obligations, including Obligation No. 1. Neither the Designated Affiliates nor the Limited Designated Affiliates are obligated to make payments on Obligations. However, they may be required to transfer funds to Members of the Obligated Group in amounts necessary to enable the Members of the Obligated Group to make payments due on Obligations. Although Designated Affiliates and Limited Designated Affiliates are not obligated to make payments on Obligations, financial covenants and ratios under the Master Indenture are based on the consolidated financial results of the Credit Group. *See* APPENDIX E – "FORM OF MASTER INDENTURE." *See* also "Designated Affiliates" and "Limited Designated Affiliates" below.

*Issuance of Obligations; Joint and Several Obligations.* Under the Master Indenture, each Member of the Obligated Group authorizes to be issued from time to time Obligations or Series of Obligations, without limitation as to amount, except as provided in the Master Indenture or as may be limited by law, and subject to the terms, conditions and limitations established in the Master Indenture. Obligations may be in any form set forth in a Related Supplement, including, but not limited to, bonds, notes, obligations, debentures, reimbursement agreements, loan agreements, guarantees, Financial Product Agreements or leases. Each Member of the Obligated Group jointly and severally covenants to promptly pay, or cause to be paid, all Required Payments at the place, on or before the dates and in the manner provided in the Master Indenture or in any Related Supplement or Obligation. Each Member of the Obligated Group further covenants to faithfully observe and perform all of the conditions, covenants and requirements of the Master Indenture, any Related Supplement and any Obligation.

*Changes to the Members of the Credit Group.* Entities may be added to and withdrawn from the Credit Group from time to time. The Master Indenture imposes minimum conditions on the right of any Member of the Obligated Group or Credit Group Member to enter or withdraw from the Obligated Group or the Credit Group, respectively, at any time, or to change the status of a Member of the Obligated Group to that of a Designated Affiliate or Limited Designated Affiliate; provided, however, in no event may HSS withdraw from the Obligated Group For a more detailed discussion of entry into or withdrawal from the Obligated Group or Credit Group, respectively, *see* APPENDIX E – "FORM OF MASTER

INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Membership in Obligated Group," "– Withdrawal from Obligated Group," and "– Designation of Designated Affiliates."

*Designated Affiliates*.  Under the Master Indenture, HSS, as the Credit Group Representative, may designate "Designated Affiliates" from time to time, and may rescind any such designation at any time.  **It is anticipated that, initially, there will be no Designated Affiliates under the Master Indenture.**  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Designation of Designated Affiliates."  In connection with such designation, the Credit Group Representative shall designate for each Designated Affiliate a Member of the Obligated Group to serve as the Controlling Member for such Designated Affiliate.  So long as such Person is designated as a Designated Affiliate, the Controlling Member of such Designated Affiliate shall either (i) maintain, directly or indirectly, control of such Designated Affiliate to the extent necessary to cause such Designated Affiliate to comply with the terms of the Master Indenture, whether through the ownership of voting securities, by contract, corporate membership, reserved powers or the power to appoint corporate members, trustees or directors, or otherwise or (ii) execute and have in effect such contracts or other agreements which the Credit Group Representative and the Controlling Member, in the judgment of their respective Governing Bodies, deem sufficient for the Controlling Member to cause such Designated Affiliate to comply with the terms of the Master Indenture.

Designated Affiliates are not obligated to make payments on any Obligation.  Each Controlling Member agrees, however, that it shall cause each of its Designated Affiliates to pay, loan or otherwise transfer to the Credit Group Representative such amounts as are necessary to enable the Members of the Obligated Group to comply with the provisions of the Master Indenture, subject to applicable legal or regulatory restrictions; *provided*, *however*, that nothing in the Master Indenture shall be construed to require any Controlling Member to cause its Designated Affiliate to pay, loan or otherwise transfer to the Credit Group Representative any amounts that constitute Restricted Moneys.

*Limited Designated Affiliates.*  The Master Indenture further provides that Designated Affiliates may be designated by the Credit Group Representative as "Limited Designated Affiliates."  A Limited Designated Affiliates liability to transfer moneys or other assets to the Credit Group Representative shall be limited to a specified amount set forth in an Officer's Certificate delivered to the Master Trustee upon the designation of the Limited Designated Affiliate as a Limited Designated Affiliate.  **It is anticipated that, initially, there will be no Limited Designated Affiliates under the Master Indenture.**  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Designation of Designated Affiliates."

*Security for Obligations Issued Under the Master Indenture.*  All Obligations Outstanding from time to time under the Master Indenture, are secured by security interests in the Gross Receivables of the Members of the Obligated Group and each of the future Members of the Obligated Group (subject to the right of a Member to withdraw from the Obligated Group upon satisfying the applicable provisions of the Master Indenture).  *See* "SOURCES OF PAYMENTS FOR THE BONDS − Security and Enforceability Under the Master Indenture – Perfection of a Security Interest.  *See* also APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Gross Receivables Pledge."

*Security Interests in Gross Receivables for Obligations Issued Under the Master Indenture.*  Each Member of the Obligated Group will grant to the Master Trustee a security interest in its Gross Receivables subject to Permitted Liens, to the extent the same may be pledged and a security interest

granted therein under the UCC, whether now owned or hereafter acquired.  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Gross Receivables Pledge."  Any future Members of the Obligated Group will also be required to grant a security interest in their Gross Receivables.  For purposes of the Master Indenture, "*Gross Receivables*" is defined to mean all of the accounts, chattel paper, instruments and general intangibles (all as defined in the UCC) of each Member of the Obligated Group, as are now in existence or as may be hereafter acquired, and the proceeds thereof; excluding, however, (i) all the proceeds of any grant, gift, bequest, contribution or other donation and (ii) all accounts or general intangibles consisting of or arising from patents and royalties.  The security interest of the Master Trustee in the Gross Receivables is subject to certain limitations as described below in this section "Security and Enforceability Under the Master Indenture – Perfection of Security Interest."

The Master Trustee's security interest in the Gross Receivables described above will be perfected, to the extent that such security interest may be so perfected, by the filing of financing statements which comply with the requirements of the UCC.  Each Member of the Obligated Group shall file, in accordance with the requirements of the UCC, financing statements; and, from time to time thereafter, shall deliver such other documents (including, but not limited to, continuation statements as required by the UCC) as may be necessary or reasonably requested by the Master Trustee in order to perfect or maintain perfected such security interests or give public notice thereof.  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Gross Receivables Pledge."

*Permitted Liens Under the Master Indenture.*  Pursuant to the Master Indenture, each Member of the Obligated Group agrees, and each Controlling Member covenants that it will not permit any of its Designated Affiliates to, create or suffer to be created or permit the existence of any Lien upon Property, now owned or hereafter acquired by it, other than Permitted Liens.  Permitted Liens include, but are not limited to, Liens that may be granted to secure additional Obligations and other Indebtedness and Liens not otherwise identified as a Permitted Lien where the Value of all Property that is encumbered by such Liens does not exceed 30% of the Value of all Property of the Credit Group Members, calculated at the time of creation of such Lien.  The Obligated Group may incur substantial liabilities secured by Permitted Liens.  *See* the definition of "Permitted Liens" in APPENDIX E – "FORM OF MASTER INDENTURE – Definitions."

*Other Master Indenture Covenants.*  In addition to the security and other provisions described above, the Master Indenture contains provisions, covenants and restrictions related to debt service coverage, mergers and other corporate combinations and divestitures, sales, leases or other dispositions of assets and other matters.  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Debt Service Coverage," "– Merger, Consolidation, Sale or Conveyance," "– Limitation on Disposition of Assets" and "– Limitation on Indebtedness."

*Additional Obligations.*  Pursuant to the Master Indenture, Obligations may be issued from time to time in the future pursuant to the Master Indenture, and such other Obligations will be secured on parity under the Master Indenture with any other Obligations then outstanding.  *See* APPENDIX E – "FORM OF MASTER INDENTURE – PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATION; OBLIGATED GROUP COVENANTS – Limitation on Indebtedness."

**Security and Enforceability Under the Master Indenture**

*Perfection of a Security Interest.*  Each Member of the Obligated Group (which is currently only HSS) under the Master Indenture will grant a security interest in all of its Gross Receivables, subject to

Permitted Liens, and has agreed to perfect the grant of a security interest in the Gross Receivables to the extent that the same may be pledged and a security interest granted therein under the UCC.  The Master Indenture provides that the Master Trustee's security interest in the Gross Receivables shall be perfected, to the extent that such security interest may be so perfected, by the filing of financing statements which comply with the requirements of the UCC.  It may not be possible to perfect a security interest in any manner whatsoever in certain types of Gross Receivables (e.g., certain insurance proceeds and payments under the Medicare and Medicaid programs) prior to actual receipt by any Member.  *See* also "BONDHOLDERS' RISKS – Enforceability of Lien on Gross Receivables."

***Enforceability of the Master Indenture and Future Obligations.***  The state of the insolvency, fraudulent conveyance and bankruptcy laws relating to the enforceability of guaranties or obligations issued by one corporation in favor of the creditors of another or the obligations of a Member of the Obligated Group to make debt service payments on behalf of a Member of the Obligated Group is unsettled, and the ability to enforce the Master Indenture and the Obligations against any Member of the Obligated Group that would be rendered insolvent thereby could be subject to challenge.

The legal right and practical ability of the Bond Trustee to enforce its rights and remedies against HSS under the Bond Indenture and related documents and of the Master Trustee to enforce its rights and remedies against the Members of the Obligated Group under Obligation No. 1 may be limited by laws relating to bankruptcy, insolvency, reorganization, fraudulent conveyance or moratorium and by other similar laws affecting creditors' rights.  In addition, the Bond Trustee's and the Master Trustee's ability to enforce such rights will depend upon the exercise of various remedies specified by such documents which may in many instances require judicial actions that are often subject to discretion and delay or that otherwise may not be readily available or may be limited.  *See* "BONDHOLDERS' RISKS – Risks Related to Obligations Issued under the Master Indenture," "Enforceability of Remedies" and "Enforceability of Lien of Gross Receivables."

The bankruptcy of a Designated Affiliate or a Limited Designated Affiliate would not trigger an event of default under the Master Indenture or the Bond Indenture, but the bankruptcy of a Designated Affiliate or Limited Designated Affiliate could have a material adverse effect on the Credit Group.  If a Designated Affiliate were to file for bankruptcy and had no contractual obligation to make payments to the Credit Group Representative, neither the Credit Group Representative nor the Controlling Member would be able to file a claim in a bankruptcy proceeding involving the Designated Affiliate for the payment of any amounts due on Obligation No. 1 (or a replacement Obligation).  The Master Trustee has no contractual rights against Designated Affiliates or Limited Designated Affiliates and would not be able to file such a claim whether or not a contract existed between the Controlling Member, the Designated Affiliate or the Limited Designated Affiliate.  In addition, in the event the Controlling Member were to become a debtor in a bankruptcy case, the Credit Group Representative or such Controlling Member, as debtor-in-possession, or a trustee in bankruptcy, may not be able to cause the Designated Affiliate to transfer funds to the Obligated Group Agent or the trustee in bankruptcy.

## Outstanding Indebtedness

As of December 31, 2017, HSS has approximately $263 million in outstanding indebtedness, approximately $142 million of which will be defeased with a portion of the proceeds of the Series 2018 Bonds. See APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY – Outstanding Long Term Indebtedness".

### ESTIMATED DEBT SERVICE REQUIREMENTS ON THE SERIES 2018 BONDS AND CERTAIN OTHER INDEBTEDNESS

The following is a summary of the estimated debt service requirements on the Bonds and certain other indebtedness[1] of HSS:

| Fiscal Year Ending December 31 | Principal on the Bonds | Interest on the Bonds | Total Debt Service on the Bonds | Estimated Existing Debt Service[1] | Total Debt Service |
|---|---|---|---|---|---|
| 2018 | - | $ 3,534,202 | $ 3,534,202 | $ 42,991,281 | $ 46,525,483 |
| 2019 | - | 7,147,825 | 7,147,825 | 31,225,650 | 38,373,475 |
| 2020 | - | 7,147,825 | 7,147,825 | 25,383,565 | 32,531,390 |
| 2021 | - | 7,147,825 | 7,147,825 | 17,354,518 | 24,502,342 |
| 2022 | - | 7,147,825 | 7,147,825 | 7,612,370 | 14,760,195 |
| 2023 | - | 7,147,825 | 7,147,825 | 5,084,428 | 12,232,252 |
| 2024 | - | 7,147,825 | 7,147,825 | 3,555,142 | 10,702,967 |
| 2025 | - | 7,147,825 | 7,147,825 | 1,779,417 | 8,927,242 |
| 2026 | - | 7,147,825 | 7,147,825 | - | 7,147,825 |
| 2027 | - | 7,147,825 | 7,147,825 | - | 7,147,825 |
| 2028 | $ 57,340,000 | 6,076,427 | 63,416,427 | - | 63,416,427 |
| 2029 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2030 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2031 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2032 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2033 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2034 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2035 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2036 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2037 | - | 5,005,029 | 5,005,029 | - | 5,005,029 |
| 2038 | 59,668,000 | 3,787,503 | 63,455,503 | - | 63,455,503 |
| 2039 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2040 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2041 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2042 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2043 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2044 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2045 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2046 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2047 | - | 2,569,978 | 2,569,978 | - | 2,569,978 |
| 2048 | 62,212,000 | 1,284,989 | 63,496,989 | - | 63,496,989 |

---

[1]  Excludes debt service on taxable and tax-exempt bonded indebtedness of HSS being advance refunded with the proceeds of the Series 2018 Bonds.  Includes estimated debt service on the Outstanding Indebtedness of HSS expected to remain outstanding upon issuance of the Series 2018 Bonds, which includes non-recourse Tax-Exempt Equipment Leasing Program Loans, a bank loan, and a promissory note.  **For a discussion of outstanding debt of HSS, see APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY" and APPENDIX B-1 – "CONSOLIDATED FINANCIAL STATEMENTS OF HSS AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2017 AND 2016 WITH REPORT OF INDEPENDENT AUDITORS".**

## THE BONDS

### Description of the Bonds

Unless the context requires otherwise, references to "Bonds" for all purposes of the Bond Indenture and this "Description of the Bonds" include any Additional Bonds that are issued and consolidated with the Bonds.

The Bonds will be dated, will bear interest at the rates and will mature in the principal amounts and on the dates (subject to prior redemption) as set forth on the cover page to this Offering Memorandum. Interest on the Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

The Bonds will be delivered in the form of fully registered Bonds in denominations of $1,000 and any integral multiple thereof. The Bonds will be registered initially in the name of "Cede & Co.," as nominee of DTC and will be evidenced by one Bond for each maturity in the principal amount of the Bonds of such maturity. Registered ownership of the Bonds, or any portions thereof, may not thereafter be transferred except as set forth in the Bond Indenture. See APPENDIX D – "FORM OF BOND INDENTURE" attached hereto.

The principal or redemption price of the Bonds will be payable by check or by wire transfer of immediately available funds in lawful money of the United States of America at the Designated Office of the Bond Trustee.

Interest on the Bonds will accrue beginning on the date of issuance of the Bonds and will be payable on each Interest Payment Date. An "Interest Payment Date" for the Bonds will occur on April 1 and October 1 of each year, commencing on October 1, 2018. Payment of the interest on each Interest Payment Date will be made to the Person whose name appears on the bond registration books of the Bond Trustee as the Holder thereof as of the close of business on the Record Date for each Interest Payment Date, such interest to be paid by check mailed by first class mail to such Holder at its address as it appears on such registration books, or, upon the written request of any Holder of at least $1,000,000 in aggregate principal amount of Bonds, submitted to the Bond Trustee at least one Business Day prior to the Record Date, by wire transfer in immediately available funds to an account within the United States designated by such Holder. *Notwithstanding the foregoing, as long as Cede & Co. is the Holder of the Bonds in book-entry form, said principal or redemption price and interest payments will be made to Cede & Co. by wire transfer in immediately available funds.*

All payments by HSS in respect of the Bonds will be made after the deduction or withholding of any taxes required by law to be deducted or withheld.  See "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS – Certain U.S. Federal Income Tax Consequences" herein.

### Redemption

#### *Optional Redemption*

The Bonds are subject to redemption prior to their respective stated maturities, at the option of HSS in whole or in part (by such maturities and in such amounts as may be specified by HSS) on any Business Day, (a) with respect to the Bonds maturing April 1, 2028, (i) prior to January 1, 2028, at the Make-Whole Redemption Price (defined below), and (ii) on or after January 1, 2028, at a redemption price equal to the principal amount of such Bonds to be redeemed, (b) with respect to the Bonds maturing April 1, 2038, (i) prior to January 1, 2038, at the Make-Whole Redemption Price, and (ii) on or after

January 1, 2038, at a redemption price equal to the principal amount of such Bonds to be redeemed, and (c) with respect to the Bonds maturing April 1, 2048, (i) prior to October 1, 2047, at the Make-Whole Redemption Price, and (ii) on or after October 1, 2047, at a redemption price equal to the principal amount of such Bonds to be redeemed, in each case, together with the interest, if any, accrued thereon from the most recent Interest Payment Date to which interest has been paid or duly provided for upon the date fixed for redemption.

The Make-Whole Redemption Price shall be determined by an independent accounting firm or financial advisor retained by HSS and such accounting firm or financial advisor shall perform all actions and make all calculations required to determine the Make-Whole Redemption Price. The Bond Trustee and HSS may conclusively rely on such accounting firm's or financial advisor's calculations in connection with, and determination of, the Make-Whole Redemption Price, and shall bear no liability for such reliance. For purposes of this subsection, the following definitions shall apply:

"*Business Day*" means any day other than (A) a Saturday or Sunday or legal holiday or a day on which banking institutions in the city or cities in which the Principal Corporate Trust Office of the Bond Trustee or the Master Trustee is located are authorized by law or executive order to close or (B) a day on which the New York Stock Exchange is closed.

"*Comparable Treasury Issue*" shall mean the United States Treasury security or securities selected by a Designated Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Bonds to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Bonds.

"*Comparable Treasury Price*" shall mean, with respect to any redemption date, the average of the Reference Treasury Dealer Quotations for such redemption date or, if the Designated Investment Banker obtains only one Reference Treasury Dealer Quotation, such Reference Treasury Dealer Quotation.

"*Designated Investment Banker*" shall mean one of the Reference Treasury Dealers appointed by HSS.

"*Make-Whole Redemption Price*" shall mean the greater of:

(1)     100% of the principal amount of any Bonds being redeemed; or

(2)     The sum of the present values of the remaining unpaid scheduled payments of principal and interest on any Bonds being redeemed (exclusive of interest accrued to the date of redemption) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) (i) with respect to the Bonds maturing April 1, 2028, at the Treasury Rate plus 15 basis points, (ii) with respect to the Bonds April 1, 2038, at the Treasury Rate plus 15 basis points and (iii) with respect to the Bonds maturing April 1, 2048, at the Treasury Rate plus 20 basis points.

"*Reference Treasury Dealer*" shall mean Goldman Sachs & Co. LLC or its affiliates which are primary U.S. government securities dealers and each of three additional firms, as designated by HSS, and their respective successors; provided that if any of them shall cease to be a primary U.S. government securities dealer (a "*Primary Treasury Dealer*"), HSS shall substitute therefor another Primary Treasury Dealer; provided, further, that HSS may, at its option, substitute another Primary Treasury Dealer for Goldman Sachs & Co. LLC or its affiliates.

"*Reference Treasury Dealer Quotations*" shall mean, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Designated Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such redemption date.

"*Treasury Rate*" shall mean, with respect to any redemption date, the rate per annum equal to the semiannual equivalent yield to maturity or interpolated (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

### Purchase in Lieu of Redemption

The Bonds are subject to purchase in lieu of redemption by the Bond Trustee at the direction of HSS prior to maturity on the same terms that would apply to the Bonds if the Bonds were then being optionally redeemed.

### Selection of Bonds for Redemption

If less than all of the Bonds are called for redemption, HSS shall select the maturities of Bonds to be redeemed. If less than all of the Bonds of a maturity are to be redeemed, including mandatory sinking account redemption, if any, the Bond Trustee shall select the Bonds of a maturity to be redeemed from the Bonds Outstanding of such maturity not previously called for redemption, on a pro rata pass-through distribution of principal basis, from among all Holders of the Bonds of such maturity based upon the principal amount of Bonds owned by each such Holder, provided that so long as the only Holder of the Bonds is a Securities Depository (as defined in APPENDIX E) nominee, such selection shall be made by the Securities Depository in accordance with its operating rules and procedures then in effect, and, if the Securities Depository's operational arrangements at such time do not allow for redemption on a pro rata pass-through distribution of principal basis, the Bonds shall be selected for redemption, in accordance with the Securities Depository's procedures, by lot, or in such other manner as in accordance with the applicable arrangements of the Securities Depository. If the only Holder of the Bonds is a Securities Depository nominee, the Bond Trustee shall request the Securities Depository to select the amount of each direct participant's interest in the Bonds of such maturity to be redeemed on a "Pro-Rata Pass Through Distribution of Principal" basis in accordance with the procedures of the Securities Depository; *provided*, *however*, that so long as the only Holder of the Bonds is a Securities Depository nominee, the selection of redemption of such Bonds shall be made in accordance with the operational arrangements of the Securities Depository then in effect that currently provide for adjustment of the principal by a factor provided by the Bond Trustee pursuant to the Securities Depository's operational arrangements. If the Bond Trustee does not provide the necessary information and identify the redemption as on a "Pro-Rata Pass Through Distribution of Principal" basis, the Bonds shall be selected for redemption in accordance with the procedures of the Securities Depository by lot. Neither HSS nor the Bond Trustee shall have any responsibility for ensuring that the Bonds are called for redemption on a pro-rata basis.

It is HSS's intent that redemption allocations made by DTC be made on a pro rata pass-through distribution of principal basis as described above. However, HSS can provide no assurance that DTC, DTC's direct and indirect participants or any other intermediary will allocate the redemption of Bonds on such basis. If the DTC's operational arrangements do not allow for the redemption of the Bonds on a pro rata pass-through distribution of principal basis as discussed above, the Bonds will be selected for redemption, in accordance with DTC procedures, by lot.

If the Bonds are no longer registered in book-entry only form, each Beneficial Owner will receive an amount of Bonds equal to the original face amount then beneficially held by that Beneficial Owner registered in such Beneficial Owner's name.  Thereafter, any redemption of less than all of the Bonds of any maturity will continue to be paid to the Beneficial Owners of such Bonds on a pro-rata basis, based on the portion of the original face amount of any such Bonds to be redeemed.

### Notice of Redemption

Notice of redemption will be mailed by HSS to the Bond Trustee by first class mail, not less than 35 days prior to the redemption date, or such fewer days as may be agreed to by HSS and the Bond Trustee. Notice of redemption will be mailed by the Bond Trustee by first class mail, not less than 30 days, nor more than 60 days prior to the redemption date, to the respective Holders of any Bonds designated for redemption at their addresses appearing on the bond registration books of the Bond Trustee. If the Bonds are no longer held by DTC or its successor or substitute, the Bond Trustee shall also give notice of redemption by overnight mail to such securities depositories and/or securities information services as shall be designated in a certificate of HSS. Each notice of redemption shall state the date of such notice, the date of issue of the Bonds, the redemption date, the method of calculating the redemption price, the interest rate, the place or places of redemption (including the name and appropriate address or addresses of the Bond Trustee), the maturity (including CUSIP number, if any), and, in the case of Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed. Each such notice will also state that on said date there will become due and payable on each of said Bonds the redemption price thereof or of said specified portion of the principal amount thereof in the case of a Bond to be redeemed in part only, together with interest accrued thereon to the redemption date, and that from and after such redemption date interest thereon shall cease to accrue, and shall require that such Bonds be then surrendered.

Failure by the Bond Trustee to give notice as described above to any one or more of the securities information services or depositories designated by HSS, or the insufficiency of any such notice will not affect the sufficiency of the proceedings for redemption. Failure by the Bond Trustee to mail notice of redemption to any one or more of the respective Holders of any Bonds designated for redemption will not affect the sufficiency of the proceedings for redemption with respect to the Holders to whom such notice was mailed.

HSS may instruct the Bond Trustee to provide conditional notice of redemption, which may be conditioned upon the receipt of moneys or any other event. If such conditions are not met, the Bond Trustee is to give notice, as soon thereafter as practicable, in the same manner, to the same Persons, as notice of such redemption was given pursuant to the Bond Indenture and as described above. Additionally, any such notice may be rescinded by written notice given to the Bond Trustee by HSS no later than five Business Days prior to the date specified for redemption. The Bond Trustee will give notice of such rescission, as soon thereafter as practicable, in the same manner, to the same Persons, as notice of such redemption was given.

*Partial Redemption of Bonds*

Upon surrender of any Bond redeemed in part only, the Bond Trustee shall provide a replacement Bond in a principal amount equal to the portion of such Bond not redeemed, and deliver it to the registered owner thereof. The Bond so surrendered shall be cancelled by the Bond Trustee as provided herein. HSS and the Bond Trustee shall be fully released and discharged from all liability to the extent of payment of the redemption price for such partial redemption.

*Effect of Redemption*

Notice of redemption having been duly given as aforesaid, and moneys for payment of the redemption price being held by the Bond Trustee, the Bonds, or portions thereof, so called for redemption shall, on the redemption date designated in such notice, become due and payable at the redemption price specified in such notice, interest on the Bonds or portions thereof so called for redemption shall cease to accrue, said Bonds shall cease to be entitled to any lien, benefit or security under the Bond Indenture, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof.

## Transfer of Bonds

Any Bond may, in accordance with its terms and subject to the limitations provided in the Bond Indenture, be transferred upon the books required to be kept pursuant to the provisions of the Bond Indenture by the Person in whose name it is registered, in person or by its duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by delivery of a written instrument of transfer, duly executed in a form approved by the Bond Trustee.

Whenever any Bond or Bonds shall be surrendered for transfer, HSS shall execute and the Bond Trustee shall authenticate and deliver a new Bond or Bonds, bearing interest at the same rate and maturing on the same date, for a like aggregate principal amount in Authorized Denominations. The Bond Trustee may require the Holder requesting such transfer to pay any tax or other governmental charge required to be paid with respect to such transfer, and the Bond Trustee may also require the Holder requesting such transfer to pay a reasonable sum to cover any expenses incurred by HSS in connection with such transfer. The Bond Trustee shall not be required to transfer (i) any Bond during the fifteen (15) days next preceding the selection of Bonds for redemption or (ii) any Bond called for redemption.

## Exchange of Bonds

Bonds may be exchanged at the Designated Office of the Bond Trustee for a like aggregate principal amount of Bonds bearing interest at the same rate and maturing on the same date of other Authorized Denominations. The Bond Trustee may require the Holder requesting such exchange to pay any tax or other governmental charge required to be paid with respect to such exchange, and the Bond Trustee may also require the Holder requesting such exchange to pay a reasonable sum to cover any expenses incurred by HSS in connection with such exchange. The Bond Trustee shall not be required to exchange (i) any Bond during the fifteen (15) days next preceding the selection of Bonds for redemption or (ii) any Bond called for redemption.

## Bond Register

The Bond Trustee shall keep or cause to be kept sufficient books for the registration and transfer of the Bonds, which shall at all times (during regular business hours at the location where such books are kept) be open to inspection by any Holder, HSS or their respective agents duly authorized in writing; and,

upon presentation for such purpose, the Bond Trustee shall, under such reasonable regulations as it may prescribe, register or transfer or cause to be registered or transferred, on such books, Bonds as provided in the Bond Indenture.

**Acceleration**

If any Event of Default occurs under the Bond Indenture, including an Event of Default resulting from a payment default on the part of HSS, the principal of the Bonds, and the interest accrued thereon, may be accelerated and become immediately due and payable, with interest payable thereon to the accelerated payment date. For a description of the Events of Default under the Bond Indenture, see APPENDIX D – "FORM OF BOND INDENTURE – Events of Default" attached hereto. See also "BONDHOLDERS' RISKS" herein.

## BOOK-ENTRY ONLY SYSTEM

*The following information concerning DTC and DTC's book-entry system has been obtained from sources that HSS and the Underwriters believe to be reliable, but none of HSS or the Underwriters takes any responsibility for the accuracy thereof.*

The Depository Trust Company, New York, New York, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each maturity of the Bonds, and will be deposited with DTC.

**General**

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks and trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect

Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for such Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to HSS as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from HSS or the Bond Trustee on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Underwriters, the Bond Trustee or HSS subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of HSS or the Bond Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

HSS and the Bond Trustee may treat DTC (or its nominee) as the sole and exclusive registered owner of the Bonds registered in its name for the purposes of payment of the principal and redemption premium, if any, of, or interest on, the Bonds, giving any notice permitted or required to be given to a registered owners under the Bond Indenture, registering the transfer of the Bonds, or other action to be

15

taken by registered owners and for all other purposes whatsoever. HSS and the Bond Trustee shall not have any responsibility or obligation to any Direct or Indirect Participant, any person claiming a beneficial ownership interest in the Bonds under or through DTC or any Direct or Indirect Participant, or any other person which is not shown on the registration books of HSS (kept by the Bond Trustee) as being a registered owner, with respect to the accuracy of any records maintained by DTC or any Direct or Indirect Participant; the payment by DTC or any Direct or Indirect Participant of any amount in respect of the principal, redemption premium, if any, or interest on the Bonds; any notice which is permitted or required to be given to registered owners thereunder or under the conditions to transfers or exchanges adopted by HSS; or other action taken by DTC as registered owner. Interest, redemption premium, if any, and principal will be paid by the Bond Trustee to DTC, or its nominee. Disbursement of such payments to the Direct or Indirect Participants is the responsibility of DTC and disbursement of such payments to the Beneficial Owners is the responsibility of the Direct or Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to HSS or the Bond Trustee. Under such circumstances, in the event that a successor depository is not obtained, the Bond certificates are required to be printed and delivered.

HSS may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, the Bond certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that HSS, the Bond Trustee and the Underwriters believe to be reliable, but HSS, the Bond Trustee and the Underwriters do not take responsibility for the accuracy thereof.

Each person for whom a Participant acquires an interest in the Bonds, as nominee, may desire to make arrangements with such Participant to receive a credit balance in the records of such Participant, and may desire to make arrangements with such Participant to have all notices of redemption or other communications of DTC, which may affect such persons, to be forwarded in writing by such Participant and to have notification made of all interest payments. NONE OF HSS, THE UNDERWRITERS OR THE BOND TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO SUCH PARTICIPANTS OR THE PERSONS FOR WHOM THEY ACT AS NOMINEES WITH RESPECT TO THE BONDS.

So long as Cede & Co. is the registered owner of the Bonds, as nominee for DTC, references herein to the Holders or registered owners of the Bonds shall mean Cede & Co., as aforesaid, and shall not mean the Beneficial Owners of the Bonds.

When reference is made to any action which is required or permitted to be taken by the Beneficial Owners, such reference only relates to those permitted to act (by statute, regulation or otherwise) on behalf of such Beneficial Owners for such purposes. When notices are given, they will be sent by the Bond Trustee to DTC only.

For every transfer and exchange of Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax, fee or other governmental charge that may be imposed in relation thereto.

NONE OF HSS, THE UNDERWRITERS OR THE BOND TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, TO INDIRECT PARTICIPANTS, OR TO ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT, OR ANY INDIRECT PARTICIPANT; (II) ANY NOTICE THAT IS PERMITTED OR REQUIRED TO BE GIVEN TO THE OWNERS OF THE BONDS UNDER THE BOND INDENTURE; (III) THE SELECTION BY DTC OR

ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY PERSON TO RECEIVE PAYMENT IN THE EVENT OF A PARTIAL REDEMPTION OF THE BONDS; (IV) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OR REDEMPTION PREMIUM, IF ANY, OR INTEREST DUE WITH RESPECT TO THE BONDS; (V) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS THE OWNER OF THE BONDS; OR (VI) ANY OTHER MATTER.

## BONDHOLDERS' RISKS

*The following discussion of risks to holders of the Bonds, in addition to other risks described throughout this Official Statement, is not intended to be exhaustive, but rather to summarize certain matters which could affect payment of the Bonds or the financial condition of HSS.*

While HSS is obligated under the bond documents to satisfy any deficiency with respect to debt service on the Bonds, the primary security for the Bonds are payments made by the Obligated Group on Obligation No. 1 that are to be deposited by the Bond Trustee as received into the Indenture Fund in accordance with, and as established pursuant to, the Indenture. All payments on Obligation No. 1 are secured by a pledge of the Gross Receivables of the Obligated Group. There are certain risks which might adversely impact the ability of HSS, as the sole current Member of the Obligated Group, to obtain sufficient revenues to meet all of its obligations. Future revenue and expenses of HSS are subject to conditions which may change to an extent that cannot be determined at this time. Some of the possible changes in future conditions and other risks are discussed below.

### General Factors Affecting HSS's Revenues and Expenses

AN INVESTMENT IN THE BONDS INVOLVES A DEGREE OF RISK. A PROSPECTIVE PURCHASER OF THE BONDS IS ADVISED TO READ THE ENTIRE OFFERING MEMORANDUM, INCLUDING THE APPENDICES HERETO. REFER TO THE SECTION "SOURCES OF PAYMENT FOR THE BONDS" AND THIS SECTION FOR A DISCUSSION OF CERTAIN RISK FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH AN INVESTMENT IN THE BONDS. The factors listed below, among others, could adversely affect HSS's operation, revenues and expenses and its ability to meet its Obligated Group payment obligations to an extent and in a manner which cannot be determined at this time.

### General

The receipt of future revenue by HSS is subject to, among other factors, federal and state regulations and policies affecting the health care industry and the policies and practices of managed care providers, private insurers, and other third party payors, and private purchasers of health care services, all of which may affect rates, costs, third party payments, and governmental regulations and policies concerning payment. The effect on HSS of certain changes in federal, state and private policies cannot be determined at this time. Loss of established managed care or other payor contracts could also adversely affect the future revenues of HSS.

HSS's financial condition and operating performance are subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond HSS's control, such as inflation, unemployment, and interest rates which may affect HSS's ability to control labor and other expenses, demand for health care services, increased use of risk contracting and physician incentive discounted payment schedules with health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), and other payors, physician integration and HSS's relationship with physicians, changes in levels of philanthropy, the costs of graduate medical education, economic and demographic developments in HSS's service areas, competition from other health care providers and hospitals, and

changes in rates, costs, third party payments (including, without limitation, Medicare and Medicaid program reimbursement), and governmental regulations concerning payment, and investment results and returns.  In addition, changes in HSS brand loyalty may impact referrals from physicians and self-referred patients.  Furthermore, HSS's expenditures may be affected by malpractice claims, other litigation, investigations and audits.  See "APPENDIX A – HOSPITAL FOR SPECIAL SURGERY" and "APPENDICES B-1 and B-2 for consolidated financial statements and auditor's reports.

*Certificate of Need and State Regulations; Land Use Restrictions.*

New York and many other states in which HSS operates or may operate in the future employ a Certificate of Need ("CON") program, whereby health care facilities are required to obtain approval from the state before undertaking certain projects, including constructing or developing a new health care facility, selling, purchasing or leasing part or all of any existing hospital, changing bed capacity in a manner which increases the total number of licensed beds or redistributes beds, and/or offering a new tertiary health service.  There can be no assurance that HSS will be able to obtain CONs that are needed for its purposes.

HSS is also subject to regulations issued by the New York State Department of Health ("DOH") and regulatory agencies in other states in which HSS operates or may operate in the future.  Compliance with such regulations may require substantial expenditures for administrative or other costs.  Regulations of such state regulatory agencies could change or the regulatory agencies could decide to revoke or not renew the operating certificate of HSS for failure to comply with regulatory requirements.

In addition, land use restrictions and other factors may impair HSS's development of property for use as health care facilities.  In this regard, HSS was recently notified that an action was commenced by a cooperative corporation proximate to HSS challenging the New York City Planning Commission's 2008 grant (renewed in 2017) of a Special Permit to allow HSS to construct a facility on a platform above the FDR Drive (see Main Campus Project" under "Clinical Delivery System" in Appendix A).

*Changes in Government Health Care Programs and the Tax Law may Adversely Affect HSS.*

The health care industry is heavily regulated by the federal and state governments, and approximately twenty-one percent (21%) of HSS's net patient revenue is derived from governmental payors.  Governmental revenues sources are subject to legislative and policy changes by the governmental and private agencies that administer Medicare, Medicaid, other third-party payors, and governmental payors, and actions by, among others, DOH, The Joint Commission, the Office of Medicaid Inspector General ("OMIG"), Centers for Medicare & Medicaid Services ("CMS"), and other federal, state and local government agencies.  These agencies have broad discretion to alter or eliminate programs that contribute significantly to HSS's revenues.  In the past, there have been frequent and significant changes in the methods and standards used by government agencies to reimburse and regulate the operation of hospitals.

In recent years, legislative and regulatory changes have resulted in limitations on and, in some cases, reductions in levels of payments to health care providers for certain services under the Medicare program.  The Budget Control Act of 2011 (the "BCA") requires automatic spending reductions of $1.2 trillion for federal fiscal years 2013 through 2021, minus any deficit reductions enacted by Congress and debt service costs.  However, the percentage reduction for Medicare may not be more than 2% for a fiscal year, with a uniform percentage reduction across all Medicare programs.  The BCA spending reductions began on March 1, 2013, with CMS imposing a 2% reduction on Medicare claims beginning on April 1, 2013.  These reductions have been extended by Congress through 2025.  HSS is unable to predict what other deficit reduction initiatives may be proposed by Congress or whether Congress will attempt to

suspend or restructure the automatic budget cuts.  These reductions are in addition to reductions mandated by The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "Health Reform Law), which provides for material reductions in the growth of Medicare program spending, including reductions in Medicare market basket updates.  In addition, the President has stated his intent to repeal and replace the Health Reform Law.  Repeal and replace legislation has been passed in the House of Representatives, but did not obtain the necessary votes in the Senate.  Subsequently, the President has affirmed his intention to repeal and replace the Health Reform Law and has taken a number of administrative actions to materially weaken the Health Reform Law.    Further, from time to time, CMS revises the reimbursement systems used to reimburse health care providers, including changes to the Medicare severity diagnosis-related group ("MS-DRG") system and other payment systems, which may result in reduced Medicare payments.  Reduction in, or restructuring of, graduate medical education funding is regularly proposed.

Another notable Medicare health care reform initiative, the Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA"), enacted on April 16, 2015, establishes a new payment framework, called the Quality Payment Program, which modifies certain Medicare payments to "eligible clinicians," including physicians, dentists and other practitioners.  Under MACRA, eligible clinicians will be required to participate in Medicare through the Merit-Based Incentive Payment System ("MIPS") or Advanced Alternative Payment Models ("APMs").    MIPS generally will consolidate three current programs; the physician quality reporting system, the value-based payment modifier and the Medicare electronic health record ("EHR") program, into a single program in which Medicare reimbursement to eligible clinicians will include both positive and negative payment adjustments that take into account quality, resource use, clinical practice improvement and meaningful use of certified EHR technology.  Advanced APMs generally involve higher levels of financial and technology risk.  A final rule was published in the Federal Register on November 4, 2016 and allows eligible Medicare clinicians to pick their pace of participation for the first performance period that began January 1, 2017.  The data collected in the first performance year will determine payment adjustments beginning January 1, 2019.  A final rule updating certain Quality Payment Program regulations was published on November 16, 2017, which is effective as of January 1, 2018. MACRA represents a fundamental change in physician reimbursement that is expected to provide substantial financial incentives for physicians to participate in risk contracts, and to increase physician information technology and reporting obligations.  The implications of the implementation of MACRA are uncertain and will depend on future regulatory activity and physician activity in the marketplace.

Legislation is also periodically introduced in Congress and in the state legislature that could result in limitations on HSS's revenue, third-party payments, and costs or charges, or that could result in increased competition or an increase in the level of indigent care required to be provided by HSS.  From time to time, legislative and administrative proposals are made at the federal and state level to engage in broader reform of the health care industry, including proposals to promote competition in the health care industry, to contain health care costs, to provide national health insurance and to impose additional requirements and restrictions on health care insurers, providers and other health care entities.  These include, for example, the Medicare's Comprehensive Joint Replacement ("CJR") program that requires the integration of all aspects of a joint replacement procedure "episode of care" and puts HSS at risk for services that it does not provide.  The effects of future reform efforts on HSS cannot be predicted.

On December 22, 2017, the President signed the Tax Cuts and Jobs Act (the "Tax Law") into law, which, among other things, repeals the individual mandate of the Health Reform Law. The Tax Law also increases the standard deduction and lowers the tax rates, which may have a negative impact on charitable contributions to HSS. Moreover, the potentially broad impact of the Tax Law could have a material adverse effect on HSS operations.  The Tax Law also imposes a 21% excise tax on any compensation in excess of $1 million and on certain excess severance "parachute" payments paid to any "covered

employee" of the exempt organization (which is generally defined as any employee or former employee who is one of the five highest-compensated employees for any taxable year beginning after December 31, 2016). The excise tax will be paid by the exempt organization and applies to all remuneration paid to a covered employee (including most taxable benefits other than designated Roth contributions) as well as certain deferred amounts that are not subject to a substantial risk of forfeiture, but excluding the portion of any compensation paid to a licensed medical professional which is for the performance of medical services by the professional.  Further, the Tax Law requires tax-exempt organizations that carry on more than one unrelated trade or business to separately compute their unrelated business taxable income with respect to each trade or business, meaning that deductions or net operating losses from one business may no longer offset income from another.  In addition, by increasing future federal deficits and eliminating deduction for state and local taxes, the Tax Law may increase pressure on governmental payors to reduce their costs by reducing payment rates. HSS believes that the current adverse impact of the Tax Law will not be material.  However, there is no assurance that future changes in the tax law will not impose material additional taxes on HSS.

On February 9, 2018, the President signed the Bipartisan Budget Act of 2018 (the "2018 Act") into law, increasing the Budget Control Act discretionary spending caps by $296 billion over the next two years. Among other things, the 2018 Act makes changes to MACRA and revises some provisions of the Health Reform Law. These changes include, for example, delaying reductions in DSH reimbursement for two years and accelerating the reduction of Medicare Part D "donut hole" coverage gap. The effect of the 2018 Act on HSS cannot be predicted.

In some cases, commercial third-party payors rely on all or portions of Medicare payment systems to determine payment rates.  Changes to government health care programs that reduce payments under these programs may negatively impact payments from commercial third-party payors.

Current or future health care reform and deficit reduction efforts, changes in laws or regulations regarding government health care programs, other changes in the administration of government health care programs, and changes to commercial third-party payors in response to health care reform and other changes to government health care programs could have a material adverse effect on HSS's financial position and results of operations.

*Failure to Comply with Extensive Laws and Government Regulations Could Result in Penalties or Require Significant Changes to HSS's Operations.*

The health care industry is required to comply with extensive and complex laws and regulations at the federal, state and local government levels, as well as rules and requirements of applicable accrediting agencies, relating to, among other things:

- billing and coding for services and properly handling overpayments;

- classification of level of care provided, including proper classification of inpatient admissions, observation services and outpatient care;

- relationships with physicians and other referral sources and referral recipients;

- necessity and adequacy of medical care;

- quality of medical equipment and services;

- qualifications of medical and support personnel;

- confidentiality, maintenance, data breach, identity theft, and security issues associated with health-related and personal information and medical records;

- screening, stabilization and transfer of individuals who have emergency medical conditions;

- licensure, accreditation and certification of facilities and practitioners;

- hospital rate or budget review;

- preparing and filing of cost reports;

- operating policies and procedures;

- activities regarding competitors; and

- addition or expansion of facilities and services, including certificate of need laws and other processes for review and approval of proposed additions or expansions.

Among these laws are the federal Anti-kickback Statute, the federal Stark Law, the federal False Claims Act and similar state taws.

The Anti-kickback Statute.  HSS has a variety of financial relationships with physicians and others who either refer or influence the referral of patients to HSS's acute care hospital, other health care facilities, and employed physicians who are the recipients of referrals, and these laws govern those relationships.  The Office of the Inspector General of the United States Department of Health and Human Services ("OIG") has enacted safe harbor regulations that outline practices deemed protected from prosecution under the Anti-kickback Statute.  While HSS endeavors to comply with the applicable safe harbors, certain of HSS's current arrangements, including joint ventures and financial relationships with physicians and other referral sources and persons and entities to which HSS refer patients, do not qualify for safe harbor protection.  Failure to qualify for a safe harbor does not necessarily mean the arrangement violates the Anti-kickback Statute but may subject the arrangement to greater scrutiny.  However, HSS cannot offer assurance that practices outside of a safe harbor will not be found to violate the Anti-kickback Statute.  Allegations of violations of the Anti-kickback Statute may be brought under the federal Civil Monetary Penalty Law, which requires a lower burden of proof than other fraud and abuse laws, including the Anti-kickback Statute.

The Stark Law.  HSS's financial relationships with referring physicians and their immediate family members must comply with the Stark Law by meeting an exception.  HSS attempts to structure HSS's relationships to meet an exception to the Stark Law, but the regulations implementing the exceptions are detailed and complex, and HSS cannot provide assurance that every relationship complies fully with the Stark Law.  Unlike the Anti-kickback Statute, failure to meet an exception under the Stark Law results in a violation of the Stark Law, even if such violation is technical in nature.

False Claims Act.  The federal criminal False Claims Act ("criminal FCA") makes it illegal to submit or present a false, fictitious or fraudulent claim to the federal government.  Violation of the criminal FCA can result in imprisonment and/or a fine.  The federal civil False Claims Act ("civil FCA"), one of the government's primary weapons against health care fraud, allows the United States government to recover significant damages from persons or entities that submit fraudulent claims for payment to any federal agency through actions taken by a United States Attorney's Office or the Department of Justice. New York (the "State") also has a False Claims Act that closely tracks the civil FCA (the '"New York State FCA").  It imposes penalties and fines on individuals and entities that file false or fraudulent claims

for payment from any state or local government, including health care programs such as Medicaid, which may be in addition to civil FCA penalties. The civil FCA and New York State FCA also permit individuals to initiate actions on behalf of the government in lawsuits called *qui tam* actions. These *qui tam* plaintiffs, or "whistleblowers," can share in the damages recovered by the government.

Under the civil FCA and the New York State FCA, health care providers may be liable if they take steps to obtain improper payments from the government by submitting false claims or failing to refund known overpayments. Civil FCA and New York State FCA violations have been established solely on the existence of improper kickback or self-referral arrangements. Even in the absence of evidence that literally false claims have been submitted, these cases argue that the improper business relationship tainted the subsequently submitted claims, thereby rendering the claims false under the civil FCA and the New York State FCA. The Federal Enforcement and Recovery Act of 2009 amended the FCA to impose liability on so-called "reverse false claims," where a person knowingly fails to repay the Federal government for any overpayments resulting from a false statement of record. The Health Reform Law requires that any overpayment be reported and repaid within sixty (60) days after the date in which overpayment was identified. Failure to do so will be considered *per se* a false claim under the FCA. The Health Reform Law also modifies the FCA by specifically extending the FCA to any Anti-Kickback Law violation, which confirmed earlier judicial holdings noted above. Under the Supreme Court case decided in June of 2016, *Universal Health Services v. United States ex rel. Escobar*, the underlying violation must be material to the federal government's decision to pay the contractor for the particular goods or services at issue. It is impossible to predict with certainty whether courts will uniformly hold that regulatory non-compliance are subject to prosecutions as false claims. If HSS is faced with a civil FCA or New York State FCA prosecution based on one of these theories, however, allocation of the funds required to contest or settle the matter could have a material adverse impact on HSS. Violations of the civil FCA and the New York State FCA can result in penalties up to triple the actual damages incurred by the government and also substantial monetary penalties. Violations of the civil FCA can result in treble damages, and, in accordance with a final rule published by the Department of Justice on February 3, 2017, which increased the maximum and minimum civil penalties for FCA violations, the amounts for civil penalties assessed after February 3, 2017, whose associated violations occurred after November 2, 2015, were increased to a minimum per-claim penalty of $10,957, and from a maximum per-claim penalty of $21,916.

If HSS fails to comply with the Anti-kickback Statute, the Stark Law, the civil FCA, the New York State FCA, or other applicable laws and regulations, HSS could be subjected to liabilities, including civil monetary penalties, loss of HSS's licenses to operate one or more facilities, exclusion of HSS or one or more of its facilities from participation in the Medicare, Medicaid and other federal and state health care programs, and, for violations of certain laws and regulations, criminal penalties.

Health Insurance Portability and Accountability Act. Pursuant to Title II, Subtitle F, "Administrative Simplification" of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") adopted national standards for certain electronic health care transactions, including federal privacy standards for the protection of health information kept by health care providers that conduct certain financial and administrative transactions electronically, as well as other organizations such as health plans and health care clearinghouses (the "Privacy Rule") and standards relating to the security of such health information when it is maintained or transmitted in electronic form (the "Security Rule"). Compliance with the requirements of the Privacy Rule, the Security Rule, and other HIPAA requirements has required HSS to, among other things, develop and implement policies and procedures designed to inform patients about their privacy rights and how their protected health information may be used and disclosed, to keep protected health information secure, to train employees so that they understand the privacy procedures and practices of HSS, and to designate a privacy officer responsible for seeing that privacy procedures are adopted and followed. HIPAA imposes civil monetary penalties for violations and criminal penalties for

knowingly obtaining or disclosing individually identifiable health information in violation of the Privacy Rule.

On February 17, 2009, President Obama signed into law the HITECH Act, which is part of the American Recovery and Reinvestment Act ("ARRA"). The HITECH Act expanded the scope and application of HIPAA and its implementing regulations, in particular by: (i) expanding the reach of the Privacy Rule and the Security Rule to business associates, (ii) imposing a written notice obligation upon covered entities for security breaches involving "unsecured" protected health information, (iii) limiting certain uses and disclosures of protected health information, (iv) increasing certain individual rights with respect to protected health information, (v) increasing penalties for violations, and (vi) providing for enforcement of violations by state attorneys general.

On January 25, 2013, HHS issued comprehensive modifications to the existing HIPAA regulations to implement the requirements of the HITECH Act, commonly known as the "HIPAA Omnibus Rule." The HIPAA Omnibus Rule, among other things: (i) set forth a new standard for what constitutes a breach of private health information; (ii) established four levels of culpability with respect to civil monetary penalties assessed for HIPAA violations; (iii) provided for direct liability of business associates for certain violations of HIPAA; (iv) modified the rules governing research; (v) imposed stricter requirements regarding non-exempt marketing practices; (vi) modified the rules for distribution of notices of privacy practices; and (vii) imposed stricter requirements regarding the protection of genetic information. While the effects of the HIPAA Omnibus Rule cannot be predicted at this time, and while HSS believes it is in compliance with HIPAA, as amended by the HITECH Act, and the Omnibus Rule, any non-compliance could have a materially adverse effect on HSS.

The Civil Monetary Penalty Act. The federal Civil Monetary Penalty Act ("CMPA") provides for administrative sanctions against health care providers for a broad range of billing and other abuses, including, without limitation, presenting, or causing to be presented, improper claims for reimbursement, paying a physician to limit or reduce services to Medicare fee-for-service beneficiaries or offering an inducement to a beneficiary to obtain certain services. The CMPA authorizes imposition of substantial civil money penalties. Section 6408 of the Health Reform Law added and enhanced CMPA penalties for false statements for knowingly making, using or causing to be made, a false record or statement material to a claim for payment for items or services furnished under a Federal health care program or failing to grant timely access on reasonable request to the OIG for carrying out audits or investigations. The Department of Health and Human Services published a final rule on February 3, 2017, which also increased the amount of CMPA penalties for violations of the federal fraud and abuse laws. For example, in addition to exclusion from the Medicare program and possible false claims act liability (see above), there is a penalty of up to $24,253 for submitting or causing to be submitted claims in violation of the Stark Law's restrictions on patient referrals, and a maximum penalty of $161,692 for circumventing the Stark Law's restrictions on physician self-referrals. There is also a penalty of up to $15,270 for knowingly presenting or causing to be presented a false claim to an officer, employee, or agent of the United States. The Health Reform Law also established CMPA penalties for ordering or prescribing services while excluded from the Federal health care program and knowingly failing to repay an identified overpayment. Health care providers may be found liable under the CMPA even when they did not have actual knowledge of the impropriety of their action. Knowingly undertaking the action is sufficient. Ignorance of the Medicare regulations is no defense.

The Physician Payment Sunshine Act. A Health Reform Law provision, generally referred to as the Physician Payment Sunshine Act, has imposed new reporting and disclosure requirements for drug and device manufacturers with regard to payments or other transfers of value made to certain practitioners (including physicians and teaching hospitals, such as HSS), and for such manufacturers and for group purchasing organizations, with regard to certain ownership interests held by physicians in the reporting

entity. Payments to HSS and its physicians have been reported since 2014.  HSS believes all payments it received and has been reported as having received comply with law, but the information could nevertheless generate claims regarding such payments.

Under the reporting and disclosure obligations of the Physician Payment Sunshine Act, the general public and government officials are being provided with new access to detailed information with regard to payments or other transfers of value to certain practitioners (including physicians and teaching hospitals, such as HSS) by applicable drug and device manufacturers and distributors subject to such reporting and disclosure obligations.  This information may lead to greater scrutiny, which may result in modifications to established practices and additional costs.

HSS does not always have the benefit of significant regulatory or judicial interpretation of these laws and regulations.  In the future, different interpretations or enforcement of, or amendment to, these laws and regulations could subject HSS's current or past practices to allegations of impropriety or illegality or could require HSS to make changes in HSS's operations, equipment, personnel, services, capital expenditure programs and operating expenses.  A determination that HSS has violated these laws, or the public announcement that HSS is being investigated for possible violations of these laws, could have a material adverse effect on HSS's business, financial condition, results of operations or prospects, and HSS's business reputation could suffer significantly.  In addition, other legislation or regulations at the federal or state level may be adopted that adversely affect HSS's business.

*HSS Could Become the Subject of Governmental Investigations, Claims and Litigation.*

Governmental agencies and their agents, such as the Medicare Administrative Contractors, fiscal intermediaries and carriers, as well as the OIG, CMS and state Medicaid programs, conduct audits of HSS's health care operations.  Private payors may conduct similar post-payment audits, and HSS also performs internal audits and monitoring.  Depending on the nature of the conduct found in such audits and whether the underlying conduct could be considered systemic, the resolution of these audits could have a material adverse effect on HSS's financial position, results of operations and liquidity.

CMS contracts with recovery audit contractors ("RACs") on a contingency fee basis to conduct post-payment reviews to detect and correct improper payments in the fee-for-service Medicare program. In September 2012, CMS initiated a RAC prepayment demonstration program in 11 states, which ran for 3 years, with the goal of lowering the number of improper payments for those claims that were shown through Comprehensive Error Rate Testing reports and other data analysis to have high rates of improper payments.  As part of the close-out process for the existing RAC contracts while CMS worked to procure new contracts, the Prepayment Review Demonstration was paused and remained on hold until its conclusion in August 2015.  RACs prevented over $192.8 million in improper payments through the 3-year demonstration.  CMS awarded the next round of Medicare Fee-for-Service RAC contracts on October 31, 2016. The original Medicare RACs will be under contract with CMS until 2018 for administrative purposes, and providers may still receive correspondence related to claims adjusted under the original RAC contracts.  The Health Reform Law expanded the RAC program's scope to include managed Medicare plans and Medicaid claims.  RAC denials are appealable. In addition, CMS employs Medicaid integrity contractors ("MICs") to perform post-payment audits of Medicaid claims and identify overpayments.  CMS announced changes that limit RAC activity to more contemporaneous claims, assure timely RAC review, limit reviews of compliant hospitals, require RACs to maintain high accuracy rates, and prohibit incentive payments on claims that are not sustained on initial appeal, and provide other reforms to control RAC behavior.  These new rules will be implemented as RAC contracts with CMS expire and are renewed.  HSS is not certain that such reforms will mitigate RAC activity in practice.  In addition to RACs and MICs, the state Medicaid agencies and other contractors have increased their review activities.

In addition to increasing enforcement of laws governing payment and reimbursement, the federal government has also increased enforcement of laws governing the conduct of research at hospitals. HHS has strengthened its Office for Human Research Protections, one of the agencies with responsibility for monitoring federally-funded research. In addition, the National Institutes of Health ("NIH") significantly increased the number of facility inspections that its agencies perform. The Food and Drug Administration ("FDA") also has authority over the conduct of clinical trials performed in hospitals when these trials are seeking FDA approval to market the drug or device that is the subject of the research. Moreover, in its "Work Plans" and other regulatory guidance, the OIG has consistently included enforcement initiatives related to reimbursement for experimental drugs and devices (including kickback concerns) and has issued compliance program guidance directed at recipients of extramural research awards from the NIH and other agencies of the U.S. Public Health Service. HSS receives payments for health care items and services under many of these grants and is subject to complex and, at times ambiguous, coverage principles and rules governing billing for items or services it provides to individuals participating in clinical trials funded by governmental agencies or private sponsors. These federal agencies' enforcement powers range from substantial fines and penalties, to exclusion of researchers, to suspension or termination of entire research programs, and errors in billing of the Medicare program for care provided to patients enrolled in clinical trials that is not eligible for Medicare reimbursement can subject a hospital to sanctions as well as repayment obligations. HSS expects that it will be subject to inquiries and investigations with respect to its research activities in the ordinary course of its operations. There can be no assurance that such inquiries and investigations will not lead to enforcement action or that HSS will not be charged with, or found to have violated, the applicable laws and rules and, if so, that any fines or other penalties would not have a material adverse effect on its research activities.

Should HSS be found out of compliance with any of these laws, regulations or programs, depending on the nature of the findings, HSS's business, financial position and results of operations could be negatively impacted.

*Risks Related to Retaining and Negotiating Favorable Contracts with Non-Governmental Payors.*

HSS's ability to obtain favorable contracts with non-government payors, including HMOs, PPOs, and other managed care plans, and increasingly with employers, significantly affects the revenues and operating results of HSS. Revenues derived from these entities and other insurers accounted for approximately seventy-five percent (75%) of HSS's patient revenues. The trend toward consolidation among non-government payors tends to increase their bargaining power over fee structures. As various provisions of the Health Reform Law are implemented, including the health insurance marketplace, non-government payors increasingly may demand reduced fees and utilize plan structures such as narrow networks and tiered networks that limit beneficiary provider choices or impose significantly higher cost sharing obligations when care is obtained from providers in a disfavored tier. Other health care providers may impact HSS's ability to enter into managed care contracts or negotiate increases in HSS's reimbursement and other favorable terms and conditions. For example, other providers may negotiate exclusivity provisions with managed care plans or otherwise restrict the ability of managed care companies to contract with HSS. HSS's future success will depend, in part, on its ability to retain and renew managed care and other third party payor contracts and enter into new such contracts on terms favorable to HSS, including with employers. It is not clear what impact, if any, the increased obligations on managed care payors and other payors imposed by the Health Reform Law will have on HSS's ability to negotiate reimbursement increases and participate in plan networks on favorable terms. If HSS is unable to retain and negotiate favorable contracts with managed care plans and/or other third party payors or experiences reductions in payment increases or amounts received from non-government payors, HSS's revenues may be reduced.

*Risk of Increased Non-Collectible Patient Accounts and Collectability of Patient Accounts.*

The primary collection risks of HSS's accounts receivable relate to the uninsured patient accounts and patient accounts for which the primary insurance carrier has paid the amounts covered by the applicable agreement, but patient responsibility amounts (exclusions, co-insurance, deductibles and copayments) remain outstanding. The patient responsibility amount has been increasing under new insurance designs, such as high deductible health plans.

The amount of the provision for doubtful accounts is based upon management's assessment of historical write-offs and expected net collections, business and economic conditions, trends in federal and state governmental and private employer health care coverage, including increased use of high deductible plans, the number of uninsured patients and other collection indicators. HSS's total provision for doubtful accounts increased from $8.8 million for 2015, to $8.9 million for 2016, and to $9.1 million for 2017.

Any increase in the amount or deterioration in the collectability of accounts receivable will adversely affect HSS's cash flow and results of operations.

*Failure to Comply with Recent Changes to Laws Governing Fair Debt Collection Practices Could Result in Penalties or Require Significant Changes to HSS's Operations.*

The federal Fair Debt Collection Practices Act (the "FDCPA") regulates persons who regularly collect or attempt to collect, directly or indirectly, consumer debts owed or asserted to be owed to another person. The FDCPA establishes specific guidelines and procedures that debt collectors must follow in communicating with consumer debtors, including the time, place and manner of such communications. Further, the FDCPA prohibits harassment or abuse by debt collectors, including the threat of violence or criminal prosecution, obscene language or repeated telephone calls made with the intent to abuse or harass. The FDCPA also places restrictions on communications with individuals other than consumer debtors in connection with the collection of any consumer debt and sets forth specific procedures to be followed when communicating with such third parties for purposes of obtaining location information about the consumer. In addition, the FDCPA contains various notice and disclosure requirements and prohibits unfair or misleading representations by debt collectors. Finally, the FDCPA imposes certain limitations on lawsuits to collect debts against consumers. Debt collection activities are regulated at the state level as well by state attorneys general.

HSS's efforts to collect uninsured accounts receivable must also comply with the detailed and prescriptive requirements of Section 501(r) of the Code, added by the Health Reform Law, and the rules recently promulgated by the IRS thereunder, as well as prior New York state law. These rules address, for example, required notices of the availability of financial assistance, limits on when HSS may begin collection actions (including notices to credit agencies), and what actions HSS must take before beginning collection actions if an individual may be eligible for financial assistance. HSS believes it is compliant with Section 501(r) and prior New York state law regarding collection activities.

*Risk to HSS Revenues of Physician Utilization Practices and Treatment Methodologies, or Governmental or Managed Care Controls Designed to Reduce Inpatient Services or Surgical Procedures.*

Controls imposed by Medicare, managed Medicare, Medicaid, managed Medicaid, and commercial third-party payors designed to reduce admissions, intensity of services, surgical volumes, and lengths of stay, in some instances referred to as "utilization review," have affected and are expected to continue to affect HSS's operations. Utilization review entails the review of the admission and course of

treatment of a patient by health plans. Inpatient utilization is negatively affected by payor-required pre-admission authorization and utilization review and by payor pressure to maximize outpatient and alternative health care delivery services for less acutely ill patients. For example, Medicare has recently determined to permit the provision of certain knee replacement procedures on an outpatient basis, and it is considering permitting hip replacement procedures to be done on such basis. Efforts to impose more stringent cost controls are expected to continue. For example, the Health Reform Law expanded the use of prepayment review by Medicare contractors by eliminating statutory restrictions on their use. CMS also has established what is referred to as the "two midnight rule," which provides that Medicare beneficiaries are only to be admitted as inpatients when there is a reasonable expectation that the hospital care is medically necessary and will be required across two midnights. Such changes may significantly limit the scope of services reimbursed and reimbursement rates and fees, which could have a material adverse effect on HSS's business, financial position and results of operations. Additionally, trends in physician treatment protocols and managed care health plan design, such as plans that shift increased costs and accountability for care to patients, could reduce HSS's surgical volumes and admissions.

*Risk of Industry Trend Toward Value-Based Purchasing.*

There is a trend in the health care industry toward value-based purchasing of health care services. These value-based purchasing programs include both public reporting of quality data and preventable adverse events tied to the quality and efficiency of care provided by facilities. Governmental programs including Medicare currently require hospitals to report certain quality data to receive full reimbursement updates. In addition, Medicare does not reimburse for care related to certain preventable adverse events (also called "never events"). The Health Reform Law also prohibits the use of federal funds under the Medicaid program to reimburse providers for medical assistance provided to treat hospital acquired conditions ("HACs"). Beginning in federal fiscal year 2015, the 25% of hospitals with the worst national risk-adjusted HAC rates in the previous year will receive a 1% reduction in their total inpatient operating Medicare payments. CMS finalized the adoption of the Winsorized z-score methodology in the federal fiscal year 2017 final rule, which replaced the decile-based scoring methodology used in prior years. In December 2017, CMS also reported certain federal fiscal year 2018 HAC Reduction Program information for each hospital on Hospital Compare.

Hospitals with excess readmission rates for conditions designated by HHS will receive a reduction in operating payments for all Medicare inpatient discharges, not just discharges relating to the conditions subject to the excess readmission standard. The reduction in payments to hospitals with excess readmissions is capped at 3% for federal fiscal year 2015 and thereafter.

As required by the Health Reform Law, HHS implemented a value-based purchasing program for inpatient hospital services that reduces inpatient hospital payments for all discharges by 2% in federal fiscal year 2017 and subsequent years. HHS pools the amount collected from these reductions to fund payments to reward hospitals that meet or exceed certain quality performance standards established by HHS. HHS estimates that approximately $1.9 billion will be available in 2018 to reward high-performing hospitals. Hospitals that meet or exceed the quality performance standards will receive greater reimbursement under the value-based purchasing program than they would have otherwise.

Many large commercial payors currently require hospitals to report quality data, and several commercial payors do not reimburse hospitals for certain preventable adverse events. Value-based purchasing programs, including programs that condition reimbursement on patient outcome measures, may become more common and to involve a higher percentage of reimbursement amounts. HSS has certain such agreements in place. While to date HSS has not been penalized and in fact received a reward for exceeding certain quality performance standards from Medicare, HSS is unable at this time to predict

HSS's future payments under these programs or how this trend will affect HSS's results of operations, but it could negatively impact HSS's revenues.

*Competition for Patients from Other Hospitals and Health Care Providers.*

The health care business is highly competitive, and competition among hospitals and other health care providers for patients has intensified in recent years.  New York State effectively precludes for-profit hospitals from operating in the State. Should New York permit the operation of for-profit hospitals, competition may be increased. Other hospitals and healthcare facilities in the communities HSS serves provide many of the musculoskeletal care services also offered by HSS.  HSS competes with facilities that are owned by governmental agencies or that are part of large regional or national health systems that may provide economies of scale and broad access to capital.  If other hospitals and healthcare facilities in the communities that HSS serves are able to increase their market share of musculoskeletal services, HSS may experience slower growth or a decline in patient volume.

In addition, CMS publicizes on its Hospital Compare website performance data related to quality measures and data on patient satisfaction surveys hospitals submit in connection with their Medicare reimbursement.  Similarly, CMS added PY 2016 performance information to the Physician Compare website, including a small subset of 2016 Physician Quality Reporting System (PQRS) group-level measures to be publicly reported for groups as star ratings.  MACRA also requires that performance and participation information under MIPS and APMs be made available for public reporting on the Physician Compare website, so consumers will be able to see how providers rate relative to each other on a 100-point scale and within each of the four MIPS performance categories.  Federal law provides for the future expansion of the number of quality measures that must be reported.  Further, the Health Reform Law requires every hospital to establish and update annually a public listing of its standard charges for items and services.  If in the future HSS achieves results on these quality measures or on patient satisfaction surveys that are lower than its historical results relative to its competitors, HSS's patient volumes could grow at a slower rate or decline.

As noted above, many procedures that had historically been done in hospitals are now being performed at ambulatory surgical centers ("ASCs") and more types of procedures could be performed at ASCs in the future.  ASCs are generally a more cost-effective venue than hospitals for these procedures.  The number of surgery centers in the geographic areas in which HSS draws patients has increased in recent years, adding to the competition.  In this regard, it is important to note that HSS is a joint venture partner in two ASCs in New York County, one that has begun operations and one that is under development, and in one ASC in Florida that is under development.  See discussion re: Florida Campus and Ambulatory Surgery Centers in Appendix A.  If ASCs in the communities that HSS serves are able to increase their market share of musculoskeletal surgeries, HSS may experience a slower growth or a decline in patient volume.

*Risk Relating to HSS's Ability to Recruit and Retain Quality Physicians.*

The success of HSS depends in part on the number and quality of the physicians on the medical staff, the admitting and utilization practices of those physicians, maintaining good relations with those physicians, and controlling costs related to the employment of physicians.  If HSS is unable to recruit and retain such physicians, HSS may experience slower growth or a decline in patient volume.

*Risk of Competition for Staffing and Increased Labor Union Activity; Increased Labor Costs.*

HSS's operations are dependent on the efforts, abilities and experience of HSS's management and medical support personnel, such as nurses, pharmacists and lab technicians, as well as HSS's physicians.

HSS competes with other health care providers in recruiting and retaining qualified management and support personnel responsible for the daily operations of HSS, including nurses and other non-physician health care professionals. Although HSS has not had problems recruiting and obtaining nurses and other non-physician health care professionals, in recent years, the availability of such personnel has been a significant operating issue to health care providers generally. HSS may be required to continue to enhance wages and benefits to recruit and retain nurses and other medical support personnel or to hire more expensive temporary or contract personnel. As a result, HSS's labor costs could increase in excess of expected levels. HSS also depends on the available labor pool of semi-skilled and unskilled employees. In addition, the state legislature could adopt mandatory nurse-staffing ratios. Such mandated nurse-staffing ratios could significantly affect labor costs and operating margins. Because the substantial majority of HSS's patient revenues are either based on government-regulated or contractually-negotiated reimbursement rates, HSS's ability to pass along increased labor costs is constrained. HSS's failure to recruit and retain a sufficient number of qualified management, nurses and other medical support personnel could have a material adverse effect on HSS's patient volume growth.

*Tax-Exempt Status Risk; Internal Revenue Service Claims and Audits.*

As a not-for-profit tax-exempt organization, HSS is subject to federal, state and local laws, regulations, rulings and court decisions relating to its organization and operation, including its operation for charitable purposes. At the same time, HSS conducts large-scale complex business transactions and is a significant employer in its geographic area. There can often be a tension between the rules designed to regulate a wide range of charitable organizations and the day-to-day operations of a complex health care organization.

Recently, an increasing number of the operations or practices of health care providers have been challenged or questioned to determine if they are consistent with the regulatory requirements for not-for-profit tax-exempt organizations. These challenges, in some cases, are broader than concerns about compliance with federal and state statutes and regulations, such as Medicare and Medicaid compliance, and instead in many cases are examinations of core business practices of the health care organizations. Areas that have come under examination have included pricing practices, billing and collection practices, charitable care, executive compensation, exemption of property from real property taxation and others. These challenges and questions have come from a variety of sources, including state attorneys general, the IRS, labor unions, Congress, state legislatures, and patients, and in a variety of forums, including hearings, audits and litigation.

The IRS has recently intensified its scrutiny of a broad variety of contractual relationships commonly entered into by hospitals and affiliated entities, and has issued detailed hospital audit guidelines suggesting that field agents scrutinize numerous activities of hospitals in an effort to determine whether any action should be taken with respect to limitations on, or revocation of, their tax-exempt status or assessment of additional tax. The IRS has also commenced intensive audits of select health care providers to determine whether the activities of these providers are consistent with their continued tax-exempt status. The IRS has indicated that, in certain circumstances, violation of the fraud and abuse statutes could constitute grounds for revocation of a hospital's tax-exempt status.

Any suspension, limitation or revocation of the tax-exempt status of HSS or assessment of significant tax liability could have a material adverse effect on HSS.

Section 501(c)(3) of the Code specifically conditions the continued exemption of all Section 501(c)(3) organizations upon the requirement, among others, that no part of the net earnings of the organization inure to the benefit of any private individual. Any violation of the prohibition against private inurement may cause the organization to lose its tax-exempt status under Section 501(c)(3) of the

Code.  The IRS has issued guidance in published rulings, as well as informal private letter rulings and general counsel memoranda, on some situations that give rise to private inurement, but there is no definitive body of law and no regulations or public advisory rulings that address many common arrangements between exempt health care providers and non-exempt individuals or entities.  There can be no assurance concerning the outcome of an audit or other investigation given the lack of clear authority interpreting the range of activities undertaken by HSS.

The Health Reform Law contains new requirements for tax-exempt hospitals described in Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended, the "Code").  Under new Section 50l(r) of the Code, added by the Health Reform Law, each tax-exempt hospital facility is required to (i) conduct a community health needs assessment at least every three years and adopt an implementation strategy to meet the needs identified, or be subject to an excise tax of $50,000; (ii) adopt, implement and widely publicize a written financial assistance policy and a policy to provide emergency medical treatment without discrimination; (iii) limit charges for medically necessary care to individuals who qualify for financial assistance under the hospital's financial assistance policy to no more than the amounts generally billed to individuals with coverage and refrain from using "gross charges" when billing such individuals; and (iv) refrain from taking "extraordinary" collection actions without first making reasonable efforts to determine whether the individual is eligible for assistance under the hospital's financial assistance policy.  The Health Reform Law further requires the IRS to review information about each exempt hospital's community benefit activities at least once every three years and, in consultation with the Secretary of HHS, submit to Congress annually a report on governmental, for-profit, and tax- exempt hospitals' charity care, bad debt, unreimbursed costs, and community benefit activities, and a report on trends in these matters every five years.

On December 29, 2014, final rules detailing the IRS's interpretation of the requirements of Section 501(r) of the Code imposed on tax-exempt hospitals were released.  The regulations became effective in 2016. HSS believes it is in compliance with these regulations.

Intermediate sanctions legislation enacted in 1996 imposes penalty excise taxes in cases where an exempt organization is found to have engaged in an "excess benefit transaction" with a "disqualified person." Such penalty excise taxes may be imposed in lieu of revocation of exemption or in addition to such revocation in cases where the magnitude or nature of the excess benefit calls into question whether the organization functions as a charity.  The tax is imposed both on the disqualified person receiving such excess benefit and on any officer, director, trustee or other person having similar powers or responsibilities who participated in the transaction willfully or without reasonable cause, knowing it would involve "excess benefit." "Excess benefit transactions" include transactions in which a disqualified person receives unreasonable compensation for services or receives other economic benefit from the organization that either exceeds fair market value or, to the extent provided in regulations yet to be promulgated, is determined in whole or in part by the revenues of one or more activities of such organization, and results in prohibited private inurement.  "Disqualified persons" include "insiders" such as board members and officers, senior management, and members of the medical staff, who in each case are in a position to substantially influence the affairs of the organization; their family members; and entities which are more than 35% controlled by a disqualified person.  The legislative history sets forth Congressional intent that compensation of disqualified persons shall be presumed to be reasonable if it is: (i) approved by disinterested members of the organization's board or compensation committee; (ii) based upon data regarding comparable compensation arrangements paid by similarly situated organizations; and (iii) adequately documented by the board or committee as to the basis for its determination.  A presumption of reasonableness will also arise with respect to transfers of property between the exempt organization and disqualified persons if a similar procedure with approval by an independent board is followed.  Although HSS believes that the sanction of revocation of tax-exempt status is likely to be imposed only in cases of pervasive excess benefit, and HSS believes it has complied with the

requirements for the presumption of reasonableness in regard to its highest paid employees, the imposition of an excise tax penalty in lieu of revocation, based upon a finding that any member of HSS engaged in an excess benefit transaction, is likely to result in negative publicity and other consequences that could have a materially adverse effect on the operations, property or assets of HSS.

Taxing authorities periodically conduct general tax audits of not-for-profit organizations to confirm that such organizations are in compliance with applicable tax rules and in some instances have collected significant payments as part of the settlement process. Although HSS is not the subject of any such audit at this time, other hospitals located in the state have been the subject of such audits.

*Risks HSS May Face in Servicing its Outstanding Indebtedness or Raising Additional Capital to Fund Hospital's Operations.*

As of December 31, 2017, HSS's total indebtedness was $259 million. HSS has the ability to incur additional indebtedness in the future. HSS's current amount of leverage, and any further indebtedness incurred, could have important consequences, including:

- increasing HSS's vulnerability to downturns or adverse changes in general economic, industry or competitive conditions and adverse changes in government regulations;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on HSS's indebtedness, therefore reducing HSS's ability to use HSS's cash flow to fund HSS's operations, capital expenditures and future business opportunities;

- limiting HSS's ability to make strategic acquisitions or causing HSS to make nonstrategic divestitures;

- limiting HSS's ability to obtain additional financing for working capital, capital expenditures, product or service line development, debt service requirements, acquisitions and general corporate or other purposes; and

- limiting HSS's ability to adjust to changing market conditions and placing HSS at a competitive disadvantage compared to HSS's competitors who may be less leveraged.

*Secondary Market.*

There can be no assurance that there will be a secondary market for the purchase or sale of the Bonds. From time to time there may be no market for them depending upon prevailing market conditions, including the financial condition or market position of firms who may make the secondary market, the evaluation of the Obliged Group's capabilities and the financial conditions and results of operations of the Obligated Group.

*Risk that HSS's Operations Could be Impaired by a Failure of HSS's Information Systems, including Security Breaches/Cyber Security.*

Like many other large organizations, HSS relies on digital technologies to conduct its customary operations. Any system failure that causes an interruption in service or availability of HSS's systems could adversely affect operations or delay the collection of revenues. In the past several years, a number of entities have sought to gain unauthorized access to digital systems of large organizations for the purposes of misappropriating assets or information or causing operational disruption. These attempts include highly sophisticated efforts to electronically circumvent network security as well as more

traditional intelligence gathering and social engineering aimed at obtaining information necessary to gain access.  HSS employs a multi-layered approach to mitigating cybersecurity risks and maintains a network security system designed to stop ''cyber-attacks'' by third parties, and minimize its impact on operations; however, no assurances can be given that such network security systems will be completely successful. Additionally, some of HSS's systems and programs (some of which transmit or maintain electronic protected health information ("ePHI") or other sensitive information) are not locally hosted, and while HSS generally performs information security assessments on vendors who would be required to access sensitive information like ePHI, those third party's processes and systems are outside of HSS's control. The occurrence of any of these events could result in interruptions, delays, the loss or corruption of data, cessations in the availability of systems or liability under privacy and security laws, including HIPAA, all of which could have a material adverse effect on HSS's financial position and results of operations and harm HSS's business reputation.

The performance of HSS's information technology and systems is critical to HSS's business operations.  HSS's information systems are essential to a number of critical areas of HSS's operations, including, but not limited to:

- accounting and financial reporting;

- billing and collecting accounts;

- coding and compliance;

- clinical systems;

- medical records and document storage;

- inventory management;

- negotiating, pricing and administering managed care contracts and supply contracts; and

- monitoring quality of care and collecting data on quality measures necessary for full Medicare payment updates.

HSS's failure to maintain the operation of the information systems could have a material adverse effect on HSS.

*Failure to Effectively and Timely Implement Electronic Health Record Systems Could Adversely Affect HSS's Operations.*

As required by ARRA, the Secretary of HHS has developed and implemented an incentive payment program for eligible hospitals and health care professionals that adopt and meaningfully use certified EHR technology.  HHS uses the Provider Enrollment, Chain and Ownership System ("PECOS") to verify Medicare enrollment prior to making EHR incentive program payments.  HSS has received $5.2 million in incentive payments from 2013 through 2016 and has avoided penalties to date.  Beginning in 2017, as it attested in Stage 3, HSS is no longer eligible to receive incentive payments.

HSS has incurred and will continue to incur both capital costs and operating expenses in order to implement HSS's certified EHR technology and meet meaningful use requirements. Further, eligible providers that have failed to demonstrate meaningful use of certified EHR technology in an applicable prior reporting period will be subject to reduced payments from Medicare.  While HSS believes it meets

meaningful use requirements, the standards are complex and increase each year.  Failure to implement and continue to demonstrate meaningful use of certified EHR technology could have a material adverse effect on HSS's financial position and results of operations.

The use of certified EHR technology will continue as a feature of MACRA's MIPS program, and in connection with this, Medicare EHR program payment adjustments to eligible clinicians will sunset at the end of 2018 and MIPS payment adjustments will begin on January 1, 2019. The first performance period for MIPS began January 1, 2017, and will afford eligible clinicians different reporting options linked to the amount of data reported and the duration of the reporting period, with positive payment adjustments generally linked to more robust reporting.

*Risk of Increased Regulatory Oversight of New York Not-For-Profit Corporations as a Result of Recent Changes to New York State Law.*

Under the New York Nonprofit Revitalization Act of 2013 (the "NPRA"), New York not-for-profit entities, such as HSS, are required to have audit committees and are subject to enhanced oversight by the New York State Attorney General.  On November 28, 2016, Governor Cuomo signed into law additional amendments to Nonprofit Revitalization Act intended to improve and make clarifying amendments. While HSS believes it is compliant with the NPRA, any non-compliance could adversely affect HSS.

*Risk of Challenges to HSS's Intellectual Property Rights.*

HSS relies on a combination of trademark, copyright, patent and trade secret laws, as well as contractual terms and conditions, to protect HSS's and its affiliates' rights in its intellectual property assets, including the right to use the name "HSS" or "Hospital for Special Surgery" (the "Brand"), in the United States and abroad.  Legal standards relating to the validity, enforceability and scope of protection of intellectual property can be uncertain.  Intellectual property protection outside of the United States can be limited and difficult to enforce.  HSS's existing intellectual property rights could be challenged, and any patents that may be granted in the future from pending or future applications may be opposed, contested, circumvented, designed around by a third party, or found to be invalid or unenforceable.  Third parties may develop technologies that are similar or superior to HSS's proprietary technologies, duplicate or otherwise obtain and use HSS's proprietary technologies, or design around patents owned or licensed by HSS. In addition, the words "Hospital for Special Surgery" are descriptive and harder to protect, so HSS has had to use distinctive marks to protect its Brand.  Conversely, although HSS does not believe its technology infringes any patent or other intellectual property right held by a third party, HSS could be prevented from providing HSS's service offerings and could be subject to significant damage awards if it is found to so provide such service offerings.

*Risk that HSS May Not be Able to Act in Concert with Other Health Care Providers as Part of its Expansion Plans.*

HSS plans to continue expanding regionally and nationally.  HSS has entered into joint venture or other agreements with other healthcare service providers both in and outside of the New York region and may enter into more such ventures.  Failure to reach agreement with these other providers in regard to such future joint ventures could limit HSS's ability to expand.

*Risk that Liabilities from Claims May Exceed Insurance Coverages.*

HSS is subject to litigation relating to its business practices, including claims and legal actions by patients and others in the ordinary course of business alleging malpractice, general liability, and other

legal theories.  Many of these actions seek large sums of money as damages and involve significant defense costs.  HSS and the majority of the members of its medical staff are insured for professional and general liability through a combination of commercial insurance and a "captive" insurance company, Medical Indemnity Assurance Company Ltd.  ("MIAC"), which is affiliated with HSS.  MIAC also provides workers' compensation insurance to HSS together with a commercial carrier.  For a description of MIAC, see "APPENDIX A – HOSPITAL FOR SPECIAL SURGERY – HSS Enterprise".  HSS believes that available coverage is sufficient to meet existing and foreseeable claims, but there can be no assurance that this will be the case.  HSS currently also carries directors' and officers' liability, billing errors and omissions, and other lines of insurance that HSS considers adequate.

Coverage amounts and coverage availability for all of HSS's insurance may vary in the future due to cost, availability of capacity and other factors.  Accordingly, no assurance can be given that in the future HSS will maintain insurance coverage of the types and in the amounts that are currently in place.  For a discussion of the insurance coverage of HSS, see "APPENDIX A – HOSPITAL FOR SPECIAL SURGERY – Insurance".

*Risk of Suspension or Revocation of any of HSS's Accreditations.*

HSS is currently accredited by The Joint Commission, and its accreditation is subject to periodic review against the standards promulgated by The Joint Commission.  Although HSS believes it is in material compliance with those standards and intends to maintain its accreditation, no assurance can be given as to its continuing accreditation.  Failure to maintain accreditation would have a material adverse effect on the operations and financial condition of HSS.  In addition, no assurance can be given as to the effect on HSS' future operations of its complying with The Joint Commission's existing, or subsequently amended, standards for accreditation.

In addition, HSS sponsors programs of graduate medical education training for residents and fellows ("GME Programs") that are accredited by the Accreditation Council for Graduate Medical Education ("ACGME") (for medical programs).  All GME Programs are subject to periodic review by the applicable specialty Residency Review Committee of the ACGME.  No assurance can be given as to (i) the outcome of future reviews of these GME Programs, (ii) such GME Programs' continued accreditation, or (iii) the continuing eligibility of the costs associated therewith for graduate medical education reimbursement.  See "APPENDIX A – HOSPITAL FOR SPECIAL SURGERY – Licensure and Accreditation".

*Risk of Criminal and Civil Enforcement Actions for Violations of Antitrust Laws.*

Antitrust liability may arise in a wide variety of circumstances including medical staff privilege disputes, payor contracting, physician relations, joint ventures, merger, affiliation and acquisition activities and certain pricing and salary setting activities.  The most common areas of potential liability are joint action among providers with respect to payor contracting, medical staff credentialing, and use of a hospital's local market position for entry into related health care businesses.  From time to time, HSS may be involved with all of these types of activities, and it cannot be predicted whether or to what extent liability may arise.  Liability in any of these or other trade regulation areas may be substantial, depending on the facts and circumstances of each case.

Some judicial decisions have permitted physicians who are subject to disciplinary or other adverse actions by a hospital at which they practice, including denial or revocation of medical staff privileges, to seek treble damages from the hospital under the federal antitrust laws.  The Federal Health Care Quality Improvement Act of 1986 provides immunity from liability for discipline of physicians by hospitals under certain circumstances, but courts have differed over the nature and scope of this

34

immunity.  In addition, hospitals occasionally indemnify medical staff members who incur costs as defendants in lawsuits involving medical staff privilege decisions.  Some court decisions have also permitted recovery by competitors claiming harm from a hospital's use of its market power to obtain unfair competitive advantage in expanding into ancillary health care businesses.  Antitrust liability in any of these contexts can be substantial, depending upon the facts and circumstances involved.

*Environmental Risks and Remediation Expenses.*

Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations.  These requirements govern medical and toxic or hazardous waste management, air and water quality control, notices to employees and the public and training requirements for employees.  Typical health care provider operations include, but are not limited to, in various combinations, the handling, use, storage, transportation, disposal and/or discharge of infectious, toxic, radioactive, flammable and other hazardous materials, waste, pollutants and contaminants.  As such, health care provider operations are particularly susceptible to the practical, financial and legal risks associated with the obligations imposed by applicable environmental laws and regulations.  Such risks may result in damage to individuals, property or the environment; may interrupt operations or increase their cost; may result in legal liability, damages, injunctions or fines; may result in investigations, administrative proceedings, civil litigation, criminal prosecution, penalties or other governmental agency actions; and may not be covered by insurance.  There can be no assurance that HSS will not encounter such risks in the future, and such risks may result in material adverse consequences to HSS's operations or financial condition.

*Risk of Disruptive Change.*

The healthcare industry is subject to dramatic change based on new technology that may disrupt existing service parameters. These could include artificial intelligence, new and increasingly expensive technology, or technology that eliminates the need for the services HSS provides.

*Health Information Exchanges.*

HSS shares data with unrelated third parties. In doing so, HSS is reliant upon the information provided by the third party. Such sharing of information may increase the risk of misinformation being conveyed and privacy breaches arising.

*Development and Innovation.*

HSS seeks to develop products and services to enhance orthopedic care. These goods and services, which may include lifestyle products and services (i.e., fitness oriented products and services), must be protected by appropriate patents or other intellectual property protections. HSS will develop certain products on its own. In other cases, these products will be developed by third parties or co-branded with HSS. In these cases, HSS will not be the manufacturer of the product and will depend on third parties for compliance. All products sold under the Brand are subject to product liability and patent claims related to such products that may be material. HSS believes it has adequate insurance to cover the product liability risk and endeavors to ensure appropriate intellectual property protection for its products.

HSS conducts research to enhance musculoskeletal care, and such research sometimes results in the development of products that will be made available commercially. In order to conduct this research, HSS must comply with complex regulations guiding research and must use the expertise of its faculty. Although HSS believes it is in compliance with these complex regulations, it cannot provide assurance that it has complied with all requirements and will be able to develop new products or services.

*Affiliation with New York Presbyterian Hospital and Weill Cornell Medical College.*

HSS has established affiliations with New York Presbyterian Hospital ("NYPH") and Weill Cornell Medical College ("Weill Cornell") dating from 1955.  In 1998, HSS and NYPH entered into a corporate relationship agreement that memorializes the medical and clinical affiliation between the two parties, including HSS serving as the Department of Orthopedics for NYPH.   While the affiliation established a more integrated governance and clinical structure, each entity maintains a separate corporate existence and operates independently.  HSS's net assets remain under HSS's control.  HSS also serves as the Department of Orthopedics for Weill Cornell through a separate agreement between HSS and Weill Cornell.  HSS, NYPH and Weill Cornell are also parties to a tri-partite agreement pertaining to the academic affiliation of the institutions.   Termination could have a material impact on HSS's operations.

*Risk of Technological Advancements Affecting HSS Infrastructure Costs.*

Medical research and resulting discoveries have grown exponentially in the last decade.  Federal legislation was passed in 1992 that levied fees on industry to support a substantial upgrade and reorganization of the federal Food and Drug Administration, the agency that regulates the introduction of new drugs and devices to the market, for the purpose of dramatically decreasing the time required to secure approval for new drugs and devices, which has cut in half the median time required for new drug approval.  In addition, many devices were rapidly approved through the 501(k) process.  Other legislation decreased the types of devices regulated and reformed the biologics approval process.  Once new drugs secure market approval, they are often included on hospitals' formularies – the list of drugs maintained by hospitals for patient care – and also may be prescribed off-label by physicians.  New drugs and devices could also reduce utilization or render obsolete the way that services are currently provided, thereby either increasing expense or reducing revenue.

New drugs and devices may add greatly to HSS's cost of providing services with no or little offsetting increase in federal or other third-party reimbursement because the costs of new drugs and devices may not be accounted for in the DRG or other third-party payment received by hospitals.  The prospective payment system imposed on outpatient services does permit a direct pass-through of the costs of certain new technologies defined by the government and HSS's contracts with some of its managed care organizations may provide for adjustments to payment rates to reflect the costs of such new drugs, devices or technologies.

The acquisition and operation of certain equipment and services may continue to be a significant factor in hospital utilization, but the ability of HSS to offer such equipment or services may be subject to the availability of equipment and specialists, governmental approval, and the ability to finance such acquisitions and operations.

*International Activities.*

The HSS Enterprise is increasingly involved in international activities. In doing so, HSS may be subject to the Foreign Corrupt Practices Act, the U.K. Bribery Act, and other anti-bribery laws and laws pertaining to the accuracy of our internal books and records, as well as other types of foreign requirements similar to those imposed in the United States.

In addition, the European Parliament and the Council of the European Union have adopted a new pan-European General Data Protection Regulation ("GDPR"), effective from May 25, 2018, which increases privacy rights for individuals in Europe, extends the scope of responsibilities for data controllers and data processors and imposes increased requirements and potential penalties on companies offering goods and services to individuals who are located in Europe ("Data Subjects") or monitoring the behavior

of such individuals (including by companies based outside of Europe). Noncompliance can result in penalties of up to the greater of EUR 20 million, or 4% of global company revenues. Individual member states may impose additional requirements and penalties as they relate to certain things such as employee personal data. Among other things, the GDPR requires with respect to data concerning Data Subjects, company accountability, consents from Data Subjects' or other acceptable legal basis needed to process the personal data, prompt breach notifications within 72 hours, fairness and transparency in how the personal data is stored, used or otherwise processed, and data integrity and security, and provides rights to Data Subjects relating to modification, erasure and transporting of the personal data. Compliance with this regulation may impose additional costs on HSS and HSS cannot predict whether the interpretations of the requirements or changes in our practices in response to new requirements or interpretations of the requirements, could have a material adverse effect on HSS.

There may be other rules and regulations outside of the United States that may be a material adverse effect on the operations of HSS.

*Brand and Reputational Risk.*

Any damage to HSS's brand and/or reputation may cause HSS to experience slower growth or a decline in patient volume. HSS is involved in joint ventures with other third parties that involve use of the HSS brand. These joint ventures are structured in a way to provide HSS the ability to control the quality of patient care provided pursuant to such joint ventures and the use of its brand. In addition, HSS often treats well-known athletes and celebrities. Any adverse event relating to treating such patients may be widely publicized and potentially harm HSS's brand and/or reputation.

*Reliance on Fundraising.*

As an exempt entity, HSS relies on fundraising and charitable donations to support its activities. Any substantial reduction in such fundraising, as a result of changes to the tax law or otherwise, may have a material adverse effect on HSS.

*Enforceability Remedies.*

The Bonds are secured by Obligation No.1 of the Obligated Group payable as described in this Offering Memorandum. The practical realization of money from the Obligated Group upon any default will depend upon the exercise of various remedies specified by the Master Indenture. These and other remedies may, in many respects, require judicial actions which are often subject to discretion and delay.

Under existing law, the remedies specified by the Master Indenture may not be readily available or may be limited. A court may decide not to order the performance of the covenants contained in those documents. The legal opinions to be delivered concurrently with the delivery of the Bonds will be qualified as to the enforceability of the various agreements and other instruments by limitations imposed by State and Federal laws, rulings and decisions affecting remedies and by bankruptcy, reorganization or other laws affecting the enforcement of creditors' rights generally.

*Enforceability of the Master Indenture.*

Under New York law, a not-for-profit corporation may guarantee the debt of another corporation only if such guaranty is in furtherance of the corporate purposes of such guarantor not-for-profit corporation. In addition, it is possible that the joint and several obligation of a member to make payments due under an Obligation, relating to indebtedness issued for the benefit of another member, may be declared void in an action brought by a third-party creditor pursuant to the New York fraudulent

conveyance statutes or may be avoided by a member or a trustee in bankruptcy in the event of the bankruptcy of the member from which payment is requested.  An obligation may be voided under the Federal Bankruptcy Code or under the New York fraudulent conveyance statute, if (a) the obligation was incurred without receipt by the obligor of "fair consideration" or "reasonably equivalent value," and (b) the obligation renders the obligor "insolvent," as such terms are defined under the applicable statute. Interpretation by the courts of the tests of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law.  For example, a member's joint and several obligation under the Master Indenture to make all payments thereunder, including payments in respect of funds used for the benefit of the other members, may be held to be a "transfer" which makes such member "insolvent" in the sense that the total amount due under the Master Indenture could be considered as causing its liabilities to exceed its assets.  Also, one of the members may be deemed to have received less than "fair consideration" for such obligation because none or only a portion of the proceeds of the indebtedness is to be used to finance projects occupied or used by such member.  While the members may benefit generally from the projects financed from indebtedness for the other members, the actual cash value of this benefit may be less than the joint and several obligation.  The rights under the New York fraudulent conveyance statutes may be asserted for a period of up to six years from the incurring of the obligations under the Master Indenture.

In addition, the assets of any member may be held by a court to be subject to a charitable trust which prohibits payments in respect of obligations incurred by or for the benefit of others if a member has insufficient assets remaining to carry out its own charitable functions or, under certain circumstances, if the obligations paid by such member were issued for purposes inconsistent with or beyond the scope of the charitable purposes for which the member was organized.  The enforceability of similar master trust indentures has been challenged in jurisdictions outside of the State.  In the absence of clear legal precedent, in this area, the extent to which the assets of any member can be used to pay Obligations issued by or on behalf of others cannot be determined at this time.

In addition, there exists common law authority and authority under state statutes for the ability of the state courts to terminate the existence of a not-for-profit corporation or undertake supervision of its affairs on various grounds, including a finding that such cooperation has insufficient assets to carry out its states charitable purposes or has taken some action which renders it unable to carry out such purposes. Such court action may arise on the court's own motion or pursuant to a petition of the state attorney general or such other persons who have interests different from those of the general public, pursuant to common law and statutory power to enforce charitable trusts and to see the application of their funds to their intended charitable uses.

An action to enforce a charitable trust and to see to the application of its funds could also arise if an action to enforce the obligation to make payments on an Obligation issued for the benefit of another Member of the Obligated Group would result in the cessation or discontinuation of any material portion of the healthcare or related services previously provided by HSS from which payment is requested. While currently HSS is the only Member of the Obligated Group, this may change depending on the needs and future plans of HSS and a variety of other factors.

*Exercise of Remedies under Master Indenture.*

"Events of Default" under the Master Indenture include the failure of the Obligated Group to make payments on any Obligation under the Master Indenture but the occurrence of an event of default under the Bond Indenture is not automatically an event of default under the Master Indenture.  The Master Indenture provides that upon an "Event of Default" thereunder, the Master Trustee may in its discretion, declare the principal of all (but not less than all) Obligations thereunder to be due and payable immediately and may exercise other remedies thereunder.  However, the Master Trustee is not required to

declare amounts under the Master Indenture to be due and payable immediately except as provided in the Master Indenture.  Consequently, upon the occurrence of an "Event of Default" under the Bond Indenture with respect to the Bonds and an acceleration of the maturity of the Bonds, the Master Trustee may not be required to accelerate all Obligations under the Master Indenture.

*Bankruptcy.*

The rights and remedies of the holders of the Bonds are subject to various provisions of Title 11 of the United States Code (the "*Bankruptcy Code*").  If HSS were to file a petition for relief under the Bankruptcy Code, the filing would automatically stay the commencement or continuation of any judicial or other proceedings against HSS and its property.  HSS would not be permitted or required to make payments of principal or interest under the Obligations, unless an order of the United States Bankruptcy Court were issued for such purpose.  In addition, without an order of the United States Bankruptcy Court the automatic stay may serve to prevent the Bond Trustee from applying amounts on deposit in certain funds and accounts held under the Bond Indenture from being applied in accordance with the provisions of the Bond Indenture, and the application of such amounts to the payment of principal and interest on, the Bonds.  Moreover, any motion for an order canceling the automatic stay and permitting such funds and accounts to be applied in accordance with the provisions of the Bond Indenture would be subject to the discretion of the United States Bankruptcy Court, and may be subject to objection and/or comment by other creditors of such Member of the Obligated Group, which could affect the likelihood or timing of obtaining, such relief  The automatic stay may also adversely affect the ability of the Master Trustee under to exercise remedies upon default, including the acceleration of all amounts payable by HSS, the Master Indenture, and may adversely affect the Master Trustee's or the Bond Trustee' s ability to take all steps necessary to file a claim under the applicable  documents on a timely basis.

HSS could file a plan for the adjustment of its debts in a proceeding under the Bankruptcy Code, which plan could include provisions modifying or altering the rights of creditors generally, or any class of them, whether secured or unsecured.  The plan, when confirmed by the United States Bankruptcy Court, would bind all creditors who have notice or knowledge of the plan and could discharge all claims against HSS provided for in the plan.  No plan may be confirmed unless certain conditions are met, among which are that the plan is in the best interests of creditors, is feasible and has been (except as set forth below) accepted by each class of claims impaired thereunder.  Each class  of claims has accepted the plan if at least two-thirds in dollar amount and more than one-half in number of the allowed claims of the class that are voted with respect to the plan are cast in its favor.  Even if the plan is not so accepted, it may be confirmed if the court finds that the plan is fair and equitable with respect to each class of non-accepting creditors impaired thereunder and does not discriminate unfairly.

In the event of bankruptcy of HSS, transfers of property by the bankrupt entity, including the payment of debt on or after the date which is 90 days (or, in some circumstances, one year) prior to the commencement of the case in bankruptcy court may be subject to avoidance or recoupment as preferential transfers.  Under certain circumstances, a court may have the power to direct the use of revenues to meet expenses of HSS before paying debt service on the Bonds.

*Considerations Relating to Additional Debt.*

The Bond Indenture and the Master Indenture permit HSS to incur additional indebtedness.  Such indebtedness would increase the Obligated Group's debt service and repayment requirements and may adversely affect debt service coverage on the Bonds.

*Risk of General Economic Weakness on HSS's Operations.*

During periods of economic weakness and high unemployment, hospitals face potential declines in the population covered under managed care agreements, patient decisions to postpone or cancel non-emergency health care procedures (including delaying surgical procedures), potential increases in the uninsured and underinsured populations and further difficulties in HSS's collecting patient copayment and deductible receivables.

*Risk of Future Legislation Having an Adverse Effect on HSS's Operations.*

In addition to legislative proposals previously discussed herein, other legislative proposals that could have an adverse effect on HSS include:  (a) any changes in the taxation of tax-exempt organizations or in the scope of their exemption from income or property taxes; (b) limitations on the amount or availability of tax-exempt financing for tax-exempt organizations; and (c) regulatory limitations affecting the ability of HSS to undertake capital projects or develop new services.

Legislative bodies have considered legislation concerning the charity care standards that tax-exempt hospitals must meet to maintain their tax-exempt status under the Code and legislation mandating that tax-exempt hospitals have an open-door policy toward Medicare and Medicaid patients as well as offer, in a non-discriminatory manner, qualified charity care and community benefits.  Excise tax penalties on not-for-profit, charitable hospitals that violate these charity care and community benefit requirements could be imposed or their tax-exempt status under the Code could be revoked.  The scope and effect of legislation, if any, that may be enacted at the federal or state levels with respect to charity care of tax-exempt hospitals cannot be predicted.  Any such legislation or similar legislation, if enacted, could have the effect of subjecting a portion of the income of HSS to federal or state income taxes or to other tax penalties and adversely affect the ability of HSS to generate net revenues sufficient to meet its obligations.

*Miscellaneous Risks and Uncertainties that May Adversely Affect HSS's Operations.*

In the future, the following factors, among others, may adversely affect the operations of health care providers, including HSS, or the market value of the Bonds, to an extent that cannot be determined at this time:

- Increased unemployment or other adverse economic conditions in HSS's service area which might increase the proportion of patients without health insurance benefits or who otherwise are unable to pay fully for the costs of their care;

- Efforts by employers to reduce the costs of health insurance by having employees bear a greater portion of their health care costs, causing employees to be more selective and cost-conscious in choosing health care services;

- Reduced need for hospitalization or other health care services arising from medical and scientific advances;

- Competition in the Obligated Group's service area could increase from alternative modes of care;

- Efforts by employers, insurers and governmental agencies to limit the cost of hospital and physician services, to reduce the utilization  of  hospital facilities by such means as preventive medicine, improved occupational health and safety and outpatient care, or

attempts by third-party payors to control or restrict the operations of certain health care facilities;

- Adoption of legislation that would establish a national or statewide single-payor health program or that would establish national, statewide or otherwise regulated rates;

- Bankruptcy of an indemnity/commercial insurer, managed care plan, provider or other payor with which HSS has contracted or that otherwise has any outstanding obligations to reimburse HSS for services provided;

- The occurrence of a natural or man-made disaster, including but not limited to acts of terrorists, that could damage the facilities of the Obligated Group, interrupt utility service to the facilities, result in an abnormally high demand for health care services or otherwise impair the operations and the generation of revenues from the Obligated Group's facilities;

- Adoption of a so-called "flat tax" federal income tax, a reduction in the marginal rates of federal income taxation, or replacement of the federal income tax with another form of taxation, any of which might adversely affect the market value of the Bonds and the level of charitable donations to HSS;

- The need to find qualified replacements for HSS's medical staff and workforce as existing employees reach retirement age;

- Reduced demand for the services of the Obligated Group that might result from decreases in population and/or innovations in technology;

- Increases in cost and limitations in the availability of any insurance, such as fire, flood and/or business interruption, automobile and comprehensive general liability, that the Obligated Group generally carries; and

- Developments affecting the Federal or state tax-exempt status of not-for-profit hospitals.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain U.S. federal tax income considerations generally applicable to holders of the Bonds that acquire their Bonds in the initial offering. The discussion below is based upon laws, regulations, rulings, and decisions in effect and available on the date hereof, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the U.S. IRS with respect to any of the U.S. federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following discussion does not deal with all U.S. federal income tax consequences applicable to any given investor, nor does it address the U.S. federal income tax considerations applicable to categories of investors some of which may be subject to special taxing rules (regardless of whether or not such persons constitute U.S. Holders), such as certain U.S. expatriates, banks and other financial institutions, real estate investment trusts, grantor trusts, regulated investment companies, insurance companies, tax-exempt organizations, pension funds, retirement plans, individual retirement accounts or tax-deferred accounts, persons holding bonds in tax advantaged or tax deferred accounts, persons required to accelerate the recognition of any item of gross income with respect to the Bonds as a result of such incoming be recognized on an applicable financial statement, brokers, dealers or traders in securities or currencies, partnerships (and other pass-through entities), investors that hold their

Bonds as part of a hedge, straddle or an integrated or conversion transaction, constructive ownership, constructive sale or other risk reduction transaction, investors whose "functional currency" is not the U.S. dollar. Furthermore, it does not address (i) alternative minimum tax, estate tax or gift tax consequences or tax consequences under any state, local or foreign laws or (ii) the indirect effects on persons who hold equity interests in a U.S. Holder. In addition, this summary generally is limited to investors that purchase their Bonds for cash in connection with this initial offering for the "issue price" within the meaning of Section 1273 of the Code (i.e., the first price at which a substantial amount of the Bonds are sold to the public for cash) and who will hold the Bonds as "capital assets" within the meaning of Section 1221 of the Code. This discussion does not address the tax consequences to holders who purchase the Bonds after their original issuance.

As used herein, "U.S. Holder" means a beneficial owner of a Bond that is an individual citizen or resident of the United States for U.S. federal income tax purposes, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to U.S. federal income taxation regardless of its source, a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust, or a trust that has made a valid election under U.S. Treasury Regulations to be treated as a United States person for U.S. federal income tax purposes. As used herein, "Non-U.S. Holder" generally means any owner (or beneficial owner) of a Bond (other than a partnership or other pass-through entity) that is not a U.S. Holder. If a partnership or other pass-through entity holds Bonds, the tax treatment of a partner (or other owner) will generally depend upon the status of the partner (or other owner) and upon the activities of the partnership. Partners of partnerships (and other owners of pass-through entities) holding Bonds should consult their own tax advisors regarding the tax consequences of an investment in the Bonds (including their status as U.S. Holders or Non-U.S. Holders).

BECAUSE INDIVIDUAL CIRCUMSTANCES MAY DIFFER, PROSPECTIVE HOLDERS OF THE BONDS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THEIR PARTICULAR TAX SITUATIONS AND AS TO ANY FEDERAL, FOREIGN, STATE, LOCAL OR OTHER TAX CONSIDERATIONS (INCLUDING ANY POSSIBLE CHANGES IN TAX LAW) AFFECTING THE PURCHASE, HOLDING AND DISPOSITION OF THE BONDS.

**Certain U.S. Federal Income Tax Consequences to U.S. Holders**

This section describes certain U.S. federal income tax consequences to U.S. Holders. Non-U.S. Holders should see the discussion under the heading "Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders" for a discussion of certain tax consequences applicable to them.

*Interest on the Bonds*. Interest on the Bonds (including any amount withheld as backup withholding) generally will be taxable to a U.S. Holder as ordinary interest income at the time such amounts are accrued or received, in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes.

If a Bond is issued at a discount from its stated redemption price at maturity, and the discount is at least equal to the product of one-quarter of one percent (0.25%) of the stated redemption price at maturity of the Bond multiplied by the weighted average maturity of the Bonds, the Bond will be an "OID Bond." In general, the excess of the stated redemption price at maturity of an OID Bond over its issue price will constitute original issue discount ("OID") for U.S. federal income tax purposes. The stated

redemption price at maturity of a Bond is the sum of all scheduled amounts payable on the Bond (other than qualified stated interest). The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the Issuer), or that is treated as constructively received, at least annually at a single fixed rate or, under certain conditions, at a variable rate. U.S. Holders of OID Bonds will be required to include OID in income for U.S. federal income tax purposes as it accrues, in accordance with a constant yield method based on the compounding of interest (which may be before the receipt of cash payments attributable to such income). Under this method, U.S. Holders generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

If a Bond is issued at a price greater than the principal amount payable at maturity, a U.S. Holder generally will be considered to have purchased the Bond at a premium, and generally may elect to amortize the premium as an offset to interest income otherwise required to be included in respect of the Bond during a taxable year, using a constant-yield method, over the remaining term of the Bond. If a U.S. Holder makes the election to amortize the premium, it generally will apply to all debt instruments held by such U.S. Holder at the time of the election, as well as any debt instruments that are subsequently acquired by such U.S. Holder. In addition, a U.S. Holder may not revoke the election without the consent of the IRS. If such U.S. Holder elects to amortize the premium, such U.S. Holder will be required to reduce its tax basis in the Bond by the amount of the premium amortized during the holding period of the U.S. Holder. If such U.S. Holder does not elect to amortize premium, the amount of premium will be included in its tax basis in the Bond. Therefore, if a U.S. Holder does not elect to amortize premium and holds the Bond to maturity, the premium will decrease the amount of gain or increase the amount of loss otherwise recognized on the disposition of such Bond. Special rules for determining the amount of amortizable bond premium attributable to a debt instrument may be applicable of the debt instrument may be optionally redeemed. These rules are complex and prospective purchasers are urged to consult their own tax advisors regarding the application of the amortizable bond premium rules to their particular situation.

*Disposition of the Bonds*. Unless a non-recognition provision of the Code applies, the sale, exchange (including a deemed exchange in the event of a legal defeasance of the Bonds), redemption, retirement (including pursuant to an offer by HSS) or other disposition of a Bond, will be a taxable event for U.S. federal income tax purposes. In such event, in general, a U.S. Holder of Bonds will recognize gain or loss equal to the difference between (i) the amount of cash plus the fair market value of property received (except to the extent attributable to accrued but unpaid interest on the Bonds which will be taxed in the manner described above under "*Interest on Bonds*") and (ii) the U.S. Holder's adjusted tax basis in the Bonds. A U.S. Holder's adjusted tax basis in a Bond generally will equal the purchase price paid by the U.S. Holder increased by any original issue discount included in income and decreased by the amount of payments, other than qualified stated interest payments, received and amortizable bond premium taken with respect to the Bond. Any such gain or loss generally will generally be long-term capital gain or loss, provided the Bond has been held for more than a year at the time of disposition. The deductibility of capital losses is subject to limitations.

*Potential Tax Treatment of Make-Whole Redemption Price Payment*.  As described above under "THE BONDS – Optional Redemption", HSS may optionally redeem all or a portion of the Bonds prior to their respective stated maturities and, during certain time periods, will be required to redeem Bonds at the Make-Whole Redemption Price, together with unpaid accrued interest.  In such event, investors subject to U.S. federal income taxation should note that any gain recognized as a result thereof could be subject to contingent payment debt treatment under applicable U.S. Treasury Regulations, in which case, Holders would be required to treat such gain as ordinary income rather than as capital gain.  Holders should consult their tax advisors regarding their tax consequences in such event.

*Medicare Tax.* An additional 3.8% tax will be imposed on the net investment income (which includes interest, original issue discount and gains from a disposition of a Bond) of certain individuals, trust and estates. Prospective investors in the Bonds should consult their tax advisors regarding the possible applicability of this tax to an investment in the Bonds.

*Information Reporting and Backup Withholding.* Payments of interest on the Bonds generally will be subject to U.S. information reporting. In addition, under Section 3406 of the Code and applicable Treasury Regulations, a non-corporate U.S. Holder of the Bonds may be subject to backup withholding (currently at a rate of 24%, which is expected to increase to 28% for taxable years beginning after December 31, 2025) with respect to "reportable payments," which include interest paid on the Bonds and the gross proceeds of a sale, exchange, redemption or retirement of the Bonds. The applicable payor will be required to deduct and withhold the prescribed amounts if (i) the payee fails to furnish a U.S. taxpayer identification number ("TIN") to the payor in the manner required, (ii) the payee furnishes an incorrect TIN, (iii) there has been a "notified payee underreporting" described in section 3406(c) of the Code or (iv) there has been a failure of the payee to certify under penalty of perjury that the payee is not subject to withholding under section 3406(a)(1)(C) of the Code. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be refunded or credited against the U.S. Holder's federal income tax liability, if any, provided that the required information is timely furnished to the IRS. Potential investors should consult their tax advisors regarding the applicability of backup withholding in their particular situation, the availability of an exception from backup withholding and the procedure for obtaining such an exemption, if available.

## Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders

This section describes certain U.S. federal income tax consequences to Non-U.S. Holders.

*Interest on the Bonds.* If, under the Code, interest on the Bonds is "effectively connected with the conduct of a trade or business within the United States" by a Non-U.S. Holder, such interest will be subject to U.S. federal income tax in a similar manner as if the Bonds were held by a U.S. Holder, as described above, and in the case of Non-U.S. Holders that are corporations may be subject to U.S. branch profits tax at a rate of up to 30%, unless an applicable tax treaty provides otherwise. Such Non-U.S. Holder will not be subject to U.S. federal withholding taxes, however, if it provides a properly executed Form W-8ECI (subject to the discussion below concerning FATCA withholding).

Interest on the Bonds held by other Non-U.S. Holders may be subject to withholding taxes of up to 30% of each payment made to the Non-U.S. Holders unless the "portfolio interest" exemption applies (subject to the discussion below concerning FATCA withholding). In general, interest paid on the Bonds to a Non-U.S. Holder will qualify for the portfolio interest exemption, and thus will not be subject to U.S. federal withholding tax, if (i) such Non-U.S. Holder is not a "controlled foreign corporation" (within the meaning of Section 957 of the Code) related, directly or indirectly, to HSS; (ii) the Non-U.S. Holder is not actually or constructively a "10-percent shareholder" under Section 871(h) of the Code; (iii) the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Code; (iv) the interest is not effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States under Section 871(b) or Section 882 of the Code; and (v) either (a) the Non-U.S. Holder who is the beneficial owner of the obligation provides a statement signed by such person under penalties of perjury, on IRS Form W-8BEN (or successor form), certifying that such owner is not a U.S. Holder and providing such owner's name and address or (b) a securities clearing organization, bank or other financial institution that holds the Bonds on behalf of such Non-U.S. Holder in the ordinary course of its trade or business certifies under penalties of perjury that such an IRS Form W-8BEN (or a successor form) has been received from the beneficial owner and furnishes a copy thereof. A certificate (on Form W-8BEN (or successor form)) is effective only with respect to payments or interest made to the certifying

Non-U.S. Holder after issuance of the certificate in the calendar year of its issuance and the two immediately succeeding calendar years. Alternative methods may be applicable for satisfying the certification requirement described above. Foreign trusts and their beneficiaries are subject to special rules, and such persons should consult their own tax advisors regarding the certification requirements.

The Bonds will not be includible in the estate of a Non-U.S. Holder unless, at the time of the decedent's death, income from such Bonds was effectively connected with the conduct by the decedent of a trade or business in the United States.

If a Non-U.S. Holder does not claim, or does not qualify for, the benefit of the portfolio interest exemption, the Non-U.S.-Holder may be subject to a 30% withholding tax on interest payments on the Bonds. However, the Non-U.S. Holder may be able to claim the benefit of reduced withholding tax rate under an applicable income tax treaty between the Non-U.S. Holder's country of residence and the U.S. Non-U.S. Holders are urged to consult their own tax advisors regarding their eligibility for treaty benefits. The required information for claiming treaty benefits is generally submitted on Form W-8BEN (or successor form). In addition, a Non-U.S. Holder may under certain circumstances be required to obtain a U.S. taxpayer identification number.

*Disposition of the Bonds*. Subject to the discussion below concerning FATCA withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income tax or withholding tax on gain recognized on a sale, exchange (including a deemed exchange in the event of a legal defeasance of the Bonds), redemption, retirement or other disposition of a Bond. (Such gain does not include proceeds attributable to accrued but unpaid interest on the Bonds, which will be treated as interest.) A Non-U.S. Holder may, however, be subject to U.S. federal income tax on such gain if: (i) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met under Section 871(a)(2) of the Code; or (ii) the gain is effectively connected with the conduct of a U.S. trade or business, as provided by applicable U.S. tax rules (in which case the U.S. branch profits tax may also apply), unless an applicable treaty provides otherwise.

*Information Reporting and Backup Withholding*. Certain payors must report annually to the IRS and to each Non-U.S. Holder any interest that is subject to U.S. withholding taxes or that is exempt from U.S. withholding taxes pursuant to an income tax treaty or certain provisions of the Code. Copies of these information returns may also be made available under the provisions of a specific tax treaty or agreement with the tax authorities of the country in which the Non-U.S. Holder resides.

A Non-U.S. Holder generally will not be subject to backup withholding with respect to payments of interest on the Bonds as long as the Non-U.S. Holder (i) has furnished to the applicable payor, a valid IRS Form W-8BEN (or successor form) certifying, under penalties of perjury, its status as a non-U.S. person, (ii) has furnished to the applicable payor other documentation upon which it may rely to treat the payments as made to as non-U.S. person in accordance with Treasury regulations, or (iii) otherwise establishes an exemption. Upon the sale of a Bond to or through a broker, the broker must report the sale and withhold the entire purchase price, unless either (i) the broker determines that the seller is a corporation or other exempt recipient or (ii) the seller certifies that such seller is a Non-U.S. Holder (and certain other conditions are met). Certification of the registered owner's Non-U.S. status would be made normally on an IRS Form W-8BEN under penalties of perjury, although in certain cases it may be possible to submit other documentary evidence. Non-U.S. Holders should consult their own tax advisors regarding their qualification for exemption from backup withholding and the procedures for obtaining such an exemption.

Amounts withheld under the backup withholding rules may be refunded or credited against the Non-U.S. Holder's U.S. federal income tax liability, if any, provided that the required information is timely furnished to the IRS.

*FATCA Withholding*. Under legislation commonly referred to as the "Foreign Account Tax Compliance Act" ("FATCA"), a withholding tax of 30% is generally applied to payments of (i) interest on a debt obligation of a U.S. issuer, and (ii) gross proceeds from the sale or other disposition of such a debt obligation on or after January 1, 2019, in each case made to (a) a foreign financial institution (as beneficial owner or as an intermediary), unless such institution enters into an agreement with the U.S. government (or is required by applicable local law) to collect and provide to the United States or other relevant tax authorities certain information regarding U.S. account holders of such institution or unless the institution is otherwise exempt from FATCA and provides appropriate documentation (such as an IRS Form W-8BEN-E); or (b) a foreign entity that is not a financial institution (as a beneficial owner or as an intermediary), unless such entity provides the withholding agent with a certification that it does not have any substantial U.S. owners or identifying its substantial U.S. owners, which generally includes any specified U.S. person that directly or indirectly owns more than a specified percentage of such entity, or unless such entity is otherwise exempt from FATCA and provides appropriate documentation (such as an IRS Form W-8BEN-E). Investors are encouraged to consult with their own tax advisors regarding the implications of this legislation and the applicable regulations on their investment in a Bond.

THE FOREGOING SUMMARY IS INCLUDED HEREIN FOR GENERAL INFORMATION ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF THE BONDS IN LIGHT OF THE HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION. PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO ANY POTENTIAL TAX CONSEQUENCES TO THEM FROM THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE BONDS, INCLUDING THE APPLICATION AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.

## CERTAIN ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Code generally prohibit certain transactions between employee benefit plans under ERISA or tax-qualified retirement plans under the Code (collectively, the "Plans"), and persons who, with respect to a Plan, are fiduciaries or other "parties in interest" within the meaning of ERISA or "disqualified persons" within the meaning of the Code. In addition, each fiduciary of a Plan (a "Plan Fiduciary") must give appropriate consideration to the facts and circumstances that are relevant to an investment in the Bonds, including the roles that such an investment in the Bonds would play in the Plan's overall investment portfolio. Each Plan Fiduciary, before deciding to invest in the Bonds, must be satisfied that such investment in the Bonds is a prudent investment for the Plan, that the investments of the Plan, including the investment in the Bonds, are diversified so as to minimize the risk of large losses and that an investment in the Bonds complies with the documents of the Plan and related trust, to the extent such documents are consistent with ERISA. All Plan Fiduciaries, in consultation with their advisers, should carefully consider the impact of ERISA and the Code on an investment in any Series 2018 Bond, including the applicability to such investment of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code or similar laws.

Employee benefit plans that are governmental plans, as defined in Section 3(32) of ERISA, and certain church plans, as defined in Section 3(33) of ERISA ("Other Plans"), are not subject to ERISA requirements but may be subject to federal, State or local law that impose requirements similar to Title I of ERISA or Section 4975 of the Code ("Other Law"). A governmental or church plan which is qualified

under Section 401(a) of the Code and exempt from taxation under Section 501(a) of the Code is subject to the prohibited transaction rules in Section 503 of the Code. A fiduciary of an Other Plan considering a purchase of any Series 2018 Bond should consult its legal advisors to confirm that the acquisition and holding of the security will not result in a violation of any applicable Other Laws.

By acquiring the Bonds (or interest therein), each purchaser and transferee (and if the purchaser or transferee is a Plan or other employee benefit plan or arrangement, its fiduciary) is deemed to represent and warrant that either (i) it is not acquiring the Bonds (or interest therein) with the assets of a Plan or other employee benefit plan or arrangement that is subject to Other Law; or (ii) the acquisition and holding of the Bonds (or interest therein) will not give rise to a non-exempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code or a violation of Other Law. In addition, each purchaser or transferee that is a Plan or using assets of a Plan (a "Benefit Plan Investor") that acquires a Bond (or interest therein), including any Plan Fiduciary, will be deemed to have represented by its acquisition of the Bonds (or interest therein) that:

1.   none of HSS, the Master Trustee, Underwriters or any of their respective affiliated entities (the "Transaction Parties"), has been relied upon for any advice with respect to the Benefit Plan Investor's decision to purchase or hold any Bonds (or interest therein) and none of the Transaction Parties shall at any time be relied upon as the Benefit Plan Investor's fiduciary with respect to any decision to purchase, hold, transfer or otherwise dispose of the Bonds (or interest therein);

2.   the Benefit Plan Investor's decision to invest and any decision to continue investment in or to transfer or otherwise dispose of the Bonds (or interest therein) has been made at the recommendation or direction of a fiduciary (the "Independent Fiduciary") that is ''independent'' (within the meaning of clause (c)(1) of the U.S. Department of Labor regulations codified at 29 C.F.R. § 2510.3-21 (the ''Fiduciary Definition'')) of the Transaction Parties that is one of the following:

- a bank as defined in Section 202 of the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or similar institution that is regulated and supervised and subject to periodic examination by a state or federal agency of the U.S.;

- an insurance carrier which is qualified under the laws of more than one state of the U.S. to perform the services of managing, acquiring or disposing of assets of a Benefit Plan Investor;

- an investment adviser registered with the U.S. Securities and Exchange Commission (the "SEC") under the Advisers Act, or, if not registered an as investment adviser with the SEC under the Advisers Act by reason of paragraph (a)(1) of Section 203A of the Advisers Act, is registered as an investment adviser under the laws of the U.S. state (referred to in such paragraph (a)(1)) in which it maintains its principal office and place of business;

- a broker-dealer registered under the Securities Exchange Act of 1934, as amended; or

- a fiduciary that holds, or has under its management or control, total assets of at least U.S. $50,000,000 (provided that this provision shall not be satisfied if the Independent Fiduciary is either (i) the owner or a relative of the owner of an individual retirement account, in the case of an investor that is an individual retirement account or (ii) a participant or beneficiary or a relative of a participant or beneficiary of a self-directed pension plan, in the case of an investor that is a self-directed pension plan);

3.   the Independent Fiduciary is capable of evaluating investment risks independently, both in general and with respect to particular transactions and investment strategies, including the acquisition by the Benefit Plan Investor of the Bonds (or interest therein);

4.   the Independent Fiduciary is a "fiduciary" (under ERISA and/or Section 4975 of the Code) with respect to the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions, and is responsible for exercising independent judgment in evaluating the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions;

5.   none of the Transaction Parties has exercised any authority to cause the Benefit Plan Investor to invest in the Bonds (or interest therein) or to negotiate the terms of the Benefit Plan Investor's investment in the Bonds (or interest therein);

6.   the Independent Fiduciary is aware of and acknowledges that (a) none of the Transaction Parties is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein), (b) the Transaction Parties have a financial interest in the Benefit Plan Investor's investment in the Bonds on account of the fees and other compensation they expect to receive in connection with the transactions contemplated by this Offering Memorandum, as disclosed in this Offering Memorandum and (c) any such fees or other compensation received by the Transaction Parties do not constitute fees rendered for the provision of investment advice to the Benefit Plan Investor; and

7.   the Independent Fiduciary is aware of and acknowledges that the Transaction Parties are relying on the exception set forth in clause (c)(1) of the Fiduciary Definition (i.e., the "Transactions with independent fiduciaries with financial expertise" exception) with respect to any communications made to the Benefit Plan Investor or the Independent Fiduciary concerning the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein).

**The foregoing is a summary of certain considerations associated with the purchase and holding of the Bonds (or interest therein) by Benefit Plan Investors and is designed only to provide a general overview of the basic issues.  Each fiduciary of a Benefit Plan Investor should consult with its legal advisor concerning the potential consequences to the investor under ERISA, the Code or Other Laws of an investment in the Bonds (or interest therein). The sale of the Bonds (or interest therein) to a Benefit Plan Investor subject to ERISA, the Code or any Other Laws is in no respect a representation by any Transaction Party that such an investment meets all relevant requirements applicable to investments by such investors generally or any particular investor, or that such an investment is appropriate for such investors generally or any particular investor.**

## UNDERWRITING

Goldman Sachs & Co. LLC is acting as representative of the underwriters (the "Underwriters") with respect to the Bonds. The Underwriters have agreed to purchase the Bonds at an aggregate purchase price of $178,297,017 (representing the par amount of the Series 2018 Bonds, less an underwriting discount (together with certain expenses) in the amount of $922,983). The purchase contract for the Bonds provides that the Underwriters will purchase all of the Bonds if any are purchased. The Underwriters' obligations to make such purchase is subject to certain terms and conditions set forth in the purchase contract, the approval of certain legal matters by counsel and certain other conditions. The initial public offering price of the Bonds may be changed by the Underwriters.

The Underwriters may offer and sell the Bonds to certain dealers and others at a price lower than the initial offering price; provided, however, that a substantial amount (as such term is used in United States Treasury Regulation § 1.1273-2(a)) of the Bonds shall be sold at the initial offering price. The offering price of Bonds may be changed from time to time by the Underwriters.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into negotiated dealer agreements (each, a "Dealer Agreement") with each of Charles Schwab & Co., Inc. ("CS&Co.") and LPL Financial LLC ("LPL") for the retail distribution of certain securities offerings at the original issue prices.  Pursuant to each Dealer Agreement, each of CS&Co. and LPL may purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that such firm sells.  JPMorgan Chase Bank, N.A., an affiliate of JPMS, is also a credit provider to HSS and its affiliates on various transactions.

The Underwriters and their affiliates are full service financial institutions engaged in various activities, which may include sales and trading, commercial and investment banking, advisory, investment management, investment research, principal investment, hedging, market making, brokerage and other financial and non-financial activities and services.

In the ordinary course of their various business activities, the Underwriters and their affiliates, officers, directors and employees may purchase, sell or hold a broad array of investments and actively traded securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers, and such investment and trading activities may involve or relate to assets, securities and/or instruments of the issuer (directly, as collateral securing other obligations or otherwise) and/or persons and entities with relationships with the issuer. The Underwriters and their affiliates may also communicate independent investment recommendations, market color or trading ideas and/or publish or express independent research views in respect of such assets, securities or instruments and may at any time hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and instruments of HSS.

## FINANCIAL ADVISOR

HSS has retained Melio & Company, LLC, Northfield, Illinois, as an independent, registered financial advisor. Although Melio & Company, LLC has assisted in the preparation of this Offering Memorandum, Melio & Company, LLC was not obligated to undertake, and has not undertaken to make, an independent verification and assumes no responsibility for the accuracy, completeness, or fairness of the information contained in this Offering Memorandum.

## CONTINUING DISCLOSURE

Within 150 days after the end of each fiscal reporting period commencing with HSS's and Hospital for Special Surgery Fund, Inc.'s fiscal year ending December 31, 2018, HSS shall post on its website or a national repository or furnish to the Bond Trustee and to Holders requesting the same, (1) the audited financial statements of HSS and its consolidated subsidiaries, (2) the audited financial statements of The Hospital for Special Surgery Fund, Inc. and its consolidated subsidiaries, (3) select information regarding the HSS Enterprise of the type described in Appendix C, (4) financial and operating data for the applicable fiscal year only of the type included under the following headings herein in APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY": (i) utilization statistics of the type set forth in Tables C1, C2 and C3 under the heading "Utilization"; (ii) sources of gross patient service revenue of the type set forth in Table D under the heading "Sources of Patient Service Revenue"; (iii) revenue and expense data of the type set forth under the heading "Combined Statements of Operations and Changes in Unrestricted Net Assets-HSS Enterprise"; (iv) financial information of the type set forth under the heading "Combined

Statements of Financial Position-HSS Enterprise"; and (v) financial information of the type set forth under the subheadings "Days Cash on Hand", "Maximum Annual Debt Service Coverage" and "Long-term Debt to Capitalization" under the heading "Financial Ratios" (excluding the "Pro-Forma" column in each such table), together with (5) such narrative explanation, as may be necessary to avoid misunderstanding regarding the presentation of financial and operating data concerning HSS. Such consolidated financial statements shall be audited by an independent auditor and prepared in conformity with U.S. generally accepted accounting principles on a consistent basis, except that such audited consolidated financial statements may contain such changes as are in accordance with U.S. generally accepted accounting principles, and shall include such statements and narrative explanations as reasonably necessary for a fair presentation of the consolidated financial position, results of operations, changes in net assets and cash flows of such fiscal reporting period.  Notwithstanding the above, nothing in the Bond Indenture shall be deemed to require the consolidation of accounts of entities (i.e. entities other than HSS) that are not Members of the Obligated Group, as the case may be, even if generally accepted accounting principles would require such consolidation; provided, such financial statements include a supplementary information section presenting the financial statements for the same twelve-month period of the Obligated Group or the Obligated Group and its consolidated subsidiaries.

Within 45 days after the end of each of HSS's first three fiscal quarters of each fiscal year, HSS shall post on its website or a national repository or furnish to the Bond Trustee and to Holders requesting the same, copies of the unaudited interim financial statements of HSS and its consolidated subsidiaries (including statements of financial position, activities, changes in net assets and cash flows), and quarterly utilization and operating data for the applicable fiscal quarter only of HSS and its consolidated subsidiaries of the type described in Appendix A hereto in Tables C1, C2 and C3 under the heading "Utilization";" and in Table D under the heading "Sources of Patient Service Revenue".

The failure of HSS to comply with the covenants under this heading "Continuing Disclosure" shall not be considered an event of default under the Bond Indenture, the Master Indenture or any Supplemental Indenture. As the sole and exclusive remedy for HSS's failure to comply with these covenants, the Bond Trustee may (and, at the request of the holders of at least 51% of the aggregate principal amount in the Outstanding Bonds, shall) or any Holder or owner of a beneficial interest in a Bond or Bonds may take such actions to seek specific performance by court order and to cause HSS to comply with its obligations under this section and no person, including any Holder or any Beneficial Owner of the Bonds, may recover monetary damages.

Copies of the reports and statements required to be filed with the Bond Trustee, as described above, shall be filed with the Bond Trustee in sufficient quantity to permit the Bond Trustee to mail a copy to each Holder who requests it, and, if not made available to the Bond Trustee, on HSS's website or a national repository.

The foregoing undertakings are intended to set forth a general description of the type of financial information and operating data that will be provided; the descriptions are not intended to state more than general categories of financial information and operating data; and where an undertaking calls for information that no longer can be generated because the operations to which it related have been materially changed or discontinued, a statement to that effect will be provided. Any agreement regarding continuing disclosure, however, may be amended or modified under certain circumstances without the consent of the Holders of the Series 2018 Bonds. Any such agreement when executed by the parties thereto will be on file at the principal office of HSS.

## APPROVAL OF LEGALITY

Legal matters incident to validity of the Bonds are subject to the approval of Harris Beach PLLC, New York, New York, transaction counsel to HSS, and certain other matters by General Counsel for HSS and Proskauer Rose LLP, New York, New York, special counsel to HSS. In addition, certain other legal matters will be passed upon for the Underwriters by their counsel, Katten Muchin Rosenman LLP, New York, New York.

## ABSENCE OF MATERIAL LITIGATION

There is no controversy or litigation of any nature, to the knowledge of its officers, now pending or threatened against HSS restraining or enjoining the issuance, sale, execution or delivery of the Bonds, or in any way contesting or affecting the validity of the Bonds. For a discussion of certain litigation affecting HSS, see APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY – Litigation" attached hereto.

## INDEPENDENT AUDITORS

The consolidated financial statements of HSS and The Hospital for Special Surgery Fund, Inc. and Affiliates as of and for the years ended December 31, 2017 and 2016 included in Appendix B-1 and B-2, respectively, of this Offering Memorandum, have been audited by Ernst & Young LLP, independent auditors, as stated in their reports appearing therein.

## RATINGS

Moody's Investors Service, Inc. ("Moody's") and S&P Global Ratings ("S&P"), assigned a long-term rating of "A1" and "A+", respectively, to the Series 2018 Bonds. Any explanation of the significance of such ratings may only be obtained from Moody's and S&P. Generally, rating agencies base their ratings on information and materials furnished and on investigation, studies, and assumptions of their own. The above ratings are not a recommendation to buy, sell or own the Bonds and there is no assurance that the ratings mentioned above will remain in effect for any given period of time or that a rating might not be lowered or withdrawn entirely, if in the judgment of the rating agency maintaining the rating, circumstances so warrant. Any such downward change in or withdrawal of a rating might have an adverse effect on the market price or marketability of the Bonds.

## MISCELLANEOUS

All quotations from and summaries and explanations of the Bond Indenture, the Master Indenture and the Supplemental Indenture and of statutes and other documents contained herein do not purport to be complete, and reference is made to said documents and statutes for full and complete statements of their provisions. Copies of the Bond Indenture, the Master Indenture and the Supplemental Indenture are on file at the offices of the Bond Trustee.

Any statements in this Offering Memorandum involving matters of opinion are intended as such and not as representations of fact. This Offering Memorandum is not to be construed as a contract or agreement between HSS and Holders of any of the Bonds.

Information relating to DTC and the book-entry system described herein under the heading "BOOK-ENTRY ONLY SYSTEM" has been furnished by DTC and is believed to be reliable.

51

The execution and delivery of this Offering Memorandum has been duly authorized by HSS.

NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY

By: _/s/ Stacey L. Malakoff_

Stacey L. Malakoff
Executive Vice President and Chief Financial Officer

52

## APPENDIX A

## HOSPITAL FOR SPECIAL SURGERY

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

APPENDIX A – HOSPITAL FOR SPECIAL SURGERY

*FORWARD-LOOKING STATEMENTS*
*Certain statements in this Appendix A and elsewhere in this Offering Memorandum that relate to HSS and the HSS Enterprise are forward-looking statements that are based on the beliefs of, and assumptions made by, the management of HSS. Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results or performance of HSS to be materially different from any expected future results or performance. Such factors include but are not limited to, items discussed in "BONDHOLDERS' RISKS" in the front part of this Offering Memorandum.*
\* \* \* \* \*
*PREVIOUSLY REPORTED INFORMATION WITH RESPECT TO PRIOR PERIODS*
*Certain financial information and utilization data set forth herein with respect to past periods may differ from what HSS and the HSS Enterprise have previously reported in earlier disclosure documents. This is generally due to changes in accounting standards and related guidance, or the application of relevant accounting standards, that require a reclassification or restatement of certain items and to adjustments in utilization data that occur in the normal course of patient care or as services are billed and coded.*
\* \* \* \* \*
*The information contained in this Appendix A and elsewhere in this Offering Memorandum may include statistics and other data relating to the healthcare industry in the United States that have been derived from third party sources. Such statistics and data are not necessarily reflective of current or future industry and market conditions. While HSS has no reason to question the accuracy of such statistics and data, such statistics and data have not been independently verified by HSS.*
\* \* \* \* \*

**Introduction**

Founded in 1863, HSS is the world's leading academic medical center focused on musculoskeletal health.  HSS is singularly focused on musculoskeletal care and its vision is to lead the world as the most innovative source of medical care, the premier research institution, and the most trusted educator in the fields of orthopedics, rheumatology and their related disciplines.   In the U.S. alone, musculoskeletal conditions affect more than 127 million people, at an annual cost of more than $870 billion, nearly 6% of GDP.  HSS is committed to improving the quality of life and the value of musculoskeletal care worldwide by concentrating and scaling integrated specialized expertise, knowledge, and data amassed methodically over the past 30 years.

For many years, HSS has provided nationally leading care in its specialties.  HSS has been nationally ranked number one in orthopedics for eight consecutive years and is currently number three in rheumatology according to *U.S. News & World Report* (2017-18).  It has been among the top-ranked hospitals for orthopedics and rheumatology for 26 consecutive years.  With its main campus on the upper east side of Manhattan in New York City, HSS has leading market shares throughout the New York City Tri-State Area (see section on Service Area and Market Share in this Appendix A) for non-emergent inpatient orthopedic surgery.  In 2017, only 6% of the HSS's inpatient discharges were from patients residing on the Upper East Side of Manhattan community surrounding HSS's main campus, 80% were from the rest of the New York City Tri-State Area, and 14% were from patients residing outside the New York City Tri-State Area (including 2% international).  People from all 50 U.S. states and 80 countries (1,200+ patients) travelled to New York City to receive care at HSS in 2017.  HSS was the first hospital in New York State to receive Magnet Recognition for Excellence in Nursing Service from the American Nurses Credentialing Center four consecutive times. HSS has achieved a 99th percentile ranking (as

benchmarked against other Magnet recognized hospitals) in Press Ganey's patient satisfaction survey for "likelihood to recommend" for 38 consecutive quarters and has received Press Ganey's Guardian of Excellence Award five consecutive years.  In addition, in 2017, HSS achieved a 93% "Net Promoter Score", which is a metric widely used by Fortune 1000 companies to measure customer loyalty and is a leading indicator of business growth.  Scores can range from -100% to +100%, and a score above +70% is considered "world class".

Through Global Ventures, a division of HSS, HSS is collaborating with medical centers and other organizations worldwide to advance the quality and value of musculoskeletal care, and to make HSS-caliber care more widely accessible.  HSS also leads the field in research, innovation, and education.  The Research Institute, a division of HSS, comprises 20 laboratories and over 300 staff members focused on leading the advancement of musculoskeletal health through prevention of degeneration, tissue repair, and tissue regeneration.  The Global Innovation Institute, a division of HSS, was formed in 2016 to facilitate the development and utilization of new drugs, therapeutics, devices, and musculoskeletal care delivery solutions, including in the fields of digital and mobile health.  A historic commitment to excellence in education continues to influence HSS's present day mission and vision.  Since 1887, the orthopedic residency program at HSS has set the standard for orthopedic resident training all over the country.  The active Alumni Association (consisting of graduates of HSS training programs) spans the globe with over 2,000 members located in 31 foreign countries and 47 U.S. States.  The Education Institute, a division of HSS, is the world's leading provider of education on the topic of musculoskeletal health, providing continuing medical education to more than 21,000 subscribing musculoskeletal healthcare professionals, publishing the award-winning HSS Journal, and facilitating dozens of international academic exchanges each year.

**Care Delivery**

To achieve its goals in patient care, all of HSS's physicians, residents, fellows, nurses, and other care professionals are singularly focused on delivering fully integrated musculoskeletal care across the care continuum. This includes operative care, non-operative care, diagnostics/imaging, and rehabilitation, with the overriding objective of providing the right diagnosis, the right treatment, and the best outcomes. While HSS orthopedic surgeons performed over 32,000 surgeries during 2017, non-operative care is often the best course of treatment for HSS's patients.   Based on a 2017 internal study, 36% of patients who came to HSS for a second opinion after being indicated for surgery received a non-surgical recommendation.

The medical staff includes over 100 orthopedic surgeons and over 200 physicians in related medical specialties actively practicing full time at HSS (see section on Medical Staff in this Appendix A). The medical staff turnover rate has historically been nominal. Physicians on the medical staff are global leaders and leading researchers in their respective specialties, publishing hundreds of articles and holding leadership positions across many major national musculoskeletal societies.  Drawing from HSS's leading residency and fellowship programs, along with the recruitment of other nationally recognized talent, HSS's physicians consistently rank among the top doctors in the world. These accolades include, but are not limited to, inclusion on New York Magazine's "Best Doctors," and Castle Connolly's "Top Doctors" (over 25 HSS physicians included on its "America's Top Doctors List"). Members of HSS's medical staff treat professional athletes from around the world and care for over 20 professional and collegiate teams and organizations as official physicians.  Furthermore, hundreds of professional athletes from other teams choose to see HSS physicians for their care.

The medical staff is supported by residents, fellows, and over 1,000 physician assistants, nurse practitioners, registered nurses, and physical therapists.   In addition to being singularly focused on musculoskeletal care, the orthopedic surgeons are further sub-specialized across nine service lines and, in some cases further sub-specialized within a service line.   The other physicians and care professionals are similarly sub-specialized.  In total, there are approximately 5,000 members of the HSS family, including medical staff.   HSS's strong culture and engaged workforce is evidenced in a number of ways, including a 7:1 ratio of engaged to disengaged employees based on Gallup Employee Engagement Score (generally Gallup suggests  that a 4:1 ratio is the tipping point where organizations begin to realize the benefits of an engaged workforce).

HSS's talented and engaged medical staff and workforce, along with high volumes, and specialization have enabled HSS to develop and continue to improve its best practices and clinical pathways. Steadfast specialization creates advantaged expertise, talent and experience.  For orthopedic surgery, HSS has fewer complications (including infections), fewer readmissions, and a higher number of discharges to home than other high volume providers in the New York City Tri-State Area and nationally as indicated by the below outcomes measures:

| Outcomes Measure | HSS | Leading Orthopedic Volume Hospitals |
|---|---|---|
| 1. Fewer Complications (a) | 1.2% | 2.3% to 4.7% (National Leaders) |
| 2. Fewer Infections (b) | 0.3% | 0.5% to 1.2% (NY City Leaders) |
| 3. Higher Discharges Home (c) | 81.2% | 69.8% to 83.8% (NY City Leaders) |
| 4. Fewer Readmissions (d) | 3.0% | 3.6% to 4.6% (National Leaders) |

(a) CareChex, Medicare 2016.  Major inpatient orthopedic surgery; risk
   adjustment not available.
(b) New York State Department of Health Hospital-Acquired Infections Report 2015, hip
    replacements, all payors, risk-adjusted.
(c) SPARCS 2014 (Public Use, De-identified), hip and knee replacements, commercial
    payors, risk adjustment not available.
(d) Hospital Compare, 30 day readmission rate July 2013-June 2016, hip and knee replacements,
    Medicare only, risk-adjusted.

The following is just some of the recognition that HSS has received recently from outside organizations:
1. New York State Department of Health - seven consecutive years of hip replacement infection rates lower than New York State average
2. Healthgrades – ranked as a 5 Star hospital for spine surgery
3. Medicare.gov – hip/knee all-cause readmissions 31% better than national average
4. CareChex – number one in nation for joint replacement and number one in New York State for spine surgery; CareChex is an information service of Quantros, Inc. and provides clinical, financial, and patient satisfaction findings to consumers, providers, and purchasers of U.S. medical care
5. CMS – only hospital in New York State rated 5 stars

A-3

**Strategy**

HSS is executing a Strategic Roadmap introduced in 2016.  At the core of this is a three-part strategy – *Better, Knowledge, Scale*:

1. **Better –** HSS's growth strategy is focused on leveraging its unique specialization, high volumes, and best practices while widening its quality leadership and maintaining its independence.
2. **Knowledge -** HSS is focused on leveraging and spreading its expertise to reinforce its leadership position and broaden its impact.   This includes launching and commercializing novel solutions that improve musculoskeletal care, including new drugs, therapeutics, devices, and musculoskeletal care delivery solutions.
3. **Scale –** HSS is focused on leveraging its commitment to musculoskeletal care delivery, research, innovation, and education to extend its reach and impact. This includes domestic and international expansion of HSS-caliber care delivery through advisory relationships and collaborations with complementary organizations, as well as "Knowledge" initiatives.

The execution of the strategy is being enabled by the creation of new capabilities:

1. **Shared Leadership** – Enabling everyone at HSS to work towards the same goals and take responsibility for the collective success of the organization
2. **New Ideas** – Launching and commercializing novel solutions that improve care and fuel HSS's "knowledge factory"
3. **New Alignment** – Providing the structure and environment that allow HSS to strategically and economically align with its medical staff in the pursuit of new opportunities

Success is broadly measured by achievement in the following categories:

1. **Leadership** – Distinction in reputation, rankings, and academics
2. **Value** – Top performance in quality, outcomes, and value measures over episode of care
3. **Growth** – Across markets and through "knowledge-based" initiatives
4. **Financial Health** – Robust financial health for ongoing success

**Clinical Delivery System**

   **Main Campus**

        HSS was founded in 1863 in a brownstone on Manhattan's lower east side, eventually moving to a location next to Grand Central Station and in 1955 to its current location on East 70th Street on Manhattan's Upper East Side (the "Main Campus").  The Main Campus now occupies a variety of buildings within an area bounded by East 70th Street to East 75th Street and Second Avenue to the East River.

        The Main Campus  currently  has 215 certified inpatient beds (all in operation, including a pediatric unit, a stepdown unit, and an intensive care unit), 39 operating rooms, physician office space, diagnostic and therapeutic imaging services (including MRI, x-ray, CT scan, and ultrasound), and rehabilitation facilities, along with related ancillary and support services.  It is also the main hub for the following divisions – Global Ventures, Research Institute, Global Innovation Institute, and Education Institute.  The Main Campus includes the following facilities:

1. The Main Building, located at 535 East 70th Street between York Avenue and the East River, is a 506,254 square foot facility comprised of two physically connected wings (the "East Wing" and the "West Wing").  The West Wing is the original Main Campus nine story structure and the East Wing is a twelve story structure on a platform over the FDR Drive (the highway which runs along the east side of

Manhattan) built in several phases from 1996 through 2011.  This Main Building houses all of the Main Campus inpatient beds and operating rooms, as well as certain physician, imaging, rehabilitation, and ancillary/support services.

2. Leasehold condominium unit ("Research Space"), located at 515 East 71st Street between York Avenue and the East River, is comprised of five floors (approximately 39,000 square foot) and gives HSS the right to the Research Space for 31 years, with an 18 year renewal option.  HSS acquired the Research Space in January 2015 and relocated the Research Institute to the space in early 2016.

3. The Pavilion (previously the Caspary Research Building), located at 537-545 East 71st Street, is an 80,400 square foot, eight story building located directly across 71st Street from the Main Building.  A bridge over 71st Street connects the two buildings on the second floor.  The Pavilion housed the Research Institute prior to its relocation in 2016.  During 2016 and 2017, the building was renovated, renamed the Pavilion, and now houses physician offices and imaging.

4. The first thirteen floors and the sub-levels of the Belaire Building, located at 525 East 71st Street (directly across 71st Street from the Main Building and adjacent to the Pavilion), total 189,420 square feet.  The building houses a parking facility and residential apartments for HSS visitors, as well as HSS's sports medicine rehabilitation facility, computer data center, administrative space, cafeteria, physician offices, and imaging.  The space is owned by HSS Properties Corporation ("Properties"), an affiliate of HSS (see section on HSS Enterprise in this Appendix A), and certain of the space is leased to HSS.

5. Medical office building located at 429 East 75th Street, between York and First Avenues, is a 30,000 square foot facility and houses physician offices, imaging, and minor procedures.  The building is owned by Properties and leased to HSS.

6. Residential apartment building owned and operated by Properties, located at 310 East 71st Street between First Avenue and Second Avenue, contains 68 apartments that are leased to HSS Enterprise employees, primarily residents and fellows.

7. Parking garage leased and operated by Properties, located at 524-528 East 73rd Street between York Avenue and the East River, is 41,864 square feet and accommodates HSS Enterprise visitors and employees.  Properties has exercised a purchase option for this facility and the purchase is expected to close during 2019.

8. Approximately 210,000 square feet of leased space at various locations on the Main Campus that is used for physician offices, imaging, outpatient rehabilitation, outpatient clinics, and various administrative and support functions.  This space is leased by Properties and sublet to HSS.

Properties has approximately 70,000 square feet of leased office space in Mid-Town Manhattan that it sublets to HSS.  During the second quarter of 2018, certain administrative departments currently located on the Main Campus will be relocating to this space.  This will address current Main Campus space constraints, as well as position HSS to proceed with a Main Campus expansion and renovation.

Planning and feasibility analysis is currently underway for a project to expand and renovate the Main Campus ("Main Campus Project").  The Main Campus Project is expected to include the construction of a new building (approximately 90,000 square feet) on a platform over the FDR Drive and connected to the Pavilion, as well as renovations to the Main Building. The cost is expected to be funded through a combination of philanthropy and proceeds of a future bond issue.  Construction on the Main Campus Project is anticipated to commence by 2020. Note that HSS has recently learned that an action was commenced by a cooperative corporation proximate to HSS challenging the New York City Planning Commission's 2008 grant (renewed in 2017) of a Special Permit to allow HSS to construct the above-referenced building over the FDR Drive.

**Outpatient Centers**

In order to provide patients from its broad geographic service area with more convenient access to care and further grow market share, HSS embarked on a strategy in 2012 of looking beyond the Main Campus to develop locations to provide outpatient non-operative care to its patients. At the time, HSS operated three such sites (Madison Avenue in Midtown Manhattan; Uniondale, Long Island, New York; and Queens County, New York) which had all opened prior to 2000. Three additional locations have commenced operations within the past four years, an additional site is under development (expected to open in 2019), and more sites are expected to be developed in future years. Patient care is provided at these locations by HSS medical staff and consistent with HSS quality standards. The outpatient centers are all in locations leased by Properties and sublet to HSS, range in size, and provide a variety of outpatient services, including physician professional services, x-ray, MRI, minor procedures, and rehabilitation. The following are outpatient centers either currently in operation or under development (square footage numbers represent rentable square footage from underlying leases):

1. **Madison Avenue, Midtown Manhattan, New York** - 9,265 square feet housing physician services, rehabilitation
2. **Uniondale, Long Island, New York** – 19,393 square feet housing physician services, x-ray, MRI, minor procedures
3. **Queens County, New York** – 4,115 square feet housing physician services, x-ray
4. **Paramus, New Jersey** – 14,689 square feet housing physician services, x-ray, MRI, rehabilitation
5. **Stamford, Connecticut** – 18,500 square feet housing physician services, x-ray, MRI, minor procedures
6. **White Plains, Westchester County, New York** – 40,300 square feet housing physician services, x-ray, MRI, rehabilitation. An additional 27,925 square feet of shell space is being held for future development.
7. **West 58th Street, Manhattan, New York** – Under development, estimated to open in 2019, 42,000 square feet, housing physician services, x-ray, MRI, CT Scan, rehabilitation; located in the same building as West Side ASC (see section on Ambulatory Surgery Centers in this Appendix A)

In addition, Properties is in active lease negotiations for medical office space at two additional locations. If leases are ultimately executed, the space will be sublet to HSS and outpatient centers will be developed and operated as follows:

1. **Hudson Yards, Manhattan, New York** – Approximately 15,000 square feet housing physician services, x-ray, rehabilitation
2. **Brooklyn, New York** – Approximately 14,000 square feet housing physician services, x-ray, MRI, rehabilitation

**Ambulatory Surgery Centers**

In response to the growing trend of certain musculoskeletal outpatient surgeries shifting out of hospital settings to ambulatory surgery centers, along with the goal of enhancing alignment with its medical staff, HSS embarked on a strategy of partnering with its medical staff in the development and operations of ambulatory surgery centers. As certain outpatient surgical volume shifts to these ambulatory surgery centers, it creates capacity on the Main Campus for greater focus and concentration on complex inpatient and outpatient surgery. The following are current ambulatory surgery centers:

1. ASC of Manhattan, located in leased space on East 65th Street (approximately 0.7 miles from the Main Building), is a 22,000 square foot single specialty orthopedic ambulatory surgery center with four operating rooms. It commenced operations in September, 2017. See section

on HSS Consolidated Subsidiaries in this Appendix A for a summary of the organizational structure of ASC of Manhattan.

2.  West Side ASC, located in leased space on Manhattan's west side on West 58th Street (in the same building where HSS is developing an outpatient center), will be a 23,000 square foot single specialty orthopedic ambulatory surgery center with two operating rooms (with shell space to expand to four).  It is currently under development and is expected to commence operations in 2019.  See section on HSS Consolidated Subsidiaries in this Appendix A for a summary of the organizational structure of West Side ASC.

In addition, HSS operates "HSS Orthopedics at Tully" on its Stamford Campus (see section on Stamford Campus in this Appendix A), which has two ambulatory operating rooms and opened in March, 2017, and is developing an ambulatory surgery center on its Florida Campus (see section on Florida Campus in this Appendix A) which is expected to open with two operating rooms during the second half of 2019.

**Rehabilitation Programs**

Outpatient rehabilitation is an important component of the fully integrated musculoskeletal care that HSS provides to its patients.  HSS has a preferred provider network of over 160 independently owned and operated physical and occupational therapy providers located throughout the New York City Tri-State Area, Palm Beach County in Florida, and suburban Philadelphia ("Rehab Network").  Rehab Network membership criteria are based on HSS's standards and members are selected through a rigorous application and inspection process.  The Rehab Network provides patients with a resource to access HSS-caliber rehabilitative care near where they live or work.  The HSS Enterprise does not own or operate any of the members in the Rehab Network.

HSS is currently in negotiations for a collaboration agreement with an operator of physical therapy providers that, if consummated, will entail the  provision of rehabilitation-related clinical guidance and advisory services, admission of certain facilities into the Rehab Network, and collaborating to develop certain HSS-branded "Rehab Centers of Excellence", with HSS providing training and continuing guidance/oversight.

**Global Ventures**

Global Ventures, a division of HSS, engages in advisory relationships, management service arrangements, and operating collaborations to create a global network of leading orthopedic providers to bring HSS's cutting edge knowledge to the world.

1.  Advisory relationships – HSS shares its knowledge and best practices; Hospital Alvorada in Brazil and Bumin Hospital Group in South Korea are two current relationships, bearing the designation of HSS "Orthopedic Alliance Members", which requires meeting a certain set of standards that are monitored on an ongoing basis.
2.  Management service arrangements – HSS provides advisory services, as well as on-site management, training, and access to its clinical pathways and platforms.
3.  Operating collaborations – HSS collaborates on all orthopedic and related services, providing leadership, staff, and operational oversight and sharing in benefits and risks of such collaborations

The success of Global Ventures requires the time, efforts, and expertise of HSS's orthopedic surgeons in providing physician recruitment, training, advisory, and other value-added services. To facilitate a structure and environment that enable the necessary strategic and economic alignment, $HS^2$, LLC ("$HS^2$"), a limited liability company was organized under Delaware law in 2017. The purpose of $HS^2$ is to develop, own, and operate a surgeon talent management and services business that will support the initiatives of Global Ventures.  $HS^2$ is a joint venture among HSS (10.05% ownership interest) and 68

individual orthopedic surgeons on HSS's medical staff (89.95% ownership interest in the aggregate). HSS has equal Board representation on HS$^2$ and has requisite reserved powers and other rights.

Additionally, HSS is in exploratory discussions and doing preliminary assessments on a variety of other potential initiatives which may include joint ventures, affiliations, collaborations, and/or similar relationships to further expand HSS's global network.  In some of these cases, HSS has entered into substantively non-binding agreements and is not able to determine which, if any, of such potential transactions will come to fruition.

Building upon its strategic rationale for developing its outpatient centers-providing patients from its broad geographic service area with more convenient access to care and further growing market share-HSS also has two current operating collaborations with third-party partners to develop and operate other "Campuses" - Stamford Campus and Florida Campus.  HSS defines a "Campus" as a location providing a broad spectrum of HSS services, including operative care, non-operative care, diagnostics/imaging, and rehabilitation.

**Stamford Campus**

To meet historically strong and growing demand for HSS care from residents of Southern Connecticut and surrounding regions, in 2016, HSS executed a collaboration agreement with The Stamford Hospital ("SH"), an acute care hospital in Stamford Connecticut, and Stamford Health, Inc. ("SHI"), the sole member of SH.  The goal of the agreement is to develop an HSS-caliber program for musculoskeletal care in Stamford, CT (the "SH Collaboration"), where HSS also operates an outpatient center.  Under the SH Collaboration, subject to oversight and control of SH, HSS is managing the SH Department of Orthopedic Surgery and is managing and co-branding certain discrete orthopedic space and activities as follows:

- "HSS Orthopedics at Stamford Hospital" – fifth floor in the new SH hospital building opened in November, 2017.  The space contains two inpatient operating rooms (with room to expand to six) and 19 beds (with room to expand to 31).
- "HSS Orthopedics at Tully" – two ambulatory operating rooms in SH's Tully Center (an outpatient facility located 1.6 miles from the SH hospital building) opened in March, 2017.

Under the terms of the SH Collaboration, only surgeons employed by or otherwise affiliated with HSS's subsidiary, TJA Orthopedic Surgery, P.C. d/b/a HSS Orthopedics Stamford (or its subsidiary TJA Orthopedic Surgery & Medicine, PLLC d/b/a HSS Orthopedics), are permitted to perform surgery at HSS Orthopedics at Stamford Hospital and HSS Orthopedics at Tully.  Certain of these surgeons have their clinical practices based full time at HSS's nearby Stamford Outpatient Center and are performing the majority of their surgeries at HSS Orthopedics at Stamford Hospital or HSS Orthopedics at Tully.  HSS and SHI share in the gains and losses of the SH Collaboration.

**Florida Campus**

To meet historically strong and growing demand for HSS care from year-round and seasonal residents of Florida, in 2017 and 2018, the HSS Enterprise executed a series of agreements with Tenet Healthcare Corporation ("Tenet"), its affiliate, United Surgical Partners International ("USPI"), and certain other affiliates of Tenet and USPI to develop and operate an HSS-branded outpatient center in West Palm Beach, Florida (the "Florida Collaboration").  HSS will be responsible for implementing HSS quality of care protocols, as well as recruiting and credentialing the medical staff (including a Medical Director).  The Florida Collaboration is expected to serve a local, national, and international market and commence operations during the second half of 2019.  The primary components are as follows:

- Florida licensed musculoskeletal outpatient clinic providing physician services, x-ray, MRI, and rehabilitation ("Florida Clinic"). HSS-Florida Physicians, LLC, an HSS consolidated subsidiary

(see section on HSS Consolidated Subsidiaries in this Appendix A), will own and operate the Florida Clinic.

- Single specialty orthopedic ambulatory surgery center expected to open with two operating rooms, with shell space to expand to four ("Florida ASC").  The Florida ASC will be jointly owned by HSS and an affiliate of USPI (collectively a minimum of 51%), and individual surgeon investors (maximum of 49% in the aggregate).  The USPI affiliate holds a controlling ownership interest, however HSS and the USPI affiliate will jointly manage the Florida ASC.
- Real estate joint venture (*300 PBL Development LLC*) to acquire land and construct the medical office facility that will house the Florida Clinic and the Florida ASC.  The land was acquired in 2017.  An affiliate of USPI and HSS's affiliate (HSS Properties Corporation) each own a 50% interest, and the USPI affiliate will manage the day-to-day operations.

In addition, HSS has entered into an Orthopedics service line management services agreement with Good Samaritan Medical Center, which is owned by Tenet and located across the street from the site where the outpatient center is being constructed. This agreement does not include HSS branding.

[Remainder of Page Intentionally Left Blank]

A-9

**Service Area and Market Share**

     HSS's primary service area consists of the five boroughs of New York City (Manhattan, Queens, Brooklyn, Bronx and Staten Island). The secondary service area consists of the New Jersey counties of Sussex, Passaic, Bergen, Warren, Morris, Essex, Hudson, Hunterdon, Somerset, Union, Middlesex, and Monmouth; Long Island (Nassau and Suffolk counties), Northern New York counties of Westchester, Putnam, Rockland and Orange; and Fairfield County in Connecticut.  Collectively, the primary service area and secondary service area are referred to as the "New York City Tri-State Area".  The following is a map of the New York City Tri-State Area, along with locations of facilities in the HSS clinical delivery system:



HSS has a broad geographic service area.  In 2017, only 6% of HSS's inpatient discharges were from patients residing in the Upper East Side of Manhattan community surrounding the Main Campus, 80% were from the rest of the New York City Tri-State Area, and 14% were from patients residing outside the New York City Tri-State Area (including 2% international).  This geographic mix has been relatively stable over the three year period from 2015 to 2017.  The following table summarizes HSS's inpatient discharges by service area for 2015-2017.

### Table A
### HSS Inpatient Discharges by Service Area

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| **Primary Service Area** |  |  |  |
| Manhattan [1] | 16% | 16% | 15% |
| Brooklyn | 7% | 7% | 7% |
| Queens | 6% | 6% | 7% |
| Staten Island | 3% | 3% | 3% |
| Bronx | 2% | 2% | 2% |
|  | **34%** | **34%** | **34%** |
|  |  |  |  |
| **Secondary Service Area** |  |  |  |
| Northern / Central NJ | 19% | 19% | 19% |
| Long Island | 17% | 17% | 18% |
| Northern NY Suburbs | 11% | 11% | 11% |
| Fairfield CT | 5% | 5% | 4% |
|  | **52%** | **52%** | **52%** |
|  |  |  |  |
| **Beyond New York City Tri-State Area** |  |  |  |
| National | 12% | 12% | 12% |
| International | 2% | 2% | 2% |
|  | **14%** | **14%** | **14%** |
|  |  |  |  |
| **Total** | **100%** | **100%** | **100%** |

[1]   In 2017, 6% of inpatient discharges were from patients residing in the community surrounding the Main Campus on Manhattan's Upper East Side.

Source: HSS records

The New York City Tri-State Area is a broad geographic area with a population of approximately 20 million people and a diverse competitive landscape.  Based on its analysis, HSS has leading market shares throughout the New York City Tri-State Area for non-emergent inpatient orthopedic surgery:

1.   #1 in Manhattan – 29% (#2 hospital is 11%)
2.   #1 in New York City – 15% (#2 hospital is 10%)
3.   #2 in Northern/Central NJ – 10% (#1 hospital is 12%)
4.   #1 in Long Island – 15% (#2 hospital is 8%)
5.   #1 in Northern NY Suburbs – 15% (#2 hospital is 6%)
6.   #3 in Fairfield CT – 12% (#1 hospital is 18%, #2 is 16%)

**Research Institute**

The Research Institute, a division of HSS, has long been at the forefront of basic and translational science in the field of musculoskeletal health. Its clinical and basic research programs facilitate and accelerate the development of better patient outcomes, novel treatments, knowledge, and commercial innovations that address the needs of musculoskeletal patients. Among its achievements are:

- Design and development of the first modern total knee replacement, and current global standard
- Identification of biomarkers that may predict orthopedic implant loosening
- Linking the signaling pathway to rheumatoid arthritis, which led to an FDA-approved therapy to stop the disease's symptoms and progression

With more than 300 scientists and support staff working across 20 laboratories and clinical support services, and 2017 expenditures in excess of $42 million, the Research Institute is expanding to address three critical areas:

- **Prevention of tissue degeneration.** Investigating the mechanical factors and molecular pathways that cause injuries, stress, inflammation and aging to compromise musculoskeletal tissues. One example is the landmark discovery by scientists at HSS of the link between interferon, a protein involved in immune system activation and inflammation, and lupus; the Research Institute is now exploring revolutionary ways to inhibit interferon-related molecular pathways, preventing the immune system from attacking its own tissues in lupus and other autoimmune diseases.
- **Tissue repair.** Using approaches that integrate basic science, genomics and precision medicine, the Research Institute is investigating poor tissue healing in orthopedic conditions, arthritis and autoimmune diseases. The aim is to help the body heal itself, developing new therapies that target inflammation and growth pathways to repair the musculoskeletal system. One example is the identification by HSS scientists of molecules and pathways important for the function of cells that repair bones, cartilage and muscles; this is leading toward the development of new therapeutic approaches to restore function to patients with arthritis and prevent major surgical complications, such as implant loosening.
- **Tissue regeneration.** Working with tissue too damaged for current medicines to treat, HSS is working to rejuvenate and replace destroyed tissue to restore mobility by combining disciplines from orthopedics, tissue engineering, developmental biology, epigenetics, stem cell reprogramming, and imaging. One current example is that scientists at HSS are developing new biomaterials such as scaffolds and hydrogels that can be seeded with stem cells to create replacements for injured or degenerated soft tissue, including knee meniscus (cartilage) and tendons; these biomaterials are customized, and can integrate seamlessly into the native knee.

The work of the Research Institute has been featured in some of the most esteemed journals reporting on the field, published in *The Journal of the American Medical Association, Nature Immunology, The Journal of Clinical Investigation,* and *The Journal of Bone and Joint Surgery*.

**Global Innovation Institute**

Invention at HSS stems from high concentrations of musculoskeletal volume and complexity propelled by enduring focus and specialization.  Scale enables an advantaged understanding of increasingly granular opportunities for improvement.  Expertise creates disproportionate exposure to the most complex challenges, which inspire and invite increasingly advanced solutions. HSS has had a long history and strong culture of invention, and in 2016 the Global Innovation Institute (a division of HSS) was formed to develop the strategic vision, infrastructure, and processes to accelerate the rate and impact of innovation, as well as the cultivating and commercializing of intellectual property and other inventions.

The Global Innovation Institute focuses on facilitating the development and utilization of new drugs, therapeutics, devices, and musculoskeletal care delivery solutions, including in the fields of digital and mobile health. It enters into agreements with outside organizations whereby HSS's proven areas of scientific, clinical and operational expertise, as well as best practices in care delivery are applied in the development of technologies, products, and services that will enhance the delivery of medicine and patient care in orthopedics, rheumatology, and their related disciplines.  These outside organizations include betterPT, Docent Health, and Imagen to name a few.  Shared bench-to-bedside insights and experiences have led to new discoveries, technologies, and systems to diagnose, heal and prevent disease. HSS's surgeons and engineers have collaborated to develop joint replacements for the hip, knee, ankle, shoulder, elbow and wrist, as well as devices for enhancing spine fusion and improving spinal stabilization.  HSS has also led the way in the role of co-developer and co-collaborator for numerous transformative digital health technologies which could affect care delivery around the globe.

Through the Global Innovation Institute, the concepts and inventions developed at HSS can continue facilitating industry interactions and creating marketable products that will advance and improve the care of patients worldwide.  The Global Innovation Institute satisfies its objectives by entering into a variety of agreements with co-collaborators and developers in the industry, whether through collaboration, license, equity, royalty, and/or similar terms designed to incentivize innovation and invention.  For agreements that require the efforts, time, and expertise of HSS's orthopedic surgeons, the Global Innovation Institute may engage HS2.  In some case, the Global Innovation Institute may refer to the Research Institute components of a collaboration or similar relationship that require industry sponsored research, pre-clinical product testing, post-market product validation, and/or clinical trials.

The culture of innovation at HSS is accelerating as 130 and 112 new idea submissions were made to the Global Innovation Institute in 2017 and 2016, respectively (45 submissions were made in 2015). During 2016 and 2017, a total of 63 patents were filed, with 14 being issued to date and the majority of the rest in various stages of the approval process through the U.S. Trademark and Patent Office. HSS has a total of 63 patents.

**Education Institute**

HSS is the world's leading provider of education on the topic of musculoskeletal health.  Its 6,500-page website attracts approximately six million unique visitors per year.  HSS eAcademy® online learning platform offers more than 600 courses to more than 21,000 medical professional members.  In 2017, 150 new academic offerings were produced with over 5,000 program participants.  The International Society of Orthopedic Centers (ISOC) was founded by HSS in 2006 to facilitate the exchange of ideas and best practices, and now comprises 21 premier orthopedic specialty centers in 17 countries.

A historic commitment to excellence in education continues to influence HSS's present day mission and vision.  Since 1887, the orthopedic residency program at HSS has set the standard for orthopedic resident training all over the country.  HSS is a teaching affiliate of Weill Cornell Medical Center ("WCMC") and physicians on the HSS medical staff are on the WCMC faculty.  HSS's residency

program, which currently has 47 residents, receives over 650 applications for nine open slots each year. The program has been rated the number one orthopedic residency program by Doximity for three years in a row.

In 2017, HSS engaged 99,450 individuals in educational programs. In addition to its orthopedic residency program, HSS trained 70 fellows, 69 medical students, and 451 Graduate Medical Education trainees from other institutions. Resident, fellows, and medical students are trained in Orthopedic specialties that include but are not limited to sports medicine, hand surgery, foot and ankle surgery, spine surgery/scoliosis, adult reconstruction, metabolic bone, limb lengthening, trauma, and pediatric orthopedic surgery, as well as the specialties of musculoskeletal radiology, rheumatology, neurology, physiatry, sports medicine, and anesthesiology. State-of-the-art training and simulations are provided in HSS's Bioskills Education Laboratory.

The active Alumni Association (consisting of graduates of HSS training programs) spans the globe with over 2,000 members located in 31 foreign countries and 47 U.S. States. In addition to these training programs, HSS supports an Academic Visitors Program where physicians from around the world come to HSS to observe and learn advanced surgical techniques. In 2017, HSS hosted 427 Academic visitors. HSS also has academic collaborations in China, Greece, India, and Austria.

**Information Technology**

HSS and its medical staff went live in early 2016 on Epic's fully integrated electronic medical record and revenue cycle system. The implementation was completed on time and on budget, with a total capital investment of $74.4 million and with minimal impact on revenue collections during the "post-live" period. HSS received an "Excellent" rating from Epic within the first six months of "go-live", placing it in the top 7% of all Epic implementations. In addition, HSS was awarded HIMSS Stage 7 inpatient certification (less than 5% of U.S. hospitals are awarded this certification).

Core principles of information technology investment going forward are:
- Strong technology infrastructure and systems supporting the HSS care delivery model, research, and education, as well as the Strategic Roadmap
- Focus on optimization of the functionality of Epic and other current "core" systems
- Information security program, including dedicated information technology leadership and active executive management engagement throughout HSS
- Robust business intelligence and data analytics
- Structured governance, led by clinical and operational leadership prioritizes projects

**HSS Enterprise**



**HSS revenues represent approximately 98% of HSS Enterprise revenues. HSS is the only entity that is currently obligated with respect to repayment of its indebtedness, including the Series 2018 Bonds offered by this Offering Memorandum. None of the assets or revenue of any of the other entities described above and included in the combined financial information below is committed to the repayment of HSS's indebtedness.**

**HSS Consolidated Subsidiaries**

*HSS's consolidated subsidiaries are those entities in which HSS has a controlling interest. These entities are included in HSS's consolidated financial statements prepared in accordance with U.S. generally accepted accounting principles, but are not legally obligated on HSS's indebtedness.*

*Hospital for Special Surgery Ambulatory Surgery Center of Manhattan, LLC ("ASC of Manhattan")* is a limited liability company organized in 2014 under the laws of the State of New York for the purpose of developing and operating a single specialty orthopedic ambulatory surgery center. HSS owns 51% of ASC of Manhattan and the remaining 49% is owned by 20 individual surgeons from HSS's medical staff.

*Hospital for Special Surgery West Side Ambulatory Surgery Center, LLC ("West Side ASC")* is a limited liability company organized in 2016 under the laws of the State of New York for the purpose of developing and operating a single specialty orthopedic ambulatory surgery center. HSS owns 67% of West Side ASC and the remaining 33% is owned by four individual surgeons from HSS's medical staff.

*TJA Orthopedic Surgery, P.C.,* is a professional corporation and *TJA Orthopedic Surgery & Medicine, PLLC* is a professional limited liability company organized in 2016 and 2017, respectively under the laws of the State of New York. These entities were formed for the purpose of providing professional medical services in the State of Connecticut in connection with a collaboration agreement

with Stamford Health (see section on Stamford Campus in this Appendix A).   TJA Orthopedic Surgery, P.C., is 100% owned by HSS's Surgeon-in-Chief, as HSS's designee, and is the sole member of TJA Orthopedic Surgery & Medicine, PLLC.   An application for exemption from federal income taxation has been submitted on behalf of TJA Orthopedic Surgery, P.C. and is pending before the IRS.

*HSS-Florida Physicians, LLC* is a limited liability company organized in 2018 under the laws of the State of Florida for the purpose of developing and operating a Florida licensed musculoskeletal outpatient clinic in South Florida.  HSS owns 51% of HSS-Florida Physicians, LLC and 49% is owned by Tenet Florida Physicians, LLC, an affiliate of Tenet.  See section on Florida Campus in this Appendix A.

### The Hospital for Special Surgery Fund, Inc. and Consolidated Subsidiaries

*The following is a description of The Hospital for Special Surgery Fund, Inc. and its currently active consolidated subsidiaries. None of these entities are legally obligated on HSS's indebtedness.*

*The Hospital for Special Surgery Fund, Inc.* ("HSS Fund, Inc.") is a not-for-profit corporation organized in 1984 under the laws of the State of New York for the purpose of supporting the charitable, educational, and scientific purposes of HSS and other related healthcare organizations.  The HSS Fund, Inc. Board of Trustees appoints its members, who are required to be members of HSS's Board of Trustees.

*HSS Properties Corporation ("Properties")* is a not-for-profit corporation organized in 1984 under the laws of the State of New York.  Properties owns, leases, and operates real estate for HSS Enterprise purposes.  With the exception of the Main Building, Research Building, and the Pavilion (which are all owned by HSS), all HSS Enterprise real estate is either owned or leased by Properties.  Such real estate utilized in the operations of HSS, ASC of Manhattan, and West Side ASC is leased (or sub-leased) by Properties to those entities.  HSS Fund, Inc. is the sole member of Properties.

*Medical Indemnity Assurance Company, Ltd. ("MIAC")* is a corporation licensed under Cayman Islands law organized in 1981 to conduct an insurance and reinsurance business.  MIAC's activities are the insurance and reinsurance of portions of HSS Enterprise workers' compensation, professional and comprehensive general liability risks together with the medical malpractice liability risks of a majority of HSS's medical staff.  Insureds in MIAC are also covered for billing errors and omissions and information security/privacy liability policies which are purchased commercially.  HSS Fund, Inc. owns all of the outstanding stock of MIAC.  MIAC's Board of Directors is composed of four directors, including two HSS management representatives, one HSS Board member, and one HSS attending physician (ex officio, the Surgeon-in-Chief of HSS).

### Governance

HSS is governed by a Board of Trustees consisting of 45 elected and eight ex officio members.  There is currently one vacancy.  There are five classes of elected Board members serving staggered five year terms and one class of elected physician members (consisting of two physicians) serving staggered two year terms.  In addition, there are Life Trustees who, although not entitled to vote, do receive Board materials, may attend Board meetings, and may serve on Board committees.

Regular meetings of the Board of Trustees are generally scheduled five times per year (including the annual meeting).  Officers, consisting of one Chair, three Vice-Chairs, the President and Chief Executive Officer, a Medical Director, a Deputy Medical Director, and three Executive Vice Presidents (including a Treasurer and a Secretary), are elected by the Board at its annual meeting. The following are active committees of the Board:

Audit and Corporate Compliance Committee
Community Benefit & Services Committee
Development Committee
Executive Committee
Executive Compensation Committee
Finance Committee
Governance Committee
Investment Committee
Quality/Better Committee
Research Committee

The present members of the Board including their affiliations and year appointed are listed below:

| Name | First Year of Service [6] | Affiliation |
|------|--------------------------|-------------|
| Kendrick R. Wilson III [1] | 1998 | BlackRock |
| Michael Esposito [2] | 2010 | Goldman Sachs & Company [5] |
| Thomas Lister [2] | 2011 | Permira Advisers LLC |
| Deirdre Stanley [2] | 2011 | Thomson Reuters |
| James M. Benson | 1996 | Benson Botsford, LLC |
| Daniel C. Benton | 2011 | Andor Capital Management, LLC |
| Herbert Black | 2013 | American Iron & Metal Company |
| Michael C. Brooks | 2008 | Venrock |
| Kathryn Chenault | 2011 | Trustee / Civic Leader |
| Charles P. Coleman III | 2006 | Tiger Technology Management |
| Leslie Cornfeld | 2008 | Harvard Kennedy School of Government |
| Cynthia Foster Curry | 2009 | Colliers International NY LLC |
| Barrie M. Damson | 2002 | Damson Financial Resources, Inc. |
| James G. Dinan | 2009 | York Capital Management |
| Anne Ehrenkranz | 2010 | Trustee / Civic Leader |
| Marina Kellen French | 2013 | Trustee / Civic Leader |
| Steven B. Haas, M.D. [4] | 2016 | Hospital for Special Surgery |
| Craig Ivey | 2011 | Retired, Consolidated Edison Co. of New York |
| Winfield P. Jones [3] | 1976 | Retired, Jones Hirsch Connors & Bull |
| Warren B. Kanders | 2015 | Kanders & Company |
| Scott Kapnick | 2017 | HPS Investment Partners, LLC. |
| Monica Keany | 2006 | Trustee / Civic Leader |
| Thomas J. Kelly, MD, PhD | 2010 | Sloan-Kettering Institute for Cancer Research |
| David H. Koch | 2004 | Koch Industries |
| Sacha Lainovic | 2017 | Invus Financial Advisors, LLC |
| Laurie Hodges Lapeyre | 2014 | Trustee / Civic Leader |
| Pablo Legorreta | 2015 | Royalty Pharma |
| Lara Lerner | 2007 | Trustee / Civic Leader |
| Kathy Leventhal | 2015 | Trustee / Civic Leader |
| Marylin B. Levitt | 2000 | Trustee / Civic Leader |

A-17

| | | |
|---|---|---|
| Alan S. MacDonald | 1988 | Citibank |
| David H. McCormick | 2017 | Bridgewater Associates, L.P. |
| Mary Kathryn Navab | 2016 | Trustee / Civic Leader |
| Terence O'Toole | 2016 | Tinicum Incorporated |
| Gordon B. Pattee [7] | 2008 | MAP Capital Corporation |
| Joel Press, M.D. [4] | 2017 | Hospital for Special Surgery |
| Steven Rattner | 2016 | Willett Advisors, LLC |
| Susan W. Rose | 2005 | Trustee / Civic Leader |
| Thomas P. Sculco, M.D. | 1995 | Hospital for Special Surgery |
| Jonathan Sobel | 2009 | Flexpoint Ford, LLC |
| Robert K. Steel | 2009 | Perella Weinberg Partners, L.P. |
| Patricia G. Warner | 1999 | Trustee / Civic Leader |
| Sanford I. Weill | 2012 | S. I. Weill |
| Ellen M. Wright | 2008 | Interior Design |

---

[1.]   Chair
[2.]   Co-Vice Chair
[3.]   Chairman, Emeritus
[4.]   Member of a specific Physician Class to which an HSS physician is appointed every two years
[5.]   Goldman Sachs & Co. LLC is the lead underwriter for the  Series 2018 Bonds offered by this Offering Memorandum
[6.]   Trustees, other than ex officio members and Physician class members, are limited to three consecutive five year terms of service with limited exceptions, unless and until one year has passed following the Trustee's last date of service
[7.]   Also serves on the Board of Governors of the Foundation and the Board of Trustees of NYPH in accordance with the CRA with NYPH

### *Ex Officio Board Members*

| **Name** | **First Year of Service** | **Affiliation** |
|---|---|---|
| Todd J. Albert, M.D. | 2014 | Surgeon-in-Chief of HSS |
| Mary K. Crow, MD | 2010 | Physician-in-Chief of HSS |
| Robert N. Hotchkiss. M.D. [1] | 2013 | Orthopedic Surgeon, HSS [3] |
| Lionel Ivashkiv, M.D. | 2015 | Chief Scientific Officer/Director of Research Institute |
| Michael Parks, M.D. | 2016 | Clinical Director of Orthopedic Surgery |
| William M. Ricci, M.D. [1] | 2017 | Director of Orthopedic Trauma Service of HSS/NYPH |
| Louis A. Shapiro | 2006 | President and Chief Executive Officer |
| Robert Yaffa [1] | 2015 | Chair of the Board of Advisors [2] |

---

[1] Non-voting member
[2] HSS Board of Advisors is an advisory body
[3] Elected by HSS orthopedic surgeons in 2013

### Affiliations

In 1999, HSS and New York Presbyterian Hospital ("NYPH") entered into a Corporate Relationship Agreement (the "CRA") that reaffirmed HSS's medical and clinical affiliation with NYPH. Under the CRA, HSS became a membership corporation consisting of five members, with three required to be from HSS's Board of Trustees (and one of the three to also serve on the Board of NYPH).  The members have the authority to elect HSS's Board of Trustees, as nominated by the Governance

Committee of HSS's Board of Trustees.  While the affiliation established a more integrated governance and clinical structure, each entity maintains a separate corporate existence and operates independently. HSS's net assets remain under HSS's control.

Concurrently with the CRA, HSS also entered into a new agreement with WCMC that established the orthopedics department at HSS as the Department of Orthopedics at WCMC.  Additionally, HSS, NYPH, and WCMC developed a tri-partite agreement pertaining to the academic affiliation of the institutions, which maintains and enhances the historical clinical and academic relationship among the parties.

**Conflicts of Interest**

HSS's Conflict of Interest Policy and Procedures require all Board members, members of Board committees, officers, Medical Staff and Allied Professional Staff members, Research Professional Staff, management and other key personnel to complete Financial Interest Disclosure Statements on at least an annual basis and to update such Disclosure Statements whenever there is a change to any of the information disclosed.  Additional disclosure requirements apply with respect to the conduct of research and continuing medical education programs at HSS and with respect to any transaction or arrangement in HSS's day-to-day operations that might benefit the private interest of a person in the categories listed above.

Further, with respect to particular matters under Board consideration, Board members must disclose all potential conflicts of interest and such disclosures are then made a matter of record.  In addition, a Board member who has any such potential conflict of interest is excluded from the attendance count required for determining whether a quorum is present and may not participate in the deliberation or vote on the matter under consideration, nor may he or she use personal influence on such matter.

**Executive Management**

The executive management of HSS includes of the President and Chief Executive Officer, the Surgeon-in-Chief, the Executive Vice President and Chief Operating Officer, the Executive Vice President and Chief Financial Officer, the Executive Vice President and Chief Legal Officer, the Senior Vice President of Patient Care Services and Chief Nursing Officer, and the Senior Vice President of Human Resources and Service Excellence.

***Louis A. Shapiro*** (age 58) – President and Chief Executive Officer joined HSS in 2006.  He is responsible for overseeing all strategic and operational aspects of HSS and fulfilling its mission to advance the field of musculoskeletal medicine through world class patient care, research and education. Under Mr. Shapiro's leadership, HSS has experienced significant growth, expansion of facilities and recognition as the world leader in its specialty areas of orthopedics, rheumatology and their related disciplines.  Mr. Shapiro has more than 30 years of healthcare experience, including as Executive Vice President and Chief Operating Officer of Geisinger Health System in Pennsylvania, and as a leader in the healthcare practice at McKinsey & Company. He began his career at Allegheny General Hospital in Pittsburgh, where he served in a number of capacities.  In the past, Mr. Shapiro has served as Board Chairman of the Greater New York Hospital Association, for which he continues to serve on the Executive Committee.  He also serves on the Board of Crutches for Kids and Move Mountains Foundation and Prep for Prep.  Mr. Shapiro earned his BS and MHA degrees from the University of Pittsburgh.

***Todd J. Albert, M.D.*** (age 56) - Surgeon-in-Chief joined HSS in 2014.  He presently holds the Korein-Wilson Chair in Orthopedic Surgery and serves as Chief Medical Officer, as well as serving as Chairman of the Department of Orthopedic Surgery and as a Professor of Orthopedic Surgery at WCMC.  Formerly Chairman of the Department of Orthopedics and  President of The Rothman Institute at Thomas Jefferson

University Hospital in Philadelphia, he is renowned as one of the nation's leading orthopedic surgeons specializing in cervical spine conditions. He is Past President of The Cervical Spine Research Society, Past Chair of The International Meeting of Advanced Spinal Techniques (IMAST) for the Scoliosis Research Society, and past Chair of Development for the American Orthopedic Association. He is President of the Scoliosis Research Society. Dr. Albert has published over 375 scientific articles, authored over 80 book chapters, presented his research both nationally and internationally, and served as chairman at numerous courses. He has published seven textbooks on Spinal Surgery and serves on the boards of several scholarly journals. Dr. Albert graduated magna cum laude from Amherst College, received his doctor of medicine degree from the University Of Virginia School Of Medicine, completed his residency in Orthopedic Surgery at Thomas Jefferson University Hospital where he was named outstanding chief resident, and performed a fellowship in spinal surgery at the Minnesota Spine Center.

*Lisa A. Goldstein* (age 62) - Executive Vice President and Chief Operating Officer joined HSS in 1997. Prior to joining HSS, Ms. Goldstein served as Vice President and Chief Operating Officer at Wayne General Hospital in Wayne, New Jersey. Ms. Goldstein was also Vice President, Operations at Hackensack University Medical Center and Assistant Director at Jewish Hospital and Medical Center of Brooklyn. She received her Bachelor of Science Degree in Industrial and Labor Relations from Cornell University in 1977 and her Master's Degree in Health Services Administration from Johnson Graduate School of Management at Cornell University in 1979.

*Stacey L. Malakoff* (age 54) - Executive Vice President and Chief Financial Officer joined HSS in 1990 and was appointed to her current position as Executive Vice President and Chief Financial Officer in 1998. Prior to joining HSS, Ms. Malakoff served as manager in the audit division of Ernst & Young LLP. She is a member of the New York State Society of CPAs, the American Institute of CPAs, the Greater New York Hospital Association's Audit & Finance and Investment Committees, and an advanced member of the Healthcare Financial Management Association. In 2001, she was honored by Crain's Magazine in their "40 under 40" issue listing of top executives in the New York City area. She has been listed on the Becker's Hospital Review "Hospital & Health System CFO's to Know" for the past five consecutive years and its annual list of "130 Women Hospital & Health System Leaders to Know" for 2016 and 2017. She received her Bachelor of Science Degree in Business Administration from Washington University in Saint Louis, MO in 1985 and was licensed as a Certified Public Accountant in 1987.

*Irene M. Koch* (age 53) – Executive Vice President and Chief Legal Officer joined HSS in 2015. Prior to joining HSS, Ms. Koch held leadership positions at two regional health information organizations in New York City, serving as Executive Vice President and General Counsel at Healthix, Inc. and Executive Director at Brooklyn Health Information Exchange (BHIX). Ms. Koch received a Bachelor of Arts degree from Cornell University in 1986 and a J.D. degree from Fordham University School of Law in 1989. She is a member of the Bar of New York.

*Stephanie J. Goldberg* (age 65) – Senior Vice President and Chief Nursing Officer joined HSS in 2005. Prior to joining HSS, Ms. Goldberg held management positions at Hackensack University Medical Center. She also served in the United States Navy as an Ensign assigned to the Charleston, South Carolina Naval Hospital. Ms. Goldberg is an Advanced Certified Nurse Administrator and is affiliated with the New York Organization of Nurse Executives, American Organization of Nurse Executives, Sigma Theta Tau, and the American Nurses Credentialing Center. She is a Magnet Surveyor for the American Nurses Credentialing Center. She received a nursing diploma from Holy Name Hospital School of Nursing, a Bachelor of Science in Nursing from William Paterson University, and a Masters of Science in Nursing from Rutgers University.

*Bruce M. Slawitsky* (age 63) – Senior Vice President of Human Resources and Service Excellence, joined HSS in 2005 as Assistant Director of Organizational Learning. He was promoted to Vice President of Human Resources and Service Excellence in 2009. Prior to joining HSS, Mr. Slawitsky was Director of

Organizational Development at Hackensack University Medical Center. He served three years as a Baldrige Examiner.   He received a Bachelor of Arts degree from the University of Scranton, a Master's degree (cum laude) in International Relations from The Hebrew University of Jerusalem, and a Master of Administrative Science degree from Fairleigh Dickinson University.

**Medical Staff**

The following is a summary, by specialty, of HSS's active medical staff as of December 31, 2017, along with combined inpatient and ambulatory surgery volume (includes medical staff practicing at the Stamford Campus, along with related volumes):

**Table B**
**Medical Staff**

| Specialty | Number of Physicians | Board Certified | Combined Inpatient and Ambulatory Surgery Volume | | |
|---|---|---|---|---|---|
| | | | 2017 | 2016 | 2015 |
| **Orthopedics** | | | | | |
| Adult Reconstruction and Joint | 26 | 24 | 10,826 | 9,965 | 9,913 |
| Foot and Ankle | 9 | 8 | 2,627 | 2,640 | 2,611 |
| Hand and Upper Extremity | 10 | 10 | 2,869 | 2,639 | 2,899 |
| Limb Lengthening | 2 | 2 | 558 | 596 | 630 |
| Metabolic Bone Disease | 1 | 1 | 14 | 29 | 28 |
| Pediatrics | 9 | 8 | 1,041 | 971 | 952 |
| Spine | 17 | 17 | 3,703 | 3,552 | 3,324 |
| Sports | 28 | 27 | 10,032 | 9,945 | 9,923 |
| Trauma | 6 | 6 | 881 | 771 | 740 |
| | 108 | 103 | 32,551 | 31,108 | 31,020 |
| **Other Specialties** | | | | | |
| Anesthesiology | 57 | 55 | | 3 | 4 |
| Neurology | 9 | 9 | | | |
| Pain Management | 10 | 10 | 15 | 24 | 45 |
| Pathology | 6 | 6 | | | |
| Pediatric Medicine | 2 | 2 | | | |
| Physiatry | 18 | 18 | | | 1 |
| Primary Sports Medicine | 12 | 12 | | | |
| Radiology | 24 | 24 | | | |
| Rheumatology/Medicine[1] | 64 | 63 | 10 | 19 | 21 |
| Other | 6 | 4 | 16 | 20 | 14 |
| | 208 | 203 | 41 | 66 | 85 |
| **Total** | **316** | **306** | **32,592** | **31,174** | **31,105** |

[1] Rheumatology/Medicine includes Hospitalists, Internists, Endocrinologists and Infectious Disease.

The average age of the medical staff is 53.  Generally, HSS requires members of the medical staff to be Board certified.  The Board of Trustees has the authority to waive this requirement if the physician's other qualifications demonstrate comparable competence and it deems such waiver to be in the best interests of patient care.  The Board of Trustees has waived the requirement for three physicians who are not yet eligible for Board certification and for seven other physicians for a variety of other reasons, for

example, certain international-trained physicians and physicians who have Board certification equivalency.

The substantial majority of the active medical staff practice full time at the Main Campus and/or at one of HSS's outpatient centers pursuing patient care, research, education, and HSS administrative, activities. Physicians are generally (with limited exception) either employed on a full-time basis (sometimes referred to as "employed physicians") or employed part-time only for their teaching, administrative and research services (sometimes referred to as "independent physicians"). Physicians who are employed on a full-time basis conduct substantially all of their professional activities, including their clinical practice, as employees of HSS. Physicians who are employed part-time to provide teaching, administrative, and research services to HSS conduct their clinical activities as independent private practices and pay fair market value rent to HSS for space and other resources utilized in their private practice.

In addition to the active medical staff, there are over 300 physicians who hold appointments at NYPH and are on HSS's medical staff as consulting physicians. These consulting physicians are in specialties other than those of HSS's active medical staff and generally do not have admitting privileges at HSS.

**Utilization**

To achieve its goals in patient care, HSS and its medical staff are singularly focused on delivering fully integrated musculoskeletal care across the care continuum. This includes operative care, non-operative care, diagnostics/imaging, and rehabilitation. HSS also operates for its patients over 30 outpatient clinics on the Main Campus which provide specialized musculoskeletal care and programs. HSS has a track record of consistent growth, with average annual growth of 5% in surgical volume over the past ten years.

In 2017, approximately 64% of HSS's net patient revenue (excluding revenue from physician professional services) was from inpatient volume (98% of which is surgical) and another 16% was from ambulatory surgery volume. HSS does not have an emergency room, so the substantial majority of inpatient and outpatient surgical volume are elective surgeries performed by HSS's orthopedic surgeons. The remaining 20% of HSS's net patient revenue was from other outpatient services provided on the Main Campus and HSS's outpatient centers, including clinic visits, MRI and other imaging services, rehabilitation, and laboratory services.

Tables C1, C2, and C3 set forth selected key utilization and capacity statistics of the HSS Enterprise, along with the Stamford Campus, for the years ended December 31, 2017, 2016 and 2015.

**Table C1**

**Selected Utilization Statistics**

| | Year Ended December 31 | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| **Inpatient and Ambulatory Surgery Volume** | | | |
| **Inpatient:** | | | |
| Main Campus | 16,303 | 15,792 | 15,623 |
| Stamford Campus [(1)] | 57 | | |
| Combined – HSS Enterprise and Stamford Campus | 16,360 | 15,792 | 15,623 |
| | | | |
| **Ambulatory Surgery:** | | | |
| Main Campus | 15,787 | 15,382 | 15,482 |
| ASC of Manhattan (commenced operations September 2017) | 288 | | |
| Sub-total HSS Enterprise | 16,075 | 15,382 | 15,482 |
| Stamford Campus [(1)] | 157 | | |
| Combined – HSS Enterprise and Stamford Campus | 16,232 | 15,382 | 15,482 |
| | | | |
| **Total Inpatient and Ambulatory Surgery:** | | | |
| HSS Enterprise | 32,378 | 31,174 | 31,105 |
| Stamford Campus [(1)] | 214 | | |
| Combined - HSS Enterprise and Stamford Campus | 32,592 | 31,174 | 31,105 |

[(1)]   HSS Orthopedics at Stamford Hospital commenced operations in November 2017 and HSS Orthopedics at Tully commenced operations in March 2017.  Data provided by Stamford Hospital.  HSS and Stamford Hospital share in the gains and losses of the SH Collaboration, with HSS share reflected in other operating revenue on HSS's audit consolidated financial statements.

**Table C2**

**Selected Utilization Statistics**

| | Year Ended December 31 | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| **# of Operating Rooms (at year end)** | | | |
| Main Campus | 39 | 36 | 36 |
| ASC of Manhattan (commenced operations September 2017) | 4 | | |
| Sub-total HSS Enterprise | 43 | 36 | 36 |
| Stamford Campus [(1)] | 4 | | |
| Combined – HSS Enterprise and Stamford Campus | 47 | 36 | 36 |
| **Inpatient Bed Occupancy** | | | |
| **Main Campus:** | | | |
| Licensed Beds (at year end) | 215 | 215[(2)] | 215[(2)] |
| Average Length of Stay | 3.18 | 3.36 | 3.46 |
| Occupancy Rate | 67% | 69% | 74% |
| | | | |
| **Stamford Campus Licensed Beds (at year end) [(1)]** | 19 | | |
| | | | |
| **# of MRIs (at year end)** | | | |
| Main Campus | 11 | 10 | 10 |
| Outpatient Centers | 4 | 3 | 2 |
| Total | 15 | 13 | 12 |

(1)   HSS Orthopedics at Stamford Hospital commenced operations in November 2017 and HSS Orthopedics at Tully commenced operations in March 2017.  Data provided by Stamford Hospital.  HSS and Stamford Hospital share in the gains and losses of the SH Collaboration, with HSS share reflected in other operating revenue on HSS's audit consolidated financial statements.
(2)   209 beds in operations.

**Table C3**

**Selected Utilization Statistics**

|  | Year Ended December 31 | | |
|---|---|---|---|
|  | **2017** | **2016** | **2015** |
| **Other Outpatient Statistics** | | | |
| **By Service:** | | | |
| Clinic Visits | 25,741 | 23,202 | 25,142 |
| MRI | 40,754 | 38,809 | 37,320 |
| Other Visits | 347,342 | 325,825 | 325,652 |
| Total | 413,837 | 387,836 | 388,114 |
| **By Location:** | | | |
| Main Campus | 369,882 | 345,215 | 351,440 |
| Outpatient Centers | 43,955 | 42,621 | 36,674 |
| Total | 413,837 | 387,836 | 388,114 |

## Management's Discussion of Utilization

*Year ended December 31, 2017 compared to year ended December 31, 2016*

For the year ended December 31, 2017, combined inpatient and ambulatory surgery volume increased by 1,418 (4.5%) compared to the year ended December 31, 2016.  This is primarily attributable to the growth in the practices of HSS's orthopedic surgeons (including new surgeons joining the medical staff in 2016 and 2017), as well as increased capacity related to three additional Main Campus operating rooms which opened in early 2017 and the opening of ASC of Manhattan and the Stamford Campus.

For the year ended December 31, 2017, other outpatient visits increased by 26,001 (6.7%) compared to the year ended December 31, 2016.  This is partially attributable to the temporary scaling down in 2016 of patient visit schedules in certain department and physician offices during the pre and post live periods of HSS's implementation of the Epic electronic medical record/revenue cycle system (approximately one month).  Other contributing factors were the growth in the practices of HSS's medical staff, a significant increase in the number of patients receiving outpatient rehabilitation services, the implementation of efficiency and outreach initiatives to increase clinic volume, and the addition of two new MRI units.

For the year ended December 31, 2017, Main Campus inpatient bed occupancy was 67% compared to 69% for the year ended December 31, 2016.  The decline occurred despite a 3.2% increase in inpatient discharges and is attributable to a decline in average length of stay to 3.18 (from 3.36) and an increase in the number of inpatient beds in operation from 209 to 215.  The majority of inpatient discharges are elective surgical cases taking place Monday to Friday, resulting in a greater concentration of occupancy during weekdays than a typical hospital with an emergency room and a larger proportion of medical admissions spread out over seven days of the week.  Peak occupancy days are Thursdays and Fridays which, during 2017, had occupancy rates of approximately 90%.

*Year ended December 31, 2016 compared to year ended December 31, 2015*

For the year ended December 31, 2016, combined inpatient and ambulatory surgery volume increased by 69 (0.2%) compared to the year ended December 31, 2015.  This moderate growth is primarily attributable to capacity constraints, as the operating rooms were operating at close to maximum capacity on weekdays and no new operating rooms were added during the year.  New operating rooms were added during 2017.

For the year ended December 31, 2016, other outpatient visits decreased by 278 (0.1%) compared to the year ended December 31, 2015.  This essentially flat growth is primarily attributable to the temporary scaling down in 2016 of patient visit schedules in certain department and physician offices during the pre and post live periods of HSS's implementation of the Epic electronic medical record/revenue cycle system (approximately one month), as well as the flat surgical volume growth.

For the year ended December 31, 2016, Main Campus inpatient bed occupancy was 69% compared to 74% for the year ended December 31, 2016.  The decline occurred despite a 1.1% increase in inpatient discharges and is attributable to a decline in average length of stay to 3.36 (from 3.46).

**Sources of Patient Service Revenue**

The majority of patient service revenue received by HSS is derived from programs that are either insured or administered by third party organizations.  The following table reports the percentage of gross charges by payor source for the years ended December 31, 2017, 2016, and 2015.

**Table D**
**Percent of Gross Charges - by Payor Source**

|  | Year Ended December 31 | | |
|---|---|---|---|
|  | **2017** | **2016** | **2015** |
| **Payor** | | | |
| Commercial | 57% | 59% | 58% |
| Medicare [1] | 35 | 34 | 34 |
| Medicaid [2] | 3 | 3 | 3 |
| Self-pay/International | 2 | 1 | 1 |
| Workers' Compensation/No-Fault | 3 | 3 | 4 |
| **Total** | 100% | 100% | 100% |

(1)  Includes Medicare managed care.
(2)  Includes Medicaid managed care.

Source: HSS records

All revenue, statistics, and reimbursement information in this Appendix A represent historical data and may not be indicative of future activity.  HSS cannot assess or predict the ultimate effect on its operations which may result from existing or future reimbursement legislation or regulations or other changes in law or market conditions.  See "BONDHOLDERS' RISKS" for additional information.

**Contracted Payors**

HSS is an in-network participating provider with the majority of large commercial payors that operate in the New York City Tri-State Area.  This includes Aetna, Cigna, Empire Blue Cross Blue Shield, Emblem (HIP), and United Healthcare.  HSS's strategy is to balance the objective of maximizing patient access to HSS's services with that of negotiating rates of payment and payment structures that recognize HSS's value.  HSS has developed relationships at all levels of payor organizations which enables it to demonstrate its distinctive value proposition of superior clinical and patient satisfaction outcomes.  The rates of payment for all contracted payors are based on rates, terms, and conditions as set forth in the agreement between HSS and each of the respective payors.

**Combined Financial Information – HSS Enterprise**

The combined financial information of the HSS Enterprise presented below has been derived from the respective consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates.  The combined statements of operations and changes in unrestricted net assets and combined statements of financial position as of and for the years ended December 31, 2017, 2016 and 2015 have been derived from each of the consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates, which have been audited by Ernst & Young, LLP.  The consolidated financial statements of HSS for the years ended December 31, 2017 and 2016 are included in Appendix B-1 to this Offering Memorandum.  The consolidated financial statements of HSS Fund, Inc. and Affiliates for the years ended December 31, 2017 and 2016 are included in Appendix B-2 to this Offering Memorandum.  The consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates for the years ended December 31, 2016 and 2015 can be found at www.dacbond.com.  The Combined HSS Enterprise financial information set forth below should be read in conjunction with each such audited consolidated financial statements of the entities and the related notes thereto and "Management's Discussion of HSS Enterprise Financial Performance" herein. Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

**Combined Statements of Operations and Changes in Unrestricted Net Assets-HSS Enterprise**

| | Year Ended December 31 | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| | (In Thousands) | | |
| **Operating revenue** | | | |
| Net patient service revenue | $952,044 | $867,629 | $820,689 |
| Other operating revenue | 196,033 | 173,000 | 164,377 |
| Net assets released from restrictions for operations | 17,930 | 16,759 | 16,343 |
| Total operating revenue | 1,166,007 | 1,057,388 | 1,001,409 |
| **Operating expenses** | | | |
| Salaries and wages | 482,721 | 434,983 | 391,550 |
| Employee benefits | 134,542 | 124,567 | 121,358 |
| Supplies and other | 389,416 | 360,787 | 323,113 |
| Interest expense | 9,470 | 10,027 | 9,333 |
| Depreciation and amortization | 65,751 | 59,327 | 57,063 |
| Bad debt expense | 9,164 | 8,948 | 8,821 |
| Total operating expenses | 1,091,064 | 998,639 | 911,238 |
| Operating income before research operations, change in unrestricted interest in The Hospital for Special Surgery Fund, Inc., bequest and operating loss attributable to non-controlling interest in subsidiaries | 74,943 | 58,749 | 90,171 |
| Research operations: | | | |
| Net assets released from restrictions for research operations | 35,524 | 35,815 | 31,813 |
| Operating expenses | 42,171 | 41,035 | 39,006 |
| Net research operations | (6,647) | (5,220) | (7,193) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | - | - | - |
| Bequest | - | 985 | 6,748 |
| Operating income before operating loss attributable to non-controlling interest in subsidiaries | 68,296 | 54,514 | 89,726 |
| Operating loss attributable to non-controlling interest in subsidiaries | 2,877 | 1,271 | 807 |
| Operating income | 71,173 | 55,785 | 90,533 |
| Operating loss attributable to non-controlling interest in subsidiaries | (2,877) | (1,271) | (807) |
| Non-controlling members' capital contribution | - | 1,485 | 2,572 |
| Net assets released from restrictions for capital expenditures | 11,351 | 6,661 | 3,363 |
| Change in net unrealized gains and losses on investments | 33,708 | 5,994 | (6,094) |
| Change in defined benefit pension and other postretirement plan liability to be recognized in future periods | (39,264) | (4,520) | (4,319) |
| Total change in unrestricted net assets | $74,091 | $64,134 | $85,248 |

A-27

**Combined Statements of Financial Position-HSS Enterprise**

| | As of December 31 | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (In Thousands) | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $104,416 | $103,468 | $95,300 |
| Receivables: | | | |
| Patient care, less allowance for doubtful accounts | 108,134 | 101,287 | 94,286 |
| Other | 48,369 | 43,412 | 31,920 |
| Total receivables | 156,503 | 144,699 | 126,206 |
| Investments | 657,819 | 589,570 | 569,538 |
| Inventories | 10,973 | 8,292 | 8,157 |
| Prepaid expenses and other current assets | 8,575 | 6,664 | 6,117 |
| Pledges receivable | 14,303 | 15,507 | 13,589 |
| Assets limited as to use | - | 5,625 | 8,131 |
| Total current assets | 952,589 | 873,825 | 827,038 |
| Insurance claims receivable, net of current portion | 1,972 | 2,551 | 2,537 |
| Other noncurrent assets | 25,709 | 19,028 | 15,443 |
| Pledges receivable | 10,777 | 18,845 | 22,361 |
| Assets limited as to use | 50,029 | 63,394 | 79,335 |
| Long-term investments | 121,693 | 115,123 | 106,027 |
| Property, plant and equipment – net | 675,951 | 615,508 | 568,249 |
| Total assets | $1,838,720 | $1,708,274 | $1,620,990 |
| **Liabilities and net assets** | | | |
| Current liabilities: | | | |
| Accounts payable and accrued expenses | $116,598 | $101,005 | $79,711 |
| Accrued salaries and related liabilities | 44,731 | 41,397 | 38,808 |
| Current portion of long-term debt | 49,187 | 47,240 | 45,522 |
| Due to third-party payors – net | 3,509 | 3,873 | 3,125 |
| Other current liabilities | 30,439 | 32,195 | 33,561 |
| Total current liabilities | 244,464 | 225,710 | 200,727 |
| Long-term debt | 242,261 | 266,754 | 295,738 |
| Insurance claims liabilities, net of current portion | 1,972 | 2,551 | 2,537 |
| Other noncurrent liabilities, including due to third-party payors – net | 318,940 | 276,130 | 263,190 |
| Total liabilities | 807,637 | 771,145 | 762,192 |
| Net assets: | | | |
| Unrestricted: | | | |
| Unrestricted | 695,056 | 618,088 | 554,168 |
| Designated for quasi-endowment | 3,719 | 3,719 | 3,719 |
| Non-controlling interest in subsidiaries | (898) | 1,979 | 1,765 |
| Total unrestricted | 697,877 | 623,786 | 559,652 |
| Temporarily restricted: | | | |
| Specific purpose | 67,602 | 57,153 | 56,166 |
| Plant replacement and expansion | 33,488 | 50,117 | 42,851 |
| Research | 93,517 | 74,305 | 76,251 |
| Total temporarily restricted | 194,607 | 181,575 | 175,268 |
| Permanently restricted | 138,599 | 131,768 | 123,878 |
| Total net assets | 1,031,083 | 937,129 | 858,798 |
| Total liabilities and net assets | $1,838,720 | $1,708,274 | $1,620,990 |

**Management's Discussion of HSS Enterprise Financial Performance**

*Year ended December 31, 2017 compared to year ended December 31, 2016*

For the year ended December 31, 2017, the HSS Enterprise had operating income of $71.1 million, compared to $55.8 million for the year ended December 31, 2016.  Operating revenue increased by $108.6 million (10.3%) primarily due to 4.5% growth in combined inpatient and ambulatory surgery volume, 6.7% growth in other outpatient visit volume, and payment rate increases.  Favorable investment returns also contributed to increased operating revenue.  Operating expenses increased by $92.4 million (9.3%) primarily due to volume growth, inflationary increases to labor and non-labor expenses, and increased expenses for strategic initiatives that are positioning the HSS Enterprise for future growth.

*Year ended December 31, 2016 compared to year ended December 31, 2015*

For the year ended December 31, 2016, the HSS Enterprise had operating income of $55.8 million, compared to $90.5 million for the year ended December 31, 2015.  Operating revenue increased by $56.0 million (5.6%) primarily due to payment rate increases and changes in payor mix.  Operating expenses increased by $87.4 million (9.6%) primarily due to expenses (including one-time costs) relating to the go-live of the Epic electronic medical record/revenue cycle system, inflationary increases to labor and non-labor expenses, and increased expenses for strategic initiatives that are positioning the HSS Enterprise for future growth.  Bequests decreased by $5.7 million.

**Financial Ratios**

**Days Cash on Hand**

|  | As of December 31 |  |  |  |
| --- | --- | --- | --- | --- |
|  | Pro-Forma[1] | 2017 | 2016 | 2015 |
|  | *(In thousands)* |  |  |  |
| **HSS (Obligated Group)** |  |  |  |  |
| Unrestricted cash and investments [2] | $ 448,872 | $ 422,903 | $ 394,606 | $ 382,426 |
| Average daily operating expenses [3] | 2,839 | 2,839 | 2,632 | 2,401 |
| **Days cash on hand [4]** | **158** | **149** | **150** | **159** |
| **HSS Enterprise** |  |  |  |  |
| Unrestricted cash and investments[2] | $ 568,849 | $ 542,880 | $ 502,856 | $ 471,705 |
| Average daily operating expenses[3] | 2,890 | 2,890 | 2,652 | 2,414 |
| **Days cash on hand [4]** | **197** | **188** | **190** | **195** |

[1] *Reflects release of FHA mortgage reserve funds.*
[2] *Includes all cash, cash equivalents, and investments that are not restricted by donors, other third parties, or otherwise encumbered.*
[3] *(Total operating expenses - bad debt expense - depreciation and amortization)/ 365 days.*
[4] *Unrestricted cash and investments divided by average daily operating expenses.*

Note: Days cash on hand decreased from 159 at December 31, 2015 to 149 at December 31, 2017.  As noted the Capital Expenditures section of this Appendix A, capital spend included key investments in delivery system expansion and information technology.  Spending was funded through a combination of debt proceeds, philanthropy, and internal resources, but with a focus on minimizing debt.

**Maximum Annual Debt Service Coverage**

| | Year Ended December 31 | | | |
| --- | --- | --- | --- | --- |
| | Pro-Forma[2] | 2017 | 2016 | 2015 |
| | *(In thousands)* | | | |
| **HSS (Obligated Group)** | | | | |
| Changes in unrestricted net assets | $ 68,796 | $ 68,796 | $ 58,227 | $ 78,184 |
| Adjustments to change in unrestricted net assets[1] | (2,628) | (2,628) | (6,389) | 7,703 |
| Depreciation and amortization | 65,536 | 65,536 | 59,813 | 57,603 |
| Interest expense | 9,845 | 9,845 | 10,511 | 8,231 |
| Income Available for Debt Service | $ 141,549 | $ 141,549 | $ 122,162 | $ 151,721 |
| Maximum Annual Debt Service[3] | $ 49,920 | $ 54,971 | $ 54,747 | $ 52,738 |
| **Maximum Annual Debt Service Coverage** | **2.8 x** | **2.6 x** | **2.2 x** | **2.9 x** |
| **HSS Enterprise** | | | | |
| Changes in unrestricted net assets | $ 74,091 | $ 74,091 | $ 64,134 | $ 85,248 |
| Adjustments to change in unrestricted net assets | (17,678) | (17,678) | (9,260) | 6,854 |
| Depreciation and amortization | 69,234 | 69,234 | 62,656 | 60,249 |
| Interest expense | 10,832 | 10,832 | 11,516 | 9,363 |
| Income Available for Debt Service | $ 136,479 | $ 136,479 | $ 129,046 | $ 161,714 |
| Maximum Annual Debt Service | $ 57,031 | $ 61,377 | $ 61,172 | $ 59,163 |
| **Maximum Annual Debt Service Coverage** | **2.4 x** | **2.2 x** | **2.1 x** | **2.7 x** |

[1]*Adjustments per the MTI definition of "Income Available for Debt Service".  Includes net assets released for capital, unrealized investment gains/losses, and changes in pension/post-retirement.  Income associated with affiliates (other than Fund Inc.) is only included to the extent distributions have been made.  SEE APPENDIX E - FORM OF MASTER INDENTURE.*

[2]*Historic Pro Forma.  Income Available for Debt Service for Fiscal Year Ended December 31, 2017.  Maximum annual debt service is calculated starting on January 1, 2018 and giving effect to the issuance of the Series 2018 Bonds and refunding of the Refunded Bonds.*

[3]*Maximum Annual Debt Service calculated in accordance with the MTI.  At the election of HSS, the Series 2018 Bonds have been smoothed over a 30 year period based on level debt service payments.  SEE APPENDIX E – FORM OF MASTER INDENTURE.*

**Long-term Debt to Capitalization**

| | Pro-Forma | 2017 | 2016 | 2015 |
|---|---|---|---|---|
| | | *As of December 31* | | |
| | | *(In thousands)* | | |
| **HSS (Obligated Group)** | | | | |
| 2018 Series Revenue Bonds | $ 179,220 | $    - | $    - | $    - |
| FHA Insured Mortgages[1] | - | 141,714 | 151,541 | 160,971 |
| Other debt [2] | 120,904 | 120,904 | 141,317 | 155,887 |
| Total debt | 300,124 | 262,618 | 292,858 | 316,858 |
| Less: | | | | |
| Current portion of long-term debt | (42,728) | (42,728) | (41,653) | (39,852) |
| Total long-term debt | 257,396 | 219,890 | 251,205 | 277,006 |
| Unrestricted net assets | 628,646 | 628,646 | 559,850 | 502,463 |
| **Long-term debt to capitalization** | **29.1 %** | **25.9 %** | **31.0 %** | **35.5 %** |
| **HSS Enterprise** | | | | |
| 2018 Series Revenue Bonds | $ 179,220 | $    - | $    - | $    - |
| FHA Insured Mortgages[1] | - | 141,714 | 151,541 | 160,971 |
| Other debt [2] | 153,431 | 153,431 | 166,425 | 184,534 |
| Total debt | 332,651 | 295,145 | 317,966 | 345,505 |
| Less: | | | | |
| Current portion of long-term debt | (49,224) | (49,187) | (47,240) | (45,522) |
| Total long-term debt | 283,427 | 245,958 | 270,726 | 299,983 |
| Unrestricted net assets | 697,877 | 697,877 | 623,786 | 559,652 |
| **Long-term debt to capitalization** | **28.9%** | **26.1 %** | **30.3 %** | **34.9 %** |

[1] Excludes unamortized premium and deferred financing costs.
[2] Primarily bank loans for capital investments.

A-31

**Outstanding Long Term Indebtedness**

A summary of long term indebtedness of HSS and the HSS Enterprise as of December 31, 2017 is set forth in the following table (in thousands):

|  | Actual | Pro Forma[1] |
|---|---:|---:|
| **HSS (Obligated Group)** |  |  |
| 2018 Series Revenue Bonds |  | $179,220 |
|  |  |  |
| FHA Insured |  | - |
| -    Mortgage loan (2009) | $69,651 | - |
| -    Mortgage loan (2011) | 32,854 | - |
| -    Mortgage loan (2015) | 39,209 | - |
|  |  |  |
| Other | 120,904 | 120,904 |
|  | 262,618 | 300,124 |
| Less unamortized deferred financing costs | 4,539 | 3,000 |
| Add unamortized mortgage premium | 841 |  |
| **Total HSS (Obligated Group)** | **258,920** | **297,124** |
|  |  |  |
| **HSS Consolidated Subsidiaries** | **14,972** | **14,972** |
|  |  |  |
| **Total HSS and Consolidated Subsidiaries** | **273,892** | **312,096** |
|  |  |  |
| **HSS Fund, Inc. and Consolidated Subsidiaries** | **17,556** | **17,556** |
|  |  |  |
| **Total HSS Enterprise** | **$291,448** | **$329,652** |

_____
(1)   Reflects the issuance of Series 2018 Bonds in the amount of $179.22 million and the refinancing of the FHA-insured mortgage loans.

**Investments**

The HSS Enterprise maintains a pooled investment program for certain investments held by HSS, HSS Fund, Inc. and Properties.  There are three investment portfolios and investments consist of money market mutual funds, equity mutual funds, including exchange-traded funds, marketable equity securities, fixed income securities, fixed income mutual funds, alternative investments and cash and cash equivalents.  The primary investment objectives for each of the three portfolios are as follows:

- Endowment – Grow market value of assets over the long term on a real basis net of spending and inflation to meet future operating expenses for donor-designated purpose;
- Pension – Grow market value of assets, while minimizing the volatility of the funding ratio due to interest rate fluctuations; and
- General – Grow market value of assets with a lower tolerance for volatility and greater need for liquidity than the endowment portfolio

Asset allocations are determined by Finance Committee of the HSS Board of Trustees.  Investment decisions are made by the Investment Committee of the HSS Board of Trustees.  The

Investment committee is comprised of Board members who are prominent professionals in the investment community.   Investment analyses, due diligence, and advisory services are provided by independent investment consultant firm, Monticello Associates.

The following is a summary table of investment assets as of December 31, 2017:

| Asset Allocation | Endowment | Pension | General |
|---|---|---|---|
| Large Cap Equity | 22% | 15% | 28% |
| Small Cap Equity | 6% | 2% | |
| International Equity | 19% | 11% | 10% |
| Alternative Investments | 43% | 25% | 16% |
| Fixed Income | 10% | 47% | 46% |
| | 100% | 100% | 100% |
| | | | |
| Market Value at 12/31/17 ($MM) | $208 | $289 | $455 |

The following table shows, as of December 31, 2017, the liquidity of the investment portfolio:

| Liquidity | Endowment | Pension | General |
|---|---|---|---|
| 30 days or less | 31% | 59% | 82% |
| 1 to 6 months | 28% | 17% | 12% |
| 6 months to 1 year | 13% | 8% | 6% |
| 1 to 2 years | 16% | 9% | 0% |
| 2 to 3 years | 2% | 3% | 0% |
| 3 to 5 years | 3% | 1% | 0% |
| 5 years or more | 7% | 3% | 0% |
| | 100% | 100% | 100% |

**Philanthropy**

HSS's most recent fundraising campaign, "Your Life, Our Mission" (the "Campaign"), came to a close at the end of 2017 and raised $324 million, exceeding its $300 million goal.  Through December 31, 2017, $291 million has been received in cash, with $33 million in pledges to be substantially collected over the next five years.  The collection rate for pledges, based on recent history, has been in excess of 90%.  Funds raised by the Campaign supported efforts to expand and enhance facilities, advance research, build endowment for the future and enrich education for physicians, patients and the global community.  HSS's strength in fundraising is largely driven by a strong commitment by the Board of Trustees, management, and medical staff, as well as donors who make HSS part of their legacy.  The following is a summary by funding source of the $324 million raised by the Campaign (in millions):



In 2018, HSS will be launching a new fundraising campaign in support of key strategic priorities, including research, education, main campus development, and regional and global expansion.  Major and leadership gifts will be a primary priority.

**Capital Expenditures**

During the three year period ended December 31, 2017, the HSS Enterprise spent approximately $384 million for property, plant, and equipment in order to improve and expand the facilities and information systems necessary to support the quality and growth in its clinical, research, and educational programs. Included in the $384 million were the acquisition and renovation of the Research Space, renovation of the Pavilion, development of the Westchester outpatient center, implementation of the Epic electronic medical record/revenue cycle system, and renovation of ASC of Manhattan space.  Capital spending was funded through a combination of debt proceeds, philanthropy, and internal resources.

**Charity Care and Community Benefit**

The mission of HSS is to provide the highest quality patient care, improve mobility and enhance the quality of life for all and to advance the science of orthopedic surgery, rheumatology and their related fields through research and education.  HSS does this regardless of race, color, creed, sexual orientation

or ethnic origin.  Consistent with its mission, HSS invests significant amounts for the benefit of its local, national and international communities through patient care, education, research and other community benefit activities.  The calculation of community benefits is consistent with the guidelines prescribed by the Internal Revenue Service.

HSS maintains a financial assistance program that provides full or partial uncompensated care to eligible patients.  The eligibility threshold is 700% of the Federal Poverty Guidelines, which is in excess of the New York State minimum requirement of 300%.  HSS also provides health care services to patients with government sponsored insurance (Medicare and Medicaid) at amounts less than the estimated costs of those services.

HSS is a preeminent provider of education in the field of musculoskeletal medicine for physicians and allied health professionals.  The community benefit represents estimated costs in excess of amounts reimbursed by third-party payors such as direct medical education from the Medicare program.

HSS is a leader in the advancement of research in musculoskeletal diseases.  HSS's community benefit in research represents fully allocated amounts used for basic, translational and clinical research from governmental, other not-for-profit and HSS resources.

HSS also participates in numerous other community activities with the goal of improving population health, including social service, outreach and education to patients and the general public through targeted programs, humanitarian efforts across various countries.  The community benefit is derived from actual expenditures less amounts funded from outside sources.  See additional information in Appendix B-1.

## Employee Benefits

Employees receive benefits that include group health insurance, short and long-term disability, life insurance, retirement benefits, dental insurance, and other miscellaneous benefits.  HSS has no collective bargaining agreement with any union regarding its healthcare services or facilities and considers its relations with its employees to be excellent.

HSS offers a defined benefit plan (the "Plan") which provides benefits in the form of cash balance accounts.  This plan was closed to employees hired after 2009.  Since then, new employees are offered a defined contribution plan.  HSS funds the Plan in accordance with Pension Protection Act ("PPA") rules based on actuarial valuations, plus additional amounts that HSS may deem appropriate and is projected to be approximately 116% funded as of January 1, 2018.    Under generally accepted accounting principles, the Plan was approximately 67% funded as of December 31, 2017, with a goal to be 85% funded by 2022.  For additional information see the consolidated audited financial statements of HSS (Appendix B-1).

## Licenses and Accreditation

HSS has an operating certificate from the New York State Department of Health and is accredited by The Joint Commission for three-year periods, the most recent of which started April 30, 2016.  HSS is also accredited by the Accreditation Council on Graduate Medical Education for its residency and fellowship programs and is approved for participation in the Medicare and Medicaid programs.

## Insurance

Since 1981, MIAC has reinsured HSS's primary professional liability exposure, along with the professional liability exposure of the majority of HSS's medical staff.  In addition, MIAC reinsures HSS's

primary general liability exposure on the Main Building.  MIAC also directly insures a buffer layer above the primary policy.  MIAC's total limits are $3 million per claim/$35 million annual aggregate, with excess limits of $100 million provided by commercial carriers.  MIAC also reinsures $150,000 of each workers' compensation claim.

The HSS Enterprise also maintains the following other insurance coverage with appropriate limits: property including builders risk, boiler & machinery, flood, and business interruption insurance, information security and privacy liability insurance, general liability for all operations other than the Main Building, automobile liability, clinical trials/products liability, pollution legal liability and first party clean up expenses, advertising/media liability, fiduciary liability, directors and officers, employment practices liability, crime, and medical billing errors and omissions, business travel accident, miscellaneous professional liability, international travel health insurance, construction general liability, and foreign workers' compensation.

**Litigation**

HSS is involved in litigation and claims which are not considered unusual to its business.  While the outcome of any such litigation and claims (whether currently pending or in the future) cannot be predicted at this time, HSS believes that the ultimate resolution of such litigation and claims will not have a material adverse effect on HSS.

*               *               *

**APPENDIX B-1**

**CONSOLIDATED FINANCIAL STATEMENTS OF HSS AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2017 AND 2016 WITH REPORT OF INDEPENDENT AUDITORS**

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

CONSOLIDATED FINANCIAL STATEMENTS
AND SUPPLEMENTARY INFORMATION

New York Society for the Relief of the Ruptured and Crippled,
Maintaining the Hospital for Special Surgery
Years Ended December 31, 2017 and 2016
With Report of Independent Auditors

Ernst & Young LLP





EY
Building a better
working world

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidated Financial Statements
and Supplementary Information

Years Ended December 31, 2017 and 2016

# Contents

Report of Independent Auditors..................................................................................................1

Consolidated Financial Statements

Consolidated Statements of Financial Position.........................................................................3
Consolidated Statements of Operations and Changes in Net Assets .......................................5
Consolidated Statements of Cash Flows...................................................................................8
Notes to Consolidated Financial Statements.............................................................................9

Supplementary Information

Report of Independent Auditors on Supplementary Information ..................................................53

Consolidating Financial Statements

Consolidating Statement of Financial Position – December 31, 2017 .......................................54
Consolidating Statement of Financial Position – December 31, 2016 .......................................56
Consolidating Statement of Operations and Changes in Unrestricted Net
    Assets – December 31, 2017...............................................................................................58
Consolidating Statement of Operations and Changes in Unrestricted Net
    Assets – December 31, 2016...............................................................................................59



**Ernst & Young LLP**
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350
ey.com

# Report of Independent Auditors

The Board of Trustees
New York Society for the Relief of the Ruptured and Crippled,
    Maintaining the Hospital for Special Surgery

We have audited the accompanying consolidated financial statements of New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery, which comprise the consolidated statements of financial position as of December 31, 2017 and 2016, and the related consolidated statements of operations and changes in net assets, and cash flows for the years then ended, and the related notes to the consolidated financial statements.

## Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

## Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery at December 31, 2017 and 2016, and the consolidated results of its operations and changes in net assets, and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

March 12, 2018

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidated Statements of Financial Position

|  | December 31 | |
|  | 2017 | 2016 |
|  | *(In Thousands)* | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  **98,391** | $    95,157 |
| Receivables: | | |
| Patient care, less allowance for doubtful accounts | | |
| (2017 – $22,458; 2016 – $15,933) | **108,134** | 101,287 |
| Insurance claims receivable | **13,498** | 11,738 |
| Other | **35,554** | 29,591 |
| Total receivables | **157,186** | 142,616 |
| Investments | **448,568** | 403,106 |
| Inventories | **10,973** | 8,292 |
| Prepaid expenses and other current assets | **8,245** | 6,331 |
| Pledges receivable | **14,303** | 15,507 |
| Assets limited as to use | **–** | 5,625 |
| Due from affiliates – net | **13,727** | 10,424 |
| Total current assets | **751,393** | 687,058 |
| Insurance claims receivable, net of current portion | **63,550** | 61,412 |
| Other noncurrent assets | **15,472** | 12,352 |
| Due from affiliates – net | **11,071** | 11,071 |
| Pledges receivable | **10,309** | 18,845 |
| Assets limited as to use | **50,029** | 63,394 |
| Long-term investments | **121,693** | 115,123 |
| Interest in The Hospital for Special Surgery Fund, Inc. | **54,987** | 45,711 |
| Property, plant and equipment – net | **595,523** | 535,675 |
| Total assets | $ **1,674,027** | $  1,550,641 |

|  | December 31 | |
|---|---|---|
|  | 2017 | 2016 |
|  | *(In Thousands)* | |
| **Liabilities and net assets** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ **81,713** | $ 76,337 |
| Accrued salaries and related liabilities | **44,731** | 41,397 |
| Current portion of long-term debt | **43,517** | 41,653 |
| Due to third-party payors – net | **3,509** | 3,873 |
| Insurance claims liabilities | **13,498** | 11,738 |
| Other current liabilities | **19,011** | 21,098 |
| Total current liabilities | **205,979** | 196,096 |
| Long-term debt | **230,375** | 249,199 |
| Insurance claims liabilities, net of current portion | **63,550** | 61,412 |
| Other noncurrent liabilities, including accrued retirement benefits and due to third-party payors – net | **214,402** | 168,762 |
| Total liabilities | **714,306** | 675,469 |
| Commitments and contingencies | | |
| Net assets: | | |
| Unrestricted: | | |
| Unrestricted | **624,162** | 556,131 |
| Designated for quasi-endowment | **3,719** | 3,719 |
| Noncontrolling interest in subsidiaries | **(898)** | 1,979 |
| Total unrestricted | **626,983** | 561,829 |
| Temporarily restricted: | | |
| Specific purpose | **67,134** | 57,153 |
| Plant replacement and expansion | **33,488** | 50,117 |
| Research | **93,517** | 74,305 |
| Total temporarily restricted | **194,139** | 181,575 |
| Permanently restricted | **138,599** | 131,768 |
| Total net assets | **959,721** | 875,172 |
| Total liabilities and net assets | $ **1,674,027** | $ 1,550,641 |

*See accompanying notes.*

4

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidated Statements of Operations and Changes in Net Assets

|  | Year Ended December 31 | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In Thousands) | |
| **Operating revenue** | | |
| Net patient service revenue | $ **952,044** | $ 867,629 |
| Other operating revenue | **172,471** | 153,770 |
| Net assets released from restrictions for operations | **17,930** | 16,759 |
| Total operating revenue | **1,142,445** | 1,038,158 |
| **Operating expenses** | | |
| Salaries and wages | **478,192** | 431,597 |
| Employee benefits | **133,048** | 123,450 |
| Supplies and other | **386,453** | 361,558 |
| Interest expense | **8,584** | 9,022 |
| Depreciation and amortization | **62,824** | 56,484 |
| Bad debt expense | **9,164** | 8,948 |
| Total operating expenses | **1,078,265** | 991,059 |
| Operating income before research operations, change in unrestricted interest in The Hospital for Special Surgery Fund, Inc., bequest and operating loss attributable to non-controlling interest in subsidiaries | **64,180** | 47,099 |
| Research operations: | | |
| Net assets released from restrictions for research operations | **35,524** | 35,815 |
| Operating expenses, including depreciation (2017 – $3,483; 2016 – $3,329) | **42,171** | 41,035 |
| Net research operations | **(6,647)** | (5,220) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | **13,276** | 7,380 |
| Bequest | **–** | 985 |
| Operating income before operating loss attributable to non-controlling interest in subsidiaries | **70,809** | 50,244 |
| Operating loss attributable to non-controlling interest in subsidiaries | **2,877** | 1,271 |
| Operating income | **73,686** | 51,515 |

*Continued on pages 6 and 7.*

5

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidated Statements of Operations and Changes in Net Assets (continued)

Year Ended December 31, 2017

| | Unrestricted | | | | Temporarily Restricted | | | | | |
| | Unrestricted | Quasi-Endowment | Non-controlling Interest in Subsidiaries | Total Unrestricted | Specific Purpose | Plant Replacement and Expansion | Research | Total Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(In Thousands)* | | | | | |
| Operating income (from page 5) | $ 73,686 | $ – | $ – | $ 73,686 | $ – | $ – | $ – | $ – | $ – | $ 73,686 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | (2,877) | (2,877) | – | – | – | – | – | (2,877) |
| Net assets released from restrictions for capital expenditures | 11,351 | – | – | 11,351 | – | – | – | – | – | 11,351 |
| Change in net unrealized gains and losses on investments | 22,258 | – | – | 22,258 | – | – | – | – | – | 22,258 |
| Change in defined benefit pension and other postretirement plan liability to be recognized in future periods | (39,264) | – | – | (39,264) | – | – | – | – | – | (39,264) |
| Contributions, including research grants | – | – | – | – | 20,292 | 3,799 | 24,391 | 48,482 | 6,831 | 55,313 |
| Net asset reclassification | – | – | – | – | – | (10,752) | 10,752 | – | – | – |
| Investment activity, including net investment income of $3,467, net realized gain of $3,553 and change in net unrealized gains and losses and equity in earnings of alternative investments of $21,867 | – | – | – | – | 8,740 | 212 | 19,935 | 28,887 | – | 28,887 |
| Net assets released from restrictions for: | | | | | | | | | | |
| Research operations | – | – | – | – | – | – | (35,524) | (35,524) | – | (35,524) |
| Capital expenditures | – | – | – | – | (1,121) | (9,888) | (342) | (11,351) | – | (11,351) |
| Operating expenses | – | – | – | – | (17,930) | – | – | (17,930) | – | (17,930) |
| Total net assets released from restrictions | – | – | – | – | (19,051) | (9,888) | (35,866) | (64,805) | – | (64,805) |
| Total change in net assets | 68,031 | – | (2,877) | 65,154 | 9,981 | (16,629) | 19,212 | 12,564 | 6,831 | 84,549 |
| Net assets at December 31, 2016 | 556,131 | 3,719 | 1,979 | 561,829 | 57,153 | 50,117 | 74,305 | 181,575 | 131,768 | 875,172 |
| Net assets at December 31, 2017 | $ 624,162 | $ 3,719 | $ (898) | $ 626,983 | $ 67,134 | $ 33,488 | $ 93,517 | $ 194,139 | $ 138,599 | $ 959,721 |

*See accompanying notes.*

6

## New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery

### Consolidated Statements of Operations and Changes in Net Assets

Year Ended December 31, 2016

| | Unrestricted | | | | Temporarily Restricted | | | | Permanently Restricted | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unrestricted | Quasi-Endowment | Non-controlling Interest in Subsidiaries | Total Unrestricted | Specific Purpose | Plant Replacement and Expansion | Research | Total Temporarily Restricted | Permanently Restricted | Total |
| | *(In Thousands)* | | | | | | | | | |
| Operating income (from page 5) | $ 51,515 | $ – | $ – | $ 51,515 | $ – | $ – | $ – | $ – | $ – | $ 51,515 |
| Non-controlling members' capital contribution | – | – | 1,485 | 1,485 | – | – | – | – | – | 1,485 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | (1,271) | (1,271) | – | – | – | – | – | (1,271) |
| Net assets released from restrictions for capital expenditures | 6,661 | – | – | 6,661 | – | – | – | – | – | 6,661 |
| Change in net unrealized gains and losses on investments | 4,571 | – | – | 4,571 | – | – | – | – | – | 4,571 |
| Change in defined benefit pension and other postretirement plan liability to be recognized in future periods | (4,520) | – | – | (4,520) | – | – | – | – | – | (4,520) |
| Contributions, including research grants | – | – | – | – | 16,447 | 11,021 | 27,233 | 54,701 | 7,890 | 62,591 |
| Investment activity, including net investment income of $3,792, net realized gain of $2,587 and change in net unrealized gains and losses and equity in earnings of alternative investments of $4,462 | – | – | – | – | 2,880 | 18 | 7,943 | 10,841 | – | 10,841 |
| Net assets released from restrictions for: | | | | | | | | | | |
| Research operations | – | – | – | – | – | – | (35,815) | (35,815) | – | (35,815) |
| Capital expenditures | – | – | – | – | (1,581) | (3,773) | (1,307) | (6,661) | – | (6,661) |
| Operating expenses | – | – | – | – | (16,759) | – | – | (16,759) | – | (16,759) |
| Total net assets released from restrictions | – | – | – | – | (18,340) | (3,773) | (37,122) | (59,235) | – | (59,235) |
| Total change in net assets | 58,227 | – | 214 | 58,441 | 987 | 7,266 | (1,946) | 6,307 | 7,890 | 72,638 |
| Net assets at December 31, 2015 | 497,904 | 3,719 | 1,765 | 503,388 | 56,166 | 42,851 | 76,251 | 175,268 | 123,878 | 802,534 |
| Net assets at December 31, 2016 | $ 556,131 | $ 3,719 | $ 1,979 | $ 561,829 | $ 57,153 | $ 50,117 | $ 74,305 | $ 181,575 | $ 131,768 | $ 875,172 |

*See accompanying notes.*

7

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidated Statements of Cash Flows

| | Year Ended December 31 | |
| --- | --- | --- |
| | 2017 | 2016 |
| | *(In Thousands)* | |
| **Operating activities** | | |
| Change in net assets | $ 84,549 | $ 72,638 |
| Adjustments to reconcile change in net assets to net cash provided by operating activities: | | |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | (13,276) | (7,380) |
| Distribution from The Hospital for Special Surgery Fund, Inc. | 4,000 | – |
| Depreciation and amortization | 66,307 | 59,813 |
| Amortization of bond premium | (266) | (298) |
| Change in defined benefit pension and other postretirement plan liability to be recognized in future periods | 39,264 | 4,520 |
| Change in net unrealized gains and losses on investments and equity in earnings of alternative investments | (56,008) | (10,158) |
| Realized gains on investments | (5,443) | (2,806) |
| Contributions to permanently restricted net assets | (6,831) | (7,890) |
| Contributions restricted to acquisition of plant assets – net | (3,799) | (11,021) |
| Employer contributions to pension plan | (31,500) | (28,900) |
| Changes in operating assets and liabilities: | | |
| Receivables, net | (12,810) | (19,585) |
| Net due from affiliates | (808) | 674 |
| Pledges receivable, net | 9,740 | 1,598 |
| Accounts payable and accrued expenses and accrued salaries and related liabilities | 8,710 | 16,392 |
| Current amount due to third-party payors | (364) | 748 |
| Other noncurrent liabilities, including due to third-party payors | 37,876 | 35,998 |
| Other assets and liabilities, net | (9,802) | (2,403) |
| Net cash provided by operating activities | 109,539 | 101,940 |
| **Investing activities** | | |
| Additions to property, plant and equipment | (125,615) | (103,852) |
| Net increase in investments | 7,102 | (8,041) |
| Net decrease in assets limited as to use | 18,812 | 18,365 |
| Net cash used in investing activities | (99,701) | (93,528) |
| **Financing activities** | | |
| Principal payments on long-term debt | (45,219) | (43,993) |
| Proceeds from long-term borrowings | 27,985 | 21,960 |
| Contributions restricted to acquisition of plant assets – net | 3,799 | 11,021 |
| Contributions to permanently restricted net assets | 6,831 | 7,890 |
| Net cash used in financing activities | (6,604) | (3,122) |
| Net increase in cash and cash equivalents | 3,234 | 5,290 |
| Cash and cash equivalents at beginning of year | 95,157 | 89,867 |
| Cash and cash equivalents at end of year | $ 98,391 | $ 95,157 |

*See accompanying notes.*

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements

December 31, 2017

## 1. Organization and Significant Accounting Policies

### Organization

The accompanying consolidated financial statements include the accounts of New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery (the Hospital), HSS ASC of Manhattan, LLC (Manhattan ASC), HSS West Side Ambulatory Surgery Center, LLC (West Side ASC), and TJA Orthopedic Surgery, P.C. (TJA) but do not include the Hospital's separately incorporated affiliates: The Hospital for Special Surgery Fund, Inc. (Fund); HSS Properties Corporation (Properties); HSS Horizons, Inc. (Horizons); HSS Ventures, Inc. (Ventures); and Medical Indemnity Assurance Company, Ltd. (MIAC).

Fund is a not-for-profit corporation organized under the Not-for-Profit Corporation Law of the State of New York for the purpose of supporting the charitable, educational and scientific purposes of the Hospital and other related charitable health care organizations. Fund's subsidiaries include Properties, Horizons, Ventures and MIAC, collectively referred to herein as Fund Inc. and Affiliates.

In 1998, The Society of the New York Hospital and The Presbyterian Hospital in the City of New York (Presbyterian) merged to form the New York Presbyterian Hospital (NYPH). Subsequently, the Hospital, NYPH and the Joan and Sanford I. Weill Medical College and Graduate School of Medical Sciences of Cornell University (Cornell) agreed to restructure their relationship, prompted in large measure by regulatory and operational issues raised by the addition of Presbyterian, a hospital with an established orthopedics department. The restructuring resulted in a Corporate Relationship Agreement (the Agreement) that reaffirms and continues the Hospital's medical and clinical affiliation with NYPH by permitting and requiring the Hospital to continue to function as the principal orthopedic and rheumatology facility for NYPH at its East 68-East 70 Street facility (East Campus).

Under the Agreement, the Hospital became a membership corporation, with the five Hospital members elected by an NYPH affiliate, subject to specific affiliation guidelines for each of the five member positions that require three of the Hospital members to come from the Hospital's Board of Trustees (with one of the three to also serve on the Board of the NYPH affiliate). The members have the authority to elect the Hospital's Board of Trustees, as nominated by the Governance Committee of the Hospital's Board of Trustees or by a member. As a result of certain procedural elements of the Agreement, the Hospital has not had any significant changes in the nominating process for, or in the composition of, its Board of Trustees.

9

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

The Agreement did not involve a merger of the institutions and the Hospital's net assets remain under the Hospital's control.

As part of the restructuring, the Hospital executed an agreement with Cornell that established the orthopedics department at the Hospital as the Department of Orthopedics at Cornell. Additionally, the Hospital, NYPH and Cornell have developed a tri-partite agreement pertaining to the academic affiliation of the institutions, which maintains and enhances the historical clinical and academic relationship among the parties.

Manhattan ASC is a limited liability company organized under the laws of the State of New York. Manhattan ASC was formed in 2014 and offers outpatient orthopedic surgery services in collaboration with a group of Hospital surgeons. Operations of Manhattan ASC commenced in September 2017. The Hospital owns 51% of Manhattan ASC and the remaining 49% is owned by certain members of the Hospital's surgical staff. The Hospital has consolidated the activities of Manhattan ASC in the consolidated financial statements. Non-controlling interests represent the portion of Manhattan ASC not controlled by the Hospital, but are required to be presented in the Hospital's consolidated financial statements.

West Side ASC is a limited liability company organized under the laws of the State of New York. West Side ASC was formed in 2016 and will offer outpatient orthopedic surgery services in collaboration with a group of Hospital surgeons. The Hospital owns 67% of West Side ASC and the remaining 33% is owned by certain members of the Hospital's surgical staff. The Hospital has consolidated the activities of West Side ASC in the consolidated financial statements. Non-controlling interests represent the portion of West Side ASC not controlled by the Hospital, but are required to be presented in the Hospital's consolidated financial statements. Operations of West Side ASC are expected to commence during the first quarter of 2019.

In 2016, the Hospital executed a Collaboration Agreement with The Stamford Hospital (SH), an acute care hospital in Stamford, Connecticut, and Stamford Health, Inc. (SHI), the sole member of SH. Under the Collaboration Agreement, the Hospital manages the SH Department of Orthopedic Surgery, including certain discrete orthopedic space and activities within the main building of SH, which has been named HSS Orthopedics at Stamford Hospital, and within SH's Tully Center, which has been named HSS Orthopedics at Tully, that SH operates.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

Under the terms of the Collaboration Agreement, only SH-credentialed surgeons employed by or otherwise contractually affiliated with TJA, a New York professional service corporation owned by a designee of the Hospital, are permitted to perform surgery at HSS Orthopedics at Stamford Hospital and HSS Orthopedics at Tully. Operations at HSS Orthopedics at Tully and HSS Orthopedics at Stamford Hospital commenced in February 2017 and November 2017, respectively. Activity from the Collaboration Agreement is recognized within other operating revenue in the consolidated statement of operations and changes in net assets. Amounts were not significant in 2017.

HSS-Florida Physicians, LLC (HSS-Florida) is a limited liability company organized under the laws of the State of Florida and was formed on January 4, 2018. The purpose of HSS-Florida is to develop and operate a Florida licensed musculoskeletal outpatient clinic in West Palm Beach, Florida. The Hospital controls and owns 51% and a limited liability company affiliated with a third-party health system owns 49%.

### Cash and Cash Equivalents

The Hospital considers highly liquid financial instruments purchased with a maturity of three months or less, excluding those held in its investment portfolio and assets limited as to use, to be cash equivalents. The Hospital maintains its cash deposits with certain financial institutions. Total deposits maintained at these institutions exceed the amount insured by Federal agencies and, therefore, bear a risk of loss. Cash and cash equivalents includes approximately $675,000 and $710,000 of amounts held in escrow for various purposes at December 31, 2017 and 2016, respectively.

### Net Patient Service Revenue and Receivables for Patient Care

Net patient service revenue and patient accounts receivable from third-party programs for which the Hospital receives payment under various reimbursement formulae or negotiated rates are stated at the estimated net amounts realizable and receivable from such payors, which are generally less than the Hospital's established billing rates. See Note 2 for additional information relative to third-party payor programs.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

The amount of the allowance for doubtful accounts is based upon management's assessment of historical and expected net collections, business and economic conditions, trends in health care coverage and other collection indicators. Additions to the allowance for doubtful accounts result from the provision for bad debts. Accounts written off as uncollectible are deducted from the allowance for doubtful accounts.

### Performance Indicator

The consolidated statements of operations and changes in net assets include operating income as the performance indicator. Excluded from the performance indicator are net assets released from restrictions for capital expenditures, change in net unrealized gains and losses on investments and unrealized losses on securities included in accounts not managed by external parties, change in defined benefit pension and other postretirement plan liability to be recognized in future periods, and operating loss attributable to non-controlling interest in subsidiaries.

### Charity Care and Community Benefit

The mission of the Hospital is to provide the highest quality patient care, improve mobility and enhance the quality of life for all and to advance the science of orthopedic surgery, rheumatology and their related fields through research and education. The Hospital does this regardless of race, color, creed, sexual orientation or ethnic origin.

Consistent with its mission, the Hospital invests significant amounts for the benefit of its local, national and international communities through patient care, education, research and other community benefit activities. The calculation of community benefits is consistent with the guidelines prescribed by the Internal Revenue Service.

The Hospital maintains a financial assistance program that provides full or partial uncompensated care to eligible patients. In 2016, the eligibility threshold was increased from 500% to 700% of the Federal Poverty Guidelines, which is in excess of the New York State minimum requirements of 300%. As the collection of amounts determined to qualify as financial assistance is not pursued, such amounts are not reported as a component of net patient service revenue. Costs of providing financial assistance are estimated by multiplying the total charges incurred by the patients that qualify for financial assistance by a ratio of historical expenses to charges as derived from the Hospital's accounting records.

12

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

The Hospital also provides health care services to patients with government sponsored means-tested insurance (Medicaid) at amounts less than the estimated costs of those services. Losses from Medicaid insurance are obtained by identifying total cost (direct and indirect) in providing patient service to Medicaid and Medicaid Managed Care patients from the Hospital's accounting records.

In addition to providing health care services to Medicaid patients at a loss, the Hospital also provides services to Medicare patients at a loss. The loss related to providing services to Medicare patients is calculated in a similar manner as described above for Medicaid patients.

The Hospital is a preeminent provider of education in the field of musculoskeletal medicine for physicians and allied health professionals. The community benefit represents estimated costs in excess of amounts reimbursed by third-party payors such as direct medical education from the Medicare program.

The Hospital is a leader in the advancement of research in musculoskeletal diseases. The Hospital's community benefit in research represents fully allocated amounts used for basic, translational and clinical research from governmental, other not-for-profit and Hospital resources. Community benefit for research is estimated using historical allocation percentages from the Hospital's accounting records.

The Hospital also participates in numerous other community activities, including social service, outreach and education to patients and the general public. The community benefit is derived from actual expenditures, less amounts funded from outside sources.

13

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

The following is a summary of the Hospital's community benefit for providing financial assistance, support of governmental sponsored insurance programs, health professions education, research and other community benefit activities. Amounts for activities as reported below are based on estimated and actual data, subject to changes in estimates upon finalization of the Hospital's cost report and other government filings.

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Financial assistance (charity care), net (see below) | $ 11,061 | $ 8,107 |
| Un-reimbursed cost of means-tested government sponsored health care (Medicaid) | 21,829 | 22,078 |
| Health professions education | 43,685 | 42,341 |
| Research | 21,445 | 19,251 |
| Other community benefit activities | 7,881 | 7,104 |
|  | 105,901 | 98,881 |
| Un-reimbursed cost of providing Medicare sponsored health care | 46,813 | 45,460 |
|  | $ 152,714 | $ 144,341 |

Funds received to offset financial assistance provided are included above and totaled approximately $1.8 million and $2.0 million for the years ended December 31, 2017 and 2016, respectively.

### Investments and Investment Income

The Hospital maintains a pooled investment program for certain investments held by the Hospital, Fund and Properties. Investments consist of money market mutual funds, equity mutual funds, including exchange-traded funds, marketable equity securities, fixed income securities, fixed income mutual funds, alternative investments and cash and cash equivalents. All investments are carried at fair value based on quoted market prices (except alternative investments).

14

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

Alternative investments (nontraditional, not readily marketable securities) consist of common collective trust funds, event-driven funds, multi-strategy hedge funds, emerging market debt funds, global hedge funds and private equity funds. Alternative investment interests generally are structured such that the investment pool holds a limited partnership interest or an interest in an investment management company. The investment pool's ownership structure does not provide for control over the related investees and the investment pool's financial risk is limited to the carrying amount reported for each investee, in addition to any unfunded capital commitment. Future funding commitments for alternative investments in the investment pool aggregated approximately $7.1 million at December 31, 2017.

Individual investment holdings within the alternative investments include non-marketable and market-traded debt and equity securities and interests in other alternative investments. The investment pool may be exposed indirectly to securities lending, short sales of securities and trading in futures and forward contracts, options and other derivative products. Alternative investments often have liquidity restrictions under which the pooled investment capital may be divested only at specified times. The liquidity restrictions range from approximately one month to twelve years. Liquidity restrictions may apply to all or portions of a particular invested amount.

Alternative investments included in the investment pool are stated in the accompanying consolidated statements of financial position based upon net asset values derived from the application of the equity method of accounting. Alternative investments held by the defined benefit pension plan are stated in the accompanying consolidated statements of financial position at fair value based upon, as a practical expedient, net asset values derived from the application of the equity method of accounting. Financial information used by the Hospital to evaluate its alternative investments is provided by the investment manager or general partner and includes fair value valuations (quoted market prices and values determined through other means) of underlying securities and other financial instruments held by the investee, and estimates that require varying degrees of judgment. The financial statements of the investee companies are audited annually by independent auditors, although the timing for reporting the results of such audits does not coincide with the Hospital's annual financial statement reporting.

There is uncertainty in determining values of alternative investments arising from factors such as lack of active markets (primary and secondary), lack of transparency into underlying holdings and time lags associated with reporting by the investee companies. As a result, there is at least a reasonable possibility that estimates will change.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

Investment income, including realized, and the net change in unrealized, gains and losses and equity in earnings of alternative investments, earned on permanently and temporarily restricted net assets upon which restrictions have been placed by donors, is added to temporarily restricted net assets or reduces unrestricted net assets in the event a donor restricted endowment fund falls below the level of the original principal donation and related accumulation of temporarily restricted net assets, if any, have been used. This accounting policy is not intended to create a liability of the unrestricted fund (see Note 10). All other investment income is reflected in the accompanying consolidated statements of operations and changes in net assets. The net change in unrealized gains and losses is excluded from the performance indicator, unless deemed to be an other than temporary decline in fair value or if the unrealized loss pertains to securities included in accounts managed by external parties, in which case the amount is included within the performance indicator. See Note 3 for additional information relative to investments.

**Pledges**

Pledges (promises to give) are enforceable, but unsecured and derived from individuals, corporations and foundations. Allowances for uncollectible amounts are provided to reflect pledges at their estimated realizable value based on management's review of individual pledges and historical collection percentages. Outstanding pledges receivable, net of present value allowances (based on a range of interest rates of 0.7% to 3.5%) of approximately $418,000 at December 31, 2017 and $700,000 at December 31, 2016 are due to be collected at December 31 over the following periods:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Less than one year | $ 16,272 | $ 17,621 |
| One to five years | 11,241 | 20,709 |
| Greater than five years | 213 | 305 |
|  | 27,726 | 38,635 |
| Less allowance for uncollectible amounts | 3,114 | 4,283 |
|  | 24,612 | 34,352 |
| Less current portion | 14,303 | 15,507 |
|  | $ 10,309 | $ 18,845 |

16

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

**Assets Limited as to Use**

Assets limited as to use represent assets whose use is restricted for specific purposes under terms of agreements, donor stipulations or are internally designated. Such assets consist of money market mutual funds, fixed income securities and cash and cash equivalents.

**Deferred Financing Costs**

Deferred financing costs represent costs incurred to obtain financing for construction and renovation projects at the Hospital. Amortization of these costs is provided using the effective interest method over the term of the related debt. At December 31, 2016, the Hospital adopted Accounting Standards Update (ASU) 2015-03, *Simplifying the Presentation of Debt Issuance Costs,* retrospectively as required. As a result, unamortized deferred financing costs of $4.5 million and $5.1 million at December 31, 2017 and 2016, respectively, have been reported as a direct reduction from long-term debt. Amortization expense was approximately $541,000 and $571,000 for the years ended December 31, 2017 and 2016, respectively. See Note 5 for additional information relative to debt.

**Property, Plant and Equipment**

Property, plant and equipment purchased are stated at cost and those acquired by gifts and bequests are stated at fair value established at the date of acquisition. The carrying amounts of assets and the related accumulated depreciation and amortization are removed from the accounts when such assets are disposed of and any resulting gain or loss is included in operations. See Note 4 for additional information relative to property, plant and equipment.

**Depreciation and Amortization**

Depreciation and amortization of all depreciable assets is computed using the straight-line method over the estimated useful life of the asset or the lesser of the estimated useful life of the asset or lease term.

17

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

**Temporarily and Permanently Restricted Net Assets**

Temporarily restricted net assets are those whose use by the Hospital has been limited by donors to a specific time period or purpose. Permanently restricted net assets have been restricted by donors to be maintained by the Hospital in perpetuity.

**Contributions**

Contributions, including unconditional promises to give cash and other assets, are reported at fair value on the date the contribution is received. The gifts are reported as either temporarily or permanently restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the consolidated statements of operations and changes in net assets as net assets released from restrictions. Donor-restricted contributions whose restrictions are met within the same year as received are reflected in temporarily restricted net assets and net assets released from restrictions in the accompanying consolidated financial statements.

**Inventories of Supplies**

Inventories, consisting mainly of supplies, are stated at the lower of average cost or market determined by the first-in, first-out method.

**Assets Held by Related Organizations**

The Hospital recognizes its beneficial interest in the unrestricted net assets held by a related organization as interest in The Hospital for Special Surgery Fund, Inc. in its consolidated statements of financial position and also recognizes the periodic change in such interest in its consolidated statements of operations and changes in net assets. Such interest does not include the net assets of Fund's subsidiaries described above. In 2017, Fund made a distribution of $4.0 million to the Hospital which is recorded as a reduction in the interest in The Hospital for Special Surgery Fund, Inc.

18

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

### Use of Estimates

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, such as estimated uncollectible for accounts receivable for services to patients, insurance claims liabilities and receivables and estimated receivables from and payables to third-party payors, and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements. Estimates also affect the reported amounts of revenue and expenses during the reporting period. The allowance for doubtful accounts, insurance claims liabilities and receivables and the estimated net amount due to third-party payors, among other accounts, require significant use of estimates. Actual results could differ from those estimates. Management believes that amounts recorded based on estimates and assumptions are reasonable and any differences between estimates and actual should not have a material effect on the Hospital's consolidated financial position.

### Recent Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board (FASB) issued ASU 2014-09, *Revenue from Contracts with Customers* (ASU 2014-09). The core principle of ASU 2014-09 is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The guidance in ASU 2014-09 supersedes the FASB's current revenue recognition requirements in Accounting Standards Codification Topic 605, *Revenue Recognition,* and most industry-specific guidance. The FASB subsequently issued ASU 2015-14, *Revenue from Contracts with Customers*, which deferred the effective dates of ASU 2014-09. Based on ASU 2015-14, the provisions of ASU 2014-09 are effective for the Hospital for annual periods beginning after December 15, 2017, and interim periods within that fiscal year. In accordance with ASU 2014-09, the Hospital will analyze revenue streams utilizing the portfolio approach to group patient contracts with similar characteristics, such that revenue for a given portfolio would not be materially different than if it were evaluated on a contract-by-contract basis. The Hospital does not expect the adoption of ASU 2014-09 to have a significant effect on its consolidated financial statements. The adoption of ASU 2014-09 will require enhanced disclosures related to the disaggregation of revenue, information about contract balances, and other disclosures about contracts with customers, including revenue recognition policies to identify performance obligations and significant judgments in measurement and recognition. The Hospital plans to use the modified retrospective method of adoption in 2018.

19

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

In August 2014, the FASB issued ASU 2014-15, *Presentation of Financial Statements – Going Concern* (ASU 2014-15)*,* that requires management of public and nonpublic companies to evaluate and disclose where there is substantial doubt about an entity's ability to continue as a going concern. The standard is effective for annual periods ending after December 15, 2016, and for annual periods thereafter. Management adopted ASU 2014-15 for the year ended December 31, 2016. There was no effect on the accompanying consolidated financial statements or disclosures.

In April 2015, the FASB issued ASU 2015-05, *Customer's Accounting for Fees Paid in a Cloud Computing Arrangement* (ASU 2015-05). ASU 2015-05 provides guidance to customers about whether a cloud computing arrangement includes a software license. If certain criteria are met, an entity may account for such an arrangement under the internal use software guidance included in Accounting Standards Codification (ASC) 350-40, *Internal Use Software*, whereby amounts are capitalized. If such criteria are not met, the cloud computing arrangement is considered a service contract and the related costs are expensed as incurred. ASU 2015-05 is effective for public business entities for fiscal years beginning after December 15, 2015 with the option to apply the guidance prospectively to all arrangements entered into or materially modified after the effective date or retrospectively. The Hospital adopted ASU 2015-05 prospectively as of January 1, 2016 with no effect on the consolidated financial statements.

In May 2015, the FASB issued ASU 2015-07, *Disclosures for Investments in Certain Entities that Calculate Net Asset Value Per Share (or its Equivalent)* (ASU 2015-07). ASU 2015-07 removes the requirement to categorize within the fair value hierarchy investments for which fair values are estimated using the net asset value practical expedient provided by Accounting Standards Codification 820, *Fair Value Measurement*. Disclosures about investments in certain entities that calculate net asset value per share are limited under ASU 2015-07 to those investments for which the entity has elected to estimate the fair value using the net asset value practical expedient. ASU 2015-07 is effective for entities (other than public business entities) for fiscal years beginning after December 15, 2016, with retrospective application to all periods presented. The Hospital adopted ASU 2015-07 at December 31, 2016. The adoption of ASU 2015-07 did not have a significant effect on the Hospital's consolidated financial statements.

20

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

In January 2016, the FASB issued ASU 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities* (ASU 2016-01). ASU 2016-01 will require business-oriented health care not-for-profit entities to measure equity investments that do not result in consolidation and are not accounted for under the equity method at fair value, and recognize any changes in fair value in the performance indicator unless the investments qualify for a new practicability exception. The practicability exception is available for equity investments without readily determinable fair values. Health care not-for-profit entities will no longer be able to recognize unrealized gains and losses on equity securities they classify today as other than trading separately from the performance indicator. The guidance is effective for annual periods beginning after December 15, 2018, and for interim periods within annual periods beginning a year later. Early adoption is permitted for annual periods beginning after December 15, 2017, and interim periods therein. Adoption of ASU 2016-01 will require the Hospital to present the change in unrealized gains and losses on unrestricted investments within the performance indicator.

In February 2016, the FASB issued ASU 2016-02, *Leases* (ASU 2016-02), which will require lessees to report most leases on their statements of financial position and recognize expenses on their income statements in a manner similar to current accounting. The guidance also eliminates current real estate-specific provisions. Lessors continue to recognize the underlying asset and recognize lease income on either a straight line or another systematic and rational basis. The provisions of ASU 2016-02 are effective for the Hospital for annual periods beginning after December 15, 2018. Earlier adoption in the first interim period thereafter is permitted. The Hospital has not completed the process of evaluating the impact of ASU 2016-02 on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-14, *Not-for-Profit Financial Statement Presentation* (ASU 2016-14), which eliminates the requirement for not-for-profits (NFPs) to classify net assets as unrestricted, temporarily restricted and permanently restricted. Instead, NFPs will be required to classify net assets as net assets with donor restrictions or without donor restrictions. Among other things, the guidance also modifies required disclosures and reporting related to net assets, investment expenses and qualitative information regarding liquidity. NFPs will also be required to report all expenses by both functional and natural classification in one location. The provisions of ASU 2016-14 are effective for the Hospital for annual periods beginning after December 15, 2017. Earlier adoption in the first interim period thereafter is permitted. The Hospital has not completed the process of evaluating the impact of ASU 2016-14 on its consolidated financial statements.

21

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

In March 2017, the FASB issued ASU 2017-07, *Compensation—Retirement Benefits: Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost* (ASU 2017-07). ASU 2017-07 addresses how employers that sponsor defined benefit pension and/or other postretirement benefit plans present the net periodic benefit cost in the income statement. Employers will be required to present the service cost component of net periodic benefit cost in the same income statement line item as other employee compensation costs arising from services rendered during the period. Employers will present the other components of the net periodic benefit cost separately from the line item that includes the service cost and outside of any subtotal of operating income, if one is presented. The standard is effective for the Hospital for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted. Adoption of ASU 2017-07 will require the Hospital to include the service cost component of net periodic benefit cost related to its cash balance defined benefit plan and other postretirement benefit plan (aggregate of approximately $16.1 million and 16.9 million for 2017 and 2016, respectively) within salaries and wages on the consolidated statements of operations and changes in net assets and to present all other components (aggregate of approximately $6.6 million and $9.1 million for 2017 and 2016, respectively) as a separate line item outside of any subtotal of the performance indicator. Net periodic benefit cost is recorded currently as a component of employee benefits on the consolidated statements of operations and changes in net assets.

### Tax Status

The Hospital is a Section 501(c)(3) organization exempt from Federal income taxes under Section 501(a) of the Internal Revenue Code and is exempt from New York state and local income taxes. The Manhattan ASC and West Side ASC are New York limited liability companies classified as a partnership for U.S. Federal income tax purposes. The TJA tax exempt status has not yet been approved. Operations were not significant in 2017 and the Hospital is not aware of any adverse effect on its tax exempt status. As a result of the recent federal income tax reform enacted into law, certain provisions will impact taxable and tax-exempt organizations, including revisions to taxes on unrelated business activities, excise tax on compensation of certain employees, reduction of corporate income tax rates and various other provisions. The regulations necessary to implement the law when enacted are expected to be promulgated throughout 2018. The Hospital is currently in the process of assessing the impact of these regulations on the consolidated financial statements.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

### Reclassifications

Certain reclassifications have been made to the 2016 financial statements to conform to the presentation in the 2017 financial statements.

## 2. Net Patient Service Revenue and Receivables for Patient Care

Net patient service revenue is reported at the estimated net realizable amounts due from patients; third-party payors and others for services rendered and includes estimated future retroactive revenue adjustments due to ongoing and future audits and reviews. Retroactive adjustments are considered in the recognition of revenue on an estimated basis in the period the related services are rendered and such adjustments are recorded in future periods as they become known or as years are no longer subject to audits, reviews and investigations. There were no significant prior year settlements and adjustments during 2017 and 2016.

### Non-Medicare Reimbursement

In New York State, hospitals and all non-Medicare payors, except Medicaid, workers' compensation and no-fault insurance programs, negotiate hospitals' payment rates. If negotiated rates are not established, payors are billed at hospitals' established charges. Medicaid, workers' compensation and no-fault payors pay inpatient and outpatient hospital rates promulgated by the New York State Department of Health on a prospective payment basis system. Medicaid rate methodologies are subject to approval at the Federal level by the Centers for Medicare and Medicaid Services (CMS), which may routinely request information about such methodologies prior to approval. Revenue related to specific rate components that have not been approved by CMS are not recognized until the Hospital is reasonably assured that such amounts are realizable. Adjustments to the current and prior years' payment rates for those payors will continue to be made in future years.

### Medicare Reimbursement

Medicare pays hospitals for most inpatient and outpatient services under its respective national prospective payment systems, and uses other, generally fee schedule based, methodologies for payment for other services. Federal regulations provide for certain adjustments to current and prior years' payment rates, based on industry-wide and Hospital-specific data, including quality measures.

23

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**2. Net Patient Service Revenue and Receivables for Patient Care (continued)**

The Hospital has established estimates, based on information presently available, of amounts due to or from Medicare and non-Medicare payors for adjustments to current and prior years' payment rates, based on industry-wide and Hospital-specific data. Such estimates are included in third-party payor liabilities in the accompanying consolidated statements of financial position. Medicare cost reports, which serve as a basis for final settlement with the Medicare program, have been audited by the Medicare fiscal intermediary and settled through 2014. Other years remain open for audit and settlement as are cost reports and other issues related to the New York State Medicaid program for prior years. As a result, there is at least a reasonable possibility that recorded estimates will change by a material amount when open years are settled and additional information is obtained. The current Medicaid, Medicare and other third-party payor programs are based upon extremely complex laws and regulations that are subject to interpretation. Noncompliance with such laws and regulations could result in fines, penalties and exclusion from such programs. The Hospital is not aware of any allegations of noncompliance that could have a material adverse effect on the consolidated financial statements and believes that it is in compliance, in all material respects, with all applicable laws and regulations.

There are various proposals at the Federal and State levels that could, among other things, significantly reduce payment rates or modify payment methods. The ultimate outcome of these proposals and other market changes, including the potential effects of health care reform that have been enacted by the Federal and State governments, cannot presently be determined.

Future changes in the Medicare and Medicaid programs and any reduction of funding could have an adverse effect on the Hospital. Additionally, certain payors' payment rates for various years have been appealed by the Hospital. If the appeals are successful, additional income applicable to those years might be realized.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**2. Net Patient Service Revenue and Receivables for Patient Care (continued)**

The Hospital grants credit without collateral to its patients, most of whom are insured under various third-party agreements. The significant concentrations of accounts receivable for services to patients include 12.6% from Medicare and Medicaid, 15.7% from self-pay and 71.7% from commercial insurance and others at December 31, 2017 (14.7%, 14.3% and 71% respectively, in 2016).

In 2017, approximately 20.2% of the Hospital's net patient service revenue was derived from the Medicare and Medicaid programs (approximately 18.4% in 2016).

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**3. Investments and Assets Limited as to Use**

The Hospital maintains a pooled investment program for certain investments owned by the Hospital, Fund and Properties. The Hospital's pro rata share of the pooled investment program and its pro rata share of investment income, including realized gains and losses, and the net change in unrealized gains and losses and equity in earnings of alternative investments, are reflected in the accompanying consolidated financial statements.

Investments, including the pooled investment program pertaining to the Hospital, were as follows at December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Money market mutual funds | $  132,913 | $   139,171 |
| Marketable equity securities | 26,519 | 22,561 |
| Equity mutual funds | 127,847 | 103,728 |
| Fixed income mutual funds | 24,381 | 24,265 |
| Fixed income securities | 43,038 | 43,267 |
| Alternative investments: | | |
| Hedge and common collective trust funds: | | |
| U.S. equity large/small cap | 37,627 | 31,176 |
| International equity | 36,331 | 17,901 |
| Long/short equity | 73,586 | 65,059 |
| Multi-strategy | 54,215 | 55,872 |
| Real assets | 3,009 | 2,902 |
| Private equity | 10,795 | 12,327 |
|  | 570,261 | 518,229 |
| Less current portion | 448,568 | 403,106 |
|  | $  121,693 | $   115,123 |

26

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**3. Investments and Assets Limited as to Use (continued)**

Additionally, a portion of Fund's investment portfolio represents net assets received by Fund on behalf of the Hospital which are due to the Hospital. These investments and related investment income, including change in net unrealized gains and losses and equity in earnings of alternative investments, are reflected in the accompanying consolidated financial statements within the amounts due from affiliates (approximately $22.2 million at December 31, 2017 and $20.2 million at December 31, 2016). At December 31, 2017 and 2016, investments include amounts set aside by the Hospital's Board of Trustees for quasi-endowment of approximately $4.3 million and $3.9 million. Investment income earned during the year is included in other operating revenue on the consolidated statements of operations and changes in net assets.

The composition of assets limited as to use at December 31, at fair value, is as follows:

|  | 2017 | | 2016 |
|---|---|---|---|
|  | *(In Thousands)* | | |
| Money market mutual funds | $ | **24,959** | $ | 33,512 |
| Fixed income securities | | **25,070** | | 26,479 |
| Cash and cash equivalents | | **–** | | 9,028 |
| | | **50,029** | | 69,019 |
| Less current portion of assets limited as to use | | **–** | | 5,625 |
| | $ | **50,029** | $ | 63,394 |

|  | 2017 | | 2016 |
|---|---|---|---|
|  | *(In Thousands)* | | |
| Mortgage reserve funds | $ | **25,969** | $ | 26,626 |
| Equipment loans | | **–** | | 9,028 |
| Restricted assets – future campus expansion | | **24,060** | | 33,365 |
| | | **50,029** | | 69,019 |
| Less current portion of assets limited as to use | | **–** | | 5,625 |
| | $ | **50,029** | $ | 63,394 |

27

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**4. Property, Plant and Equipment**

A summary of property, plant and equipment is as follows at December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Land and land improvements | $ **2,006** | $ 2,006 |
| Buildings and improvements | **674,308** | 598,089 |
| Furniture, equipment and software | **534,822** | 469,749 |
|  | **1,211,136** | 1,069,844 |
| Less accumulated depreciation and amortization | **635,714** | 573,428 |
|  | **575,422** | 496,416 |
| Construction-in-progress | **20,101** | 39,259 |
|  | $ **595,523** | $ 535,675 |

At December 31, 2017, the Hospital had capital commitments of approximately $14.4 million related to construction and renovation projects, information technology, and certain other capital projects.

The Hospital capitalizes costs incurred in connection with the development of internal use software or purchased software modified for internal use. Included in property, plant, and equipment is $84.4 million and $77.9 million of capitalized software costs at December 31, 2017 and December 31, 2016, respectively. Accumulated amortization of capitalized software costs at December 31, 2017 and December 31, 2016 is $43.8 million and $43.3 million, respectively.

In 2017, the Hospital removed from its accounts, furniture and equipment with a historical cost of approximately $3.5 million, which was fully depreciated and no longer in use.

Rent expense, the majority of which is paid to Properties, was approximately $48.2 million in 2017 and $40.2 million in 2016.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 5. Debt-Related Matters

**Long-Term Debt**

Long-term debt consisted of the following at December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Insured mortgage loan (2009)[a] | $ **69,651** | $ 71,544 |
| Insured mortgage loan (2011)[b] | **32,854** | 38,598 |
| Insured mortgage loan (2015)[c] | **39,209** | 41,399 |
| Promissory note[d] | **21,329** | 23,516 |
| Commercial mortgage loan[e] | **1,758** | 3,166 |
| Tax-exempt loans[g] | **97,817** | 114,635 |
|  | **262,618** | 292,858 |
| Less unamortized deferred financing costs | **4,539** | 5,080 |
| Add unamortized mortgage premium, net of accumulated amortization of $2,067 in 2017 ($1,801 in 2016) | **841** | 1,107 |
|  | **258,920** | 288,885 |
| Add Manhattan ASC – Construction Loan[f] | **13,722** | 1,967 |
| Add Manhattan ASC – Working Capital Loan[f] | **1,250** | – |
| Less current portion of long-term debt | **43,517** | 41,653 |
|  | $ **230,375** | $ 249,199 |

[a] The Hospital's 2009 mortgage loan is insured under the provisions of the Federal Housing Administration ("FHA") 241 program.

The mortgage loan bears interest at a rate of 6.03% per annum. Monthly principal and interest payments of approximately $513,000 are due during each of the ensuing 20 years, with final payment due no later than January 1, 2037. The mortgage loan may be prepaid after August 15, 2019. The mortgage loan is collateralized by certain of the Hospital's property and equipment

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**5. Debt-Related Matters (continued)**

The provisions of the loan and related agreements require the Hospital to establish and maintain a mortgage reserve fund. The mortgage reserve fund approximated $6.6 million and $5.3 million at December 31, 2017 and 2016, respectively (see mortgage reserve funding requirements below). The Hospital is also required to maintain specified current, debt service coverage, and other financial ratios. At December 31, 2017 and 2016, the Hospital met the various financial ratio and mortgage reserve requirements.

(b) The Hospital's 2011 mortgage loan is insured under the provisions of the FHA 242 Program.

The mortgage loan bears interest at an annual rate of 3.835%. Monthly principal and interest payments of approximately $594,000 are due, with final payment due no later than January 1, 2023. The mortgage loan may be prepaid at any time after June 30, 2021. The mortgage loan is collateralized by certain of the Hospital's property and equipment. The mortgage premium is being amortized over the remaining term of the loan using the effective interest method.

The provisions of the loan and related agreements require the Hospital to establish and maintain a mortgage reserve fund and to maintain specified current debt service coverage, and other financial ratios. The mortgage reserve fund approximated $12.0 million and $14.0 million at December 31, 2017 and 2016, respectively (see mortgage reserve funding requirements below). At December 31, 2017 and 2016, the Hospital met the various financial ratio and mortgage reserve funding requirements.

(c) The Hospital's 2015 mortgage loan is insured under provisions of the FHA 242 Program.

The mortgage loan bears interest at an annual rate of 3.17%. Monthly principal and interest payments of approximately $289,000 are due, with final payment due no later than December 31, 2031. The mortgage loan may be prepaid at any time after May 31, 2022. The mortgage loan is collateralized by certain of the Hospital's property and equipment.

30

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 5. Debt-Related Matters (continued)

The provisions of the loan and related agreements require the Hospital to establish and maintain a mortgage reserve fund. The mortgage reserve fund approximated $7.3 million at December 31, 2017 and 2016, (see mortgage reserve funding requirements below). The Hospital is also required to maintain specified current, debt service coverage, and other financial ratios. At December 31, 2017 and 2016, the Hospital met the various financial ratio and mortgage reserve funding requirements.

(d) In January 2015, the Hospital entered into a promissory note agreement for approximately $26.6 million to finance a portion of the purchase of a leasehold condominium interest. The note bears interest at a rate of 6.0% per annum. Monthly principal and interest payments of approximately $295,000 are due, with final payment due no later than July 1, 2025. The note can be prepaid at any time without penalty.

(e) The commercial mortgage loan is collateralized by a first mortgage lien on the Caspary Building and also by marketable securities held by the Hospital and Fund (having a total fair value of approximately $2.1 million at December 31, 2017), which have been pledged to reduce the interest rate. The variable interest rate is reduced to the extent that there is additional investment collateral pledged to the bank. The variable interest is calculated based on the bank's quarterly money market rates, plus 65 basis points (1.98% at December 31, 2017). The provisions of the mortgage loan require that the Hospital maintain specified financial ratios. As of December 31, 2017 and 2016, the Hospital met the various financial ratio requirements.

(f) In May 2016, Manhattan ASC entered into a loan agreement with a commercial bank to borrow a total of $15.75 million ($14.50 million Project Loan for construction and equipment, and $1.25 million Working Capital Loan). The Hospital has guaranteed its proportionate share (51%) of the debt.

For a period of up to two years from date of closing (the Draw Period), interest only payments are due on amounts drawn. Interest is charged at a variable rate equal to one month LIBOR plus 140 basis points during the Draw Period. At the end of the Draw Period or sooner should Manhattan ASC elect, the Project Loan will be converted to an eight or ten year term loan, at the option of the borrower, and the Working Capital Loan will be converted to a five year term loan. Interest is fixed at the then 10 year U.S.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**5. Debt-Related Matters (continued)**

Treasury rate plus 140 basis points for the Project Loan and the 5 year U.S. Treasury rate plus 140 basis points for the working capital loan on the date of each respective conversion.

(g) The Hospital has balances outstanding under tax-exempt financing agreements under the Dormitory Authority Tax-Exempt Leasing Program relating primarily to investments in information technology and equipment purchases with some associated construction and soft costs. The following is a summary of the loans, for which the related equipment serves as collateral:

| Origination Year | Original Loan Amount | Monthly Principal and Interest Payments | Fixed Interest Rates | Final Payment |
|---|---|---|---|---|
| 2012 | $ 22.0 million | $ 316,195 | 1.16% | October 2018 |
| 2013 | 26.0 million | 375,802 | 1.32 | July 2019 |
| 2014 | 28.0 million | 403,571 | 1.24 | May 2020 |
| 2014 | 62.4 million | 916,608 | 1.86 | August 2021 |
| 2015 | 18.0 million | 260,664 | 1.43 | June 2021 |
| 2016 | 20.0 million | 287,058 | 1.10 | June 2022 |
| 2017 | 15.0 million | 218,607 | 1.64 | July 2023 |

Interest paid on all debt was approximately $10.1 million and $10.7 million in 2017 and 2016, respectively. Capitalized interest was not significant in 2017 and 2016, respectively.

32

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**5. Debt-Related Matters (continued)**

Annual principal payments on all debt, mortgage premium amortization and required mortgage reserve funding for each of the next five years and thereafter are as follows:

| | Principal Payments | Mortgage Premium Amortization | Total | Mortgage Reserve Funding Requirements |
|---|---|---|---|---|
| | | *(In Thousands)* | | |
| 2018 | $ 43,285 | $ 232 | $ 43,517 | $ 1,128 |
| 2019 | 41,651 | 197 | 41,848 | 1,179 |
| 2020 | 36,885 | 160 | 37,045 | 1,230 |
| 2021 | 30,643 | 123 | 30,766 | 1,282 |
| 2022 | 20,881 | 83 | 20,964 | 1,128 |
| Thereafter | 104,245 | 46 | 104,291 | – |
| Total obligations | $ 277,590 | $ 841 | $ 278,431 | $ 5,947 |

In July 2015, the Hospital entered into revolving loan agreements with a commercial bank for two lines of credit (the Lines), which are unsecured, for $25.0 million and $50.0 million. The $25.0 million line is intended for general working capital needs and the $50.0 million line was intended to provide additional funding, if needed, for temporary cash flow interruptions relating to certain information technology projects. No amounts have been drawn in 2017 and 2016. The $25.0 million line of credit expires July 30, 2018 and the $50.0 million line of credit was cancelled in August 2016.

In September 2017, West Side ASC entered into a loan agreement with a commercial bank to borrow a total of $13.50 million ($12.53 million Project Loan for construction and equipment, and $970,000 Working Capital Loan). The Hospital has guaranteed its proportionate share (67%) of the debt. For a period of up to two years from date of closing (the Draw Period), interest only payments are due on amounts drawn. Interest is charged at a variable rate equal to one month LIBOR plus 140 basis points during the Draw Period. At the end of the Draw Period or sooner should West Side ASC elect, the Project Loan can be converted to an eight or ten year term loan and the Working Capital Loan can be converted to a five year term loan. Interest is fixed at the then 10 year U.S. Treasury rate plus 140 basis points for the Project Loan and the 5 year U.S. Treasury rate plus 140 basis points for the Working Capital Loan. As of December 31, 2017, no amounts have been drawn.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 6. Other Operating Revenue

A summary of the components of other operating revenue is as follows for the years ended December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Physician practice revenue and overhead recovery | $ 146,091 | $ 135,633 |
| Investment income (interest and dividends) | 3,973 | 3,664 |
| Net realized gains on investments | 1,890 | 219 |
| Operating component of change in net unrealized gains and losses on investments and equity in earnings of alternative investments | 11,883 | 1,125 |
| Royalty income | 425 | 3,425 |
| Rebates and discounts | 2,478 | 2,397 |
| Dietary income | 1,141 | 1,065 |
| Other | 4,590 | 6,242 |
|  | $ 172,471 | $ 153,770 |

## 7. Insurance Coverage

The Hospital maintained commercial insurance for professional and general liabilities prior to March 1976 and for workers' compensation coverage prior to March 1980. Subsequent to those dates, those coverages have been purchased by the Hospital from commercial carriers that reinsure the majority of the primary portions of such coverages with MIAC, a Cayman Islands corporation organized by the Hospital in 1981 and licensed under Cayman Islands law to conduct an insurance business. Effective June 15, 2003, MIAC commenced to directly insure a buffer layer between the primary and excess positions of certain of such coverages. MIAC also reinsures the primary professional liability coverage of the majority of Hospital physicians and directly insures a buffer layer above the primary portion of such coverage. The Hospital, which in March 1981 had purchased for $10,000 all of the outstanding stock of MIAC, transferred its interest in MIAC to the Hospital's affiliate, Fund as of January 1, 1985.

34

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

### 7. Insurance Coverage (continued)

The Hospital has guaranteed payment of certain of MIAC's obligations related to MIAC's existing professional, general liability and workers' compensation reinsurance commitments to the extent that MIAC's insurance liabilities might require such support.

MIAC's insurance liabilities, which have been evaluated by an independent actuarial firm, approximated $113.3 million at December 31, 2017 and $105.5 million at December 31, 2016. Total assets were approximately $127.7 million and $120.8 million at December 31, 2017 and 2016, respectively. Underwriting income approximated $21.7 million and $20.6 million for 2017 and 2016, respectively. MIAC's net operating results in 2017 and 2016 were not significant.

In the accompanying consolidated financial statements, the Hospital has recognized estimated discounted professional claims liabilities, certain workers' compensation claims liabilities, and insurance recovery receivables of approximately $77.0 million (approximately $13.5 million current and $63.5 million long term) as of December 31, 2017, and approximately $73.1 million (approximately $11.7 million current and $61.4 million long term) as of December 31, 2016.

### 8. Benefit Plans

The Hospital maintains a noncontributory cash balance defined benefit pension plan (the Plan) that covers certain employees of the Hospital and its affiliates. The Hospital's funding policy is to contribute amounts to the Plan sufficient to meet the minimum funding requirements pursuant to the Employee Retirement Income Security Act of 1974, plus such additional amounts as the Hospital may deem appropriate from time to time.

Contributions are intended to provide not only for benefits attributed to service to date but also for those expected to be earned in the future. At December 31, 2017, the assets of the Plan consist primarily of money market mutual funds, equity mutual funds, fixed income mutual funds and alternative investments.

In 2009, the Hospital amended the Plan to implement a "soft freeze" effective January 1, 2010. Any new employees hired after October 15, 2009 are not eligible to participate in the Plan. In addition, existing employees had the option to remain active in the Plan or freeze their status, with new benefits accruing to a new defined contribution plan effective January 1, 2010. The soft freeze did not constitute a curtailment of the Plan.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**8. Benefit Plans (continued)**

In addition to providing pension benefits, the Hospital provides certain health care benefits for certain retired employees through a postretirement plan. The Hospital accrues the obligation to provide postretirement health care and other welfare benefits during the years in which employees provide service and funds such benefits on a pay-as-you-go basis.

The Hospital recognizes the funded status (i.e., the difference between the fair value of plan assets and the projected benefit obligations) of the defined benefit and postretirement benefit plans in its consolidated statements of financial position.

Net actuarial losses and the net prior service costs at the reporting date will be subsequently recognized in the future as net periodic benefit cost pursuant to the Hospital's accounting policy for amortizing such amounts. Further, actuarial gains and losses that arise in subsequent periods and are not recognized as net periodic benefit cost in the same periods will be recognized as a component of unrestricted net assets.

Included in other changes in unrestricted net assets at December 31, 2017 and 2016 are the following amounts that have not yet been recognized in net periodic benefit cost:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Net actuarial loss recognized in unrestricted net assets | $ **(187,144)** | $ (147,950) |
|  | $ **(187,144)** | $ (147,950) |

The actuarial loss and prior service cost included in other changes in unrestricted net assets at December 31, 2017 and expected to be recognized in net periodic benefit cost during the year ending December 31, 2018 are as follows (in thousands):

| | |
|---|---|
| Net actuarial loss recognized in unrestricted net assets | $    12,246 |
| | $    12,246 |

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**8. Benefit Plans (continued)**

The following tables provide a reconciliation of the changes in each of the plans' projected benefit obligations and fair value of plan assets as of December 31:

| | Pension Plan | | Postretirement Plan | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| | *(In Thousands)* | | | |
| **Reconciliation of the projected benefit obligation** | | | | |
| Obligation at beginning of year | $ 351,250 | $ 319,828 | $ 5,298 | $ 5,408 |
| Service cost | 16,057 | 16,884 | 65 | 63 |
| Interest cost | 14,564 | 13,968 | 195 | 204 |
| Actuarial loss (gain) | 64,900 | 11,366 | 1,395 | (78) |
| Benefit payments, net | (13,103) | (10,796) | (305) | (299) |
| Obligation at end of year | $ 433,668 | $ 351,250 | $ 6,648 | $ 5,298 |
| | | | | |
| **Reconciliation of fair value of plan assets** | | | | |
| Fair value of plan assets at beginning of year | $ 236,103 | $ 206,256 | $ – | $ – |
| Actual return on plan assets | 35,307 | 11,743 | – | – |
| Employer contributions | 31,500 | 28,900 | 305 | 299 |
| Plan participants' contributions | – | – | 387 | 373 |
| Benefit payments | (13,103) | (10,796) | (692) | (672) |
| Fair value of plan assets at end of year | $ 289,807 | $ 236,103 | $ – | $ – |

37

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**8. Benefit Plans (continued)**

The following table provides the amounts recognized as liabilities in the consolidated statements of financial position at December 31:

|  | Pension Plan | | Postretirement Plan | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
|  | *(In Thousands)* | | | |
| **Funded status** | | | | |
| Unfunded status at end of year | $ **(143,861)** $ (115,147) | | $ **(6,648)** $ (5,298) | |

The following table provides the components of the net periodic benefit cost for each of the plans for the years ended December 31:

|  | Pension Plan | | Postretirement Plan | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
|  | *(In Thousands)* | | | |
| Service cost – benefits earned during the year | $ **16,057** $ | 16,884 | $ **65** $ | 63 |
| Interest cost on projected benefit obligations | **14,564** | 13,968 | **195** | 204 |
| Expected return on plan assets | **(16,412)** | (13,996) | – | – |
| Amortization of prior service cost | – | 38 | – | – |
| Recognized actuarial loss | **7,995** | 8,650 | **211** | 264 |
| Net periodic benefit cost | $ **22,204** $ | 25,544 | $ **471** $ | 531 |

The accumulated benefit obligation for the Plan as of December 31, 2017 and 2016 was approximately $433.2 million and $350.9 million, respectively.

38

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**8. Benefit Plans (continued)**

Prior service costs are amortized on a straight-line basis over the average remaining service period to full retirement eligibility of active participants. Gains and losses in excess of 10% of the greater of the benefit obligations and the market-related value of assets are amortized over the average remaining service period of active participants. The weighted-average assumptions used in the measurement of the Hospital's benefit obligations at December 31 were:

|  | Pension Plan | | Postretirement Plan | |
|  | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Discount rate | **3.70%** | 4.30% | **3.30%** | 3.80% |
| Rate of increase in compensation levels | **3.70** | 3.70 | **—** | — |

The actuarial loss in 2017 primarily relates to a change in the discount rate as compared to the prior period.

The weighted-average assumptions used in the measurement of the Hospital's net periodic benefit cost for the years ended December 31 were as follows:

|  | Pension Plan | | Postretirement Plan | |
|  | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Discount rate | **4.30%** | 4.50% | **3.80%** | 3.90% |
| Expected long-term rate of return on plan assets | **6.50** | 6.50 | **—** | — |
| Rate of increase in compensation levels | **3.70** | 3.50 | **—** | — |

The Plan's weighted-average asset allocations at December 31, 2017 and 2016, by asset category, are as follows:

|  | 2017 | 2016 |
|---|---|---|
| Asset category: | | |
| Money market mutual funds | **13%** | 8% |
| Equity mutual funds | **13** | 11 |
| Fixed income mutual funds | **35** | 40 |
| Alternative investments | **39** | 41 |
| Total | **100%** | 100% |

39

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**8. Benefit Plans (continued)**

To develop the expected long-term rate of return on plan assets assumption, the Hospital considered the historical return and the future expectations for returns for each asset class, as well as the target asset allocation of the pension portfolio.

The defined benefit pension plan's investment objectives are to achieve long-term growth in excess of long-term inflation and to provide a rate of return that meets or exceeds the expected long-term rate of return on Plan assets over a long-term time horizon. In order to minimize the risk, the Plan aims to minimize the variability in yearly returns. The Plan also aims to diversify its holding among sectors, industries, and companies.

The assets of the Plan are managed in accordance with the Employee Retirement Income Security Act of 1974. The assets of the Plan are measured at fair value in accordance with the policies discussed in Note 1. Refer to Note 16 for fair value measurement information related to the defined benefit plan asset categories noted in the table above.

The Hospital expects to make contributions of approximately $31.5 million and $378,000 to the Pension Plan and Postretirement Plan, respectively, during 2018.

Benefit payments, which reflect expected future benefit accruals, as appropriate, are expected to be paid as follows:

|  | Pension Plan | | Postretirement Plan |
|---|---|---|---|
|  | *(In Thousands)* | | |
| 2018 | $ | 17,822 | $ 378 |
| 2019 | | 16,840 | 404 |
| 2020 | | 16,674 | 427 |
| 2021 | | 16,732 | 447 |
| 2022 | | 18,345 | 458 |
| 2023 to 2027 | | 101,075 | 2,215 |

40

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 8. Benefit Plans (continued)

Assumed health care cost trend rates have a significant effect on the amounts reported for the postretirement plans. A 1% change in assumed health care cost trend rates would have the following effects relating to the postretirement plans:

|  | 2017 | | 2016 | |
|---|---|---|---|---|
|  | 1% Increase | 1% Decrease | 1% Increase | 1% Decrease |
|  | (In Thousands) | | | |
| Effect on total of service and interest cost components of net periodic postretirement benefit cost | $ 1 | $ (1) | $ 1 | $ (1) |
| Effect on the health care component of the accumulated postretirement benefit obligation | 1 | (3) | 4 | (9) |

The Hospital also provides pension benefits to certain employees through a defined contribution plan. Pension expense related to this plan was approximately $12.9 million and $11.3 million for the years ended December 31, 2017 and 2016, respectively.

## 9. Functional Expenses

The Hospital provides musculoskeletal health care and related services, including research and graduate medical education. It is not practicable to separately identify the expenses relating to each of the Hospital's programs. Expenses related to primary services were as follows:

|  | Year Ended December 31 | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In Thousands) | |
| Health care and related services | $ 893,808 | $ 829,468 |
| General and administrative | 184,457 | 161,591 |
| Research operations | 42,171 | 41,035 |
|  | $ 1,120,436 | $ 1,032,094 |

41

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**10. Permanently Restricted Net Assets**

Permanently restricted net assets are restricted as follows at December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Assets to be held in perpetuity, the income from which is restricted for research | $ 98,849 | $ 95,844 |
| Assets to be held in perpetuity, the income from which is restricted for other specific purposes | 39,340 | 35,514 |
| Assets to be held in perpetuity, the income from which is unrestricted as to use | 410 | 410 |
|  | $ 138,599 | $ 131,768 |

Changes in endowment investments for the year ended December 31, 2017 are as follows:

|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|
|  | *(In Thousands)* | | | |
| Endowment investments, beginning balance | $ 6,425 | $ 50,530 | $ 126,194 | $ 183,149 |
| Total investment return | 680 | 27,331 | – | 28,011 |
| (Transfers) contributions | – | (249) | 6,570 | 6,321 |
| Appropriation of endowment investments for expenditure | (258) | (8,884) | – | (9,142) |
| Endowment investments, ending balance | $ 6,847 | $ 68,728 | $ 132,764 | $ 208,339 |

42

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 10. Permanently Restricted Net Assets (continued)

Changes in endowment investments for the year ended December 31, 2016 are as follows:

|  | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|
|  | | *(In Thousands)* | | |
| Endowment investments, beginning balance | $ 5,797 | $ 49,752 | $ 117,099 | $ 172,648 |
| Total investment return | 700 | 8,559 | – | 9,259 |
| (Transfers) contributions | – | (250) | 9,095 | 8,845 |
| Appropriation of endowment investments for expenditure | (72) | (7,531) | – | (7,603) |
| Endowment investments, ending balance | $ 6,425 | $ 50,530 | $ 126,194 | $ 183,149 |

Permanently restricted net assets represent endowments that have been restricted by donors to be maintained in perpetuity. Quasi-endowment represents amounts set aside by the Hospital's Board of Trustees for certain internally designated purposes. The Hospital follows the requirements of the New York Prudent Management of Institutional Funds Act (NYPMIFA) passed into law effective September 2010, as they relate to its permanently restricted net assets. The Hospital has interpreted NYPMIFA as requiring the preservation of the fair value of the original gift, as of the gift date, of the donor-restricted endowment fund absent explicit donor stipulations to the contrary. The Hospital classifies as permanently restricted net assets the original value of the gifts donated to the permanent endowment and the original value of subsequent gifts to the permanent endowment. Returns on the permanent endowment are used in accordance with the direction of the applicable donor gift. Returns on permanently restricted net assets are classified as temporarily restricted net assets until the amounts are appropriated for expenditure in accordance with a manner consistent with the standard of prudence prescribed by NYPMIFA. In accordance with NYPMIFA, the Hospital considers the following factors in making a determination to appropriate or accumulate donor-restricted endowment funds: (1) the duration and preservation of the fund; (2) the purposes of the donor-restricted endowment fund; (3) general economic conditions; (4) the possible effects of inflation and deflation; (5) where appropriate and circumstances would otherwise warrant, alternatives to expenditure of the endowment fund, giving due consideration to the effect that such alternatives may have on the institution; (6) the expected total return from

43

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

### 10. Permanently Restricted Net Assets (continued)

income and the appreciation of investments; (7) other resources of the Hospital; and (8) the
investment and spending policies of the Hospital. The Hospital has adopted investment and
spending policies for endowment assets that attempt to provide a predictable stream of funding to
programs supported by its endowment.

Under Hospital policy, as approved by the Board of Trustees, the endowment assets are invested
in a manner to provide that sufficient assets are available as a source of liquidity for the intended
use of the funds, achieve the optimal return possible within the specified risk parameters, prudently
invest assets in a high-quality diversified manner and adhere to the established guidelines.

To satisfy its long-term rate-of-return objectives, the Hospital relies on a total return strategy in
which investment returns are achieved through both capital appreciation (realized and unrealized)
and current yield (interest and dividends). The Hospital targets a diversified allocation that places
a greater emphasis on equity-based investments to achieve its long-term return objectives within
prudent risk constraints.

The Hospital's permanently restricted endowment funds are managed according to endowment
and similar fund policies that guide investment of donations, spending and distribution of total
return investment income. The policies also provide the guidelines for setting the annual
endowment spend rate (5% for 2017 and 2016 or income if the fair value is below the original
endowment donation) and the treatment of any investment returns in excess of the annual spending
rate. The 5% endowment spend rate is calculated on the year-end average three-year rolling fair
value of each endowed fund. Any excess investment returns beyond the spending rate, to the extent
available, are added to temporarily restricted funds and classified appropriately.

The Hospital distributes the investment income earned on the endowment funds as required for the
donor-restricted purpose of the endowment assets held in perpetuity.

From time to time, the fair value of assets associated with individual donor restricted endowment
funds may fall below the level of the original principal donation. There are no significant
deficiencies of this nature that are reported in unrestricted net assets as of December 31, 2017 and
2016.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

## 11. United States Public Health Service Research Grants

Expenditures and overhead allocations charged to United States Public Health Service research grants are subject to audit by the funding agencies. It is management's opinion that adjustments, if any, will not be materially different from recorded amounts. The revenue from these grants is included in net assets released from restrictions for research operations.

## 12. Bicknell Trust

The Hospital's institutional research funds are the beneficiary of income from the Bicknell Trust. The fair value of investments in the trust was approximately $39.1 million and $35.7 million at December 31, 2017 and 2016, respectively. Income received from this trust was approximately $1.8 million for both 2017 and 2016 and is recorded directly in the research funds (temporarily restricted net assets).

## 13. Bequest

The Hospital is a beneficiary of a charitable trust (the Trust) established by certain donors (the Donors). Under the terms of the Trust agreement, the Hospital received distributions from the Trust upon the death of the Donors (which has occurred), finalization of the probate administration process and upon settlement of certain other matters. In 2016, the Hospital received a final distribution and recorded revenue from the Trust of approximately $985,000.

## 14. Transactions with Affiliates

Fund and Properties purchase certain administrative, general and plant services from the Hospital. Amounts charged for these services (approximately $5.5 million and $5.1 million in 2017 and 2016, respectively) are determined principally on the basis of allocated costs. Fund provides certain fundraising services to the Hospital valued at approximately $6.9 million in 2017 and $5.9 million in 2016, respectively. The methodology used to allocate costs is based on a formula of historical contributions received. Amounts due to and from the Hospital for these services are

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**14. Transactions With Affiliates (continued)**

reimbursed in the normal course of business. Additionally, Properties leases various facilities to the Hospital. Rental expense under these arrangements amounted to approximately $46.5 million and $39.0 million for the years ended December 31, 2017 and 2016, respectively.

At December 31, amounts due from the Hospital's affiliates are as follows:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Fund | $ 1,877 | $ 1,493 |
| Properties | 1,007 | 136 |
| Horizons | 3,587 | 3,421 |

In addition to the amounts above (and as discussed in Note 3), a portion of Fund's investment portfolio represents amounts received by Fund on behalf of the Hospital which are due to the Hospital (approximately $22.2 million at December 31, 2017 and $20.2 million at December 31, 2016).

Amounts due to and from affiliates generally are not interest-bearing, except for the amount due from Horizons, for which interest is charged at the prime rate.

Certain lease agreements entered into between the Hospital and Properties include tenant improvement allowances to be used for future renovations. The tenant improvement allowances will be amortized over the life of the leases as a reduction of rental expense. In accordance with the lease agreements, the Hospital will be reimbursed by Properties for renovation expenditures. Amounts to be reimbursed by Properties are recorded as a tenant improvement receivable. The balance of the tenant improvement receivable, which is included as a component of other receivables on the accompanying consolidated statements of financial position, is approximately $10.0 million and $12.2 million at December 31, 2017 and 2016, respectively. The balance of the leasehold incentive liability, which is included as a component of current and noncurrent other liabilities on the accompanying consolidated statements of financial position, is approximately $13.4 million and $11.9 million at December 31, 2017 and 2016, respectively.

46

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**14. Transactions With Affiliates (continued)**

Following is a summary of consolidated financial information for Fund, Inc. and Affiliates as of December 31, 2017 and 2016 and for the years then ended:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Total assets | $ 357,902 | $ 323,509 |
| Total liabilities | $ 234,834 | $ 219,122 |
| Total net assets | $ 123,068 | $ 104,387 |
| Operating revenue | $ 90,312 | $ 78,046 |
| Operating expenses | $ 79,549 | $ 66,396 |

The Hospital is not responsible for the debts or obligations of its affiliates, nor are such affiliates responsible for the debts or obligations of the Hospital other than as disclosed in Notes 5 and 7.

**15. Contingencies**

The Hospital is a defendant in certain legal actions arising out of the normal course of its operations, the final outcome of which cannot presently be determined. Hospital management is of the opinion that the ultimate liability, if any, with respect to all of these matters will not have a material effect on the Hospital's consolidated financial position.

**16. Fair Value Measurements**

For assets and liabilities required to be measured at fair value, the Hospital measures fair value based on the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurements are applied based on the unit of account from the Hospital's perspective.

The unit of account determines what is being measured by reference to the level at which the asset or liability is aggregated (or disaggregated) for purposes of applying other accounting pronouncements.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**16. Fair Value Measurements (continued)**

The Hospital follows a valuation hierarchy that prioritizes observable and unobservable inputs used to measure fair value into three broad levels, which are described below:

*Level 1* – Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities. The fair value hierarchy gives the highest priority to Level 1 inputs.

*Level 2* – Observable inputs that are based on inputs not quoted in active markets, but corroborated by market data.

*Level 3* – Unobservable inputs are used when little or no market data is available. The fair value hierarchy gives the lowest priority to Level 3 inputs.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. In determining fair value, the Hospital uses valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible and considers nonperformance risk in its assessment of fair value.

Financial instruments, excluding the defined benefit plan assets, carried at fair value as of December 31, 2017 are classified in the table below in one of the three categories described above:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
|  | *(In Thousands)* | | | |
| Cash and cash equivalents | $ 98,391 | $        – | $        – | $ 98,391 |
| Marketable equity securities | 26,519 | – | – | 26,519 |
| Money market mutual funds | 157,872 | – | – | 157,872 |
| Equity mutual funds | 127,847 | – | – | 127,847 |
| Fixed income mutual funds | 24,381 | – | – | 24,381 |
| Fixed income securities | 68,108 | – | – | 68,108 |
|  | $ 503,118 | $        – | $        – | $ 503,118 |

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**16. Fair Value Measurements (continued)**

Financial instruments, excluding the defined benefit plan assets, carried at fair value as of December 31, 2016 are classified in the table below in one of the three categories described above:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
|  | *(In Thousands)* | | | |
| Cash and cash equivalents | $ 104,185 | $ — | $ — | $ 104,185 |
| Marketable equity securities | 22,561 | — | — | 22,561 |
| Money market mutual funds | 172,683 | — | — | 172,683 |
| Equity mutual funds | 103,728 | — | — | 103,728 |
| Fixed income mutual funds | 24,265 | — | — | 24,265 |
| Fixed income securities | 69,746 | — | — | 69,746 |
|  | $ 497,168 | $ — | $ — | $ 497,168 |

The Hospital's alternative investments, excluding alternative investments in the defined benefit plan, of approximately $215.6 million and $185.2 million at December 31, 2017 and 2016, respectively, are reported using the equity method of accounting and, therefore, are not included in the table above.

Defined benefit plan assets, carried at fair value as of December 31, 2017 are classified in the table below in one of the three categories described above:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
|  | *(In Thousands)* | | | |
| Money market mutual funds | $ 36,250 | $ — | $ — | $ 36,250 |
| Equity mutual funds | 38,615 | — | — | 38,615 |
| Fixed income mutual funds | 101,849 | — | — | 101,849 |
|  | $ 176,714 | $ — | $ — | 176,714 |
| Alternative investments measured at net asset value: | | | | |
| Hedge funds | | | | 109,923 |
| Private equity | | | | 3,170 |
|  | | | | $ 289,807 |

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

### 16. Fair Value Measurements (continued)

Defined benefit plan assets, carried at fair value as of December 31, 2016 are classified in the table below in one of the three categories described above:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | *(In Thousands)* | | | |
| Money market mutual funds | $ 20,013 | $ – | $ – | $ 20,013 |
| Equity mutual funds | 25,475 | – | – | 25,475 |
| Fixed income mutual funds | 94,218 | – | – | 94,218 |
| | $ 139,706 | $ – | $ – | 139,706 |
| Alternative investments measured at net asset value: | | | | |
| Hedge funds | | | | 93,390 |
| Private equity | | | | 3,007 |
| | | | | $ 236,103 |

The following is a description of the Hospital valuation methodologies for assets measured at fair value. Fair value for Level 1 is based upon quoted market prices. The methods described above may produce a fair value that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while the Hospital believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different estimate of fair value at the reporting date.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**16. Fair Value Measurements (continued)**

The following is a summary of investments, including alternative investments reported using the equity method and those in the defined benefit plan and the nature of restrictions on the Hospital's ability to redeem its investments at the measurement date, any unfunded capital commitments and investments strategies of the investees as of December 31, 2017:

| | Carrying Value | Unfunded Commitments | Redemption Notice Period | Funds Availability |
|---|---|---|---|---|
| | *(In Thousands)* | | | |
| U.S. equity large/small cap | $ 56,315 | $ n/a | 0 days – 30 days | 1 month to 5 years |
| International equity | 57,858 | n/a | 14 days – 120 days | 1 week to 6 months |
| Long/short equity | 123,315 | n/a | 45 days – 180 days | 1 month to 2.5 years |
| Multi-strategy | 74,194 | n/a | 60 days – 120 days | 3 months to 2.25 years |
| Real assets | 3,009 | n/a | 0 days – 45 days | 3 months to 6 months |
| Private equity | 13,965 | 14,295 | none | 9 months to 12 years |
| | $ 328,656 | $ 14,295 | | |

The carrying values and fair values (net of deferred financing costs) of the Hospital's financial instruments that are not required to be carried at fair value are as follows at December 31:

| | 2017 | | 2016 | |
|---|---|---|---|---|
| | Fair Value | Carrying Value | Fair Value | Carrying Value |
| | *(In Thousands)* | | | |
| Long-term debt, including unamortized mortgage premium | $ 277,477 | $ 273,892 | $ 296,966 | $ 290,852 |

The fair value of the Hospital's long-term debt is based on discounted cash flow analyses, using current borrowing rates for similar types of debt and is classified as Level 2 within the valuation hierarchy.

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Notes to Consolidated Financial Statements (continued)

**17. Events Subsequent to December 31, 2017**

Subsequent events have been evaluated through March 12, 2018, which is the date the consolidated financial statements were issued.

Supplementary Information



**Ernst & Young LLP**
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350
ey.com

## Report of Independent Auditors on Supplementary Information

The Board of Trustees
New York Society for the Relief of the Ruptured and Crippled,
   Maintaining the Hospital for Special Surgery

We have audited the consolidated financial statements of New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery as of and for the year ended December 31, 2017, and have issued our report thereon dated March 12, 2018, which contained an unmodified opinion on those financial statements. Our audit was performed for the purpose of forming an opinion on the consolidated financial statements as a whole. The accompanying supplementary information is presented for the purposes of additional analysis and is not a required part of the consolidated financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States. In our opinion, the information is fairly stated in all material respects in relation to the consolidated financial statements as a whole.

*Ernst & Young LLP*

March 12, 2018

Consolidating Financial Statements

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Financial Position

December 31, 2017

| | Hospital for Special Surgery* | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS West Side ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | *(In Thousands)* | | | |
| **Assets** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 94,544 | $ – | $ 604 | $ 3,243 | $ – | $ 98,391 |
| Receivables: | | | | | | |
| Patient care, less allowance for doubtful accounts of $22,458 | 107,057 | – | 1,077 | – | – | 108,134 |
| Insurance claims receivable | 13,498 | – | – | – | – | 13,498 |
| Other | 34,440 | – | – | 2,204 | (1,090) | 35,554 |
| Total receivables | 154,995 | – | 1,077 | 2,204 | (1,090) | 157,186 |
| Investments | 448,568 | – | – | – | – | 448,568 |
| Inventories | 9,858 | – | 1,115 | – | – | 10,973 |
| Prepaid expenses and other current assets | 7,749 | – | 496 | – | – | 8,245 |
| Pledges receivable | 14,303 | – | – | – | – | 14,303 |
| Due from affiliates – net | 15,868 | – | – | – | (2,141) | 13,727 |
| Total current assets | 745,885 | – | 3,292 | 5,447 | (3,231) | 751,393 |
| Insurance claims receivable, net of current portion | 63,550 | – | – | – | – | 63,550 |
| Other noncurrent assets | 15,108 | – | 364 | – | – | 15,472 |
| Due from affiliates – net | 11,071 | – | – | – | – | 11,071 |
| Pledges receivable | 10,309 | – | – | – | – | 10,309 |
| Assets limited as to use | 50,029 | – | – | – | – | 50,029 |
| Long-term investments | 121,693 | – | – | – | – | 121,693 |
| Interest in The Hospital for Special Surgery Fund, Inc. | 54,987 | – | – | – | – | 54,987 |
| Interest in HSS ASC of Manhattan, LLC | (1,712) | – | – | – | 1,712 | – |
| Interest in HSS West Side ASC, LLC | 1,516 | – | – | – | (1,516) | – |
| Property, plant and equipment – net | 579,966 | – | 14,700 | 857 | – | 595,523 |
| Total assets | $ 1,652,402 | $ – | $ 18,356 | $ 6,304 | $ (3,035) | $ 1,674,027 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.*

54

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Financial Position (continued)

December 31, 2017

| | Hospital for Special Surgery* | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS West Side ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **Liabilities and net assets** | | | *(In Thousands)* | | | |
| Current liabilities: | | | | | | |
| Accounts payable and accrued expenses | $    79,586 | $    – | $    2,097 | $    30 | $    – | $    81,713 |
| Accrued salaries and related liabilities | 44,542 | – | 189 | – | – | 44,731 |
| Current portion of long-term debt | 42,728 | – | 789 | – | – | 43,517 |
| Due to affiliates – net | – | 765 | 1,149 | 227 | (2,141) | – |
| Due to third-party payors – net | 3,509 | – | – | – | – | 3,509 |
| Insurance claims liabilities | 13,498 | – | – | – | – | 13,498 |
| Other current liabilities | 18,875 | – | 31 | 105 | – | 19,011 |
| Total current liabilities | 202,738 | 765 | 4,255 | 362 | (2,141) | 205,979 |
| Long-term debt | 216,192 | – | 15,273 | – | (1,090) | 230,375 |
| Insurance claims liabilities, net of current portion | 63,550 | – | – | – | – | 63,550 |
| Other noncurrent liabilities, including due to third-party payors – net | 208,538 | – | 2,185 | 3,679 | – | 214,402 |
| Total liabilities | 691,018 | 765 | 21,713 | 4,041 | (3,231) | 714,306 |
| **Net assets:** | | | | | | |
| Unrestricted: | | | | | | |
| Unrestricted | 624,927 | (765) | (3,357) | 2,263 | 1,094 | 624,162 |
| Designated for quasi-endowment | 3,719 | – | – | – | – | 3,719 |
| Noncontrolling interest in subsidiaries | – | – | – | – | (898) | (898) |
| Total unrestricted | 628,646 | (765) | (3,357) | 2,263 | 196 | 626,983 |
| Temporarily restricted: | | | | | | |
| Specific purpose | 67,134 | – | – | – | | 67,134 |
| Plant replacement and expansion | 33,488 | – | – | – | – | 33,488 |
| Research | 93,517 | – | – | – | – | 93,517 |
| Total temporarily restricted | 194,139 | – | – | – | – | 194,139 |
| Permanently restricted | 138,599 | – | – | – | – | 138,599 |
| Total net assets | 961,384 | (765) | (3,357) | 2,263 | 196 | 959,721 |
| Total liabilities and net assets | $  1,652,402 | $    – | $    18,356 | $    6,304 | $    (3,035) | $  1,674,027 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.*

55

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Financial Position

December 31, 2016

| Assets | Hospital for Special Surgery* | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 87,328 | $ 3,329 | $ 4,500 | $ – | $ 95,157 |
| Receivables: | | | | | |
| Patient care, less allowance for doubtful accounts of $15,933 | 101,287 | – | – | – | 101,287 |
| Insurance claims receivable | 11,738 | – | – | – | 11,738 |
| Other | 27,387 | – | 2,204 | – | 29,591 |
| Total receivables | 140,412 | – | 2,204 | – | 142,616 |
| Investments | 403,106 | – | – | – | 403,106 |
| Inventories | 8,292 | – | – | – | 8,292 |
| Prepaid expenses and other current assets | 6,331 | – | – | – | 6,331 |
| Pledges receivable | 15,507 | – | – | – | 15,507 |
| Assets limited to use | 5,625 | – | – | – | 5,625 |
| Due from affiliates – net | 12,220 | – | – | (1,796) | 10,424 |
| Total current assets | 678,821 | 3,329 | 6,704 | (1,796) | 687,058 |
| Insurance claims receivable, net of current portion | 61,412 | – | – | – | 61,412 |
| Other noncurrent assets | 12,352 | – | – | – | 12,352 |
| Due from affiliates – net | 11,071 | – | – | – | 11,071 |
| Pledges receivable | 18,845 | – | – | – | 18,845 |
| Assets limited as to use | 63,394 | – | – | – | 63,394 |
| Long-term investments | 115,123 | – | – | – | 115,123 |
| Interest in The Hospital for Special Surgery Fund, Inc. | 45,711 | – | – | – | 45,711 |
| Interest in HSS ASC of Manhattan, LLC | 648 | – | – | (648) | – |
| Interest in HSS West Side ASC, LLC | 2,757 | – | – | (2,757) | – |
| Property, plant and equipment – net | 530,782 | 4,864 | 29 | – | 535,675 |
| Total assets | $ 1,540,916 | $ 8,193 | $ 6,733 | $ (5,201) | $ 1,550,641 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.

56

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Financial Position (continued)

December 31, 2016

| | Hospital for Special Surgery* | HSS ASC of Manhattan, LLC | HSS West Side ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Liabilities and net assets** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable and accrued expenses | $ 74,494 | $ 1,661 | $ 182 | $ – | $ 76,337 |
| Accrued salaries and related liabilities | 41,397 | – | – | – | 41,397 |
| Current portion of long-term debt | 41,653 | – | – | – | 41,653 |
| Due to affiliates – net | – | 1,635 | 161 | (1,796) | – |
| Due to third-party payors – net | 3,873 | – | – | – | 3,873 |
| Insurance claims liabilities | 11,738 | – | – | – | 11,738 |
| Other current liabilities | 20,993 | – | 105 | – | 21,098 |
| Total current liabilities | 194,148 | 3,296 | 448 | (1,796) | 196,096 |
| Long-term debt | 247,232 | 1,967 | – | – | 249,199 |
| Insurance claims liabilities, net of current portion | 61,412 | – | – | – | 61,412 |
| Other noncurrent liabilities, including due to third-party payors – net | 164,931 | 1,660 | 2,171 | – | 168,762 |
| Total liabilities | 667,723 | 6,923 | 2,619 | (1,796) | 675,469 |
| **Net assets:** | | | | | |
| Unrestricted: | | | | | |
| Unrestricted | 556,131 | 1,270 | 4,114 | (5,384) | 556,131 |
| Designated for quasi-endowment | 3,719 | – | – | – | 3,719 |
| Noncontrolling interest in subsidiaries | – | – | – | 1,979 | 1,979 |
| Total unrestricted | 559,850 | 1,270 | 4,114 | (3,405) | 561,829 |
| Temporarily restricted: | | | | | |
| Specific purpose | 57,153 | – | – | – | 57,153 |
| Plant replacement and expansion | 50,117 | – | – | – | 50,117 |
| Research | 74,305 | – | – | – | 74,305 |
| Total temporarily restricted | 181,575 | – | – | – | 181,575 |
| Permanently restricted | 131,768 | – | – | – | 131,768 |
| Total net assets | 873,193 | 1,270 | 4,114 | (3,405) | 875,172 |
| Total liabilities and net assets | $ 1,540,916 | $ 8,193 | $ 6,733 | $ (5,201) | $ 1,550,641 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.*

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Operations and Changes in Unrestricted Net Assets

December 31, 2017

| | Hospital for Special Surgery* | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS West Side ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | *(In Thousands)* | | | |
| **Operating revenue** | | | | | | |
| Net patient service revenue | $ 948,987 | $ 914 | $ 2,143 | $ – | $ – | $ 952,044 |
| Other operating revenue | 169,683 | – | – | – | 2,788 | 172,471 |
| Net assets released from restrictions for operations | 17,930 | – | – | – | – | 17,930 |
| Total operating revenue | 1,136,600 | 914 | 2,143 | – | 2,788 | 1,142,445 |
| **Operating expenses** | | | | | | |
| Salaries and wages | 475,235 | 1,086 | 1,871 | – | – | 478,192 |
| Employee benefits | 132,476 | – | 572 | – | – | 133,048 |
| Supplies and other | 381,367 | 593 | 3,455 | 1,851 | (813) | 386,453 |
| Interest expense | 8,483 | – | 101 | – | – | 8,584 |
| Depreciation and amortization | 62,053 | – | 771 | – | – | 62,824 |
| Bad debt expense | 9,164 | – | – | – | – | 9,164 |
| Total operating expenses | 1,068,778 | 1,679 | 6,770 | 1,851 | (813) | 1,078,265 |
| Operating income (loss) before research operations and change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. and operating loss attributable to noncontrolling interest in subsidiaries | 67,822 | (765) | (4,627) | (1,851) | 3,601 | 64,180 |
| Research operations: | | | | | | |
| Net assets released from restrictions for research operations | 35,524 | – | – | – | – | 35,524 |
| Operating expenses, including depreciation of $3,483 | 42,171 | – | – | – | – | 42,171 |
| Net research operations | (6,647) | – | – | – | – | (6,647) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | 13,276 | – | – | – | – | 13,276 |
| Operating income (loss) before operating loss attributable to noncontrolling interest in subsidiaries | 74,451 | (765) | (4,627) | (1,851) | 3,601 | 70,809 |
| Operating loss attributable to noncontrolling interest in subsidiaries | – | – | – | – | 2,877 | 2,877 |
| Operating income (loss) | 74,451 | (765) | (4,627) | (1,851) | 6,478 | 73,686 |
| Operating loss attributable to noncontrolling interest in subsidiaries | – | – | – | – | (2,877) | (2,877) |
| Net assets released from restrictions for capital expenditures | 11,351 | – | – | – | – | 11,351 |
| Changes in net unrealized gains and losses on investments | 22,258 | – | – | – | – | 22,258 |
| Changes in defined benefit pension and other postretirement plan liability to be recognized in future periods | (39,264) | – | – | – | – | (39,264) |
| Total change in unrestricted net assets | $ 68,796 | $ (765) | $ (4,627) | $ (1,851) | $ 3,601 | $ 65,154 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.*

New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery

Consolidating Statement of Operations and Changes in Unrestricted Net Assets

December 31, 2016

| | Hospital for Special Surgery* | HSS ASC of Manhattan, LLC | HSS West Side ASC, LLC | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating revenue** | | | | | |
| Net patient service revenue | $  867,629 | $         – | $         – | $         – | $  867,629 |
| Other operating revenue | 152,322 | – | – | 1,448 | 153,770 |
| Net assets released from restrictions for operations | 16,759 | – | – | – | 16,759 |
| Total operating revenue | 1,036,710 | – | – | 1,448 | 1,038,158 |
| **Operating expenses** | | | | | |
| Salaries and wages | 431,597 | – | – | – | 431,597 |
| Employee benefits | 123,450 | – | – | – | 123,450 |
| Supplies and other | 358,839 | 2,333 | 386 | – | 361,558 |
| Interest expense | 9,022 | – | – | – | 9,022 |
| Depreciation and amortization | 56,484 | – | – | – | 56,484 |
| Bad debt expense | 8,948 | – | – | – | 8,948 |
| Total operating expenses | 988,340 | 2,333 | 386 | – | 991,059 |
| Operating income (loss) before research operations and change in unrestricted interest in The Hospital for Special Surgery Fund, Inc., bequest and operating loss attributable to noncontrolling interest in subsidiaries | 48,370 | (2,333) | (386) | 1,448 | 47,099 |
| Research operations: | | | | | |
| Net assets released from restrictions for research operations | 35,815 | – | – | – | 35,815 |
| Operating expenses, including depreciation of $3,329 | 41,035 | – | – | – | 41,035 |
| Net research operations | (5,220) | – | – | – | (5,220) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | 7,380 | – | – | – | 7,380 |
| Bequest | 985 | – | – | – | 985 |
| Operating income (loss) before operating loss attributable to noncontrolling interest in subsidiaries | 51,515 | (2,333) | (386) | 1,448 | 50,244 |
| Operating loss attributable to noncontrolling interest in subsidiaries | – | – | – | 1,271 | 1,271 |
| Operating income (loss) | 51,515 | (2,333) | (386) | 2,719 | 51,515 |
| Operating loss attributable to noncontrolling interest in subsidiaries | – | – | – | (1,271) | (1,271) |
| Non-controlling members' capital contribution | – | – | – | 1,485 | 1,485 |
| Net assets released from restrictions for capital expenditures | 6,661 | – | – | – | 6,661 |
| Changes in net unrealized gains and losses on investments | 4,571 | – | – | – | 4,571 |
| Changes in defined benefit pension and other postretirement plan liability to be recognized in future periods | (4,520) | – | – | – | (4,520) |
| Total change in unrestricted net assets | $   58,227 | $  (2,333) | $    (386) | $   2,933 | $   58,441 |

*New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery is defined throughout the consolidating financial statements as Hospital for Special Surgery.*

59

EY | Assurance | Tax | Transactions | Advisory

**About EY**

EY is a global leader in assurance, tax, transaction and advisory services. The insights and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization, and may refer to one or more, of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com.

© 2018 Ernst & Young LLP.
All Rights Reserved.

**ey.com**



**APPENDIX B-2**

**CONSOLIDATED FINANCIAL STATEMENTS OF THE HOSPITAL FOR SPECIAL SURGERY FUND, INC. AND AFFILIATES AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2017 AND 2016 WITH REPORT OF INDEPENDENT AUDITORS**

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

CONSOLIDATED FINANCIAL STATEMENTS

The Hospital for Special Surgery Fund, Inc. and Affiliates
Years Ended December 31, 2017 and 2016
With Report of Independent Auditors

Ernst & Young LLP





EY
Building a better
working world

The Hospital for Special Surgery Fund, Inc. and Affiliates

Consolidated Financial Statements

Years Ended December 31, 2017 and 2016

# Contents

Report of Independent Auditors.................................................................................................1

Consolidated Financial Statements

Consolidated Statements of Financial Position..................................................................3
Consolidated Statements of Operations and Changes in Net Assets .............................4
Consolidated Statements of Cash Flows............................................................................5
Notes to Consolidated Financial Statements.....................................................................6



**Ernst & Young LLP**
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350
ey.com

## Report of Independent Auditors

The Board of Trustees
The Hospital for Special Surgery Fund, Inc.

We have audited the accompanying consolidated financial statements of The Hospital for Special Surgery Fund, Inc. and Affiliates, which comprise the consolidated statements of financial position as of December 31, 2017 and 2016, and the related consolidated statements of operations and changes in net assets and cash flows for the years then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We did not audit the financial statements of Medical Indemnity Assurance Company, Ltd. (MIAC), a wholly owned subsidiary, which statements reflect total assets of approximately $127.7 million and $120.8 million as of December 31, 2017 and 2016, respectively, and total revenues of approximately $21.7 million and $20.6 million for the years then ended. Those statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for MIAC, is based solely on the report of the other auditors. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express



no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, based on our audits and the report of the other auditors, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of The Hospital for Special Surgery Fund, Inc. and Affiliates at December 31, 2017 and 2016, and the consolidated results of their operations and changes in net assets and their cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

March 12, 2018

The Hospital for Special Surgery Fund, Inc. and Affiliates

Consolidated Statements of Financial Position

| | December 31 | |
| --- | --- | --- |
| | 2017 | 2016 |
| | *(In Thousands)* | |
| **Assets** | | |
| Cash and cash equivalents | $ 6,025 | $ 8,311 |
| Investments | 209,251 | 186,464 |
| Accrued interest receivable | 2,261 | 1,577 |
| Insurance premiums receivable | 10,140 | 9,718 |
| Tenants' security deposits – cash | 330 | 333 |
| Pledges receivable | 468 | – |
| Deferred rent receivable | 13,842 | 3,391 |
| Tenant improvement receivable | 10,131 | 15,353 |
| Leasehold incentive receivable | 13,382 | 11,853 |
| Investment in joint venture | 3,025 | – |
| Property, plant, and equipment – net | 80,428 | 79,833 |
| Other assets | 8,619 | 6,676 |
| Total assets | $ 357,902 | $ 323,509 |
| | | |
| **Liabilities and net assets** | | |
| Liabilities: | | |
| Accounts payable, accrued expenses and other | $ 35,690 | $ 25,140 |
| Unearned insurance premiums | 10,864 | 10,528 |
| Tenants' security deposits payable | 330 | 333 |
| Due to affiliate – net | 28,386 | 24,916 |
| Tenant improvement payable | 10,011 | 12,215 |
| Leasehold incentive payable | 18,664 | 17,371 |
| Long-term debt | 17,556 | 23,142 |
| Insurance reserves | 113,333 | 105,477 |
| Total liabilities | 234,834 | 219,122 |
| | | |
| Commitments and contingencies | | |
| | | |
| Net assets: | | |
| Unrestricted | 122,600 | 104,387 |
| Temporarily restricted | 468 | – |
| Total net assets | 123,068 | 104,387 |
| Total liabilities and net assets | $ 357,902 | $ 323,509 |

*See accompanying notes.*

3

The Hospital for Special Surgery Fund, Inc. and Affiliates

Consolidated Statements of Operations and Changes in Net Assets

| | Year Ended December 31 | |
| --- | --- | --- |
| | 2017 | 2016 |
| | *(In Thousands)* | |
| **Unrestricted net assets:** | | |
| **Operating revenue** | | |
| Contributions | $ **6,227** | $ 4,713 |
| Legacies and trusts | **1,181** | 1,359 |
| Net investment gain, excluding change in net unrealized gains and losses on investments | **2,343** | 1,803 |
| Insurance premiums | **21,692** | 20,623 |
| Rentals | **54,701** | 45,593 |
| Parking | **4,161** | 3,949 |
| Other | **7** | 6 |
| Total operating revenue | **90,312** | 78,046 |
| | | |
| **Operating expenses** | | |
| Salaries and wages | **4,529** | 3,386 |
| Employee benefits | **1,494** | 1,117 |
| Supplies and other expenses | **6,542** | 7,292 |
| Rent expense | **38,960** | 30,598 |
| Depreciation and amortization | **2,927** | 2,843 |
| Interest | **886** | 1,005 |
| Insurance losses and related expenses | **24,211** | 20,155 |
| Total operating expenses | **79,549** | 66,396 |
| | | |
| Operating income | **10,763** | 11,650 |
| | | |
| Distribution to the Hospital for Special Surgery | **(4,000)** | – |
| Change in net unrealized gains and losses on investments | **11,450** | 1,423 |
| Change in unrestricted net assets | **18,213** | 13,073 |
| Total unrestricted net assets at beginning of year | **104,387** | 91,314 |
| Total unrestricted net assets at end of year | $ **122,600** | $ 104,387 |
| | | |
| **Temporarily restricted net assets:** | | |
| Contributions | $ **468** | $ – |
| Change in temporarily restricted net assets | **468** | – |
| Total temporarily restricted net assets at beginning of year | **–** | – |
| Total temporarily restricted net assets at end of year | $ **468** | $ – |

*See accompanying notes.*

The Hospital for Special Surgery Fund, Inc. and Affiliates

Consolidated Statements of Cash Flows

| | Year Ended December 31 | |
| | 2017 | 2016 |
|---|---|---|
| | *(In Thousands)* | |
| **Operating activities** | | |
| Change in net assets | $    **18,681** | $    13,073 |
| Adjustments to reconcile change in net assets to | | |
| net cash provided by operating activities: | | |
| Change in net unrealized gains and losses on investments | **(11,450)** | (1,423) |
| Depreciation and amortization | **2,927** | 2,843 |
| Distribution to the Hospital for Special Surgery | **4,000** | – |
| Changes in operating assets and liabilities: | | |
| Insurance reserves | **7,856** | (603) |
| Due to affiliate – net | **978** | (534) |
| Other assets and liabilities, net | **(337)** | 7,101 |
| Net cash provided by operating activities | **22,655** | 20,457 |
| | | |
| **Investing activities** | | |
| Net increase in investments | **(8,845)** | (6,618) |
| Investment in joint Venture | **(3,025)** | – |
| Additions to property, plant and equipment – net | **(3,485)** | (5,455) |
| Net cash used in investing activities | **(15,355)** | (12,073) |
| | | |
| **Financing activities** | | |
| Distribution to the Hospital for Special Surgery | **(4,000)** | – |
| Repayments of long-term debt | **(5,586)** | (5,506) |
| Net cash used in financing activities | **(9,586)** | (5,506) |
| | | |
| Net (decrease) increase in cash and cash equivalents | **(2,286)** | 2,878 |
| Cash and cash equivalents at beginning of year | **8,311** | 5,433 |
| Cash and cash equivalents at end of year | $    **6,025** | $    8,311 |

*See accompanying notes.*

5

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements

December 31, 2017

## 1. Organization and Significant Accounting Policies

### Organization

The Hospital for Special Surgery Fund, Inc. (Fund) is a not-for-profit corporation organized under the Not-for-Profit Corporation Law of the State of New York for the purpose of supporting the charitable, educational and scientific purposes of New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery and its affiliates (the Hospital) and other related charitable health care organizations. Fund is the sole member of HSS Properties Corporation (Properties), a separately incorporated New York not-for-profit corporation, which manages and operates real estate for Hospital purposes. Both Fund and Properties are Section 501(c)(3) organizations exempt from Federal income taxes under Section 501(a) of the Internal Revenue Code. Fund also owns all of the outstanding stock of Medical Indemnity Assurance Company, Ltd. (MIAC), a Cayman Islands corporation licensed under Cayman Islands law to conduct an insurance business. In addition, in 2000, HSS Ventures, Inc. (Ventures), a for-profit corporation organized under the laws of Delaware, was formed, with Fund as the sole shareholder; the effects on the accompanying consolidated financial statements of income taxes for Ventures are not significant. Fund is also the sole member of HSS Horizons, Inc. (Horizons), a Section 501(c)(3) not-for-profit corporation organized under the Not-for-Profit Corporation Law of the State of New York, which was established in 2000.

In 1998, The Society of the New York Hospital and The Presbyterian Hospital in the City of New York (Presbyterian) merged to form the New York Presbyterian Hospital (NYPH). Subsequently, the Hospital, NYPH and the Joan and Sanford I. Weill Medical College and Graduate School of Medical Sciences of Cornell University (Cornell) agreed to restructure their relationship, prompted in large measure by regulatory and operational issues raised by the addition of Presbyterian, a hospital with an established orthopedics department. The restructuring resulted in a Corporate Relationship Agreement (the Agreement) that reaffirms and continues the Hospital's medical and clinical affiliation with NYPH by permitting and requiring the Hospital to continue to function as the principal orthopedic and rheumatology facility for NYPH at its East 68-East 70 Street facility (East Campus).

Under the Agreement, the Hospital became a membership corporation, with the five Hospital members elected by an NYPH affiliate, subject to specific affiliation guidelines for each of the five member positions that require three of the Hospital members to come from the Hospital's Board of Trustees (with one of the three to also serve on the Board of the NYPH affiliate). The members have the authority to elect the Hospital's Board of Trustees, as nominated by the

6

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

Governance Committee of the Hospital's Board of Trustees or by a member. As a result of certain procedural elements of the Agreement, the Hospital has not had any significant changes in the nominating process for, or in the composition of, its Board of Trustees. The Agreement did not involve a merger of the institutions and the Hospital's, Fund's and Properties' net assets remain under the Hospital's, Fund's and Properties' respective control.

As part of the restructuring, the Hospital executed an agreement with Cornell that established the orthopedics department at the Hospital as the Department of Orthopedics at Cornell. Additionally, the Hospital, NYPH and Cornell have developed a tri-partite agreement pertaining to the academic affiliation of the institutions, which maintains and enhances the historical clinical and academic relationship among the parties.

The accompanying consolidated financial statements include the accounts of Fund, Properties, Ventures, Horizons and MIAC. Intercompany transactions and accounts have been eliminated in consolidation. The accompanying consolidated financial statements do not include the accounts of Fund's other affiliate, the Hospital.

During 2017, Properties and a third-party health system real estate holding company formed 300 PBL Development LLC (PBL), a joint venture limited liability corporation. PBL was formed to acquire land, and to develop and own a medical office facility in West Palm Beach, Florida, which it is anticipated, will be leased to a Florida licensed outpatient clinic that will be owned by the Hospital and an affiliate of the real estate holding company and an ambulatory surgery center that will be owned by the Hospital, an affiliate of the health system real estate holding company and individual physicians. Properties and the third-party health system real estate holding company each own 50% of PBL. Upon formation, Properties provided PBL with a capital contribution of approximately $3.0 million. The investment in PBL is accounted for using the equity method of accounting.

**Cash and Cash Equivalents**

Fund considers highly liquid financial instruments purchased with a maturity of three months or less, excluding those held in its investment portfolio and tenants' security deposits, to be cash equivalents. Fund invests in money market funds and maintains its cash deposits with certain financial institutions. Total deposits maintained at these institutions exceed the amount insured by Federal agencies and, therefore, bear a risk of loss.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

**Investments and Investment Income**

The Hospital maintains a pooled investment program for certain investments held by Fund, the Hospital and Properties. Investments consist of money market mutual funds, fixed income securities, marketable equity securities, equity mutual funds, including exchange-traded funds, fixed income mutual funds, alternative investments and cash and cash equivalents. All investments are carried at fair value based on quoted market prices (except alternative investments).

Alternative investments (nontraditional, not readily marketable securities) consist of common collective trust funds, event-driven funds, multi-strategy hedge funds, emerging market debt funds, global hedge funds, and private equity funds. Alternative investment interests generally are structured such that the investment pool holds a limited partnership interest or an interest in an investment management company. The investment pool's ownership structure does not provide for control over the related investees and the investment pool's financial risk is limited to the carrying amount reported for each investee, in addition to any unfunded capital commitment. Future funding commitments for alternative investments aggregated approximately $7.1 million at December 31, 2017, for the investment pool.

Individual investment holdings within the alternative investments include nonmarketable and market-traded debt and equity securities and interests in other alternative investments. The investment pool may be exposed indirectly to securities lending, short sales of securities and trading in futures and forward contracts, options and other derivative products. Alternative investments often have liquidity restrictions under which the pooled investment capital may be divested only at specified times. The liquidity restrictions range from approximately several months to eight years. Liquidity restrictions may apply to all or portions of a particular invested amount.

Alternative investments included in the investment pool are stated in the accompanying consolidated statements of financial position at fair value, as estimated in an unquoted market. Fair value is determined by Fund's management for each investment based upon, as a practical expedient, net asset values derived from the application of the equity method of accounting. Financial information used by Fund to evaluate its alternative investments is provided by the investment manager or general partner and includes fair value valuations (quoted market prices and values determined through other means) of underlying securities and other financial instruments held by the investee, and estimates that require varying degrees of judgment.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

The financial statements of the investee companies are audited annually by independent auditors, although the timing for reporting the results of such audits does not coincide with Fund's annual financial statement reporting.

There is uncertainty in determining fair values of alternative investments arising from factors such as lack of active markets (primary and secondary), lack of transparency into underlying holdings, time lags associated with reporting by the investee companies and the subjective evaluation of liquidity restrictions. As a result, the estimated fair values reported in the accompanying consolidated statements of financial position might differ from the values that would have been used had a ready market for the alternative investment interests existed and there is at least a reasonable possibility that estimates will change.

Investment income, including realized gains and losses, and the net change in unrealized gains and losses on investments, either restricted by donors for use by Fund or earned on investments held by Fund for the benefit of Fund, is recognized directly by Fund; other investment income is recognized by the Hospital. Unrestricted investment income is reflected in the accompanying consolidated statements of operations and changes in net assets. See Note 2 for additional information relative to investments.

**Pledges**

Pledges (unconditional promises to give) are enforceable, but unsecured, and are derived from individuals, corporations and foundations. Pledges are recognized at fair value when received and are recorded at net present value using a discount rate that reflects the time value of money (2.18% at December 31, 2017). Allowances for uncollectible amounts are provided to reflect pledges at their estimated realizable value based on management's review of individual pledges and historical collection percentages.

**Property, Plant, and Equipment**

Property, plant, and equipment purchased are stated at cost and those acquired by gifts and bequests are stated at fair value established at the date of acquisition. The carrying amounts of assets and the related accumulated depreciation are removed from the accounts when such assets are disposed of and any resulting gain or loss is included in operations. See Note 3 for additional information relative to property, plant and equipment.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

**Revenue Recognition**

Tenant leases are accounted for as operating leases. Scheduled base rent increases under tenant leases are recognized as rental income on a straight-line basis over the lease term.

**Depreciation**

Depreciation of all depreciable assets is computed using the straight-line method over the estimated useful life of the asset or the lesser of the estimated useful life of the asset or lease term.

**Insurance Premiums**

Premiums written and assumed by MIAC are recognized as earned on a pro-rata basis over the terms of the related policies. Premiums are based upon estimated payroll in the case of workers' compensation and, in the case of medical malpractice physicians' contributions to premiums, upon comparable premium levels established for the captive insurance company (Medical Liability Mutual Insurance Company) formed by The Medical Society of the State of New York. Adjustments to premiums are recognized in the period which they are determined or became reasonably estimable. Unearned premiums are established for the portion of premiums written applicable to the unexpired portion of policies in force.

**Insurance Liabilities**

Insurance reserves represent estimated unpaid losses and loss adjustment expenses. Such amounts are established using management's estimates on the basis of claims records and an independent actuarial review and include an amount for the adverse development of reported claims. Adjustments to the estimate of the liability for losses are reflected in earnings in the period in which the adjustment is determined. The insurance liabilities are necessarily based on estimates and, while management believes that the amount is adequate, the ultimate liability may vary significantly from the amount provided.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

**Use of Estimates**

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, such as insurance liabilities, and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements. Estimates also affect the reported amounts of revenue and expenses during the reporting period. In the accompanying consolidated financial statements, estimates principally affect the estimation of insurance liabilities. Actual results could differ from those estimates. Management believes that the amounts recorded based on estimates and assumptions are reasonable and any differences between estimates and actual should not have a material impact on Fund's consolidated financial position.

**Functional Expenses**

Expenses related to services provided by Fund consist of the following:

|  | Year Ended December 31 | |
|  | 2017 | 2016 |
|  | *(In Thousands)* | |
| Real estate services | $ 52,516 | $ 44,099 |
| Insurance activities | 24,566 | 20,404 |
| Fundraising, charitable, and other general and administrative activities | 2,300 | 1,753 |
| Horizons' expenses | 167 | 140 |
|  | $ 79,549 | $ 66,396 |

**Recent Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2014-09, *Revenue from Contracts with Customers* (ASU 2014-09). The core principle of ASU 2014-09 is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The guidance in

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

ASU 2014-09 supersedes the FASB's current revenue recognition requirements in Accounting Standards Codification Topic 605, *Revenue Recognition*, and most industry-specific guidance. The FASB subsequently issued ASU 2015-14, *Revenue from Contracts with Customers*, which deferred the effective dates of ASU 2014-09. Based on ASU 2015-14, the provisions of ASU 2014-09 are effective for Fund for annual periods beginning after December 15, 2018. Fund is currently in the process of evaluating the impact of ASU 2014-09 on its consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases* (ASU 2016-02), which will require lessees to report most leases on their statements of financial position and recognize expenses on their income statements in a manner similar to current accounting. The guidance also eliminates current real estate-specific provisions. Lessors continue to recognize the underlying asset and recognize lease income on either a straight line or another systematic and rational basis. The provisions of ASU 2016-02 are effective for Fund for annual periods beginning after December 15, 2019, and interim periods the following year. Early adoption is permitted. Fund has not completed the process of evaluating the impact of ASU 2016-02 on its consolidated financial statements.

In August 2016, the FASB issued ASU 2016-14, *Not-for-Profit Financial Statement Presentation* (ASU 2016-14), which eliminates the requirement for not-for-profits (NFPs) to classify net assets as unrestricted, temporarily restricted and permanently restricted. Instead, NFPs will be required to classify net assets as net assets with donor restrictions or without donor restrictions. Among other things, the guidance also modifies required disclosures and reporting related to net assets, investment expenses and qualitative information regarding liquidity. NFPs will also be required to report all expenses by both functional and natural classification in one location. The provisions of ASU 2016-14 are effective for Fund for annual periods beginning after December 15, 2017 and interim periods thereafter. Fund has not completed the process of evaluating the impact of ASU 2016-14 on its consolidated financial statements.

**Reclassifications**

Certain reclassifications have been made to the 2016 financial statements to conform to the presentation in the 2017 financial statements.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

## 2. Investments

The Hospital maintains a pooled investment fund for certain investments held by Fund, the Hospital and Properties. Fund's pro rata share of the pooled investment fund, as well as its separately invested funds, are included in investments in the accompanying consolidated statements of financial position.

Fund's investments, at fair value, including Fund's pro rata share of the pooled investment fund and MIAC's investments, were as follows at December 31:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Money market mutual funds | $ **23,820** | $ 20,725 |
| Marketable equity securities | **5,060** | 3,853 |
| Fixed income securities | **90,323** | 90,890 |
| Equity mutual funds | **36,891** | 28,014 |
| Fixed income mutual funds | **7,596** | 7,141 |
| Alternative investments | **45,561** | 35,841 |
|  | $ **209,251** | $ 186,464 |

A portion of Fund's investment portfolio represents amounts due to the Hospital. These investments and related investment income, including change in net unrealized gains and losses, are reflected in the accompanying consolidated financial statements within the amount due to affiliate – net (approximately $22.2 million at December 31, 2017 and 20.2 million at December 31, 2016).

Net investment gain, as reported in the accompanying consolidated statements of operations and changes in net assets, includes net realized gains on sales of securities of approximately $324,000 and $17,000 for the years ended December 31, 2017 and 2016, respectively.

Change in net unrealized gains and losses on investments are reported as a component of the change in unrestricted net assets in the accompanying consolidated statements of operations and changes in net assets.

13

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**3. Property, Plant and Equipment**

A summary of property, plant and equipment is as follows at December 31:

| | 2017 | 2016 |
|---|---|---|
| | *(In Thousands)* | |
| Land and land improvements | $ 46,775 | $ 46,775 |
| Buildings and improvements | 93,020 | 86,112 |
| Furniture and equipment | 3,382 | 3,093 |
| | 143,177 | 135,980 |
| Less accumulated depreciation | 62,749 | 59,859 |
| | 80,428 | 76,121 |
| Construction-in-progress | – | 3,712 |
| | $ 80,428 | $ 79,833 |

Properties has entered into lease agreements which included tenant improvement allowances, recorded as leasehold incentive payables, to be used for future renovations. The tenant improvement allowances will be amortized over the life of the leases as a reduction of rental expense. In accordance with the lease agreements, Properties will be reimbursed by the landlords for renovation expenditures. Amounts to be reimbursed by the landlords are recorded as a reduction of tenant improvement receivable. The balance of the tenant improvement receivable and leasehold incentive payable related to the leases is approximately $0.1 million and $5.3 million, respectively, as of December 31, 2017 and $3.2 million and $5.5 million, respectively, as of December 31, 2016.

In conjunction with certain leases entered into during 2016 and 2017, Properties entered into sub-lease agreements with the Hospital, whereby the Hospital will fund renovation expenditures. Properties will be required to reimburse the Hospital for those renovation expenditures funded by the Hospital and reimbursed by the landlord. The balance of the tenant improvement receivable and leasehold incentive payable related to these leases is approximately $10.0 million and $13.4 million, respectively, as of December 31, 2017 and $12.2 million and $11.9 million, respectively, as of December 31, 2016. Properties has recorded a leasehold incentive receivable from HSS of approximately $13.4 million and $11.9 million at December 31, 2017 and 2016, respectively, which will be amortized over the life of the leases as a reduction of rental revenue. Amounts funded by the Hospital for renovation expenditures and due from Properties of approximately $10.0 million and $12.2 million as of December 31, 2017 and 2016, respectively, are recorded as a tenant improvement payable.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**4. Medical Indemnity Assurance Company, Ltd.**

MIAC's principal business is the reinsurance of the primary portions of the professional and general liability and workers' compensation coverages maintained by the Hospital. Effective June 15, 2003, MIAC commenced to directly insure a buffer layer between the primary and excess portion of such professional and general liability coverages. MIAC also reinsures the primary professional liability coverage of the majority of all Hospital physicians and directly insures a buffer layer above the primary portion of such coverage.

MIAC has accepted the reinsurance, from an unrelated ceding company, of medical professional liability risks relating to the Hospital and its comprehensive general liability risks, together with the medical professional liability risks of certain of its affiliated physicians. The underlying policies run from June 15 of each year. The coverage has been provided on claims made basis continuously since 1981 with varying annual policy limits. The limits of liability for the policy for the year ending June 15, 2018 are $2.0 million per claim, with a policy aggregate of $3.0 million (identical limits were in effect for the policy year ending June 15, 2017). Retroactive coverage is provided for claims reported in the period of coverage and with occurrence dates subsequent to June 15, 1985. This policy has a multi-year term which has run annually from June 15, 2008 to June 15, 2018. MIAC recognizes premium income on this policy as though it were a single year policy, based upon the terms and conditions contained within the policy.

Effective June 15, 2003, MIAC commenced writing buffer layer excess policies, on a claims made basis, insuring medical professional and comprehensive general liability risks referred to above. The policy runs annually from June 15 of each year. For the 2017-2018 policy year, the limits are $1.0 million per occurrence with an aggregate limit of $32.0 million in excess of the limits reinsured above (identical limits were in effect for the 2016-2017 policy year). This policy provides retroactive insurance coverage for claims reported in the period of coverage and with occurrence dates subsequent to June 15, 1985.

Effective January 1, 2001 (and with effect for all subsequent policy periods), MIAC assumed the outstanding tail liabilities of the Hospital's claims made policies, effectively making these occurrence based policies.

MIAC has accepted the reinsurance, from an unrelated ceding company, of statutory workers' compensation and employer's liability risks relating to the Hospital. The underlying policies run annually from July 1 of each year. The coverage has been provided on an occurrence basis

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**4. Medical Indemnity Assurance Company, Ltd. (continued)**

continuously since 1981 with varying annual policy limits. The limits of liability for the 2017-2018 policy years are $150,000 each occurrence with a $2.5 million policy aggregate. Employer's liability coverage has separate limits of $1.0 million per accident with no policy aggregates and $1.0 million per employee and in aggregate for injury caused by disease.

MIAC maintained an irrevocable letter of credit of approximately $12.7 million and $14.6 million at December 31, 2017 and 2016, respectively, as statutory security for certain of its insurance obligations. This letter of credit was secured by a like amount of investments at December 31, 2017 and 2016.

The Hospital and Fund have guaranteed payment of certain of MIAC's obligations incident to MIAC's existing professional, general liability and workers' compensation reinsurance commitments to the extent that MIAC's insurance liabilities might require such support.

The reserve for losses and loss adjustment expenses included in insurance reserves in the accompanying consolidated statements of financial position at December 31, 2017 and 2016, which represents management's best estimate, on a discounted basis, of MIAC's liability under the policies issued, is adequate to cover the discounted expected ultimate liability of the risk insured. Due to the nature of the underlying insurance risks and the general uncertainty surrounding medical malpractice claims, the liability for losses is an estimate and could vary significantly from the amount ultimately paid.

Activity in the provision for unpaid losses and loss adjustment expenses is summarized as follows:

|  | 2017 | 2016 |
|---|---|---|
|  | *(In Thousands)* | |
| Balance at January 1 | $ 70,599 | $ 75,985 |
| Incurred related to: | | |
| Current year | 30,249 | 27,262 |
| Prior years | (13,254) | (15,790) |
| Total incurred | 16,995 | 11,472 |
| Paid/payable related to: | | |
| Current year | (3,450) | (4,134) |
| Prior years | (9,068) | (12,724) |
| Total paid/payable | (12,518) | (16,858) |
| Balance at December 31 | $ 75,076 | $ 70,599 |

16

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**4. Medical Indemnity Assurance Company, Ltd. (continued)**

The change in the provision of incurred losses relating to prior years resulted from recent trends in MIAC's loss experience and is not attributable to any one incident. Incurred losses include approximately $469,000 in 2017 (approximately $408,000 in 2016), of loss prevention expenses recharged to MIAC by the Hospital.

The provision for unpaid losses and loss adjustment expenses relating to the professional liability and comprehensive general liability policies are based upon the discounted ultimate liability of MIAC as determined by independent actuaries and has been discounted to present value using pay-out patterns derived from insurance industry medical professional liability data using a discount rate of 0.5% for 2017 and 2016 annual return on invested funds.

At December 31, 2017 and 2016, gross undiscounted total loss provisions were approximately $76.0 million and $71.5 million, respectively. The provision for unpaid losses and loss adjustment expenses relating to statutory workers' compensation and employer's liability risk policies is based upon the gross undiscounted ultimate liability of MIAC as determined by independent actuaries.

At December 31, 2017 and 2016, MIAC's total assets approximated $127.7 million and $120.8 million, respectively. Underwriting income approximated $21.7 million for 2017 and $20.6 million for 2016. MIAC's net operating results for 2017 and 2016 were not significant.

No income, capital gains or premium taxes are levied in the Cayman Islands, and MIAC has been granted an exemption until March 20, 2021, for any such taxes that might be introduced.

The Cayman Islands Monetary Authority (CIMA) has statutory powers that enable it to use its discretion to require MIAC to conduct its operations in accordance with general or specific conditions which may be imposed by CIMA or may be agreed upon between CIMA and MIAC. Generally, such matters are set out in the Business Plan which MIAC files with CIMA and, among other things, includes reference to the risks assumed and retained by MIAC, the premium funding and capitalization levels, and MIAC investment policies.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

## 5. Transactions with Affiliates

Fund and Properties purchase certain administrative, general and plant services from the Hospital. Amounts charged for these services (approximately $5.5 million and $5.1 million in 2017 and 2016, respectively) are determined principally on the basis of allocated costs. Fund provides certain fundraising services to the Hospital valued at approximately $6.9 million in 2017 and $5.9 million in 2016. The methodology used to allocate costs is based on a formula of historical contributions received. Amounts due to and from the Hospital for these services are reimbursed in the normal course of business. Additionally, Properties leases various facilities to the Hospital. Rental expense under these arrangements amounted to approximately $46.5 million and $39.0 million for the years ended December 31, 2017 and 2016, respectively. At December 31, 2017 and 2016, net amounts due to the Hospital were approximately $6.4 million and $5.1 million, respectively. In addition, in 2017, Fund distributed $4.0 million to the Hospital.

Fund and the corporations it controls are not responsible for the debts or obligations of the Hospital, nor is the Hospital responsible for the debts or obligations of Fund and such controlled corporations, other than as disclosed in Notes 4 and 6.

## 6. Long-Term Debt

In January 2010, Properties entered into a $26.0 million mortgage loan agreement with a commercial bank to finance the purchase of a medical office building. The building is leased to the Hospital at fair market value rents. $13.0 million of the mortgage loan bears interest at a fixed rate of 5.50%, with equal monthly principal and interest payments of $141,084 to be made over ten years. The remaining $13.0 million bears interest at a variable LIBOR-based rate (approximately 3.34% as of December 31, 2017) with equal quarterly principal payments of $325,000 to be made over ten years. The outstanding balance of the loan at December 31, 2017, is approximately $6.3 million (approximately $9.0 million at December 31, 2016). The mortgage loan is collateralized by a first mortgage lien on a portion of the Belaire Building which is owned by Properties, and is also collateralized by an assignment of leases and rents with respect to a lease between Properties and the Hospital for a portion of the Belaire Building.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**6. Long-Term Debt (continued)**

In June 2013, Properties entered into a $24.0 million mortgage loan agreement with a commercial bank to finance a portion of the purchase of certain property in New York City. $12.0 million of the mortgage loan bears interest at a fixed rate of 3.30%, and the remaining $12.0 million bears interest at a variable LIBOR-based rate (approximately 3.45% as of December 31, 2017). Interest is due monthly in arrears and principal is due in equal of $235,094 through December 2021. The outstanding balance of the loan at December 31, 2017 is approximately $11.3 million (approximately $14.1 million at December 31, 2016). The mortgage loan is collateralized by a second mortgage lien on the Belaire Building, and is also collateralized by an assignment of leases and rents with respect to a lease between Properties and the Hospital for a portion of the Belaire Building.

The provisions of both loan agreements require Properties to maintain a specified debt service coverage ratio. At December 31, 2017 and 2016, Properties met the financial ratio requirement.

Annual principal payments on long-term debt for each of the next four years (through maturity) are as follows (in thousands):

| | |
|---|---:|
| 2018 | $ 5,670 |
| 2019 | 5,758 |
| 2020 | 3,304 |
| 2021 | 2,824 |
| Total obligations | $ 17,556 |

Interest paid on all debt was approximately $743,000 in 2017 and $900,000 in 2016.

**7. Hospital Pension and Other Retirement Benefits**

The Hospital maintains a noncontributory cash balance defined benefit pension plan (the Plan) which covers certain employees of the Hospital and its affiliates. The Hospital's funding policy is to contribute amounts to the Plan sufficient to meet the minimum funding requirements pursuant to the Employee Retirement Income Security Act of 1974, plus such additional amounts as the Hospital may deem appropriate from time to time.

Contributions are intended to provide not only for benefits attributed to service to date but also for those expected to be earned in the future. At December 31, 2017, the assets of the Plan consist primarily of money market mutual funds, equity mutual funds, fixed income mutual funds, and alternative investments.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**7. Hospital Pension and Other Retirement Benefits (continued)**

In 2009, the Hospital amended the Plan to implement a "soft freeze" effective January 1, 2010. Any new employees hired after October 15, 2009 are not eligible to participate in the Plan. In addition, existing employees had the option to remain active in the Plan or freeze their status with new benefits accruing to a new defined contribution plan effective January 1, 2010. The soft freeze did not constitute a curtailment of the Plan.

Additionally, the Hospital provides certain health care benefits for certain retired employees. The Hospital accrues the obligation to provide postretirement benefits during the years in which the employees provide service and funds such benefits on a pay-as-you-go basis.

The Hospital's Plan and postretirement benefit plan information do not separately identify employees by affiliated companies.

The Hospital charges Fund for these items on the basis of allocated costs; such charges are included in the administrative service charge as discussed in Note 5.

**8. Commitments and Contingencies**

**Rental Expense Commitments and Rental Income**

Future minimum rental expense commitments and related rental income to be received under operating leases for office and other facilities for each of the next five years are as follows (in thousands):

| | | |
|---|---|---:|
| 2018 | $ | 35,315 |
| 2019 | | 37,028 |
| 2020 | | 35,420 |
| 2021 | | 34,103 |
| 2022 | | 34,395 |

Aggregate minimum rental expense and related rental revenue are recorded on a straight-line basis over the terms of the respective leases. The difference between amounts paid under rental agreements and the rental expense recognized on a straight-line basis is recorded as deferred rent payable and is included in accounts payable, accrued expenses and other in the accompanying consolidated statements of financial position. The difference between amounts received under rental agreements and the rental revenue recognized on a straight-line basis is recorded as deferred rent receivable in the accompanying consolidated statements of financial position.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**8. Commitments and Contingencies (continued)**

**Tax Reform**

As a result of the recent federal income tax reform enacted into law under the Tax Cuts and Jobs Act of 2017, certain provisions will impact taxable and tax-exempt organizations, including revisions to taxes on unrelated business activities, excise taxes on compensation of certain employees, reduction of corporate income tax rates and various other provisions. The regulations necessary to implement the law are expected to be promulgated throughout 2018. Fund is currently in the process of assessing the impact of these regulations on the consolidated financial statements.

**9. Fair Value Measurements**

For assets and liabilities required to be measured at fair value, Fund measures fair value based on the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurements are applied based on the unit of account from Fund's perspective. The unit of account determines what is being measured by reference to the level at which the asset or liability is aggregated (or disaggregated) for purposes of applying other accounting pronouncements.

Fund follows a valuation hierarchy that prioritizes observable and unobservable inputs used to measure fair value into three broad levels, which are described below:

*Level 1* – Quoted prices (unadjusted) in active markets that are accessible at the measurement date for identical assets or liabilities. The fair value hierarchy gives the highest priority to Level 1 inputs.

*Level 2* – Observable inputs that are based on inputs not quoted in active markets, but corroborated by market data.

*Level 3* – Unobservable inputs are used when little or no market data is available. The fair value hierarchy gives the lowest priority to Level 3 inputs.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. In determining fair value, Fund uses valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible and considers nonperformance risk in its assessment of fair value.

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**9. Fair Value Measurements (continued)**

Financial assets carried at fair value as of December 31, 2017, are classified in the table below in one of the three categories described above:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | *(In Thousands)* | | | |
| Cash and cash equivalents | $ 6,355 | $ – | $ – | $ 6,355 |
| Marketable equity securities | 5,060 | – | – | 5,060 |
| Money market mutual funds | 23,820 | – | – | 23,820 |
| Equity mutual funds | 36,891 | – | – | 36,891 |
| Fixed income mutual funds | 7,596 | – | – | 7,596 |
| Fixed income securities | 90,323 | – | – | 90,323 |
| | $ 170,045 | $ – | $ – | $170,045 |
| Alternative investments measured at net asset value: | | | | |
| Hedge funds | | | | 44,231 |
| Private equity | | | | 1,330 |
| | | | | $ 215,606 |

Financial assets carried at fair value as of December 31, 2016, are classified in the table below in one of the three categories described above:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | *(In Thousands)* | | | |
| Cash and cash equivalents | $ 8,644 | $ – | $ – | $ 8,644 |
| Marketable equity securities | 3,853 | – | – | 3,853 |
| Money market mutual funds | 20,725 | – | – | 20,725 |
| Equity mutual funds | 28,014 | – | – | 28,014 |
| Fixed income mutual funds | 7,141 | – | – | 7,141 |
| Fixed income securities | 90,890 | – | – | 90,890 |
| | $ 159,267 | $ – | $ – | 159,267 |
| Alternative investments measured at net asset value: | | | | |
| Hedge funds | | | | 34,279 |
| Private equity | | | | 1,562 |
| | | | | $ 195,108 |

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**9. Fair Value Measurements (continued)**

The following is a description of Fund's valuation methodologies for assets measured at fair value. Fair value for Level 1 is based upon quoted market prices. Fair value for Level 2 is based on quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active and model-based valuation techniques for which all significant assumptions are observable in the market or can be corroborated by observable market data for substantially the full term of the assets. Inputs are obtained from various sources, including market participants, dealers and brokers. Investments measured at net asset value consist of alternative investments, the valuation for which is described in Note 1. The methods described above may produce a fair value that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while Fund believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different estimate of fair value at the reporting date.

The following is a summary of investments (by major category) that use net asset value as a practical expedient, and the nature of restrictions on Fund's ability to redeem its investments at the measurement date, unfunded capital commitments and investments strategies of the investees as of December 31, 2017:

| | Fair Value | | Unfunded Commitments | | Redemption Notice Period | Funds Availability |
|---|---|---|---|---|---|---|
| | *(In Thousands)* | | | | | |
| U.S. equity large/small cap | $ | 18,406 | $ | – | 0 days–30 days | 1 month to 5 years |
| International equity | | 5,515 | | – | 14 days–120 days | 1 week to 0.5 year |
| Long/short equity | | 11,284 | | – | 45 days–180 days | 1 months to 2.5 years |
| Multi-strategy | | 8,655 | | – | 60 days–120 days | 3 months to 2.25 year |
| Real assets | | 371 | | – | 0 days–45 days | 3 months to 6 months |
| Private equity | | 1,330 | | 782 | none | 9 months to 12 years |
| | $ | 45,561 | $ | 782 | | |

The Hospital for Special Surgery Fund, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

**9. Fair Value Measurements (continued)**

The carrying values and fair values of Fund's financial instruments that are not required to be carried at fair value are as follows at December 31:

|  | 2017 | | 2016 | |
|---|---|---|---|---|
|  | Fair Value | Carrying Value | Fair Value | Carrying Value |
|  | *(In Thousands)* | | | |
| Long-term debt | $ 17,643 | $ 17,556 | $ 23,476 | $ 23,142 |

The fair value of Fund's long-term debt is based on discounted cash flow analyses, using current borrowing rates for similar types of debt and is classified as Level 2 within the valuation hierarchy.

**10. Events Subsequent to December 31, 2017**

Subsequent events have been evaluated through March 12, 2018, which is the date the consolidated financial statements were available to be issued. No subsequent events have occurred that require disclosure in or adjustment to the consolidated financial statements.

EY | Assurance | Tax | Transactions | Advisory

**About EY**

EY is a global leader in assurance, tax, transaction and advisory services. The insights and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization, and may refer to one or more, of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com.

© 2018 Ernst & Young LLP.
All Rights Reserved.

**ey.com**



**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**APPENDIX C**

**SELECT INFORMATION REGARDING THE HSS ENTERPRISE**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX C

### SELECT INFORMATION REGARDING THE HSS ENTERPRISE

HSS is the sole member of the Obligated Group under the Master Trust Indenture.  None of the other entities whose financial information is included in the combining financial information below are obligated to repay the obligations issued under this bond offering.

The combining financial information of the HSS Enterprise presented below has been derived from the respective consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates.

The combining statements of operations and changes in unrestricted net assets and combining statements of financial position as of and for the years ended December 31, 2017, 2016 and 2015 have been derived from each of the consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates, which have been audited by Ernst & Young, LLP.  The consolidated financial statements of HSS for the years ended December 31, 2017 and 2016 are included in Appendix B-1 to this Offering Memorandum.  The consolidated financial statements of HSS Fund, Inc. and Affiliates for the years ended December 31, 2017 and 2016 are included in Appendix B-2 to this Offering Memorandum.  The audited consolidated financial statements of HSS and HSS Fund, Inc. and Affiliates for the years ended December 2016 and 2015 can be found at www.dacbond.com.  The combining HSS Enterprise financial information set forth below should be read in conjunction with each such audited consolidated financial statements of the entities and the related notes thereto and "Management's Discussion of the HSS Enterprise Financial Performance" in Appendix A.  Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

# HSS Enterprise

## Combining Statements of Financial Position
*(In Thousands)*

December 31, 2017

| | HSS[*] | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc. and[**] Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Current assets: | | | | | | | | | |
| Cash and cash equivalents | $ 94,544 $ | – $ | 604 $ | 3,243 $ | – $ | 98,391 $ | 6,025 $ | – $ | 104,416 |
| Receivables: | | | | | | | | | |
| Patient care, less allowance for doubtful accounts | 107,057 | – | 1,077 | – | – | 108,134 | – | – | 108,134 |
| Insurance claims receivable | 13,498 | – | – | – | – | 13,498 | – | (13,498) | – |
| Other | 34,440 | – | – | 2,204 | (1,090) | 35,554 | 22,532 | (9,717) | 48,369 |
| Total receivables | 154,995 | – | 1,077 | 2,204 | (1,090) | 157,186 | 22,532 | (23,215) | 156,503 |
| Investments | 448,568 | – | – | – | – | 448,568 | 209,251 | – | 657,819 |
| Inventories | 9,858 | – | 1,115 | – | – | 10,973 | – | – | 10,973 |
| Prepaid expenses and other current assets | 7,749 | – | 496 | – | – | 8,245 | 330 | – | 8,575 |
| Pledges receivable | 14,303 | – | – | – | – | 14,303 | – | – | 14,303 |
| Due from affiliates – net | 15,868 | – | – | – | (2,141) | 13,727 | – | (13,727) | – |
| Total current assets | 745,885 | – | 3,292 | 5,447 | (3,231) | 751,393 | 238,138 | (36,942) | 952,589 |
| Insurance claims receivable, net of current portion | 63,550 | – | – | – | – | 63,550 | – | (61,578) | 1,972 |
| Other noncurrent assets | 15,108 | – | 364 | – | – | 15,472 | 38,868 | (28,631) | 25,709 |
| Due from affiliates – net | 11,071 | – | – | – | – | 11,071 | – | (11,071) | – |
| Pledges receivable | 10,309 | – | – | – | – | 10,309 | 468 | – | 10,777 |
| Assets limited as to use | 50,029 | – | – | – | – | 50,029 | – | – | 50,029 |
| Long-term investments | 121,693 | – | – | – | – | 121,693 | – | – | 121,693 |
| Interest in The Hospital for Special Surgery Fund, Inc. | 54,987 | – | – | – | – | 54,987 | – | (54,987) | – |
| Interest in HSS ASC of Manhattan, LLC | (1,712) | – | – | – | 1,712 | – | – | – | – |
| Interest in HSS Westside ASC, LLC | 1,516 | – | – | – | (1,516) | – | – | – | – |
| Property, plant and equipment – net | 579,966 | – | 14,700 | 857 | – | 595,523 | 80,428 | – | 675,951 |
| Total assets | $ 1,652,402 $ | – $ | 18,356 $ | 6,304 $ | (3,035) $ | 1,674,027 $ | 357,902 $ | (193,209) $ | 1,838,720 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Financial Position (continued)
*(In Thousands)*

| | HSS[*] | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc. and[**] Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|---|
| **Liabilities and net assets** | | | | | | | | | |
| Current liabilities: | | | | | | | | | |
| Accounts payable and accrued expenses | $ 79,586 | $ – | $ 2,097 | $ 30 | $ – | $ 81,713 | $ 35,690 | $ (805) | $ 116,598 |
| Accrued salaries and related liabilities | 44,542 | – | 189 | – | – | 44,731 | – | – | 44,731 |
| Current portion of long-term debt | 42,728 | – | 789 | – | – | 43,517 | – | 5,670 | 49,187 |
| Due to affiliates – net | – | 765 | 1,149 | 227 | (2,141) | – | 28,386 | (28,386) | – |
| Due to third-party payors – net | 3,509 | – | – | – | – | 3,509 | – | – | 3,509 |
| Insurance claims liabilities | 13,498 | – | – | – | – | 13,498 | – | (13,498) | – |
| Other current liabilities | 18,875 | – | 31 | 105 | – | 19,011 | 21,205 | (9,777) | 30,439 |
| Total current liabilities | 202,738 | 765 | 4,255 | 362 | (2,141) | 205,979 | 85,281 | (46,796) | 244,464 |
| Long-term debt | 216,192 | – | 15,273 | – | (1,090) | 230,375 | 17,556 | (5,670) | 242,261 |
| Insurance claims liabilities, net of current portion | 63,550 | – | – | – | – | 63,550 | – | (61,578) | 1,972 |
| Other noncurrent liabilities, including due to third-party payors – net | 208,538 | – | 2,185 | 3,679 | – | 214,402 | 131,997 | (27,459) | 318,940 |
| Total liabilities | 691,018 | 765 | 21,713 | 4,041 | (3,231) | 714,306 | 234,834 | (141,503) | 807,637 |
| **Net Assets** | | | | | | | | | |
| Unrestricted: | | | | | | | | | |
| Unrestricted | 624,927 | (765) | (3,357) | 2,263 | 1,094 | 624,162 | 122,600 | (51,706) | 695,056 |
| Designated for quasi-endowment | 3,719 | – | – | – | – | 3,719 | – | – | 3,719 |
| Non-controlling interest in subsidiaries | – | – | – | – | (898) | (898) | – | – | (898) |
| Total unrestricted | 628,646 | (765) | (3,357) | 2,263 | 196 | 626,983 | 122,600 | (51,706) | 697,877 |
| Temporarily restricted: | | | | | | | | | |
| Specific purpose | 67,134 | – | – | – | – | 67,134 | 468 | – | 67,602 |
| Plant replacement and expansion | 33,488 | – | – | – | – | 33,488 | – | – | 33,488 |
| Research | 93,517 | – | – | – | – | 93,517 | – | – | 93,517 |
| Total temporarily restricted | 194,139 | – | – | – | – | 194,139 | 468 | – | 194,607 |
| Permanently restricted | 138,599 | – | – | – | – | 138,599 | – | – | 138,599 |
| Total net assets | 961,384 | (765) | (3,357) | 2,263 | 196 | 959,721 | 123,068 | (51,706) | 1,031,083 |
| Total liabilities and net assets | $ 1,652,402 | $ – | $ 18,356 | $ 6,304 | $ (3,035) | $ 1,674,027 | $ 357,902 | $ (193,209) | $ 1,838,720 |

[*] HSS is the sole member of the Obligated Group.

[**]Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Operations and Changes in Unrestricted Net Assets
*(In Thousands)*

December 31, 2017

| | HSS[*] | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc. and[**] Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|---|
| **Operating revenue** | | | | | | | | | |
| Net patient service revenue | $ 948,987 | $ 914 | $ 2,143 | $ – | $ – | $ 952,044 | $ – | $ – | $ 952,044 |
| Other operating revenue | 169,683 | – | – | | 2,788 | 172,471 | 90,312 | (66,750) | 196,033 |
| Net assets released from restrictions for operations | 17,930 | – | – | – | – | 17,930 | – | – | 17,930 |
| Total operating revenue | 1,136,600 | 914 | 2,143 | – | 2,788 | 1,142,445 | 90,312 | (66,750) | 1,166,007 |
| **Operating expenses** | | | | | | | | | |
| Salaries and wages | 475,235 | 1,086 | 1,871 | – | – | 478,192 | 4,529 | – | 482,721 |
| Employee benefits | 132,476 | – | 572 | – | – | 133,048 | 1,494 | – | 134,542 |
| Supplies and other | 381,367 | 593 | 3,455 | 1,851 | (813) | 386,453 | 69,713 | (66,750) | 389,416 |
| Interest expense | 8,483 | – | 101 | – | – | 8,584 | 886 | – | 9,470 |
| Depreciation and amortization | 62,053 | – | 771 | – | – | 62,824 | 2,927 | – | 65,751 |
| Bad debt expense | 9,164 | – | – | – | – | 9,164 | – | – | 9,164 |
| Total operating expenses | 1,068,778 | 1,679 | 6,770 | 1,851 | (813) | 1,078,265 | 79,549 | (66,750) | 1,091,064 |
| Operating income (loss) before research operations and change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. and operating loss attributable to non-controlling interest in subsidiaries | 67,822 | (765) | (4,627) | (1,851) | 3,601 | 64,180 | 10,763 | – | 74,943 |
| **Research operations:** | | | | | | | | | |
| Net assets released from restrictions for research operations | 35,524 | – | – | – | – | 35,524 | – | – | 35,524 |
| Operating expenses, including depreciation of $3,483 | 42,171 | – | – | – | – | 42,171 | – | – | 42,171 |
| Net research operations | (6,647) | – | – | – | – | (6,647) | – | – | (6,647) |

[*] HSS is the sole member of the Obligated Group.
[**]Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

C-4

HSS Enterprise

Combining Statements of Operations and Changes in Unrestricted Net Assets (continued)
*(In Thousands)*

| | HSS[*] | TJA Orthopedic Surgery, PC | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|---|
| Net research operations (from page C-4) | $ (6,647) | $ – | $ – | $ – | $ – | $ (6,647) | $ – | $ – | $ (6,647) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | 13,276 | – | – | – | – | 13,276 | – | (13,276) | – |
| Operating income (loss) before operating loss attributable to non-controlling interest in subsidiaries | 74,451 | (765) | (4,627) | (1,851) | 3,601 | 70,809 | 10,763 | (13,276) | 68,296 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | – | – | 2,877 | 2,877 | – | – | 2,877 |
| Operating income (loss) | 74,451 | (765) | (4,627) | (1,851) | 6,478 | 73,686 | 10,763 | (13,276) | 71,173 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | – | – | (2,877) | (2,877) | – | – | (2,877) |
| Net assets released from restrictions for capital expenditures | 11,351 | – | – | – | – | 11,351 | – | – | 11,351 |
| Equity transfer | – | – | – | – | – | – | (4,000) | 4,000 | – |
| Changes in net unrealized gains and losses on investments | 22,258 | – | – | – | – | 22,258 | 11,450 | – | 33,708 |
| Changes in defined benefit pension and other postretirement plan liability to be recognized in future periods | (39,264) | – | – | – | – | (39,264) | – | – | (39,264) |
| Total change in unrestricted net assets | $ 68,796 | $ (765) | $ (4,627) | $ (1,851) | $ 3,601 | $ 65,154 | $ 18,213 | $ (9,276) | $ 74,091 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

# HSS Enterprise

## Combining Statements of Financial Position
*(In Thousands)*

### December 31, 2016

| | HSS[*] | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Current assets: | | | | | | | | |
| Cash and cash equivalents | $ 87,328 | $ 3,329 | $ 4,500 | $ – | $ 95,157 | $ 8,311 | $ – | $ 103,468 |
| Receivables: | | | | | | | | |
| Patient care, less allowance for doubtful accounts | 101,287 | – | – | – | 101,287 | – | – | 101,287 |
| Insurance claims receivable | 11,738 | – | – | – | 11,738 | – | (11,738) | – |
| Other | 27,387 | – | 2,204 | – | 29,591 | 26,648 | (12,827) | 43,412 |
| Total receivables | 140,412 | – | 2,204 | – | 142,616 | 26,648 | (24,565) | 144,699 |
| Investments | 403,106 | – | – | – | 403,106 | 186,464 | – | 589,570 |
| Inventories | 8,292 | – | – | – | 8,292 | – | – | 8,292 |
| Prepaid expenses and other current assets | 6,331 | – | – | – | 6,331 | 333 | – | 6,664 |
| Pledges receivable | 15,507 | – | – | – | 15,507 | – | – | 15,507 |
| Assets limited to use | 5,625 | – | – | – | 5,625 | – | – | 5,625 |
| Due from affiliates – net | 12,220 | – | – | (1,796) | 10,424 | – | (10,424) | – |
| Total current assets | 678,821 | 3,329 | 6,704 | (1,796) | 687,058 | 221,756 | (34,989) | 873,825 |
| Insurance claims receivable, net of current portion | 61,412 | – | – | – | 61,412 | – | (58,861) | 2,551 |
| Other noncurrent assets | 12,352 | – | – | – | 12,352 | 21,920 | (15,244) | 19,028 |
| Due from affiliates – net | 11,071 | – | – | – | 11,071 | – | (11,071) | – |
| Pledges receivable | 18,845 | – | – | – | 18,845 | – | – | 18,845 |
| Assets limited as to use | 63,394 | – | – | – | 63,394 | – | – | 63,394 |
| Long-term investments | 115,123 | – | – | – | 115,123 | – | – | 115,123 |
| Interest in The Hospital for Special Surgery Fund, Inc. | 45,711 | – | – | – | 45,711 | – | (45,711) | – |
| Interest in HSS ASC of Manhattan, LLC | 648 | – | – | (648) | – | – | – | – |
| Interest in HSS Westside ASC, LLC | 2,757 | – | – | (2,757) | – | – | – | – |
| Property, plant and equipment – net | 530,782 | 4,864 | 29 | – | 535,675 | 79,833 | – | 615,508 |
| Total assets | $ 1,540,916 | $ 8,193 | $ 6,733 | $ (5,201) | $ 1,550,641 | $ 323,509 | $ (165,876) | $ 1,708,274 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Financial Position (continued)

*(In Thousands)*

| | HSS[*] | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|
| **Liabilities and net assets** | | | | | | | | |
| Current liabilities: | | | | | | | | |
| Accounts payable and accrued expenses | $  74,494 | $  1,661 | $  182 | $  – | $  76,337 | $  25,140 | $  (472) | $  101,005 |
| Accrued salaries and related liabilities | 41,397 | – | – | – | 41,397 | – | – | 41,397 |
| Current portion of long-term debt | 41,653 | – | – | – | 41,653 | – | 5,587 | 47,240 |
| Due to affiliates – net | – | 1,635 | 161 | (1,796) | – | 24,916 | (24,916) | – |
| Due to third-party payors – net | 3,873 | – | – | – | 3,873 | – | – | 3,873 |
| Insurance claims liabilities | 11,738 | – | – | – | 11,738 | – | (11,738) | – |
| Other current liabilities | 20,993 | – | 105 | – | 21,098 | 23,076 | (11,979) | 32,195 |
| Total current liabilities | 194,148 | 3,296 | 448 | (1,796) | 196,096 | 73,132 | (43,518) | 225,710 |
| Long-term debt | 247,232 | 1,967 | – | – | 249,199 | 23,142 | (5,587) | 266,754 |
| Insurance claims liabilities, net of current portion | 61,412 | – | – | – | 61,412 | – | (58,861) | 2,551 |
| Other noncurrent liabilities, including due to third-party payors – net | 164,931 | 1,660 | 2,171 | – | 168,762 | 122,848 | (15,480) | 276,130 |
| Total liabilities | 667,723 | 6,923 | 2,619 | (1,796) | 675,469 | 219,122 | (123,446) | 771,145 |
| **Net assets** | | | | | | | | |
| Unrestricted: | | | | | | | | |
| Unrestricted | 556,131 | 1,270 | 4,114 | (5,384) | 556,131 | 104,387 | (42,430) | 618,088 |
| Designated for quasi-endowment | 3,719 | – | – | – | 3,719 | – | – | 3,719 |
| Non-controlling interest in subsidiaries | – | – | – | 1,979 | 1,979 | – | – | 1,979 |
| Total unrestricted | 559,850 | 1,270 | 4,114 | (3,405) | 561,829 | 104,387 | (42,430) | 623,786 |
| Temporarily restricted: | | | | | | | | |
| Specific purpose | 57,153 | – | – | – | 57,153 | – | – | 57,153 |
| Plant replacement and expansion | 50,117 | – | – | – | 50,117 | – | – | 50,117 |
| Research | 74,305 | – | – | – | 74,305 | – | – | 74,305 |
| Total temporarily restricted | 181,575 | – | – | – | 181,575 | – | – | 181,575 |
| Permanently restricted | 131,768 | – | – | – | 131,768 | – | – | 131,768 |
| Total net assets | 873,193 | 1,270 | 4,114 | (3,405) | 875,172 | 104,387 | (42,430) | 937,129 |
| Total liabilities and net assets | $  1,540,916 | $  8,193 | $  6,733 | $  (5,201) | $  1,550,641 | $  323,509 | $  (165,876) | $  1,708,274 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Operations and Changes in Unrestricted Net Assets
*(In Thousands)*

December 31, 2016

| | HSS[*] | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|
| **Operating revenue** | | | | | | | | |
| Net patient service revenue | $ 867,629 | $ – | $ – | $ – | $ 867,629 | $ – | $ – | $ 867,629 |
| Other operating revenue | 152,322 | – | – | 1,448 | 153,770 | 78,046 | (58,816) | 173,000 |
| Net assets released from restrictions for operations | 16,759 | – | – | – | 16,759 | – | – | 16,759 |
| Total operating revenue | 1,036,710 | – | – | 1,448 | 1,038,158 | 78,046 | (58,816) | 1,057,388 |
| **Operating expenses** | | | | | | | | |
| Salaries and wages | 431,597 | – | – | – | 431,597 | 3,386 | – | 434,983 |
| Employee benefits | 123,450 | – | – | – | 123,450 | 1,117 | – | 124,567 |
| Supplies and other | 358,839 | 2,333 | 386 | – | 361,558 | 58,045 | (58,816) | 360,787 |
| Interest expense | 9,022 | – | – | – | 9,022 | 1,005 | – | 10,027 |
| Depreciation and amortization | 56,484 | – | – | – | 56,484 | 2,843 | – | 59,327 |
| Bad debt expense | 8,948 | – | – | – | 8,948 | – | – | 8,948 |
| Total operating expenses | 988,340 | 2,333 | 386 | – | 991,059 | 66,396 | (58,816) | 998,639 |
| Operating income (loss) before research operations and change in unrestricted interest in The Hospital for Special Surgery Fund, Inc., bequest and operating loss attributable to non-controlling interest in subsidiaries | 48,370 | (2,333) | (386) | 1,448 | 47,099 | 11,650 | – | 58,749 |
| Research operations: | | | | | | | | |
| Net assets released from restrictions for research operations | 35,815 | – | – | – | 35,815 | – | – | 35,815 |
| Operating expenses, including depreciation of $3,329 | 41,035 | – | – | – | 41,035 | – | – | 41,035 |
| Net research operations | (5,220) | – | – | – | (5,220) | – | – | (5,220) |

[*] HSS is the sole member of the Obligated Group.

[**]Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Operations and Changes in Unrestricted Net Assets (continued)
*(In Thousands)*

| | HSS* | HSS ASC of Manhattan, LLC | HSS Westside ASC, LLC | Eliminations | HSS Consolidated | Fund, Inc.** and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|---|
| Net research operations (from page C-8) | $ (5,220) | $ – | $ – | $ – | $ (5,220) | $ – | $ – | $ (5,220) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | 7,380 | – | – | – | 7,380 | – | (7,380) | – |
| Bequest | 985 | – | – | – | 985 | – | – | 985 |
| Operating income (loss) before operating loss attributable to non-controlling interest in subsidiaries | 51,515 | (2,333) | (386) | 1,448 | 50,244 | 11,650 | (7,380) | 54,514 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | – | 1,271 | 1,271 | – | – | 1,271 |
| Operating income (loss) | 51,515 | (2,333) | (386) | 2,719 | 51,515 | 11,650 | (7,380) | 55,785 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | – | (1,271) | (1,271) | – | – | (1,271) |
| Non-controlling members' capital contribution | – | – | – | 1,485 | 1,485 | – | – | 1,485 |
| Net assets released from restrictions for capital expenditures | 6,661 | – | – | – | 6,661 | – | – | 6,661 |
| Changes in net unrealized gains and losses on investments | 4,571 | – | – | – | 4,571 | 1,423 | – | 5,994 |
| Changes in defined benefit pension and other postretirement plan liability to be recognized in future periods | (4,520) | – | – | – | (4,520) | – | – | (4,520) |
| Total change in unrestricted net assets | $ 58,227 | $ (2,333) | $ (386) | $ 2,933 | $ 58,441 | $ 13,073 | $ (7,380) | $ 64,134 |

* HSS is the sole member of the Obligated Group.

**Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Financial Position
*(In Thousands)*

December 31, 2015

| | HSS[*] | HSS ASC of Manhattan, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 84,617 | $ 5,250 | $ – | $ 89,867 | $ 5,433 | $ – | $ 95,300 |
| Receivables: | | | | | | | |
| Patient care, less allowance for doubtful accounts | 94,286 | – | – | 94,286 | – | – | 94,286 |
| Insurance claims receivable | 17,138 | – | – | 17,138 | – | (17,138) | – |
| Other | 18,413 | – | – | 18,413 | 16,858 | (3,351) | 31,920 |
| Total receivables | 129,837 | – | – | 129,837 | 16,858 | (20,489) | 126,206 |
| Investments | 391,631 | – | – | 391,631 | 177,907 | – | 569,538 |
| Inventories | 8,157 | – | – | 8,157 | – | – | 8,157 |
| Prepaid expenses and other current assets | 5,812 | – | – | 5,812 | 305 | – | 6,117 |
| Pledges receivable | 13,589 | – | – | 13,589 | – | – | 13,589 |
| Assets limited to use | 8,131 | – | – | 8,131 | – | – | 8,131 |
| Due from affiliates – net | 11,781 | – | (1,199) | 10,582 | – | (10,582) | – |
| Total current assets | 653,555 | 5,250 | (1,199) | 657,606 | 200,503 | (31,071) | 827,038 |
| Insurance claims receivable, net of current portion | 61,384 | – | – | 61,384 | – | (58,847) | 2,537 |
| Other noncurrent assets | 9,475 | – | – | 9,475 | 7,840 | (1,872) | 15,443 |
| Due from affiliates – net | 11,071 | – | – | 11,071 | – | (11,071) | – |
| Pledges receivable | 22,361 | – | – | 22,361 | – | – | 22,361 |
| Assets limited as to use | 79,335 | – | – | 79,335 | – | – | 79,335 |
| Long-term investments | 106,027 | – | – | 106,027 | – | – | 106,027 |
| Interest in The Hospital for Special Surgery Fund, Inc. | 38,331 | – | – | 38,331 | – | (38,331) | – |
| Interest in HSS ASC of Manhattan, LLC | 2,678 | – | (2,678) | – | – | – | – |
| Property, plant and equipment – net | 490,581 | 484 | – | 491,065 | 77,184 | – | 568,249 |
| Total assets | $ 1,474,798 | $ 5,734 | $ (3,877) | $ 1,476,655 | $ 285,527 | $ (141,192) | $ 1,620,990 |

[*] HSS is the sole member of the Obligated Group.
[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

C-10

HSS Enterprise

Combining Statements of Financial Position (continued)

*(In Thousands)*

| | HSS[*] | HSS ASC of Manhattan, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|
| **Liabilities and net assets** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued expenses | $ 63,339 | $ 932 | $ – | $ 64,271 | $ 18,791 | $ (3,351) | $ 79,711 |
| Accrued salaries and related liabilities | 38,808 | – | – | 38,808 | – | – | 38,808 |
| Current portion of long-term debt | 39,852 | – | – | 39,852 | – | 5,670 | 45,522 |
| Due to affiliates – net | – | 1,199 | (1,199) | – | 24,934 | (24,934) | – |
| Due to third-party payors – net | 3,125 | – | – | 3,125 | – | – | 3,125 |
| Insurance claims liabilities | 17,138 | – | – | 17,138 | – | (17,138) | – |
| Other current liabilities | 23,030 | – | – | 23,030 | 10,303 | 228 | 33,561 |
| Total current liabilities | 185,292 | 2,131 | (1,199) | 186,224 | 54,028 | (39,525) | 200,727 |
| Long-term debt | 272,760 | – | – | 272,760 | 28,648 | (5,670) | 295,738 |
| Insurance claims liabilities, net of current portion | 61,384 | – | – | 61,384 | – | (58,847) | 2,537 |
| Other noncurrent liabilities, including due to third-party payors – net | 153,753 | – | – | 153,753 | 111,537 | (2,100) | 263,190 |
| Total liabilities | 673,189 | 2,131 | (1,199) | 674,121 | 194,213 | (106,142) | 762,192 |
| **Net assets** | | | | | | | |
| Unrestricted: | | | | | | | |
| Unrestricted | 498,744 | 3,603 | (4,443) | 497,904 | 91,314 | (35,050) | 554,168 |
| Designated for quasi-endowment | 3,719 | – | – | 3,719 | – | – | 3,719 |
| Non-controlling interest in subsidiaries | – | – | 1,765 | 1,765 | – | – | 1,765 |
| Total unrestricted | 502,463 | 3,603 | (2,678) | 503,388 | 91,314 | (35,050) | 559,652 |
| Temporarily restricted: | | | | | | | |
| Specific purpose | 56,166 | – | – | 56,166 | – | – | 56,166 |
| Plant replacement and expansion | 42,851 | – | – | 42,851 | – | – | 42,851 |
| Research | 76,251 | – | – | 76,251 | – | – | 76,251 |
| Total temporarily restricted | 175,268 | – | – | 175,268 | – | – | 175,268 |
| Permanently restricted | 123,878 | – | – | 123,878 | – | – | 123,878 |
| Total net assets | 801,609 | 3,603 | (2,678) | 802,534 | 91,314 | (35,050) | 858,798 |
| Total liabilities and net assets | $ 1,474,798 | $ 5,734 | $ (3,877) | $ 1,476,655 | $ 285,527 | $ (141,192) | $ 1,620,990 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

# HSS Enterprise

## Combining Statements of Operations and Changes in Unrestricted Net Assets
*(In Thousands)*

### December 31, 2015

| | HSS[*] | HSS ASC of Manhattan, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] & Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|
| **Operating revenue** | | | | | | | |
| Net patient service revenue | $ 820,689 | $ – | $ – | $ 820,689 | $ – | $ – | $ 820,689 |
| Other operating revenue | 144,298 | – | 840 | 145,138 | 76,922 | (57,683) | 164,377 |
| Net assets released from restrictions for operations | 16,343 | – | – | 16,343 | – | – | 16,343 |
| Total operating revenue | 981,330 | – | 840 | 982,170 | 76,922 | (57,683) | 1,001,409 |
| **Operating expenses** | | | | | | | |
| Salaries and wages | 387,836 | – | – | 387,836 | 3,714 | – | 391,550 |
| Employee benefits | 120,132 | – | – | 120,132 | 1,226 | – | 121,358 |
| Supplies and other | 324,326 | 1,647 | – | 325,973 | 54,823 | (57,683) | 323,113 |
| Interest expense | 8,201 | – | – | 8,201 | 1,132 | – | 9,333 |
| Depreciation and amortization | 54,417 | – | – | 54,417 | 2,646 | – | 57,063 |
| Bad debt expense | 8,821 | – | – | 8,821 | – | – | 8,821 |
| Total operating expenses | 903,733 | 1,647 | – | 905,380 | 63,541 | (57,683) | 911,238 |
| Operating income (loss) before research operations and change in unrestricted interest in The Hospital for Special Surgery Fund, Inc., bequest and operating loss attributable to non-controlling interest in subsidiaries | 77,597 | (1,647) | 840 | 76,790 | 13,381 | – | 90,171 |
| Research operations: | | | | | | | |
| Net assets released from restrictions for research operations | 31,813 | – | – | 31,813 | – | – | 31,813 |
| Operating expenses, including depreciation of $3,186 | 39,006 | – | – | 39,006 | – | – | 39,006 |
| Net research operations | (7,193) | – | – | (7,193) | – | – | (7,193) |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

HSS Enterprise

Combining Statements of Operations and Changes in Unrestricted Net Assets (continued)
*(In Thousands)*

| | HSS[*] | HSS ASC of Manhattan, LLC | Eliminations | HSS Consolidated | Fund, Inc.[**] and Affiliates | Eliminations | Total HSS Enterprise |
|---|---|---|---|---|---|---|---|
| Net research operations (from page C-12) | $ (7,193) | $ – | $ – | $ (7,193) | $ – | $ – | $ (7,193) |
| Change in unrestricted interest in The Hospital for Special Surgery Fund, Inc. | 8,091 | – | – | 8,091 | – | (8,091) | – |
| Bequest | 6,748 | – | – | 6,748 | – | – | 6,748 |
| Operating income (loss) before operating loss attributable to non-controlling interest in subsidiaries | 85,243 | (1,647) | 840 | 84,436 | 13,381 | (8,091) | 89,726 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | 807 | 807 | – | – | 807 |
| Operating income (loss) | 85,243 | (1,647) | 1,647 | 85,243 | 13,381 | (8,091) | 90,533 |
| Operating loss attributable to non-controlling interest in subsidiaries | – | – | (807) | (807) | – | – | (807) |
| Non-controlling members' capital contribution | – | – | 2,572 | 2,572 | – | – | 2,572 |
| Net assets released from restrictions for capital expenditures | 3,363 | – | – | 3,363 | – | – | 3,363 |
| Changes in net unrealized gains and losses on investments | (6,103) | – | – | (6,103) | 9 | – | (6,094) |
| Changes in defined benefit pension and other postretirement plan liability to be recognized in future periods | (4,319) | – | – | (4,319) | – | – | (4,319) |
| Total change in unrestricted net assets | $ 78,184 | $ (1,647) | $ 3,412 | $ 79,949 | $ 13,390 | $ (8,091) | $ 85,248 |

[*] HSS is the sole member of the Obligated Group.

[**] Certain amounts were reclassified from amounts previously reported to conform to the current presentation.

C-13

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

## APPENDIX D

## FORM OF BOND INDENTURE

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

---

# INDENTURE OF TRUST

---

**Dated as of April 1, 2018**

**$179,220,000**
**HOSPITAL FOR SPECIAL SURGERY**
**TAXABLE BONDS,**
**SERIES 2018**

# TABLE OF CONTENTS

**Page**

## ARTICLE I DEFINITIONS; CONTENT OF CERTIFICATES AND OPINIONS

Section 1.01   Definitions. ......................................................................... 2

Section 1.02   Content of Certificates. .......................................................... 8

Section 1.03   Interpretation. ....................................................................... 9

## ARTICLE II THE BONDS

Section 2.01   Authorization of Bonds. ......................................................... 9

Section 2.02   Terms of the 2018 Bonds. ...................................................... 9

Section 2.03   Form of Bonds. ..................................................................... 10

Section 2.04   Execution of Bonds. .............................................................. 11

Section 2.05   Transfer of Bonds. ................................................................ 11

Section 2.06   Exchange of Bonds. ............................................................... 11

Section 2.07   Bond Register. ...................................................................... 12

Section 2.08   Temporary Bonds. ................................................................ 12

Section 2.09   Bonds Mutilated, Lost, Destroyed or Stolen. ........................... 12

Section 2.10   Use of Securities Depository. ................................................. 12

Section 2.11   Additional Bonds. ................................................................. 14

## ARTICLE III ISSUANCE OF BONDS; APPLICATION OF PROCEEDS

Section 3.01   Issuance of Bonds. ................................................................ 14

Section 3.02   Application of Proceeds of Bonds. ........................................... 14

Section 3.03   Validity of Bonds. ................................................................. 14

## ARTICLE IV REDEMPTION OF BONDS

Section 4.01   Terms of Redemption ............................................................ 15

Section 4.02   Registration of Bonds in the Book-Entry System. ..................... 15

Section 4.03   Selection of Bonds for Redemption. ........................................ 17

Section 4.04   Notice of Redemption. ........................................................... 17

Section 4.05   Partial Redemption of Bonds. ................................................. 18

Section 4.06   Effect of Redemption. ............................................................ 18

Section 4.07   Purchase in Lieu of Redemption. ............................................ 19

**TABLE OF CONTENTS**
(continued)

Page

**ARTICLE V FUNDS AND ACCOUNTS**

Section 5.01  Establishment and Pledge of Indenture Fund.............................................19

Section 5.02  Bond Fund...................................................................................................20

Section 5.03  Interest Account..........................................................................................21

Section 5.04  Principal Account.........................................................................................21

Section 5.05  Redemption Fund........................................................................................21

Section 5.06  Payments by the Hospital; Allocation of Funds.........................................22

Section 5.07  Investment of Moneys in Funds and Accounts Held by Trustee...............23

Section 5.08  Amounts Remaining in Funds and Accounts.............................................24

Section 5.09  Trustee Direction Regarding Obligation No. 1..........................................24

**ARTICLE VI PARTICULAR COVENANTS; REPRESENTATIONS AND WARRANTIES**

Section 6.01  Punctual Payment........................................................................................24

Section 6.02  Compliance With Indenture........................................................................24

Section 6.03  Against Encumbrances................................................................................24

Section 6.04  Power to Issue Bonds and Make Pledge and Assignment..........................25

Section 6.05  Accounting Records of the Trustee and Financial Statements...................25

Section 6.06  Use of Proceeds...........................................................................................25

Section 6.07  Representations and Warranties of the Hospital........................................25

Section 6.09  Limitations on Consolidated Bonds...........................................................28

Section 6.10  Obligation No. 1..........................................................................................29

**ARTICLE VII EVENTS OF DEFAULT AND REMEDIES OF BONDHOLDERS**

Section 7.01  Events of Default.........................................................................................29

Section 7.02  Acceleration of Maturity.............................................................................29

Section 7.03  Rights as a Secured Party............................................................................30

Section 7.04  Application of Moneys Collected by the Trustee.......................................30

Section 7.05  Trustee to Represent Bondholders..............................................................31

Section 7.06  Bondholders' Direction of Proceedings......................................................32

Section 7.07  Limitation on Bondholders' Right to Sue...................................................32

Section 7.08  Absolute Obligation of Hospital.................................................................32

**TABLE OF CONTENTS**
(continued)

Page

Section 7.09   Termination of Proceedings. .................................................. 32

Section 7.10   Remedies Not Exclusive. ...................................................... 33

Section 7.11   Delay or Omission Not Waiver. ............................................. 33

Section 7.12   Waiver of Past Events of Defaults. ........................................ 33

Section 7.13   Undertaking for Costs. ......................................................... 33

Section 7.14   Notice of Default. ................................................................ 33

Section 7.15   Trustee May File Proofs of Claim. ......................................... 34

**ARTICLE VIII THE TRUSTEE**

Section 8.01   Duties, Immunities and Liabilities of Trustee. ........................ 35

Section 8.02   Liability of Trustee. ............................................................. 36

Section 8.03   Right of Trustee to Rely on Documents. ................................ 38

Section 8.04   Preservation and Inspection of Documents. ........................... 38

Section 8.05   Compensation and Indemnification. ...................................... 38

Section 8.06   Notice to Rating Agency. ..................................................... 39

**ARTICLE IX MODIFICATION OR AMENDMENT OF THE INDENTURE**

Section 9.01   Amendments Permitted. ....................................................... 39

Section 9.02   Effect of Supplemental Bond Indenture. ................................ 40

Section 9.03   Endorsement of Bonds; Preparation of New Bonds. ................ 40

Section 9.04   Amendment of Particular Bonds. .......................................... 41

**ARTICLE X DEFEASANCE**

Section 10.01   Discharge of Indenture. ...................................................... 41

Section 10.02   Discharge of Liability on Bonds. .......................................... 42

Section 10.03   Deposit of Money or Securities With Trustee. ........................ 42

Section 10.04   Payment of Bonds After Discharge of Indenture. ................... 43

**ARTICLE XI MISCELLANEOUS**

Section 11.01   Successor Is Deemed Included in All References to Predecessor ........... 43

Section 11.02   Limitation of Rights to Parties and Bondholders. .................... 43

Section 11.03   Waiver of Notice. ............................................................... 43

## TABLE OF CONTENTS
(continued)

Page

Section 11.04  Destruction of Bonds.................................................................44

Section 11.05  Severability of Invalid Provisions.............................................44

Section 11.06  Notices.......................................................................................44

Section 11.07  Evidence of Rights of Bondholders. .........................................44

Section 11.08  Disqualified Bonds....................................................................45

Section 11.09  Money Held for Particular Bonds. ............................................45

Section 11.10  Funds and Accounts...................................................................45

Section 11.11  Waiver of Personal Liability. ....................................................45

Section 11.12  Business Days. ...........................................................................45

Section 11.13  Governing Law; Venue..............................................................46

Section 11.14  Execution in Several Counterparts............................................46

Section 11.15  CUSIP Numbers.........................................................................46

Section 11.16  Agreement Not for the Benefit of Other Parties. ......................46

Section 11.17  Entire Agreement. ......................................................................46

Section 11.18  ERISA Provisions. .....................................................................46

Exhibit A – Form of 2018 Bond

THIS INDENTURE OF TRUST (this "Indenture"), is made and entered into as of April 1, 2018, by and between NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY, a corporation organized under the not-for-profit laws of the State of New York (the "Hospital"), and THE BANK OF NEW YORK MELLON, a banking organization duly organized under the laws of the State of New York and being duly qualified to accept and administer the trusts created hereby (the "Trustee");

W I T N E S S E T H:

WHEREAS, the Hospital has the requisite power to contract, to borrow money and to issue its bonds, and desires to provide for and has authorized the issuance of its Hospital for Special Surgery Taxable Bonds, Series 2018 (the "2018 Bonds") in an original aggregate principal amount of $179,220,000;

WHEREAS, the proceeds of the 2018 Bonds will be used by the Hospital for the lawful corporate purposes of the Hospital;

WHEREAS, in order to provide for the authentication and delivery of the 2018 Bonds, to establish and declare the terms and conditions upon which the 2018 Bonds are to be issued and secured and to secure the payment of the principal or Redemption Price (as defined herein) thereof and of the interest thereon, the Hospital has authorized the execution and delivery of this Indenture;

WHEREAS, the 2018 Bonds, and the Trustee's certificate of authentication and assignment to appear thereon, shall be in substantially the form attached hereto as Exhibit A, with necessary or appropriate variations, omissions and insertions, as permitted or required by this Indenture;

WHEREAS, the Hospital has entered into that certain Master Trust Indenture dated as of April 1, 2018 (the "Master Indenture"), between the Hospital and The Bank of New York Mellon, as master trustee (the "Master Trustee"), to secure obligations of the Hospital;

WHEREAS, the Hospital is the Obligated Group Representative and, currently, the sole Member of the Obligated Group;

WHEREAS, pursuant to the Master Indenture, in connection with the issuance of the 2018 Bonds, the Hospital is entering into Supplemental Indenture for Obligation No. 1, dated as of April 1, 2018 (the "Supplemental Indenture No. 1");

WHEREAS, pursuant to the Supplemental Indenture No. 1, the Hospital is issuing an obligation under the Master Indenture ("Obligation No. 1") to evidence and secure the Hospital's obligations arising under the 2018 Bonds;

WHEREAS, Obligation No. 1 and all obligations issued from time to time under the Master Indenture are secured under the Master Indenture on an equal and ratable basis;

WHEREAS, Obligation No. 1 will be held by the Trustee on behalf of the holders of the 2018 Bonds;

WHEREAS, all acts and proceedings required by law necessary to make the 2018 Bonds, when executed by the Hospital, authenticated and delivered by the Trustee and duly issued, the valid and binding obligations of the Hospital, and to constitute this Indenture a valid and binding agreement for the uses and purposes herein set forth, in accordance with its terms, have been done and taken, and the execution and delivery of this Indenture have been in all respects duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH, that in order to secure the payment of the principal or Redemption Price of, and the interest on the 2018 Bonds and any Additional Bonds that are consolidated with the 2018 Bonds, at any time issued and outstanding under this Indenture, according to their tenor, and to secure the performance and observance of all the covenants and conditions therein and herein set forth, and to declare the terms and conditions upon and subject to which the Bonds are to be issued and received, and for and in consideration of the premises and mutual covenants herein contained, of the acceptance by the Trustee of the trusts hereby created, of the purchase and acceptance of the Bonds by the Holders (as defined herein) thereof, and for other valuable consideration, the receipt of which is hereby acknowledged, the Hospital and the Trustee have executed and delivered this Indenture;

TO HAVE AND TO HOLD the same unto the Trustee and its successors in trust forever;

IN TRUST, NEVERTHELESS, upon the terms and trusts herein set forth for the benefit and security of those who shall hold or own the Bonds issued and to be issued hereunder, or any of them, without preference of any of the Bonds over any others thereof for any reason whatsoever, except as otherwise provided herein;

IT IS HEREBY COVENANTED, DECLARED AND AGREED by and between the parties hereto that all the Bonds to be issued hereunder are to be issued, authenticated and delivered, and that all property subject or to become subject hereto, is to be held and applied, upon and subject to the further covenants, conditions, uses and trusts hereinafter set forth; and the Hospital, for itself and its successors, does hereby covenant and agree to and with the Trustee and its successors in trust, for the benefit of all those who shall hold the Bonds, or any of them, as follows:

## ARTICLE I

## DEFINITIONS; CONTENT OF CERTIFICATES AND OPINIONS

SECTION 1.01 Definitions.  Unless the context otherwise requires, the terms defined in this Section 1.01 shall, for all purposes of this Indenture and of any indenture supplemental hereto and of any certificate, opinion or other document herein mentioned, have the meanings herein specified, to be equally applicable to both the singular and plural forms of any of the terms herein defined.

"2018 Bonds" means the Hospital for Special Surgery Taxable Bonds, Series 2018 authorized by, and at any time Outstanding pursuant to, this Indenture.

"Additional Bonds" means bonds issued under this Indenture subsequent to the initial issuance of the 2018 Bonds that are consolidated with such bonds. The Additional Bonds consolidated with the 2018 Bonds shall be treated as a single series of 2018 Bonds for all purposes hereof.

"Affiliate" means any corporation, partnership, joint venture, association, business trust or similar entity organized under the laws of the United States of America or any state thereof that (a) directly or indirectly controls or is controlled by, or is under common control by the same Person or entity as, the Hospital or (b) directly or indirectly controls or is controlled by, or is under common control by the same Person or entity as, any entity referred to in clause (a) of this sentence. For purposes of this definition, "control" means with respect to: (i) a corporation having stock, ownership, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the members of the board of directors or other governing body of such corporation; (ii) a nonprofit corporation not having stock, having the power to elect or appoint, directly or indirectly, a majority of the board of directors, trustees or other governing body of such corporation; and (iii) any other entity, having the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect a majority of the members of the board of directors or other governing body of such entity.

"Authorized Denomination" means $1,000 or any multiple integral thereof.

"Authorized Representative" means the Hospital's Chief Executive Officer and President, Executive Vice President and Chief Financial Officer or any other Person designated as an Authorized Representative of the Hospital by a Certificate of the Hospital signed by the Hospital's Chief Executive Officer and President or Executive Vice President and Chief Financial Officer and filed with the Trustee.

"Beneficial Owner" means any Person which has or shares the power, directly or indirectly, to make investment decisions concerning ownership of any of the Bonds (including any Person holding Bonds through nominees, depositories or other intermediaries) established to the reasonable satisfaction of the Trustee or the Hospital.

"Bond Fund" means the fund by that name established pursuant to Section 5.02.

"Bonds" means bonds authorized by, and at any time Outstanding pursuant to, this Indenture, including any Additional Bonds that are consolidated with the 2018 Bonds.

"Book-Entry Form" or "Book-Entry System" means a form or system, as applicable, under which physical bond certificates in fully registered form are registered only in the name of a Securities Depository or its nominee as Bondholder, with the physical bond certificates held by and "immobilized" in the custody of the Securities Depository and the book-entry system maintained by and the responsibility of others than the Hospital or the Trustee

is the record that identifies and records the transfer of the interests of the owners of book-entry interests in those Bonds.

"Business Day" means any day other than (A) a Saturday or Sunday or legal holiday or a day on which banking institutions in the city or cities in which the Designated Office of the Trustee or the Master Trustee is located are authorized by law or executive order to close or (B) a day on which the New York Stock Exchange is closed.

"Certificate", "Statement", "Request" and "Requisition" of the Hospital mean, respectively, a written certificate, statement, request or requisition signed in the name of the Hospital by an Authorized Representative.  Any such instrument and supporting opinions or representations, if any, may, but need not, be combined in a single instrument with any other instrument, opinion or representation, and the two or more so combined shall be read and construed as a single instrument.  If and to the extent required by Section 1.02, each such instrument shall include the statements provided for in Section 1.02

"Code" means the Internal Revenue Code of 1986 or any successor statute thereto and any regulations promulgated thereunder.

"Comparable Treasury Issue" means the United States Treasury security or securities selected by a Designated Investment Banker as having an actual or interpolated maturity comparable to the remaining term of the Bonds to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the remaining term of such Bonds.

"Comparable Treasury Price" means, with respect to any redemption date, the average of the Reference Treasury Dealer Quotations for such redemption date or, if the Designated Investment Banker obtains only one Reference Treasury Dealer Quotation, such Reference Treasury Dealer Quotation.

"Designated Investment Banker" shall mean one of the Reference Treasury Dealers appointed by the Hospital.

"Designated Office" means the Designated Office of the Trustee, which as of the date of this Indenture is located at 101 Barclay Street, 7-East New York, NY 10286 and such other offices as the Trustee may designate from time to time by written notice to the Hospital and the Holders.

"Event of Default" means any of the events specified in Section 7.01.

"Fiscal Year" means a twelve month period beginning January 1st of a year and ending on December 31st of such year, or such other twelve month period as the Hospital may elect as its fiscal year.

"Holder" or "Bondholder", whenever used herein with respect to a Bond, means the Person in whose name such Bond is registered.

4

"Indenture" means this Indenture of Trust, as originally executed or as it may from time to time be supplemented, modified or amended by any Supplemental Bond Indenture.

"Indenture Fund" means the fund by that name established pursuant to Section 5.01

"Hospital" means the New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery, a corporation organized under the not-for-profit laws of the State of New York, or its successor or successors.

"Interest Account" means the account by that name in the Bond Fund established pursuant to Section 5.02.

"Interest Payment Date" means with respect any Bonds, the April 1 and October 1 of each year, commencing October 1, 2018.

"Investment Securities" means either of the following:  (1) direct nonprepayable, noncallable obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury of the United States of America) or direct nonprepayable, noncallable obligations, the timely payment of the principal of and interest on which is fully guaranteed by the United States of America, including instruments evidencing a direct ownership interest in securities described in this clause such as CATS, TIGRs, and Stripped Treasury Coupons rated or assessed in the highest Rating Categories by S&P and Moody's and held by a custodian for safekeeping on behalf of holders of such securities and (2) money market funds registered under the Investment Company Act of 1940, the shares in which are registered under the Securities Act of 1933 and that have a rating by S&P of AAAm-G, AAAm or AAm, including such funds for which the Trustee or its affiliates provide investment advisory or other management services.

"Make-Whole Redemption Price" means the greater of: (1) 100% of the principal amount of any Bonds being redeemed; or (2) the sum of the present values of the remaining unpaid scheduled payments of principal and interest on any Bonds being redeemed (exclusive of interest accrued to the date of redemption) discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) (i) with respect to the Bonds maturing April 1, 2028, at the Treasury Rate plus 15 basis points, (ii) with respect to the Bonds April 1, 2038, at the Treasury Rate plus 15 basis points and (iii) with respect to the Bonds maturing April 1, 2048, at the Treasury Rate plus 20 basis points.

"Mandatory Sinking Account Payment" means the amount required by Section 4.01(B) to be paid by the Hospital on any single date for the retirement of the Term Bonds.

"Master Indenture" shall have the same meaning as set forth in the recitals hereto.

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any

other nationally recognized securities rating agency designated by the Hospital upon notice to the Trustee.

"Obligation No. 1" shall have the same meaning as set forth in the recitals hereto.

"Obligated Group" means the Obligated Group Members, collectively.

"Obligated Group Member" means the Hospital and any Person that shall become an Obligated Group Member in accordance with the Master Indenture (other than any Person that shall have withdrawn from the Obligated Group in accordance with the Master Indenture).

"Obligated Group Representative" means the Hospital or such other Person as shall be designated as such by Notice to the Trustee executed by all of the Obligated Group Members.

"Offering Memorandum" means the final offering memorandum dated March 23, 2018, relating to the 2018 Bonds.

"Opinion of Counsel" means a written opinion of counsel (who may be counsel for the Hospital) satisfactory to the Trustee.

"Outstanding" when used as of any particular time with reference to Bonds, means (subject to the provisions of Section 11.08) all Bonds theretofore, or thereupon being, authenticated and delivered by the Trustee under this Indenture except (1) Bonds theretofore cancelled by the Trustee or surrendered to the Trustee for cancellation; (2) Bonds with respect to which all liability of the Hospital shall have been discharged in accordance with Section 10.02, including Bonds (or portions of Bonds) referred to in Section 11.08; and (3) Bonds for the transfer or exchange of or in lieu of or in substitution for which other Bonds shall have been authenticated and delivered by the Trustee pursuant to this Indenture.

"Parity Debt" means the Bonds and any obligation evidenced by an Obligation under the Master Indenture, collectively.

"Payment Date" means an Interest Payment Date or a Principal Payment Date.

"Person" means an individual, corporation, firm, association, partnership, trust, limited liability company or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

"Principal Account" means the account by that name in the Bond Fund established pursuant to Section 5.02.

"Principal Payment Dates" means with respect to any Bonds, the date or dates set forth in Section 2.02 hereof.

"Rating Agency" means Moody's and/or S&P and/or Fitch.

"Rating Category" means a generic securities rating category, without regard to any refinement or gradation of such rating category by a numerical modifier or otherwise.

"Record Date" means the fifteenth (15th) day (whether or not a Business Day) of the month immediately preceding each Interest Payment Date.

"Redemption Price" shall have the meaning set forth in Section 4.01 hereof.

"Redemption Fund" means the fund by that name established pursuant to Section 5.05.

"Reference Treasury Dealer" shall mean Goldman Sachs & Co. LLC or its affiliates which are primary U.S. government securities dealers and each of three additional firms, as designated by the Hospital, and their respective successors; provided that if any of them shall cease to be a primary U.S. government securities dealer (a "Primary Treasury Dealer"), the Hospital shall substitute therefor another Primary Treasury Dealer; provided, further, that the Hospital may, at its option, substitute another Primary Treasury Dealer for Goldman Sachs & Co. LLC or its affiliates.

"Reference Treasury Dealer Quotations" shall mean, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Designated Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Investment Banker by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third Business Day preceding such redemption date.

"Responsible Officer" means any officer of the Trustee assigned to administer its duties hereunder.

"S&P" means S&P Global Ratings, a corporation organized and existing under the laws of the State of New York, its successors, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Hospital upon notice to the Trustee.

"Securities Depository" means The Depository Trust Company and its successors and assigns, or any other securities depository selected as set forth in Section 2.10, which agrees to follow the procedures required to be followed by such securities depository in connection with the Bonds.

"Special Record Date" means the date established by the Trustee pursuant to Section 2.02 as the record date for the payment of defaulted interest on the Bonds.

"Supplemental Bond Indenture" means any indenture hereafter duly authorized and entered into between the Hospital and the Trustee, authorizing the issuance of Additional Bonds that are consolidated with the 2018 Bonds or supplementing, modifying or amending this Indenture; but only if and to the extent that such Supplemental Bond Indenture is specifically authorized hereunder.

7

"Term Bonds" means the 2018 Bonds payable at or before their specified maturity date or dates from Mandatory Sinking Account Payments, if any, calculated to retire some 2018 Bonds on or before their specified maturity date or dates.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semiannual equivalent yield to maturity or interpolated (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

"Trustee" means The Bank of New York Mellon, a New York banking organization, or its successor or successors, as Trustee hereunder as provided in Section 8.01.

"Underwriters" means, when used with respect to the 2018 Bonds, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect in the State of New York from time to time.

SECTION 1.02 Content of Certificates.  Every certificate provided for in this Indenture to be given by or on behalf of the Hospital with respect to compliance with any provision hereof shall include (1) a statement that the Person making or giving such certificate has read such provision and the definitions herein relating thereto; (2) a brief statement as to the nature and scope of the examination or investigation upon which the certificate is based; (3) a statement that, in the opinion of such Person, he or she has made or caused to be made such examination or investigation as is necessary to enable him or her to express an informed opinion with respect to the subject matter referred to in the instrument to which his or her signature is affixed; and (4) a statement as to whether, in the opinion of such Person, such provision has been complied with.

Any such certificate made or given by an officer of the Hospital may be based, insofar as it relates to legal, accounting or management matters, upon a certificate or opinion of or representation by counsel, an accountant or a management consultant, unless such officer knows, or in the exercise of reasonable care should have known, that the certificate, opinion or representation with respect to the matters upon which such certificate or statement may be based, as aforesaid, is erroneous.  Any such certificate or opinion made or given by counsel, an accountant or a management consultant may be based, insofar as it relates to factual matters (with respect to which information is in the possession of the Hospital) upon a certificate or opinion of or representation by an officer of the Hospital, unless such counsel, accountant or management consultant knows, or in the exercise of reasonable care should have known, that the certificate or opinion or representation with respect to the matters upon which such Person's certificate or opinion or representation may be based, as aforesaid, is erroneous.  The same officer of the Hospital, or the same counsel, accountant or management consultant, as the case may be, need not certify to all of the matters required to be certified under any provision of this Indenture, but different officers, counsel, accountants or management consultants may certify to different matters, respectively.

SECTION 1.03  Interpretation.

(A)   Unless the context otherwise indicates, words expressed in the singular shall include the plural and vice versa and the use of the neuter, masculine, or feminine gender is for convenience only and shall be deemed to mean and include the neuter, masculine or feminine gender, as appropriate.

(B)   Headings of articles and sections herein and the table of contents hereof are solely for convenience of reference, do not constitute a part hereof and shall not affect the meaning, construction or effect hereof.

(C)   All references herein to "Articles", "Sections" and other subdivisions are to the corresponding Articles, Sections or subdivisions of this Indenture; the words "herein", "hereof", "hereby", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or subdivision hereof.

## ARTICLE II

## THE BONDS

SECTION 2.01  Authorization of Bonds.   An issue of Bonds to be issued hereunder in order to obtain funds to carry out the purposes indicated herein for the benefit of the Hospital is hereby created.  Such Bonds are designated as the "Hospital for Special Surgery Taxable Bonds, Series 2018".  Nothing contained herein shall be deemed to preclude or restrict the consolidation of any Additional Bonds issued pursuant hereto with the 2018 Bonds theretofore issued; provided, however, that each of the conditions and other requirements contained herein for the authorization and issuance of Additional Bonds shall be met and complied with.  The Additional Bonds consolidated with the 2018 Bonds shall be treated as a single series of Bonds for all purposes hereof.  The aggregate principal amount of Bonds that may be issued and Outstanding under this Indenture is not limited.  This Indenture constitutes a continuing agreement with the Holders from time to time of the Bonds to secure the full payment of the principal or Redemption Price of and interest on all such Bonds subject to the covenants, provisions and conditions contained herein and in the Bonds.

SECTION 2.02  Terms of the 2018 Bonds.

(A)   The 2018 Bonds shall be issued as fully registered Bonds in Authorized Denominations.  The 2018 Bonds shall be registered initially in the name of Cede & Co., as nominee of the Securities Depository, and shall be evidenced by one 2018 Bond for each maturity in the principal amount of the 2018 Bonds of such maturity.  Registered ownership of the 2018 Bonds, or any portion thereof, may not thereafter be transferred except as set forth in Section 2.10.  The 2018 Bonds shall be dated as of the date of first authentication and delivery by the Trustee and shall be numbered from R-1 upward.  The 2018 Bonds shall be issued in the principal amounts, bear interest at the following rates per annum and mature (subject to prior redemption) on the following dates:

| Principal Amount | Interest Rate | Maturity Date |
|---|---|---|
| $57,340,000 | 3.737% | April 1, 2028 |
| 59,668,000 | 4.081 | April 1, 2038 |
| 62,212,000 | 4.131 | April 1, 2048 |

(B)     The principal or Redemption Price of the Bonds shall be payable by check or by wire transfer of immediately available funds in lawful money of the United States of America at the Designated Office of the Trustee.

Interest on the 2018 Bonds will accrue beginning on the date of issuance of the Bonds and will be payable on each Interest Payment Date.  Payment of the interest on each Interest Payment Date shall be made to the Person whose name appears on the bond registration books of the Trustee as the Holder thereof as of the close of business on the Record Date for each Interest Payment Date, such interest to be paid by check mailed by first class mail to such Holder at its address as it appears on such registration books, or, upon the written request of any Holder of at least $1,000,000 in aggregate principal amount of 2018 Bonds, submitted to the Trustee at least one (1) Business Day prior to the Record Date, by wire transfer in immediately available funds to an account within the United States designated by such Holder.

All payments in respect of the Bonds will be made after the deduction or withholding of any taxes required by law to be deducted or withheld.

Notwithstanding the foregoing, for so long as the Securities Depository or its nominee is the registered owner of all or part of the 2018 Bonds in Book-Entry Form, principal or Redemption Price and interest payments shall be made to the Securities Depository by wire transfer in immediately available funds.  CUSIP number identification shall accompany all payments of principal or Redemption Price and interest, whether by check or by wire transfer.

(C)     Interest on the 2018 Bonds shall be calculated on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months.

(D)     Any such interest not so punctually paid or duly provided for with respect to any 2018 Bond shall forthwith cease to be payable to the Bondholder on such Record Date and shall be paid to the Person in whose name the 2018 Bond is registered at the close of business on a "Special Record Date" for the payment of such defaulted interest to be fixed by the Trustee, notice whereof to be given by first class mail to the Holders of such 2018 Bonds not less than ten (10) days prior to such Special Record Date.

(E)     The 2018 Bonds shall be subject to redemption as provided in ARTICLE IV.

SECTION 2.03  Form of Bonds.  The 2018 Bonds, and the Trustee's certificate of authentication and assignment to appear thereon, shall be in substantially the form attached hereto as Exhibit A, with necessary or appropriate variations, omissions and insertions, as permitted or required by this Indenture.

10

SECTION 2.04  Execution of Bonds.  The Bonds shall be executed in the name and on behalf of the Hospital with the manual or facsimile signature of its Chief Executive Officer, President, Chief Financial Officer or Executive Vice President and attested to with the manual or facsimile signature of its Corporate Secretary, Assistant Secretary or other authorized officer.  The Bonds shall then be delivered to the Trustee for authentication by it.  In case any officer who shall have signed any of the Bonds shall cease to be such officer of the Hospital before the Bonds so signed shall have been authenticated or delivered by the Trustee or issued by the Hospital, such Bonds may nevertheless be authenticated, delivered and issued and, upon such authentication, delivery and issue, shall be as binding upon the Hospital as though those who signed the same had continued to be such officer of the Hospital, and also any Bond may be signed on behalf of the Hospital by such Person as at the actual date of execution of such Bond shall be the proper officer of the Hospital although at the nominal date of such Bond any such Person shall not have been such officer of the Hospital.

Only such of the Bonds as shall bear thereon a certificate of authentication substantially in the form hereinbefore recited, manually executed by an authorized signatory of the Trustee, shall be valid or obligatory for any purpose or entitled to the benefits of this Indenture, and such certificate of the Trustee shall be conclusive evidence that the Bonds so authenticated have been duly executed, authenticated and delivered hereunder and are entitled to the benefits of this Indenture.

SECTION 2.05  Transfer of Bonds.  Any Bond may, in accordance with its terms and subject to the limitations provided in Section 2.10, be transferred upon the books required to be kept pursuant to the provisions of Section 2.07 by the Person in whose name it is registered, in person or by its duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by delivery of a written instrument of transfer, duly executed in a form approved by the Trustee.

Whenever any Bond or Bonds shall be surrendered for transfer, the Hospital shall execute and the Trustee shall authenticate and deliver a new Bond or Bonds, bearing interest at the same rate and maturing on the same date, for a like aggregate principal amount in Authorized Denominations.  The Trustee may require the Bondholder requesting such transfer to pay any tax or other governmental charge required to be paid with respect to such transfer, and the Trustee may also require the Bondholder requesting such transfer to pay a reasonable sum to cover any expenses incurred by the Hospital in connection with such transfer.  The Trustee shall not be required to transfer (i) any Bond during the fifteen (15) days next preceding the selection of Bonds for redemption or (ii) any Bond called for redemption.

SECTION 2.06  Exchange of Bonds.  Bonds may be exchanged at the Designated Office of the Trustee for a like aggregate principal amount of Bonds, bearing interest at the same rate and maturing on the same date of other Authorized Denominations.  The Trustee may require the Bondholder requesting such exchange to pay any tax or other governmental charge required to be paid with respect to such exchange, and the Trustee may also require the Bondholder requesting such exchange to pay a reasonable sum to cover any expenses incurred by the Hospital in connection with such exchange.  The Trustee shall not be required to exchange (i) any Bond during the fifteen (15) days next preceding the selection of Bonds for redemption or (ii) any Bond called for redemption.

SECTION 2.07  <u>Bond Register</u>.  The Trustee shall keep or cause to be kept sufficient books for the registration and transfer of the Bonds, which shall at all times (during regular business hours at the location where such books are kept) be open to inspection by any Bondholder, the Hospital or their respective agents duly authorized in writing; and, upon presentation for such purpose, the Trustee shall, under such reasonable regulations as it may prescribe, register or transfer or cause to be registered or transferred, on such books, Bonds as hereinbefore provided.

SECTION 2.08  <u>Temporary Bonds</u>.  The Bonds may be issued in temporary form exchangeable for definitive Bonds when ready for delivery.  Any temporary Bond may be printed, lithographed or typewritten, shall be of such denomination as may be determined by the Hospital, shall be in fully registered form without coupons and may contain such reference to any of the provisions of this Indenture as may be appropriate.  A temporary Bond may be in the form of a single fully registered Bond payable in installments, each on the date, in the amount and at the rate of interest established for the Bonds.  Every temporary Bond shall be executed by the Hospital and be authenticated by the Trustee upon the same conditions and in substantially the same manner as the definitive Bonds.  If the Hospital issues temporary Bonds it will issue definitive Bonds as promptly thereafter as practicable, and thereupon the temporary Bonds may be surrendered, for cancellation, in exchange therefor at the Designated Office of the Trustee, and the Trustee shall authenticate and deliver in exchange for such temporary Bonds an equal aggregate principal amount of definitive Bonds of the same series, bearing interest at the same rate and maturing on the same date of Authorized Denominations.  Until so exchanged, the temporary Bonds shall be entitled to the same benefits under this Indenture as definitive Bonds authenticated and delivered hereunder.

SECTION 2.09  <u>Bonds Mutilated, Lost, Destroyed or Stolen</u>.  If any Bond shall become mutilated, the Hospital, at the expense of the Holder of said Bond, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor in exchange and substitution for the Bond so mutilated, but only upon surrender to the Trustee of the Bond so mutilated.  Every mutilated Bond so surrendered to the Trustee shall be cancelled by it and delivered to, or upon the order of, the Hospital.  If any Bond shall be lost, destroyed or stolen, evidence of such loss, destruction or theft may be submitted to the Trustee and, if such evidence be satisfactory to it and indemnity satisfactory to the Trustee and the Hospital shall be given, the Hospital, at the expense of the Holder, shall execute, and the Trustee shall thereupon authenticate and deliver, a new Bond of like tenor in lieu of and in substitution for the Bond so lost, destroyed or stolen (or if any such Bond shall have matured or shall be about to mature, instead of issuing a substitute Bond, the Trustee may pay the same without surrender thereof).  The Trustee may require payment of a sum not exceeding the actual cost of preparing each new Bond issued under this Section 2.09 and of the expenses which may be incurred by the Hospital and the Trustee in complying with this Section 2.09.  Any Bond issued under the provisions of this Section 2.09 in lieu of any Bond alleged to be lost, destroyed or stolen shall constitute an original additional contractual obligation on the part of the Hospital whether or not the Bond so alleged to be lost, destroyed or stolen be at any time enforceable by anyone, and shall be entitled to the benefits of this Indenture with all other Bonds secured by this Indenture.

SECTION 2.10  <u>Use of Securities Depository</u>.  Notwithstanding any provision of this Indenture to the contrary:

(A)      The Bonds shall be initially issued as provided in Section 2.02.  Registered ownership of the Bonds, or any portion thereof, may not thereafter be transferred except:

(1)      To any successor of the Securities Depository or its nominee, or to any substitute depository designated pursuant to clause (2) of this subsection (A) ("substitute depository"); provided that any successor of the Securities Depository or substitute depository shall be qualified under any applicable laws to provide the service proposed to be provided by it;

(2)      To any substitute depository designated by the Hospital and not objected to by the Trustee, upon (i) the resignation of the Securities Depository or its successor (or any substitute depository or its successor) from its functions as depository or (ii) a determination by the Hospital that the Securities Depository or its successor (or any substitute depository or its successor) is no longer able to carry out its functions as depository; provided that any such substitute depository shall be qualified under any applicable laws to provide the services proposed to be provided by it; or

(3)      To any Person as provided below, upon (i) the resignation of the Securities Depository or its successor (or substitute depository or its successor) from its functions as depository; provided that no substitute depository which is not objected to by the Trustee can be obtained or (ii) a determination by the Hospital that it is in the best interests of the Hospital to remove the Securities Depository or its successor (or any substitute depository or its successor) from its functions as depository.

(B)      In the case of any transfer pursuant to clause (1) or clause (2) of subsection (A), upon receipt of the Outstanding Bonds by the Trustee, together with a Certificate of the Hospital to the Trustee, new Bonds for each maturity shall be executed and delivered in the principal amount of the Bonds of such maturity, registered in the name of such successor or such substitute depository, or their nominees, as the case may be, all as specified in such Certificate of the Hospital.  In the case of any transfer pursuant to clause (3) of subsection (A), upon receipt of the Outstanding Bonds by the Trustee together with a Certificate of the Hospital to the Trustee, new Bonds shall be executed and delivered in such denominations and registered in the names of such Persons as are requested in such a Certificate of the Hospital, subject to the limitations of Section 2.02, provided the Trustee shall not be required to deliver such new Bonds within a period less than sixty (60) days from the date of receipt of such a Certificate of the Hospital.

(C)      [RESERVED].

(D)      The Hospital and the Trustee shall be entitled to treat the Person in whose name any Bond is registered as the Bondholder thereof for all purposes of the Indenture and any applicable laws, notwithstanding any notice to the contrary received by the Hospital or the Trustee.

(E)      So long as the Outstanding Bonds are registered in the name of the Cede & Co. or its registered assign, the Hospital and the Trustee shall cooperate with Cede & Co., as sole registered Bondholder, and its registered assigns, in effecting payment of the principal or

Redemption Price of and interest on the Bonds by arranging for payment in such manner that funds for such payments are properly identified and are made immediately available on the date they are due, all in accordance with the letter of representations of the Hospital to the Securities Depository or as otherwise agreed by the Trustee and the Securities Depository.

SECTION 2.11  Additional Bonds.  Additional Bonds that are consolidated with the 2018 Bonds shall be authorized by a Supplemental Bond Indenture.  Such Additional Bonds so authorized shall from time to time and in such amounts as directed by the Hospital be authenticated by the Trustee and by it delivered to or upon the order of the Hospital upon receipt of the consideration therefor.  Each Supplemental Bond Indenture authorizing the issuance of Additional Bonds that are consolidated with the 2018 Bonds shall specify the following:

(A)     The authorized principal amount of Additional Bonds to be issued;

(B)     The purpose for which the Additional Bonds are to be issued;

(C)     The first Interest Payment Date, Principal Payment Dates and the Maturity Dates for the Additional Bonds that are consolidated with the 2018 Bonds;

(D)     Directions for the applications of the proceeds of the Additional Bonds;

(E)     Delivery of an Obligation (or an amended Obligation No.1 that secures and provides for the payment of such Additional Bonds) under the Master Indenture to evidence such Additional Bonds; and

(F)     Such other provisions as the Hospital deems advisable.

**ARTICLE III**

**ISSUANCE OF BONDS; APPLICATION OF PROCEEDS**

SECTION 3.01  Issuance of Bonds.   At any time after the execution of this Indenture, the Hospital may execute and the Trustee shall authenticate and, upon Request of the Hospital, deliver the Bonds.

SECTION 3.02  Application of Proceeds of Bonds.  The proceeds from the sale of the 2018 Bonds (net of underwriter's discount and original issue discount, if any) shall be transferred by the Underwriters to the Trustee and disbursed as directed by the Hospital.  The proceeds of any Additional Bonds shall be applied in accordance with the Supplemental Bond Indenture authorizing the issuance thereof.

SECTION 3.03  Validity of Bonds.   The recital contained in Bonds duly authenticated in accordance with this Indenture that such Bonds are issued pursuant to the Indenture shall be conclusive evidence of their validity and of compliance with the provisions of the Indenture in their issuance.

## ARTICLE IV

## REDEMPTION OF BONDS

SECTION 4.01   Terms of Redemption.

(A)     The 2018 Bonds are subject to redemption prior to their respective stated maturities, at the option of the Hospital in whole or in part (by such maturities and in such amounts as may be specified by the Hospital) on any Business Day (i) with respect to the 2018 Bonds maturing April 1, 2028, (a) prior to January 1, 2028, at the Make-Whole Redemption Price, and (b) on or after January 1, 2028, at a redemption price equal to the principal amount of such 2018 Bonds to be redeemed, (ii) with respect to the 2018 Bonds maturing April 1, 2038, (a) prior to January 1, 2038, at the Make-Whole Redemption Price, and (b) on or after January 1, 2038, at a redemption price equal to the principal amount of such 2018 Bonds to be redeemed, and (iii) with respect to the 2018 Bonds maturing April 1, 2048, (a) prior to October 1, 2047, at the Make-Whole Redemption Price, and (b) on or after October 1, 2047, at a redemption price equal to the principal amount of such 2018 Bonds to be redeemed, in each case, together with the interest, if any, accrued thereon from the most recent Interest Payment Date to which interest has been paid or duly provided for upon the date fixed for redemption.

The Make-Whole Redemption Price shall be determined by an independent accounting firm or financial advisor retained by the Hospital and such accounting firm or financial advisor shall perform all actions and make all calculations required to determine the Redemption Price.  The Trustee and the Hospital may conclusively rely on such accounting firm's or financial advisor's calculations in connection with, and determination of, the Make-Whole Redemption Price, and shall bear no liability for such reliance.

(B)     No Mandatory Sinking Account Payments are required to be made with respect to the 2018 Bonds.

In connection with any repayment of principal, including payments of Mandatory Sinking Account Payments, if any, the Trustee will direct DTC or its registered assigns or a successor Depository to make a pass-through distribution of principal to the holders of the 2018 Bonds.

If the 2018 Bonds are no longer registered in book-entry only form, each Beneficial Owner will receive an amount of Bonds equal to the original face amount then beneficially held by that Beneficial Owner registered in such Beneficial Owner's name.   Thereafter, any redemption of less than all of the 2018 Bonds of any maturity will continue to be paid to the Beneficial Owners of such 2018 Bonds on a pro-rata basis, based on the portion of the original face amount of any such 2018 Bonds to be redeemed.

SECTION 4.02   Registration of Bonds in the Book-Entry System.

(A)     The provisions of this section shall apply with respect to any Bond registered to Cede & Co. or any other nominee of the Securities Depository while the Book-Entry System is in effect.

15

(B)     On the date of original delivery thereof, the Bonds shall be registered in the registry books of the Trustee in the name of Cede & Co., as nominee of the Securities Depository as agent for the Hospital in maintaining the Book-Entry System.  With respect to Bonds registered in the registry books kept by the Trustee in the name of Cede & Co., as nominee of the Securities Depository, the Hospital and the Trustee shall have no responsibility or obligation to any Participant (which means securities brokers and dealers, banks, trust companies, clearing corporations and various other entities, some of whom or their representatives own the Securities Depository) or to any Beneficial Owner (which means, when used with reference to the Book-Entry System, the Person who is considered the beneficial owner of the Bonds pursuant to the arrangements for book entry determination of ownership applicable to the Securities Depository) with respect to the following:  (1) the accuracy of the records of the Securities Depository, Cede & Co. or any Participant with respect to any ownership interest in the Bonds, (2) the delivery to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository, of any notice with respect to the Bonds, including any notice of redemption, or (3) the payment to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository, of any amount with respect to the principal or Redemption Price of and interest on the Bonds only to or upon the order of the Securities Depository, and all such payments shall be valid and effective fully to satisfy and discharge the Hospital's obligations with respect to the principal or Redemption Price of and interest on the Bonds to the extent of the sum or sums so paid.  No Person other than the Securities Depository (or any designated representative or agent) shall receive an authenticated Bond evidencing the obligation of the Hospital to make payments of principal or Redemption Price of and interest pursuant to this Indenture.  Upon delivery by the Securities Depository to the Trustee of written notice to the effect that the Securities Depository has determined to substitute a new nominee in place of Cede & Co., the words "Cede & Co." in this Indenture shall refer to such new nominee of the Securities Depository.

(C)     In the event the Hospital determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bond certificates, the Hospital may so notify the Securities Depository and the Trustee, whereupon the Securities Depository will notify the Participants of the availability through the Securities Depository of Bond certificates.  In such event, the Trustee shall issue, transfer and exchange Bond certificates as requested by the Securities Depository in appropriate amounts and in authorized denominations.  Whenever the Securities Depository requests the Hospital and the Trustee to do so, the Trustee and the Hospital will cooperate with the Securities Depository in taking appropriate action after reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(D)     Notwithstanding any other provision of this Indenture to the contrary, so long as any Bond is registered in the name of Cede & Co., as nominee of the Securities Depository, all payments with respect to the principal or Redemption Price of and interest on such Bond and all notices with respect to such Bond shall be made and given, respectively, to the Securities Depository as provided in the Representation Letter, which is on file with the Hospital.

(E)     Notwithstanding any provision in ARTICLE IV to the contrary, so long as all of the Bonds Outstanding are held in the Book-Entry System, if less than all of such Bonds are to be redeemed upon any redemption of Bonds hereunder, the particular Bonds or portions of

16

Bonds to be redeemed shall be selected by the Securities Depository in such manner as the Securities Depository may determine.

SECTION 4.03  Selection of Bonds for Redemption.   Whenever provision is made in this Indenture for the redemption of less than all of the Bonds of a maturity, the Trustee shall select the Bonds to be redeemed from all Bonds subject to redemption or such given portion thereof not previously called for redemption, pro rata, as described in the following sentence (or, if a Securities Depository is not in place with respect to the Bonds, in any manner that is customary in the industry); provided, the Hospital may select the maturity if there is more than one maturity then outstanding.  If less than all of the Bonds of any one maturity are to be called for redemption, the Trustee shall select the Bonds to be redeemed on a pro rata basis among all Holders of the Bonds of such maturity based upon the principal amount of Bonds owned by each such Holder, provided that so long as the only Holder of the Bonds is a Securities Depository nominee, such selection shall be made by the Securities Depository in accordance with its operating rules and procedures then in effect, and, if the Securities Depository's operational arrangements at such time do not allow for redemption on a pro rata pass-through distribution of principal basis, the Bonds shall be selected for redemption, in accordance with the Securities Depository's procedures, by lot, or in such other manner as in accordance with the applicable arrangements of the Securities Depository.  If the only Holder of the Bonds is a Securities Depository nominee, the Trustee shall request the Securities Depository to select the amount of each direct participant's interest in the Bonds of such maturity to be redeemed on a "Pro-Rata Pass Through Distribution of Principal" basis in accordance with the procedures of the Securities Depository; provided, however, that so long as the only Holder of the Bonds is a Securities Depository nominee, the selection of redemption of such Bonds shall be made in accordance with the operational arrangements of the Securities Depository then in effect that currently provide for adjustment of the principal by a factor provided by the Trustee pursuant to the Securities Depository's operational arrangements.  If the Trustee does not provide the necessary information and identify the redemption as on a "Pro-Rata Pass Through Distribution of Principal" basis, the Bonds shall be selected for redemption in accordance with the procedures of the Securities Depository by lot.   Neither the Hospital nor the Trustee shall have any responsibility for ensuring that the Bonds are called for redemption on a pro-rata basis.

SECTION 4.04  Notice of Redemption.

(A)    Notice of redemption shall be mailed by the Hospital to the Trustee by first class mail, not less than thirty-five (35) days prior to the redemption date, or such fewer days as may be agreed to between the Hospital and the Trustee.  Notice of redemption shall be mailed by the Trustee by first class mail, not less than thirty (30) days, nor more than sixty (60) days prior to the redemption date, to the respective Holders of any Bonds designated for redemption at their addresses appearing on the bond registration books of the Trustee.  If the Bonds are no longer held by the Securities Depository or its successor or substitute, the Trustee shall also give notice of redemption by overnight mail to such securities depositories and/or securities information services as shall be designated in a Certificate of the Hospital.  Each notice of redemption shall state the date of such notice, the date of issue of the Bonds, the redemption date, the method of calculating the Redemption Price, the interest rate, the place or places of redemption (including the name and appropriate address or addresses of the Trustee), the maturity (including CUSIP number, if any), and, in the case of Bonds to be redeemed in part

only, the portion of the principal amount thereof to be redeemed.  Each such notice shall also state that on said date there will become due and payable on each of said Bonds the Redemption Price thereof or of said specified portion of the principal amount thereof in the case of a Bond to be redeemed in part only, together with interest accrued thereon to the redemption date, and that from and after such redemption date interest thereon shall cease to accrue, and shall require that such Bonds be then surrendered.

(B)     Notice of redemption of Bonds shall be given by the Trustee, at the expense of the Hospital, for and on behalf of the Hospital.

(C)     Failure by the Trustee to give notice pursuant to this Section 4.04 to any one or more of the securities information services or depositories designated by the Hospital, or the insufficiency of any such notice shall not affect the sufficiency of the proceedings for redemption.  Failure by the Trustee to mail notice of redemption pursuant to this Section 4.04 to any one or more of the respective Holders of any Bonds designated for redemption shall not affect the sufficiency of the proceedings for redemption with respect to the Holders to whom such notice was mailed.

(D)     The Hospital may instruct the Trustee to provide conditional notice of redemption, which may be conditioned upon the receipt of moneys or any other event.  If such conditions are not met, the Trustee shall give notice, as soon thereafter as practicable, in the same manner, to the same Persons, as notice of such redemption was given pursuant to this Section 4.04.  Additionally, any conditional notice given pursuant to this Section 4.04(D) may be rescinded by written notice given to the Trustee by the Hospital no later than five (5) Business Days prior to the date specified for redemption.  The Trustee shall give notice of such rescission, as soon thereafter as practicable, in the same manner, to the same Persons, as notice of such redemption was given pursuant to this Section 4.04.

SECTION 4.05  Partial Redemption of Bonds.  Upon surrender of any Bond redeemed in part only, the Hospital shall execute (but need not prepare) and the Trustee shall prepare or cause to be prepared, authenticate and deliver to the Holder thereof, at the expense of the Hospital, a new Bond or Bonds of the same series, bearing interest at the same rate and maturing on the same date of Authorized Denominations, equal in aggregate principal amount to the unredeemed portion of the Bond surrendered.

SECTION 4.06  Effect of Redemption.

(A)     Notice of redemption having been duly given as aforesaid, and moneys for payment of the Redemption Price of, together with interest accrued to the date fixed for redemption on, the Bonds (or portion thereof) so called for redemption being held by the Trustee, on the date fixed for redemption designated in such notice, the Bonds (or portion thereof) so called for redemption shall become due and payable at the Redemption Price specified in such notice and interest accrued thereon to the date fixed for redemption, interest on the Bonds so called for redemption shall cease to accrue, said Bonds (or portion thereof) shall cease to be entitled to any benefit or security under this Indenture, and the Holders of said Bonds shall have no rights in respect thereof except to receive payment of said Redemption Price and accrued interest to the date fixed for redemption from funds held by the Trustee for such payment.

(B)     All Bonds redeemed pursuant to the provisions of this ARTICLE IV shall be cancelled by the Trustee upon surrender thereof and delivered to, or upon the order of, the Hospital.

SECTION 4.07 <u>Purchase in Lieu of Redemption</u>.

The Bonds are subject to purchase in lieu of redemption by the Trustee at the direction of the Hospital prior to maturity on the same terms that would apply to the Bonds if the Bonds were then being optionally redeemed.

## ARTICLE V

## **FUNDS AND ACCOUNTS**

SECTION 5.01  <u>Establishment and Pledge of Indenture Fund</u>.

(A)     The Trustee hereby establishes for the sole benefit of the Bondholders, a master fund referred to herein as the "Indenture Fund" containing the Bond Fund and the Redemption Fund and each of the accounts contained therein.  The Indenture Fund and each of the funds and accounts in the Indenture Fund shall be identified on the books of the Trustee with reference hereto and shall be maintained by the Trustee and held in trust apart from all other moneys and securities held under this Indenture or otherwise, and the Trustee shall have the exclusive and sole right of withdrawal therefrom in accordance with the terms of this Indenture. All amounts deposited with the Trustee pursuant to this Indenture shall be held, disbursed, allocated and applied by the Trustee only as provided in this Indenture.

(B)     Subject only to the provisions of this Indenture permitting or requiring the application thereof for the purposes and on the terms and conditions set forth herein, the Indenture Fund and all amounts held therein are hereby pledged, assigned and transferred by the Hospital to the Trustee for the benefit of the Bondholders to secure the full payment of the principal or Redemption Price of and interest on the Bonds in accordance with their terms and the provisions of this Indenture.  The Hospital hereby grants to the Trustee a security interest in and acknowledges and agrees that the Indenture Fund and all amounts on deposit therein shall constitute collateral security to secure the full payment of the principal or Redemption Price of and interest on the Bonds in accordance with their terms and the provisions of this Indenture. For purposes of creating, perfecting and maintaining the security interest of the Trustee on behalf of the Bondholders in and to the Indenture Fund and all amounts on deposit therein, the parties hereto agree as follows:

(1)     this Indenture shall constitute a "security agreement" for purposes of the Uniform Commercial Code;

(2)     the Trustee shall maintain on its books records reflecting the interest, as set forth in this Indenture, of the Bondholders in the Indenture Fund and/or the amounts on deposit therein;

(3)     the Indenture Fund and the amounts on deposit therein and any proceeds thereof shall be held by the Trustee acting in its capacity as an agent of the

19

Bondholders, and the holding of such items by the Trustee (including the transfer of any items among the funds and accounts in the Indenture Fund) is deemed possession of such items on behalf of the Bondholders; and

(4)     notwithstanding anything to the contrary contained herein, the Trustee shall not be responsible for any initial or continuation filings of any financing statements or the information contained therein (including the exhibits thereto), the perfection of any such security interests, or the accuracy or sufficiency of any description of collateral in such initial filings or for filing any modifications or amendments to the initial or continuation filings required by any amendments to Article 9 of the Uniform Commercial Code.

(C)     Nothing in this Indenture or in the Bonds, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or otherwise in the assets of the Hospital other than in any interest of the Hospital in the Indenture Fund and/or the amounts on deposit therein and as provided in ARTICLE VI.  No recourse for the payment of the principal or Redemption Price of or interest on any Bond, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Hospital in this Indenture or in any Supplemental Bond Indenture or in any Bond, or because of the creation of any indebtedness represented thereby, shall be had against any employee, agent, or officer, as such, past, present or future, of the Hospital or of any successor entity, either directly or through any successor entity, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Bonds.

(D)     No officer or agent of the Hospital, nor any Person executing the Bonds, shall in any event be subject to any personal liability or accountability by reason of the issuance of the Bonds.

(E)     The funds and accounts created pursuant to this Article V may create one or more accounts and sub-accounts, as the Hospital shall direct in writing or pursuant to a Supplemental Bond Indenture.

SECTION 5.02  Bond Fund.

(A)     Upon the receipt thereof, the Trustee shall deposit all payments received from the Hospital (other than proceeds from the sale of the Bonds which are to be applied pursuant to Section 3.02, amounts which are to be applied pursuant to Section 5.05 or income or profit from investments which are to be applied pursuant to Section 5.07), and, if a deficiency exists with respect to the Bonds after the application of payments pursuant to Section 5.06 hereof, any payment received under Obligation No. 1, in a special fund designated the "Bond Fund" which the Trustee shall establish and maintain and hold in trust and which shall be disbursed and applied only as authorized in this ARTICLE V.

(B)     At the times specified below, the Trustee shall allocate within the Bond Fund in the following order of priority the following amounts to the following accounts or funds, each of which the Trustee shall establish and maintain and hold in trust and each of which shall be disbursed and applied only as hereinafter authorized:

(1)     On each Interest Payment Date, the Trustee shall deposit in the "Interest Account" the aggregate amount of interest becoming due and payable on such Interest Payment Date on all Bonds then Outstanding, until the balance in said account is equal to said aggregate amount of interest; and

(2)     On each Principal Payment Date, the Trustee shall deposit in the "Principal Account" the aggregate amount of principal becoming due and payable on such Principal Payment Date, until the balance in said account is equal to said aggregate amount of such principal.

(C)     At least six (6) but not more than twenty (20) Business Days before each Interest Payment Date, the Trustee shall determine the amount, if any, credited or to be credited to the Bond Fund during the period from the day after the last Interest Payment Date to the next succeeding Interest Payment Date from any source.  The Trustee shall give notice to the Hospital of such amount and the amount due, which notice shall be mailed, sent by facsimile transmission or other electronic means or delivered in such manner that the Hospital will receive such notice by the Business Day before such next succeeding Interest Payment Date.  Any oral or telephonic notice shall be supplemented by notice given in accordance with the preceding sentence.

(D)     The Hospital may at any time surrender to the Trustee for cancellation by it any Bonds that the Hospital may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, shall be deemed to be paid and retired.  All Bonds after such surrender and cancellation shall be destroyed by the Trustee.

SECTION 5.03  Interest Account.  All amounts in the Interest Account of the Bond Fund shall be used and withdrawn by the Trustee solely for the purpose of paying interest on the Bonds as it shall become due and payable (including accrued interest on any Bonds redeemed prior to maturity pursuant to this Indenture).

SECTION 5.04  Principal Account.  All amounts in the Principal Account of the Bond Fund shall be used and withdrawn by the Trustee solely to pay at maturity the Bonds.

SECTION 5.05  Redemption Fund.

(A)     Upon the receipt thereof, the Trustee shall deposit the following amounts in a special fund designated the "Redemption Fund" which the Trustee shall establish and maintain and hold in trust:

(1)     all moneys deposited by the Hospital with the Trustee directed to be deposited in the Redemption Fund; and

(2)     all interest, profits and other income received from the investment of moneys in the Redemption Fund.

21

(B)     All amounts deposited in the Redemption Fund shall be used and withdrawn by the Trustee solely for the purpose of redeeming Bonds, in the manner and upon the terms and conditions specified in Section 4.01, at the date of redemption for which notice has been given; provided that, at any time prior to the selection of Bonds for such redemption, the Trustee shall, upon direction of the Hospital, apply such amounts to the purchase of Bonds at public or private sale, as and when and at such prices (including brokerage and other charges, but excluding accrued interest, which is payable from the Interest Account) as the Hospital may direct, except that the purchase price (exclusive of accrued interest) may not exceed the Redemption Price then applicable to such Bonds (or, if such Bonds are not then subject to redemption, the par value of such Bonds); and provided further that in lieu of redemption at such date of redemption, or in combination therewith, amounts in such account may be transferred to the Principal Account as set forth in a Request of the Hospital.

SECTION 5.06   Payments by the Hospital; Allocation of Funds.

(A)     On or before 9:30 A.M., New York City time, on each Payment Date, until the principal of and interest on the Bonds shall have been fully paid or provision for such payment shall have been made as provided in this Indenture, the Hospital shall pay to the Trustee a sum equal to the amount payable on such Payment Date as principal of and interest on the Bonds.  Such payments shall be made in federal funds or other funds immediately available at the Designated Office of the Trustee and shall be promptly deposited by the Trustee upon receipt thereof in the Bond Fund.

Each payment made pursuant to this (A) shall at all times be sufficient to pay the total amount of interest and principal (whether at maturity or upon acceleration) becoming due and payable on the Bonds on such Payment Date.  If on any Payment Date the amounts held by the Trustee in the accounts within the Bond Fund are insufficient to make any required payments of principal of (whether at maturity or upon acceleration) and interest on the Bonds as such payments become due, the Hospital shall forthwith pay such deficiency to the Trustee.

(B)     The obligations of the Hospital to make the payments required by (A) hereof and to perform and observe the other agreements on its part contained herein shall be a general obligation of the Hospital, absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Trustee, and during the term of this Indenture, the Hospital shall pay all payments required to be made under (A) (which payments shall be net of any other obligations of the Hospital) as prescribed therein and all other payments required hereunder, free of any deductions and without abatement, diminution or set-off.  Until such time as the principal of and interest on the Bonds shall have been fully paid, or provision for the payment thereof shall have been made as required by this Indenture, the Hospital (i) will not suspend or discontinue any payments provided for in (A) hereof; (ii) will perform and observe all of its other covenants contained in this Indenture; and (iii) except as provided in ARTICLE IV or ARTICLE X hereof, will not terminate this Indenture for any cause, including, without limitation, the occurrence of any act or circumstances that may constitute failure of consideration, destruction of or damage to all or a portion of the projects financed with the proceeds of the Bonds, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of New York or any political subdivision of either of these, or any failure of the Trustee to perform and observe any

22

covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with this Indenture, except to the extent permitted by this Indenture.

SECTION 5.07  <u>Investment of Moneys in Funds and Accounts Held by Trustee</u>.

(A)     Moneys held in the Indenture Fund shall be invested by the Trustee, upon written direction of the Hospital, solely in Investment Securities.  Investment Securities shall be purchased at such prices as the Hospital may direct.  All Investment Securities shall be acquired subject to the limitations as to maturities hereinafter in this Section 5.07 set forth and such additional limitations or requirements consistent with the foregoing as may be established by Request of the Hospital.  No Request of the Hospital shall impose any duty on the Trustee inconsistent with its responsibilities hereunder.  In the absence of directions from the Hospital, the Trustee shall invest in Investment Securities specified in clause (2) of the definition thereof in Section 1.01, if possible; otherwise, the amounts in the Indenture Fund shall be held by the Trustee uninvested.  The Trustee may conclusively rely upon the Hospital's written instructions as to both the suitability and legality of the directed investments.  Ratings of permitted investments shall be determined at the time of purchase of such permitted investments and without regard to ratings subcategories. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(B)     Moneys in such funds and accounts shall be invested in Investment Securities maturing not later than the date on which it is estimated that such moneys will be required for the purposes specified in this Indenture.

(C)     All interest, profits and other income received from the investment of moneys in the Redemption Fund shall be deposited when received in the Redemption Fund.  All interest, profits and other income received from the investment of moneys in the Bond Fund shall be deposited when received in the Bond Fund.

(D)     Investment Securities acquired as an investment of moneys in any fund or account established under this Indenture shall be credited to such fund or account.  Registrable Investment Securities held by the Trustee shall be registered in the name of the Trustee.  In making any valuations of investments hereunder, the Trustee may utilize and rely on computerized securities pricing services that are available to it, including those available through its regular accounting system.

(E)     The Trustee may commingle any of the funds or accounts established pursuant to this Indenture (other than a fund or account established pursuant to Article X) into a separate fund or funds for investment purposes only, provided that all funds or accounts held by the Trustee hereunder shall be accounted for separately as required by this Indenture.  The Trustee or its affiliates may act as sponsor, depository, advisor, principal or agent in the making or disposing of any investment.  The Trustee is hereby authorized, in making or disposing of any investment permitted by this Section 5.07, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or such affiliate is acting as an agent of the Trustee or for any third person or dealing as principal for its own account.  The Trustee may sell at the best price reasonably obtainable by it, or present for redemption, any Investment Securities so

purchased whenever it shall be necessary to provide moneys to meet any required payment, transfer, withdrawal or disbursement from the fund or account to which such Investment Security is credited, and, subject to the provisions of Section 8.02, the Trustee shall not be liable or responsible for any loss resulting from any investment made in accordance with provisions of this Section 5.07.  The Trustee shall not be responsible for any tax, fee or other charge in connection with any investment, reinvestment or the liquidation thereof.

(F)     The parties hereto acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant the Hospital the right to receive brokerage confirmations of security transactions as they occur, the Hospital specifically waives receipt of such confirmations to the extent permitted by law.  The Trustee will furnish the Hospital with monthly account statements detailing all funds and accounts and investment transactions made by the Trustee hereunder.

SECTION 5.08  Amounts Remaining in Funds and Accounts.  When there are no longer any Bonds Outstanding, all reasonable fees, charges and expenses of the Trustee, including reasonable fees and expenses of outside counsel to the Trustee, have been paid or provided for and this Indenture has been discharged and satisfied, the Trustee shall pay any amounts remaining in any of the funds or accounts created under this Indenture to the Hospital on the date of discharge and satisfaction.

SECTION 5.09  Trustee Direction Regarding Obligation No. 1.  Upon any deficiency in the payments for the 2018 Bonds received from the Hospital pursuant to the provisions Section 5.06 hereof, the Trustee is directed to (i) request payment of the amount of such deficiency pursuant to Obligation No. 1 and Supplemental Indenture No. 1 issued concurrently with the issuance of the 2018 Bonds, and (ii) deposit the amount of such payments into the Bond Fund.

**ARTICLE VI**

**PARTICULAR COVENANTS; REPRESENTATIONS AND WARRANTIES**

SECTION 6.01  Punctual Payment.  The Hospital covenants to punctually pay the principal or Redemption Price and interest to become due in respect of all the Bonds, in strict conformity with the terms of the Bonds and this Indenture, according to the true intent and meaning thereof.  When and as paid in full, all Bonds shall be delivered to the Trustee and shall forthwith be cancelled by the Trustee and delivered to, or upon the order of, the Hospital.

SECTION 6.02  Compliance With Indenture.  The Hospital covenants not to issue, or permit to be issued, any Bonds in any manner other than in accordance with the provisions of this Indenture, and shall not suffer or permit any default (within its power to prevent) to occur under this Indenture, but shall faithfully observe and perform all the covenants, conditions and requirements of this Indenture.  Nothing herein shall limit the ability of the Hospital to incur indebtedness or other obligations other than pursuant to this Indenture.

SECTION 6.03  Against Encumbrances.  The Hospital shall not create or suffer to be created any pledge, lien, charge or other encumbrance upon all or any part of the Indenture

Fund or any of the amounts held therein pledged or assigned under this Indenture while any of the Bonds are Outstanding, except the pledge and assignment created by this Indenture and any statutory liens or other liens arising by operation of law.  The Hospital will assist, at the Hospital's cost and expense, the Trustee in contesting any pledge, lien, charge or other encumbrance that does not comply with the provisions of this Section 6.03.

SECTION 6.04  <u>Power to Issue Bonds and Make Pledge and Assignment</u>.  The Hospital represents and warrants that it is duly authorized to issue the Bonds and to enter into this Indenture and to pledge and assign the funds and accounts purported to be pledged and assigned under this Indenture in the manner and to the extent provided in this Indenture.  The Bonds are and will be legal, valid and binding obligations of the Hospital in accordance with their terms, and the Hospital and the Trustee shall at all times, to the extent permitted by law, defend, preserve and protect the pledge and assignment of funds and accounts created by this Indenture and all the rights of the Bondholders under this Indenture against all claims and demands of all Persons whomsoever, subject to the limitations set forth in ARTICLE VIII relating to the Trustee.

SECTION 6.05  <u>Accounting Records of the Trustee and Financial Statements</u>. With respect to each fund or account established and maintained by the Trustee pursuant to this Indenture, the Trustee shall at all times keep, or cause to be kept, proper books of record and account prepared in accordance with corporate trust accounting standards, in which complete and accurate entries shall be made of all transactions relating to the receipt, investment, disbursement, allocation and application of payments received from the Hospital and the proceeds of the Bonds.  Such books of record and account shall be available for inspection by the Hospital and any Bondholder, or his or her agent or representative duly authorized in writing, at reasonable hours and under reasonable circumstances.

SECTION 6.06  <u>Use of Proceeds</u>.  The Hospital covenants to apply the proceeds of the Bonds to (A) the advance refunding of the outstanding (i) Dormitory Authority of the State of New York Hospital For Special Surgery FHA-Insured Mortgage Hospital Revenue Bonds, Series 2009, (ii) Hospital For Special Surgery GNMA Collateralized Taxable Revenue Bonds, Series 2011, and (iii) Hospital For Special Surgery GNMA Collateralized Taxable Revenue Bonds, Series 2015, and (B) other lawful corporate purposes of the Hospital.

SECTION 6.07  <u>Representations and Warranties of the Hospital</u>.

(A)  <u>Corporate Organization, Authorization and Powers</u>.  The Hospital represents and warrants that it is a corporation organized and validly existing and in good standing under the laws of the State of New York, with the power to enter into and perform this Indenture, that it is a not-for-profit corporation within the State and that by proper corporate action it has duly authorized the execution and delivery of this Indenture.  The Hospital further represents and warrants that the execution and delivery of this Indenture and the consummation of the transactions contemplated herein will not, in any material respect, conflict with or constitute a breach of or default under any bond, indenture, note or other evidence of indebtedness of the Hospital, the charter or by-laws of the Hospital, any gifts, bequests or devises pledged to or received by the Hospital, or any contract, lease or other instrument to which the

Hospital is a party or by which it is bound or cause the Hospital to be in violation of any applicable statute or rule or regulation of any governmental authority.

(B)    Tax Matters.  (1) The Hospital represents and warrants that (a) it is an organization described in Section 501(c)(3) of the Code and it is not a "private foundation" as defined in Section 509 of the Code; (b) it has received letters from the Internal Revenue Service to that effect; (c) such letters have not been modified, limited or revoked; (d) it is in compliance with all terms, conditions and limitations, if any, contained in such letters; (e) the facts and circumstances which form the basis of such letters continue substantially to exist as represented to the Internal Revenue Service; and (f) it is exempt from federal income taxes under Section 501(a) of the Code.   To the extent consistent with its status as a not-for-profit corporation, the Hospital agrees that it will not take any action or omit to take any action if such action or omission would cause any revocation or adverse modification of the Hospital's status as an organization described in Section 501(c)(3) of the Code except as otherwise permitted by the Master Indenture.

(C)    Securities Law Status.  The Hospital represents and warrants that it is an organization organized and operated exclusively for charitable purposes and not for pecuniary profit and that no part of its net earning inures to the benefit of any Person, private stockholder or individual, all within the meaning of the Securities Act of 1933, as amended.  The Hospital shall not take any action or omit to take any action if such action or omission would change its status as set forth in this section unless there is delivered to the Trustee evidence satisfactory to the Trustee that the failure to maintain such status will not result in any requirement that the Bonds be registered under the Securities Act of 1933, as amended or that this Indenture be qualified under the Trust Indenture Act of 1939, as amended.

(D)    Annual and Quarterly Continuing Disclosure Reporting Requirements; Access to Records.  The Hospital covenants and agrees to provide continuing disclosure regarding itself and its financial condition and operations by filing annual and quarterly financial reports at the times and in the manner described below.  Copies of the reports and statements required to be filed with the Trustee pursuant to this Section shall be filed with the Trustee in sufficient quantity to permit the Trustee to mail a copy to each Bondholder who requests it, and, if not made available to the Trustee, on the Hospital's website or a national repository.

Within 150 days after the end of each fiscal reporting period commencing with the Hospital's and The Hospital for Special Surgery Fund, Inc.'s fiscal year ending December 31, 2018, the Hospital shall post on its website or a national repository or furnish to the Trustee and to Bondholders requesting the same, (1) the audited financial statements of the Hospital and its consolidated subsidiaries, (2) the audited financial statements of The Hospital for Special Surgery Fund, Inc. and its consolidated subsidiaries, (3) select information regarding the HSS Enterprise of the type described in Appendix C, (4) financial and operating data for the applicable fiscal year only of the type included under the following headings herein in APPENDIX A – "HOSPITAL FOR SPECIAL SURGERY": (i) utilization statistics of the type set forth in Tables C1, C2 and C3 under the heading "Utilization"; (ii) sources of gross patient service revenue of the type set forth in Table D under the heading "Sources of Patient Service Revenue"; (iii) revenue and expense data of the type set forth under the heading "Combined Statements of Operations and Changes in Unrestricted Net Assets – HSS Enterprise"; (iv)

financial information of the type set forth under the heading "Combined Statements of Financial Position – HSS Enterprise"; and (v) financial information of the type set forth under the subheadings "Days Cash on Hand", "Maximum Annual Debt Service Coverage" and "Long-term Debt to Capitalization" under the heading "Financial Ratios" (excluding the "Pro-Forma" column in each such table), together with (5) such narrative explanation, as may be necessary to avoid misunderstanding regarding the presentation of financial and operating data concerning the Hospital.  Such consolidated financial statements shall be audited by an independent auditor and prepared in conformity with U.S. generally accepted accounting principles on a consistent basis, except that such audited consolidated financial statements may contain such changes as are in accordance with U.S. generally accepted accounting principles, and shall include such statements and narrative explanations as reasonably necessary for a fair presentation of the consolidated financial position, results of operations, changes in net assets and cash flows of such fiscal reporting period.  Notwithstanding the above, nothing in this Indenture shall be deemed to require the consolidation of accounts of entities that are not Members of the Obligated Group (i.e., entities other than the Hospital), as the case may be, even if generally accepted accounting principles would require such consolidation; provided, such financial statements include a supplementary information section presenting the financial statements for the same twelve-month period of the Obligated Group or the Obligated Group and its consolidated subsidiaries.

Within 45 days after the end of each of the Hospital's first three fiscal quarters of each fiscal year, the Hospital shall post on its website or a national repository or furnish to the Trustee and to Bondholders requesting the same, copies of the Hospital's unaudited interim financial statements of the Hospital and its consolidated subsidiaries (including statements of financial position, activities, changes in net assets and cash flows), and quarterly utilization and operating data for the applicable fiscal quarter only of the Hospital and its consolidated subsidiaries of the type described in Appendix A hereto in Tables C1, C2 and C3 under the heading "Utilization";" and in Table D under the heading "Sources of Patient Service Revenue".

The failure of the Hospital to comply with the covenants under this heading " (D) Annual and Quarterly Continuing Disclosure Reporting Requirements; Access to Records" shall not be considered an Event of Default under this Indenture, the Master Indenture or Supplemental Indenture No. 1.  As the sole and exclusive remedy for the Hospital's failure to comply with these covenants the Trustee may (and, at the request of the holders of at least 51% of the aggregate principal amount in the Outstanding Bonds, shall) or any Bondholder or owner of a beneficial interest in a Bond or Bonds may take such actions to seek specific performance by court order and to cause the Hospital to comply with its obligations under this section and no Person, including any Holder or any Beneficial Owner of the Bonds, may recover monetary damages.

Copies of the reports and statements required to be filed with the Trustee, as described above, shall be filed with the Trustee in sufficient quantity to permit the Trustee to mail a copy to each Bondholder who requests it, and, if not made available to the Trustee, on the Hospital's website or a national repository.

The foregoing continuing disclosure undertakings are intended to set forth a general description of the type of financial information and operating data that will be provided; the descriptions are not intended to state more than general categories of financial information and

operating data; and where an undertaking calls for information that no longer can be generated because the operations to which it related have been materially changed or discontinued, a statement to that effect will be provided. Any agreement regarding continuing disclosure, however, maybe amended or modified under certain circumstances without the consent of the Holders of the 2018 Bonds. Any such agreement when executed by the parties thereto will be on file at the principal office of the Hospital.

(E)     Access to Records.  At any and all reasonable times and from time to time, permit the Trustee or any agents or representatives thereof, to examine and make copies of and abstracts from the records and books of account (other than those books and records that by law must be treated as confidential) of, and visit the properties of the Hospital and to discuss the affairs, finances and accounts of the Hospital with any of its officers.

(F)     Maintenance of Corporate Existence.  The Hospital shall maintain its existence under the laws of the State of New York and shall not dissolve or dispose of all or substantially all its assets, or consolidate with or merge into another entity or entities, or permit one or more other entities to consolidate with or merge into it, except that it may consolidate with or merge into one or more other entities or permit one or more other entities to consolidate with or merge into it, or transfer all or substantially all of its assets to one or more other entities (and thereafter dissolve or not dissolve as it may elect), if (1) the surviving, resulting or transferee entity or entities each is a corporation having the status and powers set forth in (A), (B) and (C) of this Section 6.07 (to the extent required by such paragraphs), (2) the transaction does not result in a conflict, breach or default referred to in (A), (3) the surviving, resulting or transferee entity or entities each (a) assumes by written agreement with the Trustee all the obligations of the Hospital hereunder, (b) notifies the Trustee of any change in the name of the Hospital, and (c) executes, delivers, registers, records and files such other instruments the Trustee may reasonably require to confirm, perfect or maintain the security granted hereunder.

SECTION 6.08  Limitations on Consolidated Bonds.  The Hospital covenants and agrees that:

(A)     Additional Bonds that are consolidated with the 2018 Bonds shall constitute a part of the 2018 Bonds;

(B)     Additional Bonds that are consolidated with the 2018 Bonds shall mature on one or more of the same maturity date or dates of the 2018 Bonds to which they are being consolidated, bear interest at the same rate or rates per annum as the 2018 Bonds to which they are being consolidated, and shall be subject to redemption at the same times and at the same Redemption Price(s) as the 2018 Bonds to which they are being consolidated.

(C)     Additional Bonds that are consolidated with the 2018 Bonds shall have the same minimum denominations as the 2018 Bonds; and

(D)     As a condition to the issuance of such Additional Bonds to be consolidated with the 2018 Bonds, there shall be delivered to the Trustee a certificate of the Hospital, certifying that, after consultation with counsel experienced in federal securities and tax laws, the issuance and consolidation of such Additional Bonds will not (i) cause any adverse tax impact on

the Holders of Outstanding 2018 Bonds, (ii) require the Outstanding 2018 Bonds to be registered under the Securities Act of 1933, as amended or (iii) require the Indenture to be qualified under the Trust Indenture Act of 1939, as amended.

SECTION 6.09   Obligation No. 1.   The 2018 Bonds are general obligations of the Hospital and are further evidenced by Obligation No. 1 issued under the Master Indenture, which is secured equally and ratably under the Master Indenture with all other Obligations of the Obligated Group Members issued thereunder.

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES OF BONDHOLDERS

SECTION 7.01   Events of Default.   The following events shall be "Events of Default":

(A)      default in the due and punctual payment of the principal or Redemption Price of any Bond when and as the same shall become due and payable, whether at maturity as therein expressed, by proceedings for redemption, by acceleration or otherwise;

(B)      default in the due and punctual payment of any interest on any Bond when and as such interest shall become due and payable;

(C)      an Event of Default as defined in and pursuant to the Master Indenture;

(D)      the Hospital fails to duly and punctually observe any other covenant or agreement herein contained and such failure continues for thirty (30) days after written notice thereof shall have been given to the Hospital; provided, however, that if such observance requires work to be done, actions to be taken or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied within such thirty (30) day period but can be cured by appropriate action, but can be cured by appropriate action, it shall not constitute an Event of Default hereunder if the Hospital within such thirty (30) day period initiates corrective action and thereafter diligently pursues the same;

(E)      any representation or warranty made by the Hospital herein or in the Master Trust Indenture or in any certificate, agreement, instrument or statement made in connection herewith or with the sale and issuance of Bonds shall prove to have been false or misleading in any material respect;

(F)      the Master Indenture or any material provision of this Indenture shall cease for any reason to be valid and binding, or the Hospital or the Obligated Group Representative shall initiate legal proceedings or assert in legal proceedings that (i) this Indenture or the Master Indenture or any material provision of this Indenture or the Master Indenture is invalid or (ii) the Hospital has no liability on this Indenture or (C) the Obligated Group Members have no liability on the Master Indenture.

SECTION 7.02   Acceleration of Maturity.   If an Event of Default shall occur, then, and in each and every such case during the continuance of such Event of Default, the

29

Trustee may, upon notice in writing to the Hospital, declare the principal of all the Bonds then Outstanding, and the interest accrued thereon, to be due and payable immediately, together with interest payable thereon to the accelerated payment date, and upon any such declaration by the Trustee the same shall become and shall be immediately due and payable, anything in this Indenture or in the Bonds contained to the contrary notwithstanding.

Any such declaration, however, is subject to the condition that if, at any time after such declaration and before any judgment or decree for the payment of the moneys due shall have been obtained or entered, there shall be deposited with the Trustee a sum sufficient to pay all the principal of and interest on the Bonds payment of which is overdue, with interest on such overdue principal at the rate borne by the Bonds, and the reasonable charges and expenses of the Trustee, and any and all other Events of Defaults known to the Trustee (other than in the payment of principal of and interest on the Bonds due and payable solely by reason of such declaration) shall have been made good or cured or provision shall have been made therefor, then, and in every such case, the Trustee shall, on behalf of the Holders of all of the Bonds, by written notice to the Hospital, rescind and annul such declaration and its consequences and waive such Event of Default; but no such rescission and annulment shall extend to or shall affect any subsequent Event of Default, or shall impair or exhaust any right or power consequent thereon.

SECTION 7.03  <u>Rights as a Secured Party</u>.  The Trustee, as appropriate, may exercise all of the rights and remedies of a secured party under the Uniform Commercial Code with respect to securities in the Indenture Fund, including without limitation the Bond Fund and the Redemption Fund, including the right to sell or redeem such securities and the right to retain the securities in satisfaction of the obligation of the Hospital hereunder.  Notice sent by registered or certified mail, postage prepaid, or delivered during business hours, to the Hospital at least seven (7) days before an event under Uniform Commercial Code Sections 9-610 and 9-611, or any successor provision of law shall constitute reasonable notification of such event.

SECTION 7.04  <u>Application of Moneys Collected by the Trustee</u>.  If an Event of Default shall occur and be continuing, all moneys then held or thereafter received by the Trustee under any of the provisions of this Indenture (subject to Section 11.09) shall be applied by the Trustee as follows and in the following order:

(A)    To the payment of any expenses necessary in the opinion of the Trustee to protect the interests of the Holders of the Bonds and payment of reasonable fees and expenses of the Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under this Indenture; and

(B)    To the payment of the principal of and interest then due on the Bonds (upon presentation of the Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of this Indenture, as follows:

(1)    Unless the principal of all of the Bonds shall have become or have been declared due and payable,

*First*: To the payment to the Persons entitled thereto of all installments of interest then due in the order of the maturity of such installments, and, if the amount

available shall not be sufficient to pay in full any installment or installments due on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the Persons entitled thereto, without any discrimination or preference; and

*Second*:   To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any Bonds which shall have become due, whether at maturity or by call for redemption, in the order of their due dates, with interest on the overdue principal at the rate borne by the Bonds, and, if the amount available shall not be sufficient to pay in full all the Bonds due on any date, together with such interest, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date to the Persons entitled thereto, without any discrimination or preference.

(2)   If the principal of all of the Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the Bonds, with interest on the overdue principal at the rate borne by the Bonds, and, if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any Bond over any other Bond, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference.

SECTION 7.05  Trustee to Represent Bondholders.   The Trustee is hereby irrevocably appointed (and the successive respective Holders of the Bonds, by taking and holding the same, shall be conclusively deemed to have so appointed the Trustee) as trustee and true and lawful attorney-in-fact of the Holders of the Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the Bonds, this Indenture and applicable provisions of any law.  Upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Trustee to represent the Bondholders, the Trustee in its discretion may, and upon the written request of the Holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding, and upon being indemnified to its satisfaction therefor, shall, proceed to protect or enforce its rights or the rights of such Holders by such appropriate action, suit, mandamus or other proceedings as it shall deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Trustee, or in such Holders under the Bonds, this Indenture or any applicable law; and upon instituting such proceeding, the Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the amounts pledged under this Indenture, pending such proceedings.  All rights of action under this Indenture or the Bonds or otherwise may be prosecuted and enforced by the Trustee without the possession of any of the Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in the name of the Trustee for the benefit and protection of all the Holders of such Bonds, subject to the provisions of this Indenture.

31

SECTION 7.06 <u>Bondholders' Direction of Proceedings</u>.   The Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, and upon indemnifying the Trustee to its satisfaction therefor, to direct the time, method and place of conducting all remedial proceedings taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law and the provisions of this Indenture, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

SECTION 7.07 <u>Limitation on Bondholders' Right to Sue</u>.   No Holder of any Bond shall have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under this Indenture or any applicable law with respect to such Bond, unless (1) such Holder shall have given to the Trustee written notice of the occurrence of an Event of Default; (2) the Holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding shall have made written request upon the Trustee to exercise the powers hereinbefore granted or to institute such suit, action or proceeding in its own name; (3) such Holder or said Holders shall have tendered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Trustee shall have refused or omitted to comply with such request for a period of sixty (60) days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Trustee.

Such notification, request, tender of indemnity and refusal or omission are hereby declared, in every case, to be conditions precedent to the exercise by any Holder of Bonds of any remedy hereunder or under law; it being understood and intended that no one or more Holders of Bonds shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture or the rights of any other Holders of Bonds, or to enforce any right under this Indenture or applicable law with respect to the Bonds, except in the manner herein provided, and that all proceedings at law or in equity to enforce any such right shall be instituted, had and maintained in the manner herein provided and for the benefit and protection of all Holders of the Outstanding Bonds, subject to the provisions of this Indenture.

SECTION 7.08 <u>Absolute Obligation of Hospital</u>.   Notwithstanding any other provision of this Indenture, or in the Bonds, nothing shall affect or impair the obligation of the Hospital, which is absolute and unconditional, to pay the principal or Redemption Price of and interest on the Bonds to the respective Holders of the Bonds at their respective dates of maturity, or upon call for redemption, as herein provided, or, subject to Section 7.07, affect or impair the right of such Holders to enforce such payment by virtue of the contract embodied in the Bonds.

SECTION 7.09 <u>Termination of Proceedings</u>.   In case any proceedings taken by the Trustee or any one or more Bondholders on account of any Event of Default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Bondholders, then in every such case the Hospital, the Trustee and the Bondholders, subject to any determination in such proceedings, shall be restored to their former positions and rights hereunder, severally and respectively, and all rights, remedies, powers and duties of the Hospital, the Trustee and the Bondholders shall continue as though no such proceedings had been taken.

SECTION 7.10  Remedies Not Exclusive.  No remedy herein conferred upon or reserved to the Trustee or to the Holders of the Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

SECTION 7.11  Delay or Omission Not Waiver.  No delay or omission of the Trustee or of any Holder of the Bonds to exercise any right or power arising upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and every power and remedy given by this Indenture to the Trustee or to the Holders of the Bonds may be exercised from time to time and as often as may be deemed expedient.

SECTION 7.12  Waiver of Past Events of Defaults.  The Trustee may, and upon request of the Holders of not less than a majority in aggregate principal amount of the Outstanding Bonds shall, on behalf of the Holders of all the Bonds waive any past Event of Default hereunder and its consequences, except an Event of Default:

(A)    In the payment of the principal or Redemption Price of or interest on any Bond, or

(B)    In respect of a covenant or other provision of this Indenture which, pursuant to Section 9.01, cannot be modified or amended without the consent of the Holder of each Outstanding Bond affected.

Upon any such waiver, such Event of Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

SECTION 7.13  Undertaking for Costs.  Subject to the provisions of Section 8.05, the parties to this Indenture agree, and each Holder of any Bond by such Person's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 7.13 shall not apply to any suit instituted by the Trustee or to any suit instituted by any Bondholder or group of Bondholders holding in the aggregate more than a majority in aggregate principal amount of the Outstanding Bonds.

SECTION 7.14  Notice of Default.

(A)    Upon a Responsible Officer's actual knowledge of the existence of any default under this Indenture, the Trustee shall notify the Hospital in writing as soon as practicable, but in any event within five (5) Business Days.

(B)     Upon a Responsible Officer's actual knowledge of the existence of any Event of Default under this Indenture, the Trustee shall transmit by mail to all Bondholders, as their names and addresses appear in the bond register, notice of such Event of Default hereunder within thirty (30) days; provided, however, that, except in the case of an Event of Default in the payment of the principal or Redemption Price of or interest on any Bond, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors or Responsible Officers of the Trustee in good faith determine that the withholding of such notice is in the interest of the Bondholders.

SECTION 7.15   Trustee May File Proofs of Claim.

(A)     In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Hospital or any other obligor upon the Bonds or the property of the Hospital or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Bonds shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Hospital for the payment of overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(1)     To file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Bonds and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel including expenses and fees of outside counsel and allocated costs of internal legal counsel) and of the Bondholders allowed in such judicial proceeding; and

(2)     To collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and any receiver, assignee, trustee, liquidator or sequestrator (or other similar official) in any such judicial proceeding is hereby authorized by each Bondholder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Bondholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel including expenses and fees of outside counsel and allocated costs of internal legal counsel, and any other amounts due the Trustee under this Indenture.

(B)     Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Bondholder any plan of reorganization, arrangement, adjustment or composition affecting the Bonds or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Bondholder in any such proceeding.

## ARTICLE VIII

## **THE TRUSTEE**

SECTION 8.01  Duties, Immunities and Liabilities of Trustee.

(A)     The Trustee shall, prior to an Event of Default, and after the curing or waiver of all Events of Default which may have occurred, perform such duties and only such duties as are specifically set forth in this Indenture, and, except to the extent required by law, no implied covenants or obligations shall be read into this Indenture against the Trustee.  The Trustee shall, during the existence of any Event of Default (which has not been cured or waived), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(B)     The Hospital may remove the Trustee at any time unless an Event of Default shall have occurred and then be continuing, and shall remove the Trustee if at any time requested to do so by an instrument or concurrent instruments in writing signed by the Holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding (or their attorneys duly authorized in writing) or if at any time the Trustee shall cease to be eligible in accordance with subsection (E) of this Section 8.01, or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or its property shall be appointed, or any public officer shall take control or charge of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, in each case by giving written notice of such removal to the Trustee, and thereupon shall appoint a successor Trustee by an instrument in writing.

(C)     The Trustee may at any time resign by giving written notice of such resignation to the Hospital and by giving the Bondholders notice of such resignation by mail at the addresses shown on the registration books maintained by the Trustee.  Upon receiving such notice of resignation, the Hospital shall promptly appoint a successor Trustee by an instrument in writing.  The Trustee shall not be relieved of its duties until such successor Trustee has accepted appointment.

(D)     Any removal or resignation of the Trustee and appointment of a successor Trustee shall become effective upon acceptance of appointment by the successor Trustee.  If no successor Trustee shall have been appointed and have accepted appointment within thirty (30) days of giving notice of removal or notice of resignation as aforesaid, the resigning Trustee or any Bondholder (on behalf of itself and all other Bondholders) may petition any court of competent jurisdiction for the appointment of a successor Trustee, and such court may thereupon, after such notice (if any) as it may deem proper, appoint such successor Trustee.  Any successor Trustee appointed under this Indenture, shall signify its acceptance of such appointment by executing and delivering to the Hospital and to its predecessor Trustee a written acceptance thereof, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the moneys, estates, properties, rights, powers, trusts, duties and obligations of such predecessor Trustee, with like effect as if originally named Trustee herein; but, nevertheless at the request of the successor Trustee, such predecessor Trustee shall

35

execute and deliver any and all instruments of conveyance or further assurance and do such other things as may reasonably be required for more fully and certainly vesting in and confirming to such successor Trustee all the right, title and interest of such predecessor Trustee in and to any property held by it under this Indenture and shall pay over, transfer, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.  Upon request of the successor Trustee, the Hospital shall execute and deliver any and all instruments as may be reasonably required for more fully and certainly vesting in and confirming to such successor Trustee all such moneys, estates, properties, rights, powers, trusts, duties and obligations.  Upon acceptance of appointment by a successor Trustee as provided in this subsection, the successor Trustee shall mail or cause to be mailed (at the expense of the Hospital) a notice of the succession of such Trustee to the trusts hereunder to the Bondholders at the addresses shown on the registration books maintained by the Trustee.

(E)   Any successor Trustee shall be a trust company or bank having trust powers in the State of New York, having a combined capital and surplus of (or if such trust company or bank is a member of a bank holding system, its bank holding company shall have a combined capital and surplus of) at least fifty million dollars ($50,000,000), and subject to supervision or examination by federal or state of authority.  If such bank or trust company publishes a report of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for the purpose of this subsection the combined capital and surplus of such bank or trust company shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this subsection (E), the Trustee shall resign immediately in the manner and with the effect specified in this Section 8.01.

(F)   Merger or Consolidation.  Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be eligible under subsection (E) of Section 8.01, shall be the successor to such Trustee without the execution or filing of any paper or any further act, anything herein to the contrary notwithstanding.

SECTION 8.02   Liability of Trustee.

(A)   The Trustee assumes no responsibility for the correctness of the recitals of fact herein except as they specifically apply to the Trustee, and makes no representations as to the validity or sufficiency of this Indenture or of the Bonds, nor shall the Trustee incur any responsibility in respect thereof, other than in connection with the duties or obligations herein or in the Bonds assigned to or imposed upon it and except for any recital or representation specifically relating to the Trustee or its powers.  The Trustee shall, however, be responsible for its representations contained in its certificate of authentication on the Bonds.  The Trustee shall not be liable in connection with the performance of its duties hereunder, except for its own negligent action, negligent failure to act or willful misconduct.

(B)     The Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts.

(C)     The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority (or such lesser or greater number as this Indenture may permit to direct the Trustee) in aggregate principal amount of the Bonds at the time Outstanding relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Indenture.

(D)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Bondholders pursuant to the provisions of this Indenture unless such Bondholders shall have offered to the Trustee indemnity reasonably acceptable to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby.  The Trustee has no obligation or liability to the Holders for the payment of interest, principal or Redemption Price with respect to the Bonds from its own funds; but rather the Trustee's obligations shall be limited to the performance of its duties hereunder.

(E)     Except with respect to Events of Default specified in Section 7.01(A) or Section 7.01(B), the Trustee shall not be deemed to have knowledge of any Event of Default unless and until a Responsible Officer shall have actual knowledge thereof or the Trustee shall have received written notice thereof from the Hospital or the holders of at least five percent (5%) in aggregate principal amount of the Outstanding Bonds at the Designated Office.  The Trustee shall not be responsible for the validity or effectiveness of any collateral given to or held by it.

(F)     The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through attorneys-in-fact, agents or receivers.  The Trustee shall be entitled to advice of counsel and other professionals concerning all matters of trust and its duty hereunder.

(G)     The Trustee shall not be concerned with or accountable to anyone for the subsequent use or application of any moneys or Bond proceeds that shall be released or withdrawn in accordance with the provisions hereof.

(H)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this ARTICLE VIII.

(I)     The Trustee shall have no responsibility with respect to any information, statement, or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

(J)     The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty.

SECTION 8.03  <u>Right of Trustee to Rely on Documents</u>.  The Trustee shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond, statement, requisition, facsimile transmission, electronic mail or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Trustee may consult with counsel, who may be counsel of or to the Hospital, with regard to legal questions, and the opinion or written advice of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance therewith.

The Trustee shall not be bound to recognize any Person as the Holder of a Bond unless and until such Bond is submitted for inspection, if required, and such Person's title thereto is satisfactorily established, if disputed.

Whenever in the administration of the trusts imposed upon it by this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a Certificate of the Hospital, and such Certificate shall be full warrant to the Trustee for any action taken or suffered in good faith under the provisions of this Indenture in reliance upon such Certificate, but in its discretion the Trustee may, in lieu thereof, accept other evidence of such matter or may require such additional evidence as to it may deem reasonable.

SECTION 8.04  <u>Preservation and Inspection of Documents</u>.  All documents received by the Trustee under the provisions of this Indenture shall be retained in its possession and shall be subject upon prior written notice to the inspection of the Hospital and any Bondholder, and their agents and representatives duly authorized in writing, at reasonable hours and under reasonable conditions, until ninety (90) days after the termination of this Indenture.

SECTION 8.05  <u>Compensation and Indemnification</u>.

(A)  No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of its rights or powers, if it has not received the agreed compensation for such services or, in cases where the Trustee has a right to reimbursement or indemnification for such performance or exercise, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(B)  The Hospital further covenants and agrees to indemnify and hold harmless the Trustee, and its officers, directors, employees, and agents against any loss, expense and liabilities that it may incur arising out of or in connection with (1) the exercise and performance of the Trustee's powers and duties hereunder in accordance with the provisions hereof or (2) the sale of any Bonds and the carrying out of any of the transactions contemplated by the Bonds or related documents, including the costs and expenses of defending against any claim of liability, but excluding liabilities that are due to the Trustee's negligence or willful misconduct.  The obligations of the Hospital under this Section 8.05 shall survive resignation or removal of the Trustee under this Indenture and payment of the Bonds and discharge of this Indenture.

SECTION 8.06  <u>Notice to Rating Agency</u>.  The Trustee shall give written notice to each Rating Agency then rating the Bonds if (1) a successor Trustee is appointed hereunder, (2) if this Indenture is amended or supplemented, (3) if the Bonds are paid and this Indenture defeased pursuant to Section 10.01, (4) if the Bonds are accelerated pursuant to Section 7.02, or (5) if the Bonds are redeemed in whole or in part pursuant to Section 4.01, provided that the Trustee shall incur no liability for failure to give any such notice.

## ARTICLE IX

## <u>MODIFICATION OR AMENDMENT OF THE INDENTURE</u>

SECTION 9.01  <u>Amendments Permitted</u>.

(A)     This Indenture and the rights and obligations of the Hospital and of the Holders of the Bonds and of the Trustee may be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Hospital and the Trustee may enter into when the written consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have been filed with the Trustee.  No such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or reduce the rate of interest thereon, or extend the time of payment of interest thereon, or reduce any premium payable upon the redemption thereof, without the consent of the Holder of each Bond so affected or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Indenture Fund or the amounts pledged under this Indenture prior to or on a parity with the lien created by this Indenture, or deprive the Holders of the Bonds of the lien created by this Indenture on the Indenture Fund and such amounts (except as expressly provided in this Indenture), without the consent of the Holders of all Bonds then Outstanding.  It shall not be necessary for the consent of the Bondholders to approve the particular form of any Supplemental Bond Indenture, but it shall be sufficient if such consent shall approve the substance thereof.  Promptly after the execution by the Hospital and the Trustee of any Supplemental Bond Indenture pursuant to this subsection (A), the Trustee shall mail a notice, setting forth in general terms the substance of such Supplemental Bond Indenture, to the Bondholders at the addresses shown on the registration books maintained by the Trustee.  Any failure to give such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such Supplemental Bond Indenture.

(B)     This Indenture and the rights and obligations of the Hospital, of the Trustee and of the Holders of the Bonds may also be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Hospital and the Trustee may enter into without the necessity of obtaining the consent of any Bondholders, but only to the extent permitted by law and only for any one or more of the following purposes:

(1)     to add to the covenants and agreements of the Hospital contained in this Indenture other covenants and agreements thereafter to be observed, to pledge or assign additional security for the Bonds (or any portion thereof), or to surrender any right or power herein reserved to or conferred upon the Hospital, provided that such covenant,

agreement, pledge, assignment or surrender shall not materially adversely affect the interests of the Holders of the Bonds;

(2)  to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in this Indenture, or in regard to matters or questions arising under this Indenture, as the Hospital or the Trustee may deem necessary or desirable and not inconsistent with this Indenture, and which shall not materially adversely affect the interests of the Holders of the Bonds;

(3)  to modify, amend or supplement this Indenture or any Supplemental Bond Indenture in such manner as to permit the qualification hereof under the Trust Indenture Act of 1939, as amended, or any similar federal statute hereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute, and which shall not materially adversely affect the interests of the Holders of the Bonds (provided, however, that such modifications, amendments, supplements and additions shall be permitted under this subsection (B) only if qualification under said act or similar federal statute is required by applicable law now or hereafter in effect);

(4)  to provide for the procedures required to permit any Bondholder, at its option, to utilize an uncertificated system of registration of its Bond or to facilitate the registration of the Bonds in the name of a nominee of the Securities Depository in accordance with the provisions of Section 2.10; or

(5)  to authorize the issuance of Additional Bonds in accordance with the provisions of Section 2.11.

(C)  The Trustee may in its discretion, but shall not be obligated to, enter into any such Supplemental Bond Indenture authorized by subsections (A) or (B) of this Section 9.01 which materially adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

SECTION 9.02  Effect of Supplemental Bond Indenture.  Upon the execution of any Supplemental Bond Indenture pursuant to this ARTICLE IX, this Indenture shall be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Indenture of the Hospital, the Trustee and all Holders of Bonds Outstanding shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendment, and all the terms and conditions of any such Supplemental Bond Indenture shall be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 9.03  Endorsement of Bonds; Preparation of New Bonds.  Bonds delivered after the execution of any Supplemental Bond Indenture pursuant to this ARTICLE IX may, and if the Hospital so determines shall, bear a notation by endorsement or otherwise in form approved by the Hospital and the Trustee as to any modification or amendment provided for in such Supplemental Bond Indenture, and, in that case, upon demand of the Holder of any

Bond Outstanding at the time of such execution and presentation of such Bond for the purpose at the Designated Office of the Trustee or at such additional offices as the Trustee may select and designate for that purpose, a suitable notation shall be made on such Bond. If the Supplemental Bond Indenture shall so provide, new Bonds so modified as to conform, in the opinion of the Hospital (which may be based on an Opinion of Counsel, in the sole discretion of the Hospital), to any modification or amendment contained in such Supplemental Bond Indenture, shall be prepared by the Trustee at the expense of the Hospital, executed by the Hospital and authenticated by the Trustee, and, subject to the provisions of Section 4.Section 4.01(B)2, while the Bonds remain in the Book-Entry System, upon demand of the Holders of any Bonds then Outstanding shall be exchanged at the Designated Office of the Trustee, without cost to any Bondholder, for Bonds then Outstanding, upon surrender for cancellation of such Bonds, in equal aggregate principal amounts of the same series and maturity and bearing interest at the same rate.

SECTION 9.04  Amendment of Particular Bonds.  The provisions of this ARTICLE IX shall not prevent any Bondholder from accepting any amendment as to the particular Bonds held by such Bondholder, provided that due notation thereof is made on such Bonds.

## ARTICLE X

## DEFEASANCE

SECTION 10.01  Discharge of Indenture.  The Bonds may be paid or discharged by the Hospital or the Trustee on behalf of the Hospital in any of the following ways:

(A)  by paying or causing to be paid the principal or Redemption Price of and interest on all Bonds Outstanding, as and when the same become due and payable;

(B)  by depositing with the Trustee, in trust, at or before maturity, moneys or securities in the necessary amount (as provided in Section 10.03) to pay when due or redeem all Bonds then Outstanding; or

(C)  by delivering to the Trustee, for cancellation by it, all Bonds then Outstanding.

If the Hospital shall also pay or cause to be paid all other sums payable hereunder by the Hospital, then and in that case at the election of the Hospital (evidenced by a Certificate of the Hospital filed with the Trustee signifying the intention of the Hospital to discharge all such indebtedness and this Indenture), and notwithstanding that any Bonds shall not have been surrendered for payment, this Indenture and the pledge of the Indenture Fund and all amounts held therein made under this Indenture and all covenants, agreements and other obligations of the Hospital under this Indenture (except as otherwise provided in Section 8.05) shall cease, terminate, become void and be completely discharged and satisfied and the Bonds shall be deemed paid. In such event, upon the request of the Hospital, the Trustee shall cause an accounting for such period or periods as may be requested by the Hospital to be prepared and filed with the Hospital and shall execute and deliver to the Hospital all such instruments as may be necessary to evidence such discharge and satisfaction, and the Trustee shall pay over, transfer,

assign or deliver to the Hospital all moneys or securities or other property held by it pursuant to this Indenture which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

SECTION 10.02 <u>Discharge of Liability on Bonds</u>. Upon the deposit with the Trustee, in trust, at or before maturity, of money or securities in the necessary amount (as provided in Section 10.03) to pay or redeem any Outstanding Bond (whether upon or prior to the maturity or the redemption date of such Bond), provided that, if such Bond is to be redeemed prior to maturity, notice of such redemption shall have been given as in ARTICLE IV provided or provision satisfactory to the Trustee shall have been made for the giving of such notice and any conditions to the redemption set forth in such notice shall have been satisfied, then all liability of the Hospital in respect of such Bond shall cease, terminate and be completely discharged, and such Bond shall be deemed paid, except only that thereafter the Holder thereof shall be entitled to payment of the principal or Redemption Price of and interest on such Bond by the Hospital, and the Hospital shall remain liable for such payments, but only out of such money or securities deposited with the Trustee as aforesaid for its payment, subject, however, to the provisions of Section 10.04.

The Hospital may at any time surrender to the Trustee for cancellation by it any Bonds previously issued and delivered, which the Hospital may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, shall be deemed to be paid and retired.

SECTION 10.03 <u>Deposit of Money or Securities With Trustee</u>. Whenever in this Indenture it is provided or permitted that there be deposited with or held in trust by the Trustee money or securities in the necessary amount to pay or redeem any Bonds, the money or securities so to be deposited or held may include money or securities held by the Trustee in the funds and accounts established pursuant to this Indenture and shall be:

(A)	lawful money of the United States of America in an amount equal to the principal amount of such Bonds and all unpaid interest thereon to maturity, except that, in the case of Bonds which are to be redeemed prior to maturity and in respect of which notice of such redemption shall have been given as in ARTICLE IV provided or provision satisfactory to the Trustee shall have been made for the giving of such notice, the amount to be deposited or held shall be the principal amount or Redemption Price of such Bonds and all unpaid interest thereon to the redemption date; or

(B)	Investment Securities described in clause (1) of the definition thereof in Section 1.01 (not callable by the holder thereof prior to maturity), the principal of and interest on which when due will provide money sufficient to pay the principal or Redemption Price of and all unpaid interest to maturity, or to the redemption date, as the case may be, on the Bonds to be paid or redeemed, as such principal or Redemption Price and interest become due; provided that, in the case of Bonds which are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given as in ARTICLE IV provided or provision satisfactory to the Trustee shall have been made for the giving of such notice; provided, in each case, that the Trustee shall have been irrevocably instructed (by the terms of this Indenture or by direction of

the Hospital) to apply such money to the payment of such principal or Redemption Price and interest with respect to such Bonds.

SECTION 10.04 <u>Payment of Bonds After Discharge of Indenture</u>. Notwithstanding any provisions of this Indenture, any moneys held by the Trustee in trust for the payment of the principal or Redemption Price of, or interest on, any Bonds and remaining unclaimed for three years (or, if shorter, one day before such moneys would escheat to the State of New York under then applicable New York law) after such principal, Redemption Price or interest, as the case may be, has become due and payable (whether at maturity or upon call for redemption), shall be repaid to the Hospital free from the trusts created by this Indenture upon receipt of an indemnification agreement acceptable to the Hospital and the Trustee indemnifying the Hospital and the Trustee with respect to claims of Holders of Bonds which have not yet been paid, and all liability of the Trustee and the Hospital with respect to such moneys shall thereupon cease; provided, however, that before the repayment of such moneys to the Hospital as aforesaid, the Trustee may (at the cost of the Hospital) first mail to the Holders of Bonds which have not yet been paid, at the addresses shown on the registration books maintained by the Trustee, a notice, in such form as may be deemed appropriate by the Trustee with respect to the Bonds so payable and not presented and with respect to the provisions relating to the repayment to the Hospital of the moneys held for the payment thereof.

## ARTICLE XI

## <u>MISCELLANEOUS</u>

SECTION 11.01 <u>Successor Is Deemed Included in All References to Predecessor</u>. Whenever in this Indenture either the Hospital or the Trustee is named or referred to, such reference shall be deemed to include the successors or assigns thereof, and all the covenants and agreements in this Indenture contained by or on behalf of the Hospital or the Trustee shall bind and inure to the benefit of the respective successors and assigns thereof whether so expressed or not.

SECTION 11.02 <u>Limitation of Rights to Parties and Bondholders</u>. Nothing in this Indenture or in the Bonds expressed or implied is intended or shall be construed to give to any Person other than the Hospital, the Trustee and the Holders of the Bonds, any legal or equitable right, remedy or claim under or in respect of this Indenture or any covenant, condition or provision therein or herein contained; and all such covenants, conditions and provisions are and shall be held to be for the sole and exclusive benefit of the Hospital, the Trustee and the Holders of the Bonds.

SECTION 11.03 <u>Waiver of Notice</u>. Whenever in this Indenture the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the Person entitled to receive such notice and in any such case the giving or receipt of such notice shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

43

SECTION 11.04  Destruction of Bonds.  Whenever in this Indenture provision is made for the cancellation by the Trustee and the delivery to, or upon the order of, the Hospital of any Bonds, the Trustee may, in lieu of such cancellation and delivery, destroy such Bonds.

SECTION 11.05  Severability of Invalid Provisions.  If any one or more of the provisions contained in this Indenture or in the Bonds shall for any reason be held to be invalid, illegal or unenforceable in any respect, then such provision or provisions shall be deemed severable from the remaining provisions contained in this Indenture and such invalidity, illegality or unenforceability shall not affect any other provision of this Indenture, and this Indenture shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.

SECTION 11.06  Notices.  Any notice, direction, instruction or demand given or made pursuant to this Indenture shall be given or made in writing and shall be served by: (i) United States first-class mail, postage prepaid, addressed to the requisite party as set forth in this paragraph; (ii) hand delivery, addressed to the requisite party as set forth in this paragraph; or (iii) confirmed facsimile, addressed to the requisite party as set forth in this paragraph.  Any notice, direction or instruction to or demand upon the Trustee shall be addressed to the Trustee at the Designated Office of the Trustee.  Any notice to or demand upon the Hospital shall be addressed to the Hospital at: Hospital for Special Surgery, 535 East 70th Street, New York, New York 10021, Attention:  Chief Financial Officer (or such other address as may have been filed in writing by the Hospital with the Trustee).

The Trustee shall have the right to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods, provided, however, that the Hospital shall provide to the Trustee an incumbency certificate listing designated Persons with the authority to provide such instructions and containing specimen signatures of such designated Persons, which incumbency certificate shall be amended whenever a Person is to be added or deleted from the listing.

SECTION 11.07  Evidence of Rights of Bondholders.

(A)    Any request, consent or other instrument required or permitted by this Indenture to be signed and executed by Bondholders may be in any number of concurrent instruments of substantially similar tenor and shall be signed or executed by such Bondholders in Person or by an agent or agents duly appointed in writing.

(B)    The fact and date of the execution by any Person of any such request, consent or other instrument or writing may be proved by the certificate of any notary public or other officer of any jurisdiction, authorized by the laws thereof to take acknowledgments of deeds, certifying that the Person signing such request, consent or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution duly sworn to before such notary public or other officer.

(C)    The ownership of Bonds shall be proved by the registration books for the Bonds held by the Trustee.

(D)     Any request, consent, or other instrument or writing of the Holder of any Bond shall bind every future Holder of the same Bond and the Holder of every Bond issued in exchange therefor or in lieu thereof, in respect of anything done or suffered to be done by the Trustee or the Hospital in accordance therewith or reliance thereon.

SECTION 11.08  <u>Disqualified Bonds</u>.  In determining whether the Holders of the requisite aggregate principal amount of Bonds have concurred in any demand, request, direction, consent or waiver under this Indenture, Bonds which are known to the Trustee to be owned or held by or for the account of the Hospital, or by any Affiliate of the Hospital or any other obligor on the Bonds, shall be disregarded and deemed not to be Outstanding for the purpose of any such determination.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding for the purposes of this Section 11.08 if the pledge shall establish to the satisfaction of the Trustee the pledgee's right to vote such Bonds and that the pledgee is not an Affiliate of the Hospital or any other obligor on the Bonds.  In case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel selected by it with due care shall be full protection to the Trustee.

SECTION 11.09  <u>Money Held for Particular Bonds</u>.  The money held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds (or portions of Bonds in the case of Bonds redeemed in part only) shall, on and after such date and pending such payment, be set aside on its books and held uninvested in trust by it for the Holders of the Bonds entitled thereto, subject, however, to the provisions of Section 10.04.

SECTION 11.10  <u>Funds and Accounts</u>.  Any fund required by this Indenture to be established and maintained by the Trustee may be established and maintained in the accounting records of the Trustee either as a fund or an account, and may, for the purposes of such records, any audits thereof and any reports or statements with respect thereto, be treated either as a fund or as an account; but all such records with respect to all such funds shall at all times be maintained in accordance with customary standards of the corporate trust industry, to the extent practicable, and with due regard for the requirements of Section 6.05 and for the protection of the security of the Bonds and the rights of every Holder thereof.  The Trustee may establish such additional funds and accounts as it deems necessary or appropriate to perform its obligations hereunder.

SECTION 11.11  <u>Waiver of Personal Liability</u>.  No member, officer, agent or employee of the Hospital shall be individually or personally liable for the payment of the principal or Redemption Price of or interest on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof or the performance of any duty hereunder; but nothing herein contained shall relieve any such member, officer, agent or employee from the performance of any official duty provided by law or by this Indenture.

SECTION 11.12  <u>Business Days</u>.  If any date specified herein shall not be a Business Day, any action required on such date may be made on the next succeeding Business Day with the same effect as if made on such date.

SECTION 11.13  Governing Law; Venue.  This Indenture shall be construed in accordance with and governed by the Constitution and the laws of the State of New York applicable to contracts made and performed in the State of New York.  This Indenture shall be enforceable in the State of New York, provided, however, that any action arising hereunder shall (unless waived by the Hospital and the Trustee) be filed and maintained in the State of New York.

SECTION 11.14  Execution in Several Counterparts.  This Indenture may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original; and all such counterparts, or as many of them as the Hospital and the Trustee shall preserve undestroyed, shall together constitute but one and the same instrument.

SECTION 11.15  CUSIP Numbers.  Neither the Trustee nor the Hospital shall be liable for any defect or inaccuracy in the CUSIP number that appears on any Bond or in any redemption notice.  The Trustee may, in its discretion, include in any redemption notice a statement to the effect that the CUSIP numbers on the Bonds have been assigned by an independent service and are included in such notice solely for the convenience of the Holders and that neither the Trustee nor the Hospital shall be liable for any inaccuracies in such numbers.

SECTION 11.16  Agreement Not for the Benefit of Other Parties.  This Indenture is not intended for the benefit of and shall not be construed to create rights in parties other than the Hospital, the Trustee, and the Bondholders.

SECTION 11.17  Entire Agreement.  This Indenture constitutes the entire agreement of the parties hereto and is not subject to modification, amendment, qualification or limitation except as expressly provided herein.

SECTION 11.18  ERISA Provisions.  By its acquisition of Bonds, each purchaser and subsequent transferee thereof will be deemed to have represented and warranted, on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in such Bonds through and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Bonds, either that (a) it is not, and is not acting on behalf of, or with the assets of, a Benefit Plan, or an Other Plan subject to Other Law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (b) its acquisition, holding and disposition or transfer of a bond do not and will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of an Other Plan, a non-exempt violation under any Other Law).

In addition, each purchaser or transferee that is a Benefit Plan that acquires a Bond, including any fiduciary purchasing the Bonds on behalf of a Benefit Plan (a "Plan Fiduciary") will be deemed to have represented by its acquisition of the Bonds that:

(i)     none of the Hospital, the Master Trustee, Underwriters or any of their respective affiliated entities (the "Transaction Parties"), has been relied upon for any advice with respect to the Benefit Plan Investor's decision to purchase or hold any Bonds (or interest therein) and none of the Transaction Parties shall at any time be relied upon as the Benefit

Plan Investor's fiduciary with respect to any decision to purchase, hold, transfer or otherwise dispose of the Bonds (or interest therein);

(ii)    the Benefit Plan Investor's decision to invest and any decision to continue investment in or to transfer or otherwise dispose of the Bonds (or interest therein) has been made at the recommendation or direction of a fiduciary (the "Independent Fiduciary") that is ''independent'' (within the meaning of clause (c)(1) of the U.S. Department of Labor regulations codified at 29 C.F.R. § 2510.3-21 (the ''Fiduciary Definition'')) of the Transaction Parties that is one of the following:

(1)  a bank as defined in Section 202 of the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or similar institution that is regulated and supervised and subject to periodic examination by a state or federal agency;

(2)  an insurance carrier which is qualified under the laws of more than one state of the U.S. to perform the services of managing, acquiring or disposing of assets of a Benefit Plan Investor;

(3)  an investment adviser registered with the U.S. Securities and Exchange Commission (the "SEC") under the Advisers Act, or, if not registered an as investment adviser with the SEC under the Advisers Act by reason of paragraph (a)(1) of Section 203A of the Advisers Act, is registered as an investment adviser under the laws of the state (referred to in such paragraph (a)(1)) in which it maintains its principal office and place of business;

(4)  a broker-dealer registered under the Securities Exchange Act of 1934, as amended; or

(5)  a fiduciary that holds, or has under its management or control, total assets of at least U.S. $50,000,000 (provided that this provision shall not be satisfied if the Independent Fiduciary is either (i) the owner or a relative of the owner of an individual retirement account, in the case of an investor that is an individual retirement account or (ii) a participant or beneficiary or a relative of a participant or beneficiary of a self-directed pension plan, in the case of an investor that is a self-directed pension plan);

(iii)    the Independent Fiduciary is capable of evaluating investment risks independently, both in general and with respect to particular transactions and investment strategies, including the acquisition by the Benefit Plan Investor of the Bonds (or interest therein);

(iv)    the Independent Fiduciary is a "fiduciary" (under ERISA and/or Section 4975 of the Code) with respect to the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions, and is responsible for exercising independent judgment in evaluating the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions;

(v)     none of the Transaction Parties has exercised any authority to cause the Benefit Plan Investor to invest in the Bonds (or interest therein) or to negotiate the terms of the Benefit Plan Investor's investment in the Bonds (or interest therein);

(vi)    the Independent Fiduciary is aware of and acknowledges that:

(1)     none of the Transaction Parties is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein);

(2)     the Transaction Parties have a financial interest in the Benefit Plan Investor's investment in the Bonds on account of the fees and other compensation they expect to receive in connection with the offering of the Bonds, and

(3)     any such fees or other compensation received by the Transaction Parties do not constitute fees rendered for the provision of investment advice to the Benefit Plan Investor.

(vii)   the Independent Fiduciary is aware of and acknowledges that the Transaction Parties are relying on the exception set forth in clause (c)(1) of the Fiduciary Definition (i.e., the "Transactions with independent fiduciaries with financial expertise" exception) with respect to any communications made to the Benefit Plan Investor or the Independent Fiduciary concerning the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein).

The representations in (i)-(vii) above are intended to comply with the Department of Labor's Reg. Sections 29 C.F.R. 2510.3-21(a) and (c)(1) as promulgated on April 8, 2016 (81 Fed. Reg. 20,997).   If these regulations are revoked, repealed or no longer effective, these representations shall be deemed to not be in effect.

SECTION 11.19     Any purported purchase or transfer of such Bonds, or any interest therein to a purchaser or transferee that does not comply with the requirements specified in the applicable documents will be of no force and effect and shall be null and void *ab initio*.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Hospital has caused this Indenture to be signed in its name by its Authorized Representative, and the Trustee, in token of its acceptance of the trusts created hereunder, has caused this Indenture to be signed in its corporate name by its duly authorized officer all as of the day and year first above written.

**THE NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY**


By : _____

Stacey L. Malakoff
Executive Vice President
and Chief Financial Officer




**THE BANK OF NEW YORK MELLON**
*as Trustee*


By _____

Authorized Officer

EXHIBIT A

FORM OF BOND

*Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to the Issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or such other name as requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful inasmuch as the registered owner hereof, Cede & Co., has an interest herein.*

**REGISTERED**                  **UNITED STATES OF AMERICA**                  **REGISTERED**
                               **STATE OF NEW YORK**

**No. R-[__]**                                                              **$[_____]**

**HOSPITAL FOR SPECIAL SURGERY
TAXABLE BONDS,
SERIES 2018**

| **Reference Date** | **Maturity Date** | **CUSIP** | **Rate Per Annum** |
|---|---|---|---|
| | | | % |

**Registered Owner:** Cede & Co.

**Principal Sum:** [_____]

The New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery, a corporation organized under the not-for-profit laws of the State of New York (the "Hospital"), for value received, hereby promises to pay, in lawful money of the United States of America, to the Registered Owner specified above, or registered assigns, on the maturity date specified above (subject to any right of prior redemption hereinafter mentioned), the principal amount specified above, and to pay interest on such principal amount on October 1, 2018 and semiannually thereafter on each April1 and October1 (each, an "Interest Payment Date") until payment of such principal amount shall be discharged as provided in the Indenture (as defined below). This Bond shall bear interest at the rate set forth above from the later of (i) the date of original issuance of the Bonds and (ii) the most recent Interest Payment Date to which interest has been paid or duly provided for.

Payment of the interest on each Interest Payment Date will be made to the Person whose name appears on the bond registration books of The Bank of New York Mellon, as trustee under the Indenture (such entity and any successors being referred to herein as the "Trustee"), as the Holder thereof as of the close of business on the Record Date (as defined in the Indenture) for each Interest Payment Date, such interest to be paid by check mailed by first class mail to such Holder at its address as it appears on such registration books, or, upon the written request of any Holder of at least $1,000,000 in aggregate principal amount of Bonds, submitted to the Trustee at least one Business Day (as defined in the Indenture) prior to the Record Date, by wire transfer in immediately available funds to an account within the United States designated by such Holder. The principal or Redemption Price (as defined below) hereof shall be payable by check or by wire transfer of immediately available funds in lawful money of the United States of America at

A-1

the Designated Office of the Trustee. Notwithstanding the foregoing, as long as Cede & Co. is the Holder of the Bonds in Book-Entry Form, said principal or Redemption Price and interest payments will be made to Cede & Co. by wire transfer in immediately available funds. All payments in respect of the Bonds will be made after the deduction or withholding of any taxes required by law to be deducted or withheld. Interest on this Bond will be calculated on the basis of a 360-day year consisting of twelve 30-day months. This Bond shall be delivered in the form of fully registered bonds in denominations of $1,000 and any integral multiple thereof.

1. _Indenture_. This Bond is one of a duly authorized series of bonds of the Hospital designated the "Hospital for Special Surgery Taxable Bonds, Series 2018" (the "Bonds"), aggregating One Hundred Seventy Nine Million Two Hundred Twenty Thousand Dollars ($179,220,000) in principal amount, duly issued by the Hospital under and pursuant to the Indenture of Trust dated as of April 1, 2018, by and between the Hospital and the Trustee, as the same may be amended and supplemented (the "Indenture"). Capitalized terms used herein but not defined herein have the meanings assigned to them in the Indenture. The terms of the Bonds include those stated in the Indenture, and the Bonds are subject to all such terms. Reference is made hereby to the Indenture for a description of the funds, revenues and charges pledged thereunder, the nature and extent of the security created or to be created, and the rights, limitations of rights, obligations, duties and immunities of the Hospital, the Trustee and the holders of the Bonds. By the acceptance of this Bond, the holder hereof assents to all of the provisions of the Indenture. Certified copies of the Indenture are on file at the Designated Office of the Trustee.

2. _Redemption_.

(A)   This Bond shall be subject to redemption prior to maturity, if at all, in whole or in part, on the redemption date(s) and at the redemption price(s) and in the manner and under the terms and conditions provided in the Indenture.

(B)   Notice of any proposed redemption shall be given as provided in the Indenture.

(C)   This Bond is subject to purchase in lieu of redemption by the Trustee at the direction of the Hospital prior to maturity on the same terms that would apply to the Bonds if the Bonds were then being optionally redeemed.

3. _Acceleration_. If an Event of Default shall occur, then, and in each and every such case during the continuance of such Event of Default, the Trustee may, upon notice in writing to the Hospital, declare the principal of all the Bonds then Outstanding, together with interest payable thereon to the accelerated payment date, and upon any such declaration by the Trustee the same shall become and shall be immediately due and payable, anything in the Indenture or in the Bonds contained to the contrary notwithstanding.

4. _Governing Law_. This Bond shall be governed by and construed in accordance with the laws of the State of New York.

5. _Permitted Amendments_. The Indenture and the rights and obligations of the Hospital and of the Holders of the Bonds and of the Trustee may be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Hospital and the Trustee may enter into when the written consent of the Holders of a majority in aggregate principal amount of the Bonds then Outstanding shall have been filed with the Trustee.

No such modification or amendment shall (1) extend the fixed maturity of any Bond, or reduce the amount of principal thereof, or reduce the rate of interest thereon, or extend the time of payment of interest thereon, or reduce any premium payable upon the redemption thereof, without the consent of the Holder of each Bond so affected or (2) reduce the aforesaid percentage of Bonds the consent of the Holders of which is required to effect any such modification or amendment, or permit the creation of any lien on the Indenture Fund or the amounts pledged under this Indenture prior to or on a parity with the lien created by this Indenture, or deprive the Holders of the Bonds of the lien created by this Indenture on the Indenture Fund and such amounts (except as expressly provided in this Indenture), without the consent of the Holders of all Bonds then Outstanding.

It is hereby certified and recited that any and all conditions, things and acts required to exist, to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Indenture, and that the amount of this Bond, together with all other Bonds (if any) is not in excess of the amount of Bonds permitted to be issued under the Indenture.

Nothing in the Indenture or in the Bonds, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or otherwise in the assets of the Hospital other than in any interest of the Hospital in the Indenture Fund and/or the amounts on deposit therein and as provided in the Indenture. No recourse for the payment of the principal or Redemption Price of or interest on any Bond, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Hospital in the Indenture or in any Supplemental Bond Indenture or in any Bond, or because of the creation of any indebtedness represented thereby, shall be had against any employee, agent, or officer, as such, past, present or future, of the Hospital or of any successor entity, either directly or through any successor entity, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Bonds.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Indenture until it shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

By its acquisition of this Bond or portion thereof, each purchaser and subsequent transferee thereof will be deemed to have represented and warranted, on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in such Bond through and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Bond, either that (a) it is not, and is not acting on behalf of, or with the assets of, a Benefit Plan, or an Other Plan subject to Other Law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (b) its acquisition, holding and disposition or transfer of a bond do not and will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of an Other Plan, a non-exempt violation under any Other Law).

By its acquisition of this Bond or portion thereof, each purchaser and subsequent transferee thereof will be deemed to have represented and warranted, on each day from the date on which such purchaser or transferee, as applicable, acquires its interest in such Bond through

and including the date on which such purchaser or transferee, as applicable, disposes of its interest in such Bond, either that (a) it is not, and is not acting on behalf of, or with the assets of, a Benefit Plan, or an Other Plan subject to Other Law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (b) its acquisition, holding and disposition or transfer of a bond do not and will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of an Other Plan, a non-exempt violation under any Other Law).

In addition, each purchaser or transferee that is a Benefit Plan that acquires a Bond, including any fiduciary purchasing the Bonds on behalf of a Benefit Plan (a "Plan Fiduciary") will be deemed to have represented by its acquisition of the Bonds that:

     (i)   none of the Hospital, the Master Trustee, Underwriters or any of their respective affiliated entities (the "Transaction Parties"), has been relied upon for any advice with respect to the Benefit Plan Investor's decision to purchase or hold any Bonds (or interest therein) and none of the Transaction Parties shall at any time be relied upon as the Benefit Plan Investor's fiduciary with respect to any decision to purchase, hold, transfer or otherwise dispose of the Bonds (or interest therein);

     (ii)   the Benefit Plan Investor's decision to invest and any decision to continue investment in or to transfer or otherwise dispose of the Bonds (or interest therein) has been made at the recommendation or direction of a fiduciary (the "Independent Fiduciary") that is "independent" (within the meaning of clause (c)(1) of the U.S. Department of Labor regulations codified at 29 C.F.R. § 2510.3-21 (the "Fiduciary Definition")) of the Transaction Parties that is one of the following:

     (1)  a bank as defined in Section 202 of the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or similar institution that is regulated and supervised and subject to periodic examination by a state or federal agency;

     (2)  an insurance carrier which is qualified under the laws of more than one state of the U.S. to perform the services of managing, acquiring or disposing of assets of a Benefit Plan Investor;

     (3)  an investment adviser registered with the U.S. Securities and Exchange Commission (the "SEC") under the Advisers Act, or, if not registered an as investment adviser with the SEC under the Advisers Act by reason of paragraph (a)(1) of Section 203A of the Advisers Act, is registered as an investment adviser under the laws of the state (referred to in such paragraph (a)(1)) in which it maintains its principal office and place of business;

     (4)  a broker-dealer registered under the Securities Exchange Act of 1934, as amended; or

     (5)  a fiduciary that holds, or has under its management or control, total assets of at least U.S. $50,000,000 (provided that this provision shall not be satisfied if the Independent Fiduciary is either (i) the owner or a relative of the owner of an individual retirement account, in the case of an investor that is an individual retirement account or (ii) a participant or beneficiary or a relative of a participant

or beneficiary of a self-directed pension plan, in the case of an investor that is a self-directed pension plan);

(iii)     the Independent Fiduciary is capable of evaluating investment risks independently, both in general and with respect to particular transactions and investment strategies, including the acquisition by the Benefit Plan Investor of the Bonds (or interest therein);

(iv)     the Independent Fiduciary is a "fiduciary" (under ERISA and/or Section 4975 of the Code) with respect to the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions, and is responsible for exercising independent judgment in evaluating the Benefit Plan Investor's investment in the Bonds (or interest therein) and any related transactions;

(v)     none of the Transaction Parties has exercised any authority to cause the Benefit Plan Investor to invest in the Bonds (or interest therein) or to negotiate the terms of the Benefit Plan Investor's investment in the Bonds (or interest therein);

(vi)     the Independent Fiduciary is aware of and acknowledges that:

(1)     none of the Transaction Parties is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein);

(2)     the Transaction Parties have a financial interest in the Benefit Plan Investor's investment in the Bonds on account of the fees and other compensation they expect to receive in connection in connection with the offering of the Bonds, and

(3)     any such fees or other compensation received by the Transaction Parties do not constitute fees rendered for the provision of investment advice to the Benefit Plan Investor.

(vii)     the Independent Fiduciary is aware of and acknowledges that the Transaction Parties are relying on the exception set forth in clause (c)(1) of the Fiduciary Definition (i.e., the "Transactions with independent fiduciaries with financial expertise" exception) with respect to any communications made to the Benefit Plan Investor or the Independent Fiduciary concerning the Benefit Plan Investor's initial or continued investment in, or transfer or other disposition of, the Bonds (or interest therein).

The representations in (i)-(vii) above are intended to comply with the Department of Labor's Reg. Sections 29 C.F.R. 2510.3-21(a) and (c)(1) as promulgated on April 8, 2016 (81 Fed. Reg. 20,997).   If these regulations are revoked, repealed or no longer effective, these representations shall be deemed to not be in effect

[Remainder of this page left blank intentionally]

IN WITNESS WHEREOF, the Hospital has caused this bond to be executed on its behalf by its duly authorized officer and attested by its Secretary or Assistant Secretary as of the Reference Date specified above.

**THE NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY**

[SEAL]

By: _____
        Stacey L. Malakoff
     Executive Vice President
  and Chief Financial Officer

ATTEST:

_____
        Irene M. Koch
    Executive Vice President,
Chief Legal Officer and Secretary

CERTIFICATE OF AUTHENTICATION

This is one of the Bonds described in the within mentioned Indenture, and this Bond has been registered on the date set forth below.

Date of authentication:  April 3, 2018

**THE BANK OF NEW YORK MELLON**
*as Trustee*

By: _____
Authorized Signatory

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

**APPENDIX E**

**FORM OF MASTER INDENTURE**

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

MASTER TRUST INDENTURE

NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED,
MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY

and

THE BANK OF NEW YORK MELLON,
as Master Trustee

Dated as of  April 1, 2018

## TABLE OF CONTENTS

**Page**

ARTICLE I

DEFINITIONS AND INTERPRETATION

Section 1.01.   Definitions.........................................................................................2

Section 1.02.   Interpretation......................................................................................19

Section 1.03.   References to Master Indenture ..........................................................19

Section 1.04.   Contents of Certificates and Opinions; Use of GAAP......................19

ARTICLE II

AUTHORIZATION AND ISSUANCE OF MASTER INDENTURE OBLIGATIONS

Section 2.01.   Authorization of Obligations ..............................................................20

Section 2.02.   Issuance of Obligations.......................................................................20

Section 2.03.   Appointment of Credit Group Representative ....................................21

Section 2.04.   Execution and Authentication of Obligations....................................21

Section 2.05.   Conditions to the Issuance of Obligations .........................................21

ARTICLE III

PAYMENTS WITH RESPECT TO MASTER INDENTURE
OBLIGATIONS; OBLIGATED GROUP COVENANTS

Section 3.01.   Payment of Required Payments...........................................................22

Section 3.02.   Transfers from Designated Affiliates...................................................24

Section 3.03.   Designation of Designated Affiliates...................................................24

Section 3.04.   Membership in Obligated Group .........................................................25

Section 3.05.   Withdrawal from Obligated Group ......................................................26

Section 3.06.   Covenants of Corporate Existence, Maintenance of Properties, Etc ................27

Section 3.07.   Gross Receivables Pledge ....................................................................27

Section 3.08.   Covenant Against Encumbrances .........................................................28

Section 3.09.   Rate Covenant.......................................................................................28

Section 3.10.   Merger, Aquisition, Consolidation, Sale or Conveyance ....................29

Section 3.11.   Limitation on Disposition of Assets .....................................................31

**TABLE OF CONTENTS**

(continued)

**Page**

Section 3.12.   Limitation on Indebtedness................................................................32

Section 3.13.   Filing of Financial Statements, Certificate of No Default, Other Information..33

Section 3.14.   Insurance................................................................................35

### ARTICLE IV

### DEFAULTS

Section 4.01.   Events of Default .....................................................................35

Section 4.02.   Acceleration; Annulment of Acceleration ...........................................37

Section 4.03.   Additional Remedies and Enforcement of Remedies .................................37

Section 4.04.   Application of Moneys After Default ................................................38

Section 4.05.   Remedies Not Exclusive ..............................................................40

Section 4.06.   Remedies Vested in the Master Trustee..............................................40

Section 4.07.   Master Trustee to Represent Holders................................................40

Section 4.08.   Holders' Control of Proceedings ....................................................40

Section 4.09.   Termination of Proceedings ..........................................................40

Section 4.10.   Waiver of Event of Default...........................................................41

Section 4.11.   Appointment of Receiver .............................................................41

Section 4.12.   Remedies Subject to Provisions of Law .............................................41

Section 4.13.   Notice of Default.....................................................................42

### ARTICLE V

### THE MASTER TRUSTEE

Section 5.01.   Certain Duties and Responsibilities ................................................42

Section 5.02.   Certain Rights of Master Trustee....................................................43

Section 5.03.   Right to Deal in Obligations and Related Bonds....................................46

Section 5.04.   Removal and Resignation of the Master Trustee.....................................46

Section 5.05.   Compensation and Reimbursement .....................................................47

Section 5.06.   Recitals and Representations ........................................................47

Section 5.07.   Separate or Co-Master Trustee .......................................................48

Section 5.08.   Merger or Consolidation .............................................................49

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE VI

SUPPLEMENTS AND AMENDMENTS

Section 6.01.  Supplements Not Requiring Consent of Holders ................................................49

Section 6.02.  Supplements Requiring Consent of Holders ......................................................50

Section 6.03.  Execution and Effect of Supplements ..............................................................51

Section 6.04.  Amendment of Related Supplements ...............................................................52

ARTICLE VII

SATISFACTION AND DISCHARGE

Section 7.01.  Satisfaction and Discharge of Master Indenture .................................................52

Section 7.02.  Payment of Obligations After Discharge of Lien ...............................................53

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01.  Limitation of Rights ........................................................................................53

Section 8.02.  Severability ....................................................................................................53

Section 8.03.  Holidays ........................................................................................................53

Section 8.04.  Credit Enhancer Deemed Holder of Obligation ................................................54

Section 8.05.  Governing Law ...............................................................................................54

Section 8.06.  Counterparts ..................................................................................................54

Section 8.07.  Immunity of Individuals ..................................................................................54

Section 8.08.  Binding Effect ................................................................................................54

Section 8.09.  Notices ..........................................................................................................54

APPENDIX A– LIST OF INITIAL MEMBERS OF THE CREDIT GROUP ....................A-1

APPENDIX B– EXISTING PERMITTED LIENS ...............................................................B-1

# MASTER TRUST INDENTURE

THIS MASTER TRUST INDENTURE, dated as of April 1, 2018 and effective on the Effective Date as defined herein, (the "Master Indenture"), by and between the NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY, a New York not-for-profit corporation (the "Corporation"), and THE BANK OF NEW YORK MELLON, a banking corporation organized and existing under the laws of the State of New York and being duly qualified to accept and administer the trusts created hereby (as more specifically defined herein, the "Master Trustee"),

W I T N E S S E T H :

WHEREAS, the Corporation is authorized and deems it necessary and desirable to enter into this Master Indenture for the purpose of providing for the issuance from time to time of Obligations (as defined herein) to finance or refinance health care facilities or for other lawful and proper corporate purposes of the Corporation; and

WHEREAS, all acts and things necessary to constitute this Master Indenture a valid indenture and agreement according to its terms have been done and performed, the Corporation has duly authorized the execution and delivery of this Master Indenture, and the Corporation, in the exercise of the legal rights and powers vested in it, executes this Master Indenture and proposes to make, execute, issue and deliver Obligations hereunder; and

WHEREAS, the Master Trustee agrees to accept and administer the trusts created hereby; and

WHEREAS, to secure the performance and observance of the covenants and agreements set forth in this Master Indenture, the Member of the Obligated Group do hereby sell, assign, transfer, pledge and grant a security interest to the Master Trustee in all of its right, title and interest to all funds and accounts established under this Master Indenture, including all moneys and investment therein and income thereon, and in all of its right, title and interest in and to its Gross Receivables, as hereinafter defined.  All such security shall be held by the Master Trustee in trust for the equal and ratable benefit and security of the holders of Obligations issued hereunder without preference or priority (except as specifically permitted herein) of any one Obligation over any other Obligation;

NOW, THEREFORE, in consideration of the premises, of the acceptance by the Master Trustee of the trusts hereby created, and of the giving of consideration for and acceptance of the Obligations issued hereunder by the holders thereof, and for the purpose of fixing and declaring the terms and conditions upon which such Obligations are to be issued, authenticated, delivered and accepted by all persons who shall from time to time be or become holders thereof, the Members of the Obligated Group, covenant and agree with the Master Trustee for the equal and proportionate benefit of the respective holders from time to time of Obligations issued hereunder, as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

Section 1.01.  Definitions.  Unless the context otherwise requires, the terms defined in this Section shall, for all purposes of this Master Indenture and of any supplemental indenture issued hereafter and of any certificate, opinion or other document herein mentioned, have the meanings herein specified, equally applicable to both singular and plural forms of any of the terms herein defined.

"Accountant" means any independent auditors or certified public accountant or firm of such auditors or accountants selected by the Credit Group Representative.

"Affiliate" means a corporation, limited liability company, partnership, joint venture, association, business trust or similar entity organized under the laws of the United States of America or any state thereof which controls or which is controlled, directly or indirectly, by the Credit Group Representative or other Credit Group Member, which is controlled by a Person which controls the Credit Group Representative or other Credit Group Member or of which a majority of the members of any governing body are a majority of the members of the Governing Body of the Credit Group Representative or other Credit Group Member. Notwithstanding anything contained herein to the contrary, the Hospital for Special Surgery Fund, Inc. shall be deemed an "Affiliate" hereunder.

"Annual Debt Service" means for each Fiscal Year the sum (without duplication) of the aggregate amount of principal and interest scheduled to become due and payable in such Fiscal Year on all Long-Term Indebtedness of the Credit Group then Outstanding (by scheduled maturity, acceleration, mandatory redemption or otherwise, but not including purchase price becoming due as a result of mandatory or optional tender or put), less any amounts of such principal or interest to be paid during such Fiscal Year from (a) the proceeds of Indebtedness, (b) moneys applied to the payment of principal on Balloon Indebtedness or (c) moneys or Government Obligations subject to an Irrevocable Deposit for the purpose of paying such principal or interest; provided that if an Identified Financial Product Agreement has been entered into by any Credit Group Member with respect to Long-Term Indebtedness and the counterparty thereto has not defaulted in the payment obligations thereunder, interest on such Long-Term Indebtedness shall be included in the calculation of Annual Debt Service by including for each Fiscal Year an amount equal to the amount of interest payable on such Long-Term Indebtedness in such Fiscal Year at the rate or rates stated in such Long-Term Indebtedness plus any Financial Product Payments under an Identified Financial Product Agreement payable in such Fiscal Year minus any Financial Product Receipts under an Identified Financial Product Agreement receivable in such Fiscal Year.

"Authorized Representative" means with respect to each Credit Group Member, its chief executive officer, president, chief financial officer, secretary, assistant secretary, or any other person designated as an Authorized Representative of such Credit Group Member by a Certificate of that Credit Group Member signed by its chief executive officer, president, or chief financial officer and filed with the Master Trustee.

"<u>Balloon Indebtedness</u>" means Long-Term Indebtedness, 15% or more of the principal of which (calculated as of the date of issuance) becomes due during any period of 12 consecutive months, absent acceleration, if such maturing principal amount is not required to be amortized below such percentage by mandatory redemption prior to such 12-month period.

"<u>Book Value</u>" means, when used in connection with Property, Plant and Equipment or other Property of any Credit Group Member, the value of such property, net of accumulated depreciation, as it is carried on the books of the Credit Group Member in conformity with GAAP, and when used in connection with Property, Plant and Equipment or other Property of the Credit Group, means the aggregate of the values so determined with respect to such Property of each Credit Group Member determined in such a way that no portion of such value of Property of any Credit Group Member is included more than once.

"<u>Certificate</u>," "<u>Statement</u>," "<u>Request</u>," "<u>Consent</u>" or "<u>Order</u>" of any Credit Group Member or of the Master Trustee means, respectively, a written certificate, statement, request, consent or order signed in the name of such Credit Group Member by its Authorized Representative or in the name of the Master Trustee by its Responsible Officer. Any such instrument and supporting opinions or certificates, if any, may, but need not, be combined in a single instrument with any other instrument, opinion or certificate and the two or more so combined shall be read and construed as a single instrument. If and to the extent required by Section 1.04 hereof, each such instrument shall include the statements provided for in Section 1.04.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

"<u>Completion Indebtedness</u>" means any Long-Term Indebtedness incurred for the purpose of financing the completion of construction or equipping of any project for which Long-Term Indebtedness or Interim Indebtedness has theretofore been incurred in accordance with the provisions hereof, to the extent necessary to provide a completed and fully equipped facility of the type and scope contemplated at the time said Long-Term Indebtedness or Interim Indebtedness was incurred, in accordance with the general plans and specifications for such facility as originally prepared in connection with said Long-Term Indebtedness or Interim Indebtedness as such plans and specifications may be modified to deal with budget overruns or exigencies (if any) not anticipated at commencement of construction (or matters encountered beyond budgeted-for contingencies) as certified by an Officer's Certificate.

"<u>Controlling Member</u>" means the Obligated Group Member designated by the Credit Group Representative to establish and maintain control over a Designated Affiliate.

"<u>Corporate Trust Office</u>" means the office of the Master Trustee at which its corporate trust business is conducted, which at the date hereof is located at 101 Barclay Street, 7-East New York, NY 10286.

"<u>Corporation</u>" means the New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery, a New York not-for-profit corporation, and its successors and assignees.

E-3

"Credit Group" or "Credit Group Members" means all Obligated Group Members and Designated Affiliates.

"Credit Group Financial Statements" has the meaning set forth in Section 3.13.

"Credit Group Representative" means the Corporation or such other Credit Group Member (or Credit Group Members acting jointly) as may have been designated pursuant to written notice to the Master Trustee executed by all of the Obligated Group Members.

"Debt Service Coverage Ratio" means, for any period of time, the ratio determined by dividing Income Available for Debt Service by Maximum Annual Debt Service.

"Default" means an event that, with the passage of time or the giving of notice or both, would become an Event of Default.

"Designated Affiliate" means any Person which has been so designated by the Credit Group Representative in accordance with Section 3.03 so long as such Person has not been further designated by the Credit Group Representative as no longer being a Designated Affiliate in accordance with Section 3.03.

"Effective Date" means April 3, 2018.

"Electronic Mail" means a notice, request or other communication sent by email; provided, that for purpose of this Master Indenture, an e-mail does not constitute a notice, request or other communication hereunder, but rather the portable document format or similar attachment to such e-mail shall constitute a notice, request or other communication hereunder.

"Event of Default" means any of the events specified in Section 4.01 hereof.

"Fair Market Value," when used in connection with Property, means the fair market value of such Property as determined by either:

(a)     an appraisal of the portion of such Property which is real property and the permanent improvements thereof made within five years of the date of determination by a "Member of the Appraisal Institute" and an appraisal of any material portion of such Property which is not real property made within five years of the date of determination by any expert qualified in relation to the subject matter, provided that any such appraisal shall be performed by an Independent Consultant, adjusted for the period, not in excess of five years, from the date of the last such appraisal for changes in the implicit price deflator for the gross national product as reported by the United States Department of Commerce or its successor agency, or if such index is no longer published, such other index certified to be comparable and appropriate in an Officer's Certificate delivered to the Master Trustee;

(b)     a bona fide offer for the purchase of such Property made on an arm's-length basis within six months of the date of determination, as established by an Officer's Certificate; or

E-4

(c)    an Authorized Representative of the Credit Group Representative (whose determination shall be made in good faith and set forth in an Officer's Certificate filed with the Master Trustee) if the fair market value of such Property is less than or equal to the greater of ten million dollars ($10,000,000) or 10% of cash and equivalents as shown on the Credit Group Financial Statements.

"Financial Product Agreement" means any interest rate exchange agreement, hedge or similar arrangement, including, *inter alia*, an interest rate swap, asset swap, a constant maturity swap, a forward or futures contract, cap, collar, option, floor, forward or other hedging agreement, arrangement or security, direct funding transaction or other derivative, however denominated and whether entered into on a current or forward basis, excluding however commodity (including power) forward purchase agreements.

"Financial Product Extraordinary Payments" means any payments required to be paid to a counterparty by a Credit Group Member pursuant to a Financial Product Agreement in connection with the termination thereof, tax gross-up payments, expenses, default interest, and any other payments or indemnification obligations to be paid to a counterparty by a Credit Group Member under a Financial Product Agreement, which payments are not Financial Product Payments.

"Financial Product Payments" means regularly scheduled payments required to be paid to a counterparty by a Credit Group Member pursuant to a Financial Product Agreement and excluding Financial Product Extraordinary Payments.

"Financial Product Receipts" means regularly scheduled payments required to be paid to a Credit Group Member by a counterparty pursuant to a Financial Product Agreement.

"Fiscal Year" means the period beginning on January 1 of each year and ending on the next succeeding December 31, or any other twelve-month period hereafter designated by the Credit Group Representative as the fiscal year of the Credit Group.

"GAAP" means accounting principles generally accepted in the United States of America, consistently applied.

"Governing Body" means, when used with respect to any Credit Group Member, its board of directors, board of trustees or other board or group of individuals in which all of the powers of such Credit Group Member are vested, except for those powers reserved to the corporate membership of such Credit Group Member by the articles of incorporation or bylaws of such Credit Group Member.

"Government Issuer" means any municipal corporation, political subdivision, state, territory or possession of the United States, or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof, which obligations would constitute Related Bonds hereunder.

"Government Obligations" means: (1) direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury of the United States of America) or obligations the timely payment of the principal of

E-5

and interest on which are fully and unconditionally guaranteed by the United States of America; (2) obligations issued or guaranteed by any agency, department or instrumentality of the United States of America or any state if the obligations issued or guaranteed by such entity are rated in one of the two highest Rating Categories of a Rating Agency; (3) certificates which evidence ownership of the right to the payment of the principal of and interest on obligations described in clauses (1) and/or (2), provided that such obligations are held in the custody of a bank or trust company in a special account separate from the general assets of such custodian; and (4) obligations the interest on which is excluded from gross income for purposes of federal income taxation pursuant to Section 103 of the Internal Revenue Code of 1986, and the timely payment of the principal of and interest on which is fully provided for by the deposit in trust of cash and/or obligations described in clauses (1), (2) and/or (3).

"Government and Industry Restrictions" means any federal, state or other applicable governmental law or regulations (including income tax limitations which must be respected to preserve the exempt status of the applicable Person, eligibility of a Person for benefits under any state, local or federal subsidy or exemption program, or conditions imposed specifically on the Credit Group Members of the Credit Group Members' facilities), or any general industry standards or general industry conditions affecting any Credit Group Member and its health care or research facilities or other licensed facilities placing restrictions and limitations on the (i) rates, fees, research funding and charges to be fixed, charged or collected by any Credit Group Member, (ii) rates, fees, research funding and charges to be fixed, charged and collected by the Credit Group Members, or (iii) the amount or timing of the receipt of such revenues.

"Gross Receivables" means all of the accounts, chattel paper, instruments and general intangibles (all as defined in the UCC) of each Obligated Group Member, as are now in existence or as may be hereafter acquired and the proceeds thereof; excluding, however, (1) all Restricted Moneys and (2) all accounts or general intangibles consisting of or arising from patents and royalties.

"Guaranty" means any obligation of any Credit Group Member guaranteeing, directly or indirectly, any obligation of any other Person which would, if such other Person were a Credit Group Member, constitute Indebtedness.

"Holder" means the registered owner of any Obligation in registered form or the bearer of any Obligation in coupon form which is not registered or is registered to bearer or the party or parties to any contractual obligation designated to be an Obligation set forth in a Related Supplement and identified therein as the party to whom payment is due thereunder or the "holder" thereof.

"Identified Financial Product Agreement" means a Financial Product Agreement identified to the Master Trustee in a Certificate of the Credit Group Representative as having been entered into by a Credit Group Member with a Qualified Provider with respect to Indebtedness (which is either then-Outstanding or to be issued after the date of such Certificate) identified in such Certificate, with a notional amount not in excess of the principal amount of such Indebtedness.

"Immaterial Affiliates" means Persons (i) that are not Members of the Credit Group; and (ii) whose total revenues or unrestricted net assets (or net worth in the case of Credit Group Members that are not Tax-Exempt Organizations), as shown in their financial statements for their most recent fiscal year, represented, in the aggregate, less than 15% of the combined or consolidated total revenues or unrestricted net assets of the Credit Group, as shown on the Credit Group Financial Statements, plus the total revenues or unrestricted net assets of such Persons (as if they were Members of the Credit Group for such period), for the most recently completed Fiscal Year of the Credit Group.

"Income Available for Debt Service" means, with respect to the Credit Group as to any period of time, changes in unrestricted net assets (including the beneficial interest in The Hospital for Special Surgery Fund, Inc. and distributions resulting from ownership of the beneficial interest in other Affiliates) before depreciation, amortization, and interest expense (including Financial Product Payments and Financial Product Receipts on Identified Financial Product Agreements), as determined in accordance with GAAP and as shown on the Credit Group Financial Statements; provided, that no determination thereof shall take into account:

(a)     gifts, grants, bequests, donations or contributions, to the extent (i) temporarily restricted by the donor  specifically for capital purposes or (ii) permanently restricted by the donor specifically to a particular purpose other than (1) payment of principal of, redemption premium and interest on Indebtedness, (2) release into unrestricted funds, or (3) payment of operating expenses;

(b)     the net proceeds of casualty insurance and condemnation awards;

(c)     any gain or loss resulting from the extinguishment of Indebtedness;

(d)     any gain or loss resulting from the sale, exchange or other disposition of assets not in the ordinary course of business;

(e)     any gain or loss resulting from any discontinued operations;

(f)     any gain or loss resulting from pension terminations, settlements or curtailments;

(g)     any unusual charges for employee severance;

(h)     adjustments to the value of assets or liabilities resulting from changes in GAAP;

(i)     unrealized gains or losses on investments, including "other than temporary" declines in Book Value and loss on investments and equity in earnings of alternative investments;

(j)     gains or losses resulting from changes in valuation of any hedging, derivative, interest rate exchange or similar contract (including Financial Product Agreements);

(k)     any Financial Product Extraordinary Payments or similar payments on any hedging, derivative, interest rate exchange or similar contract that does not constitute a Financial Product Agreement;

(l)     unrealized gains or losses from the write-down, reappraisal or revaluation of assets;

(m)     changes in the pension liability to be recognized in future periods (as determined under GAAP);

(n)     other nonrecurring items which do not involve the receipt, expenditure or transfer of assets; or

(o)     any gains or losses or revenues or expenses attributable to transactions between any Credit Group Member or any other Credit Group Member;

provided, however, at the option of the Credit Group Representative, net realized gains and losses from the sale of investments may be included in the computation of Income Available for Debt Service on the basis of the average annual amount of those gains and losses for the three Fiscal Years immediately preceding the computation date (rather than including the actual amount of net realized gains and losses from the sale of investments for the period for which a computation is being made).

"Indebtedness" means any Guaranty (other than any Guaranty by any Credit Group Member of Indebtedness of any other Credit Group Member) and any obligation of any Credit Group Member (a) for repayment of borrowed money, (b) with respect to capital or finance leases or (c) under installment sale agreements; provided, however, that if more than one Credit Group Member shall have incurred or assumed a Guaranty of a Person other than a Credit Group Member, or if more than one Credit Group Member shall be obligated to pay any obligation, for purposes of any computations or calculations under this Master Indenture such Guaranty or obligation shall be included only one time. Financial Product Agreements, trade payables, accrued expenses in the normal course of business, physician income guaranties or other credit/funding extension, any obligation to reimburse a bond insurer, financial institution or other Person which has guaranteed or otherwise assured the performance of a Member's obligations under a Financial Products Agreement, or any obligation to repay moneys deposited by patients or others with a Obligated Group Member as security for or as prepayment of the cost of patient care, or any rights of residents of life care, elderly housing or similar facilities to endowment or similar funds deposited by or on behalf of such residents, shall not constitute Indebtedness. Indebtedness shall not include obligations of any Member of the Obligated Group to another Member of the Obligated Group which are conditional upon the availability of funds.

"Independent Consultant" means a firm (but not an individual) selected by a Credit Group Member which (1) does not have any direct financial interest or any material indirect financial interest in any Credit Group Member (other than the agreement or agreements pursuant to which such firm is retained), (2) is not connected with any Credit Group Member as an officer or employee, and (3) in the good faith opinion of the Credit Group Member making such selection, is qualified to pass upon questions relating to the financial affairs of organizations

similar to the Credit Group or facilities of the type or types operated by the Credit Group and has the skill and experience necessary to render the particular opinion or report required by the provision hereof in which such requirement appears.

"Initial Designated Affiliates" means the corporations listed on Schedule B attached hereto.

"Initial Obligated Group Members" means the corporations listed on Schedule B attached hereto.

"Interim Indebtedness" means Indebtedness with an original maturity not in excess of five years, the proceeds of which are to be used to provide interim financing for capital improvements in anticipation of the issuance of Long-Term Indebtedness. Interim Indebtedness shall be considered Long-Term Indebtedness for purposes of this Master Indenture.

"Irrevocable Deposit" means the irrevocable deposit in trust of cash in an amount, or Government Obligations or other securities permitted for such purpose pursuant to the terms of the documents governing the payment of or discharge of Indebtedness, the principal of and interest on which will be an amount, and under terms sufficient to pay all or a portion of the principal of, premium, if any, and interest on, as the same shall become due, any such Indebtedness which would otherwise be considered Outstanding. The trustee of such deposit may be the Master Trustee, a Related Bond Trustee or any other trustee or escrow agent authorized to act in such capacity.

"LIBOR" means the rate for deposits in U.S. dollars with one-month maturity as published by Reuters (or such other service as may be nominated by the British Bankers Association, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 A.M., London time, on the date of determination, except that, if such rate is not then available, LIBOR means a rate reasonably determined by or on behalf of the Credit Group Representative on the basis of published rates at which deposits in U.S. dollars for a one-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 A.M., London time, on the date of determination, to prime banks in the London interbank market.

"Lien" means any mortgage or pledge of, or security interest in, or lien or encumbrance on, any Property of a Credit Group Member (i) which secures any Indebtedness or any other obligation of such Credit Group Member or (ii) which secures any obligation of any Person other than a Credit Group Member, and excluding liens applicable to Property in which a Credit Group Member has only a leasehold interest unless the lien secures Indebtedness of that Credit Group Member.

"Limited Designated Affiliate" means a Designated Affiliate which has been identified by the Credit Group Representative as a Limited Designated Affiliate pursuant to Section 3.03(b) hereof.

"Long-Term Indebtedness" means Indebtedness other than Short-Term Indebtedness.

"Master Indenture" means this Master Indenture dated as of April 1, 2018, between the Corporation and the Master Trustee, as supplemented and amended, and as it may from time to time hereafter be further amended or supplemented in accordance with the terms hereof.

"Master Trustee" means The Bank of New York Mellon, a New York banking organization, and, subject to the limitations contained in Section 5.07, any other corporation or association that may be co-trustee with the Master Trustee, and any successor or successors to said trustee or co-trustee in the trusts created hereunder which satisfied the requirements hereunder.

"Material Credit Group Members" means the Credit Group Members whose total revenues or unrestricted net assets, in the aggregate, as shown on their financial statements for their most recently completed fiscal year, were, in the aggregate, equal to or greater than 85% of the total revenues or unrestricted net assets of the entire Credit Group, as shown on the Credit Group Financial Statements for the most recently completed Fiscal Year of the Credit Group.

"Maximum Annual Debt Service" means the greatest amount of Annual Debt Service becoming due and payable in any Fiscal Year including the Fiscal Year in which the calculation is made or any subsequent Fiscal Year; provided, however, that for the purposes of computing Maximum Annual Debt Service:

(a)      with respect to a Guaranty, (i) if the Credit Group Members have made a payment pursuant to such Guaranty, 100% of the Annual Debt Service (calculated as if such Person were a Credit Group Member) guaranteed by the Credit Group Members under the Guaranty shall be included in the calculation of Annual Debt Service in the year in which such payment was made and for two Fiscal Years thereafter and (ii) otherwise, there shall be included in the calculation of Annual Debt Service a percentage of the Annual Debt Service (calculated as if such Person were a Credit Group Member) guaranteed by the Credit Group Members under the Guaranty, based on the ratio of Income Available for Debt Service of the Person whose indebtedness is guaranteed by the Credit Group Member (calculated as if such Person were a Credit Group Member), over the Annual Debt Service of such Person (calculated as if such Person were a Credit Group Member) (the "Ratio"). The applicable percentage of Annual Debt Service on such indebtedness shall be included in the calculation of Annual Debt Service, as follows:

| Ratio | Percentage of Annual Debt Service on such Indebtedness to be Included |
|---|---|
| Less than 2.0 | 20% |
| 2.0 or greater | 0% |

(b)      if interest on Long-Term Indebtedness is payable pursuant to a variable interest rate formula (or if Financial Product Payments under an Identified Financial Product Agreement or Financial Product Receipts under an Identified Financial Product Agreement are determined pursuant to a variable rate formula), the interest rate on such Long-Term Indebtedness (or the variable rate formula for such Financial Product Payments under an

Identified Financial Product Agreement or Financial Product Receipts under an Identified Financial Product Agreement) for periods when the actual interest rate cannot yet be determined shall be assumed to be equal to (i) if such Long-Term Indebtedness (or Identified Financial Product Agreement) was Outstanding during the 12 calendar months immediately preceding the date of calculation, an average of the interest rates per annum which were in effect during such 12 calendar-month period and (ii) if such Long-Term Indebtedness (or Identified Financial Product Agreement) was not Outstanding during the 12 calendar months immediately preceding the date of calculation, at the election of the Credit Group Representative, either (x) an average of the SIFMA Index, or LIBOR (if taxable), during the 12 calendar months immediately preceding the date of calculation or (y) an average of the interest rates per annum which would have been in effect for any 12 consecutive calendar months during the 18 calendar months immediately preceding the date of calculation, as specified in a Certificate of the Credit Group Representative or, at the sole option of the Credit Group Representative, such interest rate as shall be specified in a written statement from an investment banking or financial advisory firm selected by the Credit Group Representative;

(c)     if moneys or Government Obligations have been deposited in an Irrevocable Deposit with a trustee or escrow agent in an amount, together with earnings thereon, sufficient to pay all or a portion of the principal of or interest on Long-Term Indebtedness as it comes due, such principal or interest, as the case may be, to the extent provided for, shall not be included in computations of Maximum Annual Debt Service;

(d)     debt service on Long-Term Indebtedness incurred to finance capital improvements shall be included in the calculation of Maximum Annual Debt Service only in proportion to the amount of interest on such Long-Term Indebtedness which is payable in the then current Fiscal Year from sources other than proceeds of such Long-Term Indebtedness (other than proceeds deposited in debt service reserve funds) held by a trustee or escrow agent for such purpose; and

(e)     with respect to Balloon Indebtedness or Interim Indebtedness, such Balloon Indebtedness or Interim Indebtedness shall be treated, at the sole option of the Credit Group Representative, as Long-Term Indebtedness bearing interest at an interest rate equal to either (i) a fixed rate equal to the Thirty-Year Revenue Bond Index most recently published in *The Bond Buyer* prior to the date of calculation or (ii) such interest rate as shall be specified in a written statement from an investment banking or financial advisory firm selected by the Credit Group Representative, and with substantially level debt service or other specified amortization either, at the sole option of the Credit Group Representative, (A) to maturity or (B) over a period of up to 30 years (which period shall be designated by the Credit Group Representative) from the date of calculation.

"Merger Transaction" has the meaning set forth in Section 3.10.

"Nonrecourse Indebtedness" means any Indebtedness which is not a general obligation of the obligor of such Indebtedness and which is secured by a Lien on Property, Plant and Equipment acquired or constructed with the proceeds of such Indebtedness, liability for which is effectively limited to the Property, Plant and Equipment subject to such Lien with no recourse,

absent extraordinary events such as fraud, insolvency or waste, directly or indirectly, to any other Property of any Credit Group Member.

"Obligated Group" means all Obligated Group Members.

"Obligated Group Member" or "Member" means each Person that is obligated hereunder from and after the date upon which such Person joins the Obligated Group, but excluding any Person which withdraws from the Obligated Group to the extent and in accordance with the provisions of Section 3.05 hereof, from and after the date of such withdrawal.

"Obligation" means any obligation of the Obligated Group issued pursuant to Section 2.02 hereunder, as a joint and several obligation of each Obligated Group Member, which may be in any form set forth in a Related Supplement, including, but not limited to, bonds, notes, obligations, debentures, reimbursement agreements, loan agreements, guarantees, Financial Product Agreements or leases. Reference to a Series of Obligations or to Obligations of a Series means Obligations or Series of Obligations issued pursuant to a single Related Supplement.

"Officer's Certificate" means a certificate signed by an Authorized Representative of the Credit Group Representative.

"Opinion of Bond Counsel" means a written opinion signed by an attorney or firm of attorneys experienced in the field of public finance whose opinions are generally accepted by purchasers of bonds issued by or on behalf of a Government Issuer.

"Opinion of Counsel" means a written opinion signed by a reputable and qualified attorney or firm of attorneys who may be counsel for the Credit Group Representative or any Member of the Credit Group.

"Outstanding," when used with reference to Indebtedness or Obligations, means, as of any date of determination, all Indebtedness or Obligations theretofore issued or incurred and not paid and discharged other than (1) Obligations theretofore cancelled by the Master Trustee or delivered to the Master Trustee for cancellation or otherwise deemed paid in accordance with the terms hereof, (2) Obligations in lieu of which other Obligations have been authenticated and delivered or which have been paid pursuant to the provisions of a Related Supplement regarding mutilated, destroyed, lost or stolen Obligations unless proof satisfactory to the Master Trustee has been received that any such Obligation is held by a bona fide purchaser, (3) any Obligation held by any Credit Group Member and (4) Indebtedness deemed paid and no longer outstanding pursuant to the terms thereof; provided, however, that if two or more obligations which constitute Indebtedness represent the same underlying obligation (as when an Obligation secures an issue of Related Bonds and another Obligation secures repayment obligations to a bank under a letter of credit which secures such Related Bonds) for purposes of calculating compliance with the various financial covenants contained herein, but only for such purposes, only one of such Obligations shall be deemed Outstanding and the Obligation so deemed to be Outstanding shall be that Obligation which produces the greatest amount of Annual Debt Service to be included in the calculation of such covenants.

"Parity Financial Product Extraordinary Payments" means Financial Product Extraordinary Payments that (1) are with respect to a Financial Product Agreement secured or evidenced by an Obligation and (2) have been specified to be payable on a parity with Financial Product Payments in the Related Supplement authorizing the issuance of such Obligation.

"Permitted Liens" means and include:

(a)  Any judgment lien or notice of pending action against any Credit Group Member so long as the judgment or pending action is being contested and execution thereon is stayed or while the period for responsive pleading has not lapsed;

(b)  (i) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law, affecting any Property, to (A) terminate such right, power, franchise, grant, license or permit, provided that the exercise of such right would not materially impair the use of such Property or materially and adversely affect the Value thereof, or (B) purchase, condemn, appropriate or recapture, or designate a purchase of, such Property; (ii) any liens on any Property for taxes, assessments, levies, fees, water and sewer charges, and other governmental and similar charges and any liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or materials furnished in connection with such Property, which are not delinquent, or the amount or validity of which are being contested and execution thereon is stayed or, with respect to liens of mechanics, materialmen and laborers, have been due and payable or which are not delinquent, or the amount or validity of which, are being contested or, with respect to liens of mechanics, materialmen and laborers, have been due for less than 60 days, or the amount or validity of which are being contested; (iii) easements, rights-of-way, servitudes, restrictions and other minor defects, encumbrances, and irregularities in the title to any Property which do not materially impair the use of such Property or materially and adversely affect the Value thereof; (iv) easements, exceptions or reservations for the purpose of ingress and egress, parking, pipelines, telephone lines, telegraph lines, power lines and substations, roads, streets, alleys, highways, railroad purposes, drainage, sewerage, dikes, canals, laterals, ditches, removal of oil, gas, coal or other minerals, and other similar matters, including joint use agreements, which do not materially interfere with the use or operation of the subject Property for its intended purpose; and (v) rights reserved to or vested in any municipality or public authority to control or regulate any Property or to use such Property in any manner, which rights do not materially impair the use of such Property in any manner, or materially and adversely affect the Value thereof;

(c)  Any Lien described in APPENDIX B to this Master Indenture which is existing on the date of execution hereof or as APPENDIX B may be supplemented upon addition of a Credit Group Member with respect to Liens existing on the Property of such additional Credit Group Member, provided that no such Lien (or the amount of Indebtedness or other obligations secured thereby) may be increased, extended, renewed or modified to apply to any Property of any Credit Group Member not subject to such Lien on such date, unless such Lien as so extended, renewed or modified otherwise qualifies as a Permitted Lien;

(d)  Any Lien in favor of the Master Trustee securing all Outstanding Obligations equally and ratably;

(e)     Liens arising by reason of good faith deposits with any Credit Group Member in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by any Credit Group Member to secure public or statutory obligations, or to secure, or in lieu of, surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(f)     Any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Credit Group Member to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pension or profit sharing plans or other similar social security plans, or to share in the privileges or benefits required for companies participating in such arrangements;

(g)     Any Lien arising by reason of any escrow or reserve fund established to pay debt service or the redemption price or purchase price of Indebtedness;

(h)     Any Lien in favor of a trustee on the proceeds of Indebtedness prior to the application of such proceeds;

(i)     Liens on moneys deposited by patients or others with any Credit Group Member as security for or as prepayment for the cost of patient care;

(j)     Liens on Property received by any Credit Group Member through gifts, grants, bequests or research grants, such Liens being due to restrictions or rights reserved on such gifts, grants, bequests or research grants or the income thereon, up to the Fair Market Value of such Property;

(k)     Rights of the United States of America, including, without limitation, the Federal Emergency Management Agency ("FEMA") or the State of New York, by reason of FEMA and other federal and State of New York funds made available to any Credit Group Member of the Credit Group under federal or State of New York statutes;

(l)     Liens on Property securing Indebtedness incurred to refinance Indebtedness previously secured by a Lien on such Property, provided that (i) the amount of such new Indebtedness does not exceed the amount of such refinanced Indebtedness, (ii) the Property securing such Indebtedness is not materially increased, and (iii) the obligor with respect to such Indebtedness, whether direct or contingent, is not changed;

(m)     Liens granted by a Credit Group Member to another Credit Group Member;

(n)     Liens securing Nonrecourse Indebtedness incurred pursuant to the provisions hereof;

(o)     Liens consisting of purchase money security interests (as defined in the UCC) and lessors' interest in capitalized leases;

E-14

(p)     Liens on the Credit Group Members' accounts receivable securing Indebtedness in an amount not to exceed 30% of the Credit Group Members' aggregate net patient accounts receivable and grant and other receivables, as shown on the Credit Group Financial Statements for the most recent year for which such financial statements are available immediately prior to the incurrence of such Indebtedness;

(q)     Liens on revenues constituting rentals in connection with any other Lien permitted hereunder on the Property from which such rentals are derived;

(r)     The lease or license of the use of a part of the Credit Group Members' facilities for use in performing professional or other services necessary, appropriate or customary for the proper and economical operation of such facilities in accordance with customary business practices in the industry;

(s)     Liens created on amounts deposited by a Credit Group Member pursuant to a security annex or similar document to collateralize obligations of such Member under a Financial Product Agreement;

(t)     Liens junior to Liens in favor of the Master Trustee;

(u)     Liens in favor of banking or other depository institutions arising as a matter of law encumbering the deposits of any Credit Group Member held in the ordinary course of business by such banking institution (including any right of setoff or statutory bankers' liens) so long as such deposit account is not established or maintained for the purpose of providing such Lien, right of setoff or bankers' lien;

(v)     UCC financing statements filed with the Secretary of State of the State (or such other office maintaining such records) in connection with an operating lease entered into by any Credit Group Member in the ordinary course of business so long as such financing statement does not evidence the grant of any Lien other than a Permitted Lien;

(w)     Rights of sub-tenants, licensees or tenants under leases or rental agreements pertaining to Property, Plant and Equipment owned by any Credit Group Member so long as the lease arrangement is in the ordinary course of business of the Member, including without limitation rentals of housing to graduate and other students and rooms rented to hospice patients and families;

(x)     Deposits of Property by any Credit Group Member to meet regulatory requirements for a governmental workers' compensation, unemployment insurance or social security program, including any Lien imposed by ERISA;

(y)     Deposits to secure the performance of another party with respect to a bid, trade contract, statutory obligation, surety bond, appeal bond, performance bond or lease, and other similar obligations incurred in the ordinary course of business of a Member;

(z)     Liens resulting from deposits to secure bids from or the performance of another party with respect to contracts incurred in the ordinary course of business of a Member

E-15

(other than contracts creating or evidencing an extension of credit to the depositor or otherwise for the payment of Indebtedness);

(aa)    Present or future zoning laws, ordinances or other laws or regulations restricting the occupancy, use or enjoyment of Property, Plant and Equipment of any Credit Group Member which, in the aggregate, are not substantial in amount, and which do not in any case materially impair the use of such Property, Plant and Equipment for the purposes for which it is used or could reasonably be expected to be held or used;

(bb)    Any Lien on Property due to the rights of third-party payors for recoupment of amounts paid to any Credit Group Member;

(cc)    Any Lien existing for not more than 30 days after the Credit Group Member shall have received notice thereof unless the Credit Group Member is contesting such Lien in good faith;

(dd)    Any other Lien on Property provided that the Value of all Property encumbered by all Liens permitted as described in this clause (dd) does not exceed 30% of the Value of all Property of the Credit Group Members, calculated at the time of creation of such Lien; and

(ee)    Restrictions imposed in connection with the incurrence of Indebtedness permitted under this Master Indenture required to be imposed under applicable law in connection with such indebtedness such as regulatory agreements required under the Code for multifamily rental bonds or required in connection with mortgage insurance provided by state or federal governmental entities.

"Person" means an individual, corporation, limited liability company, firm, association, partnership, trust or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

"Property" means any and all rights, titles and interests in and to any and all assets of any Credit Group Member, whether real or personal, tangible or intangible and wherever situated, other than Restricted Moneys.

"Property, Plant and Equipment" means all Property of any Credit Group Member which is considered property, plant and equipment of such Credit Group Member.

"Qualified Provider" means any financial institution or insurance company or corporation which is a party to a Financial Product Agreement if (i) the unsecured long-term debt obligations of such provider (or of the parent or a subsidiary of such provider if such parent or subsidiary guarantees or otherwise assures the performance of such provider under such Financial Product Agreement), or (ii) obligations secured or supported by a letter of credit, contract, guarantee, agreement, insurance policy or surety bond issued by such provider (or such guarantor or assuring parent or subsidiary), are rated in one of the three highest Rating Categories of a Rating Agency at the time of the execution and delivery of the Financial Product Agreement.

E-16

"Rating Agency" means Fitch Inc., Moody's Investors Service, Inc., S&P Global Ratings, and any other national rating agency then rating Obligations or Related Bonds.

"Rating Category" means a generic securities rating category, without regard to any refinement or gradation of such rating category by a numerical modifier, outlook or otherwise.

"Related Bond Indenture" means any indenture, bond resolution, trust agreement or other comparable instrument pursuant to which a series of Related Bonds are issued.

"Related Bond Issuer" means the Government Issuer of any issue of Related Bonds.

"Related Bonds" means the revenue bonds or other obligations (including, without limitation, installment sale or lease obligations evidenced by certificates of participation) issued by any Government Issuer, the proceeds of which are loaned or otherwise made available to a Credit Group Member in consideration of the execution, authentication and delivery of an Obligation or Obligations to or for the order of such Government Issuer.

"Related Bond Trustee" means the trustee and its successors in the trusts created under any Related Bond Indenture, and if there is no such trustee, means the Related Bond Issuer.

"Related Supplement" means an indenture supplemental to, and authorized and executed pursuant to the terms of, this Master Indenture.

"Required Payment" means any payment, whether at maturity, by acceleration, upon proceeding for redemption or otherwise, including without limitation, Financial Product Payments, Financial Product Extraordinary Payments and the purchase price of Related Bonds tendered or deemed tendered for purchase pursuant to the terms of a Related Bond Indenture, required to be made by any Obligated Group Member pursuant to any Related Supplement or any Obligation.

"Responsible Officer" means, with respect to the Master Trustee, any managing director, any vice president, any assistant vice president, any assistant secretary, any assistant treasurer or any other officer of the Master Trustee customarily performing functions similar to those performed by the persons above designated or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Master Indenture.

"Restricted Moneys" means the proceeds of any grant (including without limitation any government grant), gift, bequest, contribution or other donation.

"Short-Term Indebtedness" means all Indebtedness (other than Interim Indebtedness) having an original maturity less than or equal to one year and not renewable at the option of a Credit Group Member for a term greater than one year from the date of original incurrence or issuance, or Indebtedness with a maturity greater than one year or renewable at the option of a Credit Group Member for a term greater than one year, if by the terms of such Indebtedness, for a period of at least 20 consecutive days during each calendar year no Indebtedness is permitted to be Outstanding thereunder. For purposes of this definition, (i) only the stated maturity of Indebtedness (and not any tender or put right of the holder of such Indebtedness) shall be taken

into account in determining if such Indebtedness constitutes Short-Term Indebtedness hereunder and (ii) classification of Indebtedness as current or short-term under GAAP shall not be controlling. Interim Indebtedness shall not constitute Short-Term Indebtedness for any purpose under this Master Indenture.

"SIFMA Index" means, on any date, a rate determined on the basis of the seven-day high grade market index of tax-exempt variable rate demand obligations, as produced by Municipal Market Data and published or made available by the Securities Industry & Financial Markets Association ("SIFMA") or any Person acting in cooperation with or under the sponsorship of SIFMA or if such index is no longer available "SIFMA Index" shall refer to an index selected by the Credit Group Representative, with the advice of an investment banking or financial services firm knowledgeable in health care matters.

"State" means the State of New York.

"Subordinated Indebtedness" means Long-Term Indebtedness specifically subordinated as to payment and security to the payment of all Required Payments and other obligations of the Credit Group Members under this Master Indenture.

"Surviving Entity" has the meaning set forth in Section 3.10.

"Tax Exempt Organization" means a Person organized under the laws of the United States of America or any state thereof which is an organization described in Section 501(c)(3) of the Code and exempt from federal income taxes under Section 501(a) of the Code (other than the tax on unrelated business income under Section 511 of the Code), or corresponding provisions of federal income tax laws from time to time in effect.

"Total Revenues" means, for the period of calculation in question, the sum of operating revenue (including net patient service revenue, premium revenue and other revenue and nonoperating gains (losses), but excluding realized and unrealized gains on investments), as shown on the Credit Group Financial Statements for the most recent Fiscal Year.

"Transaction Test" means, with respect to any specified transaction, that (i) no Event of Default or Default then exists and (ii) if such transaction had occurred as of the first day of the first full Fiscal Year preceding such transaction for which Credit Group Financial Statements are available, the Credit Group would be able to satisfy the conditions for the issuance of $1.00 of additional Long-Term Indebtedness set forth in Section 3.12(a) as of the date of such transaction.

"UCC" means the Uniform Commercial Code of the State, as amended from time to time.

"Value," when used with respect to Property, means the aggregate value of all such Property, with each component of such Property valued, at the option of the Credit Group Representative, at either its Fair Market Value or its Book Value.

Section 1.02.   <u>Interpretation</u>.

(a)     Any reference herein to any officer of a Credit Group Member shall include those succeeding to the functions, duties or responsibilities of such officer pursuant to or by operation of law or who are lawfully performing the functions of such officer.

(b)     Unless the context otherwise indicates, words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. The singular shall include the plural and vice versa.

(c)     Headings of Articles and Sections herein and the table of contents hereto are solely for convenience of reference, and do not constitute a part hereof and shall not affect the meaning, construction or effect hereof.

Section 1.03.   <u>References to Master Indenture</u>.   The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, used in this Master Indenture refer to this Master Indenture.

Section 1.04.   <u>Contents of Certificates and Opinions; Use of GAAP</u>.

(a)     Every Certificate or opinion provided for herein with respect to compliance with any provision hereof shall include: (a) a statement that the Person making or giving such certificate or opinion has read such provision and the definitions herein relating thereto; and (b) a brief statement as to the nature and scope of the examination or investigation upon which the certificate or opinion is based.

(b)     Any such Certificate or opinion made or given by an officer of an Obligated Group Member, Credit Group Member or the Master Trustee may be based on such officer's knowledge and, insofar as it relates to legal, accounting or health care matters, upon a Certificate or opinion or representation of counsel, an accountant or Independent Consultant unless such officer knows, or in the exercise of reasonable care should have known, that the Certificate, opinion or representation with respect to the matters upon which such Certificate or opinion may be based, as aforesaid, is erroneous. Any such Certificate, opinion or representation made or given by counsel, an accountant or an Independent Consultant, may be based, insofar as it relates to factual matters (with respect to which information is in the possession of an Obligated Group Member or Credit Group Member) upon the Certificate or opinion of, or representation by an officer of an Obligated Group Member unless such counsel, accountant or Independent Consultant knows that the Certificate, opinion of or representation by such officer, with respect to the factual matters upon which such Person's Certificate or opinion may be based, is erroneous. The same officer of an Obligated Group Member or the same counsel or accountant or Independent Consultant, as the case may be, need not certify as to all the matters required to be certified under any provision hereof, but different officers, counsel, accountants or Independent Consultants may certify as to different matters.

(c)     Unless stated otherwise, where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation, combination or other accounting computation is required to be made for the purposes of this Master Indenture or any agreement, document or certificate executed and delivered in connection

E-19

with or pursuant to this Master Indenture, such determination or computation shall be done in accordance with GAAP in effect on, at the sole option of the Credit Group Representative, (i) the date such determination or computation is made for any purpose of this Master Indenture or (ii) the date of execution and delivery of this Master Indenture if the Credit Group Representative delivers an Officer's Certificate to the Master Trustee describing why then-current GAAP is inconsistent with the intent of the parties on the date of execution and delivery of this Master Indenture; provided that the requirements set forth herein shall prevail if inconsistent with GAAP. In all cases, intercompany balances and liabilities among the Credit Group Members shall be disregarded. For avoidance of doubt, it is the intent of the parties on the date of execution and delivery of this Master Indenture that any operating lease, as defined by the Financial Accounting Standards Board on the date of execution and delivery of this Master Indenture, and any renewal of such operating lease, shall be governed in accordance with GAAP in effect on the date of execution and delivery of this Master Indenture and shall not be treated as the incurrence of Indebtedness or the disposition of Property, unless otherwise elected by the Credit Group Representative.

ARTICLE II

AUTHORIZATION AND ISSUANCE OF MASTER INDENTURE OBLIGATIONS

Section 2.01. Authorization of Obligations. Each Obligated Group Member hereby authorizes to be issued from time to time Obligations or Series of Obligations, without limitation as to amount, except as provided herein or as may be limited by law, and subject to the terms, conditions and limitations established herein and in any Related Supplement.

Section 2.02. Issuance of Obligations. From time to time when authorized by this Master Indenture and subject to the terms, limitations and conditions established in this Master Indenture or in a Related Supplement, the Credit Group Representative may authorize the issuance of an Obligation or a Series of Obligations by entering into a Related Supplement. The Obligation or the Obligations of any such Series may be issued and delivered to the Master Trustee for authentication upon compliance with the provisions hereof and of any Related Supplement.

Each Related Supplement authorizing the issuance of an Obligation or a Series of Obligations shall specify the purposes for which such Obligation or Series of Obligations are being issued; the form, title, designation, manner of numbering or denominations, if applicable, of such Obligations; the date or dates of maturity or other final expiration of the term of such Obligations; the date of issuance of such Obligations; and any other provisions deemed advisable or necessary by the Credit Group Representative. Each Related Supplement authorizing the issuance of an Obligation shall also specify and determine the principal amount of such Obligation (if any) for purposes of calculating the percentage of Holders of Obligations required to take actions or give consents pursuant to this Master Indenture (which, if such Obligation does not evidence or secure Indebtedness, shall be equal to zero, except with respect to any action which requires the consent of all of the Holders of Obligations). The designation of zero as a principal amount of an Obligation shall not in any manner affect the obligation of the Obligated Group Members to make Required Payments with respect to such Obligation.

E-20

Section 2.03.  Appointment of Credit Group Representative.  Each Obligated Group Member, by becoming an Obligated Group Member, irrevocably appoints the Credit Group Representative as its agent and attorney-in-fact and grants full power to the Credit Group Representative to execute (a) Related Supplements authorizing the issuance of Obligations or Series of Obligations and (b) Obligations.

Section 2.04.  Execution and Authentication of Obligations.

(a)  All Obligations shall be executed by an Authorized Representative of the Credit Group Representative for and on behalf of the Obligated Group as provided in the Related Supplement authorizing such Obligation. The signatures of such Authorized Representative may be mechanically or photographically reproduced on the Obligations. If any Authorized Representative whose signature appears on any Obligation ceases to be such Authorized Representative before delivery thereof, such signature shall remain valid and sufficient for all purposes as if such Authorized Representative had remained in office until such delivery. Each Obligation shall be manually authenticated by an authorized signatory of the Master Trustee, and no Obligation shall be entitled to the benefits hereof without such authentication.

(b)  The form of Certificate of Authentication to be printed on each Obligation and manually executed by an authorized signatory of the Master Trustee shall be as follows:

[FORM OF MASTER TRUSTEE'S CERTIFICATE OF AUTHENTICATION]

The undersigned Master Trustee hereby certifies that this Obligation No. ___ is one of the Obligations described in the within mentioned Master Indenture.

Dated:_____

[Name of Master Trustee],
as Master Trustee

By _____
        Authorized Signatory

Section 2.05.  Conditions to the Issuance of Obligations.  The issuance, authentication and delivery of any Obligation or Series of Obligations shall be subject to the following specific conditions:

(a)  The Credit Group Representative and the Master Trustee shall have entered into a Related Supplement providing for the terms and conditions of such Obligations and the repayment thereof; and

(b)  The Master Trustee receives an Officer's Certificate to the effect that:

(i)  each Obligated Group Member is in full compliance with all warranties, covenants and agreements set forth in this Master Indenture and in any Related Supplement; and

E-21

(ii)     no Default or Event of Default has occurred and is continuing or would occur upon issuance of such Obligations under this Master Indenture or any Related Supplement; and

(iii)     all requirements and conditions, if any, to the issuance of such Obligations set forth in the Related Supplement have been satisfied; and

(c)     The Master Trustee receives an Opinion of Counsel, subject to customary qualifications and exceptions, to the effect that:

(i)     such Obligations and Related Supplement have been duly authorized, executed and delivered by the Credit Group Representative on behalf of the Obligated Group and constitute valid and binding obligations of the Obligated Group, enforceable in accordance with their terms; and

(ii)     such Obligations (or the placement thereof) are not subject to registration under the Securities Act of 1933, as amended, and such Related Supplement is not subject to registration under the Trust Indenture Act of 1939, as amended (or that such registration, if required, has occurred); and

(d)     The Credit Group Representative shall have delivered or caused to be delivered to the Master Trustee such opinions, certificates, proceedings, instruments and other documents as the Master Trustee may (but is not obligated to) reasonably request; and

(e)     If such Obligation constitutes or secures Indebtedness, the requirements of Section 3.12 are satisfied.


## ARTICLE III

### PAYMENTS WITH RESPECT TO MASTER INDENTURE OBLIGATIONS; OBLIGATED GROUP COVENANTS

Section 3.01.   Payment of Required Payments.

(a)     Each Obligated Group Member jointly and severally covenants to promptly pay, or cause to be paid, all Required Payments at the place, on or before the dates and in the manner provided herein or in any Related Supplement or Obligation. Each Obligated Group Member acknowledges that the time of such payment and performance is of the essence for the Obligations hereunder. Each Obligated Group Member further covenants to faithfully observe and perform all of the conditions, covenants and requirements of this Master Indenture, any Related Supplement and any Obligation.

The obligation of each Obligated Group Member with respect to Required Payments shall not be abrogated, prejudiced or affected by:

(i)     the granting of any extension, waiver or other concession given to any Obligated Group Member by the Master Trustee or any Holder or by any

compromise, release, abandonment, variation, relinquishment or renewal of any of the rights of the Master Trustee or any Holder or anything done or omitted or neglected to be done by the Master Trustee or any Holder in exercise of the authority, power and discretion vested in them by this Master Indenture, or by any other dealing or thing which, but for this provision, might operate to abrogate, prejudice or affect such obligation; or

        (ii)     the liability of any other Obligated Group Member under this Master Indenture ceasing for any cause whatsoever, including the release of any other Obligated Group Member pursuant to the provisions of this Master Indenture or any Related Supplement; or

        (iii)    any Obligated Group Member failing to become liable as, or losing eligibility to become, an Obligated Group Member with respect to an Obligation whether before or after the incurrence of an Obligation for the benefit of such Obligated Group Member; or

        (iv)    the validity or sufficiency (or any contest with respect thereto) of the consideration given to support the obligations of the Obligated Group Members under this Master Indenture.

Subject to the provisions of Section 3.05 hereof permitting withdrawal from the Obligated Group, the obligation of each Obligated Group Member to make Required Payments is a continuing one and is to remain in effect until all Required Payments have been paid or deemed paid in full in accordance with Article VII hereof. All moneys from time to time received by the Credit Group Representative or the Master Trustee to reduce liability on Obligations, whether from or on account of the Obligated Group Members or otherwise, shall be regarded as payments in gross without any right on the part of any one or more of the Obligated Group Members to claim the benefit of any moneys so received until the whole of the amounts owing on Obligations has been paid or satisfied and so that in the event of any such Obligated Group Member filing a bankruptcy petition, the Credit Group Representative or the Master Trustee shall be entitled to prove up the total indebtedness or other liability on Obligations Outstanding as to which the liability of such Obligated Group Member has become fixed.

Each Obligation shall be a primary obligation of the Obligated Group Members and shall not be treated as ancillary to or collateral with any other obligation and shall be independent of any other security so that the covenants and agreements of each Obligated Group Member hereunder shall be enforceable without first having recourse to any such security or source of payment and without first taking any steps or proceedings against any other Person. The Credit Group Representative and the Master Trustee are each empowered to enforce each covenant and agreement of each Obligated Group Member hereunder and to enforce the making of Required Payments. Each Obligated Group Member hereby authorizes each of the Credit Group Representative and the Master Trustee to enforce or refrain from enforcing any covenant or agreement of the Obligated Group Members hereunder and to make any arrangement or compromise with any Obligated Group Member or Obligated Group Members as the Credit Group Representative or the Master Trustee may deem appropriate, consistent with this Master Indenture and any Related Supplement. Each Obligated Group Member hereby waives in favor

E-23

of the Credit Group Representative and the Master Trustee all rights against the Credit Group Representative, the Master Trustee and any other Obligated Group Member, insofar as is necessary to give effect to any of the provisions of this Section.

Section 3.02.   <u>Transfers from Designated Affiliates</u>.  Subject to the provisions of 3.03(b) hereof with respect to Limited Designated Affiliates, each Controlling Member hereby covenants and agrees that it shall cause each of its Designated Affiliates to pay, loan or otherwise transfer to the Credit Group Representative such amounts as are necessary to enable the Obligated Group Members to comply with the provisions of this Master Indenture including without limitation the provisions of Section 3.01; <u>provided</u>, <u>however</u>, that nothing herein shall be construed to require any Controlling Member to cause its Designated Affiliate to pay, loan or otherwise transfer to the Credit Group Representative any amounts that constitute Restricted Moneys.

Section 3.03.   <u>Designation of Designated Affiliates</u>.

(a)   The Credit Group Representative by resolution of its Governing Body may from time to time designate Persons as Designated Affiliates in addition to the Initial Designated Affiliates.  In connection with such designation, the Credit Group Representative shall designate for each Designated Affiliate an Obligated Group Member to serve as the Controlling Member for such Designated Affiliate. The Corporation shall be the initial Controlling Member for each of the Initial Designated Affiliates.  The Credit Group Representative shall at all times maintain an accurate and complete list of all Persons designated as Designated Affiliates (and of the Controlling Members for such Designated Affiliates) and file such list with the Master Trustee and any Related Bond Issuer that shall request such list in writing annually on or before January 1 of each year.

(b)   At the time of designation of a Designated Affiliate, the Credit Group Representative may additionally designate such Designated Affiliate as a Limited Designated Affiliate, or may from time to time by resolution of its Governing Body redesignate a Designated Affiliate as a Limited Designated Affiliate.  A Limited Designated Affiliate's liability to transfer moneys or other assets to the Obligated Group shall be limited to such amount as shall be specified in an Officer's Certificate delivered to the Master Trustee upon the designation of such Designated Affiliate as a Limited Designated Affiliate.  The Credit Group Representative shall give each Rating Agency then rating (and each bond insurer then insuring) any Obligations or Related Bonds thirty (30) days prior notice of any Designated Affiliate being redesignated as a Limited Designated Affiliate.  The Credit Group Representative by resolution of its Governing Body may from time to time redesignate a Limited Designated Affiliate as a Designated Affiliate.  The Credit Group Representative shall identify all Limited Designated Affiliates in the list filed with the Master Trustee pursuant to Section 3.03(a).

(c)   Each Controlling Member shall cause each of its Designated Affiliates to provide to the Credit Group Representative a resolution of its Governing Body accepting such Person's designation as a Designated Affiliate and acknowledging the provisions of this Master Indenture which affect the Designated Affiliates. So long as such Person is designated as a Designated Affiliate, the Controlling Member of such Designated Affiliate shall either (i) maintain, directly or indirectly, control of such Designated Affiliate to the extent necessary to cause such Designated Affiliate to comply with the terms of this Master Indenture, whether

E-24

through the ownership of voting securities, by contract, corporate membership, reserved powers or the power to appoint corporate members, trustees or directors, or otherwise or (ii) execute and have in effect such contracts or other agreements which the Credit Group Representative and the Controlling Member, in the judgment of their respective Governing Bodies, deem sufficient for the Controlling Member to cause such Designated Affiliate to comply with the terms of this Master Indenture.

(d)     Each Controlling Member hereby covenants and agrees that it will cause each of its Designated Affiliates to comply with any and all directives of the Controlling Member given pursuant to the provisions of this Master Indenture.

(e)     Any Person may cease to be a Designated Affiliate (and thus not subject to the terms of this Master Indenture) provided that prior to such Person ceasing to be a Designated Affiliate the Master Trustee receives:

(i)     a resolution of the Governing Body of the Credit Group Representative declaring such Person no longer a Designated Affiliate; and

(ii)     an Officer's Certificate to the effect that immediately following such Person ceasing to be a Designated Affiliate neither a Default nor an Event of Default would exist.

Section 3.04.   Membership in Obligated Group.   Additional Obligated Group Members may be added to the Obligated Group from time to time, provided that prior to such addition the Master Trustee receives:

(a)     a copy of a resolution of the Governing Body of the proposed new Obligated Group Member which authorizes the execution and delivery of a Related Supplement and compliance with the terms of this Master Indenture; and

(b)     a Related Supplement executed by the Credit Group Representative, the new Obligated Group Member and the Master Trustee pursuant to which the proposed new Obligated Group Member:

(i)     agrees to become an Obligated Group Member, and

(ii)     agrees to be bound by the terms of this Master Indenture, the Related Supplements and the Obligations, and

(iii)     irrevocably appoints the Credit Group Representative as its agent and attorney-in-fact and grants to the Credit Group Representative the requisite power and authority to execute Related Supplements authorizing the issuance of Obligations or Series of Obligations and to execute and deliver Obligations; and

(c)     an Opinion of Counsel to the effect that (i) the proposed new Obligated Group Member has taken all necessary action to become an Obligated Group Member, and upon execution of the Related Supplement, such proposed new Obligated Group Member will be bound by the terms of this Master Indenture, (ii) the addition of such Obligated Group Member

E-25

would not adversely affect the validity of any Obligation then Outstanding and (iii) (A) the addition of such Credit Group Member will not cause any Obligations then Outstanding to be subject to registration under the Securities Act of 1933, as amended, or require the qualification of any Related Bond Indenture, loan document or this Master Indenture or any Supplement under the Trust Indenture Act of 1939, as amended, or any state securities law, or (B) that such Related Bond or Obligation has been so registered and such Related Bond Indenture, loan document or Master Indenture or Supplement has been so qualified; and

(d)     an Officer's Certificate to the effect that immediately after the addition of the proposed new Obligated Group Member, the Transaction Test would be satisfied; and

(e)     so long as any Related Bonds that are tax-exempt obligations are Outstanding, an Opinion of Bond Counsel to the effect that the addition of the proposed new Obligated Group Member will not, in and of itself, result in the inclusion of interest on any Related Bonds in gross income for purposes of federal income taxation.

Section 3.05.   Withdrawal from Obligated Group.  Any Obligated Group Member may withdraw from the Obligated Group and be released from further liability or obligation under the provisions of this Master Indenture, provided that prior to such withdrawal the Master Trustee receives:

(a)     an Officer's Certificate to the effect that the Credit Group Representative has approved the withdrawal of such Obligated Group Member and the withdrawal of such Obligated Group Member would not adversely affect the validity of any Obligation then Outstanding;

(b)     an Officer's Certificate to the effect that immediately following the withdrawal of such Obligated Group Member, the Transaction Test would be satisfied;

(c)     an Opinion of Counsel to the effect that (i) the withdrawal of such Credit Group Member will not cause the Master Indenture or any Obligations then Outstanding to be subject to registration under the Securities Act of 1933, as amended, or the Trust Indenture Act of 1939, as amended (or that any such registration, if required, has occurred) and (ii) that any applicable requirements relating to Related Bonds have been satisfied or otherwise provided for; and

(d)     so long as any Related Bonds that are tax-exempt obligations are Outstanding, an Opinion of Bond Counsel to the effect that the removal of such Obligated Group Member will not, in and of itself, result in the inclusion of interest on any Related Bonds in gross income for purposes of federal income taxation.

Upon compliance with the conditions contained in this Section 3.05, the Master Trustee shall execute any documents reasonably requested by the withdrawing Obligated Group Member to evidence the termination of such Obligated Group Member's obligations hereunder, under all Related Supplements and under all Obligations.

Notwithstanding anything contained herein to the contrary, in no event may the Corporation withdraw from the Obligated Group.

E-26

Section 3.06.   <u>Covenants of Corporate Existence, Maintenance of Properties, Etc</u>.  Each Obligated Group Member agrees, and each Controlling Member agrees to cause each of its Designated Affiliates:

(a)      Except as otherwise expressly provided herein, to preserve its corporate or other legal existence and all its material rights and licenses to the extent necessary in the operation of its business and affairs and to be qualified to do business in each jurisdiction where its ownership of Property or the conduct of its business requires such qualification; <u>provided</u>, <u>however</u>, that nothing herein contained shall be construed to obligate it to retain or preserve any of its material rights or licenses no longer used or useful in the conduct of its business or affairs.

(b)      At all times to cause its material Property, Plant and Equipment to be maintained, preserved and kept in good repair, working order and condition, reasonable wear and tear, condemnation and casualty excepted, and all needed and proper repairs, renewals and replacements thereof to be made; <u>provided</u>, <u>however</u>, that nothing contained in this subsection shall be construed to (i) prevent it from ceasing to operate any immaterial portion of its Property, Plant and Equipment, (ii) prevent it from ceasing to operate any material portion of its Property, Plant and Equipment if in its judgment it is advisable or desirable not to operate the same, or (iii) obligate it to retain, preserve, repair, renew or replace any Property, Plant and Equipment no longer used or useful in the conduct of its business or which has been condemned or substantially damaged by casualty, whether or not insured.

(c)      Not take any action that would result in the alteration or loss of its status as a Tax-Exempt Organization (if it is a Tax-Exempt Organization). The foregoing notwithstanding, any Credit Group Member that is a Tax-Exempt Organization may take actions which could result in the alteration or loss of its status as a Tax Exempt Organization if (i) prior thereto there is delivered to the Master Trustee an Opinion of Bond Counsel to the effect that such action would not adversely affect the validity of any Related Bond, would not adversely affect the exclusion of interest on any Related Bond from gross income for federal income tax purposes and would not adversely affect the enforceability in accordance with its terms of this Master Indenture against any Credit Group Member and (ii) prior thereto there is delivered to the Master Trustee either (A) an Opinion of Counsel for such Credit Group Member to the effect that such actions would not subject any Related Bond or any Obligation then Outstanding to registration under the Securities Act of 1933, as amended, or require the qualification of any Related Bond Indenture, loan document or this Master Indenture or any Related Supplement under the Trust Indenture Act of 1939, as amended, or any state securities law, or (B) an Opinion of Counsel that such Related Bond or Obligation has been so registered and such Related Bond Indenture, loan document or Master Indenture or Related Supplement has been so qualified.

Section 3.07.   <u>Gross Receivables Pledge</u>.

(a)      To secure its obligation to make Required Payments hereunder and its other obligations, agreements and covenants to be performed and observed hereunder, each Obligated Group Member hereby grants to the Master Trustee security interests in the Gross Receivables to the extent the same may be pledged and a security interest granted therein under the UCC.

(b)     This Master Indenture shall be deemed a "security agreement" for purposes of the UCC.

(c)     The Master Trustee's security interest in the Gross Receivables shall be perfected, to the extent that such security interest may be so perfected, by the filing of financing statements which comply with the requirements of the UCC. Each Obligated Group Member shall execute and cause to be filed, in accordance with the requirements of the UCC, financing statements; and, from time to time thereafter, shall execute and cause to be filed such other documents (including, but not limited to, continuation statements as required by the UCC) as may be necessary or reasonably requested by the Master Trustee in order to perfect or maintain perfected such security interests or give public notice thereof.

(d)     Upon written request from the Credit Group Representative, the Master Trustee shall take all procedural steps necessary to effect the subordination of its security interest in the Gross Receivables granted herein to security interests constituting Permitted Liens.

(e)     Each Obligated Group Member shall notify the Master Trustee of any change of name and each Obligated Group Member shall execute (if necessary) and cause to be filed a new appropriate financing statement or an amendment in accordance with the requirements of the UCC, in order to maintain the perfected security interest granted herein.

Section 3.08.   Covenant Against Encumbrances.

(a)     Each Obligated Group Member agrees that it will not, and each Controlling Member agrees that it will not permit its Designated Affiliates to, create or suffer to be created or permit the existence of any Lien upon Property, now owned or hereafter acquired by it, other than Permitted Liens. Each Obligated Group Member, respectively, further covenants and agrees that if such a Lien (other than a Permitted Lien) is nonetheless created by someone other than a Credit Group Member and is assumed by any Credit Group Member, the Obligated Group Member will make or cause to be made, or the Controlling Member will cause its Designated Affiliate to make or cause to be made, effective a provision whereby all Obligations will be secured prior to any such Indebtedness or other obligation secured by such Lien.

(b)     Upon written request of the Credit Group Representative, the Master Trustee shall execute and deliver such releases, subordinations, requests for reconveyance, termination statements or other instruments as may be reasonably requested by the Credit Group Representative in connection with (1) the disposition of Property in accordance with the provisions of Section 3.11 and the applicable provisions of any Related Supplement, (2) the withdrawal of a Member pursuant to Section 3.05 and the applicable provisions of any Related Supplement, and (3) the granting by a Credit Group Member of any Lien which constitutes a Permitted Lien hereunder, as certified to the Master Trustee in writing by the Credit Group Representative.

Section 3.09.   Rate Covenant

(a)     Each Obligated Group Member agrees to manage its business such that the combined or consolidated Income Available for Debt Service of the Credit Group, calculated at

E-28

the end of each Fiscal Year, commencing with the first full Fiscal Year following the execution of this Master Indenture, will not be less than 1.1 times Annual Debt Service.

(b)     If for any Fiscal Year the Income Available for Debt Service is not sufficient to satisfy subsection (a) hereof, the Credit Group Representative covenants to retain, within six months of the filing of the financial statements, an Independent Consultant to make recommendations to increase Income Available for Debt Service in the following Fiscal Year to the level required or, if in the opinion of the Independent Consultant the attainment of such level is impracticable, to the highest level attainable.

(c)     The Credit Group Representative agrees to transmit a copy of the report of the Independent Consultant to the Master Trustee within 20 days of the receipt of such recommendations. Each Obligated Group Member shall, promptly upon its receipt of such recommendations, subject to applicable requirements or restrictions imposed by law and to a good faith determination by the Governing Body of the Credit Group Representative that such recommendations are in the best interest of the Credit Group, take such action as shall be in substantial conformity with such recommendations.

(d)     If the Obligated Group retains and substantially complies with the recommendations of the Independent Consultant, the Obligated Group Members will be deemed to have complied with the covenants set forth in this Section for such Fiscal Year, notwithstanding that the ratio of Income Available for Debt Service to the Annual Debt Service shall be less than 1.1:1.0; provided, however, that an Event of Default shall exist if the ratio of Income Available for Debt Service to Annual Debt Service shall be less than 1.0:1.0 for any two consecutive Fiscal Years. Notwithstanding the foregoing, the Obligated Group Members shall not be excused from taking any action or performing any duty required under this Master Indenture and no other Event of Default shall be waived by the operation of the provisions of this subsection (d).

(e)     If a report of an Independent Consultant is delivered to the Master Trustee that states that any Government and Industry Restrictions have been imposed which make it impossible for the Income Available for Debt Service to satisfy the requirement of subsection (a) hereof, then the required amount of Income Available for Debt Service shall be reduced to the maximum coverage permitted by such Government and Industry Restrictions.

(f)     Notwithstanding the foregoing, a Credit Group Member may permit the rendering of services or the use of its Property without charge or at reduced charges, at the discretion of the Governing Body of such Credit Group Member, to the extent necessary for maintaining its tax-exempt status or the tax-exempt status of its Property, Plant and Equipment or its eligibility for grants, loans, subsidies or payments from governmental entities, or in compliance with any recommendation for free services that may be made by an Independent Consultant.

Section 3.10.  Merger, Consolidation, Sale or Conveyance.  Each Obligated Group Member covenants that it will not merge or consolidate with any other Person that is not an Obligated Group Member or sell or convey all or substantially all of its assets to any Person that is not an Obligated Group Member (a "Merger Transaction") unless:

(a)      After giving effect to the Merger Transaction,

(i)      the successor, purchaser or surviving entity (hereinafter, the "Surviving Entity") is an Obligated Group Member, or

(ii)      the Surviving Entity shall

(A)      be a corporation or other entity organized and existing under the laws of the United States of America or any state thereof, and

(B)      become an Obligated Group Member pursuant to Section 3.04 and, pursuant to the Related Supplement required by Section 3.04(b), shall expressly assume in writing the due and punctual payment of all Required Payments of the disappearing Obligated Group Member hereunder;

(b)      The Master Trustee receives an Officer's Certificate to the effect that the Transaction Test is satisfied in connection with the Merger Transaction and the Merger Transaction will not adversely affect the validity of any Obligations then Outstanding;

(c)      So long as any Related Bonds that are tax-exempt obligations are Outstanding, the Master Trustee receives an Opinion of Bond Counsel to the effect that, under the existing law, the consummation of the Merger Transaction, in and of itself, would not result in the inclusion of interest on such Related Bonds in gross income for purposes of federal income taxation;

(d)      The Master Trustee receives an Opinion of Counsel to the effect that (i) all conditions in this Section 3.10 relating to the Merger Transaction have been complied with and the Master Trustee is authorized to join in the execution of any instrument required to be executed and delivered; (ii) the Surviving Entity meets the conditions set forth in this Section 3.10; (iii) any Obligations then Outstanding are enforceable against the Surviving Entity in accordance with their respective terms; and (iv) (A) the Merger Transaction would not subject any Obligations then Outstanding to registration under the Securities Act of 1933, as amended, or require the qualification of this Master Indenture or any Related Supplement under the Trust Indenture Act of 1939, as amended, or any state securities law, or (B) that such Obligation has been so registered and such Master Indenture or Related Supplement has been so qualified; and

(e)      The Surviving Entity shall be substituted for its predecessor in interest in all Obligations and agreements then in effect which affect or relate to any Obligation, and the Surviving Entity shall execute and deliver to the Master Trustee appropriate documents in order to effect the substitution.

From and after the effective date of such substitution (as set forth in the above-mentioned documents), the Surviving Entity shall be treated as an Obligated Group Member and shall thereafter have the right to participate in transactions hereunder relating to Obligations to the same extent as the other Obligated Group Members. All Obligations issued hereunder on behalf of a Surviving Entity shall have the same legal rank and benefit under this Master Indenture as Obligations issued on behalf of any other Obligated Group Member.

Section 3.11.   Limitation on Disposition of Assets.

(a)      Each Obligated Group Member covenants that it will not, and each Controlling Member covenants that it will not permit its Designated Affiliates to, voluntarily sell, lease or otherwise dispose of any part of its Property in any Fiscal Year unless one of the following conditions is satisfied:

(i)      Such sale, lease or other disposition is in the ordinary course of business or in compliance with the requirements imposed on any asset upon its acquisition (such as in the case of a split interest trust asset); or

(ii)      In the case of Obligated Group Members, such sale, lease or other disposition is part of a disposition of all or substantially all of its assets as permitted by Section 3.10; or

(iii)      Such sale, lease or other disposition in any single Fiscal Year is of Property with a net Book Value of 10% or less of the Value of the Property of the Credit Group; or

(iv)      Such sale, lease or other disposition in any single Fiscal Year is of Property with a net Book Value in excess of 10% of the Value of the Property of the Credit Group, and at the end of such Fiscal Year the Credit Group Representative provides an Officer's Certificate to the Master Trustee that one of the following conditions applies to such Property; or

(A)      such Property is inadequate, obsolete, unsuitable, undesirable or unnecessary for the operation and function of the primary business of the Credit Group Members; or

(B)      the disposition is for Fair Market Value and such disposition will not impair the structural soundness or operational utility of the remaining Property and does not materially adversely affect the operations of the Credit Group; or

(C)      such Property is being transferred to a Person who is not an Obligated Group Member if such Person shall become an Obligated Group Member pursuant to Section 3.04 coincidental to such transfer; or

(D)      such Property is being transferred to a Government Issuer solely to accommodate a sale or lease transaction as described in the definition of "Related Bonds"; or

(E)      the Transaction Test would be, taking into consideration the effect of such disposition, satisfied; or

(v)      Such disposition is a loan, including without limitation, an employee relocation loan, a physician or researcher recruitment loan or income guaranty or other credit/funding extension, provided that such loans or other

E-31

credit/funding extensions are in writing and either (i) are in furtherance of the exempt purposes of any of the Credit Group Members, or (ii) the Credit Group Members reasonably expect such loans to be repaid and such loans bear interest at a reasonable rate of interest and on commercially reasonable terms; or

(vi)    Such disposition is a transfer of Restricted Moneys to an Affiliate which has the purpose to receive and disburse such Restricted Moneys.

Section 3.12.    Limitation on Indebtedness.  Each Credit Group Member covenants that it will not, and each Controlling Member covenants that it will not permit its Designated Affiliates to, incur any Indebtedness except that the Credit Group Members may incur the following Indebtedness:

(a)    Long-Term Indebtedness, if prior to the date of incurrence of the Long-Term Indebtedness there is delivered to the Master Trustee:

(i)    an Officer's Certificate to the effect that the Debt Service Coverage Ratio for the most recent Fiscal Year for which Credit Group Financial Statements are available with respect to all Long-Term Indebtedness then Outstanding at the time of such certification and the additional Long-Term Indebtedness to be incurred, but excluding any Long-Term Indebtedness to be refunded with the proceeds of said additional Long-Term Indebtedness to be incurred, was not less than 1.2:1.0; or

(ii)    (A) an Officer's Certificate to the effect that the Debt Service Coverage Ratio for the most recent Fiscal Year (excluding the additional Long-Term Indebtedness to be incurred) was not less than 1.2:1.0 and (B) the report of an Independent Consultant (or, in lieu thereof, an Officer's Certificate if the Debt Service Coverage Ratio is projected to be not less than 1.5:1.0 for each such Fiscal Year) to the effect that the Debt Service Coverage Ratio for each of the two Fiscal Years beginning with the Fiscal Year commencing after the estimated completion of the facilities to be financed by the Indebtedness to be incurred with respect to all Long-Term Indebtedness projected to be outstanding (including the additional Long-Term Indebtedness to be incurred but excluding any Long-Term Indebtedness to be refunded with the proceeds of said additional Long-Term Indebtedness to be incurred), is projected to be not less than 1.35:1.0. Notwithstanding the foregoing, if the Master Trustee receives a report of an Independent Consultant to the effect that Government and Industry Restrictions prevent the Credit Group Members from generating the required levels of Income Available for Debt Service sufficient to result in Debt Service Coverage Ratios at least equal to those required by this subsection (a)(ii), the ratio requirements described in this subsection (a)(ii) shall be reduced to the highest ratios that, in the opinion of the Independent Consultant, are obtainable under such Government and Industry Restrictions, but in no event less than a ratio of 1.0:1.0.

(b)    Completion Indebtedness without limitation.

E-32

(c)     Short-term Indebtedness provided that the provisions described in subsection (a) above are satisfied calculated as if such Short-term Indebtedness was Long-Term Indebtedness or an Officer's Certificate is delivered to the Master Trustee stating that:

(i)     the total amount of such Short-term Indebtedness, together with the aggregate principal amount of Indebtedness incurred pursuant to subsection (g) of this Section 3.12, shall not exceed 25% of Total Revenues; and

(ii)     In every Fiscal Year, there shall be at least a consecutive 20-day period when the balances of such Short-term Indebtedness (excluding Short-Term Indebtedness consisting of commercial paper which is intended to be refinanced with additional commercial paper) is reduced to an amount which shall not exceed 5% of Total Revenues.

(d)     Nonrecourse Indebtedness without limitation.  Each Obligated Group Member covenants that, except as may be otherwise permitted under this Section 3.12, the proceeds of any Nonrecourse Indebtedness shall not be used to acquire or construct inpatient acute care hospital facilities.

(e)     Long-Term Indebtedness, if such Long-Term Indebtedness is issued or incurred to refund Long-Term Indebtedness and the Master Trustee receives an Officer's Certificate to the effect that the issuance of such Long-Term Indebtedness would not increase Maximum Annual Debt Service by more than 20%.

(f)     Subordinated Indebtedness, without limitation.

(g)     Any other Indebtedness, provided that an Officer's Certificate is delivered to the Master Trustee stating that the aggregate principal amount of such Indebtedness, together with the aggregate principal amount of Indebtedness incurred pursuant to the provisions of subsection (c) of this Section 3.12, does not, as of the date of incurrence, exceed 30% of Total Revenues.

(h)     Reimbursement or other repayment obligations under reimbursement agreements or similar agreements relating to credit facilities and/or liquidity facilities which provide credit support and/or liquidity for Indebtedness or Financial Products Agreements.

Section 3.13.  <u>Filing of Financial Statements, Certificate of No Default, Other Information</u>.

(a)     Each Obligated Group Member covenants that it will keep, and each Controlling Member covenants that it will cause its Designated Affiliates to keep, adequate records and books of accounts in which complete and correct entries shall be made (said books shall be subject to the inspection of the Master Trustee during regular business hours after reasonable notice and under reasonable circumstances, provided the Master Trustee shall have no duty to so inspect).

(b)     The Credit Group Representative covenants and agrees that it will furnish to the Master Trustee and any Related Bond Issuer that shall request the same in writing:

(i)    As soon as practicable, but in no event more than 150 days after the last day of each Fiscal Year beginning with the Fiscal Year ending December 31, 2017, one or more financial statements which, in the aggregate, shall include the Material Credit Group Members. Such financial statements:

(A)    may consist of (1) consolidated or combined financial results including one or more Credit Group Members and one or more other Persons required to be consolidated or combined with such Credit Group Member(s) under GAAP or (2) special purpose financial statements including only Credit Group Members;

(B)    shall be audited by an Accountant as having been prepared in accordance with GAAP (except, in the case of special purpose financial statements, for required consolidations);

(C)    shall include a consolidated or combined balance sheet, statement of operations and changes in net assets; and

(D)    if more than one financial statement is delivered to the Master Trustee pursuant to this subsection (b)(i), or if a single financial statement is delivered that includes Persons other than Credit Group Members and Immaterial Affiliates, each such financial statement shall contain, as "other financial information," a combining or consolidating schedule from which financial information solely relating to the Credit Group Members and Immaterial Affiliates may be derived.

(ii)    (A)    If a single financial statement containing information solely related to the Credit Group Members (which may, but need not, include any Immaterial Affiliates) is delivered pursuant to clause (b)(i) above, such financial statement shall constitute the "Credit Group Financial Statements".

(B)    If a single financial statement containing information related solely to the Credit Group Members and, at the option of the Credit Group Representative, any Immaterial Affiliates is not delivered pursuant to clause (b)(i) above, the Credit Group Representative shall prepare an unaudited balance sheet and statement of operations for such Fiscal Year. The unaudited financial statements shall be prepared as soon as practicable, but in no event more than 150 days after the last day of each Fiscal Year beginning with the Fiscal Year ending December 31, 2017, and shall be based on the accompanying unaudited combining or consolidating schedules delivered with the audited financial statements described in clause (b)(i)(D) above. The unaudited financial statements prepared in accordance with this clause (ii)(B) shall be the "Credit Group Financial Statements".

(C)    The Credit Group Financial Statements:

(1)    shall include all Material Credit Group Members;

E-34

(2)     at the option of the Credit Group Representative, may, but need not, include one or more Immaterial Affiliates as provided in subsection (c) below;

(3)     at the option of the Credit Group Representative, may exclude one or more Credit Group Members that are not Material Credit Group Members; and

(4)     shall exclude all combined or consolidated entities that are neither Credit Group Members nor Immaterial Affiliates.

(iii)   At the time of the delivery of the Credit Group Financial Statements, a certificate of the chief financial officer or similar position of the Credit Group Representative, stating that no event which constitutes an Event of Default has occurred and is continuing as of the end of such Fiscal Year, or specifying the nature of such event and the actions taken and proposed to be taken by the Members to cure such Event of Default.

(c)     Notwithstanding the foregoing, the results of operation and financial position of Immaterial Affiliates need not be excluded from financial statements delivered to the Master Trustee pursuant to this Section, and such results of operation and financial position may be considered as if they were a portion of the results of operation and financial position of the Credit Group Members for all purposes of this Master Indenture notwithstanding the inclusion of the results of operation and financial position of such Immaterial Affiliates. The Master Trustee shall have no duty to review, verify or analyze such financial statements and shall hold such financial statements solely as a repository for the benefit of the Holders. The Master Trustee shall not be deemed to have notice of any information contained in such financial statements or event of default which may be disclosed therein in any manner.

Section 3.14.  Insurance.   Each Member of the Obligated Group shall, and each Controlling Member covenants to cause each of its Designated Affiliates to, maintain or cause to be maintained at its sole cost and expense, insurance (which may be self-insurance) with respect to its Property, the operation thereof and its business against such casualties, contingencies and risks (including but not limited to public liability and employee dishonesty) and in amounts not less than is customary in the case of corporations engaged in the same or similar activities and similarly situated and as it determines, in good faith, to be adequate to protect its Property and operations.

ARTICLE IV

DEFAULTS

Section 4.01.  Events of Default.   Each of the following events shall be an Event of Default hereunder:

(a)     Failure on the part of the Obligated Group Members to make due and punctual payment of the principal of, redemption premium, if any, interest on or any other Required Payment on any Obligation after applicable grace, notice and/or cure periods, if any.

(b)     Failure on the part of the Obligated Group Members to attain a ratio of Income Available for Debt Service to Annual Debt Service of at least 1.0:1.0 for any two consecutive Fiscal Years.

(c)     Any Obligated Group Member shall fail to observe or perform any other covenant or agreement under this Master Indenture (including covenants or agreements contained in any Related Supplement or Obligation) and shall not have cured such failure within 60 days after the date on which written notice of such failure, requiring the failure to be remedied, shall have been received by the Credit Group Representative by the Master Trustee or to the Credit Group Representative and the Master Trustee by the Holders of 25% in aggregate principal amount of Outstanding Obligations (provided that if such failure can be remedied but not within such 60 day period, such failure shall not become an Event of Default for so long as the Credit Group Representative shall diligently proceed to remedy the failure).

(d)     Any Obligated Group Member shall default in the payment of Indebtedness (other than (1) Subordinated Indebtedness, (2) Nonrecourse Indebtedness, and (3) Indebtedness secured by an Obligation, which shall be governed by subsection (a) of this Section) in an aggregate outstanding principal amount greater than 5% of the Total Revenues of the Credit Group, and any grace, notice and/or cure period for such payment shall have expired; provided, however, that such default shall not constitute an Event of Default within the meaning of this Section if, within 60 days (or such longer period as the Master Trustee approves in writing) or within the time allowed for service of a responsive pleading if any proceeding to enforce payment of the Indebtedness is commenced, (1) any Obligated Group Member in good faith commences proceedings to contest the existence or payment of such Indebtedness, and (2) sufficient moneys are deposited in escrow with a bank or trust company or a bond acceptable to the Master Trustee is posted for the payment of such Indebtedness.

(e)     A court having jurisdiction shall enter a decree or order for relief in respect of any Obligated Group Member in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of any Obligated Group Member or for any substantial part of the Property of any Obligated Group Member, or ordering the winding up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days.

(f)     Any Obligated Group Member shall commence a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of any Obligated Group Member or for any substantial part of its Property, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due or shall take any corporate action in furtherance of the foregoing.

The Credit Group Representative agrees that, as soon as practicable, and in any event within ten days after discovery of such event, the Credit Group Representative shall notify the Master Trustee of any event which is an Event of Default hereunder which has occurred and is

E-36

continuing, which notice shall state the nature of such event and the action which the Obligated Group Members propose to take with respect thereto.

Section 4.02.   <u>Acceleration; Annulment of Acceleration</u>.

(a)     Upon the occurrence and during the continuation of an Event of Default, the Master Trustee may, and upon the written request of the Holders of not less than a majority in aggregate principal amount of Outstanding Obligations shall, by notice to the Credit Group Representative, declare all Outstanding Obligations immediately due and payable. Upon such declaration of acceleration, all Outstanding Obligations shall be immediately due and payable. If the terms of any Related Supplement give a Person the right to consent to acceleration of the Obligations issued pursuant to such Related Supplement, the Obligations issued pursuant to such Related Supplement may not be accelerated by the Master Trustee unless such consent is properly obtained pursuant to the terms of such Related Supplement. In the event of acceleration, an amount equal to the aggregate principal amount of all Outstanding Obligations, plus all interest accrued thereon and, to the extent permitted by applicable law, which accrues on such principal and interest to the date of payment, and all other amounts due thereunder, shall be due and payable on the Obligations.

(b)     At any time after the Obligations have been declared to be due and payable, and before the entry of a final judgment or decree in any proceeding instituted with respect to the Event of Default that resulted in the declaration of acceleration, the Master Trustee may annul such declaration and its consequences if:

(i)     the Obligated Group Members have paid (or caused to be paid or deposited with the Master Trustee moneys sufficient to pay) all payments then due on all Outstanding Obligations (other than payments then due only because of such declaration); and

(ii)     the Obligated Group Members have paid (or caused to be paid or deposited with the Master Trustee moneys sufficient to pay) all fees and expenses of the Master Trustee then due; and

(iii)     the Obligated Group Members have paid (or caused to be paid or deposited with the Master Trustee moneys sufficient to pay) all other amounts then payable by the Obligated Group hereunder; and

(iv)     every Event of Default (other than a default in the payment of the principal or other payments of such Obligations then due only because of such declaration) has been remedied.

No such annulment shall extend to or affect any subsequent Event of Default or impair any right with respect to any subsequent Event of Default.

Section 4.03.   <u>Additional Remedies and Enforcement of Remedies</u>.

(a)     Upon the occurrence and continuance of any Event of Default, the Master Trustee may, and upon the written request of the Holders of not less than a majority in aggregate

E-37

principal amount of the Outstanding Obligations (and upon indemnification of the Master Trustee to its satisfaction for any such request), shall, proceed to protect and enforce its rights and the rights of the Holders hereunder by such proceedings as may be deemed expedient, including but not limited to:

> (i)     Enforcement of the right of the Holders to collect amounts due or becoming due under the Obligations;

> (ii)    Civil action upon all or any part of the Obligations;

> (iii)   Civil action to require any Person holding moneys, documents or other property pledged to secure payment of amounts due or to become due on the Obligations to account as if it were the trustee of an express trust for the Holders of Obligations;

> (iv)    Civil action to enjoin any acts which may be unlawful or in violation of the rights of the Holders of Obligations;

> (v)     Civil action to obtain a writ of mandate against any Obligated Group Member or Controlling Member, or against any officer or member of the Governing Body of any Obligated Group Member or Controlling Member to compel performance of any act specifically required by this Master Indenture or any Obligation; and

> (vi)    Enforcement of any other right or remedy of the Holders conferred by law or hereby.

(b)     Regardless of the occurrence of an Event of Default, if requested in writing by the Holders of not less than a majority in aggregate principal amount of the Outstanding Obligations (and upon indemnification of the Master Trustee to its satisfaction for such request), the Master Trustee shall institute and maintain such proceedings as it may be advised shall be necessary or expedient (1) to prevent any impairment of the security hereunder by any acts which may be unlawful or in violation hereof, or (2) to preserve or protect the interests of the Holders. However, the Master Trustee shall not be required to comply with any such request or institute and maintain any such proceeding that is in conflict with any applicable law or the provisions hereof or (in the sole judgment of the Master Trustee) is unduly prejudicial to the interests of the Holders not making such request. Nothing herein shall be deemed to authorize the Master Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment, or composition affecting the Obligations or the rights of any Holder thereof, or to authorize the Master Trustee to vote in respect of the claim of any Holder in any such proceeding without the approval of the Holders so affected.

Section 4.04.   <u>Application of Moneys After Default</u>.  During the continuance of an Event of Default, all moneys received by the Master Trustee pursuant to any right given or action taken under the provisions of this Article (after payment of the costs of the proceedings resulting in the collection of such moneys and payment of all fees, expenses and other amounts owed to the Master Trustee) shall be applied as follows:

(a)     Unless all Outstanding Obligations have become or have been declared due and payable (or if any such declaration is annulled in accordance with the terms of this Article):

*First:* To the payment of all Required Payments then due on the Obligations (including Financial Product Payments to the extent made pursuant to a Financial Product Agreement secured or evidenced by an Obligation and Parity Financial Product Extraordinary Payments), in the order of their due dates, and, if the amount available is not sufficient to pay in full all Required Payments due on the same date, then to the payment thereof ratably, according to the amount Required Payments due on such date, without any discrimination or preference;

*Second:* To the payment of all Financial Product Extraordinary Payments made pursuant to a Financial Product Agreement secured or evidenced by an Obligation (other than Parity Financial Product Extraordinary Payments), in the order of their due dates, and, if the amount available is not sufficient to pay in full all Financial Product Extraordinary Payments due on the same date, then to the payment thereof ratably, according to the amounts of Financial Product Extraordinary Payments due on such date, without any discrimination or preference.

(b)     If all Outstanding Obligations have become or have been declared due and payable (and such declaration has not been annulled under the terms of this Article):

*First:* To the payment of all Required Payments then due on the Obligations (including (i) Financial Product Payments to the extent made pursuant to a Financial Product Agreement secured or evidenced by an Obligation and (ii) Parity Financial Product Extraordinary Payments), and, if the amount available is not sufficient to pay in full the whole amount then due and unpaid, then to the payment thereof ratably, without preference or priority, according to the amounts due respectively, without any discrimination or preference; and

*Second:* To the payment of all Financial Product Extraordinary Payments made pursuant to a Financial Product Agreement secured or evidenced by an Obligation (other than Parity Financial Product Extraordinary Payments), and, if the amount available is not sufficient to pay in full all such Financial Product Extraordinary Payments, then to the payment thereof ratably, without any discrimination or preference.

Such moneys shall be applied at such times as the Master Trustee shall determine, having due regard for the amount of moneys available and the likelihood of additional moneys becoming available in the future. Upon any date fixed by the Master Trustee for the application of such moneys to the payment of principal, interest on the amounts of principal to be paid on such date shall cease to accrue. The Master Trustee shall give such notices as it may deem appropriate of the deposit with it of such moneys or of the fixing of such dates. The Master

E-39

Trustee shall not be required to make payment to the Holder of any unpaid Obligation until such Obligation (and all unmatured interest coupons, if any) is presented to the Master Trustee for appropriate endorsement of any partial payment or for cancellation if fully paid.

Whenever all Obligations have been paid under the terms of this Section and all fees and expenses of the Master Trustee have been paid, any balance remaining shall be paid to the Person entitled to receive such balance. If no other Person is entitled thereto, then the balance shall be paid to the Members of the Obligated Group or such Person as a court of competent jurisdiction may direct.

Section 4.05.   Remedies Not Exclusive.  No remedy granted by the terms of this Master Indenture is intended to be exclusive of any other remedy. Each remedy shall be cumulative and shall be in addition to every other remedy given hereunder or existing at law or in equity.

Section 4.06.   Remedies Vested in the Master Trustee.  All rights of action (including the right to file proof of claims) hereunder or under any of the Obligations may be enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any proceeding relating thereto. Any proceeding instituted by the Master Trustee may be brought in its name as the Master Trustee without the necessity of joining any Holders as plaintiffs or defendants. Subject to the provisions of Section 4.04 hereof, any recovery or judgment shall be for the equal benefit of the Holders of the Outstanding Obligations.

Section 4.07.   Master Trustee to Represent Holders.   The Master Trustee is hereby irrevocably appointed as trustee and attorney in fact for the Holders for the purpose of exercising on their behalf the rights and remedies available to the Holders under the provisions of this Master Indenture, the Obligations, any Related Supplement and applicable provisions of law, in each case subject to the provisions of Section 4.08. The Holders, by taking and holding the Obligations, shall be conclusively deemed to have so appointed the Master Trustee.

Section 4.08.   Holders' Control of Proceedings.   If an Event of Default has occurred and is continuing, notwithstanding anything herein to the contrary, the Holders of at least a majority in aggregate principal amount of Outstanding Obligations shall have the right (upon the indemnification of the Master Trustee to its satisfaction) to direct the method and/or place of conducting any proceeding to be taken in connection with the enforcement of the terms hereof. Such direction must be in writing, signed by such Holders and delivered to the Master Trustee. However, the Master Trustee shall not be required to follow any such direction that is in conflict with any applicable law or the provisions hereof or (in the sole judgment of the Master Trustee) is unduly prejudicial to the interests of the Holders not joining in such direction. Nothing in this Section shall impair the right of the Master Trustee to take any other action authorized by this Master Indenture which it may deem proper and which is not inconsistent with such direction by Holders.

Section 4.09.   Termination of Proceedings.   In case any proceeding instituted by the Master Trustee with respect to any Event of Default is discontinued or abandoned for any reason or is determined adversely to the Master Trustee or the Holders, then the Obligated Group Members, the Master Trustee and the Holders shall be restored to their former positions and

rights hereunder. All rights, remedies and powers of the Master Trustee and the Holders shall continue as if no such proceeding had been taken.

Section 4.10.   <u>Waiver of Event of Default</u>.

(a)      No delay or omission of the Master Trustee or of any Holder to exercise any right with respect to any Event of Default shall impair such right or shall be construed to be a waiver of or acquiescence to such Event of Default. Every right and remedy given by this Article to the Master Trustee and the Holders may be exercised from time to time and as often as may be deemed expedient by them.

(b)      The Master Trustee may waive any Event of Default which in its opinion has been remedied before the entry of a final judgment or decree in any proceeding instituted by it under the provisions hereof, or before the completion of the enforcement of any other remedy hereunder.

(c)      Upon the written request of the Holders of at least a majority in aggregate principal amount of Outstanding Obligations, the Master Trustee shall waive any Event of Default hereunder and its consequences; <u>provided</u>, <u>however</u>, that, except under the circumstances set forth in subsection (b) of Section 4.02 hereof, the failure to pay the principal of, premium, if any, or interest on any Obligation when due may not be waived without the written consent of the Holders of all Outstanding Obligations.

(d)      In case of any waiver by the Master Trustee of an Event of Default, the Obligated Group Members, the Master Trustee and the Holders shall be restored to their former positions and rights. No waiver shall extend to, or impair any right with respect to, any other Event of Default.

Section 4.11.   <u>Appointment of Receiver</u>.   Upon the occurrence and continuance of any Event of Default, the Master Trustee shall be entitled (a) without declaring the Obligations to be due and payable, (b) after declaring the Obligations to be due and payable, or (c) upon the commencement of any proceeding to enforce any right of the Master Trustee or the Holders, to the appointment of a receiver or receivers of any or all of the Property of the Obligated Group Members (without the necessity of notice to any Obligated Group Member or any other Person), with such powers as the court making such appointment shall confer. Each Obligated Group Member consents, subject to the imposition on the receiver of any applicable Government and Industry Restrictions, and will if requested by the Master Trustee, consent at the time of application by the Master Trustee for appointment of a receiver, to the appointment of such receiver and agrees that such receiver may be given the right, to the extent the right may lawfully be given, to take possession of, operate and deal with such Property and the revenues, profits and proceeds therefrom, with the same effect as the Obligated Group Member could, and to borrow money and issue evidences of indebtedness as such receiver.

Section 4.12.   <u>Remedies Subject to Provisions of Law</u>.   All rights, remedies and powers provided by this Article may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law and any Government and Industry Restrictions. All the provisions of this Article are intended to be limited to the extent necessary so that they will not

E-41

render any provision hereof invalid or unenforceable under the provisions of any applicable law or inconsistent with any Government and Industry Restrictions.

Section 4.13.   Notice of Default.   Within ten days after a Responsible Officer of the Master Trustee has actual knowledge or has received written notice of the occurrence of an Event of Default, the Master Trustee shall mail notice of such Event of Default to all Holders, unless such Event of Default has been cured before the giving of such notice (the term "Event of Default" for the purposes of this Section being limited to the events specified in subsections (a)-(f) of Section 4.01, not including any periods of grace provided for in subsections (c), (d) and (e), and regardless of the giving of written notice specified in subsection (c) of Section 4.01). Except in the case of default in the payment of the principal of or premium, if any, or interest on any of the Obligations and the Events of Default specified in subsections (e) and (f) of Section 4.01, the Master Trustee shall be protected in withholding such notice if and so long as the Master Trustee in good faith determines that the withholding of such notice is in the best interest of the Holders.

ARTICLE V

THE MASTER TRUSTEE

Section 5.01.   Certain Duties and Responsibilities.

(a)      Except during the continuance of an Event of Default:

(i)      The Master Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Master Indenture, and no implied covenant or obligation shall be read into this Master Indenture against the Master Trustee; and

(ii)      Whenever in the administration of its rights and obligations hereunder, the Master Trustee shall deem it necessary or desirable that a matter be established or proved prior to taking or suffering any action hereunder, in the absence of bad faith on its part, the Master Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon Certificates or opinions furnished to the Master Trustee and conforming to the requirements of this Master Indenture, which Certificates or opinions shall be full warrant to the Master Trustee for any action taken or suffered under the provisions hereof upon the faith thereof and, in its discretion, the Master Trustee may in lieu thereof, accept other evidence of such matter or may require such additional evidence as it may deem reasonable; but, in the case of any Certificate or opinion specifically required by the provisions hereof to be furnished to the Master Trustee, the Master Trustee shall be under a duty to examine such Certificate or opinion to determine whether or not it conforms to the requirements of this Master Indenture on its face.

(b)      In case an Event of Default has occurred and is continuing, the Master Trustee shall exercise such of the rights and powers vested in it by this Master Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

E-42

(c)     The Master Trustee shall not be liable in connection with the performance of its duties hereunder, except for its own negligence or willful misconduct.  No provision of this Master Indenture shall be construed to relieve the Master Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)     this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(ii)     the Master Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Master Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Master Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders given in accordance with Section 4.08; and

(iv)     no provision of this Master Indenture shall require the Master Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

The Master Trustee will keep on file at its office a list of the names and addresses of the last known Holders of all Obligations and the serial numbers of such Obligations held by each of such Holders. At reasonable times and under reasonable regulations established by the Master Trustee, said list may be inspected and copied by the Obligated Group Members, any Obligation Holder or the authorized representative thereof, provided that the ownership of such Holder and the authority of any such designated representative shall be evidenced to the satisfaction of the Master Trustee.

(d)     Every provision of this Master Indenture relating to the conduct of, affecting the liability of or affording protection to the Master Trustee shall be subject to the provisions of this Section.

Section 5.02.   Certain Rights of Master Trustee.  Subject to Section 5.01:

(a)     The Master Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)     Any request or direction of the Credit Group Representative mentioned herein shall be sufficiently evidenced by an Officer's Certificate. Any action of the Governing Body of any Obligated Group Member shall be sufficiently evidenced by a copy of a resolution certified by the secretary or an assistant secretary of the Obligated Group Member to have been duly adopted by the Governing Body and to be in full force and effect on the date of such certification and delivered to the Master Trustee.

(c)     Whenever in the administration of this Master Indenture the Master Trustee shall deem it desirable that a matter be proved or established prior to taking, allowing or omitting any action hereunder, the Master Trustee may (in the absence of bad faith on its part

E-43

and unless other evidence is specifically prescribed by this Master Indenture) request and conclusively rely upon an Officer's Certificate.

(d)  The Master Trustee may consult with counsel, which may but need not be counsel to the Credit Group, engineers, architects, accountants, investment bankers and insurance consultants and the written advice of such counsel, engineers, architects, accountants, investment bankers and insurance consultants shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(e)  The Master Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Master Indenture at the request or direction of any of the Holders or any Member of the Obligated Group, unless such Holders or such Member, as applicable, shall have offered to the Master Trustee reasonable security or indemnity satisfactory to the Master Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(f)  Except as specifically provided in this Master Indenture, the Master Trustee shall not be required to monitor the financial condition of any Obligated Group Member or the physical conditions of the Property, Plant and Equipment of any Obligated Group Member.  The Master Trustee shall not be bound to make any investigation into the facts stated in any document delivered to it hereunder, but the Master Trustee, in its discretion, may make such further inquiry or investigation into such facts as it may see fit. If the Master Trustee determines to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of any Obligated Group Member (excluding specifically donor records, patient records and personnel records), personally or by agent or attorney, during regular business hours and after reasonable notice.

(g)  The Master Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, receivers or employees (but shall not be responsible for any misconduct or negligence on the part of any agent, attorney, receiver or employee appointed and supervised by it with due care), and shall be entitled to the advice of counsel concerning all matters of trust hereof and duties hereunder. The Master Trustee may in all cases pay such reasonable compensation to any and all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trusts hereof. The Master Trustee may act upon the opinion or advice of any attorney approved by the Master Trustee in the exercise of reasonable care. The Master Trustee shall not be responsible for any loss or damage resulting from any action taken or omitted to be taken in good faith in reliance upon that opinion or advice.

(h)  The Master Trustee shall not be deemed to have notice of any default or Event of Default unless a Responsible Officer of the Master Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Master Trustee at the Corporate Trust Office of the Master Trustee, and such notice references this Master Indenture.

(i)     The Master Trustee agrees to accept and act upon instructions or directions pursuant to this Master Indenture sent by unsecured Electronic Mail, facsimile transmission or other similar unsecured electronic methods, provided, however, that, the Master Trustee shall have received an incumbency certificate listing persons designated to give such instructions or directions and containing specimen signatures of such designated persons, which such incumbency certificate shall be amended and replaced whenever a person is to be added or deleted from the listing. If the Credit Group Representative elects to give the Master Trustee e-mail or facsimile instructions (or instructions by a similar electronic method) and the Master Trustee in its discretion elects to act upon such instructions, the Master Trustee's understanding of such instructions shall be deemed controlling. The Master Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Master Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Credit Group Representative agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Master Trustee, including without limitation the risk of the Master Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties.

(j)     The Master Trustee shall not be liable to the parties hereto or deemed in breach or default hereunder if and to the extent its performance hereunder is prevented by reason of force majeure. The term "force majeure" means an occurrence that is beyond the control of the Master Trustee and could not have been avoided by exercising due care. Force majeure shall include acts of God, terrorism, war, riots, strikes, fire, floods, earthquakes, epidemics or other similar occurrences.

(k)     The Master Trustee shall have no responsibility or liability with respect to any information, statements or recital in any offering memorandum or other disclosure material prepared or distributed with respect to the issuance of Related Bonds.

(l)     Delivery of reports, financial statements, information and documents is for informational purposes only and the Master Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from the information contained therein, including compliance with any covenants herein or in any related documents. The Master Trustee's sole duty with respect to such documents is to retain them in its possession and make them subject to the inspection of the Credit Group Representative, any Holder, and/or their agents and representatives duly authorized in writing, at reasonable hours and under reasonable conditions.

(m)     The Master Trustee shall not be responsible for the recording or filing of any document relating to this Master Indenture, including without limitation, recording, filing any documents or taking any other actions to perfect or continue the perfection of any security interest in any collateral given to or held by the Master Trustee.

(n)     The Master Trustee shall not be liable for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Master Indenture.

Section 5.03.   <u>Right to Deal in Obligations and Related Bonds</u>.  The Master Trustee may buy, sell or hold and deal in any Obligations and Related Bonds with the same effect as if it were not the Master Trustee. The Master Trustee may commence or join in any action which a Holder or holder of a Related Bond is entitled to take with the same effect as if the Master Trustee were not the Master Trustee.

Section 5.04.   <u>Removal and Resignation of the Master Trustee</u>.

(a)     The Master Trustee may be removed at any time by an instrument or instruments in writing signed by (1) the Holders of not less than a majority of the principal amount of Outstanding Obligations or (2) (unless an Event of Default has occurred and is then continuing) the Credit Group Representative.

(b)     The Master Trustee may at any time resign by giving written notice of such resignation to the Credit Group Representative.

(c)     No such resignation or removal shall become effective unless and until a successor Master Trustee has been appointed and has assumed the trusts created hereby. Written notice of removal of the predecessor Master Trustee and/or appointment of the successor Master Trustee shall be given by the successor Master Trustee within ten days of the successor's acceptance of appointment to the Obligated Group Members and to each Holder at the addresses shown on the books of the Master Trustee. A successor Master Trustee may be appointed at the direction of the Holders of not less than a majority in aggregate principal amount of Outstanding Obligations, or, if the Master Trustee has resigned or has been removed by the Credit Group Representative, by the Credit Group Representative. In the event a successor Master Trustee has not been appointed and qualified within 60 days of the date notice of resignation or removal is given, the Master Trustee, any Obligated Group Member or any Holder may apply at the reasonable expense of the Obligated Group Members to any court of competent jurisdiction for the appointment of an interim successor Master Trustee to act until such time as a permanent successor is appointed.

(d)     Unless otherwise ordered by a court or regulatory body having competent jurisdiction, or unless required by law, any successor Master Trustee shall be a national banking association, trust company or bank having the powers of a trust company as to trusts, qualified to do and doing trust business in one or more states of the United States of America and having an officially reported combined capital, surplus, undivided profits and reserves aggregating at least $50,000,000, if there is such an institution willing, qualified and able to accept the trust upon reasonable or customary terms.

(e)     Every successor Master Trustee shall execute and deliver to its predecessor and to each Obligated Group Member a written instrument accepting such appointment. Upon the delivery of such acceptance, the successor Master Trustee shall become fully vested with all the rights, immunities, powers, trusts, duties and obligations of its predecessor. The predecessor shall execute and deliver to the successor Master Trustee a written instrument transferring to the successor Master Trustee all the rights, powers and trusts of the predecessor. The predecessor Master Trustee (upon payment of all amounts owed to it) shall execute any documents necessary or appropriate to convey all interest it may have to the

E-46

successor Master Trustee. The predecessor Master Trustee shall promptly deliver all records relating to the trust or copies thereof and communicate all material information it may have obtained concerning the trust to the successor Master Trustee.

Section 5.05.   <u>Compensation and Reimbursement</u>.

(a)   Subject to the provisions of any specific agreement between the Credit Group Representative and the Master Trustee relating to the compensation of the Master Trustee, each Obligated Group Member agrees:

(i)   To pay the Master Trustee from time to time customary and reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust).

(ii)   Except as otherwise expressly provided herein, to reimburse the Master Trustee upon its request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Master Trustee in accordance with any provision of this Master Indenture (including the reasonable compensation and the expenses and disbursements of its counsel and its agents), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith.

(b)   The Obligated Group Members agree to indemnify each of the Master Trustee and its officers, directors, agents and employees and any predecessor Master Trustee for, and to hold it and them harmless against, any and all loss, liability, damages, claim or expense, including taxes (other than taxes based on the income of the Master Trustee) incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust or its powers or duties hereunder, including without limitation, reasonable and documented out-of-pocket legal fees and expenses and the reasonable and documented out-of-pocket costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder, unless such claim or liability is made by any Holder against the Master Trustee which does not involve any alleged conduct by any Obligated Group Member.

(c)   The respective obligations of the Obligated Group Members under this Section 5.05 to compensate the Master Trustee, to pay or reimburse the Master Trustee for expenses, disbursements and advances and to indemnify and hold harmless the Master Trustee shall survive satisfaction and discharge of this Master Indenture.   As security for the performance of the Obligated Group Members under this Section 5.05, the Master Trustee shall have a lien prior to any Obligation upon all property and funds held or collected by the Master Trustee.

Section 5.06.   <u>Recitals and Representations</u>.   The recitals, statements and representations contained herein or in any Obligation (excluding the Master Trustee's authentication on the Obligations) shall be taken and construed as made by and on the part of the Obligated Group

E-47

Members, and not by the Master Trustee. The Master Trustee assumes no responsibility for the correctness of such statements.

The Master Trustee makes no representation as to, and is not responsible for, the validity or sufficiency of this Master Indenture or of the Obligations, or for the adequacy, priority or perfection of any security for any Obligations or for any insurance to be provided. The Master Trustee shall not be concerned with or accountable to anyone for the use or application of any moneys which shall be released or withdrawn in accordance with the provisions hereof.

Section 5.07.   <u>Separate or Co-Master Trustee</u>.   At any time, for the purpose of meeting any legal requirements of any jurisdiction, the Master Trustee may appoint one or more Persons either to act as co-master trustee with the Master Trustee, or to act as separate master trustee, and to vest in such Persons or Persons, such rights, powers, duties, trusts or obligations as the Master Trustee may consider necessary or desirable, subject to the remaining provisions of this Section, and provided that doing so shall not impose a material burden on the Obligated Group Members (financial or otherwise).

Every co-master trustee or separate master trustee shall, to the extent permitted by law, be appointed subject to the following terms:

(a)     The Obligations shall be authenticated and delivered solely by the Master Trustee.

(b)     All rights, powers, trusts, duties and obligations conferred or imposed upon the trustees shall be conferred or imposed upon and exercised or performed as shall be provided in the instrument appointing such co-master trustee or separate master trustee, except to the extent that, under the law of any jurisdiction in which any particular act or acts are to be performed, the Master Trustee is incompetent or unqualified to perform such act or acts, in which event such act or acts shall be performed by such co-master trustee or separate master trustee.

(c)     Any request in writing by the Master Trustee to any co-master trustee or separate master trustee to take or to refrain from taking any action hereunder shall be sufficient for the taking, or the refraining from taking, of such action by such Person.

(d)     Any co-master trustee or separate master trustee may, to the extent permitted by law, delegate to the Master Trustee the exercise of any right, power, trust, duty or obligation, discretionary or otherwise.

(e)     The Master Trustee may at any time, by an instrument in writing, accept the resignation of or remove any co-master trustee or separate master trustee appointed under this Section. Upon the request of the Master Trustee, the Obligated Group Members shall join with the Master Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal.

(f)     No trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder, nor will the act or omission of any trustee hereunder be imputed to any other trustee.

E-48

(g)     Any demand, request, direction, appointment, removal, notice, consent, waiver or other action in writing delivered to the Master Trustee shall be deemed to have been delivered to each such co-master trustee or separate master trustee.

(h)     Any moneys, papers, securities or other items of personal property received by any such co-master trustee or separate master trustee hereunder shall be turned over to the Master Trustee immediately.

Upon the acceptance in writing of such appointment by any co-master trustee or separate master trustee, such Person shall be vested with such rights, powers, duties or obligations as are specified in the instrument of appointment jointly with the Master Trustee (except insofar as local law makes it necessary for any such co-master trustee or separate master trustee to act alone) subject to all the terms hereof. Every such acceptance shall be filed with the Master Trustee. To the extent permitted by law, any co-master trustee or separate master trustee may, at any time by an instrument in writing, constitute the Master Trustee its attorney-in-fact and agent, with full power and authority to do all acts and things and to exercise all discretion on its behalf and in its name.

In case any co-master trustee or separate master trustee shall become incapable of acting, resign or be removed, all rights, powers, trusts, duties and obligations of such Person shall, so far as permitted by law, vest in and be exercised by the Master Trustee unless and until a successor co-master trustee or separate master trustee shall be appointed in the manner herein provided.

Section 5.08.  Merger or Consolidation.  Any company into which the Master Trustee may be merged or converted, or with which it may be consolidated, or any company resulting from any merger, conversion or consolidation to which it is a party, or any company to which the Master Trustee may sell or transfer all or substantially all of its corporate trust business (provided such company is eligible under Section 5.04) shall be the successor to the Master Trustee without the execution or filing of any paper or any further act.

ARTICLE VI

SUPPLEMENTS AND AMENDMENTS

Section 6.01.  Supplements Not Requiring Consent of Holders.  The Credit Group Representative (acting for itself and as agent for each Obligated Group Member) and the Master Trustee may, without the consent of or notice to any of the Holders, enter into one or more Related Supplements for any of the following purposes:

(a)     To correct any ambiguity or formal defect or omission in this Master Indenture;

(b)     To correct or supplement any provision which may be inconsistent with any other provision, or to make any other provision with respect to matters or questions arising hereunder and which does not materially and adversely affect the interests of the Holders;

E-49

(c)     To grant or confer ratably upon all of the Holders any additional rights, remedies, powers or authority, or to add to the covenants of and restrictions on the Obligated Group Members;

(d)     To qualify this Master Indenture under the Trust Indenture Act of 1939, as amended, or corresponding provisions of federal law from time to time in effect;

(e)     To create and provide for the issuance of an Obligation or Series of Obligations as permitted hereunder;

(f)     To obligate a successor to any Obligated Group Member as provided in Section 3.10;

(g)     To add a new Obligated Group Member as provided in Section 3.04; or

(h)     To make any other change which does not materially and adversely affect the interests of the Holders.

The Master Trustee may in its discretion, but shall not be obligated to, enter into any such Related Supplement authorized by Sections 6.01 and 6.02 which materially adversely affects the Master Trustee's own rights, duties or immunities under this Master Indenture or otherwise.

In entering into any Related Supplement, the Master Trustee may rely on an Opinion of Counsel as described in Section 6.03(a) hereof.

Section 6.02.   <u>Supplements Requiring Consent of Holders</u>.

(a)     Other than Related Supplements referred to in Section 6.01 hereof and subject to the terms contained in this Article, the Holders of not less than a majority in aggregate principal amount of the Outstanding Obligations shall have the right to consent to and approve the execution by the Credit Group Representative (acting for itself and as agent for each Credit Group Member) and the Master Trustee of such Related Supplements as shall be deemed necessary or desirable for the purpose of modifying, altering, amending, adding to or rescinding any of the terms contained herein; <u>provided</u>, <u>however</u>, that nothing in this Section shall permit or be construed as permitting a Related Supplement which would:

(i)     Extend the stated maturity of or time for paying interest on any Obligation or reduce the principal amount of or the redemption premium or rate of interest or change the method of calculating interest payable on or reduce any other Required Payment on any Obligation without the consent of the Holder of such Obligation;

(ii)     Modify, alter, amend, add to or rescind any of the terms or provisions contained in Article IV hereof so as to affect the right of the Holders of any Obligations in default to compel the Master Trustee to declare the principal of all Obligations to be due and payable, or the priority of payment of Obligations set forth in Section 4.04, without the consent of the Holders of all Outstanding Obligations; or

E-50

(iii)    Reduce the aggregate principal amount of Outstanding Obligations the consent of the Holders of which is required to authorize such Related Supplement without the consent of the Holders of all Obligations then Outstanding.

(b)    The Master Trustee may execute a Related Supplement (in substantially the form delivered to it as described below) without liability or responsibility to any Holder (whether or not such Holder has consented to the execution of such Related Supplement) if the Master Trustee receives:

(i)    a Request of the Credit Group Representative to enter into such Related Supplement; and

(ii)    a certified copy of the resolution of the Governing Body of the Credit Group Representative approving the execution of such Related Supplement; and

(iii)    the proposed Related Supplement; and

(iv)    an instrument or instruments executed by the Holders of not less than the aggregate principal amount or number of Obligations specified in subsection (a) for the Related Supplement in question which instrument or instruments shall refer to the proposed Related Supplement and shall specifically consent to and approve the execution thereof in substantially the form of the copy thereof as on file with the Master Trustee.

(c)    Any such consent shall be binding upon the Holder of the Obligation giving such consent and upon any subsequent Holder of such Obligation and of any Obligation issued in exchange therefor (whether or not such subsequent Holder thereof has notice thereof), unless such consent is revoked in writing by the Holder of such Obligation giving such consent or by a subsequent Holder thereof by filing with the Master Trustee, prior to the execution by the Master Trustee of such Related Supplement, such revocation and, if such Obligation or Obligations are transferable by delivery, proof that such Obligations are held by the signer of such revocation. At any time after the Holders of the required principal amount or number of Obligations shall have filed their consents to the Related Supplement, the Master Trustee shall file a written statement to that effect with the Credit Group Representative. Such written statement shall be conclusive evidence that such consents have been so filed.

(d)    If the Holders of the required principal amount or number of the Outstanding Obligations have consented to the execution of such Related Supplement, no Holder shall have any right to object to the execution thereof, to object to any of the terms and provisions contained therein or the operation thereof, to question the propriety of the execution thereof or to enjoin or restrain the Master Trustee or the Credit Group Representative from executing such Related Supplement or from taking any action pursuant to the provisions thereof.

Section 6.03.    Execution and Effect of Supplements.

(a)    In executing any Related Supplement permitted by this Article, the Master Trustee shall be entitled to receive and to rely upon an Opinion of Counsel stating that the

E-51

execution of such Related Supplement is authorized or permitted hereby. The Master Trustee may (but shall not be obligated to) enter into any Related Supplement that materially and adversely affects the Master Trustee's own rights, duties or immunities.

(b)     Upon the execution and delivery of any Related Supplement in accordance with this Article, the provisions of this Master Indenture shall be deemed modified in accordance therewith. Such Related Supplement shall form a part hereof for all purposes and every Holder shall be bound thereby.

(c)     Any Obligation authenticated and delivered after the execution and delivery of any Related Supplement in accordance with this Article may, and, if required by the Credit Group Representative or the Master Trustee shall, bear a notation in form approved by the Master Trustee as to any matter provided for in such Related Supplement. If the Credit Group Representative or the Master Trustee shall so determine, new Obligations so modified as to conform in the opinion of the Master Trustee and the Governing Body of the Credit Group Representative to any such Related Supplement may be prepared and executed by the Credit Group Representative and authenticated and delivered by the Master Trustee in exchange for and upon surrender of Obligations then Outstanding.

Section 6.04.  Amendment of Related Supplements.  Any Related Supplement may provide that the provisions thereof may be amended without the consent of or notice to any of the Holders, or pursuant to such terms and conditions as may be specified in such Related Supplement. If a Related Supplement does not contain provisions relating to the amendment thereof, the amendment of such Related Supplement shall by governed by the provisions of Section 6.01 and Section 6.02 hereof.

ARTICLE VII

SATISFACTION AND DISCHARGE

Section 7.01.  Satisfaction and Discharge of Master Indenture.  This Master Indenture shall cease to be of further effect if:

(a)     all Obligations previously authenticated (other than any Obligations which have been mutilated, destroyed, lost or stolen and which have been replaced or paid as provided in any Related Supplement) and not cancelled are delivered to the Master Trustee for cancellation; or

(b)     all Obligations not previously cancelled or delivered to the Master Trustee for cancellation are paid; or

(c)     an Irrevocable Deposit is made in trust with the Master Trustee (or with one or more banks, national banking associations or trust companies acceptable to the Master Trustee pursuant to one or more agreements between an Obligated Group Member and such national banking associations or trust companies in form acceptable to the Master Trustee) in cash or Government Obligations or both, sufficient to pay at maturity or upon redemption all Obligations not previously cancelled or delivered to the Master Trustee for cancellation, including principal and interest or other payments (including Financial Product Payments and

E-52

Financial Product Extraordinary Payments) due or to become due to such date of maturity, redemption date or payment date, as the case may be;

and all other sums payable hereunder by the Obligated Group Members are also paid. The Master Trustee, on demand of the Credit Group Representative and at the cost and expense of the Obligated Group Members, shall execute proper instruments acknowledging satisfaction of and discharging this Master Indenture and authorizing the Credit Group Representative to file such terminations and releases as may be necessary to evidence the termination of the Master Trustee's security interest in the Gross Receivables. Unless the deposit(s) pursuant to clause (c) above is made solely with cash, the Credit Group Representative shall cause a report to be prepared by a firm nationally recognized for providing verification services regarding the sufficiency of funds for such discharge and satisfaction provided pursuant to clause (c) above, upon which report the Master Trustee may rely.

Section 7.02.  <u>Payment of Obligations After Discharge of Lien</u>.  Notwithstanding the discharge of the lien of this Master Indenture as provided in this Article, the Master Trustee shall retain such rights, powers and duties as may be necessary and convenient for the payment of amounts due or to become due on the Obligations and for the registration, transfer, exchange and replacement of Obligations. Any moneys held by the Master Trustee for the payment of the principal of, premium, if any, or interest or other Required Payment on any Obligation remaining unclaimed for one year after the principal of all Obligations has become due and payable, whether at maturity, upon proceedings for redemption or by declaration as provided herein, shall then be paid to the Obligated Group Members subject to applicable escheat laws. The Holders of any Obligations or coupons not previously presented for payment shall thereafter be entitled to look only to the Obligated Group Members for payment thereof as unsecured creditors and all liability of the Master Trustee with respect to such moneys shall thereupon cease.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01.  <u>Limitation of Rights</u>.  With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied from this Master Indenture or the Obligations is intended or shall be construed to give to any Person other than each Obligated Group Member, the Master Trustee and the Holders any legal or equitable right, remedy or claim under or with respect to this Master Indenture. This Master Indenture and all of the covenants, conditions and provisions hereof are intended to be and are for the sole and exclusive benefit of the parties mentioned in this Section.

Section 8.02.  <u>Severability</u>.  If any part of this Master Indenture is for any reason held invalid or unenforceable, no other part shall be invalidated or deemed unenforceable.

Section 8.03.  <u>Holidays</u>.  Except to the extent a Related Supplement or an Obligation provides otherwise:

(a)     Subject to subsection (b), when any action is provided herein to be done on a day or within a time period named, and the day or the last day of the period falls on a day on

which banking institutions in the jurisdiction where the Corporate Trust Office is located are authorized by law to remain closed, the action may be done on the next ensuing day that is not a day on which banking institutions in such jurisdiction are authorized by law to remain closed, with the same effect as if done on the day or within the time period named.

(b)     When the date on which principal of or interest or premium on any Obligation is due and payable is a day on which banking institutions at the place of payment are authorized by law to remain closed, payment may be made on the next ensuing day on which banking institutions at such place are not authorized by law to remain closed with the same effect as if payment were made on the due date, and, if such payment is made, no interest shall accrue from and after such due date.

Section 8.04.   Credit Enhancer Deemed Holder of Obligation.  Except to the extent a Related Supplement or an Obligation provides otherwise, any credit enhancer of Related Bonds shall be deemed the Holder of the related Obligation for purposes of this Master Indenture for so long as the credit enhancement is in effect and the credit enhancer is not in default thereunder. If the credit enhancement is applicable to a portion of Related Bonds, such related Obligation shall be treated as if such related Obligation were two Obligations, one in the principal amount of the Related Bonds for which the credit enhancement is applicable and another in the principal amount of the remainder of the Related Bonds.

Section 8.05.   Governing Law.  This Master Indenture and the Obligations are contracts made under the laws of the State, and shall be governed by and construed in accordance with such laws applicable to contracts made and performed in said State.

Section 8.06.   Counterparts.   This Master Indenture may be executed in several counterparts, each of which shall be an original and all of which shall constitute one instrument.

Section 8.07.   Immunity of Individuals.  No recourse shall be had for the payment of the principal of, premium, if any, or interest on any of the Obligations issued hereunder or for any claim based thereon or upon any obligation, covenant or agreement herein against any past, present or future officer, director, trustee, member, employee or agent of any Obligated Group Member which is a corporation, whether directly or indirectly. All liability of any such individual is hereby expressly waived and released as a condition of and in consideration for the execution hereof and the issuance of the Obligations.

Section 8.08.   Binding Effect.  This Master Indenture shall inure to the benefit of and shall be binding upon each Obligated Group Member, the Master Trustee and their respective successors and permitted assigns, subject to the limitations contained herein.

Section 8.09.   Notices.

(a)     Unless otherwise expressly specified or permitted by the terms hereof, all notices, consents or other communications required or permitted hereunder shall be in writing and shall be deemed sufficiently given or served if given: (i) by facsimile or Electronic Mail with prompt telephonic confirmation of receipt; (ii) personally by hand; (iii) by overnight delivery service; or (iv) by first class mail, postage prepaid and addressed as follows:

E-54

(i)     If to the Credit Group Representative, addressed to it at 535 East 70th Street, New York, New York 10021, Attention: Executive Vice President and Chief Financial Officer, with a copy to the same address, Attention: Executive Vice President and Chief Legal Officer;

(ii)     If to the Master Trustee, addressed to it at the Corporate Trust Office; or

(iii)     If to the registered Holder of an Obligation, addressed to such Holder at the address shown on the books of the Master Trustee.

(b)     The Credit Group Representative or the Master Trustee may from time to time designate a different address or addresses for notice by notice in writing to the others and to the Holders.

[Remainder of page intentionally left blank]

E-55

IN WITNESS WHEREOF, the NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY has caused this Master Indenture to be signed in its name by its duly authorized officer, and to evidence its acceptance of the trusts and agreements hereby created, THE BANK OF NEW YORK MELLON has caused this Master Indenture to be signed in its name by one of its duly authorized officers, all as of the day and year first above written.

NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY

By _____

    Name:  Stacey L. Malakoff
    Title:  Executive Vice President and Chief
             Financial Officer

THE BANK OF NEW YORK MELLON, as Master Trustee

By _____

    Name:  David J. O'Brien
    Title:  Vice President

**APPENDIX A TO MASTER INDENTURE**

**List of Initial Members of the Credit Group**

<u>Initial Obligated Group Members</u>

New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery

<u>Initial Designated Affiliates</u>

None

A-1

**APPENDIX B TO MASTER INDENTURE**

**Existing Permitted Liens**

None that do not otherwise qualify as a Permitted Lien under the Master Indenture.



HOSPITAL FOR SPECIAL SURGERY • Taxable Bonds, Series 2018



Mixed Sources
Product group from well managed
forests, controlled sources and
recycled wood or fibers.

Printed by: ImageMaster, LLC
www.imagemaster.com