# EXHIBIT 5

 Proskauer Rose LLP   1001 Pennsylvania Avenue, NW Suite 400 South   Washington, DC 20004-2533

Colin R. Kass
202-416-6890
ckass@proskauer.com

February 1, 2021

*Via Email*

Heather Lamberg
Winston & Strawn LLP
1901 L Street NW
Washington, D.C. 20036

Re:  *Englewood's Saturday Night Email*

Dear Heather:

We write in response to your Saturday night email.

In your email, you request a meet and confer to discuss Englewood's subpoena to HSS. We propose this Thursday at 10 am Eastern. Please let us know if that works.

In advance of our call, we believe it would be helpful to frame certain issues raised in our objections but not addressed in your email.

*First*, your email is silent on the threshold question of whether HSS and the defendants are competitors in the alleged market for commercial payor contracts for inpatient GAC hospital services. While you try to sidestep this threshold question by attempting to limit the meet and confer to "burden concerns," that puts the cart before the horse.[1] Because HSS does not compete with Englewood for commercial payor contracts, discovery from HSS is irrelevant and not proportional to the needs of the case.

Instead of identifying the cluster of services that you contend make up GAC services (*see* HSS Requests 2 and 3), you seek to put the burden on HSS to define these services for you by asking us to "interpret" this term in "good faith."[2] We have already done so. In General Objection No. 2, we indicated that, "[i]n responding to this subpoena HSS interprets the term GAC to mean the 'broad cluster' of general acute care services typically offered by full service hospitals."

Your email does not dispute that definition. Nor could you. As we noted, it is consistent with the Complaint, which defines the relevant market as a "broad cluster of hospital services" and

---

[1] To the extent your email was intended to suggest that the meet and concern will be limited to "burden concerns" – or that you are unwilling to "work with [us]" on the other issues we raised – we reject the limitation. During our meet and confer, we expect that you will be prepared to address each and every objection we have made in response to your subpoena, so that we can join issue as to each one.

[2] In your email, you alternatively suggest that we should omit the term "General" from the definition of "General Acute Care" services, and interpret it to mean any specialized care that requires inpatient stays. That is not the definition of GAC services contained in the Complaint or the subpoena, nor is it a plausible reading of the term. Moreover, such a definition increases the burden on HSS, and reduces the relevance of the requested information. We, therefore, reject your post-hoc effort to amend your subpoena in this way.

Proskauer»

Page 2

– while recognizing the theoretical *possibility* of analyzing the merger's impact on specific individual inpatient services – expressly *waives* such challenges in this case:

> "Englewood … competes head-to-head with HMH for patients and inclusion in insurer *networks*… [for] a **broad cluster** of hospital services…. Although the Proposed Transaction's likely effect on competition could be analyzed separately for each individual inpatient GAC hospital service, it is appropriate to evaluate the Proposed Transaction's likely effects *across this cluster* of inpatient GAC hospital services because these services are offered in Bergen County under substantially similar competitive conditions."³

The cluster market approach is also consistent with how courts have defined markets in hospital merger cases for decades. For example, in *Butterworth*, the court noted:

> "The FTC characterizes general acute care inpatient hospital services as 'a common host of distinct services and capabilities that are necessary to meet the medical, surgical, and other needs of inpatients, e.g., operating rooms, anesthesia, intensive care capabilities, 24–hour nursing care, lodging, and pharmaceuticals.' These services are said to represent a *cluster of services* and capabilities that are provided only by general acute care hospitals and for which there are no reasonable substitutes. Indeed, general acute care inpatient hospital services is a product market that has been commonly used to evaluate the competitive effects of hospital mergers. Defendants argue, however, that the product market cannot be so simply defined …. ***The argument is not compelling***."

*F.T.C. v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1290 (W.D. Mich. 1996) (rejecting attempt to analyze the market on a service-by-service basis), *aff'd*, 121 F.3d 708 (6th Cir. 1997).

As we noted in General Objection 3, under this definition of GAC services, HSS does not compete with defendants, and thus, has no documents responsive to requests relating to GAC services. In that regard, we already provided extensive *evidence* that HSS's offerings are

---

³ The FTC and courts routinely analyze cluster markets in areas such as banking services and retail markets, including groceries, office supplies, department stores, home improvement stores, telecommunications, etc. In such markets, courts do not look at the individual products within the cluster, but rather at the cluster of products or services as a whole. Firms that provide only a limited subset of products are properly excluded from the market because many customers must still contract with a full service provider. In *Whole Foods*, for example, the court defined a market as the cluster of products sold by "premium natural and organic supermarkets," even though there was not a single product that could not be purchased elsewhere. According to the FTC, the D.C. District Court, and the D.C. Court of Appeals, all other stores – including other supermarkets, like ShopRite and ACME, and specialty stores, like butchers and produce stands – were properly excluded from the market. This cluster market approach is especially applicable in healthcare markets. *See Economic Analysis in Health Care Antitrust*, Journal of Contemporary Health Law & Policy (1991) ("in virtually all of the hospital merger cases involving acute care hospitals that have been litigated by the FTC and the DOJ …, the FTC cases and the courts have applied a product market defined by the cluster of services offered by short term, acute care hospitals.")

Proskauer»

Page 3

materially different from those of the defendants. Your Saturday night email does not address this reality, or the fact that HSS does not compete with defendants.

*Second*, in your email, you assert your "belie[f] that HSS is plainly an appropriate ***target*** for third party discovery in this matter," but you provide *no information* to support that belief. Indeed, you expressly declined to provide the information we requested concerning the basis for issuing a subpoena to HSS, a ***non-competing specialty*** healthcare provider. For example, you have not provided:

- Any information to support a claim for substantial need for discovery from HSS, as required by Fed. R. Civ. P. 45. (HSS Request 1).

- Any evidence that any commercial payor has *ever* threatened to replace Englewood with HSS, that there is any plausible argument that any commercial payor would do so, or that Englewood in *any way* reacted to any alleged competitive pressure from HSS. (HSS Requests 5, 6, and 8).

- Any indication that Englewood considers HSS a competitor for payor contracts in the ordinary course of business. (HSS Requests 4 and 7).

It is your burden to justify the subpoena and your requests, not HSS's.

Your Saturday night email takes the contrary position – that you have no obligation to justify the relevance, proportionality, or need for your requests. We disagree. The Advisory Committee Notes to Rule 26, for example, state that "[a] party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them." The Advisory Committee Notes further indicate that the party propounding discovery should provide information about the "importance of the discovery in resolving the issues as understood by the requesting party" before any "discovery dispute [is] brought before the court." That is what we are asking. You do not claim that any of our requests are not directed to that issue, or that the information requested would not be helpful to the court in determining the proper scope of discovery, if any, from HSS.[4]

*Third*, your Saturday night email does not address HSS's objection that defendants' scorched-earth discovery tactics are plainly inappropriate. We understand that within about a week of being retained as counsel, you issued approximately 20 subpoenas to third-party health care providers. While you have refused to identify those subpoenaed parties (*see* HSS Requests 9 and 10), we understand that many, like HSS, are not providers of inpatient GAC services and have no

---

[4] Your Saturday night email asserts that requesting information about the relevance or need for discovery from HSS is improper because HSS's requests were styled as a Document Request, rather than a letter request for the same information. Specifically, your email suggests that courts have "rejected … attempts" to require the requesting party to justify their requests. But you do not cite any such authority. If the title of our document requests is the issue, you should feel free to treat the requests as having been made in letter form rather than a formal document request if that results in a substantive response. In any event, your failure to respond substantively speaks volumes.

Proskauer»

Page 4

relevance to the case.[5] Given this, we can only conclude that your third-party discovery strategy was the modern equivalent of opening the Yellow Pages and issuing subpoenas to a slew of health care providers you found there, regardless of the fact that they have nothing to do with your case. Such tactics do not satisfy your obligation to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

*Fourth*, your Saturday night email does not address HSS's objection that discovery related to competitive substitutes insurers consider or that Englewood reacts to in setting rates can more efficiently be obtained directly from your own files or that of the insurers themselves.

*Fifth*, your Saturday night email disregards the requirement that defendants agree to compensate HSS for its costs in responding to the subpoena.

*Sixth*, despite playing lip service to "burden concerns," your Saturday night email does not materially narrow the subpoena. In fact, it seeks to broaden it by asking for documents the FTC requested that you did not. Defendants, however, have no standing to enforce a subpoena issued by the FTC. As such, we will not consider those requests.

Moreover, with just a few exceptions, you have either excluded requests for which HSS has already ***fully complied*** or you repeated your request ***without modification***, as reflected in the following chart.

| Request | Englewood's January 30, 2021 Position |
|---|---|
| ***Request 1*** (Org charts) | Withdrawn, in response to relevance objection |
| ***Request 2*** (FTC Communications) | Reiterated, without modification[6] |
| ***Request 3*** (Locations) | HSS has already fully complied |
| ***Request 4*** (Service Areas) | Reiterated, without modification |
| ***Request 5*** (Business planning documents) | Reiterated, without modification[7] |
| ***Request 6*** (Consultant Materials) | Reiterated, without modification |

---

[5] While it is your prerogative to keep your third-party discovery efforts secret (subject to the Court's role under Rule 45(d)(1) to ensure that you have not abused your subpoena power), you cannot use third-party discovery as both a sword and shield. That is, you cannot both fail to provide information concerning your third-party discovery efforts and argue that the subpoena is reasonable because one or more other third-parties have responded to it in some (undisclosed) fashion. Please confirm that you agree with this.

[6] HSS has also already fully complied with Request 2, since it has no non-privileged documents assessing the proposed merger.

[7] Though you claim to have "narrowed" Requests 5-7 by excluding "one-off or stray references to competition," these requests are limited by their express terms to business planning documents or third-party consultant materials, and already exclude one-off stray comments. Thus, you have not narrowed these requests at all.

**Proskauer**

Page 5

| Request | Englewood's January 30, 2021 Position |
|---|---|
| **Request 7** (Planning documents re NJ facilities) | Reiterated, without modification |
| **Request 8** (Referrals by Physicians to Englewood) | Withdrawn, in response to objection that it seeks information not in HSS's possession |
| **Request 9** (Payor negotiations) | Reiterated, without material modification[8] |
| **Request 10** (Identification of Payor Plans) | HSS has already fully complied |
| **Request 11** (Documents submitted to NJ Health Authorities) | Withdrawn, in response to relevance objection |
| **Request 12** (Identity of NJ Plans) | HSS has already fully complied |
| **Request 13** (Advertising) | Reiterated, without material modification[9] |

---

[8] In your email, you propose limiting Request 9 (and Requests 10 and 12, which don't ask for this information and to which HSS has already complied) to plans showing the rationale for entering into, and documents showing the terms of, contracts with "health plans offered in New Jersey. The proposed modification is both illusory and reflects a basic misunderstanding of how healthcare markets work. Insurers contract with their customers (primarily employers) to cover their employees and their families, wherever they may live. For example, Blue Cross contracts with JP Morgan to cover its traders, their spouses, and their children, whether they live in the city or New Jersey. To serve these covered lives, insurers must construct provider networks that serve each of the local geographic markets in which the patients are found. A child who suffers injury on the playground while attending pre-school in Hoboken, for example, needs a hospital near Hoboken, even if a parent work on Wall Street. It does no good if the plan only contracts with NYC hospitals. Because only plans that provide adequate *local* options are viable, the fact that Blue Cross offers services to JP Morgan covered lives in both New York and New Jersey – and that it contracts with health care providers in both localities – says *nothing* about the existence or size of local provider markets. It certainly does not negate the existence of such markets within New York, New Jersey, Connecticut Tri-State area for which insurers *must* have provider options. Indeed, the fact that insurers contract with local New Jersey providers demonstrates the existence of local markets (and disproves Defendant's contention of a single broad geographic market), otherwise insurers would forego the expense and inconvenience of local contracting opportunities in favor of contracting with New York hospitals. In any event, your proposed limitation to plans that include New Jersey covered lives only goes to the issue of geographic markets, not product markets. As we previously explained, HSS is a specialty provider that does not compete with full service GAC hospitals.

[9] In your email, you propose limiting Request 13 to documents sufficient to show advertising targeted at Northern New Jersey. This proposed limitation is also illusory and reflects a basic misunderstanding of how media markets work. New York and Northern New Jersey constitute a single media market. Moreover, focusing just on advertising that may happen to reach a New Jersey resident is highly misleading. As the *world's* leading specialists in orthopedic surgery, HSS's geographic reach is far broader than that served by traditional GAC hospitals, which have limited primary and secondary service areas. Indeed, because "[p]eople travel from all 50 states and more than 80 countries to see our world-class specialists," HSS even has a "travel assistance program," called the "Coast-to-Coast" program. *See* www.hss.edu/coast-to-coast.asp. Run-of-the-mill GAC hospitals have nothing like this. For this reason, comparing HSS's service area to Englewood's is just as improper as comparing apples to oranges.



Page 6

As the above shows, your email fails to address the specific concerns we have raised in our objections. We look forward to discussing them during our upcoming meet and confer.

Sincerely,

/s *Colin R. Kass*