# EXHIBIT 6



35 W. Wacker Drive
Chicago, IL 60601
T +1 312 558 5600
F +1 312 558 5700

**HEATHER LAMBERG**
Partner
+1 202 282 5274
HLamberg@winston.com

February 3, 2021

By Email
Colin Kass, Esq.
Proskauer Rose LLP
1001 Pennsylvania Ave NW, Suite 400 South
Washington, DC 20004
ckass@proskauer.com

**Re:    Subpoena to the Hospital for Special Surgery** – *FTC v. Hackensack Meridian Health, Inc. et al.*, No. 2:20-cv-18140 (D.N.J.)

Dear Colin:

We write in response to your February 1, 2021 letter and further to our ongoing discussion of Englewood's subpoena to HSS, and HSS's objections to producing any documents in response.

As we noted, we are available to meet and confer on Thursday at 10:00 am EST, the time your letter proposed, and sent a calendar invitation and dial-in. We can discuss HSS's objections further on our call, but respond briefly to your primary points.

First, your letter has it backward when it claims there is a "threshold question of whether HSS and the defendants are competitors in the alleged market" before discovery can be taken from HSS. This is not a threshold question, but rather begs several of the ultimate questions that the Court—not the subject of a third-party subpoena—will have to reach. Who competes with the defendants and whether the FTC can prove its alleged market definition are at the core of the contested merits issues in this case. While we understand you may disagree with our arguments, the Federal Rules regarding discovery do not start with the conclusion that the plaintiff is right and then limit discovery only to facts that fit the plaintiff's theory. *See Groark v. Timek*, 989 F. Supp. 2d 378, 397 (D.N.J. 2013) ("Rule 26 does not limit discovery to evidence which tends to prove plaintiff's claim"). Rather, Englewood and HMH are entitled to discovery to rebut the FTC's alleged product and geographic market definition. Indeed, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claims or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

In the FTC's recent *Jefferson/Einstein* hospital merger challenge, a third-party unsuccessfully resisted a subpoena on similar grounds as HSS now asserts, arguing that it was "not a direct competitor of Jefferson or Einstein" because its services did not fall within the market alleged in the complaint. The court rejected this, explaining:



February 3, 2021
Page 2

> Shannondell [a third party] first contends that the subpoenas seek information that is not relevant because Shannondell "is not a direct competitor of Jefferson or Einstein." In making this argument, Shannondell relies on the Complaint's allegation that "subacute rehabilitation services provided at skilled nursing facilities are not included in the market for inpatient acute rehabilitation services." The information that the parties seek from Shannondell, however, is relevant to Einstein's rebuttal of Plaintiffs' claims.
> \*   \*   \*
> The discovery requested from Shannondell is relevant to Einstein's defense concerning whether Shannondell, in fact, exists as a competitor for acute rehabilitation services in the proper relevant market. Indeed, because Einstein contends that Shannondell's services compete with those of Einstein and Jefferson, the subpoena requests are relevant to evaluating both the product and geographic market.

*Fed. Trade Comm'n v. Thomas Jefferson Univ.*, 2020 WL 3034809, at \*2 (E.D. Pa. June 5, 2020) (internal citations omitted).

It is also incorrect to suggest that HSS—although it provides inpatient acute care hospital services and draws patients from Northern New Jersey—is wholly irrelevant because it may not provide *each and every* service within the FTC's alleged inpatient GAC hospital services market. To the contrary, the FTC has expressly advocated that specialty hospitals should be included in relevant GAC services markets. Notably, in *Jefferson/Einstein*, the FTC included at least four specialized third-party hospitals in its alleged relevant GAC services markets, including a specialized surgical hospital, two cancer specialist hospitals, and a children's hospital. *See, e.g.*, Pltfs' Proposed Findings of Fact & Conclusions of Law, *Fed. Trade Comm'n v. Thomas Jefferson Univ.*, No. 2:20-cv-01113-GJP, ECF No. 266 at 7-8 (E.D. Pa. Oct. 12, 2020) (including Physicians Care Surgical Hospital; Fox Chase Cancer Center; Cancer Treatment Centers of America, Philadelphia; and St. Christopher's Hospital for Children within alleged relevant GAC Services markets).[1]

---

[1] The out-of-circuit cases cited in your letter do not support the definition of GAC inpatient hospital services that HSS advocates and certainly do not stand for the proposition that discovery of HSS is not relevant to defendants' rebuttal case. In *FTC v. Butterworth Health Corporation*, the FTC argued that GAC inpatient hospital services was a relevant market defined as "a common host of distinct services and capabilities that are necessary to meet the medical, surgical, and other needs of inpatients, e.g. operating rooms, anesthesia, intensive care capabilities, 24-hour nursing care, lodging, pharmaceuticals." 946 F. Supp. 1285, 1290 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708 (6th Cir. 1997). The court rejected the defendants' argument that outpatient services should also be included in the relevant market, but did not make any ruling limiting the alleged inpatient GAC market to exclude specialized hospitals. *Id* (in addition, in footnote 5 the court actually "questions the reliability of the cluster approach in evaluating hospital mergers in today's evolving and increasingly complex world of health care services"). Indeed, HSS would fall within the relevant services market definition in *Butterworth*, as it provides services to "meet the medical, surgical, and other needs of inpatients" such as "operating rooms, anesthesia, intensive care capabilities, 24-hour nursing care, lodging, [and] pharmaceuticals," and operates its HSS Main Campus inpatient facility just 13 miles from Englewood. The other two cases cited in HSS's Objections and Responses—*FTC v. Tenet Healthcare Corporation*, 17 F. Supp. 2d 937 (E.D. Mo. 1998) and *FTC v. OSF Healthcare Systems and Rockford Health System*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012)—do not grapple with the definition of inpatient GAC hospital services.



February 3, 2021
Page 3

Moreover, HSS falls unambiguously within the definition of "Inpatient GAC Hospital Services" used in the FTC's own subpoena to HSS.[2] The FTC's definitions are also inconsistent with your conception that to be relevant for discovery purposes in a "cluster market" case, a competitor must provide all of the clustered services. Indeed, the FTC defines "Relevant Services" to encompass "all Inpatient GAC Hospital Services, collectively and individually" and "Hospital" to be a provider of "Inpatient GAC Hospital Services, collectively or individually." Id. at D10, D30 (emphasis added). Under any of these definitions, HSS is a relevant provider of Inpatient GAC Hospital Services for discovery purposes, without regard to whether it is specialized in orthopedic and musculoskeletal issues. Likewise, Englewood's subpoena defines "GAC" simply as the acronym it is, meaning "general acute care" services – not as a "broad cluster" of services in which market participants must perform each and every service.

Second, HSS is relevant because it plainly offers many competing services within the alleged inpatient GAC hospital services market, such as operating an inpatient hospital with a wide array of medical, surgical, and diagnostic services, including operating rooms, anesthesia, 24-hour nursing care, and pharmaceuticals. See Compl. ¶ 32. Putting aside your unsupported argument that tertiary and quaternary care are not part of the relevant market,[3] HSS still provides primary and secondary care, including identifying on its website primary care services from neurologists, osteoporosis and metabolic bone physicians, pain management physicians, physiatrists, podiatrists, and primary sports medicine physicians. See https://www.hss.edu/find-a-doctor.asp. And while HSS may be focused on musculoskeletal conditions, its services include those of anesthesiologists, internal medicine physicians, neurologists, pathologists, psychiatrists, psychologists, and radiologists. Id. These are all services in which Englewood and HMH compete, along with many other hospitals in the Northern New Jersey/New York area.

Your letter is also mistaken in its argument to exclude tertiary and quaternary services from the alleged relevant market. The cases you cite for that point in HSS's Objections and Responses, do not support this point. In Butterworth, tertiary services were included in the GAC inpatient services market. 946 F. Supp. at 1297-98 (discussing competition for tertiary services in the market). And in Tenet Healthcare and OSF Healthcare, the issue was not disputed or resolved by the court. See Tenet Healthcare, 17 F. Supp. 2d at 942; OSF Healthcare, 852 F. Supp. 2d at 1076. Here, however, the Complaint expressly alleges that Defendants' investment in growing their tertiary and quaternary care is one of the relevant forms of non-price competition between them that may be affected by the proposed transaction. Compl.

---

[2] "[T]he provision of Inpatient Services (including any Physician Services that may be provided on an inpatient basis) for medical diagnosis, Treatment, and care of physically injured or sick individuals with short-term or episodic health problems or infirmities, excluding non-acute long-term services (e.g., skilled nursing care) and the treatment of mental illness or substance abuse." See FTC Subpoena to HSS dated January 12, 2021 at D15. The FTC's subpoena further defines "Inpatient Services" as "the provision of medical services that require at least one overnight stay at a Provider or at least 24-hour nursing care, including any Physician Services rendered as part of the inpatient Treatment." Id. at D16.

[3] HSS's contention that "tertiary services fall outside of the alleged GAC service market" is not supported by the case, Butterworth, it relies upon or the FTC allegations in this case. See HSS R&Os Gen. Objections ¶ 3. The language HSS cites from the Butterworth case is a definition of the term tertiary, not a determination that tertiary services "fall outside" of an alleged GAC service market. 946 F. Supp. at 1288 n.2. Moreover, the FTC's alleged product market includes "all such services where both HMH and Englewood sell and provide to commercial insurers and their enrollees overlapping services" – both HMH and Englewood provide tertiary services, including orthopedic surgery.



February 3, 2021
Page 4

¶¶ 58-60. The Complaint further alleges that the relevant service market includes all overlapping inpatient GAC services between Englewood and HMH that are sold and provided to commercial insurers and their enrollees – without any restriction limiting that definition to only primary and secondary services. *Id.* ¶ 32. In short, HSS's services are either in the relevant service market as alleged, or clearly relevant to it.

Moreover, HSS's relevance to the geographic market allegations is manifest in that HSS has specifically targeted Northern New Jersey—particularly Bergen Country—for strategic investments since at least 2014. As noted in our January 30 email, when HSS opened its Paramus facility, HSS's CEO explained that "the New Jersey market is an important part of the hospital's growth strategy." HSS, *Hospital for Special Surgery Opens New Location in Paramus, New Jersey* (Nov. 17, 2014), https://www.hss.edu/newsroom_hss-new-location-paramus-new-jersey.asp. While the Paramus facility provides outpatient care, it was clearly an intended and actual driver of patients needing inpatient services to the HSS Main Campus in Manhattan – as the 2014 press release states, "HSS already attract[ed] a large patient population from northern New Jersey" and "if surgery is needed, it would be performed at the main hospital in Manhattan." *Id.* The HSS Paramus location has clearly been a success, as HSS further invested to expand it in 2017. https://www.hss.edu/newsroom_hss-paramus-outpatient-center-rehabilitation.asp. In 2018, HSS further deepened its presence in Englewood with a another new "strategic investment" to create the first Ivy Rehab HSS Physical Therapy Center of Excellence in Englewood. https://news.hss.edu/hss-and-ivy-rehab-to-create-physical-therapy-centers-of-excellence-nationwide/. We also understand that HSS may have recently entered a direct contract with Horizon BCBS, New Jersey's Blue Cross Blue Shield insurer. Discovery of New Jersey residents traveling to New York to receive inpatient services—and HSS's efforts to expand in New Jersey and target New Jersey residents—is relevant to resolving the geographic market allegations. This is especially true when the "phenomenon in which residents of New Jersey travel to New York to receive inpatient services" (as the FTC defines "outmigration" in its subpoena) is among the highest for orthopedic services that HSS performs.

Third, you baselessly accuse us of "scorched-earth discovery tactics" because we issued a number of subpoenas to third-party providers promptly upon discovery opening in this matter.[4] We have proceeded expeditiously under the time constraints of this matter, where discovery opened on January 4 and will close on March 12. We believe that Defendants face many competitors in the Northern New Jersey/New York area and our subpoenas have targeted them, along with seeking information from payors, other market participants, and witnesses identified by the FTC.

To your remaining points, each of our discovery requests is tailored to relevant information that HSS uniquely possesses.[5] Your February 1 letter simply accuses us of restating some requests without

---

[4] We also disagree with your letter's Footnote 5 that suggests there is some connection between how much we disclose to you about our discovery efforts with other non-parties and our ability to argue that the subpoena is reasonable because others have responded to it.

[5] Your argument that "discovery related to competitive substitutes insurers consider or that Englewood reacts to in setting rates can more efficiently be obtained directly from your own files or that of the insurers themselves" is doubly misplaced. First, while Englewood certainly has documents about competitors that *Englewood* reacts to in setting rates, its files do not contain documents about competitors that *HSS* reacts to. And while some documents reflecting HSS's negotiations with payors can be obtained from payors, (a) those documents would not reflect HSS's unique internal consideration of competitive pressures, and (b) you give no reason why it is "more efficient" to obtain them from payors. Indeed, we must go through the same process of



February 3, 2021<br>Page 5

modification in our January 30 email.  We disagree with that, but more importantly you do not make any argument challenging the relevance of the majority of our requests, other than your general objection that you do not consider HSS to be in the alleged relevant product market.  Indeed, for Requests Nos. 2-7, 10, and 12 you state only that HSS has already complied or that our narrowing proposal did not significantly narrow them.  For Request No. 9, regarding payor negotiations, your long footnote acknowledges that our "proposed limitation to plans that include New Jersey covered lives" goes to the issue of geographic markets, and returns again to your argument that HSS does not compete for all services within the alleged GAC cluster.  For Request No. 13, regarding advertising, you seem to be acknowledging that HSS's "geographic reach" includes competing for patients in Northern New Jersey and admitting that it advertises in New Jersey, but then arguing that all of that is irrelevant because HSS also advertises in a broader geographic area.  We do not agree with that logic and understand that HSS has targeted New Jersey with advertising, including advertising on billboards in New Jersey and NJ Transit.  Once again, your argument seems to reduce to your belief that HSS is irrelevant because it has a specialty in orthopedics, which we addressed previously.

      As we have offered, and continue to offer, we are willing to work with HSS to limit its burdens reasonably, while balancing our need for discovery.[6]  If HSS has concerns about the scope of particular requests or suggestions for how its search might be focused, we welcome that discussion.  When we speak on Thursday, we hope to determine whether a productive compromise is possible.  Unfortunately, due to the extremely tight timeline of this case, we must proceed quickly to resolve any disputes.

      We look forward to talking with you and hope this letter helps resolve the issues you have raised.

Best regards,

*/s/ Heather Lamberg*

Heather Lamberg

---

subpoenaing non-party payors to obtain information that we must go through with HSS and, while we have sent subpoenas to some payors, HSS contracts with several other payors (*see* https://www.hss.edu/insurance.asp.) that would each require a separate subpoena in order to obtain their HSS-negotiation information.  In short, HSS possesses relevant documents that are both unique and/or can most efficiently be obtained from HSS.

[6] Your letter also states with no support that there is a "requirement" for defendants to compensate HSS for responding to the subpoena.  We are not aware of such a requirement and do not believe cost-shifting is justified in these circumstances, however we will review the issue if HSS provides information on its plan for providing responsive information and the expected costs associated with that plan.