```
                      UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY

FEDERAL TRADE COMMISSION,          .
                                   .
        Plaintiff,                 .
                                   . Case No. 20-cv-18140
vs.                                .
                                   . Newark, New Jersey
HACKENSACK MERIDIAN HEALTH,        . March 11, 2021
INC., et al.,                      .
                                   .
        Defendants.                .


                        TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JAMES B. CLARK, III
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via teleconference):

 For the Government:        JONATHAN LASKEN, ESQ.
                            Federal Trade Commission
                            Bureau of Competition
                            600 Pennsylvania Avenue NW
                            Washington, DC 20580
                            (202) 326-2604
                            jlasken@ftc.gov

                            LINDSEY BOHL, ESQ.
                            Federal Trade Commission
                            Bureau of Competition
                            400 7th Street, SW
                            Washington, DC 20024
                            (202) 326-2805
                            lbohl@ftc.gov


Audio Operator:

Transcription Service:      KING TRANSCRIPTION SERVICES
                            3 South Corporate Drive, Suite 203
                            Riverdale, NJ  07457
                            (973) 237-6080


Proceedings recorded by electronic sound recording (not all
parties were discernible on the record); transcript produced
by transcription service.
```

```
 1   (APPEARANCES continued)

 2
     For the Government:    EMILY BOWNE, ESQ.
 3                          1733 Abbey Oak Drive
                            Vienna, VA 22182
 4                          (202) 326-2552
                            ebowne@ftc.gov
 5
                            CHARLES E. DICKINSON, ESQ.
 6                          Federal Trade Commission
                            Bureau of Competition
 7                          400 7th Street SW
                            Washington, DC 20024
 8                          (202) 326-2617
                            cdickinson@ftc.gov
 9

10   For the Defendant      LEE ROACH, ESQ.
     Hackensack Meridian    Faegre Drinker Biddle & Reath LLP
11   Health, Inc.:          1500 K Street, N.W.
                            Washington, DC 20005-1209
12                          (202) 230-5129
                            lee.roach@faegredrinker.com
13
                            DANIEL J. DELANEY, ESQ.
14                          Faegre Drinker Biddle & Reath LLP
                            191 N. Wacker Drive, Suite 3700
15                          Chicago, Illinois 60606
                            (312) 569-1175
16                          daniel.delaney@faegredrinker.com

17                          PAUL H. SAINT-ANTOINE, ESQ.
                            Drinker Biddle & Reath LLP
18                          One Logan Square
                            18th & Cherry Streets
19                          Philadelphia, PA 19103-6996
                            (215) 988-2700
20                          Paul.Saint-Antoine@dbr.com

21
     For the Defendant      JAMES BUCCI, ESQ.
22   Englewood             Genova Burns LLC
     Healthcare            2 Riverside Drive, Suite 502
23   Foundation:           Camden, NJ 08103
                            (856) 968-0686
24                          Jbucci@genovaburns.com

25
```

```
 1  (APPEARANCES continued)

 2  For the Defendant      HEATHER P. LAMBERG, ESQ.
    Englewood              Winston & Strawn LLP
 3  Healthcare             1901 L Street NW
    Foundation:            Washington, D.C.  20036
 4                         (202) 282-5274
                           Hlamberg@winston.com
 5
                           JEFFREY J. AMATO, ESQ.
 6                         Winston & Strawn LLP
                           200 Park Avenue
 7                         New York, NY  10166-4193
                           (212) 294-4685
 8                         Jamato@winston.com

 9                         DAVID E. DAHLQUIST, ESQ.
                           Winston & Strawn LLP
10                         35 W. Wacker Drive
                           Chicago, IL 60601-9703
11                         (312) 558-5660
                           Ddahlquist@winston.com
12
                           JEFFREY L. KESSLER, ESQ.
13                         Winston & Strawn LLP
                           200 Park Avenue
14                         New York, NY  010166-4193
                           (212) 294-4698
15                         jkessler@winston.com

16
    For Hospital for       COLIN KASS, ESQ.
17  Special Surgery:       Proskauer Rose LLP
                           1001 Pennsylvania Ave, N.W.
18                         Washington, District of Columbia
                           20004-2533
19                         (202) 416-6890
                           Ckass@proskauer.com
20
                           DAVID A. MUNKITTRICK, ESQ.
21                         Proskauer Rose LLP
                           Eleven Times Square
22                         New York, New York  10036-8299
                           (212) 969-3226
23                         Dmunkittrick@proskauer.com

24

25
```

```
 1  (APPEARANCES continued)

 2
    For Hospital for        EDWARD S. KORNREICH, ESQ.
 3  Special Surgery:        Proskauer Rose LLP
                            Eleven Times Square
 4                          New York, New York  10036-8299
                            (212) 969-3395
 5                          Ekornreich@proskauer.com

 6
    For New York            JOHN E. STEREN, ESQ.
 7  Presbyterian:           Epstein Becker and Green
                            1227 25th Street, NW
 8                          Suite 700
                            Washington, DC 20037
 9                          (202) 861-1825
                            esteren@ebglaw.com
10
                            MARK E. LUTES, ESQ.
11                          Epstein Becker and Green
                            1227 25th Street, NW
12                          Suite 700
                            Washington, DC 20037
13                          (202) 861-1824
                            mlutes@ebglaw.com
14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2

3    Proceeding                                        Page

4     Proceedings                                        6

5     The Court's ruling on subpoena to Hospital For     28
      Special Surgery
6
      The Court's ruling on 30(b)(6) deposition of the   44
7     FTC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (Commencement of proceedings)

 2

 3          THE COURT:  Hey, folks, Judge Clark here.  Let me

 4  say before we get started, we're on the record in FTC versus

 5  Hackensack Meridian Health, et al. It's Docket

 6  Number 20-18140 (JMV).  And it is about 1:35 in the afternoon

 7  of March 11th, 2021.

 8          Can we have appearances of counsel, please.

 9          MR. LASKEN:  Good afternoon, Your Honor.  This is

10  Jonathan Lasken from the FTC.  With me on the line are

11  Mr. Charles Dickinson, Ms. Emily Bowne, and Ms. Lindsey Bohl

12  appearing for the FTC today.

13          THE COURT:  Good afternoon.

14          MR. LASKEN:  Good afternoon.

15          MR. SAINT-ANTOINE:  Good afternoon, Your Honor.

16  This is Paul Saint-Antoine of Faegre Drinker Biddle Reath on

17  behalf of Hackensack Meridian.  And also on the phone are my

18  colleagues Lee Roach and Dan Delaney.

19          THE COURT:  All right.  Good afternoon.

20          MR. KESSLER:  Good afternoon, Your Honor.  This is

21  Jeffrey Kessler from Winston & Strawn appearing for

22  Englewood.  And with me on the phone are my colleagues David

23  Dahlquist, Heather Lamberg, and Jeffrey Amato.

24          THE COURT:  All right.  Good afternoon.

25          MR. BUCCI:  And, Your Honor, Jim Bucci, from Genova

1   Burns, local counsel for Englewood.

2              THE COURT:  Good afternoon.  Is that --

3              MR. KASS:  Good afternoon, Your Honor.  This is

4   Colin Kass, Proskauer, on behalf of the Hospital For Special

5   Surgery, HSS.  With me is Ed Kornreich and David Munkittrick.

6              THE COURT:  Good afternoon.

7              And for New York Presbyterian?

8              MR. STEREN:  Good afternoon, Your Honor.  This is

9   John Steren from Epstein Becker & Green.  And with me on the

10  phone is my partner Mark Lutes.

11             Okay.  Well, welcome all.  It's a full house today,

12  even though we are doing it virtually.

13             I have a number of issues we need to tackle.  We

14  had a call about two weeks ago, and you've done a lot of

15  things since then, and we've received a lot of briefs and a

16  lot of letters, and I want to try and attack these issues --

17  or, you know, to resolve them -- I don't say attack them --

18  as quickly as possible, because I know everybody's on a tight

19  schedule, and we want to keep the case moving along.

20             I think I'll deal -- I'm going to have to deal with

21  the issues one at a time, unless they're logically grouped.

22  And I want to touch on the first issue, which is the

23  Englewood Hospital subpoena to the Hospital of Special

24  Surgery.  I have Document Number 98 -- Document Number 98 on

25  the docket is the motion by the Hospital of Special Surgery

1    seeking to quash the subpoena.  And that's dated March 2nd,

2    2021.  And I have the reply -- or the response from

3    Englewood.  It's Number 116 on the docket, and that's dated

4    March 9th, 2021.

5            I've reviewed the briefs, and I think I understand

6    the general -- the gist of the argument.  I'm happy to hear

7    from you briefly.  You know -- and I would, you know, urge

8    and caution folks not to replow the field that has been

9    plowed in the briefs.  But if you -- if there's something you

10   want to add, I'm more than happy to hear from you.  So, you

11   know, it's Hospital For Special Surgery's motion.

12           So, Mr. Kass, anybody on your team want to address

13   it?  Or are the papers sufficient?

14           MR. KASS:  Yes, Your Honor, we would like to

15   address a few points, particularly points that arose from the

16   response that Englewood filed the other day.

17           I think when you look at the briefing, you'll see

18   that the facts are not really in dispute by anyone.  They're

19   not in dispute by us.  They're not in dispute by the FTC.

20   And they're not in dispute by the defendants.

21           We are a specialty hospital.  We only do

22   orthopedics.  We don't provide the comprehensive care that

23   insurers need to have in their networks.  Englewood doesn't

24   deny that.  And over their 2 million documents that they

25   produced and their 10 insurers that they subpoenaed and the

1   13 other GAC hospitals that they subpoenaed, they haven't

2   come up with any evidence of any threats by any insurer to

3   drop the defendants in favor of HSS primarily because we

4   don't do it, and we can't do it, and under the regulations we

5   can't do it.

6          Now, I'd like to talk about the -- you know, the

7   legal analysis that underlies the parties' position, because

8   Englewood's position is based on a clear error of law.  But

9   before I do that, I'd like to address specifically three key

10  cases that are in the papers.  The first one is the FTC

11  challenge to Advocate -- to Advocate Health.  That's a

12  Seventh Circuit case.  And Englewood relies on this case as

13  their key case to show that specialty hospitals are included

14  in a GAC market.

15         But they actually misread the case that they

16  themselves cite.  The expert in that case, the FTC expert,

17  included local hospitals but excluded what he called

18  destination hospitals, which included academic hospitals,

19  specialty hospitals, like cancer hospitals, and children's

20  hospitals.  And I don't know whether when Englewood's counsel

21  was reading the brief, they just missed the word "excluded,"

22  but that is, in fact, what the expert did.  They excluded

23  specialty hospitals from the relevant market.

24         And what the district court said was, well, why did

25  you do that?  That doesn't make any sense.

1            And didn't grant the preliminary injunction.

2            But the Seventh Circuit then reversed the district

3     court saying that these destination hospitals, these

4     specialty hospitals are not properly considered part of the

5     relevant market because they face different sets of demands.

6     So academic hospitals, even though they provide exactly the

7     same services as local GAC hospitals, are not properly

8     considered part of the relevant market under the Seventh

9     Circuit's decision in Advocate Health, which is exactly what

10    we're saying in our brief.  Orthopedic services, specialty

11    services just simply are not a substitute for having a local

12    hospital that employees and their families can turn to when

13    they need them.  That's the first case I'd like to talk

14    about.

15            THE COURT:  All right.

16            MR. KASS:  The second case -- sorry?

17            THE COURT:  No.  Go ahead.  I just said "all

18    right," assuring you that I'm still here and I'm listening

19    carefully.

20            MR. KASS:  Thank you.

21            The second case I'd like to talk about is Aggrenox,

22    In re Aggrenox Antitrust Litigation.  And that is a case,

23    it's one of the many that we cited in which the court held

24    that -- marked that products outside the alleged relevant

25    market are not proper for discovery.  And in that case,

 1  the -- the plaintiffs alleged that there was a market for

 2  Aggrenox, which is branded pharmaceutical and its generic

 3  equivalents.

 4          The defendants said, no, we want to undermine and

 5  challenge that market definition by looking to other branded

 6  pharmaceutical products that may compete at the branded

 7  leveled with Aggrenox.

 8          What the court held was discovery would be

 9  inappropriate and denied discovery of these other products

10  precisely because, as the court said, the effect of any of

11  these other products, if there was any, would -- requires no

12  evidence that is not already possessed by the defendants,

13  which is exactly what we said in this case, if there is

14  competition between HSS, if an insurer has ever threatened to

15  replace the defendants with HSS, Englewood and Hackensack

16  would know about it, and they would have it in their files.

17  And if they didn't have it in their files, the insurers, the

18  ten insurers that cover almost all of the market would have

19  it in their files.

20          So that's the other case that we'd like to point

21  out.  And importantly Englewood does not address this case in

22  their brief.

23          The third case that I'd like to talk about is --

24  and it's actually two cases but they're of a kind.  One is *In*

25  *re* Apple Antitrust Litigation, and the other is *In re* eBay

 1    Antitrust Litigation.  That is a case where both courts held

 2    that the substantial need test of Rule 45(d)(3)(C) applies to

 3    exactly the same kinds of documents Englewood is seeking from

 4    HSS here.  That is competitive strategies -- you know,

 5    competitive strategies concerning -- in that case, there was,

 6    you know, the technology markets at issue -- and the courts

 7    held that the substantial need test applies and that that

 8    test was not satisfied.

 9            And, again, Englewood does not address either of

10    those two cases in this -- in their brief.

11            So with that as background, I'd like to just spend,

12    you know, a brief minute on the substantial need test,

13    because, this, again, is where Englewood is leading the court

14    into clear error.  What Englewood says is that

15    Rule 45(d)(3)(C) does not apply and the substantial need test

16    does not apply.  They make no effort whatsoever to satisfy

17    the substantial test.  They simply say that it does not

18    apply.

19            They are wrong.  The Apple, eBay cases that I just

20    mentioned established that it does apply.

21            But what is Englewood's argument as to why it does

22    not apply?  Well, they said there's a protective order.  They

23    say a protective order is a silver bullet to avoid any motion

24    to quash under 45(d)(3)(C) and that is simply not the case.

25            Under the rules, Rule 45(d)(3)(C) is triggered as

 1   long as a subpoena requests confidential commercial

 2   information.  There is no dispute here that the subpoena

 3   seeks HSS's confidential commercial information.  Once a

 4   subpoena requests that information, the rules make it clear

 5   that the burden shifts to the requesting party to show a

 6   substantial need that cannot otherwise be met.  If they meet

 7   that burden, if they meet that burden, then the court has to

 8   balance the interests of the requesting party and the

 9   subpoenaed party factoring in issues of burden and --

10   confidential information, and a protective order might be

11   relevant at that point.

12        But the threshold requirement is that they

13   establish a substantial need that cannot otherwise be met.

14        Now, Englewood has two responses to that.  First,

15   what they say is that -- is they point to other cases that

16   are not brought under 45(d)(3)(C) saying that the standard is

17   really one of relevance under Rule 26 and question the

18   burden.

19        That is incorrect.  If we had brought a motion

20   under 45(d)(1), which is what their Gould case that they cite

21   repeatedly, was, a motion under 45(d)(1), that would be

22   correct.  That -- motions under 45(d)(1) focus on burden and

23   proportionality as in Rule 26; it's a heightened standard

24   because of burden.  But that rule does not apply to motions

25   like ours, which is brought under 45(d)(3)(C).  Okay?  Under

1   45(d)(3)(C), it's the substantial need test that applies.

2          Englewood's next argument is that, well, not every

3   single one of their request seeks confidential information.

4   And they point to only one request out of their many

5   requests, which is their last request, really, into

6   advertising, RFP 13.  They say, well, RFP 13 seeks publicly

7   available information, and, in fact, they include it in their

8   brief, an example of HSS's advertising.

9          Okay.  So is there one request that seeks public

10  information?  Yes.  There is.  That is the tail wagging the

11  dog.  Virtually all of their requests and all of their

12  requests other than 13 seeks our confidential information

13  which triggers the substantial need test.

14         I don't want to get down a rabbit hole on this one

15  RFP 13.  Suffice it to say that even under the rule of

16  proportionality under Rule 26, they do not need further

17  information about our advertising primarily because they

18  already have it.  They've attached it to their brief.  Two,

19  it's not relevant because it is focused on patient decisions,

20  not insurer decisions, and the insurer network decisions is

21  what this case is all about.  And that's what the Third

22  Circuit held in Penn State.  It's what the Seventh Circuit

23  held in Advocate and in Evanston before that.  And that's

24  what all of the cases have held for the last 10 or 15 years,

25  including their favorite case, which is Jefferson that said

1   focusing on the patient is incorrect.  You have to focus on

2   the insurers.  And, in fact, the FTC lost the <u>Jefferson</u> case

3   primarily because they lost sight of their own learning,

4   which is you have to focus on the insurers, not the patients.

5   And advertising only goes to patients; it doesn't go to

6   insurers, which is Stage 1 of the two-stage competition that

7   the Third Circuit identified in <u>Penn State</u>.

8          So for those reasons, we believe the substantial

9   need test applies.  We don't think that they've made any

10  showing whatsoever that the substantial need test is

11  satisfied.  Again, the concept -- their concept that somehow

12  we could replace -- that we could replace the defendants in

13  insurer networks, you know, makes no sense for a couple of

14  reasons.  One, the regulation itself in New Jersey says that

15  insurers that do business in Bergen County, that have

16  covered -- in Bergen County, must contract with a local acute

17  hospital.  They do not deny -- Englewood does not deny that

18  HSS does not fit within the geographic range of that statute,

19  and they do not deny that we are not an acute care hospital

20  that fits the definition of that regulation.

21         Instead, what they say is, well, that statute only

22  applies to "managed care plan," as though somehow a managed

23  care plan is a small percentage of the market.  That's what

24  they would like you to believe.  They don't actually say it.

25  And they can't say it because -- virtually hospital -- every

1    healthcare plan that every employee is on, which is what this

2    case is about, is a managed care plan.  Under the applicable

3    regulation, a managed care plan is basically a plan in which

4    the insurer has a provider network.  Exactly what we're

5    talking about here.  That's number one.

6              Number two, they say, well, we provide -- Englewood

7    says, well, we provide some services for orthopedic patients

8    in Bergen County.  There's no question that we do.  I mean,

9    we do have orthopedic services, outpatient orthopedic

10   services in Bergen County.  But outpatient services are not

11   part of the alleged relevant market, and they're not a

12   substitute for having inpatient local GAC hospitals.

13             And so for those reasons, you know, they cannot

14   establish that -- you know, they cannot establish that they

15   have a need for discovery from us, particularly in light of

16   the fact that they've subpoenaed and released 12 of 13 other

17   full GAC hospitals that they claim compete.  If they can't

18   prove competition from 13 other GAC hospitals that offer all

19   of the same services that they offer and are basically the

20   same distance away as us, they're certainly not going to be

21   able to prove that HSS is the silver bullet that saves this

22   anticompetitive merger.  It's just not going to happen.  So

23   they can't establish a substantial need.

24             They also can't meet the second element of the

25   substantial need test, which is that their needs cannot

1   otherwise be met.  And, again, we invited them over and over

2   and over again to come forward with some evidence that we are

3   a threat.

4          But if that evidence exists, it is more than

5   covered by the -- it is more than covered by the subpoenas

6   that they've already issued and the 2 million documents that

7   they produced.

8          So I know there are other issues that were raised

9   by our motion, including the scope of the request and costs

10  and others things.  If the Court does not agree with our

11  position on the substantial need test, and I'd be happy to

12  address those.

13         But I will stop here unless the Court would like me

14  to address those issues --

15         THE COURT:  No.  I don't think that's necessary,

16  Mr. Kass.

17         I'd like to hear from -- well, is it Mr. Kessler,

18  are you going to do the speaking?  Or somebody else going to

19  do the speaking for Englewood.

20         MR. KESSLER:  This will be my partner, Heather

21  Lamberg on this one.

22         THE COURT:  All right.

23         Ms. Lamberg, they put a lot of stock in the

24  substantial need test.  What do you think?

25         MS. LAMBERG:  Good afternoon, Your Honor.  Heather

 1  Lamberg from Winston & Strawn.

 2          Yeah, so I would like to make a few points in

 3  response to Mr. Kass's arguments.

 4          I'd also just like to step back for a second,

 5  because I want to put -- make sure we have the context here.

 6          You know, first of all, we -- as you remember, we

 7  subpoenaed them on January 1st.  Sitting here today, we don't

 8  even have one document.  Not one.  We have tried, Your Honor,

 9  to work with them.  We tried to clarify, to narrow,

10  et cetera, but the heart of their argument is really it's not

11  relevant.

12          As you know, from their brief, they say, you know,

13  we don't fit in the FTC's alleged market for two reasons,

14  one, because we are not a general acute -- we don't provide

15  the full cluster of general acute care services, and then,

16  two, we only have one specialty service -- excuse me -- and,

17  two, because we are not in Bergen County; we are in New York.

18          But the problem with their argument, Your Honor, is

19  this.  This is a discovery dispute.  This is not the case

20  that Judge Vazquez is going to hear in May.  And the

21  discovery rules are really clear that we are not limited to

22  evidence that's only within the FTC's allegations.  We are

23  entitled to discovery to rebut those allegations as well.

24  And that is precisely what we are trying to do.  We have

25  tried to narrow our requests and further narrow it as we

1    learn more.  That's precisely what we're doing.

2            And here's why.  This is what I don't want to get

3    lost here.  I know HSS's main -- excuse me -- I always want

4    to say HHS.  HSS's main facility inpatient hospital is in

5    Manhattan.  But that's only six miles from Bergen County, the

6    FTC's alleged market.

7            And in addition to that, what are they doing in New

8    Jersey?  They're doing a lot, Your Honor.  They opened an

9    outpatient facility in Bergen County in 2014, expanded in

10   2017, open a rehab facility in Bergen County in 2018, opened

11   an urgent center in Bergen county in 2020.  Every single

12   public statement around those three openings or expansions

13   say the following:  We are doing this not only to serve

14   people in Bergen County with these outpatient facilities, but

15   we're doing it in addition, because when those patients need

16   inpatient care, we're going to bring them over to our

17   hospital in Manhattan.

18           They're also advertising in Northern New Jersey,

19   trying to drive New Jersey patients into their facilities,

20   including their Manhattan facility for inpatient treatment,

21   that is treatment that is -- can be done -- and many of that

22   treatment can be done in north -- in Bergen County, including

23   by the defendant hospitals here.

24           So what we know is that -- and it's not surprising,

25   Your Honor, given all of this effort that they sort of put

1    into targeting Northern New Jersey, that when we look at the

2    publicly available data -- now, granted, it's a little old

3    now.  I think it's -- I don't remember -- four years old.

4    But even that shows 19 percent of the discharges are coming

5    from Northern and Central New Jersey.  That is not by

6    happenstance.  That is by plan and design.  And that is

7    information related to those decisions, the rationale, and

8    driving our patients in Northern New Jersey back to New York.

9    That's what we want here, Your Honor.  That's --

10           And that is highly relevant for our argument that

11   the FTC's Bergen County-only market is not proper.  We think

12   that's what the --

13           THE COURT:  Ms. Lamberg.

14           MS. LAMBERG:  -- the fact that these hospitals are

15   seeking --

16           THE COURT:  Ms. Lamberg.

17           MS. LAMBERG:  Yes?

18           THE COURT:  -- a lot of this is -- I understand

19   what you're saying, and a lot of it is things that you said

20   in your papers.

21           I'm curious to know what your response is to the

22   substantial need argument Mr. Kass made.

23           MS. LAMBERG:  Sure.  Sure.

24           I think that -- two parts.  I think, number one, I

25   think whether -- whatever standard it is, we meet it, number

1  one.

2          I think that we -- we have shown that the

3  information that we are seeking is highly relevant to the

4  questions of relevant market.  It's highly relevant.  It's

5  not critical to show that Bergen County residents are

6  choosing New York hospitals for services that defendants

7  could have done, that New York residents are crossing the

8  bridge, despite the tolls, et cetera, that the FTC claims are

9  too burdensome.  And we can show that this information is

10  critical.

11          I will also say we can't get it elsewhere.

12  Mr. Kass wants to suggest that we can go and get this

13  information from the payors, that this information is in

14  Englewood's files or Hackensack's files.

15          Not if you actually look at our requests.  They're

16  not.  We are asking for things like this, Your Honor.  We're

17  asking for what is the -- documents about the strategic

18  rationale for why you are planting these facilities for New

19  Jersey.  How many of those -- it says patients in New Jersey

20  are being referred back to -- for inpatient care?  What -- of

21  the documents, what is your strategic rationale for directly

22  contracting with a New Jersey payor?  That stuff is not going

23  to be in my client's files, I can tell you that.  It's not

24  going to be in the payor's files.  It is only in their files.

25          So we have done our best to fill the gaps where we

1   can.  And we are only requesting information now that cannot

2   be achieved anywhere else.  I promise you, I would be not

3   going through this -- lengthy motion practice, et cetera, for

4   stuff I've already got.  I -- we just would not be doing

5   that.

6           So we think whatever the standard is here, we meet

7   it.

8           With respect to the case law, there is a case,

9   Your Honor, that is directly on point here.  It is a case

10  from last year in Eastern District of Pennsylvania, a merger

11  case, the FTC v. Jefferson.  Same -- very similar fact

12  pattern here, Your Honor.  A -- this is a -- subpoenas went

13  out --

14     (Simultaneous conversation)

15          THE COURT:  Do you have the citation for that case?

16          MS. LAMBERG:  Sure.  2020 WL 3034809.

17          THE COURT:  Okay.  Go ahead.

18          MS. LAMBERG:  Yes.  So just briefly -- I mean, it's

19  a very short, like, three- or four-page opinion.  But very

20  briefly, a third party objected.  The third party objected on

21  basically very similar grounds to what you're hearing from

22  Mr. Kass's client.  They said, listen, we're not a

23  competitor.  We're not in the alleged market.

24          And the details here are a little bit important.

25  So in that case, the FTC alleged both a general acute care

1    services market, like they did here.  But that really wasn't

2    at issue in the third-party dispute.

3            They also -- the FTC also alleged an inpatient

4    acute rehab -- rehabilitation services market.  And this

5    third party came in and said, hey, listen, we don't actually

6    fit within that alleged inpatient acute rehab services

7    market.  And we are not a competitor.  And here's why, they

8    said.  They said, actually, the FTC's own complaint, they

9    said -- this is -- they said that in the FTC's complaint,

10   they had a statement like the following, that subacute

11   rehabilitation services provided at skilled nursing

12   facilities are not included in the market, inpatient acute

13   rehabilitation services.  And that third-party's argument

14   was, hey, that's what I am.  I am a skilled nursing facility,

15   so I am not in the market.  I don't have to give any

16   documents.

17           And the court said, oh, no -- you are relevant to

18   the defendant's defense in this case about what -- what

19   whether you compete and whether you should be included in

20   that market.

21           We are doing the same thing here, Your Honor.

22   That's exactly the applicable case.

23           Some of the other cases --

24        (Simultaneous conversation)

25           THE COURT:  And isn't your defense also that

1   it's -- that the FTC's theory is flawed.  Right?

2              MS. LAMBERG:  Yeah, our -- I mean, obviously, we --

3   paper that we are -- we are taking issue with the alleged

4   relevance geographic market, and the information we're

5   seeking from HSS is directly going to that --

6              THE COURT:  Right.

7              MS. LAMBERG:  -- that dispute.  That is what we

8   are -- and we are only limiting at that point.  We've tried

9   to narrow it to really what we need.  And I wish I could just

10  get it from a public -- publicly available information.  But

11  there are some internal documents that we would like.

12             I'm frankly a little puzzled, Your Honor, like,

13  protest thou too much.  Why are we fighting so hard about

14  what's probably is very limited amount of documents here

15  about New Jersey, rather than just turning them over?  I

16  mean, it makes me think, wow, they must really think we're

17  competitors.  Because otherwise why would they -- why not

18  just hand them over?

19             But -- and anyway, I'm getting -- but going back

20  to -- I would -- the other thing I would like to briefly

21  mention, Your Honor, is burden.  We have not heard a -- other

22  than sort of a general boilerplate objection to burden that

23  you see in everybody's general objections and their responses

24  and objections.  They have articulated no burden here.

25  During one phone call, they had mentioned kind of casual

1    remarks of concern about conducting an ESI search.  And I

2    immediately assured them to say, you know, if we can come to

3    agreement on scope, we can identify custodians and do a --

4    ESI search.

5              I have heard nothing other than that.  And the

6    reason why we've heard nothing other than that is because

7    this is basically probably going to a handful of people and

8    asking them to pull a few documents in the end of the day.

9              So I think, you know, going back to sort of the

10   test, I think we -- we need it here.  It's critical

11   information to our case.  We can't get it from anywhere else.

12   And we -- I think the cases are clear that we are able to get

13   information relevant to our defense.

14             Two other really quick points, many of the cases --

15   and I am not going to take the time, unless Your Honor wants

16   me to, I'm happy to go through the cases, if you'd like,

17   but --

18             THE COURT:  No.  I want to keep --

19        (Simultaneous conversation)

20             MS. LAMBERG:  Some of the cases that they --

21        (Simultaneous conversation)

22             THE COURT:  -- I want to keep moving a little bit.

23   We've got a lot of -- to cover here --

24        (Simultaneous conversation)

25             MS. LAMBERG:  Okay.  Okay.  I would just -- suffice

1   it to say that we do not think the law out there says you can

2   only get discovery confined to the alleged market that the

3   plaintiffs are seeking, that if it goes to your defense or

4   criticism of that market, it is discoverable information.

5           And only one example -- and I promise I'll move on,

6   Your Honor -- is the FTC/Advocate case where they told you

7   that the court ultimately decided that the specialty

8   hospitals were not in the market at the end of the day.

9   That's after trial, Your Honor.  That doesn't mean that

10  information wasn't discoverable and that they couldn't use it

11  to inform what is the proper market.  That's what we're

12  trying to do here.  So I don't think that that is in any way

13  inconsistent with what we are arguing.

14          Of course, I will stop there.  If you want me to go

15  through the requests or talk about, you know, the cost

16  issues, I'm happy to do that as well.

17          THE COURT:  No, not necessary.

18          Mr. Kass, I'll give you brief opportunity to

19  respond, but I think I have the idea here.

20          MR. KASS:  Yes, Your Honor.

21          The only real issue I want to respond here is their

22  cite to <u>Jefferson</u>, the <u>Jefferson</u> case, on which, you know, is

23  what they rely on.  The court in that case did not deal with

24  a motion under 45(d)(3)(C).  What it did was it applied

25  the -- you know, the Rule 26 standard and did not apply the

1   26 -- I mean -- sorry -- the 45(b)(3)(C) standard, which is

2   what our motion is brought on.  The court did not actually

3   apply the correct test.

4          Now, substantively, why did the court reach the

5   conclusion that it did?  It's really because the nature of

6   the markets are so very different.  There, in that case, as

7   Englewood's counsel just explained, there were two relevant

8   markets, the GAC market and then this brand-new

9   rehabilitations market.  The brand-new rehabilitations

10  market, they were writing on sort of a clean slate.  The FTC

11  had never alleged a rehabilitation market in any other case

12  before, and, really, the contours weren't entirely clear.

13         That's entirely different than the GAC markets that

14  have been the bread and butter of FTC merger challenges for

15  two or three decades.  We even cited treatises that say that

16  in all -- in all cases that the FTC has brought, they have

17  alleged a GAC market, and the GAC cluster market has been

18  upheld in every single instance.  It's a product market

19  question.  It's not a geographic market question.  It is a

20  product market question.

21         And so when there was -- there was a question in

22  Jefferson about whether a particular competitor -- there, a

23  skilled nursing facility -- was competitive with an acute

24  rehabilitation center, which is not a hospital, it's a

25  rehabilitation market, the court said, yes, that's relevant.

1              Here, what we are saying is exactly that.  If --

2    were relevant, there would be some evidence that insurers

3    would actually view us as a substitute when they're creating

4    their network.  And there isn't that threshold showing that

5    is what they need to do to show that any discovery from HSS

6    is relevant, let alone that they need to come to HSS in order

7    to prove it.

8              So I'll stop there, Your Honor.

9              THE COURT:  All right.

10             Thank you, both of you.  You gave a fulsome

11   presentation in the briefs, and you've supplemented it well

12   with all of this argument today.  I really -- I want to rule

13   on this.  And I've got --

14       (Simultaneous conversation)

15             THE COURT:  I've got to move on to the other things

16   as well.  So I don't think I need any more argument on it.

17             Bergen County is served by six general acute

18   hospitals.  A general acute care hospital, as defined by the

19   FTC's complaint, is a hospital that provides a broad cluster

20   of hospital services, medical, surgical, and diagnostic

21   services requiring an overnight hospital stay.  The FTC

22   alleges that the relevant market in this case is no broader

23   than Bergen County, New Jersey.  The FTC claims that the

24   merger of Hackensack Meridian Hospital in Englewood would

25   mean that Hackensack Meridian would have control of three of

1   the six Bergen County general acute care hospitals.

2           Hospital for Special Surgery claims that it

3   specializes in orthopedic services, and Hospital for Special

4   Surgery argues that, given its narrow focus, it is not

5   seeking to replace other general acute care hospitals in the

6   area in insurer networks, and, thus, a document production

7   from Hospital For Special Surgery is not relevant in this

8   litigation.

9           Englewood, however, contends that the documents it

10  seeks are relevant to the litigation.  Englewood claims these

11  documents are relevant to Englewood's defense that the FTC's

12  definition of the cluster market is utterly flawed.

13  Englewood claims that it has narrowed the scope of the

14  subpoenas and that a self-collection by relevant custodians

15  would be acceptable.  Englewood seeks responses only to

16  Numbers -- to Request Number 4, 5, 6, 7, 9, 10, 12, and 13.

17          Discovery generally -- on the law, discovery sought

18  by a subpoena issued pursuant to Rule 45 must fall within the

19  scope of permissible discovery under Rule 26(b).  Rule 26 is

20  to be construed liberally in favor of disclosure, as

21  relevance is a broader inquiry at the discovery stage than at

22  the trial stage.

23          Pursuant to Rule 45(d)(3)(B)(i), a court may quash

24  or modify a subpoena where the subpoena requires disclosing a

25  trade secret or other confidential, research, development, or

 1  commercial information.  In the circumstances described in

 2  Rule 45(d)(3)(B), the court may, instead of quashing or

 3  modifying a subpoena, order appearance or production under

 4  specified conditions, if the serving party, one, shows a

 5  substantial need for the testimony or material that cannot be

 6  other met without undue hardship, and, two, ensures that the

 7  subpoenaed person will be reasonably compensated.

 8          I'd also note that a nonparty to an action is

 9  afforded greater protection from discovery than a normal

10  party and that in applying Rules 26 and 45, the court must

11  balance several competing factors in assessing the

12  reasonableness of a subpoena:  Relevance, the parties' need

13  for the documents, the breadth of the document requests, the

14  time period covered by the document request, the

15  particularity with which the documents are described, the

16  burden imposed, and the subpoenaed recipient's status as a

17  nonparty to the litigation.  Those are seven factors we have

18  to look at.

19          Generally, HSS -- the Hospital For Special Surgery

20  argues that the subpoena should be quashed pursuant to

21  Rule 45(d)(3)(B), (C), because the subpoena implicates

22  confidential commercial information.  Hospital For Special

23  Surgery claims that Englewood cannot establish a substantial

24  need for the information it seeks from Hospital For Special

25  Surgery and that this need cannot be otherwise met.

1          First, the Hospital For Special Surgery argues that

2     Englewood cannot establish a substantial need that the

3     documents requested -- that the documents request are

4     requested because -- that they actually substantially need

5     the documents requested because any documents provided would

6     show only the undisputed fact that Hospital For Special

7     Surgery provides orthopedic services to the Tri-State area

8     and beyond.  Second, the Hospital For Special Surgery also

9     argues that Englewood's alleged need cannot otherwise be met

10    through alternative discovery.

11         Englewood, however, claims that the substantial

12    need standard is not warranted in this case because Hospital

13    For Special Surgery has just made generalized claims that the

14    documents implicated contain confidential information.

15    Furthermore, Englewood claims that the stipulated protective

16    order entered in this case is sufficient to protect any

17    concerns regarding the disclosure of a nonparty's

18    confidential information.  Further, Englewood argues that its

19    requests are plainly relevant to show that the FTC's alleged

20    relevant market, the cluster of -- and I quote -- "a cluster

21    of individual inpatient general acute care hospital services

22    that is no broader than Bergen County, New Jersey, is utterly

23    flawed.  End quote."  Englewood concedes that Hospital For

24    Special Surgery does not perform each and every one of the

25    services offered at a general acute care hospital, but still

1   claims that specialty hospitals are relevant in general and

2   acute care hospital services markets.

3           At the outset, I would note that I generally agree

4   with Englewood's position.  Discovery is a broad -- at the

5   discovery stage, relevance is broad, and the information that

6   people are allowed to seek is broad, and this is definitively

7   a discovery dispute.

8           As a first point, the Court agrees that the

9   protective order in this case is sufficient to protect any

10  concerns regarding the disclosure of a nonparty's

11  confidential information.  Hospital For Special Surgery may

12  certainly designate any responsive documents as confidential

13  as set forth in the parties' stipulated protective order.

14  And that's Number 63 on the docket.

15          The Court further agrees that the specific narrowed

16  requests are relevant to Englewood's defense in this matter,

17  which is attempting to rebut the FTC's definition of the

18  relevant market in this case.  The Court would also, as an

19  aside, argue that the -- that Englewood has established,

20  for -- at least for discovery purposes, substantial need.

21  While the Hospital For Special Surgery is afforded the

22  greater -- it's afforded greater protection from discovery

23  than a normal party, the Court must balance that with the

24  relevance of Englewood's request.  Englewood also credibly

25  claims that the specific requests it directed to Hospital For

1    Special Surgery cannot be obtained by any other party.

2    Accordingly, both Englewood's need and relevance arguments

3    outweigh the Hospital For Special Surgery's status as a

4    nonparty.

5           Although the Hospital For Special Surgery does not

6    specifically make a burden argument, in an effort to avoid

7    any undue burden and in an effort to collect documents

8    quickly, the Court determines that the Hospital For Special

9    Surgery may engage in the self-collection method and that the

10   parties may meet and confer regarding two or three relevant

11   custodians to conduct this self-collection.

12          Each specific request -- I'm going to deal with

13   each specific request at this point in my ruling.

14          Request Number 4 seeks documents and data

15   sufficient to show Hospital For Special Surgery's primary

16   service area and secondary service area.  Englewood clarified

17   in its proposed modification that it only seeks Hospital For

18   Special Surgery's primary service area and secondary service

19   area information for those services it does provide at the

20   Hospital For Special Surgery's main campus and the Hospital

21   For Special Surgery's system overall.  This request, as

22   modified by Englewood, shall be enforced, because its

23   relevant to Englewood's defense.

24          Requests Number 5 and 6 seek documents analyzing

25   competition with hospitals in Northern New Jersey as well as

 1   analyzing or describing any plans to expand further into

 2   Northern New Jersey.  Englewood has proposed limiting these

 3   requests to documents discussing, one, Hospital For Special

 4   Surgery's efforts to expand its inpatient and outpatient

 5   services in Northern New Jersey and the strategic rationale

 6   for doing so; two, the number of Northern New Jersey

 7   residents that come to Hospital For Special Surgery's main

 8   campus in ways to attract more of them; three, Northern New

 9   Jersey hospitals that compete with Hospital For Special

10   Surgery's main campus; and, four, how Hospital For Special

11   Surgery competes for patients that reside in Northern New

12   Jersey through Hospital For Special Surgery through -- I'm

13   sorry -- through Hospital For Special Surgery Paramus as a

14   driver of patients to the Hospital For Special Surgery main

15   campus for inpatient procedures.

16           Hospital For Special Surgery claims that these

17   requests are outside the alleged market, and Englewood cannot

18   show a substantial need for these sensitive documents.

19   Hospitals For Special Surgery also claims that Englewood,

20   during a meet-and-confer, agreed to further narrow the

21   requests to formal presentations and strategic plans.

22           This request as modified by Englewood to the

23   specific categories set forth above and further narrowed to

24   only formal presentations and strategic plans shall be

25   enforced because it's relevant to Englewood's defense.

1           Request Number 7 seeks documents reflecting

2    Hospital For Special Surgery's rationale for opening the

3    Paramus outpatient facility and the impact it has had on

4    inpatient admissions at Hospitals For Special Surgery's main

5    campus.  This request shall be enforced because it is

6    relevant to Englewood's defense.

7           Request Number 9 seeks documents concerning

8    Hospitals For Special Surgery's negotiations with New Jersey

9    payors.  Englewood has narrowed this request to include only

10   one document sufficient to show the terms of the contract

11   and, two, strategic documents discussing the rationale for

12   entering into those contractual relationships.  Hospital For

13   Special Surgery argues that during the meet-and-confer,

14   Englewood narrowed the scope further to only two insurers

15   that have New Jersey-specific plans:  Horizon and Oxford.

16   Hospital For Special Surgery requests that, if enforced, it

17   be narrowed further to only documents specifically discussing

18   Hackensack Meridian or Englewood and that it be permitted to

19   redact any rate information.

20           This request shall be enforced because it is

21   relevant to Englewood's defense, but it shall be narrowed to

22   only Horizon and Oxford.  The documents must reference either

23   HM -- Hackensack Meridian or Englewood, and to further

24   protect its concerns that sensitive data may be disclosed, in

25   addition to the protect -- and this is in addition to the

1    protective order in place, Hospital For Special Surgery will

2    be permitted to redact its rate information.

3            Requests Numbers 10 and 12 seek documents

4    identifying each New Jersey payor and each health plan

5    offered in New Jersey in which Hospital For Special Surgery's

6    main campus is or has been a participating provider since

7    January 2018.  Hospital For Special Surgery, however, has

8    already provided Englewood with public information regarding

9    the plans it accepts and has explained that its contracts do

10   not discriminate on the basis of geographic domicile.

11   Hospital For Special Surgery also objects to the requests

12   because it asks for all documents discussing possible

13   termination of such contracts.

14           Englewood claims that the public information is not

15   enough because it is insufficient to confirm which payors or

16   plans are New Jersey-specific.  And this is the one request

17   among these where I think that Englewood is overreaching a

18   bit in seeking to have Hospital For Special Surgery, perhaps,

19   spin its wheels a little.  Considering that Hospital For

20   Special Surgery has represented that none of the payors or

21   plans are New Jersey-specific, the Court directs that

22   Hospital For Special Surgery certify that its plans do not

23   discriminate on the basis of geographic domicile and that no

24   such New Jersey-specific plans which Englewood seeks exist.

25   And that will be sufficient for Requests 10 and 12.

1          And Request 13 seeks information concerning

2   Hospital For Special Surgery's advertising and marketing

3   materials.  Englewood has proposed limiting this request to

4   materials and advertisements targeted at Northern New Jersey,

5   including billboards, print advertisements in local

6   newspapers, New Jersey Transit signage and similar materials.

7   This request as modified by Englewood shall be enforced

8   because it is relevant to Englewood's defense.

9          I note that Mr. Kass mentioned the portion of his

10  brief that addressed costs, and I note also that both sides

11  have arguments on the propriety of costs in connection with

12  this production.

13          I am not going to put the cart before the horse and

14  slow down this litigation and have a -- and have a full-blown

15  motion prior to the production regarding what costs are

16  appropriate and what costs aren't.  I'm directing that

17  Hospital For Special Surgery comply with these requests, that

18  they seek costs, if they -- if they continue to desire them

19  and continue to feel that they're appropriate, and then apply

20  to the Court for costs, if there's a dispute.  And I do

21  not -- I would -- I would, you know, suggest that -- I don't

22  think that there's going to be much argument for costs in

23  connection with this motion because in the end we're

24  enforcing most of Englewood's requests for information.  I

25  would just urge the parties when it comes to costs to take a

1    common-sense approach, and, again, make that application to

2    me when the production has been made and after you've met and

3    conferred on that, and it can be a side issue down the road,

4    but it doesn't need to be something that holds us up now.

5           That -- I believe addresses the first issue on the

6    subpoena to Hospital For Special Surgery.

7           The second issue was -- regarded the updated

8    production of text messages.  And I have been advised in a

9    letter from the parties that that issue has, in fact, been

10   resolved, document 102 on the docket.  So I can set that

11   aside mercifully, and we can move on to the next issue, which

12   is the issue regarding the 30(b)(6) deposition -- or the

13   proposed 30(b)(6) deposition of an FTC representative.

14          This dispute involves the -- obviously involves the

15   FTC and involves both defendants, Hackensack Meridian Health

16   and Englewood.

17          Who -- who is it that will be speaking for the FTC

18   on this particular issue?

19          MR. LASKEN:  Your Honor, this is Jonathon Lasken.

20   Mr. Dickinson will be speaking for us.  Charles Dickinson.

21          THE COURT:  Okay.

22          So, look, I have -- well, frankly it is -- the

23   application of defendants, and we have folks from Hackensack

24   and from Englewood here.

25          I have your letter.  I've reviewed the letter

1  carefully, and, you know, I think I understand the arguments

2  on both sides.

3          Do one or both of you defendants want to say

4  something, and if so, who is going to be?

5          MR. KESSLER:  Your Honor, this is Jeffrey Kessler

6  from Englewood.  I am happy to answer any questions

7  Your Honor has or to respond to the FTC, if they're going to

8  make a presentation.

9          But if Your Honor feels you understand the issues

10  in the letter and are ready to rule, then I see no reason to

11  present the arguments for Your Honor that might be --

12          THE COURT:  All right.  I think I do understand.

13          I'll ask the FTC, Mr. Lasken, do you want to make a

14  presentation or not?

15          MR. LASKEN:  Let me throw it to Mr. Dickinson on

16  that issue, because he's --

17          THE COURT:  Well, that's right.  I'm sorry.  You

18  had told me that before.

19          MR. LASKEN:  No problem.

20          MR. DICKINSON:  Good afternoon, Your Honor.  Again,

21  this is Charlie Dickinson, an attorney for the Federal Trade

22  Commission.

23          I will do my best not to repeat anything

24  unnecessary that we've already discussed in the brief or in

25  the letter.

1            I do want to make just a couple of -- a couple of

2     points.  First, Your Honor, I want to note simply that the

3     reason that the FTC seeks the protective order here, not

4     because we don't want to disclose unidentified discoverable

5     facts, but rather because the -- really, the extraordinary

6     burden is on manner of the way in which the defendants are

7     requesting it -- do the 30(b)(6) notice.

8            Your Honor, the defendants -- framed their notices

9     in an attempt to discover facts.  But, really, the question

10    is what facts and to what end?  We have repeatedly asked the

11    defendants to clarify what it is they think they're missing

12    or what they think -- to disclose.  And we have not gotten an

13    answer.  The FTC believed, Your Honor, that we disclosed

14    everything.  We've disclosed our entire nonprivileged

15    investigative file.  We've refreshed our production,

16    responded to written -- written responses to 25

17    interrogatories and 22 requests for admissions, et cetera,

18    et cetera.

19           We submit, Your Honor, that there's nothing left to

20    discover.  And we're simply aware of no fact that we could

21    cite as evidence that has not already been disclosed to

22    defendants.

23           So while we question whether there are any facts

24    left to discover, it's important to also consider issues of

25    proportionality.  And the burden of preparing an FTC attorney

1  to sit for a deposition under -- you know, the really

2  wide-ranging topics of this notice in a complex antitrust

3  case such as this with a massive record is unjustified and,

4  we think, disproportional to the need to discover whatever

5  unspecified facts it is -- are still out there.

6          So it would certainly be a very significant burden,

7  both the parties -- to the FTC, Your Honor, but also to the

8  Court, which would undoubtedly be called on to adjudicate

9  disputes over privilege and work product, also an effort that

10 I think is unlikely to yield any useful information.

11         To be sure, Your Honor, the FTC is not a fact

12 witness.  We are not a percipient witness to any matter

13 relevant to this litigation.  The facts we obtained here are

14 mostly from the defendants themselves and from third parties,

15 are something that the defendants have already, either have

16 or have availed themselves through discovery -- that the

17 plaintiffs have.

18         So I guess just lastly, Your Honor, because we're

19 emphasizing that if the FTC were required to sit for a

20 deposition like this one, we would necessarily need to

21 designate time for a -- in this litigation or someone with

22 knowledge gained exclusively from counsel of record.  There

23 simply is no other option available.  And that is not an

24 appropriate use of Rule 30(b)(6), I submit.

25         So because -- again, because we think we've

 1   disclosed already all of the facts that we've obtained from

 2   defendants and third parties, what's left really are the

 3   inferences that our attorneys have drawn from that previously

 4   disclosed evidence and how our attorneys have marshaled or

 5   intend to marshal at the trial all of that previously

 6   disclosed evidence.  And none of that is discoverable,

 7   Your Honor.

 8           So we hope -- we hope to avoid this burden, which I

 9   can assure you will be significant, an obvious disruption to

10   counsel, you know, a mere eight weeks or so before the start

11   of the trial.  And so, you know, we appreciate the Court's

12   time and patience in hearing our requests.

13           With that, I'm happy to take any questions you

14   have.

15           THE COURT:  No.  I think I understand.  You have

16   said, you know, many of the things that were said in the

17   papers.  I understand where you're coming from,

18   Mr. Dickinson.

19           Mr. Kessler, do you want to respond or?  Are you

20   all right --

21      (Simultaneous conversation)

22           MR. KESSLER:  I'll be very brief, Your Honor.

23           THE COURT:  All right.

24           MR. KESSLER:  We appreciate the fact that the FTC

25   would like to not have the burden of 30(b)(6).  Defendants

1   would like that too.  We have sat for 30(b)(6) depositions,

2   both defendants.  Third parties have been subject to 30(b)(6)

3   depositions.  You have to spend the time to prepare your

4   witnesses.  It is a burden, but it is a burden of civil

5   litigation which every litigant, including the Government

6   must bear.  The exact language of 30(b)(6) makes it

7   applicable to the Government.  So while it's a burden they

8   would not like, they decided to bring this preliminary

9   injunction action as a civil litigant; they are subject to

10  that burden.

11          My only second point is what facts do we need?  The

12  facts we need, Your Honor, are the facts which are the basis

13  for the allegations in the complaint, a very traditional form

14  of 30(b)(6) discovery.  And the reality is we have tried to

15  get this information every which way and have been

16  unsuccessful.  Their responses to interrogatories have been

17  evasive and simply referred us to future expert testimony or

18  a pile of documents for us to fish through.  The same thing

19  on the requests for admit.  We raise this in meet-and-confers

20  over and over again.  We have gotten no satisfactory

21  response.

22          We think their obligation under 30(b)(6), just like

23  ours, is to have a witness prepared to answer very simple

24  questions.  In which paragraph of the complaint you make this

25  allegation?  What are the facts you're aware of which support

1    that allegation at the time you made it?  Very simple.  We'll

2    get clear answers with follow-up.  They won't be able to say,

3    oh, we'll answer that some other way or go look at a bunch of

4    documents.  That's what 30(b)(6) requires.  It'll be very

5    efficient.  And I do not anticipate any issues of privilege

6    or work product having to be presented to the Court, because

7    we're not going to ask anything that is privileged or work

8    product.

9              Thank you, Your Honor.

10             THE COURT:  All right.  Thank you, Mr. Kessler.

11             At the outset, I'd note that there's no absolute

12   right to this deposition from the FTC.  And many courts have

13   quashed this deposition notice when given the appropriate

14   circumstances to do so.  FTC has cited a slew of cases for

15   that proposition on pages 1 and 2 of the joint letter, which

16   is Docket Number 105, as I noted earlier.

17             The Court concedes that the defendants have cited

18   cases where such a deposition has been allowed.  So we have

19   competing authorities, apparently, and we need to consider

20   the parties' respective arguments and showings to determine

21   what is proper, given the circumstances currently before us.

22             The FTC's principal objection to the proposed

23   deposition appears to be that it will have to be a trial

24   counsel, and that it will necessarily involve delving into

25   legal reasoning, legal strategy, and work product.  I think

1    the FTC's point is well taken.  It does appear that the

2    topics which defendants want to explore will almost

3    inescapably delve into such things.  In fact, I find myself

4    asking the question how could they not get into such things?

5             The discoverable facts here, at least regarding

6    those that the defendants would seek to discover from the

7    FTC, do not seem to the Court to be all that substantial or

8    all that critical.  Rather, the critical facts -- the

9    critical facts appear mostly to head in the other direction.

10   Legal theories and strategies are the main items that the FTC

11   would bring to the table via discovery.  The FTC is not a

12   party who agreed to the challenged merger, who had any part

13   in brokering, or who had any part in competing in the

14   relevant market.  In other words, it is not a participant

15   insofar as none of its employees or agents gave rise to the

16   cause of action in the same way they would in, for example,

17   an FTCA or a Title VII action.  For this reason, I'm

18   skeptical of the need for this deposition, and I'm troubled

19   by the request.

20            The Court would also note that the defendants have

21   other avenues to obtain pertinent discovery, not the least of

22   which is the written questions they have served upon the FTC

23   and which the FTC has said it will answer.  As the FTC has

24   noted, these written questions cover much of the same ground

25   that a 30(b)(6) deposition would cover, or, from the Court's

1    view, at least, to the extent these written questions don't

2    cover much of the same ground, they certainly could cover the

3    same ground as drafted as such.

4            Accordingly, this avenue of discovery is

5    sufficient.  Although the defendants have said in their

6    papers that they have exhausted all alternative avenues for

7    discovery of this disputed evidence, it appeared to me, at

8    least, as of the writing of these briefs on the motion -- or

9    as of the writing of the letter that I'm considering, that

10   the defendants have not yet received the answers.

11   Mr. Kessler has said that he has received the answers now,

12   and he's dissatisfied with them, but I can't imagine that we

13   wouldn't have the same problems and he wouldn't be

14   dissatisfied with answers at a deposition.

15           The Court trusts that fulsome appropriate answers

16   to a written questions could and would provide defendants

17   with what they need, particularly at this point in the

18   litigation, and to the extent there's a dispute regarding the

19   answers to the questions by the FTC, the parties would have

20   an obligation to meet and confer and to address that dispute

21   and to see if a more full-bodied answer could be given to the

22   question, and then if a dispute remained about the

23   sufficiency of the answer to the written questions, then, you

24   know, that would have to be brought to the Court's attention.

25           Defendants urge that the FTC can designate a

1   nonattorney to sit for a 30(b)(6) deposition, but the Court's

2   not so sure of that.  First of all, as it appears to the

3   Court that any such deposition will necessarily involve

4   attempts to discover, perhaps almost exclusively, legal

5   theories, legal strategy and work product, I am not sure that

6   a nonattorney would be competent to sit for the deposition.

7   And even if a nonattorney were competent to do so, what

8   difference would it really make if the discovery would still

9   involve legal points fed to the witness by FTC attorneys that

10  would otherwise be privileged?  I do not think, therefore,

11  that the designation of a nonattorney would solve the basic

12  problems here.

13          Finally, I am not especially concerned about the

14  proposed 30(b)(6) deposition, given the current posture of

15  the case.  The relief requested in the complaint is being

16  treated on an emergent basis, and any undue delays may

17  inordinately derail what is already a tight and very busy

18  discovery schedule.  I envision the deposition of an FTC

19  representative quickly devolving into an all-out war

20  regarding privilege in which constant objections will be

21  raised and innumerable requests to the Court for relief will

22  be made.  That will unnecessarily increase the burden on the

23  parties and on the Court and will, most troublingly, slow the

24  case down to a crawl.  I have no intention of doing that.

25          In making this observation, I am not intending to

1   convey a message that I would approve of the proposed

2   deposition if it were not on an emergent time line, but only

3   that this is an additional and fairly important reason why

4   the proposed deposition isn't appropriate.

5           Accordingly, I'm going to quash the subpoena that

6   the defendants have served upon the FTC for a 30(b)(6)

7   deposition.

8           The next issue to be considered -- they're

9   relatively straight forward in comparison to the first two

10  issues, and they kind of go hand in hand.  I've -- that was

11  Issue 4 and Issue 5.  But I probably will deal with them

12  together.

13          Issue 4, I've listed as regarding the Englewood

14  subpoena to New York Presbyterian, and Issue Number 5 is that

15  the defendants have asked Judge Vazquez for a two-week

16  extension of discovery in this case.  And, again, I think

17  these two issues may go hand in hand.  The Englewood

18  subpoena -- it sounds like the parties have agreed to the

19  scope of the subpoena, but there's only a dispute as to the

20  timing.  Englewood wants New York Presbyterian to provide the

21  responses to the subpoena by March 17th, and needs -- and

22  claims to need the responses prior to being able to depose

23  New York Presbyterian's 30(b)(6) representative.  And New

24  York Presbyterian has said that they need a couple of more

25  weeks to respond to the subpoena.  It's just becoming

1    difficult to get all of the information together.

2            Mr. Kessler, you're on this issue again?  Do you --

3    or any of your team have anything to say about this?

4    Anything to add to what I've already said?  --

5        (Simultaneous conversation)

6            MR. KESSLER:  Go ahead.

7            MS. LAMBERG:  Sorry, Jeffrey.

8            This is Heather Lamberg again.  I'll be handling

9    this.

10           But, you know, I don't really have anything more to

11   add than what is in our letter.  I'm happy to address any

12   questions or concerns you have.  But I don't need to rehash

13   what's there.

14           THE COURT:  Okay.  And you're requesting that New

15   York Presbyterian -- the key requests for production that you

16   want them to respond to quickly are 2, 5, 6, 7, 9, 10, 14,

17   and 15?  Is that right?

18           MS. LAMBERG:  Yes, that's right.  And it's a

19   combination -- among -- are those the right requests.  And a

20   combination among those requests.  Some of them are -- and

21   some of them are, you know, custodians and search terms.  So

22   it's a combination amongst those requests.  Correct.

23           THE COURT:  Okay.  Mr. -- for New York

24   Presbyterian, who are we going to hear from?

25           MR. STEREN:  Thank you, Your Honor.  This is John

1    Steren from Epstein Becker & Green.

2            THE COURT:  Okay.  Now, Mr. Steren, let me just

3    jump right in, and this is a pretty straightforward dispute.

4    It doesn't involve the twists and turns the first two had.

5    You say you need a little more time.  Is that right?

6            MR. STEREN:  We do, Your Honor.

7            THE COURT:  When do you think you can get this

8    done?

9            MR. STEREN:  So, we had proposed to counsel for

10   Englewood that one of the` problems -- until the end of

11   the -- to complete the ESI production.

12           THE COURT:  So you're essentially seeking a

13   two-week extension from the 17th to the 31st?

14           MR. STEREN:  I think that's right, Your Honor.

15           THE COURT:  All right.  And again, this is the

16   reason I why that thought Issue 4 and Issue 5 dovetail.  The

17   defendants had asked Judge Vazquez for a two-week extension

18   of discovery.  The FTC has responded and said that they're

19   onboard for a week, but they're not onboard for two weeks.

20           Quite frankly -- look, I could hear from everybody

21   on this issue, but I've talked to Judge Vazquez, and he wants

22   the case to move forward.  He wants the case to stay largely

23   on the schedule that it's on.  But he doesn't find a problem

24   with extending the deadlines for discovery by two weeks.

25           So my inclination is to give -- well, my

1    inclination -- I think my decision is to give New York

2    Presbyterian the two weeks to respond to the subpoena and to

3    extend the discovery deadlines respectively by two weeks so

4    that the defendants will have the necessary time to do the

5    30(b)(6) deposition of the New York Presbyterian

6    representative and to do whatever other discovery they need

7    to do.

8            I don't think at this point I'm going to tinker

9    with Judge Vazquez's dates for the hearing.  But I would

10   suggest is that, perhaps, you contact Judge Vazquez regarding

11   the hearing date, and if you think that those dates need to

12   be put off a week or two as well, he certainly would be happy

13   to hear from you and to consider that request.  All right?

14           MR. STEREN:  Thank Your Honor.

15           UNIDENTIFIED SPEAKERS:  Thank Your Honor.

16           MR. LASKEN:  This is John Lasken from the FTC.

17           Can I just ask one question there?

18           THE COURT:  Sure.

19           MR. LASKEN:  You know, our concern here is that has

20   been -- I don't want to call it mystery unavailability, but

21   unavailability of without explanation.  And a lot of people

22   had scheduled to sit for depositions at certain times.  I

23   just want to make sure that in giving the extra two weeks, is

24   the Court sort of authorizing moving depositions that are

25   already scheduled?  Or is the Court anticipating that we

1    would push to meet with the schedule that's --

2         (Simultaneous conversation)

3         THE COURT:  I would hope -- I would hope that you

4    would proceed with depositions that are already scheduled.

5    And the only thing that I would expect might change are the

6    things like the New York Presbyterian 30(b)(6) deposition

7    where the defendants say, look, we've got to have these

8    documents before we can do that.  So you can't go forward

9    with the deposition in the next few days, and that would be

10   rescheduled, I would anticipate.

11        But, no, I am not -- I am not -- you know, you guys

12   have to work together, and I am not going to sit here and

13   assign dates to the depositions, but I am not anticipating

14   nor do I encourage nor do I expect that depositions that are

15   currently scheduled and that can go forward, you know,

16   because you have the appropriate documents, the appropriate

17   discovery, that they will be changed.  I think you need to

18   stick to the schedule you've got as much as you can, so that

19   we don't really fall behind.

20        MR. LASKEN:  Thank you Your Honor.

21        THE COURT:  All right?

22        With that, do we have anything for -- I almost

23   cringe when I ask this, but do we have anything further from

24   anybody?

25        MR. SAINT-ANTOINE:  Your Honor, this is Paul

1    Saint-Antoine from Faegre Drinker on behalf of Hackensack.

2    It's just a clarification on that last point, on there

3    were -- since the letter briefs went in, there have been some

4    adjustments on at least a couple of the third-party

5    depositions.  And I just want to make sure that that we don't

6    have an issue with our colleagues at the Federal Trade

7    Commission on those new dates.

8            THE COURT:  Well, every --

9        (Simultaneous conversation)

10           THE COURT:  Everybody's here, so you can ask them.

11           MR. LASKEN:  Your Honor, no, we don't have an issue

12   with the new dates --

13           THE COURT:  All right.  All right, guys.

14           Look, I know you guys are working hard, and I know

15   you've got mountains of work to do in the next month or two.

16   You've got to work together to some degree, and if you have

17   problems, you're more than welcome to bring them to us.  I

18   hope you can work them out, obviously, but I'm sure this is

19   not the last time I'm going to speak with you all.  And,

20   again, if you find that the discovery schedule necessitates a

21   postponement of the hearing, I wanted you to know that Judge

22   Vazquez would entertain that.  But it would be better to get

23   to him earlier rather than later.  All right?  And he doesn't

24   want to postpone it very much, I must say.  He does want to

25   get to -- wants to get to the finish line here.

 1              All right?

 2              MALE SPEAKER:  Thank Your Honor.

 3              THE COURT:  Okay.  Well, thank you all for calling

 4     me.  Have a good rest of the week and weekend.  And stay

 5     safe.  All right, folks?

 6              UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

 7                   (Conclusion of proceedings)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 55 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   s/ *Sara L. Kern*                        15th of March, 2021

19   _____    _____
     Signature of Approved Transcriber              Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25