**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

HACKENSACK MERIDIAN
HEALTH, INC. and
ENGLEWOOD HEALTHCARE
FOUNDATION,

Defendants.

Civil Action No. 2:20-cv-18140-JMV-JBC

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION......................................................................................................1

LEGAL STANDARD.............................................................................................5

ARGUMENT ..........................................................................................................6

I.    THE FTC CANNOT PROVE LIKELIHOOD OF SUCCESS. ....................6

    A.    The FTC Cannot Establish a Prima Facie Case That a Substantial Lessening of Competition Is Probable and Imminent..........................6

    B.    The FTC's Proposed Market Ignores Commercial Realities and Arbitrarily Excludes Clear Sources of Competition. ...........................8

        1.    The FTC's Expert Overstates the Significance of Diversion Estimates and the Hypothetical Monopolist Test. ...................11

        2.    Payers and Employers Do Not Treat Bergen County as a Distinct Market.........................................................................15

        3.    Defendants' Service Areas Extend Beyond Bergen County. ..20

        4.    The FTC's Proposed Market Excludes Many Hospitals that are Close Substitutes for Englewood and HUMC. ........................24

        5.    Modest Adjustments to the FTC's Geographic Market Eliminate Any Presumption of Anticompetitive Effect...........29

    C.    The FTC's Competitive Effects Analysis Fails to Account for the Demonstrable Procompetitive Benefits from the Merger. .................30

        1.    HUMC and Englewood are Complements, Not Substitutes....31

        2.    Englewood would not Enhance HMH's Bargaining Leverage. ..............................................................................................32

        3.    The FTC Over-Estimates Price Effects from the Merger and Ignores All Offsetting Procompetitive Effects ........................36

        4.    The Proposed Merger Will Expand Health Care Access for Patients Residing in Northern New Jersey. ...........................41

**TABLE OF CONTENTS**
(continued)

**Page**

5.    Any Predicted Price Increase would be Small and Offset by Savings from the Demonstrable Procompetitive Benefits of the Merger. ..................................................................................................45

D.    The Merger Will Have the Additional Procompetitive Effect of Improving the Quality of Care at Englewood and HMH. ...................45

E.    The Merger Will Generate Substantial Efficiencies and Cost Savings that Outweigh Any Potential Predicted Harm. ...................................47

II.    THE BALANCE OF EQUITIES DISFAVORS THE INJUNCTION. .......49

CONCLUSION ...............................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc.*,
414 F.2d 506 (3d Cir. 1969)....................................................................................5

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).........................................................................................6, 30

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).............................................................................................40

*FTC v. Advocate*,
841 F.3d 460 (7th Cir. 2016) ........................................................... 10, 14, 18, 23

*FTC v. Arch Coal, Inc.*,
329 F.Supp.2d 109 (D.D.C. 2004)......................................................................47

*FTC v. CCC Holdings, Inc.*,
605 F. Supp. 2d 26 (D.D.C. 2009)......................................................................49

*FTC v. Exxon Corp.*,
636 F.2d 1336 (D.C. Cir. 1980)............................................................................5

*FTC v. Freeman Hosp.*,
69 F.3d 260 (8th Cir. 1995) ..................................................................................7

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001)..............................................................................8

*FTC v. Ill. Cereal Mills, Inc.*,
691 F. Supp. 1131 (N.D. Ill. 1988) .....................................................................49

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)..................................................................... *passim*

*FTC v. Thomas Jefferson Univ., et al.*,
--- F. Supp. 3d ---, 2020 WL 7227250 (E.D. Pa. Dec. 8, 2020) ................. *passim*

*FTC v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) ............................................................................50

*New York v. Deutsche Telekom AG* (*T-Mobile/Sprint*),
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................ 47, 48, 49

*Novak v. Somerset Hosp.*,
  625 Fed. Appx. 65 (3d Cir. 2015) ...........................................................................8

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ...................................................................................8

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ..........................................................................12

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...................................................................................................8

*United States v. Long Island Jewish Med. Ctr.*,
  983 F. Supp. 121 (E.D.N.Y. 1997) .......................................................................47

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) ...................................................................................................7

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) .................................................................................................10

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ...................................................................................5

**STATUTES, RULES & REGULATIONS**

15 U.S.C. § 53(b) ..........................................................................................................1, 6

15 U.S.C. § 18 ...................................................................................................................6

**OTHER AUTHORITIES**

FTC Merger Guidelines § 4 ........................................................................................9

FTC Merger Guidelines § 4.1.1 ................................................................. 12, 13, 24

FTC Merger Guidelines § 4.2.1 ...............................................................................11

FTC Merger Guidelines § 5.3 ..................................................................................9

FTC Merger Guidelines § 10 ..................................................................................47

## **INTRODUCTION**

The FTC's case against the merger of Hackensack Meridian Health, Inc. ("HMH") and Englewood Healthcare Foundation ("Englewood") depends on an implausibly tiny geographic market that arbitrarily excludes numerous nearby hospitals merely because they happen to be located across the Bergen County line— a line that reflects nineteenth century politics, not twenty-first century commerce. If the market is drawn even slightly differently to account for the competitive realities of healthcare in northern New Jersey, as the law requires, then the FTC's claim that the merger will result in enhanced market power falls apart, and along with it any basis for preliminarily enjoining the merger. And when the tangible benefits the combination will bring to residents, employers, and insurers are accounted for, the case against this combination entirely collapses.

To obtain the extraordinary remedy of preliminary injunctive relief under Section 13(b) of the FTC Act, the FTC must demonstrate, among other things, that it is likely to succeed on the merits of its claim. But because its claim ignores the commercial realities of competition for inpatient general acute care ("GAC") hospital services in northern New Jersey, the FTC is *unlikely* to succeed on the merits. Its request for a preliminary injunction must therefore be denied.

The FTC's first error is to characterize Englewood and Hackensack University Medical Center ("HUMC") as "close" competitors, when the commercial reality is that they are very different. HUMC is HMH's flagship academic medical

-1-

center that provides highly complex tertiary and quaternary services. Englewood is a community hospital that does not provide these services. For this reason, it has *never* been considered a price-constraining substitute for HUMC by the insurers who pay for hospital services and form networks for sale to employers and individuals. Indeed, the prices that HMH has historically negotiated ████████████████ ███████████████████████—clear evidence that they are not seen as interchangeable by commercial insurers.[1]

The commercial reality that Englewood and HUMC are complements, rather than close competitors, has two case-defining consequences. *First*, it means that the merger will not increase the hospitals' negotiating power with insurers. *Second*, it demonstrates how the merger will yield procompetitive quality-of-care improvements for patients and direct savings for insurers, through the Defendants' well-developed Service Optimization Plan. That plan calls for transferring and redirecting significant volumes of less complex care from HUMC to Englewood, transforming Englewood into a "tertiary hub" and alleviating the substantial and growing overcapacity problems at HUMC. Simply put, by enabling patients to be

---

[1] HMH is a statewide New Jersey health care network comprised of seventeen hospitals and an integrated network of physicians, outpatient centers, and post-acute sites of care. Four of HMH's general acute care hospitals and its School of Medicine are located in northern New Jersey (Bergen, Hudson, Passaic, and Essex counties). Englewood consists of Englewood Hospital and Medical Center ("EHMC"), as well as Englewood Health Physician Network ("EHPN"), a physician practice network that serves patients across New Jersey's Bergen, Hudson, Passaic, and Essex counties and New York's Rockland County.

matched with the more efficient facility, the merger will relieve HUMC's current overcapacity and save patients, employers, and insurers more than $40 million annually. Beyond these immediate benefits, HMH has committed to investing almost $440 million in Englewood to further develop and modernize its capabilities to serve as a tertiary hub for patients in northern New Jersey, leaving HUMC free to focus on the more complex services that Englewood does not offer. The FTC simply ignores these procompetitive benefits.

The FTC's second error is to draw an artificially tiny market that ignores *all but three of the two dozen or more* competing hospitals that lie *less* than a thirty-minute drive, or *less* than 15 miles, from Englewood. Indeed, the FTC's proposed Bergen County-only market, with only six hospitals, is the *smallest* geographic market the FTC has ever proposed when challenging a hospital merger.

Among the hospitals that the FTC deems irrelevant to northern New Jersey patients and their insurers are: important community hospitals located a mile or two from the Bergen County line (*e.g.*, St. Joseph's Wayne, St. Mary's, RWJB-Clara Mass, and Hudson Regional); nearby hospitals that provide higher "tertiary" care services (*e.g.*, RWJB-Jersey City and St. Joseph's University Medical Center); several sophisticated hospitals in northern New Jersey that provide "quaternary" care (*e.g.*, RWJB-St. Barnabas, RWJB-Newark Beth Israel, and Atlantic-Morristown); and, world-renowned New York City hospitals just across the Hudson River that are a close and highly-utilized option for New Jersey residents (*e.g.*, New York-

-3-

Presbyterian/Columbia, Mt. Sinai, NYU-Langone, Memorial Sloan Kettering, and Hospital for Special Surgery). The FTC proposes to ignore all of these facilities, even though the commercial reality is that many Bergen County residents live closer to these facilities than the ones the FTC included, and they are closer competitors to HUMC and Englewood. As the FTC's own Horizontal Merger Guidelines ("Guidelines") recognize, the categorical exclusion of such close competitors when defining the relevant geographic market is a critical error.

Commercial insurers, employers, the merging parties, and other hospitals recognize the competitive realities that the FTC refuses to acknowledge. ████████ ████████████████████████████████████████████ supports the merger, which it believes will reduce, not increase, the total costs it will pay for hospital services. ████████████████████████████████ testified that it must offer health plans that include hospitals beyond Bergen County or any other single county. Indeed, no insurer offers and no employer seeks a network plan that includes hospitals only in Bergen County.

The FTC's failure to account for these commercial realities is fatal under controlling law. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016). Just five months ago, in another hospital merger case, the narrow geographic market proposed by the FTC was rejected by the Eastern District of Pennsylvania because, like the market proposed here, it failed to account for the commercial realities of hospital competition in another dense metropolitan area (Philadelphia).

*FTC v. Thomas Jefferson Univ., et al.*, --- F. Supp. 3d ---, 2020 WL 7227250 (E.D. Pa. Dec. 8, 2020). Rather than try to distinguish that case, for which it withdrew its appeal after the Third Circuit denied the FTC's motion for an injunction pending appeal, or argue that it was wrongly decided, the FTC simply ignores it.

A preliminary injunction constitutes extraordinary relief and the FTC must bear a heavy burden before obtaining one. The FTC argues that a preliminary injunction in this case is no big deal because it will simply "preserve the status quo 'pending an FTC administrative adjudication.'" Pl. Br. at 10. But that ignores the reality of the situation—issuing a preliminary injunction would effectively kill the merger. Those who would suffer as a result would be not just the parties, but the residents of northern New Jersey, who will be denied the improved health care, and their insurers, who will be denied the substantial savings, that this procompetitive merger is poised to provide.

## **LEGAL STANDARD**

Preliminarily enjoining a merger is "an extraordinary and drastic remedy," because it "may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980); *see also Allis-Chalmers Mfg. Co. v. White Consol. Indus., Inc.*, 414 F.2d 506, 510–11, n.8 (3d Cir. 1969) (same). For that reason, "a court ought to exercise extreme caution because judicial intervention in a competitive situation can itself upset the balance of market forces,

-5-

bringing about the very ills the antitrust laws were meant to prevent." *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990).

Section 13(b) of the FTC Act authorizes a court to grant the "extraordinary remedy" of a preliminary injunction only when the FTC has made "a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). When evaluating the sufficiency of the FTC's showing, a court must "first consider the FTC's likelihood of success on the merits." *Penn State Hershey*, 838 F.3d at 337. "The Government has the prima facie burden to show that it is likely to succeed on the merits of its claim that the merger is anticompetitive." *Jefferson*, 2020 WL 7227250, at *10. To carry its burden, the FTC must demonstrate "there is a reasonable probability that the merger will *substantially* lessen competition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added). If the FTC fails to do so, the inquiry is over. When the FTC has not shown it is likely to succeed on the merits, the Court need not "weigh the equities to determine whether a preliminary injunction would be in the public interest." *Penn State Hershey*, 838 F.3d at 337.

## ARGUMENT

### I.   THE FTC CANNOT PROVE LIKELIHOOD OF SUCCESS.

####    A.   The FTC Cannot Establish a Prima Facie Case That a Substantial Lessening of Competition Is Probable and Imminent.

The FTC cannot establish its prima facie case that the merger of HMH and Englewood violates Section 7 of the Clayton Act through a "substantial lessening of competition" that is "probable and imminent." *Jefferson*, 2020 WL 7227250, at \*10 (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622, 623 n.22 (1974)). To satisfy its burden, the FTC must prove: (1) the relevant product market in which to assess the merger; (2) the geographic market in which to assess the merger; and (3) the merger's probable effect on competition in the relevant product and geographic markets. *Penn State Hershey*, 838 F.3d at 337–38. Proving a relevant geographic market is "a necessary predicate" to the FTC's prima facie case. *Id*. at 338. If the FTC fails to prove the relevant market, its case fails. *See, e.g.*, *Jefferson*, 2020 WL 7227250 at \*1–2; *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995).

If the FTC proves a relevant product and geographic market, it can then establish a prima facie case by showing the merger will result in inappropriately high concentration within that market. *Penn State Hershey,* 838 F.3d at 346–47. The burden then shifts to Defendants to rebut the presumption with evidence that the FTC's "market-share statistics produce an inaccurate account of the merger's probable effects on competition in the relevant market." *Id*. Defendants can do this by showing "that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger." *Penn State Hershey*, 838 F.3d at 347. If Defendants rebut the presumption, "the burden of producing additional evidence of anticompetitive

-7-

effect shifts to the [FTC], and merges with the ultimate burden of persuasion" which "remains with the government at all times." *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 715 (D.C. Cir. 2001) (quotation omitted).

Here, the FTC fails at every step of the burden-shifting process to establish a case of harm to competition.

**B.    The FTC's Proposed Market Ignores Commercial Realities and Arbitrarily Excludes Clear Sources of Competition.**

The FTC cannot carry even its initial burden because the implausibly small geographic market for inpatient GAC services that it proposes is divorced from the reality of healthcare competition in the northern New Jersey and New York metropolitan area. The FTC's product market also ignores commercial realities because it clusters only those GAC services which "both HMH and Englewood sell and provide to commercial insurers and their enrollees," but no "[n]on-overlapping services." Compl. ¶ 32.[2] Moreover, the FTC's unduly narrow proposed geographic market fails because even minor changes to the boundaries of the proposed market

---

[2] Relevant product markets are "comprised of 'commodities reasonably interchangeable by consumers for the same purposes.'" *Novak v. Somerset Hosp.*, 625 Fed. Appx. 65, 67 (3d Cir. 2015) (quotation omitted). Courts have accepted "clustering" disparate services into the same product market "if the cluster is itself an object of consumer demand," *Sharif Pharmacy, Inc. v. Prime Therapeutics*, *LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (quotation omitted), and if "that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73 (1966). Here, insurers contract for *all* inpatient services—no insurer contracts for or considers acquiring only those specific services that overlap among Defendants, and there is no basis to presume they are an object of consumer demand.

erase any presumption of market power, showing how fragile the FTC's artificial market is and emphasizing the need to account for competitive realities.

Under the Guidelines, a merger that increases the Herfindahl-Hirschman Index ("HHI") of market concentration to above 2,500 creates a rebuttable presumption that a merger is likely to enhance market power. *Penn State Hershey*, 838 F.3d at 346 (citing Guidelines § 5.3). Here, the FTC's proposed market yields the lowest market concentration figures it has ever alleged in a hospital merger case, with a post-merger HHI of just 2,835. *See* Dafny Report ¶ 1. Moreover, as Defendants' economics expert, Dr. Lawrence Wu, illustrates, even minor adjustments to the FTC's flawed market definition to conform with commercial realities brings the post-merger HHI below 2,500 and thus erases *any* presumption of anticompetitive effect. *See* Wu Report ¶¶ 129, 134–146. Because such small changes to the geographic market definition result in a post-merger HHI *below* the threshold for a presumption, the Court should find the FTC's exceedingly fragile HHI calculations to be unreliable. Indeed, the FTC's Merger Guidelines recognize that where, as here, "analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects." Guidelines § 4.

Simply put, the FTC cannot prove that the relevant geographic market, which must conform to commercial realities, is coincidentally limited to the nineteenth-

century political boundaries of Bergen County. "The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.'" *Penn State Hershey*, 838 F.3d at 338; *see also*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (the relevant geographic market is the area in which customers can practicably turn for services). The relevant geographic market "must contain the sellers or producers who are able 'to deprive each other of significant levels of business' and is where the merger's effect 'on competition will be direct and immediate.'" *Jefferson*, 2020 WL 7227250, at *12 (quoting *FTC v. Advocate*, 841 F.3d 460, 468 (7th Cir. 2016)).

The FTC's alleged geographic market does not accord with commercial realities, as required under controlling case law. Defining the relevant geographic market as Bergen County ignores indisputable real-world facts, including:

- The primary purchasers of Defendants' GAC services—insurers and self-insured employers—do not consider Bergen County a distinct market for their commercial health plans and do not offer any insurance plans limited to Bergen County hospitals;

- The primary service areas ("PSAs") from which both Englewood and HUMC receive the vast majority of their patients, which include areas *beyond* Bergen County and parts of Hudson, Passaic, and Essex Counties; and

- More than twenty close competitors of either Englewood or HUMC, respectively, are just outside Bergen County, as vividly shown in the following map.



### 1. The FTC's Expert Overstates the Significance of Diversion Estimates and the Hypothetical Monopolist Test.

As a justification for narrowly limiting the geographic market to Bergen County, the FTC relies on an economic test, the hypothetical monopolist test, ("HMT") found in the Merger Guidelines, which asks whether "a hypothetical profit-maximizing firm that was the only … producer of the relevant product(s) located in the region" could successfully implement a small, but significant, non-

transitory increase in price ("SSNIP"). Guidelines § 4.2.1. Although the HMT is a "common method" used to help define a relevant geographic market, *Penn State Hershey*, 838 F.3d at 338; *Jefferson*, 2020 WL 7227250, at *12, the ability to craft a proposed geographic market that satisfies an HMT does not, by itself, satisfy the FTC's *prima facie* burden of establishing the relevant geographic market. Applying an economic test like the HMT does not end the market-definition inquiry, because "the Court's geographic market determination is not merely a 'statistical exercise' looking for a hypothetical monopolist that can impose" a price increase. *Jefferson*, 2020 WL 7227250, at *13. On the contrary, "[m]arket definition can rest on a mathematical equation **only if the variables used in the equation reflect the market's commercial realities**." *Id.* (rejecting proposed geographic market despite the FTC showing a SSNIP through application of an HMT); *see also*, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 39 (D.D.C. 2017) (statistical evidence "is not the only evidence that courts consider in defining the relevant market.").

This is consistent with economic principles. As explained by Defendants' expert economist, Dr. Wu, if application of the HMT results in a proposed market "that does not accurately capture the conditions that determine the competitive impact of the merger" at issue, then the resulting proposed market "would not be a reliable basis for calculations of market share or for drawing conclusions regarding an assessment of market power" from the merger. Wu Report ¶ 64. As shown above, that is precisely what the controlling case law requires. Here, the FTC's proposed

-12-

market is too narrowly defined to "illuminate the evaluation of [the] competitive effects" in this case. *Id.* (citing Guidelines § 4.1.1). It excludes several competitors that are closer substitutes for either HMH (or HUMC) or Englewood than they are to one another (*see, infra* Section I.C.4), which violates the market-definition principles set forth in the Guidelines. *Id.*

The healthcare industry is characterized by "a two-stage model of competition" in which hospitals first compete "to be included in the insurer's hospital network," and then "compete to attract individual members of insurers' plans." *Jefferson*, 2020 WL7227250, at *1 (quotation omitted); *see also, Penn State Hershey*, 838 F.3d at 342–43. For this reason, the "commercial reality" of the market in which HMH and Englewood compete is that "insurers, not patients seeking and receiving medical care, are the payors—those who will most directly feel the impact of the increased price of care." *Jefferson*, 2020 WL7227250, at *1 (quotation omitted). The validity of the relevant geographic market "must therefore be assessed 'through the lens of the insurers.'" *Id.* (quoting *Penn State Hershey*, 838 F.3d at 342).

As in *Jefferson*, the FTC here relies heavily on estimated patient-diversion statistics from HMH and Englewood when applying the HMT, improperly assuming without evidentiary support that the ***patient*** behavior modeled by such estimates correlates with the views of ***insurers*** forming hospital networks. The "[d]iversion ratios only capture insurer preferences for the purpose of constructing a relevant geographic market where there is evidence to show that insurer decisions about

which hospitals to include in their networks are aligned with patient decisions about where to seek care." *Id*. at *13. Diversion ratios, although "one piece of evidence," fail to "completely capture the commercial realities of a healthcare market with two-stage competition," *id.*, and "measures of patient substitution like diversion ratios do not translate neatly into options for insurers." *Advocate*, 841 F.3d at 475.

Despite this, neither the FTC's expert, Dr. Dafny, nor the FTC's brief address whether the patient diversion figures estimated by Dr. Dafny correlate with insurers' views of the main competitors of HMH and Englewood. Instead, Dr. Dafny assumes, contrary to the facts, that insurers consider HUMC and Englewood to be close substitutes for one another when forming networks. *See* Dafny Report ¶¶ 182–184. The FTC ignores the critical factual issues, namely, whether HUMC and Englewood are considered by insurers to be close substitutes *and* whether they consider *other* hospitals closer substitutes for HUMC and Englewood when negotiating and forming hospital networks. *See Jefferson*, 2020 WL7227250, at *13. Here, various insurers— ███████████████████████████████████████████

████████████████████████████████ —testified that, ████████████████

████████████████████████████████████████████████

██████████████████████████████████.[3]

---

[3] ████████████████████████████████████████████████

████████████████████████████████

Moreover, the diversion figures on which the FTC relies actually indicate that HUMC and Englewood face *robust* competition from nearby hospitals just outside Bergen County, including certain hospitals in New York City. As discussed, there are—in addition to the six Bergen County hospitals—at least seventeen other hospitals just a short drive over the county border. The diversion evidence indicates that these hospitals compete for and win patient volume from Bergen residents. For example, a document on which the FTC relies shows that ▆▆▆ of Bergen County residents seek treatment at hospitals outside the county.[4] This is not surprising, given that many Bergen County residents are closer to a hospital outside Bergen County than they are to one inside it. Wu Report ¶¶ 78–80.

**2.      Payers and Employers Do Not Treat Bergen County as a Distinct Market.**

The testimonial and documentary evidence obtained from insurers further demonstrates that Bergen County is not a relevant geographic market for GAC services. These insurers have testified that they do not view Bergen County as a distinct market; and no insurer offers a commercial health plan that is sold only to Bergen County residents or includes only Bergen County hospitals.[5] Nor does any

---

[4] ▆▆▆▆▆▆▆; *see also*, Pl. Br. at 21 n.55.

[5] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

insurer have plans to offer such products.[6] ███████████, ████████████████

████ testified that they do not offer any commercial health plans limited to hospitals in Bergen County or any other single county.[7] Rather, insurers build broad networks that span multiple counties, because their customers—the employers which sponsor insurance plans—have employees located in multiple counties.[8] The evidence demonstrates that these insurers look to hospitals both inside and outside of Bergen County as substitutes for HMH and Englewood in their health care plans, unimpeded by the invisible wall the FTC asks the Court to imagine around Bergen County.[9]



[6] ██████████████████████████████████
[7] ████████████████████████████████████████████████ ████████████ ████████ ████████ ████████ ██ ██████████ ██ ████████ ████████████████████████████████████.
[8] ████████████████████████████████████████████ ██████████
[9] ████████████████████████████████████████

██████████████████████████████.[10] Meanwhile, ██████████████ testified that the merger would have no impact on their ability to market a plan in Bergen County.[11] Similarly, █████ ███████████████████████ ████████████████████████ which is the relevant competitive test.[12]

Further, the FTC has submitted no evidence that insurers pit HMH (or HUMC) and Englewood against each other to extract lower prices in negotiations. Nor could it. The evidence demonstrates that HUMC and Englewood offer mostly complementary rather than competitive clusters of GAC services. Insurers have neither sought nor been offered lower prices from either for the other's exclusion from (or lower placement in) the insurers' networks.[13] To the contrary, as shown in Dr. Wu's report, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████. The FTC has previously argued that such a difference in services is a significant competitive distinction among hospitals.

---

10 ██████████████████████████████

11 ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

12 ██████████████████████████████

13 ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

*Advocate*, 841 F.3d at 473–74 ("the witnesses consistently used the term 'academic medical center' and recognized that demand for those few hospitals differs from demand for general acute care hospitals like these parties' hospitals, which draw patients from much smaller geographic areas"). AMCs provide a different set of services and thus value to insurers and their enrollees, and insurers do not view them as price constraints on each other. Wu Report ¶¶ 18-20. By contrast, one of HMH's

█████████████████████████████████████████, █████████████████████████████

█████████████████████████████ and for which ███████████████████.[14] In short, the evidence shows that HMH and Englewood compete with other hospitals in their price negotiations with insurers, but not with each other, because they are not close substitutes either in price or in the GAC services that they offer.

The FTC also erroneously contends that ██████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ Pl. Br. at 23. What the FTC does not mention is

that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[14] ██████████████████████████████████████████████████████



███████████████████████████████████.[15]

Sworn testimony from several area self-insured employers—who, like insurers, purchase GAC services directly from hospitals—corroborates the insurers' views that the market is not limited to Bergen County. For example, the ████████████████████████ testified that its member employers generally are not concerned about the merger given the many other competing hospitals in the area.[16] ██████████████████████████, testified that its Bergen County employees can and often do utilize hospitals outside Bergen County.[17] Indeed, for some ██████████████████████ employees residing in Bergen County, a hospital located outside of Bergen County is that employee's *closest* hospital.[18] Notably, ████████████ is self-insured, meaning that its insurer is simply an administrator of its plan and that ████████████—not

---

[15] ███████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████████████████.

[16] ████████████████████████

[17] ██████████████████████████████

[18] █████████████████████████████████
████████████████████████████████
███████████████████████

the insurer—purchases inpatient GAC services for its employees.[19] Similarly, a representative of the ▮▮▮▮▮▮▮▮ testified that its employees often seek care at out-of-county hospitals, including the large hospitals in New York City.[20]

The FTC offers no contrary testimony from any area employers. Rather, the FTC bases its case mainly on conclusory statements and lay opinions of a few insurers, whose hostile statements do not square with commercial realities or their own contemporaneous documents. Such unsubstantiated assertions were insufficient in *Jefferson.* 2020 WL7227250, at *18. As shown *infra* in Section I.C.2, the testimony of these insurers opposing the merger here is fueled by bias and fears of increased insurance competition from HMH, but is not supported by any evidence that the merger will have anticompetitive effects on prices or the negotiating power of HMH and Englewood.

### 3. Defendants' Service Areas Extend Beyond Bergen County.

Limiting the relevant geographic market to Bergen County also defies commercial reality by ignoring the far larger area from which Englewood and HUMC competes with others to actually draw patients. The evidence shows that the primary service areas (PSAs) for both Englewood and HUMC, HMH's flagship AMC, extend well beyond Bergen County to include significant portions of Passaic,

---

[19] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[20] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hudson, and Essex Counties (while simultaneously excluding large portions of Bergen County).[21]



----

[21] ████████████████████████████████████████████████████

The FTC's expert, Dr. Dafny, does not account for the many competing hospitals located within HUMC's and Englewood's primary service areas. Nor does she explain why some large parts of Bergen County **not** in the merging parties' primary service areas are included in the FTC's proposed market. Meanwhile, over 40% of the zip codes in HUMC's primary service area, and nearly 33% of discharged patients residing within its primary service area, are from **outside** Bergen County. Wu Report ¶ 97. When rank ordered, four of HUMC's top ten zip codes for patient discharges lie **outside** Bergen County.[22] Thus, the FTC's proposed geographic market covers barely more than half of the commercially-insured patients that seek care at HUMC and Englewood. *Id.* ¶ 95.

A complete geographic market analysis should consider the Defendants' PSAs, because the PSAs are what insurers consider in building their provider networks. When insurers negotiate with a hospital, they weigh the cost of contracting with the hospital against any loss of competitiveness they would incur were they to exclude the hospital from their network. But insurers do not negotiate contracts that cover only a portion of a hospital's service area: a hospital is either in an insurer's plan (at a certain benefit level) or it is not. Consequently, the insurers take a hospital's *entire* service area into account when evaluating the impact of including or excluding the hospital from their network. *Id.* ¶ 99. By limiting her analysis to

---

[22] ▮▮▮▮▮▮▮▮

Bergen County, Dr. Dafny improperly fails to account for the commercial realities of rate negotiations with insurers by ignoring large parts of HUMC's and Englewood's service areas.

Excluding significant parts of HUMC's and Englewood's PSAs from the FTC's proposed geographic market is also inconsistent with its prior practice. In the past, when the FTC successfully challenged a hospital merger in an urban setting, it included the entire primary service area for each of the merging parties' hospitals at issue in its proposed geographic market, not just portions thereof. For example, in the *Advocate* case involving hospitals in Chicago, the FTC relied on the merging parties' primary service areas to define the contours of its proposed relevant market, then included *all* competitors that drew significant patient volume from that area. *Advocate*, 841 F.3d at 466. Here, by contrast, without any basis for doing so, the FTC proposes a much smaller geographic market, which has barely half the number of hospitals that it included in *Advocate* and which excludes a significant portion of HUMC's and Englewood's primary service areas. As a result, the FTC's competitive analysis wrongly omits many significant competitors of HUMC and Englewood, including St. Joseph's University Medical Center and Wayne Hospital, RWJBarnabas' Jersey City and Clara Maas Medical Centers, St. Mary's, Hudson Regional, three CarePoint hospitals, and NYP-Columbia, among others. If the FTC had used the same methodology here as it used to define the relevant geographic market in *Advocate*, these competing hospitals would be included in the proposed

-23-

market and the resulting HHI number would be below what is required to establish a presumption of anticompetitive harm. *See infra* Section I.B.5; Wu Report ¶¶ 141–143.

### 4. The FTC's Proposed Market Excludes Many Hospitals that are Close Substitutes for Englewood and HUMC.

The FTC alleges that, in negotiations or when constructing networks, insurers would have few alternatives to HUMC and Englewood because only three hospitals other than the merging parties are located in Bergen County—Holy Name, Valley, and Bergen New Bridge. Pl. Br. at 5. That assertion is divorced from commercial realities because it ignores all of the other nearby hospitals just outside of Bergen County that an insurer could include in its network. Some of these hospitals, just beyond the Bergen County line, including St. Joseph's University Medical Center, St. Mary's General Hospital, and Hudson Regional Hospital, are actually a shorter drive for many Bergen County residents than either Englewood or HUMC. Wu Report ¶ 72. Excluding such hospitals contradicts the FTC's own Merger Guidelines, which require that the relevant geographic market include all competitors that are at least as close substitutes to the merging parties as are other competitors included in the market. *See* Guidelines § 4.1.1; *see also* Wu Report ¶ 64. This is illustrated in the following chart listing hospitals within 30 minutes or 15 miles of Englewood, but the same result is seen as measured from HUMC:

-24-

## Hospitals Within Close Proximity of Englewood Hospital

| Hospital | County | From Englewood Hospital | |
|---|---|:---:|:---:|
| | | **Less Than 30 Min.** | **Less Than 15 Miles** |
| Holy Name Medical Center | Bergen | ✓ | ✓ |
| NYP - Columbia University Medical Center | New York | ✓ | ✓ |
| NYC Health – Harlem | New York | ✓ | ✓ |
| NYC Health – Lincoln | Bronx | ✓ | ✓ |
| NYP – The Allen Pavilion | New York | ✓ | ✓ |
| St. Barnabas Hospital (NY) | Bronx | ✓ | ✓ |
| New Bridge Medical Center | Bergen | ✓ | ✓ |
| BronxCare – Lebanon Hospital Center | Bronx | ✓ | ✓ |
| BronxCare – Lebanon Hospital Center – Fulton | Bronx | ✓ | ✓ |
| BronxCare – Lebanon Special Care Center | Bronx | ✓ | ✓ |
| NYC Health – Metropolitan | New York | ✓ | ✓ |
| Mount Sinai – St. Luke's Hospital | New York | ✓ | ✓ |
| Valley Hospital (New Campus 2023) | Bergen | ✓ | ✓ |
| Hudson Regional Hospital | Hudson | ✓ | ✓ |
| St. Joseph's University Medical Center (NJ) | Passaic | ✓ | ☐ |
| Mount Sinai West Hospital | New York | ✓ | ✓ |
| Montefiore Medical Center – North Division | Bronx | ✓ | ✓ |
| Memorial Sloan-Kettering Cancer Center | New York | ✓ | ✓ |
| Montefiore Medical Center | Bronx | ✓ | ✓ |
| NYP – Weill Cornell Medical Center | New York | ✓ | ✓ |
| Hospital for Special Surgery | New York | ✓ | ✓ |
| NYC Health – North Central Bronx | Bronx | ✓ | ✓ |
| NYC Health – Jacobi | Bronx | ✓ | ✓ |
| Mount Sinai Hospital | New York | ✓ | ✓ |
| Mount Sinai – Queens | Queens | ☐ | ✓ |
| Northwell – Manhattan Eye, Ear and Throat | New York | ☐ | ✓ |
| Montefiore – Jack D. Weiler Hospital | Bronx | ☐ | ✓ |
| Northwell – Lenox Hill Hospital | New York | ☐ | ✓ |
| Valley Hospital (Current Campus) | Bergen | ☐ | ✓ |
| St. Joseph's Medical Center (NY) | Westchester | ☐ | ✓ |

World-renowned New York City hospitals are also a close local option for Bergen County residents. Yet the FTC's proposed market excludes *all* of them as well. The evidence shows that ███████████████████████████████

███████████████████████████████    ███████████████

███████████████████████.[23] These competitors excluded from the FTC's market definition include some of the most prominent hospitals in the nation: NYP-Columbia, Mount Sinai Hospital and Saint Luke's, Memorial Sloan Kettering, and the Hospital for Special Surgery. Underscoring the commercial reality of this cross-river competition, many of these hospitals have aggressively added outpatient facilities in Bergen and Hudson Counties, entered into clinical affiliations with hospitals in northern New Jersey, and targeted Northern New Jersey residents with advertising to draw additional patients to their inpatient facilities across the river. Wu Report ¶¶ 76, 107, 112, 118, 123.[24] Moreover, Englewood's contemporaneous business documents show that ██████████████████████████████████████████████████████████████████████████████████.[25]

That is consistent with ████████████████████████████████████████████████████████████████████████████████.[26]

According to the FTC, none of these excluded competitors provides Bergen County residents with access to "*local*, routine inpatient" GAC services. Pl. Br. at 1–2 (emphasis added). But the FTC cannot seriously dispute that hospitals like RWJBarnabas' Clara Maas Medical Center, NYP-Columbia, St. Joseph's University

---

[23] *E.g.,* ██████████████████

[24] *E.g.,* ███████ ██████████████████████████████
██████████████████████

[25] *See, e.g.,* ████████

[26] ████████████████████.

-26-

Medical Center, and Hudson Regional provide routine inpatient GAC services. What the FTC apparently contends is that hospitals outside of Bergen County are not "local" hospitals for Bergen County residents even if they are just minutes away. There is no logical or factual basis for that contention.

To support its assertion that Bergen County alone is a relevant geographic market, the FTC cites data showing that 63% of Bergen County residents "seeking elective care . . . select a hospital within [twenty] minutes of their residential zip code." Pl. Br. at 21 n.53. That statistic, however, does not support the FTC's geographic market for two distinct reasons. First, many hospitals *outside* Bergen County are within twenty minutes of Bergen County residential zip codes and many others are within just five minutes more—including, for example, Hudson Regional in Secaucus, St. Joseph's in Paterson, and NYP-Columbia in Manhattan. Second, if only 63% of Bergen County residents seeking elective care select a hospital within twenty minutes of their residential zip code, that means 37% of Bergen County residents select a hospital *more than* 20 minutes from their residential zip code. Far from supporting the FTC's position, the data make clear that the relevant geographic market extends well beyond Bergen County's borders. Indeed, Dr. Dafny's diversion analysis shows that if HUMC became unavailable, the *majority* of its patients would

go to hospitals *outside* Bergen County.[27] Dr. Dafny attempts to support her own market analysis by claiming that if Englewood Hospital was not available, "nearly four in ten" of Englewood patients would go to an HMH hospital, again ignoring the fact that the significant *majority* of Englewood patients—more than six out of ten—would go elsewhere. Dafny Report ¶ 177.

To try to evade the consequences of this commercial reality for its *prima facie* case, the FTC misstates the applicable authority. Quoting *Penn State Hershey*, the FTC argues that the Third Circuit has rejected the idea that patients willing to "travel to a distant hospital to obtain care significantly constrain the prices that the closer hospital charges to patients who will not travel to other hospitals." Pl. Br. at 43–44 (quoting *Penn State Hershey*, 838 F.3d at 340–41). While that may be, it has no bearing here, where the facts are materially different from those in *Penn State Hershey*. In that case, the FTC's proposed market covered four counties and the merging hospitals argued for the inclusion of competitors more than an hour away. *Penn State Hershey*, 838 F.3d at 338. In this case, by contrast, the FTC proposes a geographic market limited to just one county and excludes from that proposed market numerous hospitals that are within approximately 20 minutes of Englewood or HUMC and, in some cases, closer to either Englewood or HUMC than Englewood

---

[27] *See* Dafny Report ¶ 177, Figure 17 (total of 57.4% of patients would go to New York or New Jersey hospitals outside of Bergen County if HUMC unavailable). Of the minority that would remain within Bergen County, the plurality would go to Valley (20%), not Englewood (only 12.4%). *Id.*

-28-

and HUMC are to each other. Nothing in *Penn State Hershey* suggests that hospitals so close to the impacted patients are too "distant" or insufficiently "local" to act as price constraints. Rather, *Penn State Hershey* stands for the much simpler proposition that the relevant geographic market must conform to commercial realities. Here, the FTC and its expert have defined an artificially narrow geographic market that excludes numerous hospitals that compete with HMH and Englewood.

### 5.    Modest Adjustments to the FTC's Geographic Market Eliminate Any Presumption of Anticompetitive Effect.

The fragility of the FTC's proposed market is vividly illustrated by the fact that even minor adjustments to Dr. Dafny's proposed geographic market make her claims of increased market power evaporate. *See* Wu Report § V. For example, adding patients who reside within 20 minutes of HUMC or Englewood to the proposed geographic market yield a combined post-merger market share of 41.9% and a post-merger HHI of 2,319, below the threshold for an adverse competitive presumption. *See id.* ¶ 140. Other minor adjustments would lower the share and concentration figures even further, such as adding just a couple hospitals near the Bergen County border or accounting for Valley Hospital's forthcoming relocation to a new hospital facility closer to Defendants' hospitals and Bergen New Bridge's expansion into providing GAC services. *See id.* §§ V, VI.C. Similarly, a geographic market constructed according to the FTC's approach in *Advocate/NorthShore*, with a focus on the merging hospitals' primary service areas as opposed to some arbitrary

subsection of those areas, results in combined post-merger market share of 31.0% and a post-merger HHI of 2,194, also below the threshold for an adverse competitive presumption. *See id.* ¶ 143. The significant changes in measures of market concentration that result from small changes in market definition indicate that the FTC's proposed geographic market is not a reliable basis for analysis.

### C.    The FTC's Competitive Effects Analysis Fails to Account for the Demonstrable Procompetitive Benefits from the Merger.

Lacking reliable expert analysis and sufficient evidence of market concentration, the FTC cannot meet its prima facie burden. It therefore must adduce testimony and documents to try to show that the proposed merger is likely to "substantially lessen competition." *Brown Shoe Co.* 370 U.S. at 325. That record evidence, however, shows the merger will be ***pro***competitive. For example, evidence from insurers and employers and expert testimony from Defendants both demonstrate that, because HUMC and Englewood are complements but not close substitutes for purposes of forming commercial networks, the addition of Englewood to the HMH system will not increase the parties' bargaining leverage post-merger. Rather, the merger will enhance competition for inpatient GAC services. *See generally* Gowrisankaran Report §§ V-X; Wu Report § VI. In addition, Defendants' Service Optimization Framework, a central rationale for the merger, will be a significant driver of that enhanced competition.[28] As detailed below, redirecting

---

[28] *See generally* ▮▮▮▮▮

patients under the Service Optimization Framework, transforming Englewood into a tertiary hub, investing almost $440 million in Englewood to increase its capabilities and attractiveness, and reducing outmigration to New York City hospitals will result in approximately $22.8 million in direct annual savings to payers, in addition to numerous other unquantified benefits. *See* Gowrisankaran Report Tbl. 12. The FTC's brief ignores this evidence entirely, and as a result, its analysis misstates and fails to prove the likely price effects of the merger.

### 1.    HUMC and Englewood are Complements, Not Substitutes.

For insurers forming commercial networks, HMH (a large health system with an AMC at HUMC) and Englewood (a community hospital) are complements to, not substitutes for, one another.[29] Given its size and service offerings, HUMC is clearly an important component of insurers' health networks; insurers and patients want to ensure that there are in-network providers that can handle the most complex medical cases, should they arise.[30] Englewood, on the other hand, is not a "must-have" provider for commercial health insurers because it is similarly situated to many other nearby community hospitals—such as Valley, Holy Name, Bergen New Bridge, St. Mary's, CarePoint's three hospitals (Christ, Bayonne, and Hoboken University), and Hudson Regional, among others—that insurers can easily turn to if they choose not

---

[29] ████████████████████████████████████████████████████████

[30] ████████████████████████████

-31-

to contract with Englewood.[31]

Various data likewise illustrate that HUMC and Englewood are not close substitutes for insurers. First, an analysis of the patient claims generated at each hospital, which illustrates the procedures they typically perform, shows that HUMC is similar to other AMCs in the area such as Atlantic's Morristown Medical Center and RWJ-St. Barnabas Medical Center, and NYP-Columbia and Mount Sinai just across the Hudson River. By contrast, the procedures that Englewood typically performs are similar to those performed at other community hospitals in the area such as Valley or Holy Name. *See* Wu Report ¶¶ 55–56, 155–161.

Notably, HUMC's utilization rate is higher than Englewood's even though ▮



▮ *Id.* ¶¶ 162–169. Thus, contrary to what one would expect if the two hospitals were close competitors, insurers pay ▮

▮ ▮

▮ , *id.* ¶ 162, ▮

▮ . *Id.* ¶ 167.

### 2. Englewood Would Not Enhance HMH's Bargaining Leverage.

Because HUMC and Englewood are complementary, adding Englewood to

---

[31] ▮

the HMH system will not increase HMH's leverage when negotiating with insurers.[32] For example, ██████████████████████████████ that it ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████.[33] Underscoring that Englewood is not a close competitor that constrains HMH's prices, ████████████████████

██████████████████████████████████████████████████████

██████████████████████.[34]

   The ████████████ further testified that ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ ██████ ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ ██████████████████

██████, █████████████████████████████████████████████████



-33-

████████████████████████████████████████████████████████████████████.[37]

Evidence of the specific choices insurers have made in constructing networks underscores the absence of close competition between HUMC and Englewood. While the FTC baldly asserts that insurers play HMH and Englewood off each other in negotiations, *see* Pl. Br. at 38, this is belied by the factual record.

In certain instances, a payer will construct a "narrow" or "tiered" network of providers. In a narrow network, certain providers are excluded from the product altogether; in a tiered network, providers are placed into higher or lower benefit-tiers, and patients incur higher cost-sharing if they use a provider in a lower benefit tier. Here, there is no evidence of insurers leveraging HMH against Englewood, or vice versa, in negotiating price reductions as a condition for inclusion in such narrow or tiered networks.[38] For example, both HMH and Englewood are included as Tier 1 providers in Horizon's OMNIA product,[39] as they serve complementary geographies and offer complementary services. Similarly, both HMH and Englewood are excluded from Cigna's Local Plus narrow network product (currently sold to self-insured customers and planned next year for fully-insured customers), and ████

████████████████████████████████████████████████████

---

[37] ████████████████████████████████████

[38] ██████████████████████████

[39] ████████████████████████████████  ████████████████████████████
████████████████████████████████

██████████████████████.[40] By contrast, there is evidence that payers utilize ██████ ████████████████████ as a bargaining chip in negotiations with HMH because they are close substitutes to each other.[41]

Against all this contrary evidence, the FTC relies on conclusory statements and speculative testimony from a select few health insurers that supposedly fear higher rates as a result of the merger, while it downplays the testimony of ████████ ██████████████████████, and others who do not share such concerns.[42] The FTC's selective reliance on only a subset of insurers (and no employers) is unreliable as it overlooks the bias of these insurers, which face competition from HMH for their other insurance products or health services. *See Jefferson*, 2020 WL7227250, at *18. For example, HMH recently formed a new insurance company and launched a Medicare Advantage health plan to seniors in New Jersey, Braven Health, which HMH co-owns with Horizon and RWJBarnabas. ██████████████

██████████████████████████████████████████

████████████████████████ ██████████████████ ██

██████.[43] ████████████████████████████████████

---

[40] ██████████████████████████████████████.

[41] ████████████████████████████████████████████████ ██████

[42] *See, e.g.,* ████████████████████████████████████████.

[43] ██████ ████████████████████.

███████████████████████████████████████████. ███████████████ compete in the provision of healthcare services and through their acquisitions of physician practices and outpatient clinic locations that compete directly with the services provided by HMH and Englewood.[44] The opinion testimony ███████████████, accordingly, must be viewed through the lens of them being head-to-head competitors with HMH and Englewood.

More significantly, the views expressed by the insurers in opposition to the merger are not supported by contemporaneous documentary evidence or the insurers' actual behavior or negotiating strategy with HMH and Englewood. None of these insurers has testified that they used HMH and Englewood against each other in price negotiations.[45] Nor are these insurers' views substantiated by any economic or real-world analysis. Their unsupported assertions do not satisfy the FTC's burden of establishing the merger will have anticompetitive effects.

### 3.    The FTC Over-Estimates Price Effects from the Merger and Ignores All Offsetting Procompetitive Effects

The FTC over-estimates any price effects from the merger. Defendants' experts have shown the merger will not result in any price increases and, instead, will result in savings to payers and increased incentives for HMH to reduce prices.

To support her prediction of a price increase, Dr. Dafny uses a statistical

---

[44] ███████████████████████████████    ███████████████████████

[45] *E.g.,* ███████████████████████████████████████████████
███████████████████████████████████████████████

model to estimate the degree to which the merger will increase insurers' "willingness to pay" (WTP) for GAC services from HMH and Englewood post-merger. When converting this change in WTP to actual prices, as Dr. Wu demonstrates, Dr. Dafny did not perform any independent analysis of actual claims data from northern New Jersey. Wu Report ¶¶ 170–177. Instead, she used an estimate from academic literature that she simply assumes applies to the facts at issue here without doing any testing to support this assumption. *Id.* Relying on actual claims data from Northern New Jersey, Dr. Wu found no reliable evidence that the merger is likely to lead to a price increase for GAC services. *Id.* ¶¶ 178, 196. Dr. Wu's conclusion—in contrast to that of Dr. Dafny— accords with the record evidence regarding Defendants' current and future bargaining positions with insurers.

The FTC also pays no heed to evidence indicating the proposed merger will facilitate price *decreases*. As noted *infra*, in Section I.C.4, HUMC has had ███████ ██████████████,[46] and as a result ███████████████████████████ ███████████████████████████████████████████.[47] The FTC and its economic expert ignore HUMC's ███████████████ and ███████████████ ███████████████████████████. However, as Dr. Gowrisankaran

---

[46] ███████████; Nolan Report ¶ 65; ████████ ████████████████████████ ███████████████████████████████

[47] ███████████████████████ ██████████████████████████ ███████████████████████

demonstrates, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Gowrisankaran Report ¶¶ 230–233, 277.

This is because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. HMH

has a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮.[48]

In addition, the FTC failed to consider the growth and improvement plans of nearby alternative providers that will further constrain Englewood and HMH from any post-merger price increases. The FTC relies heavily on econometric analysis to argue the merger will have anticompetitive effects, but the data it relies are historical and thus ignore recent market activity, or activity that may occur in the near future. The failure to account for the increased competition from these providers further undermines the reliability of the FTC's estimate of the merger's price effects.

For example, the FTC does not account for the fact that Valley Hospital will soon relocate to Paramus, New Jersey which is five miles closer to both HUMC and Englewood than Valley's current campus in Ridgewood and better situated to take advantage of major nearby thoroughfares and greater population density.[49]

---

[48] ▮▮▮▮▮▮▮▮▮▮▮

[49] *See, e.g.,* ▮▮▮▮▮▮.

Similarly, the FTC ignores the fact that Bergen New Bridge is expanding further into GAC services.[50] Although Bergen New Bridge traditionally focused on behavioral health, it has 173 inpatient beds and ███████████████████████████████████

████████████████████████████████.[51] These investments will increase its competitive significance in Bergen County.[52] Given its proximity to HUMC and Englewood, Bergen New Bridge's expansion of its GAC services—like the relocation of Valley's entire hospital—███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

Nor does Dr. Dafny fully account for New York City providers' expanding presence in northern New Jersey. *Id.* ¶¶ 207–210. New York City hospitals already attract significant numbers of northern New Jersey residents for inpatient care, diagnostic services, ambulatory surgery, and advanced outpatient cancer treatments (to name a few). These nearby competitors are building or expanding outpatient facilities within Bergen County and surrounding areas in an attempt to draw even more New Jersey patients to their Manhattan facilities for inpatient services. For

---

[50] ████████████████████████████████████████████████████

██████████████████████████████████

[51] ███████████████████████████████████████████

[52] ██████████████████████████████████████

example, the Hospital for Special Surgery has built and recently expanded its HSS Paramus outpatient center, as well as entered into a contract ██████████

██████████████████████████████████████████

██████████████████████████████"[53] In addition, New York hospital systems such as Mt. Sinai are forming affiliations with New Jersey hospitals such as Valley and Holy Name ██████████████████

███████████.[54] The data relied upon by Dr. Dafny do not account for the competitive impact of such entry and expansion since 2019, even though outmigration rates to New York City providers have been increasing in recent years.

Finally, the FTC claims that ████████████████████

████████████████████████—which some of the insurers have also cited as a source of concern. But ████████████

█████████████████████████████████

████████████████████ might otherwise have allowed.[55] █████████████████████████

█████████████████████████████████████.

*See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977)

---

[53] ██████████

[54] *See, e.g.,* ████████ ████████████████████████
████████████

[55] ████████████████████████████

(mergers are unlawful "only when they may produce anticompetitive effects.").

Even if ███████████████████, the operation of ████████████ ████████████ would have no bearing on any analysis of the competitive effects of the merger, or whether this Court should preliminarily enjoin this transaction, as they do not demonstrate any *post*-merger increase in bargaining power or lessening of competition. Indeed, the FTC concedes that ████████ ███████████████████ ████████████ ████████████████ Pl. Br. at 29 n.71. In other words, ██████ ████████████████████████████████████ ████████████████████████████ would not be an anticompetitive effect of any post-merger increase in bargaining leverage.

### 4. The Proposed Merger Will Expand Health Care Access for Patients Residing in Northern New Jersey.

One of Defendants' procompetitive goals for the merger is to ███████████ ████████████████████████████████████ ████████████████████████████. ███ ██████████████████████████—were written into their merger agreement (the "Definitive Agreement"). The procompetitive result will be improved health care for northern New Jersey patients.

The merger's transformation of Englewood will have tangible procompetitive effects the day the merger closes. Beginning immediately, HMH will ████████

-41-

██████████████████████████████████████████████████████████████

████.[56] As a result, HUMC will ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[57] The merger will therefore enable area patients to receive the most complex medical care at a New Jersey alternative to more expensive New York City facilities.

The Service Optimization Plan provides a procompetitive opportunity to alleviate ████████████████████████████████. Currently, HUMC's ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[58] This is particularly true as to ████████████████████████████████████ which represent the core services offered at HUMC.[59] Prior to the COVID-19 pandemic, HUMC already had

---

[56] ████████████ ████████████████████████████████████████ ████████████.

[57] ████████████ ██████████████████████████████████

[58] ████████████; ████████████████████████████ Nolan Report ¶¶ 39–45.

[59] ████████( ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████. During the pandemic, █████████████████████████

████████████████████████████. Nolan Report ¶ 97.

HMH has exhausted its ability to relieve █████████████████████

████████. *Id.* ¶ 92. ███████████████████████████████. HUMC █████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████.

Gowrisankaran Report ¶¶ 56, 215; Nolan Report ¶¶ 101–103. HUMC has invested

significantly ████████████████████████████████████████

███████████████████████████████and ███████████████████████

██████████████████████████████████████████████████████████

███████████████████ Nolan Report ¶ 76.

Defendants' plan███████████████████████████████████████ is

procompetitive and achievable. ████████████████████████████████

█████████████████████████████████████████████████████████.[60]

HMH, meanwhile, already has the ███████████████████████████████

██████████████████████████████████████████████████████████.[61]

---

████████████████████████████████████████████████████████████

Nolan Report ¶ 53.

[60] ████████████; Nolan Report ¶¶ 129–131.

[61] ████████████████████████████████████████████████

Englewood is therefore well-positioned to ██████████████████████████

and HMH is well-prepared to ███████████    ██████████████████████

████████████████████████████████████████████████

The Service Optimization Plan that will be effectuated through the merger will also provide procompetitive benefits to insurers, employers, and patients through lower prices. As discussed above, HUMC, as an AMC with an on-site medical school, is ███████████████████████████████████

█████████████████████████████████████, payers will realize direct reduced expenditures of $8.1 million annually, which can then be passed on to patients. Gowrisankaran Report ¶ 189.

Moreover, by █████████████████████████████

████████████████████████, the transaction will result in an additional $12.5 million annually in reduced expenditures█████████████████

███████████████████████████████. *Id.* ¶ 190. In addition,████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████, the Defendants estimate there will be another $2.2 million in annual reduced payer expenditures. *Id.* ¶ 244. These estimated savings of $22.8 million annually, which will be directly passed on to payers, do not account for several other procompetitive benefits, including: (1) Englewood's increased attractiveness to its existing patients, due to its enhanced

capabilities; (2) the benefits of integration into the HMH system; (3) increased access to complex care in northern New Jersey; (4) improved quality outcomes as a result of increased patient volume at HUMC for complex care; (5) ███████████ ████████████████████████████████████████████████████████████ ████████████████; and (6) benefits accruing to non-commercial patients. *Id.*, Tbl. 12. As discussed, *infra*, in Section I.E, the merger will also result in significant operational efficiencies, $19 million of which will be passed on to payers. *Id.*

5.    **Any Predicted Price Increase would be Small and Offset by Savings from the Demonstrable Procompetitive Benefits of the Merger.**

As detailed above, Defendants' experts demonstrate that the merger will generate immediate and direct savings for commercial insurers. These procompetitive savings are not accounted for in Dr. Dafny's predicted price increase. When coupled with the operational efficiencies identified in Section I.E., these savings will outpace any possible price increases from the merger predicted by Dr. Dafny. *See* Gowrisankaran Report Tbl. 12.

D.    **The Merger Will Have the Additional Procompetitive Effect of Improving the Quality of Care at Englewood and HMH.**

In addition to the procompetitive benefits from ███████████████ ████████████████████████████████████████████, the combination of HMH and Englewood will have the further procompetitive effect of ███████████████ ███████████████████████████, both at Englewood and HMH.

*See generally* Meyer Report. Although the FTC argues that there is a high standard to prove efficiencies as a defense, it ignores the fact that quality of care and other health care improvements are not mere efficiencies but procompetitive effects that must be taken into account when evaluating whether the FTC has carried its burden of proving the merger to be anticompetitive. *Penn State Hershey*, 838 F.3d at 350.

Englewood and its patients will benefit from HMH's current quality infrastructure and the infusion of resources it has committed to Englewood post-merger. As a standalone hospital, despite its dedicated and high-quality professional staff, Englewood lacks the clinical expertise, physicians, infrastructure, and practices for improving quality of care that exist at an AMC like HMH. ▮

▮

▮HMH, by contrast, already invests significant system-wide resources in quality, and it has a strong national reputation as a leader in quality of care. It has a robust quality infrastructure at the network level, individual hospital level, and individual clinical service area level. Meyer Report ¶ 91. The Definitive Agreement between HMH and Englewood provides ▮

▮

▮. *See* Meyer Report ¶¶ 72, 78, 88, 116, 124–127, 141, 143, 147–150.

HMH has a history of improving quality of care at the hospitals it acquires—in fact, HMH has made significant quality-related investments at each of its prior

merger partners.[62] These investments have resulted in significant improvements in key quality metrics such as frequency of readmissions, number of hospital-acquired infections, and mortality rates. *See* Meyer Report ¶¶ 173–175.

In addition, the merger presents a unique opportunity for HUMC to alleviate

███████████████████████████████████████████████████████

██████████████████████████████. This will enable HUMC to improve its own clinical outcomes. It will also enable HUMC to deliver more complex procedures that are not currently available in northern New Jersey.

### E.    The Merger Will Generate Substantial Efficiencies and Cost Savings that Outweigh Any Potential Predicted Harm.

███████████████████████████████████████████████████████

████████████████████████████████ and the improvements to quality that will result (*see, supra*, Section I.D), HMH and Englewood will achieve significant clinical benefits and operational savings by combining. Ahern Report ¶¶ 47–50. Another way "a defendant may rebut the government's *prima facie* case," in addition to showing that the predicted anticompetitive effects are unlikely, is "with evidence that the intended merger would create significant efficiencies in the relevant market."[63] *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121,

---

[62] PX7020, ████████████████████████████████████

███████████████████████

[63] Merger Guidelines, § 10 ("[A] primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's

146–47 (E.D.N.Y. 1997) (quotation omitted); *see also FTC v. Arch Coal, Inc.*, 329 F.Supp.2d 109, 150 (D.D.C. 2004); *New York v. Deutsche Telekom AG* (*T-Mobile/Sprint*), 439 F. Supp. 3d 179, 207 (S.D.N.Y. 2020); *Penn State Hershey*, 838 F.3d at 348–49. "Courts and the Merger Guidelines generally require that claimed efficiencies be both merger-specific and verifiable." *T-Mobile/Sprint*, 439 F. Supp. 3d at 208. Efficiencies are merger-specific when they "cannot be achieved by either company alone" and therefore could not be attained "without the concomitant loss of a competitor." *Penn State Hershey*, 838 F.3d at 348 (quotation omitted).

████████████████████████████████████████████████████

██████████████████████████████████████████.[64] Since the execution of their agreement, the Parties, working with stakeholders and subject matter experts, identified the savings they could achieve from merging and developed a plan to attain those savings through integration efforts.

Defendants' efficiency expert, Lisa Ahern, analyzed and verified the savings achievable through the merger, concluding that by merging, the parties will realize over $38 million in annual recurring procompetitive operational efficiencies by Year 4 post-merger. Ahern Report ¶ 4. HMH's history of achieving efficiencies following

ability and incentive to compete, which may result in lower prices, improved quality, enhanced service or new products.").

[64] ████████ ████████████████████████████████████████

████████ ████████████████████████████████████

-48-

prior mergers lends further credence to this projection. *Id.* ¶¶ 117–122; Guidelines § 10 ("[e]fficiency claims substantiated by analogous past experience are those most likely to be credited"). These efficiencies are verifiable and merger-specific, as they could not be achieved by either Defendant independently or through alternative means. Ahern Report ¶ 49; *see T-Mobile/Sprint*, 439 F. Supp. 3d at 213 (efficiencies are merger-specific where "neither company as a standalone can achieve the level of efficiencies promised by the Proposed Merger"). At the very least, they are "sufficiently verifiable and merger-specific to merit consideration as evidence that decreases the persuasiveness of the [FTC's] prima facie case." *Id.* at 208.

Dr. Gowrisankaran estimated that 50% (or $19 million) of the $38 million efficiencies would be passed through to payers in the form of lower reimbursement rates. Gowrisankaran Report ¶ 269. These efficiencies, along with $22.8 million in procompetitive benefits described above, *infra*, at Section I.C.4, more than offset any possible anticompetitive effects predicted by the FTC and its expert.

## II. THE BALANCE OF EQUITIES DISFAVORS THE INJUNCTION.

Finally, the balance of equities tilts strongly against a preliminary injunction. "[T]he 'likelihood of success' analysis and the 'public equities' analysis are legally different points and the latter should be analyzed separately, no matter how strong the agency's case on the former." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 75 (D.D.C. 2009). The FTC has an independent burden to "show that the equities favor issuing the relief sought." *FTC v. Ill. Cereal Mills, Inc.*, 691 F. Supp. 1131,

1140 (N.D. Ill. 1988). Balancing the equities is not a "mechanical" task; the FTC cannot rely on the public interest in "antitrust enforcement" alone. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1081 (D.C. Cir. 1981). The Court must consider "whether the *injunction*, not the *merger*, would be in the public interest." *Penn State Hershey,* 838 F.3d at 353 (emphasis in original); *see also Jefferson*, 2020 WL 7227250 at *11. Thus, "[t]he question is whether the harm that [Defendants] will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Penn State Hershey,* 838 F.3d at 352.

Here, the merger will result in an entity that is significantly more efficient and will enhance the volume and quality of complex tertiary and quaternary inpatient GAC services available in northern New Jersey. It also offers an opportunity to lower prices to insurers, employers and patients, as well as increase quality of care. These procompetitive public benefits will be lost if the preliminary injunction is granted. A preliminary injunction is an extraordinary remedy that should not be taken lightly. Here, it would kill the merger and deprive New Jersey residents of the many procompetitive benefits, and improved care, that the merger will provide. The balance of equities strongly supports denying the injunction.

## CONCLUSION

For all the reasons set forth above, and as they will further demonstrate at the forthcoming hearing in this matter, Defendants respectfully submit that the Court should deny the FTC's Motion for a Preliminary Injunction.

-50-

Dated: April 12, 2021

Respectfully submitted,

s/ James Bucci

Angelo J. Genova
James Bucci
Peter Berk
GENOVA BURNS LLC
494 Broad Street
Newark, NJ 07102
(973) 533-0777
agenova@genovaburns.com
jbucci@genovaburns.com
pberk@genovaburns.com

Jeffrey L. Kessler (admitted *pro hac vice*)
Jeffrey J. Amato (admitted *pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10163
Telephone: 212-294-4698
jkessler@winston.com
jamato@winston.com

Heather P. Lamberg (admitted *pro hac vice*)
Andrew E. Tauber (*pro hac vice* to be filed)
WINSTON & STRAWN LLP
1901 L Street, NW
Washington DC 20036
Telephone: 202-282-5274
hlamberg@winston.com
atauber@winston.com

David E. Dahlquist (admitted *pro hac vice*)
Matthew R. DalSanto (admitted *pro hac vice*)
Kevin B. Goldstein (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: 312-558-5660
ddahlquist@winston.com
mdalsanto@winston.com
kbgoldstein@winston.com

s/ Paul H. Saint-Antoine

Paul H. Saint-Antoine (Bar No. 04144-1989)
Frank F. Velocci (Bar No. 01886-1999)
John S. Yi (Bar No. 11997-2014)
FAEGRE DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932
Telephone:       973-549-7000
Facsimile:       973-360-9831
paul.saint-antoine@faegredrinker.com
john.yi@faegredrinker.com

Kenneth M. Vorrasi (admitted *pro hac vice*)
John L. Roach, IV (admitted *pro hac vice*)
Jonathan H. Todt (admitted *pro hac vice*)
Alison M. Agnew (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, D.C. 20005
Telephone:       202-842-8800
Facsimile:       202-842-8465
kenneth.vorrasi@faegredrinker.com
lee.roach@faegredrinker.com
jonathan.todt@faegredrinker.com
alison.agnew@faegredrinker.com

Daniel J. Delaney (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
191 N. Wacker Drive, Suite 3700
Chicago, IL 60606
Telephone:       312-569-1000
Facsimile:       312-569-3000
daniel.delaney@faegredrinker.com

*Counsel for Defendant Hackensack Meridian Health, Inc.*

-51-

-52-

*Counsel for Defendant Englewood Healthcare Foundation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of April, 2021, a true and correct copy of the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users in this action.

/s/ *Paul H. Saint-Antoine*
Paul H. Saint-Antoine