## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| Plaintiff, | |
| v. | |
| **HACKENSACK MERIDIAN HEALTH, INC.,** | Civil Action No. 20-cv-18140-JMV-JBC |
| and | |
| **ENGLEWOOD HEALTHCARE FOUNDATION,** | **UNDER SEAL** |
| Defendants. | |

## REPLY MEMORANDUM IN SUPPORT OF FEDERAL TRADE COMMISSION'S MOTION FOR A PRELIMINARY INJUNCTION

# Table of Contents

I.    The FTC Will Likely Succeed on the Merits......................................................2

   A.  Defendants Do Not Seriously Contest the Relevant Product Market ..............3

   B.  Defendants' Attacks on the FTC's Geographic Market Fail ..........................3

      1.  Defendants' Attack on the FTC's Market Shares and Concentration Levels Fails Because It Ignores Which Hospitals the FTC Included............................5

      2.  Defendants' Remaining Attacks on the Bergen County Market Rest on Mischaracterizations and Red Herrings ...............................................................8

      3.  Defendants' Proposed Changes to the Geographic Market Are Irrelevant and Inappropriate .......................................................................................11

   C.  The FTC's Evidence of Competitive Harm Stands Unrebutted.....................13

   D.  Defendants' Claimed Benefits are Speculative, Unsupported, and Not Merger Specific, and Thus Fail to Rebut the FTC's Prima Facie Case ..........................20

II.   The Equities Favor a Preliminary Injunction...................................................26

CONCLUSION ....................................................................................27

i

## **Table of Authorities**

### **Cases**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ...14

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...........................................13

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008)................19

*FTC v. Advocate Health Care Network,* 841 F. 3d 460 (7th Cir. 2016)...……passim

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004)...............................26

*FTC v. H.J. Heinz*, 246 F.3d 708 (D.C. Cir. 2001)..................................................2

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .............. passim

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967).............................................20

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ................................................................................. 3, 26

*FTC v. Thomas Jefferson University*, 2020 WL 7227250 (E.D. Pa. Dec. 8, 2020). .1

*FTC v. Univ. Health*, 938 F.2d 1206 (11th Cir. 1991). ...........................................2

*FTC v. Warner Commc'ns*, 742 F.2d 1156 (9th Cir. 1984).....................................2

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986)..................................19

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014).....................7,14

*Saint Alphonsus Med. Center-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015). ................................................................................ 3, 7, 20

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019)....................................... 8, 21

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ...............................19

*United States v. Cont'l Can*, 378 U.S 441 (1964) .................................................12

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011)............. 20, 26

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963). ............. 1, 4, 12, 13

### **Other Authorities**

*U.S. Department of Justice & Federal Trade Commission,* 2010 Horizontal

Merger Guidelines..................................................................................... passim

The FTC's opening brief presents a straightforward case: Bergen County is an area "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate"[1] for the sale of inpatient GAC services and in which the Acquisition will result in a substantial loss of competition. The Acquisition is presumptively illegal whether one looks at Bergen County by patients residing there—taking account of all hospitals they visit, including those outside Bergen County—or by hospitals located in Bergen County. Ordinary course evidence confirms the presumption. Defendants are important competitors to each other for Bergen County patients, and the Acquisition's elimination of that competition will result in increased prices and diminished quality and services. Defendants' made-for-litigation efficiencies cannot satisfy the high standard required to rebut the strong presumption of illegality.

Defendants' brief fails to engage with the FTC's case or evidence. Instead, Defendants seek to distract the Court by mischaracterizing the FTC's case and setting up straw men. Defendants also mischaracterize evidence throughout their brief, and present evidence that is irrelevant. Defendants' heavy reliance on the *Jefferson*[2] decision and their claim that the FTC's brief is "fatal[ly]" flawed because it "simply ignores it," Opp. 4-5, exemplifies the issue. Defendants rest almost entirely on this decision, citing it nearly 20 times. But the FTC did not

---

[1] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357 (1963).
[2] *FTC v. Thomas Jefferson University*, 2020 WL 7227250 (E.D. Pa. Dec. 8, 2020).

1

address *Jefferson* because it is irrelevant. In *Jefferson*, the FTC presented the presumption based solely on shares for a particular set of hospitals located in a geographic area. 2020 WL 7227250 at *18. Here, the FTC accounts for all hospitals visited by Bergen County patients, regardless of location. This attack, and others like it, leave the FTC's actual case unrebutted. Thus, for the reasons stated in the FTC's opening brief and below, this Court should grant the injunction.

## I.    The FTC Will Likely Succeed on the Merits

The FTC stated the appropriate standards for this case in its opening brief, Mem. 10-13, and does not repeat them here. The FTC clarifies the proper standard under Section 13(b), however, because Defendants repeatedly overstate it. *E.g.*, Opp. 5. Section 13(b)'s public interest standard is lower than the traditional equity standard for injunctive relief. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016); *FTC v. H.J. Heinz*, 246 F.3d 708, 714-15 (D.C. Cir. 2001). The FTC "has demonstrated a likelihood of success . . . if it raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance." *FTC v. Warner Commc'ns*, 742 F.2d 1156, 1162 (9th Cir. 1984).[3] Defendants' claim that they will abandon their merger if a preliminary injunction issues is a business decision that has no bearing on the legal standard.

---

[3] *See also, e.g.*, *Heinz*, 246 F.3d at 714-15; *FTC v. Univ. Health*, 938 F.2d 1206, 1218 (11th Cir. 1991).

2

A.    *Defendants Do Not Seriously Contest the Relevant Product Market*

Defendants do not dispute that the FTC has correctly defined a relevant product market as inpatient GAC services, except for a single throwaway sentence implying that it was wrong to include only overlapping inpatient GAC services— *i.e.*, services that both Englewood and HMH's Bergen County hospitals provide. Opp. 8. Defendants' critique finds no support in the case law on hospital or physician service mergers, where the FTC has consistently alleged, and courts have defined, product markets limited to overlapping services.[4] This makes fundamental sense because a merger will not reduce competition for non-overlapping services. Regardless, as the FTC's opening brief explains, the vast majority of services (over 97% of discharges) provided by Englewood and HMH's Bergen County hospitals *do* overlap.[5] Thus, unsurprisingly, an analysis of market shares and concentrations based on *all* inpatient GAC services offered by either Defendant in Bergen County shows that the Acquisition is still presumptively unlawful.[6]

B.    *Defendants' Attacks on the FTC's Geographic Market Fail*

The purpose of defining a relevant market is to specify the "line of commerce. . . [and] section of the country" in which the merger raises a

---

[4] *See, e.g.*, *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *55 (N.D. Ohio Mar. 29, 2011); *Saint Alphonsus Med. Center-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015).
[5] Mem. 17; PX8000 (Dafny Rpt.) ¶¶ 130, 132, 682, Fig. 26.
[6] PX8002 (Dafny Rebuttal Rpt.) ¶ 58, Fig. 11.

3

competitive concern. 15 U.S.C. §18. Once a market is defined, market participants can be identified and market shares calculated. Ample evidence points to Bergen County as an area "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357 (1963).[7] Bergen County is therefore the FTC's relevant geographic market, and the FTC used two valid methods for calculating market shares and concentration levels for this market. The FTC's primary method focused on patients residing in Bergen County, measuring where these patients seek inpatient GAC services. This method accounts for *all* hospitals used by those patients—including all the New York and New Jersey hospitals. Mem. 26-29; PX8000 (Dafny Rpt.) Fig. 15. The FTC also presented an alternative approach to assessing market shares and concentration levels based on the hospitals located in Bergen County. Both methods yield market shares and concentrations that exceed the presumption for an unlawful transaction. *See Merger Guidelines* § 4.2; Mem. 26-29; PX8000 (Dafny Rpt.) ¶¶ 161-66, Fig. 16.

Rather than engage with this evidence, Defendants mischaracterize the FTC's market, the facts, and the law. In particular, Defendants ignore that the FTC accounts for the very same hospitals Defendants claim the market excludes, rendering Defendants' arguments moot. Defendants also mischaracterize evidence,

---

[7] This evidence is described at Mem. 17-26.

citing to documents and testimony that contradict their own arguments. Finally, Defendants' proposed adjustments to the geographic market do not negate the FTC's market and result in markets that still trigger the presumption of illegality.

1. <u>Defendants' Attack on the FTC's Market Shares and Concentration Levels Fails Because It Ignores Which Hospitals the FTC Included</u>

Defendants' attack on the FTC's approach to measuring concentration levels and market shares hinges on their incorrect claim that the FTC's Bergen County market excludes all hospitals outside of Bergen County. Opp. 3-4, 24-25. Defendants' claim is wrong. The FTC's primary method for measuring market shares and concentration levels accounts for *all* hospitals used by Bergen County patients. Under this method, which is highly favorable to Defendants, HMH's acquisition of Englewood results in a combined share of roughly 47%, an HHI increase of 841—four times the 200-point threshold—and a highly concentrated market of 2,835. Mem. 26-29. These figures well exceed the presumption for an unlawful transaction. *See Merger Guidelines* § 4.2; Mem. 26-29.

These shares confirm the commercial reality that more distant hospitals do not meaningfully compete for patients who reside in Bergen County, and thus they are not meaningful substitutes for Bergen County hospitals for insurers constructing networks. *All* New Jersey hospitals outside Bergen County collectively have only an 8.2% share of discharges of Bergen County residents, and *all* New York hospitals collectively have only a 13.9% share of discharges of

5

Bergen County residents. Mem. 29; PX8000 (Dafny Rpt.) Fig. 15. The preceding "outmigration" figures are consistent with those calculated by Defendants in the ordinary course.[8] Defendants highlight St. Joseph's University Medical Center, St. Mary's General Hospital, and Hudson Regional Hospital, Opp. 24, but these hospitals see only 1.8%, 0.7%, and 0.2% shares, respectively, of Bergen County residents. PX8000 (Dafny Rpt.) Fig. 25. ███████████████████████ ████████████████████████████████████████.[9] Similarly, Defendants point to NYP-Columbia, Mount Sinai's hospitals, Memorial Sloan Kettering, and the Hospital for Special Surgery, Opp. 26, but NYP-Columbia (the New York hospital closest to Bergen County) sees only a 3.2% share of Bergen County residents, while the others each have less than a 2% share. PX8000 (Dafny Rpt.) Fig. 25. Documents produced ████████████ show as much.[10]

The FTC also presented an alternative approach to measuring market shares and concentration levels for the Bergen County market that focuses on the six Bergen County hospitals. While Defendants' critiques primarily address this alternative approach, they do not dispute that a Bergen County hospital market satisfies the HMT. Opp. 11-12. Nor could they. Undisputed evidence shows that a hypothetical monopolist of all Bergen County hospitals could profitably impose a

---

[8] *See, e.g.,* ███████████; PX1295-007, -065; PX2080-033; PX1139-013.
[9] *See, e.g.,* PX4085-004; ████████████; ████████████; ███████████; ████████.
[10] *See, e.g.,* PX4017 at 14, 31-36; ████████████; PX4158-036; █████.

6

SSNIP.[11] Calculating market shares for the Bergen County market this way is entirely supported by the evidence, and results in dramatically higher concentration levels—HMH would have a 65% share post-Acquisition, and the HHI would increase by 1,510 points to more than 5,000. Mem. 27-29.[12]

Instead of refuting that the Bergen County market satisfies the HMT, Defendants rely almost entirely on a single district court decision to argue that a geographic market that satisfies the HMT must also satisfy a separate, additional "commercial realities" test. Opp. 11-12. This is wrong and irrelevant. First, uniform circuit court precedent for healthcare provider mergers holds that a proposed market that satisfies the HMT constitutes a relevant geographic market, without the need for yet another test. *See, e.g.*, *Hershey*, 838 F.3d at 346 (where the FTC satisfied the inquiry under the HMT, "the Government has met its burden to properly define the relevant geographic market").[13] The HMT already accounts for

---

[11] Mem. 25-26; PX8000 (Dafny Rpt.) ¶¶ 150-51, Fig. 13. A geographic market that includes all hospitals visited by Bergen County patients for inpatient GAC services unquestionably satisfies the HMT—a hypothetical monopolist of all such hospitals could impose a SSNIP on insurers serving Bergen County residents. *Id.* ¶ 148.

[12] Defendants falsely claim that the FTC's proposed geographic market is "the smallest geographic market the FTC has ever proposed." Opp. 3. Even as to a market consisting of the six Bergen County hospitals, this claim is wrong. *See, e.g.*, *FTC v. OSF Healthcare System*, 852 F. Supp. 2d 1069, 1077 (N.D.Ill. 2012) (three hospital market). In *ProMedica*, the relevant geographic market was a single county with less than half of Bergen County's population. 749 F.3d at 561-62, 565.

[13] *See also FTC v. Advocate Health Care Network*, 841 F.3d 460, 464, 468 (7th Cir 2016); *St. Luke's*, 778 F.3d at 784; *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019).

commercial realities. Second, even if there were a second test for commercial realities, those realities resoundingly confirm that insurers must include Bergen County hospitals for plans sold to Bergen County residents. *See* Mem. 25; *see also infra* at 10-12.[14]

> 2.    Defendants' Remaining Attacks on the Bergen County Market Rest on Mischaracterizations and Red Herrings

The FTC's opening brief presented abundant testimony and ordinary course evidence demonstrating that Bergen County is a relevant market. Mem. 17-24. Defendants fail to rebut this evidence, and their remaining criticisms of the FTC's Bergen County market lack merit for the reasons described below.

First, Defendants argue that a geographic market should incorporate Defendants' primary service areas ("PSAs"), and that both HUMC and Englewood's PSAs extend well beyond Bergen County. Opp. 20-24. This argument is legally immaterial and factually wrong—Defendants' representation of Englewood's PSA is not supported by a *single* document Defendants cite. ▮▮▮▮▮▮. Instead, as shown in the map on the next page ▮▮▮▮▮▮▮▮▮▮), these documents show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Defendants' own ordinary course documents also refer to ▮▮▮▮▮▮ ▮▮▮▮▮▮. ▮▮▮▮▮▮.

---

[14] Defendants' geographic market discussion also features an extended argument against diversion ratios. Opp. 13-14. While diversion ratios are highly informative of substitutability, the FTC's geographic market *did not rely* on diversion ratios.



Not only do the Defendants' cited documents fail to refute the FTC's geographic market, they confirm the anticompetitive nature of the Acquisition. These same documents reflect that HMH and Englewood have a combined █████ ████████████████ and █████████████████████████████ ██████████████████████████████ [15] And even if Defendants were correct about the documents' contents, hospital service areas need not be the focus of geographic market definition,[16] and Defendants cite no evidence supporting their claim that insurers consider PSAs in building their provider networks. Opp. 22. To whatever extent Defendants' PSAs extend beyond Bergen County, that implies nothing about the competitive effect of the transaction on Bergen County residents. *See* PX8002 (Dafny Rebuttal Rpt.) ¶¶ 32-33; *Hershey*, 838 F.3d at 339; *Advocate*, 841 F.3d at 469-70, 476.

---

[15] ████████ (citing ██████████ ; ██████████ ).
[16] *See* PX8002 (Dafny Rebuttal Rpt.) ¶¶ 32-34.

Defendants turn to ███████ testimony, but ███████ is of no help to them.[17]

Defendants claim that ███████ testified that a hypothetical monopolist of Bergen County hospitals ████████████████████████████████████████████ ████████████████████████████████████████ But ███████ testimony was that its contractual provisions, formulas, size, and relationships would protect it from a price increase.[18] This testimony is irrelevant to defining a geographic market, which considers neither private contracts nor existing insurer bargaining leverage. *Hershey*, 838 F.3d at 344 ("private contracts between merging parties and their customers have no place in the relevant geographic market analysis"); *id.* at 346 (payer leverage irrelevant to the HMT). The relevant ███████ testimony is its admission that it could not market to Bergen County residents and employers a health plan that excluded all Bergen County hospitals.[19] *See Hershey*, 838 F.3d at 346. ████████████████████████████████.[20]

Defendants then chide the FTC for not rebutting statements by some employers that an unspecified number of people leave Bergen County for

---

[17] The FTC addresses ███████ estimony *infra* at 17. Even if correctly cited by Defendants—and it is not—this testimony would be irrelevant to market definition. Contrary to Defendants' claim, the test for defining a geographic market is whether a hypothetical monopolist could profitably raise prices, not whether *the Acquisition* will cause an insurer to pay a higher price. *Hershey*, 838 F.3d at 346.

[18] ████████████████

[19] ████████

[20] ████████. ████████████████; PX7051 at 192-94; ████████████; ████ ████. Medicare Advantage insurers also confirm that Bergen County hospitals must be in network. *E.g.,* ████████████; ████████████.

unspecified types of healthcare. Opp. 19-20.[21] But such statements are not inconsistent with the FTC's geographic market. As the FTC has explained, Mem. 43-44, the Third Circuit and other courts reject attempts to disprove hospital markets by looking at whether some people leave the market for care. As with ███████, though, these employers did provide testimony relevant to *Hershey*'s inquiry—they would not buy a product that *excludes* Bergen County hospitals from its network. Becton Dickinson testified that it would not offer its employees a health plan that excluded Bergen County hospitals.[22] The Meadowlands Chamber of Commerce's CEO was unaware of any Bergen County members that have insurance plans that lack access to Bergen County hospitals.[23] ████████████ ███████████████████████████████████████████████████, testified that it is important for clients with a significant number of Bergen County employees to have in-network access to Bergen County hospitals.[24]

>   3.    Defendants' Proposed Changes to the Geographic Market Are
>          Irrelevant and Inappropriate

---

[21] Defendants also again misstate the testimony they cite. For example, Defendants claim that the Meadowlands Chamber of Commerce's declaration states that its "member employees generally are not concerned about the merger," Opp. 19, but the declaration contains no such statement. DX2902.

[22] ████████████. *See also id.* ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

[23] PX7044 at 90-91.

[24] ████████████████.

While Defendants do not submit an alternative geographic market, their experts propose "adjustments" to the FTC's geographic market. But Defendants here make an important concession—even in their misleadingly broad markets, the combined hospital system's market share would exceed the Supreme Court's 30% market share threshold for presuming harm.[25] *See Philadelphia Nat'l Bank*, 374 U.S. at 364; *see also FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000). Consequently, contrary to Defendants' claims, "modest adjustments to the FTC's geographic market" do *not* "eliminate any presumption of anticompetitive effect." Opp. 29. Moreover, these adjustments, if applied correctly, also result in changes in concentration levels well above the threshold for a presumptively anticompetitive merger. *See Merger Guidelines* § 5.3.[26]

The Court need not choose between Defendants' proposed markets and the FTC's, however. Firms compete in multiple markets, some broader and some narrower. Recognizing this, the Supreme Court and lower courts recognize that proof of broader markets does not "negative the existence" of narrower ones, *see, e.g., United States v. Cont'l Can*, 378 U.S. at 458, and courts must look to narrower markets—"submarkets" or smaller areas "within the competitive

---

[25] Specifically, under Dr. Wu's calculations, Defendants' 20-minute drive-time adjustment yields a combined market share of 41.9% and Defendants' (incorrect) *Advocate*-based adjustments yield a combined market share of 31%. Opp. 29-30.
[26] Applying an actual 20-minute drive time and the correct *Advocate* methodology, which Defendants fail to do, results in concentration levels above the Merger Guidelines presumption. PX8002 (Dafny Rebuttal Rpt.) ¶¶ 38-39, 40-41, Figs. 3, 5.

overlap"—to assess a merger's legality. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 337 (1962); *Philadelphia Nat'l Bank*, 374 U.S. at 357-58; *Advocate*, 841 F.3d at 472 ("If the analysis uses geographic markets that are too large, consumers will be harmed because the likely anticompetitive effects of hospital mergers will be understated.").

### C.     The FTC's Evidence of Competitive Harm Stands Unrebutted

The FTC's opening brief presented extensive ordinary course evidence of competition between Englewood and HMH's Bergen County hospitals—including

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████ . ███████

███ . Defendants do not attempt to refute this evidence. ████████████

███████████████████████████████████████████████

██████████████████████████████████

Instead, Defendants contend their anticompetitive transaction should be allowed because HUMC and Englewood are complements, not substitutes—a claim at odds with the case law and the evidence, including Defendants' own documents. First, the Acquisition would not be lawful even if Englewood offered significantly fewer services than HUMC. In *Hershey*, the Third Circuit preliminarily enjoined the acquisition by Hershey, "a leading academic medical

13

center" that "specializes in more complex, specialized services that are unavailable at most other hospitals," of Pinnacle, a health system that "focuses on cost-effective primary and secondary services and offers only a limited range of more complex services." 838 F.3d at 334; *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 562, 567 (6th Cir. 2014) (enjoining acquisition by ProMedica, which provided tertiary services, of St. Luke's, which offered virtually none).

The Court need not rely on this precedent, though, because HMH and Englewood are competitors that provide substantially similar services. Defendants do not cite to a *single* ordinary course document supporting their contention that HMH and Englewood are mere "complements." Instead, Defendants' documents are rife with references to each other as "competitors."[27] Defendants once again ask the Court to ignore ordinary course evidence in favor of expert opinion, Opp. 30, a frequent theme in Defendants' brief and an approach already rejected by the Supreme Court. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.").

Review of Defendants' discharges further confirms that they are competitors. Approximately 97.5% of discharges at HMH's Bergen County

---

[27] *See, e.g.*, PX1102-015; PX1143-026; PX1107; PX1205-002; ▮▮▮▮▮▮;
PX1055-001; ▮▮▮▮▮▮▮▮; PX1106-001-02; PX1127-012; PX2089-001;
PX2121-011; ▮▮▮▮▮▮▮; PX2125-014-15; PX2119-024-25; ▮▮▮▮▮▮▮.

14

hospitals are for services offered at Englewood, while more than 99.9% of discharges at Englewood are for services also offered at HMH's Bergen County hospitals. PX8000 (Dafny Rpt.) ¶ 682, Fig. 26. Defendants do not dispute the accuracy of this analysis, and Defendants' own experts and arguments acknowledge the extensive overlap between HUMC and Englewood. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ .

Relatedly, Defendants label Englewood a mere "community" hospital when arguing that HUMC and Englewood do not compete, Opp. 31, but their efficiencies claims rest on the exact opposite idea—███████████████████

███████████████████████████████████████████

███████████████████████████████████████ ; ██

█████████████ . Defendants also contradict their arguments about the significance of overlapping services in claiming that specialty hospitals providing exclusively orthopedics (Hospital for Special Surgery) or cancer care (Memorial Sloan Kettering) are meaningful competitors to Defendants. Opp. 3-4, 26.

Defendants are thus left again to mischaracterize evidence from insurers, evidence that highlights HMH and Englewood are competitors. First, neither

█████ nor █████ testified that HMH and Englewood were complements rather than substitutes.[28] █████ testified that that HMH is Englewood's "closest GAC inpatient competitor in Bergen County" because "HUMC is close to Englewood geographically and offers a similar set of GAC inpatient services," and that "for a large number of services, [Englewood and HUMC] compete for the same patient base."[29] Likewise, ████████████████, acknowledged that HMH and Englewood are competitors and that HMH's Bergen County hospitals are alternatives to Englewood (and vice versa) for Bergen County residents. █████

████████████████████████████████████

████████████████████████████████████.

Defendants also point to █████ but ignore that—on the same page Defendants cite—█████ testified that, if it lacked HUMC in-network, having Englewood in-network would be more important. █████

Defendants' repeated distortion of ████ testimony is especially notable. Opp. 33-34. ████ never testified that there would be ████████████ ████████████████████ Rather, ████

████████████████████████████████

████████████████████████████████



[28] Opp. 31 ████████████████████

[29] ████████████████ ██████████

16

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████. This testimony firmly supports the FTC's case.

Defendants' bald claim that insurers' testimony on competition between HMH and Englewood is not "supported by contemporaneous documentary evidence" or "real-world analysis," Opp. 36, is likewise demonstrably false.[30] As the FTC previously explained, ████████████████ performed analyses estimating that a substantial portion of their members would switch to HUMC if Englewood were terminated from their networks. Mem. 34-35. ██████ also performed termination analyses for HUMC and Pascack Valley estimating that, if either hospital were not in network, ██████ of its patients would go to Englewood. ████████████████████. Analyses ██████████ consultant prepared in developing

████████████████████████████████████████████

████████████████████████████ see also PX1036-002, 005 (including Englewood as a Tier 1 rather than Tier 2 hospital in OMNIA lowers the opportunity to "steer" patients to HUMC by about 15%). And during 2019 negotiations with HMH, ██████ identified Englewood as ████████ ████████

---

[30] Defendants make a thinly reasoned argument that insurer testimony is biased, but there is no reason to think ████████████████████████ would be more biased than ████████████████████████████.

17

██████████████████████████████████████████████████. ████████.[31] Thus,

a broad spectrum of evidence from the insurers supports the FTC's case.

Defendants also fail to rebut economic analyses predicting substantial harm

from the Acquisition. Defendants do not contest the accuracy of diversion

estimates measuring significant substitution among Defendants' hospitals.[32]

Defendants likewise do not contest analyses showing that the Acquisition will lead

to a substantial increase in willingness to pay ("WTP")—which implies that the

merged entity will have the incentive and ability to increase price by a meaningful

amount. PX8000 (Dafny Rpt.) ¶¶ 117, 195-96. Defendants quibble with Dr.

Dafny's translation of WTP increases to estimated price increases, Opp. 37, but Dr.

Dafny's methodology is supported by substantial theoretical and empirical

economic literature, including literature written by Defendants' own expert.[33]

Defendants err again in claiming that the FTC and Dr. Dafny's analysis did

not address Valley's new hospital, Bergen New Bridge's small growth in

commercial patients, and the modest increase in outmigration to New York

---

[31] Defendants reference narrow and tiered networks, Opp. 34, but ignore such networks centered on Englewood like ████████████████████████████████████ ██████████████████████████████████████████████████████████ tried to form a narrow network excluding HMH but including Englewood, ███████ ██████████████████████████████████████████████████

[32] *See* Mem. 36-37; PX8000 (Dafny Rpt.) ¶¶ 177, 178, 692, Figs. 17, 32. Defendants complain that this analysis does not include 2020 data, but 2020 data are not yet available and could be misleading due to the coronavirus pandemic.

[33] PX8002 (Dafny Rebuttal Rpt.) ¶¶ 83-86.

hospitals. Opp. 38-39. These factors were explicitly accounted for. *See* Mem. 43, 45; PX8000 (Dafny Rpt.) Section IX.A & Fig. 21, Section IX.B & Fig. 21. Under each analysis, the Acquisition remains presumptively unlawful and the WTP increase is substantial. PX8000 (Dafny Rpt.) Fig. 21.[34]

Finally, *after* the FTC filed its opening brief observing that the Acquisition would lead to immediate, significant price increases ███████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████  Opp. 40. It is hard to imagine conduct more clearly made for litigation than these letters—which offer no business justification for HMH's

████████████████████████████████████████

██████████████████. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 79-80 (D.D.C. 2017); *see also Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 434-35 (5th Cir. 2008); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986). ██████████████████ do nothing to prevent harms that would result from the loss of competition from the Acquisition: the merged system could still use its enhanced bargaining leverage to increase prices in subsequent insurer contract negotiations, and it would face less pressure to improve quality.

---

[34] Defendants' claim that the Acquisition will reduce prices by addressing HUMC's claimed capacity problems fails, as explained below in Section I.D.

D.     *Defendants' Claimed Benefits are Speculative, Unsupported, and Not Merger Specific, and Thus Fail to Rebut the FTC's Prima Facie Case*

Defendants assert that their merger will yield cost savings and improved quality that "offset" the harm caused by the loss of competition. The Third Circuit is "skeptical that such an efficiencies defense even exists," *Hershey*, 838 F.3d at 347-48, and the Supreme Court has suggested that it does not: "Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition," *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967).[35]

Given this defense's status, and the fact that Defendants alone possess the relevant information, efficiencies claims are subjected to "demanding scrutiny," and the burden is on the "Hospitals [to] clearly show" that any claimed efficiencies meet the defense's requirements. *Hershey*, 838 F.3d at 348-49. These requirements include that the efficiencies be both merger specific and verifiable—thus, the "efficiency claim must represent a type of cost saving that could not be achieved without the merger and the estimate of the predicted saving must be reasonably verifiable by an independent party." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011); *see also Hershey*, 838 F.3d at 347-49. Further, "the

---

[35] Defendants' claim that "quality of care and other health care improvements are not mere efficiencies but procompetitive effects that must be taken into account when evaluating whether the FTC has carried its burden," Opp. 46, finds no support in the page it cites from *Hershey*, 838 F.3d at 350, nor in other case law. *See, e.g.*, *St. Luke's*, 778 F.3d at 791-92; *Sanford*, 926 F.3d at 965-66.

20

Hospitals must demonstrate that such a benefit would ultimately be passed on to consumers," which "requires more than speculative assurances that a benefit enjoyed by the Hospitals will also be enjoyed by the public." *Hershey*, 838 at 351.

Defendants' claimed efficiencies fail each of these requirements. Most are based on expert analyses or made-for-litigation documents that Defendants attempt to substitute for rigorous planning in the ordinary course of business, and it is therefore highly uncertain whether Defendants can or will realize the purported benefits. Other claims rest on speculative predictions about multi-step chains of events. Moreover, most claimed efficiencies are facially non-cognizable because Defendants have obvious alternatives that are less anticompetitive.

The primary efficiencies Defendants claim derive from a professed plan to transfer some tertiary care patients from HUMC to Englewood to relieve alleged capacity problems at HUMC. Opp. 41-44.[36] These are not cognizable efficiencies.

As a threshold matter, the severity of HUMC's capacity problems is questionable. According to Defendants' expert, ████████████████████ ████████████████████████████████████████████ ██[37] ████████████████████████████████████████████[38]

---

[36] The Service Optimization Plan that Defendants reference is a February 27, 2021 document first produced on February 28, *see* PX1221, with a subsequent version, DX3601, produced the final day of fact discovery. HMH prepared this document long after it decided to acquire Englewood and crafted its litigation strategy.

[37] ███████████████████████████

Insurers and neighboring hospitals are unaware of HUMC having capacity problems.[39] HUMC has also been steadily growing inpatient services across numerous high-acuity service lines.[40] For the new Second Street Pavilion at HUMC, HMH elected to build exclusively private patient rooms (as well as to convert existing semi-private rooms to private rooms) ███████████████████

██████████████████████████████.[41] These actions do not suggest serious, insoluble capacity problems.

Furthermore, HMH has multiple options to resolve the alleged capacity problems without the purchase of Englewood and "the concomitant loss of a competitor." *Hershey*, 838 F.3d at 348. Rather than move tertiary patients out of HUMC, HMH could redirect lower acuity patients from HUMC to nearby community hospitals, including its own hospitals that all operate well under capacity—Pascack Valley[42] in Bergen County and Mountainside and Palisades just

---

[38] *See, e.g.*, P████████████████████████████
    PX1091-010; PX7015 at 95-96; ███████████ █ ;
[39] ████████████████ ; ███████ ;
    ██████████████████ ;
    ██████████████████████████████████████

[40] *See* PX1050; PX1244-058.
[41] PX9055-002; PX1244-061; ████████████ ; ████████████ .
[42] Indeed, HMH's Certificate of Need application to acquire Pascack Valley stated that a primary reason was to "use [Pascack Valley] as a pressure relief valve for the overflow of patients at HUMC." PX9096-013. Despite this, HMH has *not* used Pascack Valley as a relief valve, leaving it underutilized at a capacity of 30-40%. PX8001 (Romano Rpt.) ¶ 54.

outside it.[43] HUMC could take actions to improve throughput, ███████████████. [44] Indeed, a █████████████████████████████████████████████████████████. [45] Even if HUMC ███████████████████████, that would create more additional capacity than the proposed Acquisition.

Fundamentally, though, patient transfers are not in themselves cognizable efficiencies. Defendants must show that the transfers result in cost or quality improvements for consumers. Defendants offer nothing but vague, unsubstantiated claims that transfers will improve quality. Defendants' claimed cost improvements are likewise speculative: they rest mostly on the dubious assumption that Englewood's prices will remain the same post-acquisition, Opp. 44, which is unlikely given that the Acquisition will increase HMH's leverage to raise prices, especially at Englewood. The remaining cost improvements rest on the theory that HUMC will attract patients from higher-priced New York facilities by adding a few new quaternary services. Opp. 42, 44. But there is insufficient evidence that HUMC will timely add these services, some of which require a Certificate of Need from the state. Whether patients will choose HUMC for quaternary services over more prestigious and experienced New York hospitals is also uncertain, as are the

---

[43] PX8001 (Romano Rpt.) ¶¶ 53-64.
[44] PX7034 at 92-95, ████, █████, ███████.
[45] ███████████; ████████████.
███████████████████████████.

prices HUMC will charge. Moreover, these benefits are not merger specific, as HMH was already expanding complex tertiary and quaternary services at HUMC before agreeing to merge with Englewood, ███████████████████████.[46]

Defendants' other claimed quality benefits likewise are not substantiated. Defendants have not shown that quality of care at Englewood is lacking or would be enhanced by the Acquisition. Englewood receives frequent recognition for its quality and is ranked higher than HMH hospitals in many areas.[47] Dr. Meyer, Defendants' expert, has not identified specific deficiencies in Englewood's clinical performance, quality infrastructure, or policies and procedures; indeed, when looking at quality metrics such as patient experience, employee engagement, and effective infection control, Englewood outperforms HUMC.[48] Defendants' executives—as opposed to their expert—have made no progress toward identifying specific quality improvements or planning strategies to implement quality improvements.[49] Further, HMH has an inconsistent track record of improving quality at its acquired hospitals.[50] Indeed, an HMH board member expressed concerns about HMH's recent "spotty quality results" and the effect on HMH's quality of acquiring hospitals, questioning "the extent to which the culture of

---

[46] *See* PX1244-058; ███████████████████; ██████████; ██████; PX1124.
[47] PX9043-001; PX9029; ████████████████; PX1055.
[48] PX8001 (Romano Rpt.) ¶¶ 15, 98, 102-13, Table 3, Appendix D.
[49] ████████████████; PX7020 at 55-56, 69-70.
[50] *See* PX8001 (Romano Rpt.) ¶ 109; ████████████████; PX7020 at 99, 104-05.

24

Quality that has been touted as the cornerstone of [HMH's] Vision is a reality[.]"[51]



,[52] as ████████████████████████.[53]

Finally, Defendants have not shown that any prospective quality improvements are merger specific. Their expert did not consider whether any of his claimed benefits are attainable through a merger between Englewood and another health system.[54] ████████████████████████████

████████████████████████████████████████.[55] Indeed, Defendants emphasize the "infusion of resources" and the "specific capital investments" from HMH that will allow Englewood to improve quality of care, Opp. 46, but that investment would be matched or exceeded by other bidders.[56]

Finally, the theoretical cost savings identified by Defendants' expert, Lisa Ahern, find no support in ordinary course planning documents because Defendants made no plans in the ordinary course to achieve these savings. Projections "generated outside of the usual business planning process" may be "viewed with

---

[51] PX1185; PX1273-002.
[52] PX7019 at 27, █████ ; PX7018 at 18-20, █████ , █████ , 322.
[53] ████████████████████████████████████████████████████████
[54] PX8001 (Romano Rpt.) ¶¶ 116-18.
[55] ████████ ; ████████ , ████████ ; ████████ .
[56] See, e.g., ████████ PX4083-001-02.

25

skepticism." *Merger Guidelines* § 10; *ProMedica*, 2011 WL 1219281, at *40–41.[57]

Ms. Ahern's estimates rely on flawed .[58] But

the business judgment of executives is not an adequate basis for efficiencies

analysis.[59] More significantly, Ms. Ahern's claimed savings utterly fail the merger-

specificity requirement. Most are predicated on the idea that HMH, as a large

hospital system, has more favorable purchasing contracts, more robust in-house

capabilities, more available capital, and back-office staffing that is duplicative of

Englewood's.[60] But the same is doubtless true of the other large hospital systems,

that bid for Englewood. *See FTC v. Arch Coal,*

*Inc.*, 329 F. Supp. 2d 109, 151 (D.D.C. 2004).

## II.    The Equities Favor a Preliminary Injunction

The parties agree that, in evaluating the equities, the Court must "consider

whether the *injunction*, not the *merger*, would be in the public interest." *Hershey*,

---

[57] The only support for Defendants' claim that "HMH and Englewood developed a detailed plan regarding cost savings and efficiencies" is deposition testimony that Defendants are in the process of developing a plan, not any actual plan. Opp. 48.
[58] *See, e.g.,*                produced no notes from Ms. Ahern's interviews.
[59] *See H&R Block*, 833 F. Supp. 2d at 91 (rejecting claims based on "judgment of experienced executives" because "the lack of a verifiable method of factual analysis resulting in the cost estimates renders them not cognizable by the Court").
[60] *See, e.g.,*                101-04. Many are also non-cognizable fixed cost savings. *E.g.,*          ; *see also* PX8002 (Dafny Rebuttal Rpt.) ¶¶ 183-84.

838 F.3d at 353. For the reasons stated in the FTC's opening brief, a preliminary injunction is manifestly in the public interest. Mem. 47-48. As in *Hershey,* "[a]ll of the Hospitals' alleged benefits will still be available upon consummation of the merger, even if [the Court] were to grant an injunction and the FTC were to subsequently determine the merger is lawful." *Id.* "[E]ven accepting the Hospitals' assertion that they would abandon the merger following issuance of the injunction, the result . . . would be the Hospitals' doing" and not the Court's or the FTC's. *Id.* On the other hand, if a preliminary injunction does not issue, Defendants can immediately combine their operations, at which point "it is extraordinarily difficult to unscramble the egg," making it "too late to preserve competition." *Id.*

## CONCLUSION

The FTC respectfully requests that the Court preliminarily enjoin the proposed Acquisition for the reasons stated here and in the FTC's opening brief.

Dated: April 29, 2021                    Respectfully Submitted,

                                   s/ Jonathan Lasken
JONATHAN LASKEN
EMILY BOWNE
LINDSEY BOHL
ELIZABETH ARENS
NATHAN BRENNER
CHRISTOPHER CAPUTO
JAMIE FRANCE
NANDU MACHIRAJU
CHRISTOPHER MEGAW

ROHAN PAI
HARRIS ROTHMAN
ANTHONY SAUNDERS
CATHLEEN WILLIAMS

Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-2604
Email: jlasken@ftc.gov

*Attorneys for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of April, 2021, I served the foregoing on the following counsel via electronic mail:

Paul Saint-Antoine: paul.saint-antoine@faegredrinker.com
Kenneth Vorrasi: kenneth.vorrasi@faegredrinker.com
Daniel Delaney: daniel.delaney@faegredrinker.com
Lee Roach: lee.roach@faegredrinker.com
Jonathan Todt: jonathan.todt@faegredrinker.com
John Yi: john.yi@faegredrinker.com
Alison Agnew: alison.agnew@faegredrinker.com

*Counsel for Defendant Hackensack Meridian Health, Inc.*

David Dahlquist: DDahlquist@winston.com
Heather Lamberg: HLamberg@winston.com
Jeffrey Kessler: JKessler@winston.com
Jeffrey Amato: JAmato@winston.com
Matt DalSanto: mdalsanto@winston.com
Kevin Goldstein: KBGoldstein@winston.com
Johanna Hudgens: JHudgens@winston.com

*Counsel for Defendant Englewood Healthcare Foundation*

Respectfully submitted,

s/ Jonathan Lasken
Jonathan Lasken
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

29