# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FEDERAL TRADE COMMISSION** | |
| Plaintiff, | |
| v. | Civil Action No. 2:20-cv-18140-JMV-JBC |
| **HACKENSACK MERIDIAN HEALTH, INC.,** | **PUBLIC VERSION** |
| and | |
| **ENGLEWOOD HEALTHCARE FOUNDATION**, | |
| Defendants. | |

## PLAINTIFF FEDERAL TRADE COMMISSION'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY OF ABBREVIATED OR DEFINED TERMS ................................. v

FTC'S PROPOSED FINDINGS OF FACT ....................................................1

  I.  The Acquisition .........................................................................1

  II.  The Parties To The Acquisition..................................................1

  III.  Procedural History Of The Litigation .........................................2

  IV.  Fundamentals of Hospital Competition And Pricing ....................2

    A.  Stage 1: Hospitals Compete for Inclusion in Insurers' Provider Networks, Leading to Lower Rates.....................................................................3

    B.  Stage 2: In-Network Hospitals Compete With Other In-Network Hospitals for Patients ................................................................................4

    C.  The Effect of Hospital Mergers on Healthcare Competition .......................4

  V.  The Relevant Antitrust Markets .................................................5

    A.  Inpatient GAC Services Sold and Provided to Commercial Insurers and Their Insured Members is a Relevant Product Market.......................................6

    B.  Bergen County, New Jersey is a Relevant Geographic Market for Inpatient GAC Services ................................................................................7

  VI.  High Market Shares and Market Concentration Levels Establish a Strong Presumption of Harm to Competition in the Relevant Market............................22

    A.  HMH will Control at Least 47% of Inpatient GAC Services Sold and Provided to Commercial Insurers and Their Members in Bergen County........22

    B.  The Acquisition is Also Presumptively Illegal Based on the Change in Market Concentration .........................................................................24

  VII.  The Acquisition Would Substantially Lessen Competition in the Relevant Market ................................................................................25

    A.  HMH and Englewood are Close Competitors in the Relevant Market.......25

    B.  The Acquisition Significantly Reduces Stage 1 Competition and Will Likely Result in Increased Prices ....................................................34

C.   The Acquisition Would Eliminate Beneficial Stage 2 Non-Price Competition ...................................................................................40

D.   The Presence of Other Hospitals Will Not Mitigate the Harm from the Acquisition.......................................................................................42

E.   Alleged Capacity Issues Have Not Changed HMH's Incentives to Compete Aggressively ...............................................................................47

F.   Numerous Market Participants Have Concerns About the Acquisition's Impact, While Those That Support the Acquisition Have Financial Ties to HMH ...........................................................................................48

G.   An Objective of the Acquisition is to Avoid Competition..........................49

VIII. Defendants Fail to Rebut the Strong Presumption of Harm to Competition in the Relevant Market .......................................................................50

A.   Entry or Repositioning by Others Would Not Be Timely, Likely, and Sufficient to Deter or Counteract Competitive Harm .......................................50

B.   Defendants Fail to Substantiate Cognizable Efficiencies Sufficient to Prevent Harm from the Acquisition..................................................................51

C.   Englewood has Alternative Bidder Options, Some of Whom are Willing to Invest More in Englewood than HMH ..............................................60

FTC'S PROPOSED CONCLUSIONS OF LAW ....................................................61

I.   The Court Has Jurisdiction Over This Action.................................................61

II.   The Standard For A Preliminary Injunction Is Met .......................................61

III.   The FTC Has Shown A Likelihood Of Success On The Merits.................62

A.   The Acquisition is Presumptively Unlawful ..............................................64

B.   Evidence that the Acquisition will Eliminate Important Competition between Defendants Bolsters the Presumption .................................................69

C.   Defendants Have Failed to Rebut the Presumption of Illegality ...............72

IV.   The Equities Favor A Preliminary Injunction............................................75

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................ 63, 64, 65

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008).................71

*Com. v. Partners Healthcare Sys., Inc.*, 2015 WL 500995 (Mass. Super. Jan. 30, 2015) .......................................................................................................................71

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016)........... passim

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ............................ 62, 74

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .................................... passim

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) .............. 70, 74

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) .................64

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .............. passim

*FTC v. Proctor & Gamble Co.*, 386 U.S. 568 (1967).............................................73

*FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ........................................................................................................... 69, 74

*FTC v. Sanford Health*, 2017 WL 10810016 (D.N.D. Dec. 15, 2017)....... 69, 70, 75

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019)..................................... passim

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .......................................62

*FTC v. Swedish Match,* 131 F. Supp. 2d 151 (D.D.C. 2000) ........................... 69, 75

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ........................ 62, 66, 69, 72

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018).......................................66

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) ...................... 62, 73, 75

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)..............................62

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ...........................62

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ..........72

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ....................................71

*ProMedica Health Sys. v. FTC*, 749 F.3d 559 (6th Cir. 2014).................. 66, 70, 71

*Saint Alphonsus Med. Ctr. - Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775
    (9th Cir. 2015)................................................................................ passim

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953) ...........................64

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ........................ 70, 71

*United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974) ........................................66

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964)...........................................68

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011).................... passim

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................... passim

*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990).......... 65, 67

**Statutes**

15 U.S.C. § 12 ........................................................................................................61

15 U.S.C. § 18 .................................................................................................. 61, 63

15 U.S.C. § 44 ........................................................................................................61

15 U.S.C. § 45 ........................................................................................................61

15 U.S.C. § 53(b) ...................................................................................................61

28 U.S.C. § 1391 ....................................................................................................61

**Other Authorities**

*Merger Guidelines* ........................................................................... passim

## GLOSSARY OF ABBREVIATED OR DEFINED TERMS

### 1. Exhibits and Transcripts

| | |
|---|---|
| App'x | Appendix |
| DX | Defendants' Exhibit |
| Fig. | Figure |
| Hrg. Tr. | Preliminary Injunction Hearing Transcript |
| JX | Joint Exhibit |
| PX | Plaintiff's Exhibit |

### 2. Documents and Filings

| | |
|---|---|
| Complaint | Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act (December 4, 2020) (Under seal) |
| Englewood Answer | Defendant Englewood Healthcare Foundation's Answer To Complaint For Temporary Restraining Order And Preliminary Injunction (January 15, 2021) (ECF No. 65) |
| HMH Answer | Answer and Affirmative Defenses of Defendant Hackensack Meridian Health, Inc. (January 15, 2021) (ECF No. 64) |
| Merger Guidelines | U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (August 19, 2010) |

### 3. Names and Terms

| | |
|---|---|
| Acquisition | The Proposed Acquisition of Englewood by HMH |
| AMC | Academic Medical Center |
| AmeriHealth | AmeriHealth Insurance Company of New Jersey |

| | |
|---|---|
| Atlantic | Atlantic Health System |
| Bergen New Bridge | Bergen New Bridge Medical Center |
| Braven | Braven Health |
| CarePoint | CarePoint Health |
| Chartis | The Chartis Group |
| Cigna | Cigna Corporation |
| Clover | Clover Health |
| CMS | Centers for Medicare & Medicaid Services |
| CON | Certificate of Need |
| Englewood | Englewood Hospital |
| FTC | Federal Trade Commission |
| GAC | General Acute Care |
| HHI | Herfindahl–Hirschman Index |
| HMG | Horizontal Merger Guidelines |
| HMH | Hackensack Meridian Health |
| HMT | Hypothetical Monopolist Test |
| Holy Name | Holy Name Medical Center |
| Horizon | Horizon Blue Cross Blue Shield of New Jersey |
| Hudson Regional | Hudson Regional Hospital |
| HUMC | HMH's Hackensack University Medical Center |
| MA | Medicare Advantage |
| Mountainside | HMH's Mountainside Medical Center |
| Mount Sinai | Mount Sinai Health System |
| NY-Presbyterian | NewYork-Presbyterian Hospital |
| NYU Langone | NYU Langone Health |
| OSHA | Occupational Safety and Health Administration |
| Palisades | HMH's Palisades Medical Center |
| Pascack Valley | HMH's Pascack Valley Medical Center |

| | |
|---|---|
| Prime St. Mary's | Prime Healthcare Services' St. Mary's Medical Center |
| PSA | Primary Service Area |
| Relevant Geographic Market | Bergen County, NJ |
| Relevant Market | Inpatient GAC services sold and provided to commercial health insurers and plan enrollees in Bergen County |
| Relevant Service or Relevant Service Market | Inpatient GAC services sold and provided to commercial health insurers and plan enrollees |
| RWJBarnabas | RWJBarnabas Health |
| SSNIP | Small but Significant and Non-Transitory Increase in Price |
| St. Joseph's | St. Joseph's Health |
| United | UnitedHealthcare |
| Valley | Valley Health System |
| WTP | Willingness-to-Pay |

## 4. Hearing Witnesses (in order of appearance)

| | |
|---|---|
| Michael Maron | Holy Name |
| Michele Nielsen | United |
| Lynda Grajeda | Amerigroup |
| Walter Wengel | Aetna |
| Sue Anderson | Chartis |
| Kevin Lenahan | Atlantic |
| Dr. Leemore Dafny | FTC Expert |
| Ken Kobylowski | AmeriHealth |
| Ryan Tola | Doyle Alliance Group |

| Robert Garrett | HMH |
|---|---|
| Warren Geller | Englewood |
| Dr. Lawrence Wu | Defendants' Expert |
| Kristen Strobel | Becton Dickinson |
| Patrick Young | HMH |
| Allen Karp | Horizon |
| Mark Sparta | HMH |
| Kevin Nolan | Defendants' Expert |
| Dr. Gautam Gowrisankaran | Defendants' Expert |
| Dr. Stephen Brunnquell | Englewood |
| Dr. Gregg Meyer | Defendants' Expert |
| Lisa Ahern | Defendants' Expert |
| Dr. Patrick Romano | FTC Expert |
| Dr. Leemore Dafny | FTC Expert |

## 5. Deponents and Declarants

| Lisa Ahern | Defendants' Expert | JX0103 (Dep. Tr.) |
|---|---|---|
| Michael Alwell | St. Joseph's | PX7039 (Dep. Tr.) |
| Sue Anderson | Chartis | PX7006 (IH Tr.) |
| | | PX7032 (Dep. Tr.) |
| Carol Barsky | HMH | PX7020 (Dep. Tr.) |
| James Blazar | HMH | PX7005 (IH Tr. Vol. I) |
| | | PX7011 (IH Tr. Vol. II) |
| | | PX7052 (Dep. Tr.) |

| Dr. Stephen Brunnquell | Englewood | PX7019 (Dep. Tr.) |
|---|---|---|
| Ellen Busteed | County of Bergen | PX7046 (Dep. Tr.) |
| John Caby | Cigna | PX7042 (Dep. Tr.) |
| Edward Condit | Prime St. Mary's | PX7028 (Dep. Tr.) |
| Dr. Leemore Dafny | FTC Expert | JX0101 (Dep. Tr.) |
| Vivek Garipalli | Clover Health | PX5001 (Declaration)<br><br>PX7037 (Dep. Vol. I) PX7054 (Dep. Vol. II) |
| Dr. Gautam Gowrisankaran | Defendants' Expert | JX0104 (Dep. Tr.) |
| Robert Garrett | HMH | PX7004 (IH Tr.)<br>PX7043 (Dep. Tr.) |
| Warren Geller | Englewood | PX7003 (IH Tr.)<br>PX7025 (Dep. Tr.) |
| Lynda Grajeda | Amerigroup | PX5002 (Declaration)<br><br>PX7024 (Dep. Tr.) |
| John Grywalski | Hudson Regional | PX7035 (Dep. Tr. Vol. I)<br><br>PX7045 (Dep. Tr. Vol. II) |
| Kathleen Kaminsky | Englewood | PX7023 (Dep. Tr.) |
| Allen Karp | Horizon | PX7012 (IH Tr.)<br>PX7053 (Dep. Tr.) |
| James Kirkos | Meadowlands | PX7044 (Dep. Tr.) |
| Dr. Arthur Klein | Mount Sinai | PX7031 (Dep. Tr.) |
| Patrick Knaus | RWJBarnabas | PX7016 (Dep. Tr.) |
| Ken Kobylowski | AmeriHealth | PX7007 (IH Tr.) |

| | | |
|---|---|---|
| | | PX7051 (Dep. Tr.) |
| Dr. Jeffrey Le Benger | Summit Medical Group | PX7030 (Dep. Tr.) |
| Kevin Lenahan | Atlantic | PX5006 (Declaration) |
| | | PX7050 (Dep. Tr.) |
| Burak Malatyali | NY-Presbyterian | PX7055 (Dep. Tr.) |
| Terry Manna | HMH | PX7001 (IH Tr.) |
| | | PX7015 (Dep. Tr.) |
| Michael Maron | Holy Name | PX5005 (Declaration) |
| | | PX7029 (Dep. Tr.) |
| Dr. Gregg Meyer | Defendants' Expert | JX0105 (Dep. Tr.) |
| Audrey Meyers | Valley | PX7036 (Dep. Tr.) |
| Oscar Morales | WellCare Health Plans | PX7033 (Dep. Tr.) |
| Brian Murray | Brighton Health | PX7038 (Dep. Tr.) |
| Michele Nielsen | United | PX5003 (Declaration) |
| | | PX7027 (Dep. Tr.) |
| Kevin Nolan | Defendants' Expert | JX0106 (Dep. Tr.) |
| Anthony Orlando | Englewood | PX7002 (IH Tr.) |
| | | PX7047 (Dep. Tr.) |
| Michael Pietrowicz | Englewood | PX7000 (IH Tr. Vol. I) |
| | | PX7013 (IH Tr. Vol. II) |
| Dr. Patrick Romano | FTC Expert | JX0102 (Dep. Tr.) |
| Dr. Vijayant Singh | CarePoint | PX7021 (Dep. Tr.) |
| Kevin Slavin | St. Joseph's | PX7040 (Dep. Tr.) |
| Denise Smith | Humana | PX7041 (Dep. Tr.) |
| Mark Sparta | HMH | PX7034 (Dep. Tr.) |

| | | |
|---|---|---|
| Mark Stauder | HMH | PX7009 (IH Tr.) |
| | | PX7018 (Dep. Tr.) |
| Kristen Strobel | Becton Dickinson | PX7049 (Dep. Tr.) |
| Ryan Tola | Doyle Alliance Group | PX7048 (Dep. Tr.) |
| Deborah Visconi | Bergen New Bridge | PX5007 (Declaration) |
| | | PX7022 (Dep. Tr.) |
| Walter Wengel | Aetna | PX7008 (IH Tr.) PX7056 (Dep. Tr.) |
| Debbie White | Health Professionals and Allied Employees | PX7017 (Dep. Tr.) |
| Dr. Lawrence Wu | Defendants' Expert | JX0107 (Dep. Tr.) |
| Patrick Young | HMH | PX7010 (IH Tr.) PX7026 (Dep. Tr.) |

## FTC'S PROPOSED FINDINGS OF FACT

### I.    The Acquisition

1.    In mid-2018, Englewood, through its consultant Chartis, engaged with five potential health system partners: HMH, ███████████████████████ ███████████████[1] Englewood entered into a definitive affiliation agreement with HMH on September 23, 2019, under which HMH will become the sole member and ultimate parent entity of Englewood.[2]

### II.    The Parties To The Acquisition

2.    HMH is New Jersey's largest healthcare system, with twelve GAC hospitals, two children's hospitals, two rehabilitation hospitals, and one behavioral health hospital spanning eight counties in northern and central New Jersey.[3] HMH formed as the result of a merger between two major New Jersey health systems, Hackensack University Health Network and Meridian Health, in 2016.[4] Most recently, HMH acquired JFK Medical Center in 2018 and Carrier Clinic in 2019.[5] HMH owns and operates two GAC hospitals in Bergen County, NJ: HUMC, its 691-bed flagship AMC providing primary through quaternary services, and

---

[1] Chartis Hrg. Tr. at 399-400; ██████████; FTC Complaint ¶ 27; Englewood Answer ¶ 27.
[2] HMH Answer ¶ 1; PX9004; *see also* ██████.
[3] FTC Complaint ¶ 22; HMH Answer ¶ 22; *see* PX9006; PX9007-001. HMH employs more than 35,000 people and reported $5.9 billion in revenue in 2019. HMH Answer ¶ 20; PX9008-007.
[4] HMH Answer ¶ 21.
[5] FTC Complaint ¶ 21; HMH Answer ¶ 21; ██████████.

Pascack Valley, a community hospital with 128 licensed beds.[6]

3.      Englewood Health is an independent hospital and healthcare network based in Englewood, Bergen County, NJ.[7] Englewood is licensed for 531 beds, but operates closer to 350 beds, and offers primary, secondary, and tertiary Inpatient GAC services.[8] Englewood is located within five miles of HUMC, and within 10 miles of Pascack Valley.[9]

## III.    Procedural History Of The Litigation

4.      On December 3, 2020, five FTC Commissioners (three Republicans, two Democrats) voted unanimously to authorize staff to obtain preliminary injunctive relief under Section 13(b) of the FTC Act.[10]

## IV.    Fundamentals of Hospital Competition And Pricing

5.      Competition for hospital services is a two-stage process. First, hospitals compete for inclusion in an insurer's networks.[11] Second, hospitals compete to

---

[6] FTC Complaint ¶ 22; HMH Answer ¶¶ 9, 22; ███████████. HMH owns and operates two additional hospitals in counties bordering Bergen County: Palisades in Hudson County, and Mountainside in Essex County. FTC Complaint ¶ 22; HMH Answer ¶ 22.

[7] Englewood reported approximately $769 million in revenue in 2019. Englewood Answer ¶ 24; PX9009-001; PX9077-001.

[8] Englewood Answer ¶ 25; ██████████████.

[9] *See* ████████; PX9078-001; ████.

[10] On the same day, the FTC initiated an administrative proceeding on the antitrust merits of the Acquisition. Press Release, FTC, FTC Challenges Hackensack Meridian Health, Inc.'s Proposed Acquisition of Competitor Englewood Healthcare Foundation (Dec. 3, 2020), https://www.ftc.gov/news-events/press-releases/2020/12/ftc-challenges-hackensack-meridian-health-incs-proposed.

[11] Dafny Hrg. Tr. at 543-44; HMH Answer ¶ 47; ████████.

2

attract patients.[12]

### A.  Stage 1: Hospitals Compete for Inclusion in Insurers' Provider Networks, Leading to Lower Rates

**6.** Within a given geography, insurers attempt to contract with local hospitals (and other healthcare providers) whose services are demanded by the insurer's current or prospective members.[13] Negotiations for these contracts determine the reimbursement rates for a hospital treating the insurer's members during the term of the contract.[14] Hospitals and insurers also negotiate non-price terms.[15]

**7.** The relative bargaining leverage of an insurer and a hospital determines the contracted reimbursement terms and non-price terms.[16] A hospital has substantial bargaining leverage if its absence would make the insurer's provider network substantially less attractive and marketable to current and prospective members.[17] A hospital's leverage depends largely on whether other proximate hospitals could serve as viable in-network substitutes in the eyes of the insurer's members.[18]

---

[12] Dafny Hrg. Tr. at 543-44; Wu Hrg. Tr. at 935-36; Holy Name Hrg. Tr. at 63-64; ▮▮▮▮▮; HMH Answer ¶ 47; *see also* ▮▮▮▮▮.

[13] ▮▮▮▮▮;▮▮▮▮▮.

[14] ▮▮▮▮▮; Dafny Hrg. Tr. at 545; PX8000 ¶ 100; PX7038 at 21; ▮▮▮; PX7007 at 88-89.

[15] ▮▮▮▮▮; PX8000 ¶ 104; ▮▮▮▮▮; PX7038 at 20-22.

[16] ▮▮▮▮▮; Dafny Hrg. Tr. at 545-46; PX8000 ¶104-05.

[17] *See, e.g.,* ▮▮▮▮▮; PX8000 ¶106; ▮▮▮▮▮; *see also* ▮▮▮▮▮.

[18] ▮▮▮▮▮; Dafny Hrg. Tr. at 547-48; PX8000 ¶ 106; *see also* ▮▮▮▮▮.

### B.   Stage 2: In-Network Hospitals Compete With Other In-Network Hospitals for Patients

**8.**    Once in-network, hospitals compete with each other to offer access to convenient, high-quality services.[19] Such non-price competition is the primary means that hospitals within a provider network compete to attract patients.[20]

### C.   The Effect of Hospital Mergers on Healthcare Competition

**9.**    The presence of alternative, convenient, high-quality competitors limits a hospital's bargaining leverage against the insurer, and constrains the hospital's ability to obtain higher reimbursement.[21] A merger of close substitutes, therefore, may lead to higher prices because it eliminates an available alternative that an insurer could otherwise offer its health plan members, thus increasing the merged entity's bargaining leverage.[22]

**10.**   Provider rate increases result in increased premiums and out-of-pocket expenses.[23] A price increase to a self-insured employer flows directly to the

---

[19] Holy Name Hrg at 61-62; Dafny Hrg. Tr. at 544-45; PX8000 ¶109-110; ██████
██ ; ████████████ ; PX7000 at 129-30.
[20] Holy Name Hrg. Tr. at 66; Dafny Hrg. Tr. at 550-51; *see also* ████████ ;
██ ; ██ .
[21] *See, e.g.,* ████████████ ; Dafny Hrg. Tr. at 546-47; ████████
████████ ; ; PX7041 at 155-56; PX7051 at 204-05, 233-34;
████████████ .
[22] Dafny Hrg. Tr. at 547-48, 550; PX8000 ¶ 115-119; ████████ ; ████████ .
[23] Dafny Hrg. Tr. at 550; ████████████ ; Aetna Hrg. Tr. at 329; ████████
████ ; ████ .

employer because in such a plan the employer pays the cost of claims.[24] A price increase to a fully insured employer is applied to the employer's expected future claims experience, which is used to calculate premiums for the employer.[25]

11.     A merger between competing providers also harms patients by lessening stage 2 competition, where providers are competing on non-price dimensions to attract patients.[26] Academic studies have shown that hospital mergers and acquisitions have had detrimental or neutral effects on patient experience and on important hospital quality metrics such as mortality and readmission rates.[27]

## V.     The Relevant Antitrust Markets

12.     Because insurers, not their members, are the direct buyers of healthcare services, relevant markets are properly analyzed from the insurer's perspective.[28] However, patients' perspectives are also important because insurers are trying to develop a health plan that is attractive to employers, and insurers want to include hospitals that patients value highly.[29]

---

[24] *See* DAG Hrg. Tr. at 713-14.
[25] *See* ██████████████ ; DAG Hrg. Tr. at 714-15; ██████████████ . Employees may feel the price increase through higher premiums, co-pays, co-insurance, or deductibles or through changes in the level of benefits afforded by the plan. *See* DAG Hrg. Tr. at 714-16.
[26] Dafny Hrg. Tr. at 550-51; PX8000 ¶ 111; Holy Name Hrg. Tr. at 61-62; ████████ ██████ .
[27] PX8000 ¶¶ 206-07; Romano Hrg. Tr. at 1457-58; PX8001 ¶¶ 119-125; ██████ ; PX9086; PX9085; PX9088; PX1321.
[28] Dafny Hrg. Tr. at 542, 595; PX8000 ¶ 124.
[29] Dafny Hrg. Tr. at 554-55.

## A. Inpatient GAC Services Sold and Provided to Commercial Insurers and Their Insured Members is a Relevant Product Market

13. The relevant product market is the cluster of inpatient GAC services offered by both Englewood and HMH's Bergen County hospitals.[30]

14. Inpatient GAC services are medical and surgical services that require a hospital admission (generally, an overnight stay or longer).[31]

15. Commercial insurers must offer inpatient GAC services as an in-network benefit in order to sell plans that meet network adequacy and are marketable.[32] Outpatient services are not substitutes for inpatient services.[33]

16. HMH's Bergen County hospitals and Englewood provide substantially the same set of inpatient GAC services.[34] These overlapping services account for over 97% of the commercial admissions at each hospital, and these services are offered

---

[30] Dafny Hrg. Tr. at 555; Wu Hrg. Tr. at 957; PX8000 § V.C. The inpatient GAC cluster market excludes outpatient services and services provided by specialty hospitals, such as long-term care, behavioral health, and rehabilitation services, because these services are offered by a different set of facilities from inpatient GAC services, and face different competitive conditions. *See infra* Conclusions of Law, Section III.A.1.

[31] *See* Dafny Hrg. Tr. at 555; PX8000 ¶ 129; Holy Name Hrg. Tr. at 48; ███████████ ███████; PX7028 at 137-38, 161; PX7030 at 21-23; PX7016 at 217-18; PX7030 at 129-31; PX7030 at 130-31; ███████████.

[32] United Hrg. Tr. at 155-56; ███████████; *see, e.g.*, PX7024 at 147-48; PX7051 at 190-91.

[33] Holy Name Hrg. Tr. at 48; United Hrg. Tr. at 156; DAG Hrg. Tr. at 720; PX7028 at 162; *see also* PX7003 at 64; PX7004 at 73-74; PX7007 at 74-75; ███████████.

[34] *See, e.g.*, ███████████████████; ███████████.

under similar competitive conditions to each other.[35]

### B.   Bergen County, New Jersey is a Relevant Geographic Market for Inpatient GAC Services

17.   Bergen County is an appropriate geographic market because it is an area that illuminates the competitive impact of the Acquisition.[36]

18.   Located in northeast New Jersey, Bergen County is a suburban area[37] and the most populous county in the state, with just under one million residents.[38] Bergen County has six GAC hospitals: two HMH hospitals (HUMC and Pascack Valley), Englewood, Bergen New Bridge, Holy Name, and Valley.[39]

19.   Bergen County has a sizeable and affluent customer base—roughly 12% of New Jersey's commercially insured lives[40]—and thus is an area that insurers cannot and do not ignore.[41] The negotiations that insurers enter into with hospital providers are informed by the set of hospitals that residents in a geographic area

---

[35] Dafny Hrg. Tr. at 556; PX8000 ¶¶ 130, 132, 682 & Fig. 26.

[36] PX8000 ¶¶ 121, 134-154. Defendants' expert, Dr. Wu agrees that geographic market is "supposed to describe [] competitive conditions and help us illuminate that." Wu Hrg. Tr. at 938.

[37] Holy Name Hrg. Tr. at 51; PX7022 at 214; PX7049 at 118; ███████████;
PX7046 at 57; PX7027 at 340.

[38] ████████; ████████.

[39] Holy Name Hrg. Tr. at 53-54.

[40] Dafny Hrg. Tr. at 560; PX8000 ¶ 145.

[41] *See, e.g*, Dafny Hrg. Tr. at 558, 560-61; PX8000 ¶¶ 144-47; ███████████;
███████████; PX1123-002; ███████; ███████; *see also*
█; ███████; ███████.

view as reasonably close substitutes.[42]

### 1.   *Patients in Bergen County Prefer to Receive Inpatient GAC Services Locally*

20.    Patients residing in Bergen County overwhelmingly prefer to stay in Bergen County, especially for routine hospital services.[43] A large majority of Bergen County residents (77%) select Bergen County hospitals for inpatient services.[44]

21.    Insurers and healthcare providers serving Bergen County, including the Defendants, recognize that patients prefer to receive inpatient GAC services close to where they live.[45]

22.    Patients seek inpatient GAC services close to where they live because they value convenience, familiarity with local hospitals, and the ability to receive visits from friends and family during a hospital stay,[46] or because of their physicians' admitting privileges.[47]

23.    Only a limited number of patients travel from northern New Jersey into

---

[42] *See* PX8000 ¶ 121; *see also* ▇▇▇▇▇▇▇▇▇▇▇ ; ▇▇▇▇▇▇▇▇▇
[43] *See* Holy Name Hrg. Tr. at 51-53; United Hrg. Tr. at 165-66; Dafny Hrg. Tr. at 558-59; PX8000 ¶ 140.
[44] *See* PX8000 ¶ 140; *see also* ▇▇▇▇▇▇▇▇▇▇▇ .
[45] ▇▇▇▇▇▇ ; Holy Name Hrg. Tr. at 52-53; Garrett Hrg. Tr. at 812; Horizon Hrg. Tr. at 1121-22; ▇▇▇ ; ▇▇▇▇▇ ; ▇▇▇▇▇▇ ; ▇▇▇▇▇ ; PX7007 at 83-84; PX7030 at 32; PX7023 at 76; PX7005 at 152-153; PX7001 at 177; PX7004 at 67; *see also* ▇▇▇▇▇▇
[46] *See* Holy Name Hrg. Tr. at 75; DAG Hrg. Tr. at 718; ▇▇▇▇▇▇ ; ▇▇▇▇▇ ; PX7005 at 152-53; ▇▇▇▇▇ ; PX7007 at 83-84; PX7023 at 76; *see also* ▇▇▇▇▇ ; ▇▇▇▇▇ .
[47] *See* ▇▇▇▇▇ ; ▇▇▇▇ ; ▇▇▇▇ .

Manhattan for inpatient care, and most of those are traveling only for highly complex tertiary care such as oncology services or total joint replacements.[48]

24.     Only a limited number of patients travel from Bergen County to other northern New Jersey hospitals located in neighboring counties.[49]

### 2.     Insurers Confirm that Bergen County is a Relevant Geographic Market

25.     All five major commercial insurers in New Jersey recognize the significance of Bergen County hospitals and patients when forming networks. The lack of Bergen County-only plans or provider networks does not diminish the importance of Bergen County to insurers and is immaterial to market definition for hospital services.[50] Because consumers strongly prefer nearby care options, insurers consider network attractiveness at a "subarea" level that does not necessarily correspond either to the entire area in which their plans are sold, nor to the areas from which providers draw patients.[51]

26.     Commercial insurers recognize they must include access to Bergen County

---

[48] See Holy Name Hrg. Tr. at 73-74; ███████████████ ; Dafny Hrg. Tr. at 559; PX8000 ¶ 139; Chartis Hrg. Tr. at 396-97; ████████ ; PX7004 at 68-69, 195; ████████ ; ████████ ; ███████ ; PX7007 at 85-86.
[49] See Holy Name Hrg. Tr. at 79-82; ████████████ ; ████████ ; Dafny Hrg. Tr. at 559; PX8000 ¶ 140 & Fig. 12.
[50] Dafny Hrg. Tr. at 672-73, 1504-06; PX8002 ¶¶ 5, 18, 21.
[51] See PX8002 ¶¶ 18-23, 30, 32-34; ████████████████████

hospitals in their networks because Bergen County residents prefer to receive inpatient GAC services close to where they live.[52]

27.    Commercial insurers uniformly testified that they could not offer a marketable commercial plan to Bergen County employer customers or members that does not include hospitals located in Bergen County.[53]

28.    The ███████ insurers in Bergen County, which comprise approximately ████ of the members in Bergen County,[54] ███████ look at hospitals located in Bergen County when considering where to redirect patient volume if another hospital in Bergen County goes out of network.[55]

29.    Hospitals located in surrounding counties and in NYC are not substitutes for Bergen County hospitals because insurers could not offer marketable plans in Bergen County that included NYC hospitals but not Bergen County hospitals,[56] and insurers could not offer marketable plans in Bergen County that included

---

[52] *See* Dafny Hrg. Tr. at 559, 564; PX8000 ¶¶ 137-38 & Fig. 11, ¶¶ 141-43; *see also* United Hrg. Tr. at 171; ███████.

[53] ███████████████ Aetna Hrg. Tr. at 339; AmeriHealth Hrg. Tr. at 686, 690; Horizon Hrg. Tr. at 1119-20; ███████████ ; *see also* ████████

███████.

[54] ███████.

[55] ███████████ ; ███████████ ; ███████ ; ██████████ ; PX1035-008.

[56] ███████ ; AmeriHealth Hrg. Tr. at 686; ███████████ ; ███████ ; *see also* ███████████ ("[I]t's just a matter of the hassle factor . . .); PX7007 at 88 ("[Y]ou are making me either cross the George Washington Bridge or go down and go through the Lincoln Town tunnel to get to Manhattan, why would I buy that"); ███████.

hospitals in surrounding counties (*i.e.*, Hudson), but not Bergen County hospitals.[57]

30.  ██████████ explained that Bergen County is it's "most populous county in the commercial space" with "in the neighborhood of ██████" members.[58]

31.  ██████ seeks to develop plans that are attractive to ██████ Bergen County members through, among other things, "████████████████████████ ████████████" and "████████████████████████████████████."[59] According to ████████████████████, Hackensack University Medical Center, Valley, Holy Name, and Englewood are all ████████████████ ████████████████"[60]

32.  ██████ could not sell a marketable plan to Bergen County members without Bergen County hospitals.[61] ██████ conducted an "analysis of where Bergen County residents are seeking services" and found that in ████, ██% of ██████'s Bergen County members sought inpatient care at a Bergen County facility.[62]

33.  ██████'s ████████ analysis for ████████ estimates that if ████████ terminated from the network, ██% of members that visited ████████ for elective



---

[57] ██████████████████████; AmeriHealth Hrg. Tr. at 690; Wu Hrg. Tr. at 974; ████████████████████████.

[58] ████████████████.

[59] ████████████; ████████████████.

[60] ████████████████.

[61] ████████████████████████.

[62] ████████████████; ████████████.

services would turn to other hospitals in Bergen County.[63] This is consistent with ██████ internal "█████████████████████████" document for ██████████ that lists "Bergen" as "Counties Covered" and that lists hospitals in Bergen County as "Top 3 Competitors."[64]

34.     ████████████ has more members in Bergen County than most other counties in New Jersey and indicated that if a county "is in the ballpark, of ██████ lives, you know, that's just a good opportunity for any carrier."[65]

35.     ██████'s ████████ analyses of where patients would go if ████████, ██████ or ████████████ was terminated from its network focus exclusively on other Bergen County hospitals.[66]

36.     ██████'s fact sheet prepared in advance of ████ negotiations with ████████ tracks membership in Bergen County and exclusively considers other hospitals in Bergen County.[67]

37.     An ████████████████████████████████████ broke down ████████ ████████████ by county and analyzed Bergen County separately from Hudson and Passaic counties.[68] ██████████████████████████████████

---

[63] ████████████████████████: ████████████████. The remaining ████ would redirect to HMH Palisades.
[64] ████████████████ : ████ ████████ .
[65] ████████████████ : ████ ████████ .
[66] ████████████████ : ████ ████████████████ .
[67] ████████████████ .
[68] ████████████ .

12

████████████████████████████████████████████████ [69]

38.     ████   has never tried to sell a network in Bergen County that did not include
Bergen County hospitals because "it would be a very tough sell from a patient
perspective . . . if you live and reside in a county and you don't have a hospital but
maybe the competitor does . . . you'll lose those cases nine times out of ten."[70]

39.     **AmeriHealth**: Bergen County is a densely populated area that AmeriHealth
specifically sought to grow its membership in given they view the county as "a
very attractive marketplace."[71] AmeriHealth tracks its membership and sales in
Bergen County, and makes product offering decisions specific to Bergen County.[72]

40.     AmeriHealth considers other Bergen County hospitals to be the next best
alternative for their members that currently access a Bergen County hospital.[73]
AmeriHealth confirmed that "a Bergen County member would want to stay as
close to home as possible . . . and would only look outside of that area for care if
the Bergen County facilities couldn't provide the care that they needed."[74]

41.     AmeriHealth could not offer a marketable plan to employers and their
members in Bergen County that did not include Bergen County hospitals.[75] This is

---

[69] ████████████████ .
[70] ██████████████████████ ; *see also* ███████████████ .
[71] AmeriHealth Hrg. Tr. at 683.
[72] AmeriHealth Hrg. Tr. at 682-84.
[73] *See, e.g.,* AmeriHealth Hrg. Tr. at 690-91; PX7051 at 164-65; 214-15.
[74] PX7051 at 198.
[75] AmeriHealth Hrg. Tr. at 690.

"a commonsense" view because "people . . . would want to stay close to home"

and "I as a consumer would not purchase a plan if I couldn't see any of the

hospitals in my county where I live . . ."[76]

**42.**   analysis of removing ███ from its ████████

discusses that "███████████████████████████████████████████████████

██████████████████████████████████████████."[77]

**43.**  **Horizon**: Horizon—HMH's joint venture partner and the largest commercial

insurer in New Jersey—views Bergen County as "economically significant."[78]

**44.**  A Horizon presentation regarding its OMNIA tiered network discussed

HUMC's positioning to "significantly grow inpatient volumes in Bergen County"

from lower tier providers.[79]

**45.**  Horizon's letter of support discussing the Acquisition specifically mentions

Bergen County three times, without mentioning any other specific county.[80]

**46.**  Horizon could not market a plan to residents and employers in Bergen

County that did not include any Bergen County hospital in network.[81]

**47.**  ████ : █████████████████████████ testified that Bergen County is

---

[76] AmeriHealth Hrg. Tr. at 690.
[77] █████████████████████ ; █████████ .
[78] Horizon Hrg. Tr. at 1118.
[79] PX1035-012.
[80] Horizon Hrg. Tr. at 1121; DX1101.
[81] Horizon Hrg. Tr. at 1119-20; █████████████ .

important because " ███████████████████████████ "[82]



48.   A ████████████████████████████████████

████████████████████████████████ lists Englewood, Valley, and

Holy Name as "Alternative Hospitals" in Bergen County for ████████

████████.[83]

49.   ██████ could not offer a marketable network to its Bergen County employer

customers without including any of the Bergen County hospitals.[84] It would be

"very important" to employers to feel they have access to facilities in that county.[85]

50.   **MA and Managed Medicaid Insurers**: Testimony from MA and managed

Medicaid insurers supports that Bergen County is a relevant market.[86] These

insurers could not offer a marketable network to members living in Bergen County

that did not include hospitals in that county.[87]

51.   **Employers & Brokers**: Consistent with the insurer testimony, employers

and brokers also confirm that employees seek inpatient care close to home and

would not purchase a plan that did not include access to Bergen County hospitals.[88]

---



[82] ████████ .
[83] ████████ .
[84] ████████ .
[85] ████████ .
[86] ████████ .
[87] ████████ .
[88] DAG Hrg. Tr. at 718-19; Beckton Dickinson Hrg. Tr. at 1014-15; *see also* PX7044 at 90; ████████ .

15

52.    Doyle Alliance Group, an insurance broker, believes it is important for clients with many employees in Bergen County to have plans with Bergen County hospitals in-network, and that for a Bergen County client to buy a plan without Bergen County hospitals "would not make any financial sense."[89]

53.    Becton Dickinson, an employer located in Bergen County, would not be interested in a health plan that lacked hospitals in Bergen County.[90]

### 3.    Bergen County is Consistent with how Defendants View the Geography in Which Inpatient GAC Services are Provided

54.    Englewood's PSA primarily consists of zip codes in Bergen County.[91]

55.    Englewood's competitive assessments focus almost exclusively on other Bergen County GAC hospitals.[92]

56.    Englewood found that 72% of Englewood's physician referral leakage for inpatient services was to other Bergen County hospitals.[93]

57.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[89] DAG Hrg. Tr. at 718-19.
[90] Becton Dickinson Hrg. Tr. at 1014-15.
[91] ███████████; PX2000-003; PX2007-007-08; PX2009-004; ███████████; *see also* PX1107-007-08 (HMH analysis of Englewood PSA); ██████████; DX1806-010; Geller Hrg. Tr. at 909-10; ███████████.
[92] *See, e.g.*, Chartis Hrg. Tr. at 391-93; ███████████; PX2124-001; PX2125-003; PX2007-005-06; PX2235-007-12; PX2256-011-13; ███████████; PX2160-003, -014-16; *see also* ███████████; ███████████.
[93] PX2119-024-25.

<span style="background:black">████████████████████████████████████████████████████</span>[94]

58.     Multiple ordinary course HMH documents, from as recently as 2020,

identify HUMC's PSA as Bergen County and calculate market shares in Bergen

County.[95] An HMH system overview analysis circulated among HMH's strategy

department in 2020 named HUMC's PSA as Bergen County,[96] as did an October

2020 presentation summarizing HUMC's "key market share changes."[97]

59.     A June 2018 "Market Highlights & Trends for [HMH]" identified Bergen

County as HUMC's service area and concluded that 56% of HUMC's inpatients

are from Bergen County.[98] HUMC also used a PSA of Bergen County when doing

market analysis for its $714 million Second Street Tower project.[99]

60.     HMH documents frequently identify Bergen County as a "key" market and

assess competitors and market shares for the county separately from other

counties.[100] <span style="background:black">████████████████████████████</span>

---

[94] <span style="background:black">██████████████</span>; <span style="background:black">████████████</span>; <span style="background:black">█████</span>; *see also*
<span style="background:black">█████████</span>.
[95] *See e.g.,* Sparta Hrg. Tr. at 1157-61; PX1129-007, -051; PX1295-001, -059, -061, -063.
[96] PX1022-013.
[97] Sparta Hrg. Tr. at 1160-64; PX1295-001.
[98] PX1139-003, -006.
[99] Sparta Hrg. Tr. 1157-59; PX1129-007 (PSA "= Bergen County"), -51, -52.
[100] *E.g.,* <span style="background:black">██████</span>; PX1033-023; PX1071-018, -020-21; PX1105-008-10;
PX1102-004, -011-16, -031-33; <span style="background:black">████████</span>; PX1139-009, 013-25; *see also*
PX7004 at 118; PX1120-019, -023-24.

████████████████████████████████ .[101]

**61.**   HMH corresponds with insurers about Bergen County.[102]

**62.**   HMH's competitive assessments examine competitor market shares in Bergen County specifically[103] and looks to advertise the services HUMC offers within Bergen County-specific publications.[104]

> ### 4.   *Bergen County is Also Consistent With How Other Hospitals and Entities View the Geography in Which Inpatient GAC Services are Provided*

**63.**   The other Bergen County inpatient GAC hospitals likewise ████ Bergen County ████████████████ .[105]

**64.**   The Bergen County hospitals work together on a Community Health Needs Assessment.[106] The Community Health Needs assessment is specifically focused on Bergen County, and no hospitals from outside of Bergen County participate.[107]

---

[101] ████████████████████████████████████████████
████████████████████████████████████ .

[102] *See e.g.,* ████████████ ; ████████████ ; *see also* PX1130-001.

[103] *See, e.g.,* PX1315-003-05.

[104] PX1141-001-02; PX1137-002; *see also* PX1142-001 (HMH acknowledges "[w]e are getting killed by our local competition – Valley, Englewood, Holy Name.").

[105] Holy Name Hrg. Tr. at 51-52 (Bergen County "is where the community that we are here to serve resides" and "[e]asily 80, 85 percent" of Holy Name's inpatient charges are Bergen County residents); ████████████████████████████████
████████████████████████████████████████████████
████ ; PX7022 at 214-15; ████████████████████████████
████████████████████████████████████████ .

[106] Holy Name Hrg. Tr. at 60-61; PX7022 at 221-22; *see generally* PX4023.

[107] Holy Name Hrg. Tr. at 60-61; PX7022 at 221-22.

### 5. Economic Evidence Confirms the Commercial Reality that Bergen County is a Relevant Market

**65.**     Dr. Dafny identified Bergen County as a candidate geographic market because: (1) Englewood and its closest and largest HMH rival, HUMC, are both in Bergen County;[108] (2) Bergen County residents highly value hospitals in Bergen County;[109] and (3) Bergen County is economically significant, in that commercial insurers view it as an attractive business opportunity and want to offer health plans that are attractive to its residents.[110]

### 6. Bergen County Satisfies the Hypothetical Monopolist Test

**66.**     Every major commercial insurer serving this area has testified that it cannot offer a marketable plan in Bergen County that does not include Bergen County hospitals.[111] Consequently, these insurers must accept a SSNIP from a hypothetical monopolist of *all* Bergen County hospitals to compete to sell insurance in Bergen County.[112] The market reflects this commercial reality: no commercial insurer markets a plan in Bergen County without any Bergen County hospital in network

---

[108] PX8000 ¶ 134.

[109] Dafny Hrg. Tr. at 559; PX8000 ¶¶ 140, 148 & Fig. 12 (77% of Bergen County resident hospital discharges are from hospitals in Bergen County); *see also* ██████████ 74.4% of ██████ 's commercial members in Bergen County sought inpatient care at a Bergen County facility); ██████████ .

[110] Dafny Hrg. Tr. at 560; PX8000 ¶ 147; *see also* Horizon Hrg. Tr. at 1118-19.

[111] ██████████████ ; AmeriHealth Hrg. Tr. at 686, 690; Aetna Hrg. Tr. at 339; Horizon Hrg. Tr. at 1119-20; ██████████████ .

[112] Dafny Hrg. Tr. at 563-65; PX8000 ¶ 151.

today.[113] Thus, Bergen County satisfies the HMT.[114]

**67.**     Dr. Dafny's analysis confirms a hypothetical monopolist of inpatient GAC services to Bergen County residents could profitably impose a SSNIP because insurers would not cease selling plans in Bergen County.[115] Importantly, the HMT does not require a hypothetical monopolist to uniformly raise price at all of its hospitals.[116]

**68.**     As a confirmatory test, Dr. Dafny also performed a WTP analysis on a subset of the hospitals, specifically, the six in Bergen County supplying inpatient GAC services to Bergen County residents.[117] To assess a hypothetical monopolist of these hospitals' ability to impose a SSNIP, Dr. Dafny modeled the value of such a monopolist to insurers' networks relative to the sum of the value of the individual hospitals/hospital systems in Bergen County today.[118] WTP is well accepted in economic literature.[119] It revealed a 65% increase in WTP for the monopolist's services, which equates to a price increase of far more than 5%, implying that an

---

[113] AmeriHealth Hrg. Tr. at 690; United Hrg. Tr. at 164; ███████████; ███████████
███; *see also* ███████████; PX7041 at 129-31; PX8000 ¶¶ 80-81, 83-85, 88, 91.
[114] Dafny Hrg. Tr. at 564-65; PX8000 ¶ 155.
[115] Dafny Hrg. Tr. at 562-63, 1507-08; PX8000 ¶ 148.
[116] Dafny Hrg. Tr. at 1509; *see also* PX9050 (HMG) § 4.2.2. Defendants' expert, Dr. Wu, acknowledges that the HMG do not prescribe a specific method or algorithm for implementing the HMT. Wu Hrg. Tr. at 972.
[117] Dafny Hrg. Tr. at 563-64, 1509-12; PX8000 ¶¶ 144, 151 & Figs. 13, 14.
[118] Dafny Hrg. Tr. at 563-64; PX8000 ¶ 151 & Fig. 13.
[119] Dafny Hrg. Tr. at 548; PX8000 ¶ 117.

insurer would likely pay a SSNIP to a hypothetical monopolist of Bergen County

hospitals rather than offer a plan that excludes all of them.[120]

**69.**     Based on the WTP analysis, Dr. Dafny concluded that a hypothetical

monopolist of the six Bergen County hospitals could profitably impose at least a

SSNIP for inpatient GAC services provided to commercial insurers and their

members in Bergen County.[121] It therefore follows that a hypothetical monopolist

of *all* hospitals supplying inpatient GAC services to Bergen County residents could

profitably impose a SSNIP.[122]

**70.**     Dr. Dafny's WTP analysis also confirmed that a hypothetical monopolist of

the six Bergen County hospitals could profitably impose a SSNIP for inpatient

GAC services provided to commercial insurers and their members in the four-

county area.[123]

**71.**     The hypothetical monopolist's ability to engage in price discrimination is

not essential for a patient-based hospital services market nor required by the

HMG.[124] Nevertheless, Dr. Dafny explained the feasibility of price

---

[120] Dafny Hrg. Tr. at 563-64, 1511; PX8000 ¶ 151 & Fig. 13.
[121] Dafny Hrg. Tr. at 563-64, 1510-12; PX8000 ¶¶ 144, 150-53 & Figs. 13, 14.
[122] Dafny Hrg. Tr. at 563-65, ███, 1509-10.
[123] Dafny Hrg. Tr. 1511-12; PX8000 ¶¶ 144, 152-53, Fig. 14.
[124] Dafny Hrg. Tr. at 604, 1501, 1503-04; JX0101 at 30, 38; *see also* PX9050 (HMG) § 4.2. Further, the HMG do not require that firms in the market be actively engaged in price discrimination, but rather, that "the *hypothetical monopolist could* discriminate based on customer location[.]" PX9050 § 4.2.2 (emphasis added).

discrimination.[125]

## VI.    High Market Shares and Market Concentration Levels Establish a Strong Presumption of Harm to Competition in the Relevant Market

**72.**    The FTC calculated market shares in Bergen County using two accepted

methods: patient-based shares, which account for all hospitals any Bergen County

residents use, and hospital-based shares, which calculate shares based on

discharges from the six Bergen County hospitals and includes discharges of

patients residing outside of Bergen County.[126] Both methods yield market shares

and concentrations that exceed the presumption for an unlawful transaction.[127]

### A.    HMH will Control at Least 47% of Inpatient GAC Services Sold and Provided to Commercial Insurers and Their Members in Bergen County

**73.**    HMH's acquisition of Englewood creates an entity with a market share of

47.4% using a conservative method that accounts for any hospitals that Bergen

County residents use, including NYC and all other New Jersey hospitals.[128]

Limiting share calculations to only Bergen County hospitals, HMH would control

over 65% of the market post-Acquisition.[129]

---

[125] Dafny Hrg. Tr. at 601-03,1553-54; JX0101 at 30-42.
[126] Dafny Hrg. Tr. at 566-69; PX8000 ¶¶ 161, 163-66 & Figs. 15, 16.
[127] Dafny Hrg. Tr. at 568; PX8000 ¶¶ 161-66.
[128] Dafny Hrg. Tr. at 567; PX8000 ¶ 161 & Fig. 15.
[129] Dafny Hrg. Tr. at 568; PX8000 ¶ 165 & Fig. 16.

| Hospital/System | Share of discharges (patient-based) | |
|---|---|---|
| | Pre-merger | Post-merger |
| HMH | 35.6% | 47.4% |
| Englewood | 11.8% | |
| Valley | 21.2% | 21.2% |
| Holy Name | 9.2% | 9.2% |
| Bergen New Bridge | 0.2% | 0.2% |
| All other NJ Hospitals | 8.2% | 8.2% |
| All NY Hospitals | 13.9% | 13.9% |

| Hospital/System | Share of discharges (hospital-based) | |
|---|---|---|
| | Pre-merger | Post-merger |
| HMH | 50.9% | 65.7% |
| Englewood | 14.8% | |
| Valley | 24.2% | 24.2% |
| Holy Name | 9.9% | 9.9% |
| Bergen New Bridge | 0.2% | 0.2% |

74.     These shares are consistent with how Defendants view their shares of

inpatient GAC services in the ordinary course. Englewood's consultant concluded

that within Englewood's PSA, Defendants combined account for ▇▇▇▇ of

inpatient discharges.[130] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and an

HMH potential merging partner assessment, calculates that HMH/Englewood

combined would have 46.1% market share.[131]

75.     These market shares are also consistent with insurer assessments. ▇▇▇▇

believes that the Acquisition would give HMH ▇% of its hospital spend in Bergen

County.[132] ▇▇▇▇'s data show that Hackensack and Englewood combined

---

[130] Chartis Hrg. Tr. at 390-91; ▇▇▇▇▇▇▇.

[131] ▇▇▇▇▇▇; PX1065-021. The same assessment noted that HMH currently
serves all 2.1 million patients served by Englewood.

[132] ▇▇▇▇▇▇▇▇▇; ▇▇▇▇▇ ("Add Englewood, which again we
just looked at their numbers, ▇▇▇, you're creeping up to ▇▇▇ . . .

constitute ██ % of ██████ 's Bergen County commercial inpatient spend.[133]

**B.    The Acquisition is Also Presumptively Illegal Based on the Change in Market Concentration**

76.    Calculating HHIs using the conservative patient-based method, the HHI increase from HMH's acquisition of Englewood is 841—over four times the 200-point threshold—and yields a highly concentrated market of 2,835.[134] Limiting the calculation to Bergen County hospital discharges, the HHI increase is 1,510 points, yielding a post-Acquisition HHI of more than 5,000.[135]

| Method | Pre-merger HHI | Post-merger HHI | Change (Δ) in HHI |
|---|---|---|---|
| Patient-based | 1,994 | 2,835 | 841 |
| Hospital-based | 3,492 | 5,002 | 1,510 |

77.    Both measures indicate that the Acquisition is likely to substantially lessen competition and enhance Defendants' market power.[136]

78.    Defendants' experts have not defined alternative relevant geographic

_____

████████████████ will be all attributed to Hackensack Meridian hospitals if inclusion of Englewood").

[133] ████████████ ; ████████████ .

[134] Dafny Hrg. Tr. at 570; PX8000 ¶ 161 & Fig. 15.

[135] Dafny Hrg. Tr. at 570; PX8000 ¶¶ 164-65, 166 & Fig. 16. Dr. Dafny also calculated market shares and concentrations based on case-weighted discharges, which place greater weight on more complicated and intensive services. PX8000 ¶ 160. These market shares and concentrations easily establish the presumption as well. *Id.* ¶¶ 161, 166 & Figs. 15, 16.

[136] Dafny Hrg. Tr. at 570-71; PX8000 ¶ 167.

markets,[137] but even the proposed adjustments they submit result in highly

concentrated markets that would be presumed anticompetitive.[138]

## VII.   The Acquisition Would Substantially Lessen Competition in the Relevant Market

**79.**   Defendants vigorously compete with each other today and HMH will raise

prices after the merger.

### A.   HMH and Englewood are Close Competitors in the Relevant Market

**80.**   Insurers, Defendants, and other markets participants confirm the closeness of

competition between HMH and Englewood.

#### 1.   *Insurers View HMH and Englewood as Alternatives and Close Competitors*

**81.**   ████: HUMC is the best alternative to Englewood for ████'s members

because "of the scope of services that are provided. There is a tremendous amount

of overlap in . . . the bread-and-butter services that are provided at a particular

facility . . . ."[139] When ████ conducted a ████ analysis for ████,

they estimated ████ of ████ members would go to ████ for elective

services if ████ went out of network "because of the scope of services that

are rendered at ████ today and the overlap at ████

---

[137] Wu Hrg. Tr. at 973, 977 (Wu did not apply the HMT to any of the areas for
which he calculated HHIs).
[138] PX8002 ¶ 39 & Figs. 3-4.
[139] ████; *see also* ████.

█████████████ and the geographic proximity to █████████████████████

██████ .”[140] █████████████████████ also testified that if ██████ and

█████████████ went out of network for ██████████ would assume ██████

█████████ to ██████████ because based on ██ experience in Bergen County,

members "will seek care at the closest facility able to provide that care to them that

has a quality reputation."[141]

**82.**   A ████████ negotiation overview prepared for ████████ lists ████████ among

the "Top 3 Competitors" for ████████████ alongside ██████████████████ .[142]

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████ .[143]

**83.**   █████████████████████████████████████████████

████████████████████ .[144]

**84.**   According to ████████████████████████████ , the volume of

██████ 's national accounts with over ████ members in Bergen County makes it



140 ███████████████ ; ████████ .
141 ███████████████████████ .
142 ███████████████ ; ████████ .
143 ████████ ; *see also* ████████████ .
144 ███████████████████████████████████
████████████████████████



▮▮▮▮▮▮▮▮▮▮▮▮"[145]

**85.** ▮▮▮▮▮ also conducted a ▮▮▮▮▮ analysis that evidenced the closeness of competition between HUMC and Englewood.[146] In its ▮▮▮ ▮▮▮▮▮ analysis, ▮▮▮ estimated that ▮ % of its inpatient volume at ▮▮▮▮ would go to ▮▮▮▮▮▮ were not in network.[147] ▮▮▮ also performed ▮▮▮▮ analyses for ▮▮▮▮▮▮▮, which estimated that if either of those hospitals were not in network, ▮▮▮ % of patients would go to ▮▮▮▮.[148] In ▮▮▮ recently launched ▮▮▮▮▮ commercial network, ▮▮▮▮ is a Tier 1 provider while ▮▮ is Tier 2, meaning that plan members receive lower out-of-pocket costs for using ▮▮▮▮▮.[149]

**86.** <u>**AmeriHealth**</u>: If HUMC were not in network for AmeriHealth, it would be more important for AmeriHealth to have Englewood in network.[150] If Englewood were no longer available to AmeriHealth's Bergen County members, HUMC, Valley, or Holy Name would be the next best alternative for those patients because

---

[145] ▮▮▮▮▮.
[146] ▮▮▮▮▮
[147] ▮▮▮▮▮; ▮▮▮▮▮; *see also* ▮▮▮▮▮ other hospitals in or around Bergen County were not part of the analysis.
[148] ▮▮▮▮▮; ▮▮▮▮▮; *see also* ▮▮▮ ▮▮▮.
[149] ▮▮▮▮▮ ("Englewood is an anchor because Hackensack Meridian is not part of ▮▮▮▮; ▮▮▮▮; ▮▮. ▮▮▮▮▮
[150] AmeriHealth Hrg. Tr. at 691.

of the geographic proximity of those facilities.[151]

87.   **Horizon**: Horizon, HMH's joint venture partner, admitted that HMH and Englewood are competitors and HMH's Bergen County hospitals are alternatives to Englewood (and vice versa) for Bergen County residents.[152] Analyses prepared for Horizon's development of its tiered OMNIA network likewise reflect that HMH and Englewood are substitutes.[153] A Horizon presentation to HMH explained that projecting Englewood as a Tier 1 facility "primarily reduces Hackensack's steerage capture opportunity for members residing in Bergen [C]ounty."[154]

88.   ████ : ████████████████████████████████████ testified that if either HUMC or Englewood were unavailable, the other hospital would become more important for ████'s members.[155] During ████ negotiations with ████, ████ identified ████████ and ████████████████████ as the only "alternative facilities" if ████████████ went out of network.[156]

89.   **MA and Medicaid Insurers**: There is no closer hospital alternative to HUMC than Englewood for ████████'s Bergen County members.[157]

---

[151] AmeriHealth Hrg. Tr. at 690-91.
[152] Horizon Hrg. Tr. at 1117; ████████████.
[153] PX4046-019; PX1036-002, -005.
[154] PX1036-002, -005.
[155] ████████████.
[156] ████████ : ████████.
[157] ████████; *see also* ████████████.

▆▆▆▆▆▆▆▆▆▆▆▆ offer a marketable and attractive health plan to ▆▆▆

residents of Bergen County ▆▆▆▆▆▆▆, and ▆▆▆▆▆▆▆▆▆▆▆▆

in-network option.[158] Other MA and Medicaid insurers also acknowledge that

HMH and Englewood are close alternatives when building health plan networks

for their Bergen County members.[159]

### 2. *Defendants Acknowledge They are Close Competitors*

90.   Englewood's Chief Strategy Officer was concerned with telling HMH too

much during merger discussions because "in reality our strategy competes with

them[]," to which Englewood's CEO responded "100% agree."[160] Englewood

instructed consultant Chartis to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆ [161]

91.   Englewood's merger team posited that ▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ [162]

---

[158] ▆▆▆▆▆▆ ;

[159] ▆▆▆▆▆ ; ▆▆▆▆▆▆ ; PX7041 at 173, 206-07; ▆▆▆

▆ .

[160] Geller Hrg. Tr. at 819; PX2089-001.

[161] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆

[162] ▆▆▆▆▆▆▆▆▆

92.     At various times over the past 15 years, Englewood's strategic planning

documents have identified HMH as Englewood's "most direct competitor"[163] and a

███████████████████ [164] regularly compared Englewood's quality to HUMC's

quality,[165] and concluded "eliminat[ing] competition of [the] largest provider in

[Bergen County]" was a strategic benefit of partnering with HMH.[166] More

recently, Englewood's strategy consultant ████████████████████████████████

████████████████████████ [167] Englewood's anticipated Q&As from its

community after the Acquisition announcement state, "For a long time,

Hackensack has been a fierce but respected competitor. So how do we now

become partners and colleagues?"[168]

93.     ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ [169] Englewood's Physician Network President testified that ████████

████████████████████████████████████████████████████████████████ [170]

---

[163] PX2121-011.
[164] ██████████.
[165] PX2235; PX2256-011-13; ████████████████; ██████; PX2163-017.
[166] Geller Hrg. Tr. at 916; PX2127-008.
[167] ████████████.
[168] Geller Hrg. Tr. at 919; PX2291-004.
[169] ████████████; *see also* PX2157; PX2334.
[170] ████████████.

94.    In HMH's competitive tracking for its Bergen County hospitals, it consistently identifies Englewood as a competitor and, sometimes, a top competitor.[171] HUMC's June 2018 "Market Highlights & Trends" analysis concluded that HUMC was the overall market share leader and market leader for six separate service lines in Bergen County and identified Englewood as the #3 competitor overall and #3 or #4 in seven different service lines.[172]

95.    HMH is regularly concerned with leakage out of its system to Englewood.[173]

96.    To understand even modest changes in shares, HMH compiled information "specific to Englewood's market share increases in Bergen County."[174] This detailed "competitor profile" of Englewood assessed its market share, geographic draw, quality scores, and financial statistics.[175]

97.    HMH's CEO testified that HMH lacks an incentive to transfer patients to Englewood today because "quite frankly, you know, financially there's no real incentive to . . . it's a competitor."[176] He also described Englewood as offering "a higher level of care than some of the other community hospitals" and noted the

---

[171] Garrett Hrg. Tr. at 800-04; PX1055-001; PX1102-011, -015, -032; PX1143-025-27; PX1029-064-65; ███████████ ; PX1105-006, -009-10, -013, -018-20, -025; ███████ ; PX7005 at 248.

[172] PX1139-009.

[173] PX1063-001, -007; PX1239-017-18; PX1125-001-02; PX1128-001; PX1127-014; *see also* PX1207-006.

[174] PX1106-001.

[175] PX1107-001, -003-13; *see also* PX1118-001, -003-12.

[176] PX7004 at 189-90; *see also* ████████████████ .

services they offer in cardiac surgery, oncology surgery, orthopedic surgery, and

neurosciences are services that other community hospitals typically do not offer.[177]

### 3.   Other Market Participants View Defendants as Close Competitors

**98.**   Other hospitals and market participants ███████████ recognize direct

competition between HMH and Englewood.[178] HUMC and Englewood are two of

only three hospitals in Bergen County that offer tertiary services.[179] Holy Name

refers patients to only HUMC and Englewood for tertiary services, and not to

Valley or to hospitals in New York.[180]

### 4.   Quantitative Analysis by Dr. Dafny and by Third Parties Confirms that Defendants are Close Competitors

**99.**   Dr. Dafny tested the closeness of competition between Defendants by

calculating what percentage of patients at each of Defendants' hospitals, if that

hospital were no longer available, would turn to the other Defendant's hospitals.[181]

**100.**   Dr. Dafny's diversion analysis found that HMH is Englewood's closest

substitute by a wide margin for patients in Bergen County. If Englewood were to

become unavailable, roughly 45% of its Bergen County patients would seek care at

---

[177] PX7004 at 98.
[178] Holy Name Hrg. Tr. at 63, 86-87, 91; ████████████, █████; ████████████
████ PX3086-002.
[179] Holy Name Hrg. Tr. at 86-87, 91.
[180] Holy Name Hrg. Tr. at 91, 123-24.
[181] Dafny Hrg. Tr. at 571-72; PX8000 ¶¶ 173, 175-76.

an HMH hospital.[182] If HMH became unavailable, more than 17% of HMH's patients would seek care at Englewood, second only to Valley.[183]

101. Dr. Dafny's analysis includes all hospitals where Bergen County patients seek care. Even when looking at all patients residing in a broader, four-county area,[184] HMH remains Englewood's closest substitute by a wide margin. If Englewood were to become unavailable, roughly 39% of its patients in this area would switch to an HMH hospital, with nearly 30% switching to HUMC.[185] Englewood is HMH's second closest substitute (11%), behind Valley (17%).[186]

102. These results accord with ordinary course redirection analyses created by insurers.[187] Consequently, patient diversion ratios are highly relevant to insurers' preferences when negotiating with providers.[188]

---

[182] PX8000 ¶¶ 178, 692 & Fig. 32.

[183] PX8000 ¶¶ 178, 692 & Fig. 32.

[184] Dr. Dafny conducted a conservative diversion analysis using the four-county area that included Bergen, Essex, Hudson, and Passaic counties. *See* PX8000 ¶ 175. To the extent residents outside of Bergen County view the Defendants as substitutes, the four-county diversion analysis will account for such effect. Dafny Hrg. Tr. at 572-73.

[185] Dafny Hrg. Tr. at 573; PX8000 ¶ 177 & Fig. 17. The next closest hospitals are Valley and Holy Name, which are estimated to receive roughly 12% and 10% of Englewood's patients, respectively. PX8000 ¶ 177 & Fig. 17. No other facility is predicted to receive even 5% of Englewood's patients. *See id.*

[186] Dafny Hrg. Tr. at 573-74; PX8000 ¶ 177 & Fig. 17.

[187] ██████████████████████; *see also* ███████████████; ████████████████████.

[188] Dafny Hrg. Tr. at 1518-19; PX8002 ¶ 63, Section IV.B.

103.   Defendants also have similar acuity profiles.[189] The fact that HUMC is an AMC and offers some non-overlapping services does not negate the high degree of substitutability with Englewood.[190] Further, insurers utilize alternative providers for the non-overlapping services HUMC provides and contract separately for some of those services.[191]

104.   The commercial insurer pricing differential between HMH and Englewood is consistent with their substitutability in the eyes of insurers. Where networks already include HMH, Englewood adds relatively little value because insurers have already contracted with its closest substitute. Consequently, Englewood is incentivized to lower its price to secure inclusion in commercial insurer networks and thereby access additional patient volume; the Acquisition will eliminate this incentive.[192]

## B.   The Acquisition Significantly Reduces Stage 1 Competition and Will Likely Result in Increased Prices

105.   Defendants compete for inclusion in health insurer networks today. Following the Acquisition, HMH's already substantial bargaining leverage in its negotiations with commercial insurers would increase because insurers would no longer have the option of contracting with Englewood if they fail to reach an

---

[189] Dafny Hrg. Tr. at 1513-15; PX8002 ¶¶ 53-56 & Figs. 8-10.
[190] *See infra* Conclusions of Law, Section III.B ¶¶ 36-37.
[191] Dafny Hrg. Tr. at 1515-16; ███████████████; PX8002 ¶ 57.
[192] Dafny Hrg. Tr. at ██████, 1521-22; PX8002 ¶ 10.

agreement with HMH, or vice versa.[193] The resulting rate increases from this greater bargaining leverage directly harms employers and their members by increasing their cost of care.[194]

### 1. HMH Already has Substantial Market Clout and Uses it to Extract High Rates and Onerous Terms Today

106.   HMH already uses its larger scale and market power to extract favorable rates and terms from insurers; today, its rates are ████████████████████[195] When HMH negotiates with insurers, it brings all the leverage that it has to the table to get the best possible contract for HMH.[196] HMH has no other goals in negotiations other than increasing revenue.[197]

107.   In ████ contract negotiations, HMH succeeded in winning a ████ rate increase from ████, ████████████████" than other systems with which ████ negotiates.[198] In the midst of these negotiations, ████████████████ ████████ noted that ████ was ████ and referred to the relationship with HMH

---

[193] *See* PX8000 ¶¶ 115-16, 195-197, 201.
[194] Dafny Hrg. Tr. at 550, 579; ████████████████, ████████; *see also* ████████; ████.
[195] ████████, 304-05; PX7007 at 63; ████████; ████; *see also* ████; PX1111-005.
[196] Young Hrg. Tr. at 1074.
[197] Young Hrg. Tr. at 1074. Along these lines, HMH seeks to maximize revenues when it is under contract with an insurer. ████████████████ ████████████████████████████ ████ ; ████. 
[198] ████████████████.

as ███████████ [199]

**108.** Although ████ tries to limit rate increases to ███████, HMH was able to secure a ████ increase in its ████ contract negotiations.[200]

**109.** ████████████████████████ testified that HMH seeks rate increases approximately ████ higher than other health systems.[201]

**110.** MA and Medicaid insurers also confirm that HMH's rates are significantly higher than other providers, including ████████████ [202] HMH is seeking rates that are approximately ████ more expensive than ████████████'s most expensive contracted hospital.[203]

**111.** HMH uses the threat of termination to achieve its negotiation objectives with insurers.[204]



### 2. *The Acquisition Will Increase HMH's Bargaining Leverage, Which Will Likely Result in Increased Prices*

**112.** Insurers recognize that the Acquisition will enhance the merged system's bargaining leverage.[205] Insurers would likely accept the higher rates demanded by

---



199 ███████████████████████████; *see also* ████████; ████████.
200 ██████████████████████████; ████████.
201 ████████████████████████.
202 ████████████; ████████████; ████████.
203 ████████████████;
204 *See e.g.,* ████████; ████████████████; ████████;
████████████.
205 ██████████████████; ████████████; PX7007 at 155; ████████;
████████████████

the merged entity in order to keep it in network.[206]

113.   The Acquisition will permit HMH to demand higher rates from insurers because a health plan excluding Englewood and HMH is unlikely to be marketable to current or potential members in Bergen County, leaving insurers with little choice but to keep the merged entity in network.[207]

114.   Econometric analysis supports insurers' views that the merged system's enhanced market power likely will increase healthcare costs for consumers by roughly $31 million annually.[208] Dr. Dafny performed a WTP analysis to quantify the impact of the Acquisition on Defendants' bargaining leverage with insurers.[209] This WTP analysis measures the change in how insurers' customers—patients— value access to the Defendants' hospitals for overlapping services, which serves as a sound proxy for the value of a hospital to insurers.[210]

115.   Dr. Dafny found that patients living in Bergen County would have a 14.7% higher WTP for the combined HMH-Englewood system than for the Defendants

---

[206] ████████████ : ████████ : ████████ ; *see* ████████████
████ ; PX7007 at 161-64;
[207] *See, e.g.,* ████████ , ████ : ████████ ; PX7007 at 66, 154-55,
161-64; ████████ : ████████ .
[208] Dafny Hrg. Tr. at 578; PX8000 ¶ 197.
[209] Dafny Hrg. Tr. at 575-79; PX8000 ¶¶ 195-97.
[210] *See* Dafny Hrg. Tr. at 548-49, ████ ; PX8000 ¶ 117-19, 195-97. Economic literature documents a strong association between WTP and hospital prices. Dafny Hrg. Tr. at ████ , 1519; PX8000 ¶¶ 117 & n.26.

separately.[211] As a conservative measure, Dr. Dafny also calculated WTP based on patients in the wider four-county area, which yielded a 10.1% higher WTP post-transaction.[212] A 10.1% increase in WTP would allow Defendants to extract approximately $31 million annually in increased spend from commercial insurers for their members across the four-county area.[213]

### 3.   *HMH Has Previously Increased Rates to Insurers after Past Acquisitions and Will Likely Increase Rates at Englewood Regardless of* ▮▮▮▮▮▮▮▮ *Waivers*



**116.**   Almost every one of HMH's commercial insurer contracts contain ▮▮▮▮▮▮▮▮▮▮" that allows HMH to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.[214] HMH's VP of Managed Care Contracting has referred to this language as ▮▮▮▮▮▮▮▮▮▮[215] and it has led to ▮▮▮▮▮▮▮ ▮▮▮▮▮for insurers at hospitals HMH has acquired.[216]

**117.**   HMH uses its leverage to ▮▮▮▮▮▮▮▮▮▮[217] and to keep

---

[211] PX8000 ¶ 195 & Fig. 18.

[212] Dafny Hrg. Tr. at 576; PX8000 ¶ 196.

[213] Dafny Hrg. Tr. at 576-78; PX8000 ¶¶ 171, 197. To further test the robustness of her findings, Dr. Dafny analyzed her four-county WTP using *all* inpatient GAC services rather than those provided by both Defendants. This adjustment produced virtually identical results. PX8002 ¶ 58 & Fig. 11.

[214] PX1182-002; PX1156-002-04; PX1158-002-03.

[215] ▮▮▮▮▮▮▮▮▮▮; PX1179-001.

[216] ▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮; PX1231-004; PX1225-003; PX7015 at 66-67; ▮▮▮▮; *see also* ▮▮▮▮▮▮; ▮▮▮▮; ▮▮▮▮; PX1179-002.

[217] *See* ▮▮▮▮▮; ▮▮▮▮▮.

███████████████ in its contracts,[218] and views ███████████████ as a

███ ."[219] Insurers have attempted to negotiate modifications to ██████████

███████ in the past, but HMH has strongly resisted.[220]

**118.** After the FTC submitted its opening brief, HMH sent non-binding letters to

insurers promising not to trigger this language.[221] ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ [222]

**119.** ███████ described the waiver letter as merely ████████████████████ ,"

because it believes HMH will seek to "███████████████████████████████████

████████████████████████████ " in the next negotiation for ██████ [223] If

HMH does seek to ███████████████████████████████ ██████ fears it

---

[218] *See, e.g.,* ███████ .
[219] ███████ .
[220] *See, e.g.,* ████████████████ ; ████████████████ ; ████████████████ ;
████████████ ; ███████ .
[221] *See, e.g.,* PX7056 at 165-66, ███████ ; ███████ .
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████
[222] ███████ ; ███████ .
[223] ███████████████████ .



"███████████████████████████████████."[224]

**120.**   Before HMH circulated these waiver letters, ████████████████████

projected ████████████████ from the language.[225]

### C.   The Acquisition Would Eliminate Beneficial Stage 2 Non-Price Competition

**121.**   The Acquisition will likely eliminate the substantial non-price and quality

competition between HMH and Englewood that has benefitted all patients.

#### 1.   *HMH and Englewood Compete with Each Other on Non-Price Dimensions*

**122.**   After Englewood advertised its use of new heart valve technology "as first in

the State," HMH expedited the steps for approving the new valves because,

without the technology, "it is very challenging for [HMH] to keep up with

competitors," and an HMH physician expected to lose patients.[226]

**123.**   Similarly, after identifying that Englewood would be the first in the region to

use a new SBRT lung technology (a lung cancer treatment), one that "Hackensack

does not have," an Englewood employee wrote that Englewood "NEED[s] to

discuss how we can market this in a big way" to "give us the edge."[227]

**124.**   In December 2017, HMH announced that HUMC was "among the first in

---

[224] ████████████████████████████; *see also* PX8002 at 84 & n. 247.
[225] ██████████████████████; ████████; ████████████; ████████
    ██;██████████████.
[226] PX1205-001-02.
[227] PX2329; PX2358-001.

the tri-state area and the first in Bergen County, New Jersey" to perform TransCarotid Artery Revascularization (TCAR), an innovative new treatment for carotid artery disease.[228] By January 2019, Englewood announced that it was also one of the first hospitals in New Jersey to offer TCAR.[229]

### 2. *The Acquisition Would Reduce HMH's Incentive to Compete on Non-Price Dimensions*

**125.** ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████.[230]

**126.** HMH monitors competitors' quality, including Englewood's, because it helps improve the services and quality HMH offers.[231] But post-Acquisition,

---

[228] PX9094-001.
[229] PX9093-001.
[230] 
*see also* PX1113 at 10-15.
[231] Garrett Hrg. Tr. at 800-01; PX1055-001.

Englewood would no longer be competing with HMH.[232]

### D. The Presence of Other Hospitals Will Not Mitigate the Harm from the Acquisition

#### 1. Other Hospitals in Bergen County are Inadequate Substitutes and Will Not Constrain HMH Following the Acquisition

127. **Bergen New Bridge**: Bergen New Bridge is a county-owned safety net hospital that devotes nearly all its beds to long-term care or behavioral health and substance abuse treatments, does not offer many of the same GAC services that HMH and Englewood offer, currently has 0.2% market share, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ commercial patient volume for GAC services.[233]

128. **Holy Name**: Holy Name currently has 9.2% market share and lacks regulatory approval to offer tertiary services that both HUMC and Englewood offer, such as cardiac surgery.[234] HMH and its predecessor entities have blocked efforts by Holy Name to expand its services in the past.[235]

129. **Valley**: Valley has 21.2% market share today.[236] Valley is moving its hospital in 2023, but its replacement hospital is licensed for fewer inpatient beds,

---

[232] Garrett Hrg. Tr. at 804; PX7004 at 235.
[233] Holy Name Hrg. Tr. at 53-54, 59, 89; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; PX7022 at 175-76, ▮▮▮▮▮ ▮; ▮▮▮▮▮▮▮; PX7036 at 13, ▮▮▮▮▮▮; ▮▮▮▮▮ ▮; ▮▮▮▮▮▮▮▮▮▮; PX5007 ¶¶ 3-4; PX8000 ¶¶ 161, 166 & Figs. 15, 16; ▮▮▮▮▮▮▮▮▮▮; ▮; ▮▮▮▮▮▮; PX9015-002.
[234] Holy Name Hrg. Tr. at 49-50, 93, ▮▮▮, 114; PX7019 at 26-28; ▮▮▮▮▮▮▮▮▮ ▮; PX8000 ¶ 161 & Fig. 15; ▮▮▮▮▮▮▮.
[235] Holy Name Hrg. Tr. at 93, ▮▮▮▮.
[236] PX8000 ¶ 161, Fig & 15.

█████████████████████████████████.[237] Due to Valley's location, it competes with

hospitals in eastern Bergen County—Englewood, Holy Name, and HUMC—to a

limited degree.[238] ████████████████████████████████████[239] and

HMH does not expect much to change once Valley moves its hospital location.[240]

### 2. Other NJ Hospitals Do Not and Will Not Constrain the Defendants

130.   **RWJBarnabas and Atlantic**: Hospital competition for routine hospital

services is local, and although HMH competes with RWJBarnabas and Atlantic at

a system level, these systems are not substitutes in areas where there is no overlap,

such as Bergen County.[241] RWJBarnabas[242] and Atlantic[243] have very little

competitive significance in Bergen County for inpatient GAC services.

RWJBarnabas has less than 3% market share in Bergen County, and Atlantic has

less than 2% market share.[244] As a result, insurers,[245] other hospitals, and even

---

[237] ████████████████████; ██████████; PX5004 ¶¶ 3, 12-13; PX1138-002-03; PX9013; *see also* PX7037 at 320-21.
[238] Holy Name Hrg. Tr. at 59, 88; ██████████████; ██████████; PX7007 at 113-14; █████████.
[239] ██████████████.
[240] PX1138-002-03.
[241] Atlantic Hrg. Tr. at 443-44; ██████████████; *see also* PX7029 at 386.
[242] Holy Name Hrg. Tr. at 82; PX7016 at 208, 210, 230-31, 251, 274, 287-88, 290-91, ████, 365-66; PX7025 at 305; ██████████████.
[243] Atlantic Hrg. Tr. at 434, 437, ████████, █, █, ██, █; ██████████; PX7030 at 57-58; █████.
[244] PX8000 ¶ 679 & Fig. 25.
[245] ██████████████████; AmeriHealth Hrg. Tr. at 689; Horizon Hrg. Tr. at 1124-26; ██████████; ████████.

Defendants themselves[246] acknowledge Atlantic and RWJBarnabas do not compete for Bergen County patients. Indeed, ███████████████████████████████████████████

████████████████████████████████████████████████████████████[247]

**131.    Hudson County Hospitals**: HMH Palisades is in the northern part of Hudson County, close to Bergen County.[248] The other five inpatient GAC hospitals in Hudson County are not significant competitors for Bergen County residents[249] and are not alternatives to the Defendants for insurers.[250] All Hudson County hospitals combined have less than 2% market share in Bergen County, and HMH Palisades represents the plurality of that 2%.[251]

**132.    Essex County Hospitals**: HMH operates Mountainside in Essex County near the Bergen County border.[252] The remaining Essex County hospitals do not significantly compete for patients in Bergen County and do not compete with the Defendants' Bergen County hospitals.[253] All Essex County hospitals combined

---

[246] Atlantic Hrg. Tr. at 463; ████████████████.
[247] ██████████████; ███████████████ ████████.
[248] United Hrg. Tr. at 181.
[249] ██████████████████████; Horizon Hrg. Tr. at 1124-26; Holy Name Hrg. Tr. at 79; █████████████████████; ████████████; █████████████; ████████████████████████████; PX5004 ¶ 6; ████████.
[250] AmeriHealth Hrg. Tr. at 689-90; PX7007 at 86-87; ████████████████; *see also* ██████.
[251] PX8000 ¶ 679 & Fig. 25; *see also* PX7035 at 49, 116, 120-21; PX7016 at 251; PX7034 at 327.
[252] PX8000 ¶ 19.
[253] ██████████████████; ████████████; Holy Name Hrg. Tr. at 79-80; PX4011; PX4014.

account for less than 3% market share in Bergen County.[254]

133. __Passaic County Hospitals__: St. Joseph's and St. Mary's in Passaic County have little competitive significance in Bergen County and are not meaningful alternatives to the Defendants' Bergen County hospitals.[255] All Passaic County hospitals combined account for less than 3% market share in Bergen County.[256]

### 3. *NYC Hospitals Do Not and Will Not Constrain Defendants*

134. Although some patients in New Jersey seek care in Manhattan, this is largely limited to patients seeking highly specialized tertiary and quaternary care.[257] As a result, New York City hospitals typically do not compete for Bergen County residents for routine inpatient GAC services.[258] Bergen County residents do not typically travel to New York City over their local hospitals for routine care and insurers could not turn to these facilities as alternatives in order to defeat a price increase from the merged entity.[259]

---

[254] PX8000 Fig. 25.

[255] ███████████████████; ██████████; Horizon Hrg. Tr. at 1126-27; ██████████████████; PX7028 at 131, █, ██████; ████; ████████████████; ███████; ██████████████; PX8000 Fig. 25; ████████████.

[256] PX8000 Fig. 25.

[257] Holy Name Hrg. Tr. at 73-74; ████████████████████████; PX7055 at 197-200; PX4002; PX2080-033.

[258] Holy Name Hrg. Tr. at 72, 74-75; ████████████; PX7055 at 183-84; PX4007-007; PX4158-036; PX8000 ¶ 679 & Fig. 25.

[259] *See e.g.*, ████████████████; PX7007 at 84, 88; ████████████; ████████████; ████████████████; Geller Hrg. Tr. at 903; PX7025 at 287-88. Many New Jersey insurers do not even contract with New York providers. *See, e.g.*, Horizon Hrg. Tr. at 1131; AmeriHealth Hrg. Tr. at 685.

**135.**   Englewood's consultant, Chartis, concluded that fewer than 10% of inpatients from Englewood's PSA outmigrate to New York, and the small percentage that leave New Jersey go to NY-Presbyterian "or to a specialty hospital like Memorial Sloan Kettering for oncology or [Hospital for Special Surgery] for orthopedics."[260] A 2020 HMH market share presentation also showed outmigration from HUMC's service area under 10%.[261]

**136.**   New York City hospitals have experienced flat or decreasing outmigration from Bergen County over the previous few years.[262]

### 4.   *"Front Doors" Do Not and Will Not Constrain Defendants*

**137.**   If hospitals outside Bergen County open new outpatient facilities in Bergen County, this would not sufficiently constrain HMH, as such facilities do not shift meaningful inpatient GAC volume outside of Bergen County today.[263]

**138.**   Between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, just ▮ patients who received treatment at ▮▮▮▮▮▮ outpatient facility in Bergen County received additional treatment—either inpatient or outpatient—at one of ▮▮▮▮'s hospitals within 90 days.[264]

---

[260] Chartis Hrg. Tr. at 525-26; ▮▮▮▮▮; ▮▮▮▮▮▮▮▮; *see also* Chartis Hrg. Tr. at 396-97.
[261] Sparta Hrg. Tr. at 1164; PX1295-065.
[262] ▮▮▮▮▮▮; PX7055 at 185-86; PX7031 at 280-81; ▮▮▮▮.
[263] *See* PX7031 at 231; PX8000 ¶¶ 177, 217-22 & Figs. 17, 20, App'x. F.
[264] ▮▮▮▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮.

**139.**   Other entities that have previously attempted to open outposts in Bergen County have closed or been unsuccessful,[265] while affiliations with Bergen County hospitals shift very little inpatient volume outside of Bergen County.[266]

**140.**   Dr. Dafny accounted for a potential continuation of outmigration trends to New York City hospitals and concluded it would not meaningfully reduce the Defendants' post-merger increase in market power.[267]

**141.**   Defendants' expert, Dr. Wu, did not conduct any quantitative analysis of the effect of opening a "front door" facility on inpatient volumes or market shares.[268]

### E.   Alleged Capacity Issues Have Not Changed HMH's Incentives to Compete Aggressively

**142.**   Purported capacity issues at HUMC have not dissuaded HMH from competing for network participation, including offering price discounts and undertaking other efforts to increase patient volume.[269] Lifting capacity constraints at HUMC would only incentivize lower prices to the extent that such constraints

---

[265] Holy Name Hrg. Tr. at 77 (NY-Presbyterian "planting those outposts, if you will, wasn't providing referrals into New York"); PX4009; PX4012 .
[266] PX7031 at 234-37, 251; PX8000 ¶ 679 & Fig. 25.
[267] PX8000 ¶¶ 217-22.
[268] Wu Hrg. Tr. at 983.
[269] Young Hrg. Tr. at 1075; ███████████ ; PX8002 ¶¶ 11, 174-75. Dr. Dafny concluded HMH's purported capacity constraints have not impacted its decisions regarding network participation, which is necessary for such constraints to impact the negotiated price. Importantly, even if HUMC were capacity constrained, Dr. Dafny's conclusions about the Acquisition would be unchanged. PX8002 ¶¶ 63, 76-78.

are limiting its incentives to attract more patients today.[270]

### F. Numerous Market Participants Have Concerns About the Acquisition's Impact, While Those That Support the Acquisition Have Financial Ties to HMH

143.   Numerous market participants have concerns about the Acquisition's impact.[271] For example, ████ is concerned with HMH's "████████████████ "[272] and AmeriHealth is concerned that HMH is already very significant in Bergen County, and "this would be another hospital that they would own in that same county."[273]

144.   Horizon is biased because it ████████████████████████████████████████████████████████████████

████ [274] HMH asked Horizon to provide a letter of support.[275] Horizon does not know whether Horizon's costs will go down post-merger because "[t]hat will be negotiated."[276] Other supporters also have significant financial ties to HMH.[277]

145.   Other insurers' concerns with the Acquisition are not biased by ████.

---

[270] PX8002 ¶ 174.
[271] ████████████████; ████████████; ████████████; ████; Atlantic Hrg. Tr. at 465-66; ████████████; AmeriHealth Hrg. Tr. at 681-82; ████████; PX7022 at 250-52; ████████; ████; ████.
[272] ████████████████.
[273] AmeriHealth Hrg. Tr. at 681; *see also* PX7051 at 43, 227.
[274] ████████████; Young Hrg. Tr. at 1075-76.
[275] Horizon Hrg. Tr. at 1133.
[276] Horizon Hrg. Tr. at 1128-30.
[277] Garrett Hrg. Tr. at 814-815; ████.

Insurer concerns pre-date the announcement of ████████ and are supported by substantial contemporaneous ordinary course evidence demonstrating the substitutability of HUMC and Englewood.[278]

146. Insurers may be limited in their ability to respond to the Acquisition by steering patients to preferred providers by onerous contract terms[279] and because the Acquisition eliminates an alternative.[280]

### G.   An Objective of the Acquisition is to Avoid Competition

147. Internal HMH Acquisition rationale documents discuss avoiding competition as a strategic objective and a benefit of merging with Englewood.[281]

148. ████████████████████████████████████████████████



149. ████████████████████████████████████████████████

---

[278] *See, e.g.,* ████████████████████████ ; ████████████ ;
AmeriHealth Hrg. Tr. at 681; ███████████████ . Defendants also suggest
████ may be biased because of its relationship with ████████████ ;
however, ████ testified that ████ is the ████████████████
████████████████ ; ██████ .
[279] *See* ██████████████████ .
[280] Dafny Hrg at 1527; ████████████████████
[281] ████████ ; PX1109-002.
[282] ████████ ; ████



███████████████████████████████ [283]

**150.** Englewood expressed concern to other potential merger partners ████

████████████████████████████████████████████████████ [284].

**151.** Englewood's fears of retaliation from HMH were not unfounded. HMH

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████." [285] Five days later, HMH's CEO

sent a letter to Englewood stating that a "formal partnership would allow EH to

*continue* to receive the benefits" from the previous strategic partnership. [286] HMH's

Chief Strategy Officer also wrote to HUMC's President, Mark Sparta, ████████

████████████████████████████████████████" [287]

## VIII. Defendants Fail to Rebut the Strong Presumption of Harm to Competition in the Relevant Market

### A. Entry or Repositioning by Others Would Not Be Timely, Likely, and Sufficient to Deter or Counteract Competitive Harm

**152.** New Jersey is a CON state, meaning that healthcare providers must apply for



283  █████████████████;
284  █████████████████████:    ███:    ███:    ████████

████████████████████████████████████████

████████████████████████████████████.

285  ███████:    ██.
286  █████████; PX1042-001 (emphasis added).
287  ████████████████

and receive approval from the state before offering certain services or undertaking

certain projects such as building a new hospital.[288] In a CON state, building a new

hospital or expanding an existing one is expensive and time consuming.[289]

**153.** Other hospitals, including ███████, ████████ RWJBarnabas, Mount Sinai

and NY-Presbyterian, have no plans to respond to the Acquisition.[290]

> ### B.   Defendants Fail to Substantiate Cognizable Efficiencies Sufficient to Prevent Harm from the Acquisition

**154.** Defendants fail to meet the burden of substantiating their asserted

efficiencies and proving they are verifiable and merger specific.[291]

> ### 1.   The Acquisition is Not Necessary to Alleviate HUMC's Purported Capacity Issues

> #### a.   HMH has Failed to Undertake Common-Sense Measures to Alleviate Purported Capacity Issues at HUMC

**155.** HMH has failed to consider multiple common-sense measures to address

HUMC's alleged capacity issues. None of these measures requires a merger.[292]

---

[288] Holy Name Hrg. Tr. at 93; ████████████████████; PX7000 at 62-64; PX7050
at 291-92. HMH's Chief Strategy Officer admitted ████████████████████████
████████████████████████████████████████████████████████████
█.
[289] *See* PX7004 at 78-79; ███████████; PX5004 ¶¶ 11-12; PX9018. HUMC's bed
tower will cost over $700 million and will take six years. PX7004 at 142-43, 146-
47; ████████████; PX1098 at 019; PX9019. Valley started planning for a
replacement hospital in 2006; its replacement hospital will cost ████████
and will not open until 2023. ████████████████; PX5004 ¶¶ 11-12.
[290] PX7031 at 273-74, 278; PX7055 at 240-48; ████████████████; PX7016 at 72;
████████.
[291] *See infra* Conclusions of Law Section III.C.
[292] Romano Hrg. Tr. at 1440.

**156.**   HMH could utilize its community hospitals more effectively: Pascack Valley, Palisades, and Mountainside all operate significantly under capacity.[293] HUMC could "decant" patients needing lower-acuity services to these hospitals because all three hospitals are equipped to handle lower-acuity patients.[294]

**157.**   In 2011, HUMC applied for a CON to acquire Pascack Valley, and intended to use Pascack Valley as a "pressure relief valve for the overflow of patients at HUMC."[295] In other words, HUMC thought Pascack Valley could alleviate its capacity issues, but Pascack Valley's low occupancy rate today suggests HUMC is failing to properly utilize Pascack Valley to do so.[296]

**158.**   HUMC accepts many transfers from other hospitals,[297] including its own community hospitals[298] and Englewood,[299] and could limit those transfers.[300] HMH could also increase the use of physician-to-physician telehealth services,[301] or

---

[293] Romano Hrg. Tr. at 1436-37; PX8001 ¶ 54; Nolan Hrg. Tr. at 1212; ███████████ ; PX2158-001-02.
[294] Approximately 75% of HUMC's discharges overlap with the services provided at these three community hospitals. Romano Hrg. Tr. at 1437; PX7052 at 212-13; PX7004 at 201-02; PX8001 ¶ 53; ████████ .
[295] Romano Hrg. Tr. at 1437-38; PX8001 ¶¶ 55-58; PX9096-013.
[296] Romano Hrg. Tr. at 1437-38; PX8001 ¶¶ 55-58; PX9096-013.
[297] Holy Name Hrg. Tr. at 89-90; Romano Hrg. Tr. at 1438-39; PX7016 at 333-337; ████████ ; PX7028 at 144-48; PX7022 at 227; ████████ .
[298] PX1125-002; PX9002-001.
[299] PX1308-003; ████████ ; PX7000 at 104-105; PX2017-002-03; PX2018-001-02; ████████ .
[300] Romano Hrg. Tr. at 1438-39.
[301] Romano Hrg. Tr. at 1438-39; PX8001 ¶ 63; *see also* ████████ .

redirect transfers to other facilities in northern New Jersey with appropriate capabilities,[302] to reduce the number of patients at HUMC.

159.   In 2020, HMH's consultant, ███████ identified ██████ "excess days" at HUMC.[303] Similarly, according to CMS, HUMC has greater than average hospital readmission (or return) days for certain conditions.[304] By addressing even a fraction of these excess days, HUMC could free up capacity at its hospital.[305]

### b.   HUMC's Capacity Problems are Exaggerated

160.   Defendants and their expert Mr. Nolan are likely exaggerating the capacity issues at HUMC.[306] Among other things: many market participants are unaware that HUMC is experiencing capacity problems;[307] HUMC has a "no divert" policy;[308] HUMC's $714 million Second Street Tower project will add beds, add operating rooms, add ICU beds, and create shell space for 25 additional ICU rooms

---

[302] Romano Hrg. Tr. at 1439; PX8001 ¶ 65; ██████████ ; ██████████ .
[303] Romano Hrg. Tr. at 1439-40; ██████████ ; PX8001 ¶ 65.
[304] Romano Hrg. Tr. at 1440; PX8001 ¶ 65.
[305] Romano Hrg. Tr. at 1440; ██████████ ; PX8001 ¶ 65.
[306] Romano Hrg. Tr. at 1441-45; PX8001 ¶¶ 31-52.
[307] Holy Name Hrg. Tr. at 90-91; ██████████ ; Horizon Hrg. Tr. at 1127; Romano Hrg. Tr. at 1441-42; ██████████ ; PX7007 at 129-31; PX7022 at 226-27, 230-31; ██████████ ; ██████████ ; PX7028 at 154-55; PX8001 ¶¶ 32-34.
[308] Romano Hrg. Tr. at 1442; PX1121-003; PX8001 ¶ 35; Nolan Hrg. Tr. at 1208; PX7009 at 198; PX7011 at 391; ██████████ ; ██████████ ; PX1203-002. Diversion is "when you let the ambulances know that you're full and to take the patient somewhere else." PX7009 at 198.

that HUMC could build out in the future;[309] HUMC has made successful efforts to improve throughput, many of which are still ongoing;[310] HUMC continues to expand its service lines;[311] and HUMC is licensed for 781 beds, but only staffs 711.[312]

### c.   HUMC Could Use Englewood Today to Alleviate Purported Capacity Issues

**161.**   Englewood is available to accept patient transfers from HUMC <u>today</u> to alleviate alleged capacity issues, but HUMC fails to utilize this option.[313] HMH's executives testified that they limit transfers from HUMC because they lack the financial incentive to transfer patients.[314]

### d.   Even if the Acquisition Could Alleviate Alleged Capacity

---

[309] Romano Hrg. Tr. at 1443-44; PX8001 ¶¶ 38-42; Sparta Hrg. Tr. at 1147, 1173-1175; PX1052-001-02; ███████████; *see also* PX7004 at 156-57; ███████; *see generally* PX1129; PX1133.

[310] PX8001 ¶ 36; PX7034 at 92--95, 99-102, 213, ██████.

[311] PX8001 ¶¶ 43-44; PX7034 at 157-73, 175-221; PX1050 at 003-05, -008-14; ███████████; ██████████; ████████; PX1244-058; █████████; PX1119-003-06; PX1124-020, -036.

[312] PX8001 ¶ 37; PX7009 at 174-78; PX1078-001. Additionally, although Defendants' expert contends that HUMC's ORs are over capacity and causing problems throughout the hospital, HUMC's President admitted that ████████████ ██████████████████ *Compare* Nolan Hrg. Tr. at 1195-96 *with* Sparta Hrg. Tr. at 1173; PX7034 at 232. Finally, although Defendants suggest that 85% occupancy is an industry "maximum," 83-85% capacity at a hospital is considered "optimal." Romano Hrg. Tr. at 1445; PX8001 ¶¶ 45-49.

[313] Romano Hrg. Tr. at 1446; Nolan Hrg. Tr. at 1201; █████████████. More than 90% of inpatient transfers into HUMC are for services that Englewood handles today. Romano Hrg. Tr. at 1446. Englewood currently offers up to 86% of the same specialized services that HUMC offers. Nolan Hrg. Tr. at 1211.

[314] █████████████; PX7004 at 189-90.

*Constraints, the Benefits Require Uncertain Regulatory*
*Approval, are Speculative, and are Not Merger Specific*

**162.** HMH's expansion into quaternary care would require the approval of a New Jersey CON, a process that is lengthy and often exceeds a year in duration, with no guarantee that the expansion will be permitted.[315]

**163.** Additionally, HMH is already offering many of the high-end services that it claims require the Acquisition, and it had been planning to develop additional programs before it announced the Acquistion.[316] In particular, HMH's plans ██
████████████████████████████████████████████.[317]

### 2. *Quality Improvements are Unsubstantiated and are Not Merger-Specific*

#### a. *Englewood is Already High Quality and Outperforms HMH's Hospitals on Many Quality Metrics*

**164.** Englewood is already a high-quality hospital.[318] Englewood is equal to or higher quality than most or all of HMH's hospitals, including HUMC.[319] Leapfrog,

---

[315] Romano Hrg. Tr. at 1447; PX8001 ¶¶ 77-79; Holy Name Hrg. Tr. at 93-94; JX0106 at 252; ████████████████.

[316] Romano Hrg. Tr. at 1447; PX8001 ¶ 81; ██████████████████; PX7004 at 293-96.

[317] ████████████████████; ████████████; PX7004 at 271-73, 293-94; ████████

[318] Holy Name Hrg. Tr. at 109-10; Brunnquell Hrg. Tr. at 1314, 1320; PX7025 at 43-46; PX7044 at 86-87; ██████████████, 103-104; PX7019 at 27, ███████████; ████████████; PX7020 at 183-84; ████████████; PX9029-001-03; PX9042-001; PX9043-001; ██████████; ████████████████.

[319] ████████████; PX7043 at 251-252; ████; PX1256-004; ████████████████; ████████████; PX9035-001, -006, -013-15.

a nationally recognized and respected hospital ratings organization,[320] consistently rates Englewood as an "A" on hospital safety scores, while HUMC has rated "B" or "C" over the past few years.[321] A member of HMH's board expressed concerns about HMH's recent "spotty quality results," "culture of quality," and safety issues following a review of Leapfrog ratings.[322]

**165.** Englewood outperforms HUMC on many quality of care measures.[323]

**166.** Dr. Meyer ignored his own interview notes that contradict his conclusions, including ███████████████████████████████████[324]

> ### b.   HMH Has an Inconsistent Track Record of Improving Quality at its Previously Acquired Hospitals

**167.** A review of all 32 publicly available measures from CMS show mixed results in HMH's ability to improve the quality at previously acquired hospitals.[325]

---

[320] ████████████████████; Romano Hrg. Tr. at 1449-50; PX8001 ¶ 100; PX7019 at 29; *see also* ████████████; ███████████.

[321] Holy Name Hrg. Tr. at 108-112; PX4054-002; Garrett Hrg. Tr. at 800-02; PX1055-001; Brunnquell Hrg. Tr. at 1320; Romano Hrg. Tr. at 1449-50; PX9042-001; PX9043-001.

[322] Garrett Hrg. Tr. at 797-99; PX1273-002; PX2256-011-13; PX9077-001.

[323] Romano Hrg. Tr. at 1449-52; PX8001 ¶ 100-04, Tbls. 1-3; ████████████; ████████████. Defendants' expert, Dr. Meyer, looked at just a subset of measures to reach his flawed conclusion that HUMC outperforms Englewood on quality. Romano Hrg. Tr. at 1452, ████. Indeed, HMH admitted it has not assessed specific quality improvements that could be made at Englewood post-Acquisition. PX7020 at 56, 70, 141-142.

[324] ████████████████████; PX1332-002.

[325] Romano Hrg. Tr. at 1453-54; PX8001 ¶¶ 106-09 & App'x D; ████████████; ████; PX7020 at 104-105.

For example, doctor communication and stroke readmission rates worsened at hospitals following HMH's acquisition of them.[326] An HMH board member expressed concerns about the effects on HMH's quality of acquiring hospitals.[327]

c.  *Benefits of Englewood Joining the HMH System are Speculative, Unsubstantiated, and Not Merger Specific*

**168.**  Independent hospitals ███████████ have agility and nimbleness to respond to the needs of the community, consistently outperform the larger HMH, and are able to engage in many of the purported "benefits" of a larger system.[328]

**169.**  For example, while Englewood was named Leapfrog Pandemic Hero of the Year for its COVID-19 response,[329] HMH was cited and fined by OSHA for "serious violations" for failing to protect employees from COVID-19 exposure.[330] Nurse union HPAE explained that HMH had an "inordinate" number of OSHA violations during COVID and characterized HMH's response to COVID as "the worst of [their] employers across the state."[331]

**170.**  Englewood could join other large systems that have similar capabilities to

---

[326] Romano Hrg. Tr. at 1453-54; PX8001 App'x D at 163, 181.
[327] PX1185-001-02.
[328] ███████████████████; *see also* ███████████████; ███████████████. Holy Name, which is a fraction of the size of HMH and has a smaller market share than Englewood, consistently receives higher quality ratings than HUMC. PX8000, Fig. 15; ███████████████████; *see also* Brunnquell Hrg. Tr. at 1324-25.
[329] PX9003-001-03; PX7023 at 65; PX7025 at 13-15; PX9032-002.
[330] PX9037-001; PX7017 at 33-34, 163-70; *see also* PX7043 at 264; PX6023-002.
[331] PX7017 at 80, 179.

those at HMH.[332] Englewood concedes that quality-related improvements could be accomplished through a merger with another system.[333]

### 3.    *Defendants' Estimated Cost Savings are not Cognizable*

**171.**   Defendants have not identified ordinary-course cost savings estimates and have done little integration planning.[334]

**172.**   Defendants' estimated savings from redirecting care from HUMC to Englewood are not cognizable. Dr. Gowrisankaran's estimate suffers numerous flaws, including heavy reliance on Defendants' March 2021 Service Optimization Framework.[335] Further, few patients are eligible and patients have to agree to be transferred,[336] so it is impossible to verify post-merger transfer projections.[337]

**173.**   Defendants' estimated cost savings from redirecting quaternary care from

---

[332] Romano Hrg. Tr. at 1456-57; PX8001 ¶¶ 110-13; *see also infra* Section VIII.C ¶ 177.

[333] Brunnquell Hrg. Tr. at 1326; ███████████████████ .

[334] *See, e.g.*, Garrett Hrg. Tr. at 795; ██████████████████████████ ; ████████████ ; PX7020 at 69-70; PX7034 at 56-57; ██████████████████████ ; ████████████ .

[335] Gowrisankaran Hrg. Tr. at 1283-84. Dr. Gowrisankaran also did not use hospital costs, and he assumed that the current price differences between HUMC and Englewood will continue to exist post-merger. *Id.* at 1275.

[336] Nolan Hrg. Tr. at 1214-15; PX7052 at 220.

[337] Sparta Hrg. Tr. at 1170; PX1060-001. HMH did no work independent of its lawyers and experts hired for this litigation to calculate potential cost savings from transferring patients to Englewood. Garrett Hrg. Tr. at 796-97; ██████████████ . Defendants' analysis also presumes Englewood patients would not be transferred to HUMC, which an HMH executive conceded could happen. PX7009 at 146-47.

New York City to HUMC are also not cognizable or merger specific,[338] are significantly overstated,[339] and are only ████████████████████████.[340]

**174.** Defendants' claimed cost savings efficiencies are also not cognizable because they are not reasonably verifiable by an independent party or merger specific.[341] Ms. Ahern relied on over 100 party interviews for which there are no notes.[342] Further, over ████████ of claimed efficiencies assume Defendants will ████████████████████████████████████████, but Ms. Ahern has not ████████████████████████ to confirm her assumption.[343] Finally, Ms. Ahern's analysis ████████████████████████.[344]

**175.** Ms. Ahern did not assess whether, or to what degree her claimed efficiencies would be passed through to consumers to offset anticompetitive effects.[345] While

---



[338] *See infra* Section VIII.B. ¶ 163.
[339] For example, Dr. Gowrisankaran's estimate of ████████ to ████████ in reduced insurer expenditures from ████████████ is reduced to only ████████████ when accounting for ████████████████████████████████████████

[340] ████████████████████████████████████████

[341] ████████████████████████████████████████

[342] Ahern Hrg. Tr. at 1389, 1400-01; JX0103 at 70-71.
[343] Ahern Hrg. Tr. at 1400, ████.
[344] ████████████████████. For example, ████████████████████████████████████████
[345] Ahern Hrg. Tr. at 1402. Dr. Gowrisankaran did not determine which categories were fixed cost savings or when each category would be passed through.

Ms. Ahern testified about HMH's ███████████████████████, she

did not assess whether ████████████████████████████████.[346]

### C.   Englewood has Alternative Bidder Options, Some of Whom are Willing to Invest More in Englewood than HMH

**176.**   Defendants' experts declined to analyze whether transactions with

Englewood's other suitors might have brought about efficiencies similar to those

that the Defendants claim will result from the Acquisition, despite many of

Defendants claims about the benefits to Englewood being tied to simply being part

of a large system.[347]

**177.**   Other potential partners continue to be interested in acquiring Englewood

and have made similar capital commitments to those offered by HMH.[348] For

example, ██████████ exchanged a draft affiliation agreement with Englewood[349]

and offered a capital commitment of ██████████, including approximately ████

████ in fresh capital over ████████, ████████████████████████████████

---

Gowrisankaran Hrg. Tr. at 1271-72. Whether cost savings affect fixed or variable
costs is "significant when you think about the incentive to pass through any
savings that are identified." Dafny Hrg. Tr. at 1528. Instead, Ms. Ahern *included* a
category of efficiencies that result from increased revenues. Ahern Hrg. Tr. at
1410.
[346] ██████████████████████.
[347] Meyer Hrg. Tr. at 1367; Gowrisankaran Hrg. Tr. at 1265; ████████████████
██████; JX0103 at 169; JX0104 at 100-05; JX0105 at 256-58.
[348] ██████████████████████; Geller Hrg. Tr. at 904; ██████; PX7028 at 105-
06; PX4083.
[349] Geller Hrg. Tr. at 925; ████████████████████

██████████ [350] ██████████ offers many of the same capabilities and benefits

to Englewood that HMH would.[351]

## **FTC'S PROPOSED CONCLUSIONS OF LAW**

### I.    **The Court Has Jurisdiction Over This Action**

1.    This Acquisition is alleged to violate Section 7 of the Clayton Act, 15

U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

2.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 53(b).

3.    At all relevant times, Defendants have been engaging in activities in or

affecting "commerce" as defined in Section 4 of the Federal Trade Commission

Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

4.    Defendants HMH and Englewood have consented to personal jurisdiction in

the United States District Court for the District of New Jersey. Venue is proper in

this District under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

### II.    **The Standard For A Preliminary Injunction Is Met**

5.    Section 13(b) authorizes the Court to issue a preliminary injunction "[u]pon

a proper showing that, *weighing the equities* and considering the Commission's

likelihood of ultimate success, such action would be in the public interest."[352]

6.    "To show a likelihood of ultimate success, the FTC must 'raise questions

---

[350] ██████████ ██████ ; ██████ ; ██████ ;
PX1113-016.
[351] Romano Hrg. Tr. at 1456-57.
[352] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 349 (3d Cir. 2016).

going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals,'"[353] or the FTC may "show that there is a reasonable probability that the challenged transaction will substantially impair competition."[354] "[T]he FTC is not required to *establish* that the proposed merger would in fact violate section 7 of the Clayton Act."[355]

7.      After assessing the FTC's likelihood of success, the district court must weigh the equities to determine whether a preliminary injunction serves the public interest.[356] "The public interests to be considered include: (1) effective enforcement of antitrust laws; and (2) ensuring that the FTC has the ability to order effective relief if it succeeds at the merits trial."[357] Ordinarily, "a showing of likely success on the merits will presumptively warrant an injunction."[358]

## III.    The FTC Has Shown A Likelihood Of Success On The Merits

8.      Section 7 forbids mergers where "the effect . . . may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or

---

[353] *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991) (quoting *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984)).
[354] *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 22 (D.D.C. 2015).
[355] *Hershey*, 838 F.3d at 337; *see also FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).
[356] *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001).
[357] *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 (D.D.C. 2016).
[358] *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

in any activity affecting commerce in any section of the country." 15 U.S.C. § 18.

9.      Section 7 is intended to prevent anticompetitive mergers "in their incipiency," before they create anticompetitive harm.[359] "Congress used the words '*may be* substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties."[360] "[A] certainty, even a high probability, need not be shown," and any "doubts are to be resolved against the transaction."[361] "All that is necessary is that the merger create an appreciable danger of such consequences in the future."[362] Thus, the FTC need only establish that the merged firm will have the *incentive* to raise prices or reduce quality post-Acquisition.[363]

10.     The FTC establishes its prima facie case by demonstrating that the merger will result in undue concentration in a "relevant market."[364] If made, this showing creates a presumption that the merger is anticompetitive, and shifts the burden of production to Defendants.[365]

11.     Defendants must then rebut the presumption by presenting evidence "that the market-share statistics give an inaccurate account of the merger's probable

---

[359] *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963).

[360] *Hershey*, 838 F.3d at 337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)).

[361] *Hershey*, 838 F.3d at 337.

[362] *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).

[363] *See United States v. H&R Block*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011).

[364] *Hershey*, 838 F.3d at 337-38; *FTC v. Sanford Health*, 926 F.3d 959, 962 (8th Cir. 2019).

[365] *Hershey*, 838 F.3d at 337, 346-47; *Phila. Nat'l Bank*, 374 U.S. at 363.

effects on competition."[366] "[T]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."[367]

12.   If Defendants rebut the presumption, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the government at all times."[368]

### A.   The Acquisition is Presumptively Unlawful

13.   A "relevant market is defined in terms of two components: the product market and the geographic market."[369] Firms often compete in multiple markets, some narrower and some broader, and a merger violates Section 7 if it may substantially lessen competition in "any" of these markets.[370]

14.   Courts assess mergers in narrow markets—"submarkets" or smaller areas "within the area of competitive overlap"[371] —"because potential harms to competition will likely be less apparent in a broader, less concentrated market than in a narrower included market."[372] "If the analysis uses geographic markets that are too large, consumers will be harmed because the likely anticompetitive effects of

---

[366] *Heinz*, 246 F.3d at 715.
[367] *Sanford*, 926 F.3d at 963.
[368] *Hershey*, 838 F.3d at 337.
[369] *Hershey*, 838 F.3d at 338; *see also Merger Guidelines* § 4.
[370] *Brown Shoe*, 370 U.S. at 337 & n.65.
[371] *See Brown Shoe*, 370 U.S. at 325; *Phila. Nat'l Bank*, 374 U.S. at 357-58.
[372] *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 885-86 (E.D. Mo. 2020); *see also Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

hospital mergers will be understated."[373]

15.     In hospital merger cases, market definition is informed by the two-stage process in which competition for hospital services occurs.[374] "In the first stage, hospitals compete to be included in an insurance plan's hospital network."[375] "In the second stage, hospitals compete to attract individual members of an insurer's plan."[376]

### 1.     Inpatient GAC Services Constitute a Relevant Product Market

16.     A product market consists of services that are "sufficiently close substitutes to constrain any anticompetitive [] pricing after the proposed merger."[377]

17.     Courts routinely find that the cluster of inpatient GAC services sold to commercial insurers and their members is a relevant product market.[378]

---

[373] *Advocate*, 841 F.3d at 472.

[374] *See Hershey*, 838 F.3d at 342; *Advocate*, 841 F.3d at 465, 470-71; *Saint Alphonsus Med. Ctr. - Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 784 n.10 (9th Cir. 2015).

[375] *Hershey*, 838 F.3d at 342. Insurers and hospitals negotiate agreements that determine the reimbursement rates the insurer pays when its members use the hospital. *Id.*

[376] *Hershey*, 838 F.3d at 342; *see also St. Luke's*, 778 F.3d at 784 n.10. Because patients usually face similar costs when choosing among in-network hospitals, this second stage of competition focuses "primarily on non-price factors like convenience and reputation for quality." *Advocate*, 841 F.3d at 465; *see also Hershey*, 838 F.3d at 342.

[377] *H&R Block, Inc.*, 833 F. Supp. at 55; *see also Brown Shoe*, 370 U.S. at 325; *Merger Guidelines* § 4.

[378] *See, e.g., Hershey*, 838 F.3d at 338; *Advocate*, 841 F.3d at 467-68; *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990).

18.    Although each service could constitute a relevant product market, it is efficient and economically appropriate to analyze services together, as a "cluster," when the competitive conditions are reasonably similar across services.[379]

## 2.    *Bergen County is a Relevant Geographic Market*

19.    A geographic market is any area "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate."[380]

20.    Geographic markets do not reflect absolute limitations on competition because competition does not abruptly stop at any particular geographic boundary. "[M]arkets need not—indeed cannot—be defined with scientific precision."[381] Ultimately, "the relevant geographic market must be sufficiently defined so that the court understands in which part of the country competition is threatened."[382]

21.    An element of "fuzziness would seem inherent in any attempt to delineate the relevant geographic market,"[383] and "[w]hatever the market urged by the FTC, the other party can usually contend plausibly that something relevant was left out, . . . or that dividing lines between inclusion and exclusion were arbitrary."[384]

---

[379] *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014).
[380] *Phila. Nat'l Bank*, 374 U.S. at 357; *see also Advocate*, 841 F.3d at 469.
[381] *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974); *Advocate*, 841 F.3d at 476.
[382] *Sysco*, 113 F. Supp. 3d at 48-49; *cf. Merger Guidelines* § 4.
[383] *Phila. Nat'l Bank*, 374 U.S. at 360 n.37.
[384] *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018).

22.     Competition for inpatient GAC services is fundamentally local.[385]

23.     "A common method employed by courts and the FTC to determine the relevant geographic market is the hypothetical monopolist test."[386] Under this test, a geographic area is a relevant market if a hypothetical monopolist controlling all relevant services in that area could profitably implement a SSNIP because the additional profit from customers who remain outweighs the losses from customers who leave.[387] A 5% price increase is typically used in the analysis.[388]

24.     Bergen County passes the HMT because insurers "would accept a price increase rather than exclude all of the hospitals" in Bergen County from their networks.[389]

25.     No further analysis is needed to define the relevant geographic market. Uniform circuit court precedent for healthcare provider mergers holds that a proposed market that satisfies the HMT is a relevant geographic market.[390]

26.     The Third Circuit rejects the claim that a minority of patients who "travel to a distant hospital to obtain care significantly constrain the prices that the closer

---

[385] *See Rockford Mem'l*, 898 F.2d at 1284–85; *Advocate*, 841 F.3d at 470, 474.
[386] *Hershey*, 838 F.3d at 338.
[387] *Hershey*, 838 F.3d at 338; *Advocate*, 841 F.3d at 468.
[388] *Hershey*, 838 F.3d at 338 n.1.
[389] *See Hershey*, 838 F.3d at 346; *St. Luke's*, 778 F.3d at 785; *Sanford Health*, 926 F.3d at 963-64; *see also supra* Findings of Fact, Section V.B.6.
[390] *Hershey*, 838 F.3d at 346; *Advocate*, 841 F. 3d at 464, 468; *St. Luke's*, 778 F.3d at 784; *Sanford Health*, 926 F.3d at 963.

hospital charges to patients who will not travel to other hospitals."[391] Likewise, a geographic market cannot be defeated by the fact that patients outside the market enter the market for care. Relying on such data is "not an appropriate method to define geographic markets in the hospital sector."[392]

27.    Proof of competition outside of Bergen County—particularly for non-overlapping services outside of the product market —does not defeat Bergen County as geographic market. Proof of a broader market does not "negative the existence" of a narrower one.[393]

### 3.    *Market Shares and Concentration Levels Far Exceed a Presumption of Illegality*

28.     A merger that significantly increases market shares and concentration is presumptively unlawful.[394] It is "so inherently likely to lessen competition substantially that it must be enjoined" unless Defendants rebut the presumption.[395]

29.    Courts use basic metrics—market shares and HHIs—to determine whether a merger should be presumed anticompetitive.[396] Market concentration is a "useful indicator of the likely competitive, or anticompetitive, effects of a merger."[397]

---

[391] *Hershey*, 838 F.3d at 340-41; *see also Advocate*, 841 F.3d at 476.
[392] *See Hershey*, 838 F.3d at 339-40; *see also Advocate*, 841 F.3d at 469-72, 476.
[393] *See, e.g.*, *United States v. Cont'l Can Co.*, 378 U.S. 441, 458 (1964).
[394] *Phila. Nat'l Bank*, 374 U.S. at 362-63; *Heinz*, 246 F.3d at 716.
[395] *Phila. Nat'l Bank*, 374 U.S. at 363.
[396] *See, e.g.*, *Hershey*, 838 F.3d at 347.
[397] *Hershey*, 838 F.3d at 346.

30.     A merger is presumptively unlawful if it increases the HHI by more than 200 points and results in a post-merger HHI exceeding 2,500.[398] A merger is also presumptively unlawful if it yields an entity with more than 30% market share.[399]

31.     The Acquisition is presumptively unlawful, whether measured by hospital visits of Bergen County residents—including to New York hospitals and hospitals in other New Jersey counties—or by hospital visits at Bergen County hospitals—which include visits by patients residing outside Bergen County.[400]

### B.      Evidence that the Acquisition will Eliminate Important Competition between Defendants Bolsters the Presumption

32.     Direct evidence of competition between Defendants strengthens the presumption of anticompetitive harm.[401]

33.     Competition among hospitals keeps prices in check by preserving leverage of insurers. The presence of multiple alternative, geographically proximate hospitals gives insurers options when forming networks, enabling them to negotiate better reimbursement rates and other terms.[402] In addition to low prices,

---

[398] *Hershey*, 838 F.3d at 347; *St. Luke's*, 778 F.3d at 786.

[399] *Phila. Nat'l Bank*, 374 U.S. at 364; *FTC v. Swedish Match,* 131 F. Supp. 2d 151, 166 (D.D.C. 2000).

[400] *See supra* Findings of Fact Section VI.

[401] *See, e.g.*, *Heinz*, 246 F. 3d at 717; *Sysco*, 113 F. Supp. 3d at 71-72.

[402] *See, e.g.*, *FTC v. Sanford Health*, 2017 WL 10810016, at *6 (D.N.D. Dec. 15, 2017); *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *6-7 (N.D. Ohio Mar. 29, 2011); *St. Luke's*, 2014 WL 407446, at *10.

hospital competition also promotes quality, accessibility, and innovation.[403]

34.    The loss of competition from a merger of two close competitors is likely to give the merged firm the ability to raise prices or reduce quality unilaterally.[404] The likelihood of such effects turns on the degree of competition between the firms; the more customers view Defendants as substitutes, the greater the anticompetitive effects.[405] Competitive harm is likely if a "significant fraction" of customers view Defendants as their top choices, but that fraction "need not approach a majority."[406]

35.    Diversion ratios—which show the percentage of patients at a given hospital that, if the hospital were no longer available, would turn to each other hospital— are routinely used to measure closeness of competition.[407] Dr. Dafny's unrebutted diversion analysis shows the close competition between Defendants' hospitals.[408] Dr. Dafny's WTP analysis reinforces this conclusion.[409]

---

[403] *See, e.g.*, *Sanford*, 2017 WL 10810016, at *7.

[404] *See ProMedica*, 749 F.3d at 569; *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1083 (N.D. Ill. 2012); *H&R Block,* 833 F. Supp. 2d at 81; *Merger Guidelines* § 6.

[405] *ProMedica*, 749 F.3d at 569.

[406] *ProMedica*, 749 F.3d at 569 (quoting *Merger Guidelines* § 6); *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017) (substantial lessening of competition can occur "where the merging parties are not the only, or the two largest, competitors in the market").

[407] *See, e.g.*, *Advocate*, 841 F.3d at 466; *H&R Block*, 833 F. Supp. 2d at 86-88; *St. Luke's*, 2014 WL 407446, at *10; *see generally Merger Guidelines* § 6.1.

[408] *See supra* Findings of Fact Section V.II.A ¶¶ 99-101.

[409] *See supra* Findings of Fact Section Section V.II.B ¶¶ 114-15.

36.    Defendants' argument that their hospitals are "complements" rather than substitutes, because HUMC is an AMC and Englewood is not, is contrary to *Hershey*. In *Hershey*, the Third Circuit preliminarily enjoined the acquisition by Penn State Hershey Medical Center, "a leading [AMC]" that "specializes in more complex, specialized services that are unavailable at most other hospitals," of Pinnacle Health, a health system that "focuses on cost-effective primary and secondary services and offers only a limited range of more complex services."[410]

37.    Insurers do not require that each hospital in their network provide the complete array of services the insurer offers its members.[411]

38.    HMH's March 31, 2021 waiver letters should play no role in the Court's decision. Courts strongly disfavor private "remedies" such as contractual rate caps or rate freezes because they do not remedy the loss of competition and can easily be circumvented;[412] here, HMH's letters are even less significant because they do not prevent Defendants from using leverage to increase rates post-Acquisition.[413]

---

[410] 838 F.3d at 334; *see also ProMedica*, 749 F.3d at 562 (enjoining acquisition by ProMedica, which provided tertiary services, of St. Luke's, which did not).

[411] *See ProMedica*, 749 F.3d at 567-68 ("It is true that [insurers] must offer their members (i.e., patients) a network that provides a complete package of hospital services," but insurers "do not need to obtain all of those services from a single provider."); *see supra* Findings of Fact Section V.II.A ¶ 103.

[412] *See H&R Block*, 833 F. Supp. 2d at 82; *Com. v. Partners Healthcare Sys., Inc.*, 2015 WL 500995, at *23 (Mass. Super. Jan. 30, 2015).

[413] *See Aetna*, 240 F. Supp. 3d at 79-80; *see also Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008); *Hosp. Corp. of Am. v. FTC*, 807 F.2d

## C.    Defendants Have Failed to Rebut the Presumption of Illegality

### 1.    *Entry, Expansion, or Repositioning Will Not Be Timely, Likely, or Sufficient*

39.    To establish an entry defense, "Defendants bear the burden of demonstrating the ability of other [firms] to 'fill the competitive void' that will result from the proposed merger."[414] Defendants must show that entry or repositioning in response to the merger will be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."[415] The "relevant timeframe" for consideration is "two to three years."[416]

40.    A finding of "high entry barriers 'eliminates the possibility that the reduced competition caused by the merger will be ameliorated by new competition from outsiders and further strengthens the FTC's case.'"[417]

41.    Defendants did not show that new hospital entry or repositioning would alleviate the competitive impacts of the Acquisition.[418]

### 2.    *Defendants' Efficiencies Defense Fails to Rebut the Presumption*

42.    The Third Circuit has "never formally adopted the efficiencies defense."[419]

---

1381, 1384 (7th Cir. 1986). Moreover, these letters have no rational business justification and should be discounted accordingly.

[414] *Sysco*, 113 F. Supp. 3d at 80.

[415] *Sanford*, 926 F.3d at 965 (quoting *Merger Guidelines* § 9)*.*

[416] *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 67 (D.D.C. 2018).

[417] *St. Luke's*, 778 F.3d at 788 (quoting *Heinz*, 246 F.3d at 717).

[418] *See supra* Findings of Fact Section VIII.A ¶¶ 152-53.

[419] *Hershey*, 838 F.3d at 347.

"Neither has the Supreme Court."[420] If the efficiencies defense exists, it has stringent requirements and is subject to a "rigorous analysis."[421]

43.     There is no distinction between a procompetitive benefit and an efficiency; rather, efficiencies are cognizable only if they are procompetitive in nature.[422] Defendants' claims that the Acquisition will reduce prices or improve healthcare quality through patient transfers and otherwise are efficiencies claims.[423]

44.     The burden is on the hospitals to "clearly show" that all elements of cognizability—verifiability, merger specificity, pass-through, and not arising from anticompetitive reductions in output—are met.[424]

45.     Efficiencies are merger specific if they "represent a type of cost saving that could not be achieved without the merger"[425] and verifiable if the "estimate of the predicted saving [is] reasonably verifiable by an independent party."[426] Further, "the Hospitals must demonstrate that such a benefit would ultimately be passed on to consumers," which "requires more than speculative assurances that a benefit

[420] *Id.* Indeed, "Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition." *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 580 (1967).
[421] *Heinz*, 246 F.3d at 721.
[422] *See, e.g., Hershey*, 838 F.3d at 349 (quoting *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1223 (11th Cir. 1991)).
[423] *See, e.g.*, *Hershey*, 838 F.3d at 350; *St. Luke's*, 778 F.3d at 791-92; *Sanford*, 926 F.3d at 965-66; *Merger Guidelines* § 10.
[424] *Hershey*, 383 F.3d at 348-49.
[425] *H&R Block*, 833 F. Supp. 2d at 89; *see also Hershey*, 838 F.3d at 348.
[426] *H&R Block*, 833 F. Supp. 2d at 89; *see also Hershey*, 838 F.3d at 348.

enjoyed by the Hospitals will also be enjoyed by the public."[427]

46.     Defendants fail to show merger specificity because they have not shown that their claimed efficiencies "cannot be attained by practical alternatives."[428] Practical alternatives include a party's ability to achieve the efficiency on its own, through a joint venture, by other agreement, or through an alternative merger.[429]

47.     Defendants' efficiency claims are not verifiable because they are predominantly based on projections "generated outside of the usual business planning process," and thus may be "viewed with skepticism."[430] Beyond this, their efficiency claims are supported principally by testimony from and interviews with Defendants' executives, but the business judgment of executives is not an adequate basis for efficiencies analysis.[431] Further, Defendants cost saving efficiencies were not subjected to a rigorous analysis and include obvious errors.[432]

48.     Defendants failed to carry their burden to show that their claimed benefits

---

[427] *Hershey*, 838 F.3d at 351.
[428] *St. Luke's*, 778 F.3d at 791 n.15 (internal citation omitted).
[429] *See, e.g.*, *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 151 (D.D.C. 2004); *ProMedica*, 2011 WL 1219281, at *39-40; *OSF*, 852 F. Supp. 2d at 1094. Defendants' multiple experts did not analyze the availability of practical alternatives, much less show that these alternatives could not yield efficiencies comparable to those they claim. *See supra* Findings of Fact Section VIII.C. ¶¶ 176-76.
[430] *Merger Guidelines* § 10; *ProMedica*, 2011 WL 1219281, at *40–41.
[431] *H&R Block*, 833 F. Supp. 2d at 91.
[432] *See supra* Findings of Fact Section VIII.C. ¶¶ 171-75.

will be passed on to consumers,[433] and have not presented cognizable efficiencies that would outweigh the harms from the Acquisition.

## IV.   The Equities Favor A Preliminary Injunction

49.   "[T]he Hospitals face a difficult task in justifying the nonissuance of a preliminary injunction," because the FTC has shown a likelihood of success.[434] In such circumstance, "no court has denied a Section 13(b) motion for a preliminary injunction based on weight of the equities."[435]

50.   "The principal equity weighing in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws."[436] If the Acquisition is consummated, and the administrative proceeding then rules it unlawful, the FTC's ability to preserve competition will be severely impaired.[437]

51.   Defendants offer no valid equities weighing against an injunction. There is no reason why, "if the merger makes economic sense now, it would not be equally sensible to consummate the merger following an FTC adjudication."[438]

52.   The equities decisively favor a preliminary injunction.

---

[433] *Swedish Match*, 131 F. Supp. 2d at 172.
[434] *Hershey*, 838 F.3d at 352 (internal quotation marks omitted).
[435] *Sanford*, 2017 WL 10810016, at *31.
[436] *Hershey*, 838 F.3d at 352 (quoting *Univ. Health*, 938 F.2d at 1225). In weighing the equities, the Court must assess "whether the harm that the Hospitals will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Hershey*, 838 F.3d at 352.
[437] *Hershey*, 838 F.3d at 352-53; *see also Heinz*, 246 F.3d at 727.
[438] *Hershey*, 838 F.3d at 353.

Dated: May 28, 2021                    Respectfully Submitted,

                                       s/ Jonathan Lasken
                                       JONATHAN LASKEN
                                       EMILY BOWNE
                                       LINDSEY BOHL
                                       CHRISTOPHER CAPUTO
                                       ELIZABETH ARENS
                                       NATHAN BRENNER
                                       JAMIE FRANCE
                                       NANDU MACHIRAJU
                                       CHRISTOPHER MEGAW
                                       ROHAN PAI
                                       HARRIS ROTHMAN
                                       ANTHONY SAUNDERS
                                       CATHLEEN WILLIAMS

                                       Federal Trade Commission
                                       Bureau of Competition
                                       600 Pennsylvania Avenue, NW
                                       Washington, DC 20580
                                       Telephone: (202) 326-2604
                                       Email: jlasken@ftc.gov

                                       *Attorneys for Plaintiff Federal Trade Commission*