**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>       *Plaintiff*,<br><br>v.<br><br>HACKENSACK MERIDIAN HEALTH, INC.<br>and ENGLEWOOD HEALTHCARE<br>FOUNDATION,<br><br>       *Defendants*. | Civil Action No. 20-18140<br><br>**OPINION WITH FINDINGS OF**<br>**FACT & CONCLUSIONS OF LAW** |

**John Michael Vazquez, U.S.D.J.**

In this hotly contested matter, Plaintiff Federal Trade Commission ("FTC") seeks to stop Defendant Hackensack Meridian Health, Inc. ("HMH"), the largest health system in New Jersey, from acquiring Defendant Englewood Healthcare Foundation ("Englewood"), an alleged close and local competitor to two of HMH's medical centers. Presently pending before the Court is the FTC's motion for a preliminary injunction to prevent HMH and Englewood from consummating their proposed merger until completion of the pending administrative proceedings. D.E. 133. The parties agree to the relevant product market but little else. The relevant product market is a cluster of inpatient general acute care ("GAC") services sold and provided to commercial insurers and their members.

Defendants filed a brief in opposition to the FTC's motion, D.E. 157, to which the FTC filed a reply, D.E. 228. The parties also filed several motions *in limine* in advance of the evidentiary hearing, D.E. 246, 248, 260, 264, in addition to proposed findings of fact and conclusions of law, D.E. 320-21, 323-29. The Court reviewed the submissions in support of and

opposition to the motions and held a seven-day evidentiary hearing via videoconference. The parties also provided post-hearing submissions, D.E. 320, 324, and the Court heard closing arguments, also via videoconference, on June 2, 2021. For the reasons stated below, the motion for a preliminary injunction is **GRANTED**.[1]

## I.    WITNESSES

During the evidentiary hearing, the Court heard testimony from the following individuals, in order of appearance:

- Michael Maron; President & Chief Executive Officer, Holy Name Medical Center;

- Michele Nielsen; Vice President of Network Contracting & New Jersey Market Lead, UnitedHealthcare;

- Lynda A. Grajeda; Director of Contracting for Medicaid & Medicare, Amerigroup of New Jersey[2];

- Walter C. Wengel, III; Senior Director for the New Jersey Network, Aetna;

- Sue Anderson; Principal, The Chartis Group;

- Kevin Lenahan; Senior Vice President, Chief Administrative Officer, Chief Financial Officer, Atlantic Health System;

- Dr. Leemore Dafny; Plaintiff's expert in healthcare and antitrust economics[3];

- Ken Kobylowski; Senior Vice President for Provider Contracting & Network Operations, AmeriHealth New Jersey & AmeriHealth Administrators;

---

[1] The Court has considered all submissions, testimony, and exhibits in this matter. To the extent the Court does not expressly address an argument raised by the parties, the Court has considered it and found that it does not change the Court's analysis.

[2] Ms. Grajeda testified that Amerigroup only offers Medicaid and Medicare plans in New Jersey. Tr. at 282:1-4. The FTC, however, expressly excludes Medicare Advantage and managed Medicaid insurers from its relevant product market. FTC Br. at 17 n.42. As a result, the Court finds little probative value to Ms. Grajeda's testimony.

[3] Dr. Dafny also testified as a rebuttal expert.

• Ryan Tola; President, New Jersey Division, Doyle Alliance Group;

• Robert C. Garrett; President & Chief Executive Officer, HMH;

• Warren Geller; President & Chief Executive Officer, Englewood;

• Dr. Lawrence Wu; Defendants' expert in healthcare and antitrust economics;

• Kristen Strobel; Senior Director of Global Benefits, Becton, Dickinson & Co.;

• Patrick Young; President of Population Health, HMH;

• Allen Karp; Executive Vice President of Healthcare Management & Transformation, Horizon Blue Cross & Blue Shield of New Jersey;

• Mark Sparta; President & Chief Hospital Executive, Hackensack University Medical Center;

• Kevin C. "Casey" Nolan; Defendants' expert in hospital operations, capacity and strategic planning;

• Dr. Gautam Gowrisankaran; Defendants' expert in the areas of industrial organization, economics and econometrics in the healthcare industry;

• Dr. Stephen Brunnquell; President, Englewood Health Physician Network;

• Dr. Gregg Meyer; Defendants' expert in the area of healthcare quality, population health and value-based care;

• Lisa Ahern; Defendants' expert on cost savings and efficiencies for healthcare provider transactions; and

• Dr. Patrick Romano; Plaintiff's rebuttal expert on healthcare quality.[4]

---

[4] Plaintiff also sought to qualify Dr. Romano as an expert on capacity issues from the hospital operations perspective, including calculations of capacity or steps that a hospital could take to relieve capacity issues. Defendants challenged Dr. Romano's qualification regarding capacity issues, outside of the limited scope of how capacity challenges impact the quality of care. D.E. 264. Dr. Romano is a clinical practitioner. He does not have experience with healthcare system capacity constraints from the operational viewpoint. As a result, the Court grants Defendants' request to preclude Dr. Romano as an expert on operational capacity issues.

## II.     BACKGROUND, EVIDENCE, and FINDINGS OF FACT

Defendants Englewood and HMH both have hospitals in Bergen County, a densely populated county in northern New Jersey.  Englewood operates a single hospital, while HMH has two in the county, including one that it owns with a non-party partner.

Hospitals provide inpatient and outpatient care.  Outpatient care generally refers to a same-day medical service, whereas inpatient care requires an overnight stay.  Tr. at 48:11.[5]  The focus of this case is inpatient care, specifically inpatient GAC services.  As to inpatient GAC services, the type of care is divided into four categories: primary, secondary, tertiary, and quaternary care. The categories reflect the level of complexity of care; primary care is the least complex and quaternary care is the most complex.  On average, patients need primary and secondary care more frequently than the higher levels of tertiary and quaternary care.  Tr. at 49:7-19.  For example, delivery of a baby without complications is considered primary care.  A C-section, by comparison, reflects secondary care.  A baby born with medical complications requiring neonatal treatment receives tertiary care.  Tr. at 49:23-9.  Quaternary care includes complex procedures such organ transplants and high-end cancer care.  Tr. at 73:23-25; 736:15-19.  Hospitals that provide only primary and secondary care are often referred to as community hospitals (although some witnesses used community hospital to refer to an entity that also provided limited tertiary services).  *See, e.g.*, Tr. at 46:24-47:6.

### A.  Healthcare Providers

The following hospitals and healthcare systems are relevant to the Court's analysis: (1) Englewood; (2) Hackensack University Medical Center; (3) Pascack Valley Medical Center; (4) Holy Name Medical Center; (5) Valley Hospital Medical Center; (6) Bergen New Bridge Medical

---

[5] Citations to "Tr." refer to the transcript from the seven-day evidentiary hearing in this matter.

Center; (7) Palisades Medical Center; (8) Mountainside Medical Center; (9) St. Joseph's Hospital (2 locations); (10) St. Mary's General Hospital; (11) RWJBarnabas Health; (12) Atlantic Health System; and (13) New York city hospitals, including New York Presbyterian, Hospital for Special Surgery, Mt. Sinai, and Memorial Sloan Kettering.

### 1. Bergen County Hospitals

Defendant Englewood is a high-quality, community teaching hospital in Bergen County. Englewood provides primary, secondary, and some tertiary care, including cardiac and cancer surgery programs.  Tr. at 845:13-19, 24-25; 845:25-846:3; 865:12-13.  Englewood is licensed for 531 beds and is currently able to operate 350.  Englewood, however, frequently operates under its 350-bed capacity.  For example, the day before Englewood's President & Chief Executive Officer Warren Geller testified in this matter, Englewood's census was just 222 patients.  Tr. at 847:20-848:16.  As to payor mix, about half of Englewood's patients use government programs, such as Medicare and Medicaid, while the other half have commercial insurance.  Tr. at 849:14-18.  Of the commercially insured patients, approximately 55% are Bergen County residents.  The remaining 45% come from Hudson, Essex, Passaic, and Rockland counties, which all border Bergen County.  Tr. at 850:2-6.  About half of Englewood's revenue is generated from patients outside of Bergen County.  Tr. at 851:3-5.  Englewood's growth over the last several years has come from counties other than Bergen County.  Tr. at 850:11-18.

Defendant HMH's flagship hospital, Hackensack University Medical Center ("HUMC"), is also located in Bergen County, approximately five miles from Englewood.  HUMC is licensed for 781 beds and has 711 operational beds.  Tr. at 1148:9-13.  HUMC is the busiest hospital in New Jersey and more than 50% of HUMC's commercially insured patients come from outside of Bergen County.  Tr. at 735:3-17; 783:10-14.  HUMC is HMH's only hospital that performs

complex tertiary and quaternary care, in addition to primary and secondary care.  Tr. at 735:3-17.

HUMC is considered an academic medical center.  According to Robert C. Garrett, HMH's

President & Chief Executive Officer, this means that in addition to providing complex tertiary and

quaternary care, HUMC is focused on academics, research, and innovation.  Tr. at 735:6-20.

Nevertheless, there is a high overlap in the inpatient GAC services provided by HUMC and

Englewood.  ██████████.

HUMC is currently adding a new tower to its hospital complex, which was described as a

"modernization project" and was referred to during the hearing as the "Second Street" project.  Tr.

at 1150:23-1151:6.  The Second Street project will (1) replace the currently 40-year-old operating

room platform with larger operating rooms that can house equipment and technology used for

complex tertiary and quaternary care; (2) convert existing medical-surgical ("med-surg") beds into

private rooms; and (3) add twenty-two new intensive care unit ("ICU") beds.  Tr. at 1151:6-18.

HUMC started planning the Second Street project in 2012 and, at the time of the hearing,

anticipated that it would be ready for partial occupancy in approximately 18 months.  Tr. at

1151:21-25.

HMH also co-owns, with Ardent Health Services ("Ardent"), Pascack Valley Medical

Center ("Pascack Valley").  Tr. at 769:6-9.  Pascack Valley is the smallest acute care community

hospital in Bergen County, providing primary and secondary care, Tr. at 57:12-19; 768:16-18, but

not tertiary care.  Tr. at 768:17-18.

Holy Name Medical Center ("Holy Name") is also in Bergen County.  Tr. at 44:19-20.

Holy Name is a Catholic sponsored community hospital that provides primary and secondary care

services.  Tr. at 47:2-6.  At least 80% of Holy Name's inpatient admissions come from within

Bergen County.  Tr. at 52:18-21.  Michael Maron, Holy Name's President & Chief Executive

6

Officer, believes that this is because people want convenient, consistent care that is readily available.  Tr. at 52:25-6.  Englewood is approximately five miles northeast of Holy Name, and there is a significant overlap in the geographic range of patients that the two hospitals service.  Tr. at 56:5-15.  With the exception of Englewood's tertiary care offerings, the two hospitals offer virtually identical services and are roughly the same size.  Tr. at 55:25-56:4; 57:17-18.  HUMC is five miles west of Holy Name.  Tr. at 57:4-5.  Because of the overlap in services and location, Holy Name views Englewood and HUMC as its primary competitors.  Tr. at 86:10-23; 87:19-25.

Valley Hospital Medical Center ("Valley") is another hospital in Bergen County.  Valley is the second largest hospital in the county, and offers primary, secondary, and limited tertiary care.  Tr. at 59:1-3.  Valley Hospital is currently located in Ridgewood, New Jersey but is relocating to a new facility about two miles east, in Paramus, New Jersey.  Tr. at 88:5-17.  Valley's new location is a modernization project; ███████████████████████████████ ███████  Tr. at 88:13-14; 89:5-13.  The project is nearing completion.  The new construction will ultimately take Valley over five years to complete and is estimated to cost more than $750 million.  Tr. at 449:13-23.  Because of the location, Garrett believes that Valley's new hospital will make it a stronger competitor in the region.  Tr. at 776:20-25.

Bergen New Bridge Medical Center ("New Bridge") is a government-run, county-owned hospital in Bergen County.  New Bridge is predominately a long-term care facility for behavioral health but has a small acute care component that largely services its long-term care residents.  Tr. at 59:20-60:3.  New Bridge has a new management team that is investing in the facility and recently started to accept commercially insured patients.  Tr. at 864:2-9.

### 2.   Health Systems

As noted, HMH is the largest healthcare system in New Jersey.  HMH was formed after Hackensack University Health Network and Meridian Health merged in 2016.  Two additional large health systems play a significant role in the northern New Jersey marketplace, although neither has a hospital in Bergen County: RWJBarnabas Health ("RWJBH") and Atlantic Health System ("Atlantic").  RWJBH has numerous facilities throughout New Jersey, including Saint Barnabas Medical Center, an academic medical center in Essex County.  Tr. at 1108:1-8.  In 2017 and 2018, RWJBH was the market share leader within Bergen, Essex, Hudson, and Passaic Counties.  DX3213-019.[6]  According to Garrett, RWJBH is HMH's strongest competitor even though RWJBH does not have an inpatient hospital in Bergen County.  Tr. at 774:23-12; 777:16-19.  Atlantic has five hospitals: Morristown Medical Center and Chilton Medical Center, which are both in Morris County; Overlook Hospital in Union County; Newton Medical Center in Sussex County; and Hackettstown Medical Center in Warren County.  Tr. at 434:1-10.  Morristown Medical Center is also an academic medical center.  Tr. at 1108:9-13.  Although Atlantic does not have a hospital in Bergen County, it is affiliated with an urgent care facility in the county through a joint partnership.  Tr. at 434:11-13; 436:17-437:7.  █████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

---

[6] On June 1, 2021, Defendants provided the Court with their list of exhibits that they seek to move into evidence.  D.E. 332.  The FTC provided its list on June 7, 2021, D.E. 340, and Defendants provided a supplemental list on June 9, 2021.  D.E. 344.  The parties also set forth a limited list of objections to documents on the exhibit lists.  D.E. 331, 332, 344.  The Court addresses the objections to PX1061, the Optimization Plans, and the Waiver Letters below.  Otherwise, the Court did not rely on any of the documents for which there remain objections so the objections are moot.  Those exhibits without objections in D.E. 332, 340 and 344 are admitted into evidence.

### 3.   Non-Bergen County Hospitals

Turning to facilities outside of Bergen County, Palisades Medical Center ("Palisades") is in Hudson County, just south of the Bergen County line.  Palisades is owned by HMH and provides primary and secondary care.  Tr. at 768:16-18; 769:1-3.  HMH also co-owns Mountainside Medical Center with Ardent.  Tr. at 769:6-9.  Mountainside is a community hospital in Essex County that provides primary and secondary care.  Tr. at 768:16-18; 769:1-3.  St. Joseph's Hospital and Medical Center is in Paterson, New Jersey and St. Joseph's Wayne Hospital is in Wayne, New Jersey.  Wayne and Paterson are both in Passaic County, and both hospitals are within 10 miles of HUMC.  Tr. at 775:17-25.  St. Mary's General Hospital is an additional for-profit hospital in Passaic County.  Tr. at 80:24-6.

Certain New York City hospitals are also relevant.  New York Presbyterian, Hospital for Special Surgery ("HSS"), Mt. Sinai, and Memorial Sloan Kettering ("MSK") were mentioned most frequently during the hearing.  Although no party denies that some New Jersey residents receive primary and secondary care at New York hospitals, the witnesses largely view these hospitals as providing high-end, specialty care (more complex tertiary and quaternary care) to New Jersey residents.  Tr. at 73:20-74:5; ███████; 397:1-10.  As to outmigration – that is, New Jersey residents seeking medical care at a New York hospital, *see, e.g.*, Tr. at 767:10-11 – less than 30,000 New Jersey residents were discharged from a New York hospital in 2018.  DX3601-16.

New York City hospitals are also establishing a physical presence in New Jersey, which the parties refer to as "front doors."  MSK and HSS, for example, have outpatient facilities in Bergen County, and Mount Sinai has affiliations with Holy Name and Valley.  Tr. at 779:20-780:13.  Other New Jersey health systems, such as Atlantic, do the same.  These outpatient facilities – the front doors –  are intended to steer patients requiring inpatient care to an affiliated

hospital.  Tr. at 780:14-16; 780:21-25.  The parties, however, failed to provide any evidence demonstrating that the outpatient facilities actually materially impact inpatient admissions.[7]  In fact, ███████████████████████████████████████████████████████████████████████ ██████, stated that the number of patients that ultimately came to ████████ hospital for inpatient care after visiting one of its ██████████████████████ facilities accounted for ███████████████ of █████████ total inpatient admissions over a 1.5-year period.  ██████████████████.  With respect to the number of patients who were initially treated at the Bergen County ████████ facility and received subsequent inpatient or outpatient care at ███████ hospital, ███████ indicated that the number was █████████ to █████████ utilization strategy.  █████████████.

The parties also consider physician practice groups to be a driver of inpatient admissions. For example, Geller appeared to attribute Englewood's overall growth to its expanding physician network, the Englewood Health Physician Network.  Englewood's physician network is "robust," encompassing over 500 physicians in five different counties.  In fact, ███████ of Englewood's revenue comes from its outpatient services.  Tr. at 872:4.  Moreover, these 500 physicians, who are fully integrated into the Englewood network, funnel care to Englewood's hospital.  Tr. at 852:11-14; 853:6-12; 1311:1-10.  Dr. Stephen Brunnquell, President of the Englewood Health Physician Network, explained that the physician network is also a "front door" to the hospital.  Tr. at 1309:18-1; 1313:4-5.

## B.  Insurance Companies & Plans

Private (or commercial) insurance companies play a major role in the United States' healthcare system and are the payors at issue here.  Within New Jersey, the four major commercial

---

[7] Of course, there could be at least one other rational business reason for establishing outpatient facilities without regard to inpatient admissions: they are independently profitable.  The parties, however, did not address this point, so the Court does not speculate.

insurance companies, from largest to smallest, are Horizon Blue Cross & Blue Shield of New Jersey ("Horizon"), UnitedHealthcare ("United"), Aetna, and Cigna.  Tr. at 1024:6-10.  Within the commercial insurance sphere, each insurance company offers fully insured and employer-sponsored (or self-insured) plans.  For a self-insured product, the employer bears the financial responsibility for the medical expenses that are incurred on behalf of its covered employees, and the employer typically pays the insurance company a fee to administer the plan.  Tr. at 151:13-22; 1104:16-22.  For a fully insured plan, the insurance company bears the risk if the medical expenses exceed the premium paid by the employer.  Tr. at 151:23-152:5.[8]

Medical providers and facilities contract with insurance companies to be in the plan's "network."  If a provider goes "out of network," the provider is no longer a participating provider in that insurance company's product or plan.  Tr. at 1038:14-21.  Each insurance company witness spoke to the importance of a network, which includes physicians, other providers, facilities (including hospitals), and other services that are offered to plan users.  Each insurance company witness also testified that a network is "an integral component of the products" offered by the company.  *See, e.g.*, Tr. at 152:13-25.  Of critical importance is a network with a full scope of services and providers that are well-dispersed geographically.  *See, e.g.*, Tr. at 153:19-23; 156:19-25; 335:24-336:4 (explaining that Aetna wants a "big network presence" that does not have any "holes").  Individual members, and therefore plan purchasers, also want access to care that is geographically convenient.[9]  *See, e.g.*, Tr. at 155:9-15.  If an insurance company does not provide

---

[8] When referring to commercial insurers herein, the Court does not distinguish between fully insured and self-insured plans, as the difference is immaterial to the Court's analysis.

[9] The Court notes that New Jersey has GeoAccess standards that apply to certain commercial and government plans.  These standards generally require that an insurance company's network offers the requisite number of providers and facilities within a certain distance, time, and mileage of the insured population.  Tr. at 330:2-10.

an attractive network, the insurance company will not be able to sell the plan.  *See, e.g.*, Tr. at 154:16-19.

At the same time, healthcare providers and facilities want to be in-network because, among other things, it increases their volume of patients.  *See, e.g.*, ███████████.  Patrick Young, HMH's President of Population Health, explained that from HMH's perspective, it is not a benefit for a provider to go out of network (or become non-participating).  Young testified that if HMH went out of network with an insurance company, it would cause a significant financial hit for the organization due to lost revenue, and it would be disruptive to patients and physicians.  Tr. at 1039:1-1040:4.

In New Jersey, insurance companies negotiate with health systems and hospitals on a statewide basis.  This means that all of an insurer's plan members in New Jersey have access to in-network health systems' facilities and hospitals.  At the same time, counties are important considerations for insurers in developing and selling a health plan.  Bergen County is an important county because of its population size and affluence.  FTC FOF ¶ 19.  The relevant insurers have the following number of customers in Bergen County: United has approximately ███████ commercial members, Tr. at 161:13-15; Aetna has ███████ commercial members, Tr. at 341:9-11; and AmeriHealth has about 15,000 members, Tr. at 678:6-8.  All insurers who testified indicated that they could not market a plan to Bergen County residents if the plan did not include a Bergen County hospital.

The Court heard a great deal of testimony about HMH's experience with commercial insurance companies, both from HMH's view and from the perspective of the insurance companies.  HMH negotiates with commercial insurers "as a fully integrated network," that is, on a system-wide basis.  Tr. at 1024:19-25.  This means that HMH negotiates for a consistent (or the

12

same) rate increase across all its facilities. The base rate of each facility, however, differs. Tr. at 1026:15-22. Accordingly, the actual rate charged by each specific HMH facility is not uniform across HMH's system although each facility's percentage rate increases are the same. In addition, the rates HUMC charges insurers for GAC services are substantially higher than the rates that Englewood charges. On an adjusted case-mix basis, ██████████████████████.[10] DX5001, ¶ 162.

The commercial insurance witnesses who testified in this matter largely described their negotiations with HMH as difficult. ████████████, from ██████ believed that HMH's position during ██████ last negotiations with HMH in ████ were "as close to take it or leave it as I've seen in the marketplace without much justification." ████████████ ██████ further believed that HMH's most recent rate increases were ████████████ than those of other health systems in New Jersey. ████████████ ████████████████████, explained that after ████ discussions for the ██████ contract with HMH hit a "stalemate," the final rates were only agreed to ████████████████████████████████████████ ████████████████████ ██████████████ ██████████████████████. In ████████ years with ██████ had never seen negotiations escalate in such a manner. ██████████████████ stated that the ultimate rate was ██████████████████ of what ██████ typically agrees to for similarly situated hospitals. ██ ██████████

From HMH's perspective, Young stated that HMH never gets everything that it wants when negotiating with insurance companies and believes that the commercial insurance companies have significant leverage. Tr. at 1043:22-23; 1048:2-1050:2. Young also indicated that HMH

---

[10] The case-mix index is used to compare the level of care provided at different hospitals and facilities. The higher the case-mix index, the higher the overall acuity, or complexity of care, provided at the facility. *See* Tr. at 191:8-15; 397:6-10.

never negotiates on a take-it-or-leave-it basis, Tr. at 1043:19-21, but an email provided by the FTC seems to suggest otherwise.  PX1241.  In the first paragraph of this email, which was sent by a HMH employee to ▮▮▮▮ on ▮▮▮▮▮▮▮▮, the HMH representative wrote: "▮▮▮▮



."  *Id.*

" *Id.*

In addition to rates, the other sticking point in HMH's recent negotiations with private insurers involves language in certain contracts about rates after an HMH acquisition (the "Acquisition Clause").  The Acquisition Clauses predates HMH and appeared in legacy Meridian's contracts with certain commercial insurers.  Through the Acquisition Clause, when HMH acquires an entity, the new facility moves to the same rates as HMH's similar facilities within a certain time frame.  Tr. at ▮▮▮▮; 1036:5-14.  In other words, once HMH acquires a facility, that facility can charge insurers more than it used to, pursuant to the Acquisition Clause.

After the FTC filed its opening brief in this matter pointing to the Acquisition Clause, HMH informed insurers that it was waiving the Acquisition Clause for the Englewood merger.  Young was not aware of ▮▮▮▮▮▮▮▮▮▮▮▮,

▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮.

▮▮▮▮.  The Acquisition Clause has had a substantial financial impact on ▮▮  After HMH acquired JFK University Medical Center, it cost ▮▮▮▮ more per year; after HMH acquired Raritan Bay Medical Center, it cost ▮▮▮▮ more per year.  ▮▮▮▮

▮▮  As a result, during the ▮▮ negotiations, ▮▮ asked ▮▮ ▮▮▮▮.

▮▮▮▮ testified that HMH ▮▮▮▮▮▮▮▮

▮▮▮▮  ▮▮▮▮  The Acquisition Clause was also a major sticking point with



███ negotiations.  ███, however, had ███████████████████████████████

█████████████ ██████████████████. ███████████████████. When HMH

previously acquired the Carrier Clinic, HMH and ████ could not agree as to whether ████

█████████████. The classification impacted ████ ██████. As a

result, HMH █████████ ████████████████ █████████. Ultimately, HMH's

acquisition cost ████ and additional ████████████████. ███████████.

Horizon is the largest insurer in New Jersey and provides both commercial and

government-sponsored plans.  Horizon's commercial plans account for approximately 60 % of its

business in New Jersey.  Tr. at 1092:8-1093:5.  Although numerous insurance companies have had

challenges with HMH, Horizon did not voice the same concerns and supports the proposed merger.

DX1101.  In fact, after the HMH and Englewood merger was announced, Allen Karp, Horizon's

Executive Vice President of Healthcare Management and Transformation, sent Young a letter

indicating that Horizon supported the merger.[11]  DX1101.  Karp did so at the request of HMH.  Tr.

at 1133:12-15.

In the letter, Karp explained that the merger allows Englewood to "focus on tertiary care

for residents of Bergen County" and provide Englewood's patients with access to coordinated

quaternary care within the HMH system.  DX1101.  Karp also stated that HMH's ability to expand

---

[11] During the hearing, the FTC emphasized the fact that Horizon, HMH and RWJBH are co-owners
of Braven Health, a new Medicare Advantage program.  Tr. at 1131:12-1132:1; 1069:9-25.  These
entities share ██████████████ generated by Braven Health, with ████ ████ ████ █
█████.  Tr. at 1075:20-1076:1; 1131:21-23.  This relationship creates an additional financial
incentive for Horizon to keep patients at HMH's hospitals.  The FTC also emphasized the fact that
except for HSS, Horizon does not have any direct contracts with New York hospitals.  Tr. at
1131:3-11.  Again, this also creates a motive to support the merger that is unique to Horizon.
Similarly, Defendants emphasized that Atlantic and United formed a competing physicians'
practice group, which gives both United and Atlantic a motive to oppose the proposed merger.
The Court ultimately gives the various relationships little weight as the evidence did not adequately
establish how the insurers' motives resulted in slanted or biased testimony.

quaternary care would "have the added benefit of keeping care in New Jersey." *Id.* Karp does not believe that the merger would increase HMH's bargaining leverage with Horizon. Tr. at 1103:16-24. At the same time, ███████████████████████████████████████████████████████████████████ ████████████████████. Tr. at 1116:19-22. In addition, Karp is not aware what tertiary care will be provided at Englewood post-merger, or how HMH intends to keep quaternary care patients in New Jersey after the merger. Tr. at 1128:12-1129:5.

The Court does not give Karp's letter much weight. It was written at the request of HMH and while long on superlatives, it is short on supporting information or analysis.

### C.  The Proposed Merger

In April 2018, Englewood's Executive Committee and Board's outside counsel retained a consultant, The Chartis Group ("Chartis"), to assist with Englewood's strategic planning. Geller explained that he ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Tr. at 871:15-18; 384:6-9. Geller continued that Englewood had and has ██████████████████ but it would be ████████████████████████████████████████████████████████████████████████████. Tr. at 871:21-25. Englewood also had ████████████████████████████████, and wanted an ████████████████████████████████████. Tr. at 872:3-19.

The Court also heard about Englewood's strategic planning process, which led to the proposed merger, from Sue Anderson, a Principal at Chartis. Tr. at 383:4-5. Chartis's work was divided into two phases; Anderson was highly involved in both. Tr. at 386:17-22.

In Phase I, Chartis looked at whether Englewood could achieve its strategic goals by itself or whether it needed a "stronger affiliation with another health system." Tr. at 386:23-387:3. Chartis presented its Phase I work to the Executive Committee in June 2018. PX2079. Chartis

identified Englewood's key local competitors within Englewood's primary service area ("PSA")[12]: HMH accounted for 34% of inpatient discharges; Englewood for 15%; ███████████ ███████████. No other New Jersey hospital in the region had a percentage of discharges larger than 7%. Tr. at 391:9-392:18; 06:14-16; PX2079-16. In addition, about 8% of patients in Englewood's PSA sought care at a New York facility but the outmigration was for relatively complex care. Tr. at 396:12-397:10.

At the time, Englewood and HMH had a limited relationship related to a Horizon narrow network insurance product.[13] PX2079-70. During its Phase I presentation, Chartis determined that the most likely future market scenario was that ███████████████ ████████████████████████████████████████████ ███████████████████████████. Tr. at 389:9-399:10; PX2079-71–PX2079-72. Chartis identified other threats to Englewood's patient share, which included competition from New York health systems moving into the New Jersey arena (through "front doors") and the new capital projects at Valley and ██████ (*i.e.* Valley's new hospital and ████████████████████). PX2079-006. Ultimately, Chartis recommended that it would "be an opportune time for [Englewood] to explore [a] partnership opportunity, a strong affiliation." Tr. at 399:13-20. After Chartis presented its Phase I work, the Englewood Board ██████ ██████████████████████. Tr. at 873:23-25.

---

[12] By way of reference, HUMC defines a primary service area as the geographic area where 75% of inpatient discharges originate. Tr. at 1158:18-21. Englewood provided Chartis with information about its PSA but Defendants did not provide any evidence explaining how Englewood determined its PSA.

[13] Generally, a narrow network insurance product offers members access to fewer providers than the insurance company's standard offering. Tr. at 241:9-24.

In Phase II, Chartis helped Englewood find a partner.  Chartis initially identified five potential partners: HMH; █████; █████; ████████████████; and ████████.  Tr. at 399:22-400:12.  Chartis met with all five, and Englewood representatives attended some of the meetings.  Tr. at 400:13-15;  486:6-9.

Chartis also established a data room to enable Englewood and its potential partners to share information.  Tr. at 401:10-16.  When Englewood was first informed about the data room, Anderson suggested ████████████████████████████████████ ████████████████████████  PX2311-002.  Within the same email chain, an Englewood executive expressed concern over ███████████ ██████ ██████ ██ ████████████████████████████████  PX2311-001. Geller responded to this email with █████████ and then directed that the recipient have ████████████████████████████████████████ ████.  *Id.*

During the hearing, however, HMH and Englewood downplayed the fact that they are competitors.  *See, e.g.*, Tr. at 781:12-782:1 (Garrett explaining that HUMC only competes with academic medical centers in New Jersey and New York City); Tr. at 859:22-25 (Geller stating that Englewood does not compete with HUMC).  HMH and Englewood's mantra during the proceeding was that they are complements rather than competitors.  The email chain and other ordinary course documents discussed below, however, demonstrate otherwise.  *See, e.g.*, PX2291-004 (in a Q&A document that Englewood drafted after the merger was announced, one of the questions was "For a long time, Hackensack has been a fierce but respected competitor.  So how do we now become partners and colleagues?").  Accordingly, the Court finds that Englewood and HUMC do in fact

compete for patients who receive the primary, secondary, and tertiary services provided at both hospitals and that they view themselves as competitors.

Chartis and certain Englewood Executive Committee members met with HMH representatives on November 26, 2018. After the meeting, Chartis compiled feedback that it had received from Englewood's representatives. Tr. at 487:11-16; PX2325. Comments included the following: "███████████████████████████████████████████ ███████████████████████████████████████████ ██████." PX2325 at 3. Anderson explained that there was concern that ███████████ ███████████████████████████████████████████. Tr. at 489:16-21. Another Englewood attendee commented that "███████████████ ███████████████████████████████████████████ ██████." PX2325 at 3.

As Phase II continued, ███████████ withdrew from consideration. Tr. at 512:23-25; 874:15-22. ██████ provided a formal bid to Englewood, but the Englewood Board voted in January 2019 not move forward with ██████. Tr. at 512:7-18; 874:23-875:7. Geller stated that Englewood rejected ██████ offer because ███████████████████████████████ ████████████████████████. Tr. at 875:9-24. ██████ testified that Englewood was concerned that ██████ was not ███████████████████████. ██████ ██████. Next, in February 2019, ███████████████ and Englewood mutually decided not to move forward, Tr. at 490:10-19; 513:1-5, leaving HMH and ██████ as the two remaining potential partners.

Turning to HMH, as it was developing its proposal to Englewood in February of 2019, James Blazer wrote an internal email addressing Chartis's follow-up questions to HMH. PX1061-

001.  Blazer is the Chief Strategy Officer at HMH and "one of the key [HMH] executives that was involved with the transaction."  Tr. at 823:9-12.  In the email, Blazer wrote that HMH wanted to

████████████████████████████████████████████████████████████████

██████████████████████████████████████████.  The email continued that

Englewood "██████████████████████████████████████████████████████

████████████████████████████████████████████."  *Id.*  Five days later, Garrett sent by email, a letter to Chartis responding to Englewood's follow-up questions.  PX1042.[14]  Blazer was copied on the email, and the letter used a similar structure and language as that in Blazer's email.  *Id.*  Garrett began the letter by explaining that a partnership will allow HMH to build on its successes and offer more advanced care.   Garrett wrote that "HMH is confident that we can sustain or more likely grow EH's current high volume and increase its case mix index."  *Id.*  But he then stated that "a formal partnership would allow [Englewood] *to continue* to reap the benefits of the Horizon Omnia contract, as well as the Medicare Shared Savings Plan."  *Id.* (emphasis added).  In other words, HMH approached the Englewood negotiation not only with a kind word (potential benefits to Englewood) but also a gun (a threat to ending the affiliation with HMH).

---

[14]  The FTC introduced Blazer's email during its cross-examination of Garrett.  Defendants objected to the email because Garrett was not copied on it.  Tr. at 824:8-11.  The FTC established that while Blazer was the point person for the merger transaction, Garrett had final sign-off.  Tr. at 823:6-15; 824:14-21.  Moreover, as noted, Garrett sent the letter to Chartis soon after the email. Given the timing of the two documents, the similarity in content, and Blazer and Garrett's roles, it is reasonable to infer that Garrett was aware of the contents of Blazer's email, PX1061, when Garrett wrote the letter.  *See Egan v. Live Nation Worldwide, Inc.*, 764 F. App'x 204, 208-09 (3d Cir. 2019) (explaining that the burden to authenticate a document under Fed. R. Evid. 901 is "slight" and that a "party can meet its burden by making 'a prima facie showing of some competent evidence to support authentication'" (quoting *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013))).

On March 28, 2019, Chartis presented the offers from HMH and ████ to the Executive Committee.  In comparing the two entities as potential partners, Chartis noted that  a "pro" of choosing HMH is that it would "████████████████████████████████████████████████" PX6004-009.  Relatedly, a "con" for ████ was that a partnership with ████████████████ ████████████████████████████████████" *Id.*  As a "con" for HMH, Chartis indicated that "████████████████████████████████████████████ ████████████████████████████████████." *Id.*

Next, in reviewing the differences for clinical services in the two bids, the HMH offer contained several specific numerical commitments regarding the number of transfers and patients that HMH would send to Englewood and outlined certain intended capital improvement projects. The ████ offer did not provide the same level of detail.  *Id.* at 004.  Anderson, however, explained that Englewood wanted ████████████████ from HMH ████████████████ ████████████████████████.  Accordingly, Englewood explicitly asked Chartis to raise this issue with HMH.  Anderson did not recall asking ████ for a similar level of detail and did not believe that Englewood asked for such information from ████.  Tr. at 516:22-517:15; 529:1-16.  Anderson explained that if Englewood had wanted similar detailed plans from ████, ████████████████████████████████████████████." Tr. at 516:6-15. Geller, however, testified that Englewood had Chartis ████████████████████████████ ████████████████████████████████████████ ████████████████████.  Tr. at 876:17-877:15; *but see* DX0103 (Englewood's "deal asks" which does not include any questions about ████████ at Englewood).  The Court credits Anderson's recollection.  She was the point person on the deal asks, and the ████ requested

from HMH is consistent with ███████████████████████████████████████

███████████████████. No such similar concerns were raised as to ██████.

Finally, ██████ intended to provide ██████ million in "fresh" capital within the ████████

████, with a total capital contribution of ██████ million over ████████. HMH intended to provide

████████ in "fresh" capital, with a total capital contribution of █████████ over an ████████

████. PX6004-006. Geller stated that on paper, the ████████ offer looked significant but that

after the Board studied the offers, it determined that the HMH offer was better. With the ████████

offer, money that the Englewood Foundation[15] raised would decrease ████████s contribution and

███████ █ ████████████████████████████████ that would boost Englewood's

bottom line and balance sheet. Tr. at 882:11-883:10. But again, it appears that ████████ did not

give ████████████████ because Englewood did not ask. As for the HMH offer, Geller

explained that Garrett gave his commitment that ████████████████████████████

████████████████████████████████ and that this was ultimately put into the final

agreement. Tr. at 883:11-884:-2.

Once Englewood chose HMH as its partner, the parties negotiated the precise terms of the

merger. On September 23, 2019, HMH and Englewood entered into the Definitive Agreement

(the "Agreement"), under which HMH will become the sole member and ultimate parent of

Englewood. DX3800. The Agreement sets forth numerous specific commitments and provides a

level of detail that is not typically seen in a merger agreement. Tr. at 744:15-18.

The Agreement states that Englewood "will play a critical role as a tertiary hub in the HMH

Northern Region." DX3800, § 3.1. HMH agreed that Englewood would continue as a separate

---

[15] The Foundation is the philanthropic arm for Englewood Health. *See* About Us, Englewood Health Foundation, https://www.englewoodhealthfoundation.org/about-us/.

legal entity for at least 10 years with its own board of trustees. *Id.* HMH also agreed to provide Englewood with a $404,500,000 capital investment for specified projects (with 60% coming in the first 4 years) and $5,000,000 in operating funds per year for seven years, beginning three years after the closing date. *Id.*, § 3.5.2.

During the hearing, Defendants pointed to Exhibit C to the Agreement, entitled "Clinical Initiatives," as evidence of firm commitments that HMH was making to Englewood. *Id.*, Ex. C. There are 27 total commitments, but numbers 20-27 are "operational commitments" which require HMH to use its "best efforts" and to which the Englewood Trust[16] has no "right to enforce[.]" *Id.* Moreover, closer inspection of the first 19 "firm commitments" reveals that they, for the most part, do not promise much except to explore, assess, or collaborate on different issues, or make "regional" improvements. *Id.* There are, however, a few firm commitments: Englewood will become part of HMH's regional transfer center; Englewood will get a new robot; HMH ███████ ████████████████████ at Englewood; and HMH's capital commitment will be earmarked for certain projects. *Id.* The non-enforceable operational commitments (20-27) address, among other things, actual increases in patient volume (█████████████████████████ ███████████). *Id.*

While Defendants touted increased inpatient admissions at Englewood as a result of the merger, the Agreement also contemplates the opposite effect. If Englewood's volume in certain service lines ███████████████████████████████████████████████ ████████████████████████████████████████████████, then Englewood's "Trust Board" has some limited remedies. *Id.*, §§ 3.2.1, 3.2.3. After a number of

---

[16] The Englewood Trust is an entity that will be formed when the merger is consummated to enforce certain terms of the Agreement on Englewood's behalf. DX3800, at 1.

cumbersome steps and arbitration, the Trust Board can only require HMH to engage a healthcare consultant to develop a "further revised Action Plan" that has to be approved by the post-closing boards.  *Id.*  And if that revised plan is not properly implemented, then the Trust Board can return to arbitration after a meet-and-confer period.  *Id.*

Garrett explained that with the merger, HMH plans to "optimize services between the two organizations" and convert Englewood to its tertiary hub in the northern New Jersey region.  Tr. at 743:2-8.  This conversion will alleviate "significant capacity issues at HUMC," and allow HMH to expand HUMC as a quaternary academic medical center that provides the highest level of care in New Jersey.  Tr. at 743:15-20; *see also* 763:3-9.  Garrett further explained that there are specific commitments in the Agreement because "they're the basis of how we're going to transform care" and are the basis of the "optimization of services."  Tr. at 743:25-744:5.  According to Garrett, these commitments are "the centerpiece" of the merger so it was "important to put it right in the definitive agreement."  Tr. at 745:12-14.[17]

After the Agreement was signed, Englewood and HMH formed multiple committees, which were overseen by the Steering Committee, to create a plan to implement the Exhibit C commitments upon consummation of the merger.  Tr. at 1315:17-22.  Garrett stated that the Steering Committee "met regularly" after the Agreement was signed but acknowledged that there was a "significant pause" due to the COVID-19 pandemic because "people's attentions were 100 percent dedicated to taking care of COVID patients."  Tr. at 795:14-21.  Mark D. Sparta, the President and Chief Hospital Executive at HUMC, believed that between March 2020 and March 2021, the surgical, physician and cardiac integration teams "███████████████████" █

---

[17] ████████, the testimony of Anderson from Chartis suggested that ████████████ was due to ███████████████████████████.  PX6004-006.

████████.  Tr. at 1172:24-25.  Dr. Brunnquell, President of the Englewood Health Physician Network, testified that as of October 2020, the clinical teams had stopped meeting, but the Steering Committee continued to do so.  Tr. at 1329:8-19.  Dr. Brunnquell also indicated that much of the planning work was suspended because the committees had done as much as they could do prior to the actual closing of the deal.  Tr. at 1328:18-1329:4.

The initial work product from the Steering Committee was the first draft of the "HMH-Englewood Health Service Optimization Framework" (the "Optimization Plan"), dated February 26, 2021.  Tr. at 794:9-10.  A second draft was produced shortly thereafter.  The most recent Optimization Plan is dated March 31, 2021.  DX3601.  By the time this document was produced, not only had discovery been underway in this matter, but several key witnesses had already been deposed.  The Optimization Plan discusses "persistent capacity constraints" at HUMC that HMH cannot address without a merger with Englewood.  DX3601-006, 007.  Of course, the parties had already agreed to the merger in September 2019 so this after-the-fact justification is, at best, odd. For the reasons stated in the Analysis section below, the Court gives the Optimization Plan little weight.  Nevertheless, the Court reviews below some of the statements in the Optimization Report in light of other evidence.

Sparta discussed the capacity challenges at HUMC.  Sparta explained that the long-standing capacity problems stem from a shortage of med-surg beds in the facility, which are general adult hospital beds.  This causes backups in the emergency department, operating rooms, and the intensive care unit, as patients in these department are typically moved to med-surg beds for continued care.  Tr. at 1143:2-15; 1143:24-16; 1145:9-10; 1145:6-10.  The average occupancy of med-surg beds at HUMC ranges between 90 to 94% of HUMC's actual capacity over the last

four years.  Tr. at 1144:19-22.  The industry standard for hospital occupancy is 85%.  Tr. at 1186:16-18.

Critically, HMH does not point to any ordinary course documents discussing HUMC's capacity challenges before Englewood sought a merger.  Englewood, not HMH, initiated the process to achieve its strategic goals.  Moreover, others in the industry were not aware of any severe capacity issues – HUMC never declined transfers and has not gone on divert in several years.  *See, e.g.*, Tr. at 90:10-22 (Maron stating that he was not aware of capacity issues at HUMC, that HUMC had never turned away a transfer from Holy Name, and that he did not believe that HUMC's emergency department has gone on divert in the last eight or ten years); ██████████

██ (████ explaining that ██ was not aware of any severe capacity issues at HUMC and would have expected to hear about it if that were the case); Tr. at 1127:10-22 (Karp stating that he was not aware of any severe capacity issues at HUMC and that because of his position he would have expected that he would have known of such a problem).

The Optimization Plan states that in order to alleviate the capacity problems at HUMC, HMH plans to shift and redirect certain tertiary care from HUMC to Englewood.  HMH plans to redirect non-complex tertiary cases to Englewood as soon as the merger is finalized and has identified a number of cases that can annually be redirected from HMH's other hospitals in the region, including HUMC.  DX3601-011.  While HUMC plans to transfer cases to Englewood on the first day that the merger becomes effective, HUMC does not currently do so because Englewood is a competitor and Englewood would lose the revenues of the transferred case.  PX7004–189—PX7004-190.  Although there is no legal impediment to such transfers,[18] HUMC

---

[18] There was no evidence that HUMC or HMH would face perilous economic consequences if it transferred those case to Englewood.

has a legitimate business reason for not doing so.  At the same time, the fact that such legitimate financial considerations are dispositive undercuts other claims by Defendants, such as Garrett's indication that HMH's strategy is "New Jersey First," that is, to improve healthcare for New Jersey residents, as Defendants indicated that capacity constraints can have a deleterious impact on care. Tr. at 768:4-9.  If HMH's primary concern was New Jersey first, it seems that it would currently transfer patients away from HUMC to alleviate its capacity constraints.

In addition, several witnesses called into question the number of patients that HMH could transfer on its own accord.  For example, Sparta explained that about 70% of HUMC's medical staff are not HUMC employees, so HUMC cannot control where the non-staff physicians admit their patients.  Tr. at 1147:22-1148:6; *see also* Tr. at 123:22-124:7 (Maron explaining that hospitals do not refer patients to hospitals, physicians do).  In addition, when HMH first started looking into the specific number of patients that it could commit to transferring to Englewood, Sparta stated in a March 24, 2019 email that "[█████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████.█"  ███████████.  At the hearing, Sparta explained that after he sent the email, HMH ██████████████████████████████████████.  Tr. at 1178:8-18.  But notably, Sparta did not ████████████████████ in his email.  Finally, Defendants' expert witness in hospital operations, capacity, and strategic planning, Kevin C. "Casey" Nolan, also stated that because 80% of the physicians on staff at HUMC are independent, "it's very difficult for HUMC to dictate to them where they want to admit their patients."  Tr. at 1215:10-17.  Nolan acknowledged that "transfers, frankly, are a last resort."  Tr. at 1215:16-17.

In addition, the Optimization Plan notes that annually, 50 NICU patients will be redirected from HUMC to Englewood.  DX3601-011.  But again, other testimony undercuts this

representation.  Geller conceded that Englewood needs a new, updated NICU to alleviate space and noise issues.  Tr. at 915:10-20.  And Brunnquell stated that Englewood's NICU is "an older unit" that "would not meet the current code."  Tr. at 1321:7-9.  Finally, Nolan explained that "[m]oms can and do shop for their physician and the hospital they want to deliver at and they've chosen HUMC, so the ability to transfer those patients is probably not very high."  Tr. at 1215:1-4.

The Optimization Plan also states that the Second Street project (referred to as the "Helena Theurer Pavilion") "will not alleviate HUMC's capacity challenges."  DX3601-008.  Nevertheless, the construction project expands HUMC's existing footprint.  The project will result in █ new operating rooms, and HUMC plans to ███████████████████████ operating rooms.  Tr. at 1173:25-1174:9.  The new tower will also have █ new ICU beds, and HUMC plans to ██████████ of its existing ICU beds.  Tr. at 1175:9-14.  In addition, the tower will have space for █ additional ICU beds that can be added if the need arises.  Tr. at 1175:15-18.  Finally, the new tower will have ███ new private med-surg beds, and HMH plans to ██████████████ ███████████████████████████████████████.  HUMC's plan to ██████████████████████████████████████████ cuts against its capacity claims, as does the fact that it is not currently ███████████████████.

 Finally, Defendants tout the cost savings that will result from this merger.  Neither the Steering Committee, nor HMH or Englewood independently did any work, outside of this litigation, to assess the cost savings that may be incurred by transferring patients to Englewood after the merger.  Tr. at 796:19-25.  Defendants also state that their plan to optimize care between the two hospitals will reduce the need for patients to seek services at the more expensive New York hospitals.  Tr. at 766:4-21; DX3601-016.

As to cost savings from the merger, Defendants largely rely the testimony of Lisa Ahern, Defendants' expert witness on cost savings and efficiencies for healthcare provider transactions. Ahern identified eleven categories of cost saving categories that she anticipates will result from the merger.  The first eight categories address cost savings caused by corporate restructuring, such as reducing staffing redundancies and streamlining the supply chain between the two entities. Ahern referred to the remaining three categories as "ancillary services," and these are more patient "facing."  Tr. at 1385:22-1386:10.  Ahern opined that by four years after the merger closes, there will be $38 million in annual recurring efficiencies.  Tr. at 1386:23-1387:2.  Critically, however, Ahern failed to conduct any analysis as to what percentage of the identified cost savings would be passed on to commercial insurers.  Tr. at 1402:16-18.  Similarly, HMH has a history of mergers and acquisitions.  The corporate restructuring cost savings should, to some degree, result from any merger or acquisition.  But HMH failed to present any evidence of its historical performance as to the relevant cost savings being passed on to commercial insurers.

One final note, no party disputed that HMH, as a large health system, and HUMC, as a large academic center, are more desirable to insurers than Englewood.  This fact is reflected in the large price differential for services between HUMC and Englewood; in other words, Englewood is not nearly as important to an insurer as HUMC.  ███████.

The extensive expert testimony from economists is discussed below.

### III.    PROCEDURAL HISTORY

After HMH and Englewood entered into the Agreement, the FTC filed an administrative complaint against HMH and Englewood.  Through the administrative complaint, the FTC alleges that if consummated, the proposed merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act ("FTC") Act, 15 U.S.C. § 45.  On December

3, 2020, five FTC Commissioners voted unanimously to authorize FTC staff "to obtain preliminary injunctive relief under Section 13(b) of the FTC Act."  Plf. FOF ¶ 4.  The FTC filed its Complaint in this matter the following day, December 4, 2020, seeking a temporary restraining order and preliminary injunction that enjoins the merger.  D.E. 1.  The same day, the parties entered into a stipulated temporary restraining order, through which HMH and Englewood agreed that they would not consummate the proposed merger until after the Court rules on the FTC's motion for a preliminary injunction.  D.E. 4.  Then, on March 22, 2021, pursuant to the parties' case management order, the FTC filed its motion for a preliminary injunction, which sought to preserve the status quo pending a full administrative proceeding on the merits.  D.E. 133.  From May 10 through May 19, 2021, the Court conducted an evidentiary hearing on the FTC's motion for a preliminary injunction and heard closing arguments on June 2, 2021.

## IV.    LEGAL STANDARD

Pursuant to Section 13 of the FTC Act, the FTC can file suit in district court seeking a preliminary injunction "to prevent a merger pending a FTC administrative adjudication '[w]henever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act.'"  *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001)).  The standard for granting a preliminary injunction under the FTC Act is not the same as the standard used to grant injunctive relief under Federal Rule of Civil Procedure 65.  Rather, a court should issue a preliminary injunction pursuant to Section 13 "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  15 U.S.C. § 53(b).

Under Section 13(b), a court first considers the FTC's likelihood of success on the merits. *Penn State Hershey Med. Ctr.*, 838 F.3d at 337. Next, the court weighs the equities to determine whether a preliminary injunction is in the public interest. "The question is whether the harm that the [Defendants] will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Id.* at 352. Ultimately, in deciding whether to preliminarily enjoin a merger "doubts are to be resolved against the transaction." *Id.* at 337.

The FTC must show that it has a likelihood of success of demonstrating, during the administrative proceeding, that the proposed merger violates Section 7 of the Clayton Act. *Id.* at 337. Section 7 prohibits mergers where the effect "*may* be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). The definition of antitrust liability under Section 7 is "relatively expansive" as the language deals in "probabilities, not certainties." *Penn State Hershey Med. Ctr.*, 838 F.3d at 337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)). "To stop a merger, a Section 7 plaintiff ultimately must show that a 'substantial lessening of competition' is 'sufficiently probable and imminent.'" *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 537 (E.D. Pa. 2020) (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622, 623 n.22 (1974)). Thus, at the preliminary injunction stage, the FTC does not need to establish that the proposed merger violates Section 7. Rather, the FTC "need only show that there is a reasonable probability that the challenged transaction will substantially impair competition." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 22 (D.D.C. 2015) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997)).

Courts use a burden-shifting framework to determine whether a merger is likely to harm competition pursuant to Section 7. The FTC must first establish a *prima facie* case by demonstrating that the merger is anticompetitive. *Penn State Hershey Med. Ctr.*, 838 F.3d at 337.

If the FTC establishes its *prima facie* case, "it creates a presumption in favor of preliminary relief." *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 538.  Next, to rebut the presumption, a defendant must show "either that the combination would not have anticompetitive effects or that the extraordinary effects of the merger will be offset by extraordinary efficiencies resulting from the merger." *Penn State Hershey Med. Ctr.*, 838 F.3d at 337.  If the defendant successfully rebuts the *prima facie* case, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent upon the Government at all times." *Id.* at 337 (internal quotation omitted).

## V.   ANALYSIS & CONCLUSIONS OF LAW

### A.  Likelihood of Success

#### 1.  *Prima Facie* Case

To establish a *prima facie* case, the FTC must "(1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Id.* at 337-38.

##### a.  Relevant Market

The relevant market includes two components: the product market and the geographic market.  *Id.* at 338.  Appropriate market definitions are "'critical' because a proposed merger's legality 'almost always depends upon the market power of the parties involved.'"  *Thomas Jefferson*, 505 F. Supp. 3d at 539 (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998)).  Thus, defining the proper relevant market is a fact-specific analysis.  Here, the FTC defines the relevant product market as the cluster of inpatient GAC services offered by

Englewood and HMH's Bergen County hospitals and sold to commercial insurers.[19]  FTC FOF ¶¶

13-16.  Dr. Dafny, the FTC's expert in healthcare and antitrust economics, explained that (1) 97%

of patient admissions at both HUMC and Englewood are for overlapping services, and that (2)

85% of the service lines offered at HUMC or Pascack Valley are offered at Englewood, while 99%

of Englewood's service lines are offered at HUMC or Pascack Valley.  Tr. at 556:15-21.

Defendants do not meaningfully challenge the relevant product market as defined by the FTC.

Accordingly, the Court adopts the FTC's proposed relevant market, and focuses on the geographic

market.

  "The relevant geographic market 'is that area in which a potential buyer may rationally

look for the goods or services he seeks.'"  *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (*Gordon

v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)).  Moreover, the identified relevant market

"is dependent on the special characteristics of the industry involved[.]"  *Thomas Jefferson*, 505 F.

Supp. 3d at 539 (internal quotations omitted).  Courts and the FTC frequently use the hypothetical

monopolist test ("HMT") to determine the relevant geographic market.  Defendants do not

challenge the FTC's use of the HMT, instead they challenge the FTC's application of the test.

Specifically, Defendants contend that the FTC's geographic market does not comport with

commercial realities or the *Horizontal Merger Guidelines* (the "*Merger Guidelines*").[20]

---

[19] Although specific inpatient GAC services are not interchangeable, courts and parties look at
these services together as a "cluster" when the competitive conditions are reasonably similar across
services.  *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014); *see also
Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (defining relevant product market at general acute
care services sold to commercial payors).

[20] The *Merger Guidelines* are issued by the U.S. Department of Justice's Antitrust Division and
the FTC.  Although the *Guidelines* are not binding on this Court, "they are often used as persuasive
authority."  *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 n.2 (quoting *Saint Alphonsus Med.
Ctr.-Nampa Inc. v. Saint Lukes Health Sys., Ltd.*, 778 F.3d 775, 784 n.9 (9th Cir. 2015)).

An HMT analysis starts by selecting a narrow candidate market.  Then,

> if a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, the market is properly defined.  If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow.

*Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (internal quotations omitted).  A "SSNIP is typically about 5%."  *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 n.1 (quoting *Merger Guidelines*, § 4.1.2).  A relevant geographic market should not be broadly defined, and the HMT "is designed to ensure that candidate markets are not overly narrow."  *Merger Guidelines*, § 4.

The healthcare industry is unique in antitrust cases because patients, the direct users of inpatient GAC services, do not pay hospitals for the services (with the exception of co-pays or other similar charges).  Rather, "the healthcare market is represented by a two-stage model of competition."  *Penn State Hershey Med. Ctr.*, 838 F.3d at 342.  At the first stage, medical providers, including hospitals, compete to be included in an insurance plan's hospital network.  At the second stage, medical providers compete to attract individual members of an insurer's plan.  *Id.* at 342; *see also* FTC FOF ¶ 5; Tr. at 935:13-25.  Competition at the second stage involves non-monetary factors like quality and reputation.  Tr. at 550:16-551:1.  Moreover, "[p]atients are largely insensitive to healthcare prices because they utilize insurance, which covers the majority of their healthcare costs."  *Penn State Hershey Med. Ctr.*, 838 F.3d at 342.  Accordingly, the Third Circuit has instructed that courts must focus their analysis on insurers, who are the actual payors.  *Id.*  The Circuit has recognized, however, that "[p]atients are relevant to the analysis, especially to the extent that their behavior affects the relative bargaining positions of insurers and hospitals as they negotiate rates."  *Id.*; *see also* Tr. at 555:2-6 (Dafny explaining that patient preferences influence insurers' decisions when forming their networks).  In other words, the first stage is not

independent from the second stage as patients (insureds) influence decisions at the first stage. With this in mind, the Court focuses its attention on the first stage, with the understanding that the two stages cannot be completely divorced from each other. And, as noted, the Court is only focused on private (or commercial insurance) companies rather than government payors.

Here, Dr. Dafny explained that her candidate market is commercially insured patients in Bergen County. Tr. at 557:15-17. This means that any hospital that serves a resident of Bergen County is included as a market participant even if that hospital is not located in Bergen County. Tr. at 558:17-22. Dr. Dafny chose Bergen County as her candidate market for three principal reasons: (1) Englewood and HUMC are both located in Bergen County; (2) the vast majority of Bergen County residents receive care in Bergen County; and (3) Bergen County is an economically significant area for insurers. Tr. at 557:19-558:13.

The commercial insurers, including Horizon, testified that they cannot offer a marketable plan in Bergen County that does not include a Bergen County hospital. *See, e.g.*, Tr. at 165:19-22 (Nielsen testifying that United could not sell a marketable plan to Bergen County residents that did not include any Bergen County hospitals); Tr. at 339:14-23 (as to whether Aetna could sell a network without a Bergen County hospital, Wengel explained that "if you live and reside in a county and you don't have a hospital but maybe the competitor does, I think you'll lose those cases nine times out of ten"); Tr. at 1119:22-1120:5 (Karp stating that he did not think Horizon could market a plan to residents and employers of Bergen County that did not have a Bergen County hospital). Consequently, these insurers would be forced to accept a SSNIP from a hypothetical monopolist of all Bergen County hospitals to continue competing in the county. This is even reflected in the insurers' testimony. *See* ███████████ (explaining that █████ would likely be forced to accept a reasonable price increase imposed by all hospitals serving Bergen County);

Tr. at 1119:22-1120:10 (explaining that if all Bergen County hospitals increased rates a reasonable amount, Horizon would continue to sell plans in Bergen County provided that the increase was reasonable and fit within Horizon's budget). Accordingly, the Court finds that the FTC has sufficiently established that its proposed geographic market of Bergen County satisfies the HMT. FTC FOF ¶ 66.

Dr. Dafny performed a willingness to pay ("WTP") analysis to empirically test her conclusion that Bergen County satisfies the HMT. As Dafny explained, a WTP analysis provides numbers that serve to confirm that the candidate market, here Bergen County, satisfies the HMT. Tr. at 563:11-564:11. The WTP analysis examines the negotiating leverage that a hypothetical monopolist of Bergen County hospitals would have as to insurers. In performing the analysis, Dafny used a subset of hospitals that serve Bergen County residents, and her analysis showed a substantial increase in willingness to pay. Tr. at 563:11-564:15. Specifically, Dafny assumed that the hypothetical monopolist owned all hospitals in Bergen County, a subset of her candidate market (all hospitals that serve Bergen County residents). And her analysis indicated that an insurer's willingness to pay for a hypothetic monopolist of this subset increased by 65% when compared with the hospitals independently. As a result, Dafny believed that her geographic market satisfies the HMT. Tr. at 564:4:15. Dr. Dafny also performed a second WTP analysis that considered Bergen County hospitals vis-à-vis patients from Bergen County and its three surrounding counties. The WTP for this market is 49%, which is also more than a SSNIP. Tr. at 1511:17-1512:7.

Defendants challenge the FTC's proposed geographic market on several grounds. Defendants first maintain that the FTC fails to establish a relevant geographic market because it

used customers, rather than suppliers, to define the area but failed to establish price discrimination.

Defs. COL ¶ 8-13.  Defendants rely on the *Merger Guidelines*, which provide as follows:

> In the absence of price discrimination based on customer location, the [FTC] normally define[s] geographic markets based on the locations of suppliers . . . .   In other cases, notably if price discrimination based on customer location is feasible . . . the [FTC] *may* define geographic markets based on the location of customers.

*Merger Guidelines*, § 4.2 (emphasis added).  Defendants contend that as a result, the FTC must establish price discrimination as a matter of law to support its proposed geographic market here.

Although often used as persuasive authority, the *Merger Guidelines* are not binding.  *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 n.2.  Moreover, Section 4.2 of the *Guidelines* does not use mandatory language.  Consequently, price discrimination is not required as a matter of law. Importantly, the FTC has successfully used a patient-based market without evidence of price discrimination.  *See, e.g.*, *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. Saint Luke's Health Sys., Ltd.*, No. 12-560, 2014 WL 4074466, at *7-8 (D. Idaho Jan. 24, 2014), *aff'd* 778 F.3d 775, 784-85 (9th Cir. 2015).  The Court concludes that the lack of price discrimination here does not doom Bergen County as the relevant geographic market.

Defendants next contend that the FTC's geographic market does not reflect commercial realities.  Defendants maintain that Bergen County is an arbitrary "political" boundary that plays no meaningful role in the first stage of hospital competition.  Defs. COL ¶ 8.  The Court would agree if a political boundary (such as a municipality, county, or state) were not otherwise supported by evidence.  But here, the FTC has provided sufficient evidence to support a geographic market of Bergen County.  Indeed, numerous courts have defined a relevant geographic market by county or other "political" boundary.  *See, e.g.*, *Penn State Hershey Med. Ctr.*, 838 F.3d at 342 (concluding that the FTC "met its burden to properly define the relevant geographic market" as "the four-

37

county Harrisburg area"); *Saint Alphonsus Med. Ctr.-Nampa Inc.*, 778 F.3d at 781, 84 (stating that district court did not err in finding that *one city* in Idaho was the relevant geographic market); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014) (stating that there was no dispute that a *single county* was the relevant geographic market).

As noted, the critical inquiry is whether adequate evidence supports the FTC's proposed market.  Here, the evidence reflects that commercial insurers treat Bergen County as a significant target within the larger New Jersey market.  This was illustrated by testimony from representatives of United, Aetna, AmeriHealth, and Horizon.  For example, Nielsen testified that when United looks at whether its plans are attractive to its members, it reviews coverage at a state-wide level but also "drills that down to the county level" to ensure that the plan is attractive to the specific county's members.  Tr. at 161:20-23; *see also* Tr. at 180:2-6 (referring to Bergen County as a "█████████████████████████").  In addition, AmeriHealth tracks its membership and sales in Bergen County and has specifically tried to grow its membership within the county.  Tr. at 682:15-22; Tr. at 683:11-13.  Ken Kobylowski, Senior Vice President for Provider Contracting & Network Operations for AmeriHealth testified that as AmeriHealth is trying to expand its business, Bergen County is an attractive market because it is such a densely populated county.  Tr. at 683:11-18.  Even Horizon, who supports the merger, conceded that Bergen County is an important county "because of the number of members that we have there and the population."  Tr. at 1118:1-5.  Moreover, as noted, the insurers testified that they could not offer a marketable plan to Bergen County residents that did not include a Bergen County hospital.  *See, e.g.*, Tr. at 165:19-22 (Nielsen from United); 339:14-23 (Wengel as to Aetna); 1119:22-1120:5 (Karp as to Horizon).

Defendants argue that commercial insurers do not just look at Bergen County because all offer statewide plans.  Defendants continue that no insurer offers only Bergen County plans and

the providers do not ask for county only plans. *See* Defs. FOF ¶¶ 42-47. Thus, Defendants argue that because the actual commercial insurance plans do not align with the FTC's defined geographic market, the FTC fails to establish a relevant market. Tr. at 1664:4-1665:2. But Dr. Dafny explained that a relevant geographic market for antitrust purposes does not necessarily align with a consumer's understanding of a relevant market. Tr. at 592:1-17. In fact, in *Hershey*, the Third Circuit emphasized that "[t]he hypothetical monopolist test is exactly what its name suggests: hypothetical." *Penn State Hershey Med. Ctr.*, 838 F.3d at 344. Moreover, economic significance does not need to be unique. Dr. Dafny recognized, and other insurers testified, that other counties and areas of New Jersey are also important markets, Tr. at 1508:10-19, but this does not mean that Bergen County is *not* important to insurers. Dr. Dafny explained that "there is nothing in [her] opinion that relies on Bergen County being the only county that an insurer is interested in targeting." Tr. at 632:10-12.

Next, Defendants argue that using Bergen County customers artificially excludes patients just outside of Bergen County and "distinguishes between Bergen County residents and non-residents in a way that neither payors nor providers do." Defs. FOF ¶ 14. "Whatever market urged by the FTC, the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (quoting 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530d (4th ed. 2014)). Defendants point to Englewood and HUMC's PSAs, which demonstrate that both hospitals serve individuals who reside outside of Bergen County, and the fact that HUMC and Englewood consider their reach to extend beyond

Bergen County.[21]   *See* DX5001, Exs. 8, 9.   But looking at a hospital's PSA to determine a geographic market is viewing the market from the lens of the supplier, not the buyer.   As discussed, the Third Circuit has instructed that courts must apply the HMT through the lens of the insurer. *Penn State Hershey Med. Ctr.*, 838 F.3d at 342.   In addition, although the Court recognizes that patients certainly can and do cross county lines for inpatient GAC care, the evidence demonstrates that, at least for Bergen County, most residents stay within the county for such care.   Dr. Dafny calculated that more than 75% of Bergen County residents receive their inpatient GAC services at a hospital in Bergen County.   PX8000, Fig. 25.   As a result, focusing on Bergen County is likely to capture a "significant amount of potential harm."[22]   Tr. at 622:2-24.   Notably, Defendants' expert economist, Dr. Wu, did not disagree with Dr. Dafny's calculation about the number of Bergen County residents who received care within the County.   Tr. at 980:3-14.

The concept that individuals prefer to receive care close to home was also recognized by the payors.   For example, Karp explained that for emergency services and most elective in-patient services, patients will choose to go to the closest provider.   Tr. at 1121:21-1122:1; *see also* █████████ █████████ testifying that a large proportion of ████████ Bergen County participants seek care within the county and that ████████████ data demonstrates that ████████████ Bergen County

---

[21] It is not clear if Garrett or Geller were even aware of HUMC or Englewood's PSAs before this litigation began.   *See* Tr. at 806:11-18; Tr. at 908:1-25.   If the top executives of the entities at issue here were not aware of this information in ordinary course, it is difficult to infer that payors were aware of the PSA for either entity or that it was relevant to payors' decisions when forming their networks.

[22] Defendants harp on Dr. Dafny's use of the word "significant" as a subjective and the fact that Dr. Dafny did not quantify the actual harm.   Tr. at 622:10-15; 624:3-8.   But Dr. Dafny's conclusion about "significant" harm is supported by data – that 75% of Bergen County residents receive care within the County.   Further, Dr. Dafny characterized the harm as significant to indicate that it was enough *to continue with* (not end) her analysis as to whether Bergen County satisfied the HMT. Tr. at 622:19-24.

commercial participants accessed care at hospitals within the county).  So, while the proposed market does exclude non-Bergen County residents, the case law recognizes that a geographic market is often imprecise.  *See United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) ("An element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographic market.'" (*quoting United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963))).  Moreover, the exclusion is justified by the evidence.

Finally, Defendants critique Dr. Dafny's decision to start with Bergen County because Englewood and its "closest and largest" HMH rival, HUMC, are both in Bergen County.  Defendants point out that Dafny did not form an opinion as to whom Englewood's closest rival is overall or who HUMC's closest rival might be.  Thus, Defendants explain that Dafny's "first principal reason . . . boils down to the proposition that these two hospitals happen to be in the same county." Tr. at 1663:2-5.  Defendants also contend that Englewood and HUMC are complements, not competitors.  *See* Defs. FOF ¶ 85.

As noted, prior to the merger, HUMC and Englewood were competitors and viewed each other as such.  More importantly, commercial payors viewed the two as competitors.  For example, ▉▉▉▉ testified that ▉▉▉▉ considers HUMC to be the best possible alternative for Englewood because of the "tremendous amount of overlap" of services provided by the two facilities and geographic proximity.  ▉▉▉▉▉▉▉▉.  Other insurers also consider the two hospitals to be competitors.  *See, e.g.*, Tr. at 1116:23-25 (Karp agreeing that Englewood and HUMC are currently competitors).  Even Garrett acknowledged that there were overlapping services between the two hospitals. Tr. at 782:2-13.  Finally, according to Dr. Wu, across all inpatient GAC services, Englewood provides 73% of the same services that are offered at HUMC.  DX5001, Ex. 4.  The non-overlapping services account for only ▉▉ of HUMC's revenue.  *Id.*

41

This evidence undercuts Defendants' critique of Dr. Dafny's decision to use Bergen County as a candidate market.[23]

Defendants also challenge Dr. Dafny's application of the HMT.  Defendants argue that although Dafny states that she considered hospitals that served individuals outside of Bergen County, in actuality, she only looked at hospitals within Bergen County when considering whether insurers would accept a SSNIP.  Defs. COL ¶ 13.  To determine whether a hypothetical monopolist would be able to impose a SSNIP, Dafny considered the insurer's testimony that Bergen County is significant and that  they could not market a plan to Bergen County residents that did not include a Bergen County hospital.  *See* PX8000-074.  In addition, Dafny only used all Bergen County hospitals for her WTP analysis instead of all hospitals that serve Bergen County residents.  *Id.* at 075.  But Dr. Dafny explained that if this subset (Bergen County hospitals only) could "impose a SSNIP, then surely all the hospitals that are serving Bergen County could do so."  Tr. at 564:4-7. As a result, and in light of the insurer testimony about accepting a SSNIP, Dafny believed that it was appropriate to extrapolate the results of her WTP with the subset to the geographic market as a whole.  Tr. at 563:21-564:15; 642:4-7.  Defendants do not meaningfully challenge this decision,[24] and the Court finds that it is a reasonable inference.

---

[23] In any event, the Third Circuit has found that true complements can nevertheless potentially run afoul of the antitrust laws.  *See Penn State Hershey Med. Ctr.*, 838 F.3d at 334, 353-54 (granting preliminary injunction of proposed merger of academic medical center that specialized in complex services and a health system that focused on primary and secondary care).

[24] Dr. Wu indicated that there is no actual evidence of price discrimination in Bergen County and that if more hospitals were considered, it does not seem possible that a hypothetical monopolist could raise prices for Bergen County residents.  Tr. at 944:4-16.  Putting aside the Third Circuit's remonstration that the HMT is *hypothetical*, Wu's analysis appears to ignore the commercial reality that the large majority of Bergen County residents do seek inpatient GAC services in Bergen County.  Dr. Wu also challenged Dr. Dafny's HMT for focusing on hospitals rather than patients. Tr. at 943.  The Court disagrees with this reasoning.  The patients would be the appropriate focus in the opposite scenario – if an insurance company merger was being challenged and the resulting

If a hypothetical monopolist owned all the hospitals in Bergen County, then insurers could attempt to redirect their customers to nearby hospitals outside of the county (and even this scenario ignores the insurer's testimony that they cannot market a viable plan to Bergen County residents that does not include a Bergen County hospital). But if the hypothetical monopolist owned not only the hospitals in Bergen County but also the other nearby hospitals, then the monopolist would have greater leverage over the insurers because the insurers could not redirect their Bergen County customers to nearby, non-county hospitals. In other words, if a hypothetical monopolist also owned hospitals outside of Bergen County, then insurers would have even less choice in declining a SSNIP if they wanted a marketable plan for Bergen County residents.

Next, Defendants take issue with Dr. Dafny's confirmatory WTP analysis because it focused on stage two of hospital competition. The WTP model looks at the value that a hospital or health system adds to an insurer's network. PX8000-057, ¶ 117. As discussed, factors that are important in stage 2 inform stage 1 competition, which Dr. Wu acknowledges. Tr. at 990:15-21 (testifying that while the focus is on stage 1, stage 2 competition is "important" so that stage 2 must be analyzed as to how it affects stage 1). For example, if an insurer knows that individuals frequently choose Hospital A over Hospital B, that insurer would want Hospital A in its network because that hospital makes the network more desirable. Accordingly, stage 1 and stage 2 competition cannot be viewed in separate, isolated spheres. Even the Third Circuit recognizes that "[p]atients, of course, are relevant." *Penn State Hershey Med. Ctr.*, 838 F.3d at 343. Therefore, the fact that elements of patient choice play a part of the WTP analysis is not fatal.

---

hypothetical monopolist had all of the commercially insured customers in Bergen County. Then the inquiry would be whether such an insurer monopolist could impose a SSNIP (meaning a larger discount for the monopolist) on the hospitals.

Thus, in sum, the FTC demonstrates that commercially insured patients in Bergen County is a relevant geographic market.

### b. Anticompetitive Effects

After the relevant markets are determined, "a prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects in that market." *Penn State Hershey Med. Ctr.*, 838 F.3d at 346 (quoting *Saint Alphonsus Med. Ctr.-Nampa, Inc.*, 778 F.3d at 785). An anticompetitive effect means that the transaction would create an incentive for the merged parties to raise prices, lower quality, and innovate less. *See, e.g.*, *Saint Alphonsus Med. Ctr.-Nampa Inc.*, 778 F.3d at 786 (finding that high HHI and evidence demonstrating that merger would likely lead to increased reimbursement rates with high entry barriers for other entities sufficient to establish prima facie case). The *Merger Guidelines* state that market concentration, which is measured by the Herfendahl-Hirschman Index ("HHI"), is a useful indicator of the competitive effects of a merger. *Merger Guidelines*, § 5.3. "In determining whether the HHI demonstrates a high market concentration, we consider both the post-merger HHI number and the increase in the HHI resulting from the merger." *Penn State Hershey Med. Ctr.*, 838 F.3d at 346-47 (quoting *Horizontal Merger Guidelines*, § 5.3, at 18-19). An HHI above 2,500 in the post-merger market is considered "highly concentrated" and if the merger increases the HHI by more than 200 points it is "presumed to be likely to enhance market power." *Id.* (quoting *Merger Guidelines*, § 5.3, at 19). The FTC "can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Id.*

The FTC put forth evidence demonstrating that under a patient-based model, which is based on inpatient GAC discharges of Bergen County residents, the post-merger HHI is 2,835 and

the change in HHI is 841.[25]  PX8000-080, Fig. 15.  The post-merger HHI is considered highly concentrated, and the increase is above 200, meaning that the merger is likely to enhance the merged entities' market power.  In addition, HMH would control almost half of the market share in Bergen County post-merger.  PX8000, Fig. 15.  Consequently, the FTC satisfies is *prima facie* case based on this information alone.

Defendants respond that small adjustments to the geographic market eliminate the presumption of enhanced market power.  Defs. COL ¶ 19.  The *Merger Guidelines* state that "[w]here analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects." *Merger Guidelines*, § 4.  Defendants rely on a number of calculations performed by Dr. Wu to demonstrate that different candidate markets lead to very different competitive effect results.  Wu compared the post-merger HHIs for three other "markets."  DX5001, Ex. 16, 20.  Wu, however, never proposed that any of the "markets" he looked to were a potential candidate market.  Tr. at 952:25-953:26.  And Wu conceded that before calculating market concentration, there "needs to be [] an appropriately defined market."  Tr. at 49:13-15.  Moreover, Wu's markets use patient flow data, which adopts the perspective of the hospitals; this approach has been rejected by the Third Circuit. *Penn State Hershey Med. Ctr.*, 838 F.3d at 340 ("But subsequent empirical research demonstrated that utilizing patient flow data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals.").

---

[25] Dr. Dafny also calculated HHI using a hospital-based approach, as a "sensitivity check," which also resulted in an HHI over 2,500 and a change in HHI greater than 200.  Tr. at 647:7-648:22. The patient-based calculation is the more conservative of the two approaches.  Tr. at 648:10-13.

But even if the Court were to accept any of Dr. Wu's markets as alternative candidate markets, direct evidence supports the conclusion that the merger will substantially lessen competition in Bergen County.  *See Saint Alphonsus Med. Ctr.-Nampa, Inc.*, 778 F.3d at 788 (considering HHI and direct evidence of anticompetitive effect to determine that plaintiffs established their *prima facie* case); *H.J. Heinz Co.*, 246 F.3d at 717 (concluding that ordinary course documents and direct evidence regarding the market "bolstered" the FTC's market concentration statistics); *Sysco Corp.*, 113 F. Supp. 3d at 71-72 ("In summary, the FTC has bolstered its *prima facie* case with additional proof that the merger would harm competition[.]"). Using Englewood's information, Chartis calculated that HMH accounted for 34% of hospital discharges in Englewood's PSA and Englewood accounted for approximately 15% of discharges in its own PSA.  PX2079-016.  Englewood's PSA covers a large portion of Bergen County and small areas of Passaic, Hudson, and Rockland Counties.  PX2079-015.  Accordingly, after the merger, Englewood's data suggests that HMH will account for almost 50% of the market share in Englewood's PSA.  HMH's ordinary course documents before this litigation identify Bergen County as HUMC's PSA.  *See* PX1129-007, -051.  The fact that HUMC and Englewood historically defined their PSA to include similar areas demonstrates that combining the two entities will eliminate a competitor in the county.

Many insurance companies also believe that the proposed merger will lead to anticompetitive effects, as illustrated by insurers' testimony and their ordinary course documents. For example, ████ internal analysis, using ████ claim data, indicated that together, HMH's Bergen County hospitals and Englewood would account for ███ of ██████ commercial inpatient spend. ████████.  In addition, ██████ believed that post-merger, ██ ██ ██████ market share in Bergen County will go to HMH. ████████████████████████████

testifying that under ▉▉▉ modeling and projections, if HUMC were to leave ▉▉▉ broad coverage network, ▉▉ of the patients who would have gone to HUMC would chose Englewood under a conservative assumption).

Defendants' ordinary course documents and testimony also demonstrate that HMH and Englewood are competitors. By way of example, as previously discussed, during Phase 2 of Chartis's work with Englewood, Chartis set up a data room so Englewood could share documents with potential merger partners. When Englewood was first informed about the data room, an Englewood executive expressed concern with ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉." PX2311-001. Geller responded to this email with ▉▉▉▉▉▉ and then directed the recipient ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *Id.* Moreover, after meeting with HMH during phase 2 of Chartis's work, an Englewood Board member commented that "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉." PX2325 at 3. Finally, even after the merger was announced, Englewood acknowledged that "[f]or a long time, Hackensack has been a fierce but respected competitor." PX2291-004. And HMH indicates that once the merger is consummated, it can immediately transfer many cases to Englewood. Garrett, however, explained that presently, HMH has no incentive to transfer patients from HUMC because Englewood is a competitor. PX7004–189-90.

The FTC also relies on Dr. Dafny's diversion ratio calculations to further demonstrate that the merger will have an anticompetitive effect. This quantitative analysis assesses what other hospitals patients would choose if one hospital were not available. Tr. at 571:22-72:23. A "higher diversion ratio is indicative of closer competition between the parties." Tr. at 572:6-7. Dafny used

47

a patient-choice model for a four-county area.  Using this model, if Englewood were not available, more than 40% of its patients would use an HMH hospital, and almost 30% would choose HUMC. The next closest hospital was Valley, at 12%.  Tr. at 573:9-18.  If HUMC was not available, about 17% would go to Valley and approximately 10% would go to Englewood.  Tr. at 574:1-7.  Dafny explained that this quantitative analysis shows that HMH, and specifically HUMC, places a strong competitive constraint on Englewood, which affects Englewood's pricing and quality.  Tr. at 574:20-23.  Defendants maintain that the diversion ratio analysis focuses on stage 2 competition because Dafny's analysis did not capture price differences between HUMC and Englewood.  Defs. FOF ¶¶ 98-99.  As discussed, there is a large price difference between the two hospitals.  *See* ▇▇▇▇▇▇▇▇.  But as also discussed, patients' preferences inform insurers' decisions when creating networks and negotiating rates, thus are relevant to stage 1.  In fact, Dafny also relied on ▇▇▇▇▇ redirection analysis and ▇▇▇▇▇ termination analysis.  Tr. at 575:11-21.  Accordingly, while Dafny's diversion ratio analysis alone would not establish an anticompetitive effect, when viewed in combination with the HHI and direct evidence, the quantitative analysis further supports the FTC.

Dr. Dafny also calculated a "rough estimate" of the price impact of the merger at $31 million per year.  To do so, Dafny used her patient-based WTP model, which quantified the impact of the acquisition on Defendants' bargaining leverage with insurers.[26]  Plf. FOF ¶ 114.  She based her calculation on information from a peer-reviewed paper, referred to during the hearing as the

---

[26] In addition to the patient-choice model, Dafny also calculated willingness to pay using a hospital-choice model.  Tr. at 575-76.  When considering all discharges in a four-county area, Dafny concluded that "the parties combined yields an increase in this willingness to pay of 10.1% per discharge."  Tr. at 576:2-9.  Dafny then estimated that the 10% increase caused a 5.7% price increase for transaction absent any cost efficiencies, and it would increase Englewood's price around 35%.  Tr. at 576-78.

Garmon study.  Tr. at 576:16-24.  Defendants argue that Dafny's "rough estimate" is unreliable because it too is based on stage 2 considerations.  Defendants also challenge her estimate because it was based on a single study and assert that Dafny did not use an appropriate coefficient.  Defs. FOF ¶¶ 102-110.

Again, patient preferences impact and inform stage 1 negotiations.  Turning to Defendants' critiques of the Garmon study, Dafny first noted that while she adopted the coefficient from the Garmon study, substantial literature supported the general proposition that "hospitals and hospital systems with higher willingness to pay command higher negotiated prices in the marketplace."  Tr. at 577:12-14; *see also* 654:13-15.  Dafny then explained that she selected the coefficient that only included mergers without variable cost savings.  Dafny further indicated that she purposefully selected this coefficient to look at the price impact of the merger because she was "assessing the competitive effect absent mitigating factors, absent entry or efficiencies."  Tr. at 1520:9-15.  In other words, Dafny selected the category without variable cost savings because she accounted for such savings in her efficiencies analysis:  "If I were to use an estimate that included all mergers, including those with cost savings, then I [would] be double counting because I would be having cost savings in my price effect and then cost savings potentially in the efficiencies analysis."  Tr. at 1520:16-20.  Defendants do not meaningfully challenge Dafny's explanation, and the Court finds it persuasive.

Defendants point out that the full sample of mergers in the Garmon study showed that there was no statistically significant relationship between changes in WPT and price, and that the Garmon study did not include any hospitals in New Jersey.  Defs. FOF ¶¶ 108-09.  Accordingly, Defendants point to Dr. Wu's analysis of New Jersey claims data, which allegedly demonstrates that the merger will not lead to higher prices.  *Id.* ¶¶ 111-12.  According to Wu, Garmon indicated

49

that commercial claims information is "the ideal data" to evaluate potential price increases.  Tr. at 964:15-22.  Using this claims data, Wu concluded that there is no statistically significant relationship between price and hospitals' willingness to pay in Northern New Jersey.  Tr. at 965:4-11.  But even accepting Wu's conclusion, the direct evidence indicates otherwise.

Namely, the FTC points to the Acquisition Clauses as proof of a likely price impact.  *See* Plf. FOF ¶¶ 116-17.  When HMH acquires or merges with an entity, the Acquisition Clause permits HMH to raise rates at the new facility to match HMH's similar facilities.  ███████████████ ; 1036:5-14; 1083:14-21.  In response, Defendants point to unsolicited letters that HMH sent to insurers stating that HMH would not enforce the Acquisition Clauses with respect to this merger (the "Waiver Letters").  *See* ███████ .  HMH sent these letters after the FTC filed its opening briefing in this matter.  As a result, the FTC contends that the letters "may lack the reliability necessary to be admitted under Rule 803(6)," the business records exception.  D.E. 246 at 4.

The FTC does not identify any cases demonstrating that post-litigation created business records are inadmissible.  Moreover, the Court is not aware of any evidentiary rule that bars a business record simply because it was created after litigation began.  *See United States v. Casoni*, 950 F.2d 893, 911 n.10 (3d Cir. 1991) ("Thus, we are satisfied Rule 803(6) contains no general rule limiting admissible business records to those prepared *ante litem motam*.").  Accordingly, the Court will not exclude the Waiver Letters.  Rather, the critical issue is how much weight the Court should give this evidence.  The Supreme Court has explained that post-acquisition evidence "tending to diminish the probability or impact of anticompetitive effects" can be considered but "the probative value of such evidence" is "extremely limited."  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504 (1974) (internal citations omitted).  Lower courts have determined that such evidence is "deemed of limited value whenever such evidence *could arguably* be subject to

manipulation." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (emphasis

in original); *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 80-90 (D.D.C. 2017) (giving

less weight to business decision made after the merger was agreed to because the court determined

that it was made to improve the defendant's litigation position).

As discussed, Young was not aware ████████████████████████████████

████████████████████, and after each acquisition ████████████████████████

█████████████████.  Tr. at 1083:14-21.  ████████ and ██████ both sought to ████████████

████████████████████ with HMH ████████████████████████████████████

████████████.  The Acquisition Clause still appears in ████████ and ████████ contracts with HMH,

although ████████ was able to ████████████████████████████████████████████.[27] ████

████████████████████.  Finally, Garrett explained that the clauses were intended to ensure that

HMH hospitals were "paid fairly for the services that they delivered," Tr. at 787:4-9, and at his

deposition in this matter, Young testified that with respect to the Acquisition Clauses, ████████████████

████████████████████████████████████████████████████████ PX7026-148.  Thus,

until the FTC argued in its opening brief that the Acquisition Clauses are evidence of a likely price

increase, HMH seemingly had no intention of waiving the Acquisition Clauses after it acquired

Englewood.  Yet, shortly after HMH learned of the FTC's argument, it sent the Waiver Letters.

The Waiver Letters are a prime example of alleged business records that were created to

bolster Defendants' litigation position.  HMH ████████████████████████ and, just prior

to the FTC's opening brief, Young effectively testified ████████████████████████.  And the

Waiver Letters run contrary to HMH's own financial interest.  As a result, the Court gives little

---

[27] The Court notes that ████████ and ████████ contracts were executed after the proposed transaction
was announced, and ████████████ negotiations for its current contract with HMH occurred after the
announcement. ████████████████████.

weight to the Waiver Letters.[28]  Even if the Court were to consider the Waiver Letters, they do not constitute binding contracts; Defendants point to no consideration given by the insurance companies in exchange for the waivers.[29]

More importantly, even if the Acquisition Clause was enforced, it would not change the Court's analysis.  The critical inquiry, in the Court's view, is the impact that the merger will have on future negotiations with commercial insurers.  To this end, HMH makes no representations about rate increases or nonprice terms for any future system-wide negotiations.[30]  Because HMH has historically been able to negotiate higher rate increases than Englewood, the reasonable inference is that HMH will be able to do so after the merger (with the benefit of having added Englewood to its portfolio).[31]  Accordingly, although the Waiver Letters may delay a price increase in the short term, as ▮▮▮▮ explained, HMH is "really just putting off the inevitable." ▮▮▮▮

▮▮▮▮

---

[28] Defendants also argue that, based on Third Circuit precedent, the Court cannot consider private agreements or contractual language in conducting an antitrust analysis.  The Court disagrees.  The Third Circuit has clearly stated that private contracts cannot be considered in determining the relevant product market or the relevant geographic market.  *Penn State Hershey Med. Ctr.*, 838 F.3d at 344 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438-39 (3d Cir. 1997)).  But the Acquisition Clause is being considered as to anticompetitive effects, not in defining the relevant market.

[29] Defendants contend that the Waiver Letters are enforceable on equitable grounds.  D.E. 313.

[30] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[31] Defendants also contend that adding Englewood will not increase HMH's leverage with commercial insurers.  Defs. FOF ¶¶ 113-21.  Dr. Dafny acknowledged that Englewood does not have much bargaining leverage when compared to HMH, Tr. at 1522:9-10, and unlike HUMC, no commercial insurer testified that it needed Englewood in its network to create a desirable network.  However, Defendants conflate two separate issues.  The first is whether HMH and HUMC are more important to insurers than Englewood.  The answer to that inquiry is clearly yes.  The second is whether adding Englewood to HMH will further increase HMH's leverage with insurers.  The answer to that query is, based on the evidence, yes-subject to a final determination in the administrative action.

The Merger would also likely eliminate competition on a non-price level.  As discussed, although Defendants downplayed the fact that they are competitors during the hearing, ordinary course evidence demonstrates that HMH and Englewood currently monitor each other's service offerings.  For example, after Englewood advertised its use of a new technology as "first in the State," HMH expedited its approval process for the same technology due to concerns from an HMH physician about his ability to keep up with competitors.  PX1205.  Similarly, an Englewood employee noted that Englewood should market a new technology that HMH did not have "as this will give [Englewood] the edge."  PX2358.  Moreover, Garrett explained that HMH monitors competitors' quality ratings, which helps improve HMH's services.  Tr. at 800:2-17.  As part of this tracking, HMH looks at Englewood's ratings.  PX1055.  If Englewood and HUMC were no longer competitors, it would remove an incentive for both entities to continue to improve quality metrics and offer innovative medical technology.  *See Merger Guidelines*, § 6.4 (explaining that "[c]ompetition often spurs firms to innovate" and that the FTC "may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger").

In fact, one of the concerns that Englewood raised as to potentially partnering with ████ was that it would lead to *further* competition with HMH.  As noted, on March 28, 2019, Chartis presented the offers from HMH and ████ to the Executive Committee.  In comparing the two entities as potential partners, Chartis noted that  a "pro" of choosing HMH, "████████████ ████████████████" PX6004-009.  Relatedly, a "con" for ████ was that a partnership with ████ "████████████████ ████████████" *Id.*  The "████████" refers to future competition between HUMC and Englewood; likewise, the potential for ████████ indicates ████████████.

53

███████████████, *i.e.*, direct competition resulting in more and/or improved services for patients.

Finally, Defendants contend that market responses from competitors will also constrain Defendants post-merger. Defs. COC ¶ 24. "[I]n certain cases, repositioning by other competitors may be sufficient to deter or counteract the anticompetitive effects of a merger" *Penn State Hershey Med Ctr.*, 838 F.3d at 351, but the repositioning must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern," *Merger Guidelines*, § 9. Defendants' argument regarding competitors is not supported by the evidence.

Defendants argue that hospitals and health systems' use of front doors will mitigate against any price increase post-merger. Defs. FOF ¶¶ 127. But there is little to no evidence demonstrating that front doors actually have any impact on the inpatient market in Bergen County. The only evidence about the effectiveness of front door came from ███████. Specifically, the number of patients that utilized ████████ Bergen County front door who were then subsequently treated at an ████████████████ was "████████" to ██████████ utilization strategy. ████████████████. Defendants also contend that after the merger, insurers will be able to steer patients away from HMH. But again, there is no evidence that insurers are likely to take this approach. The Court also has serious doubts that this would occur given the repeated testimony that Bergen County residents prefer to receive care close to home and that insurers need to include HUMC in their networks to remain marketable to Bergen County residents. Finally, potential competitors seeking to enter the Bergen County market face high entry barriers and costs. This is evidenced by HUMC's tower project and the new Valley hospital, both of which are multi-year and multi-million-dollar (actually hundreds of millions) projects. And while Garrett and Geller both opined

that Valley's new location will increase competition, Defendants did not provide persuasive evidence to support these opinions.  Finally, any new entry into the market would need to proceed through New Jersey's certificate of need process, which is time-consuming and expensive.  FTC FOF ¶ 152.

As a result, the FTC demonstrates that the merger will likely create an anticompetitive effect.  The FTC, therefore, establishes its *prima facie* case.

### 2.  Rebuttal Evidence

To rebut the presumption that the merger is anticompetitive, Defendants must present evidence "that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition."  *H.J. Heinz Co.*, 246 F.3d at 715.  The stronger the Government's *prima facie* case, the more evidence that Defendants must present to successfully rebut the presumption. *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990)).  Defendants focus on three overarching procompetitive effects that they argue rebut the FTC's presumption: (1) upgrades to Englewood's physical plant and increased capacity; (2) expansion of the complex tertiary and quaternary care at HUMC; and (3) service optimization between the entities.  Defendants maintain that these effects will lower costs and increase the quality of healthcare for the community.

Apart from the service optimizations that will be realized through the merger, Defendants frame their rebuttal arguments in terms of the procompetitive benefits of the merger.  Defs. FOF ¶ 130, COL ¶¶ 25, 27.  Defendants do not characterize these arguments as asserting an efficiencies defense.  The FTC contends that there is "no distinction between a procompetitive benefit and an efficiency; rather efficiencies are cognizable only if they are procompetitive in nature."  Plf. COL ¶ 43.  Thus, the FTC treats Defendants' rebuttal case as invoking an efficiencies defense.

The Clayton Act itself does not expressly provide for an efficiencies defense nor has the Supreme Court formally addressed whether one exists.  Although the Third Circuit has also not concluded that an efficiencies defense exists, other circuits have determined that the defense is cognizable.  *Penn State Hershey Med. Ctr.*, 838 F.3d at 348.  Moreover, the *Merger Guidelines* recognize the defense.  *Merger Guidelines*, § 10.  Assuming that the defense is legally cognizable, it must meet several requirements.  Among other things, the efficiencies must be "merger specific," which means "they must be efficiencies that cannot be achieved by either company alone."  *Penn State Hershey Med. Ctr.*, 838 F.3d at 348.  The efficiencies must also be verifiable and not speculative.  *Id.*  This is a high bar, as "[t]he presumption of illegality may be overcome only where the defendants 'demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers.'"  *Id.* (quoting *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991)).  However, "where the evidence of efficiencies in the relevant market will not support an outright defense to an anticompetitive merger, such evidence is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 151 (D.D.C. 2004); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) ("We further find that although Tenet's efficiencies defense may have been properly rejected by the district court, the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger.").

Whether the Court construes Defendants as invoking a formal efficiencies defense or as addressing the competitive effects analysis, Defendants fail to establish extraordinary procompetitive effects to offset Plaintiff's *prima facie* case.

### a.  Upgrades and Increased Capacity at Englewood

Englewood's goals in finding a strategic partner, and in choosing HMH specifically, were to increase its inpatient utilization and obtain capital for needed improvements to the hospital. HMH is providing significant capital that is specifically earmarked for Englewood through the merger, and Garrett explained that HMH intends to turn Englewood into "a leading provider of tertiary care in Northern New Jersey."  Tr. at 743:5-8.

As noted, Defendants repeatedly pointed to the Agreement, specifically to HMH's "hard commitments" in Section 3 and Exhibit C, as evidence of HMH's plans to grow Englewood's utilization and improve its clinical offerings.  *See* Tr. at 886:19-25; DX3800, Ex. C.  But as noted, for many of the "hard commitments" (1 through 19), the commitments are to explore, assess, and collaborate on different issues or to make "regional" (not Englewood specific) improvements. DX3800, Ex. C.  Moreover, as to the first 19 commitments in Exhibit C, Englewood is only permitted to arbitrate disputes, with a remedy of specific performance or the reimbursement of costs.  *Id.*, §§ 3.2.5, 7.1.3.3.  In addition, the commitments to increase Englewood's inpatient volume (certain of commitments 20-27) are not enforceable by Englewood.

Nevertheless, HMH is providing significant capital to Englewood for necessary improvements to its physical plant, including upgrades to the OR and the Heart Center of Excellence, and providing Englewood with a robot for Englewood's robotic urology services and ██████████████████████.  *Id.*, Ex. C, ¶¶ 3, 11, 15, 19.  While not as comprehensive or firm as represented by Defendants during the hearing, the Court recognizes that these improvements to Englewood could likely amount to a procompetitive benefit to Bergen County, in that Englewood should be able to upgrade its facilities and equipment thereby offering a broader array of services for its patients.  Dr. Gowrisankaran, Defendants' expert on industrial organization, economics, and

econometrics in the healthcare industry, testified that his analysis of such capital investments indicated that they were likely to attract more patients.  Tr. at 1246-45.[32]

### b.  Expansion of Complex Services at HUMC

Next, Defendants tout that the merger will allow HMH to expand the complex tertiary and quaternary care provided at HUMC.  Defendants continue that this will reduce the outmigration of patients to New York, Defs. FOF ¶¶ 134, 140, which, in turn, helps the community in terms of cost of care and quality.  To expand HUMC's services, HMH maintains that it needs to relieve capacity constraints and "[t]he merger will ease HUMC's capacity constraints by redirecting non-complex tertiary patients to Englewood." *Id.* ¶ 136.  Defendants continue that HUMC does not have feasible alternatives to alleviate capacity constraints outside of the merger. *Id.* ¶ 137.

The Court has doubts as to several representations regarding HMH's need for the merger to realize its vision for HUMC.  First, HMH indicates that it can transfer many cases to Englewood on day one, that is, before any capital contributions and resulting improvements to Englewood have been made.  HUMC also claims that it has had capacity issues for a number of years.  As a result, the FTC posed the question as to why HUMC has not previously transferred cases to Englewood to address its capacity issues.  As discussed, in his deposition, Garrett stated that it did not presently make sense for HUMC to transfer patients to Englewood because Englewood is a competitor.  PX7004–189—PX7004-90.  And there was no indication that transferring such patients would place either HMH or HUMC in financial jeopardy.  Garrett's response is illuminating because it reflects HMH's position that financial results are more important than its claimed concern for the community and patients, *i.e.*, "New Jersey First."  The Court is not critical

---

[32] For the reasons stated in note 37, the Court declines the FTC's invitation to analyze and compare the capital investment offered by ███████ to Englewood during their merger discussions.

of this motive – HMH's financial interests are legitimate business considerations.  However, this statement nevertheless undercuts Defendants' claims that New Jersey and its residents are the primary consideration.

Defendants also rely on the Optimization Plan to support the strategy to transfer patients to Englewood and to establish that HUMC faces capacity constraints.  Among other things, the Optimization Plan identifies an initial estimate on the number and type of patients that can be transferred to Englewood.   DX3601.   Like the Waiver Letters, the FTC argues that the Optimization Plan was created after the FTC filed its complaint in this matter and contends that it "may lack the reliability necessary to be admitted under Rule 803(6)," the business records exception.  D.E. 246 at 4.

The FTC argues that the Optimization Plan is not a business record and was created for this litigation.  The FTC points to the fact that the document was not circulated until March 26, 2021, yet Defendants' capacity expert, among other of Defendants' experts, relied on the document extensively in his April 9, 2021, report.   D.E. 246 at 4-5.   Moreover, the first draft of the Optimization Report was only created on February 27, 2021.  *Id.* at 8; *see also* DX3602.

Garrett explained that the Optimization Plan was the result of the efforts of nineteen planning teams that in combination met over 300 times.  Tr. at 759:11-15.  Defendants further explain that the information about transfers in the Optimization Plan was largely created through the work of the Transfer Team, which it appears, first began meeting in April 2020.  *See* Defs. June 8, 2021, Ltr. at 1-2; DX3792-001.  Defendants also identify several documents that allegedly

illustrate the various committee work that started in April 2020 and led to the Optimization Plan. *See* Defs. June 8, 2021 Ltr.[33]

The Optimization Plan reads like an advocacy piece created for the current litigation.[34]  As noted, Defendants represented that the purpose of the Steering Committee was to create a plan *to implement* the Exhibit C commitments upon consummation of the merger, but the Optimization Plan noticeably fails to do so.  For example, despite the months of planning, the document contains no details as to how the merged entity intends to redirect cases to Englewood.  Instead, the Optimization Plan largely repeats information in the Agreement.  In fact, although the Optimization Plan identifies the number of cases HMH believes it can redirect from its other regional hospitals, the numbers for Palisades and Pascack Valley are actually less than the numbers contemplated in the Agreement.  The number of patients for Englewood's cardiac surgery and robotics urology programs are the same as in the Agreement.  Thus, rather than providing Defendants with a comprehensive plan to implement, the document reads as a sales pitch to justify the merger after the fact.  The Court, therefore, admits the Optimization Plan but gives it little

---

[33] Defendants submitted their June 8 letter with leave of Court, in response to questions that arose during closing arguments.  While Defendants reference exhibits that were included in its exhibit list in the June 8 letter, they also rely on documents that were not on their exhibit list.  Defendants sought leave to admit these additional exhibits into evidence.  These new documents are not critical to Defendants' argument on this issue, nor are they pertinent to the Court's conclusion.  As a result, the Court does not reach the request for leave to admit.

[34] In fact, the FTC also points out that statements from the Optimization Plan are word-for-word copies of statements made in a July 21, 2021 white paper that Defendants submitted to the FTC to support this merger.  D.E. 246 at 6-7.  Defendants counter that in actuality, the statements from the white paper were "derived from and consistent with their internal analysis and integration planning activities."  D.E. 256 at 7.  But the first draft of the Optimization Plan was not created until February 2021.  Moreover, despite Defendants' position that the white paper was influenced by Defendants' integration planning activities, Defendants fail to point to any documents that support this statement.  Even Defendants' additional documents identified in their June 8 Letter do not reflect that such work product existed.  Tellingly, not a single document cited in the letter makes even passing reference HUMC's capacity constraints.

weight. To give the Optimization Plan any significant weight would merely invite future antitrust litigants to create similar documents.

Next, although Defendants maintain that HMH has no alternatives to relieve the capacity constraints at HUMC except to transfer patients to Englewood, Defendants gloss over the fact that HUMC is currently expanding capacity through the Second Street Tower project. In the Optimization Plan and throughout the hearing, Defendants repeatedly explained that the Second Street project "will not alleviate HUMC's capacity challenges." DX3601-008. But the construction project expands HUMC's existing footprint. Through the project, HUMC is building ██ new operating rooms and plans to ████████████████████████████████ operating rooms. Tr. at 1173:25-1174:9. The new tower will also have ██ new ICU beds and HUMC plans to ████████████ of its existing ICU beds. Tr. at 1175:9-14. In addition, there is space for ██ additional ICU beds that can be added if the need arises. Tr. at 1175:15-18. Finally, the new tower will have ███ new private med-surg beds and HMH ██████████████████████████ ████████████████████. Tr. at 1175:19-1176:2. If HUMC's capacity constraints were so severe, or the need to expand HUMC's tertiary and quaternary services were as acute as Defendants make them out to be, the Court questions why HMH is ████████████████████ ████████████████████. At a minimum, HMH did not provide any adequate explanation as to this fact. Moreover, HMH planned *pre-merger* to expand certain quaternary service lines with the Tower project. PX1051. In addition, HUMC never gave a signal to insurers or competitors that it had severe capacity constraints; HUMC never declined a transfer and never went on redirect in the time leading up to the Agreement. Finally, HMH has three hospitals near HUMC: Pascack Valley (owned with Ardent), Palisades, and Mountainside (owned with Ardent). These three hospitals provide primary and secondary care. Pascack Valley is not at

capacity, and there was no indication that either Palisades or Mountainside was at capacity. Nevertheless, HMH provided no reason as to why HUMC could not alleviate its capacity constraints to some degree through using one or more of the three.[35]

Dr. Gowrisankaran evaluated the procompetitive benefits of the proposed merger, finding nine benefits. Tr. at 1226:12-13. The first benefit was increased patient volume at Englewood. *Id.* at 1242:14-23. Gowrisankaran explained that payors would save money through transfers to Englewood and tertiary redirections from HUMC to Englewood. Gowrisankaran continued that payors would save because Englewood is cheaper than HUMC. Tr. at 1244:11-12. The Court agrees with Dr. Dafny that transfers or redirections from HUMC to Englewood are not an efficiency; instead the transfers/redirections are a voluntary decision by HUMC to give away profits. Tr. at 586:7-24. Not only is it a voluntary decision, but it is a decision that runs counter to HUMC and HMH's financial interest. Besides the transfers not being in HMH and HUMC's financial interest, there are also serious questions as to whether the number of projected transfers can be implemented. As noted, a large number of hospital referrals come from physicians not employed by the hospital; those physicians do not have to send their patients to Englewood. And HUMC is not reducing it tertiary service lines. Moreover, Gowrisankaran drew his transfer/redirection figures from the Optimization Plan, Tr. at 1283-84:13-20, of which the Court gives little weight for the reasons stated above.

Defendants also primarily rely on Dr. Gowrisankaran to quantify the benefits that would result from HUMC's increased quaternary services. HMH, however, glosses over the fact that it

---

[35] In fact, when HMH acquired Pascack Valley, one of its stated reasons to reopen the facility was to serve as a pressure relief valve for overflow patients at HUMC. Tr. at 1437:25-4. But at the present time, Pascack Valley only operates at about 50% to 60% of its occupancy rate. Tr. at 1212:12-15.

needs state approval to expand HUMC's quaternary service lines.  Plf. FOF ¶ 162.  At least with respect to hospitals obtaining tertiary capacity, this is an expensive and time-consuming process, and approval is not guaranteed.  Tr. at 768:13-25; *see also* 93:4-19.    And Gowrisankaran opined that there would be direct payor cost savings from quaternary care received in New Jersey versus New York.  *See* Defs. FOF ¶ 146.  But quaternary services are highly complex and infrequently performed, and Gowrisankaran's patient choice model, which he based[36] on HMH's ▇▇▇▇ recapture rate, amounts to ▇▇ patients.    DX5002, Table 11A.    Moreover, Gowrisankaran acknowledged that the actual reduced payor expenditures would be much less once he accounted for transfers from lower-priced New Jersey hospitals to HUMC.  Tr. at 1287:11-18.  In fact, Gowrisankaran found that ▇▇▇▇▇▇ would have reduced expenditures post-merger for quaternary services; ▇▇▇▇▇▇▇▇▇ would all have increased expenditures.  Tr. at 1288-89:12-13.

### c.  Service Optimization

The final procompetitive benefit asserted by Defendants is cost-savings that will result from service optimization between the two entities.[37]  For this benefit, Defendants rely on their

---

[36] The Court notes that Dr. Gowrisankaran utilized a patient-choice model for his analysis of the cost-savings that HMH will realize by capturing outmigration.  The Court also notes that one of Dr. Wu's critiques of Dr. Dafny's analysis is that she improperly used a patient-choice model.

[37] Defendants frame this as an efficiency.  Defs. FOF ¶¶ 27-29.  The FTC argues that these service optimization efficiencies are not merger specific because they could also be achieved if Englewood chose a different merger partner, such as ▇▇▇▇.  *See* Plf. COL ¶ 46.  An efficiency is merger specific if it "cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor."  *H.J. Heinz Co.*, 246 F.3d at 722.  Thus, there is no legal requirement that Defendants must compare the efficiencies alleged here with those of a different hypothetical merger partner.  And the FTC has cited no authority indicating that a court can consider other potential merger partners in conducting an efficiencies analysis.  The merger specific inquiry focuses on the efficiencies that could theoretically be achieved by either merging entity alone, absent the merger.

expert Ms. Ahern, who calculated that the merger would result in $38 million in cost-savings efficiencies annually.  Defs. FOF ¶ 150.  Ahern, however, failed to account for the $439 million capital contribution by HMH, which would result in not reaching a net positive gain until thirteen years after the merger.[38]  Tr. at 1529-30:24-15.  Ms. Ahern recognized that HMH had a demonstrated track record of cost savings through past mergers and acquisitions.  Dr. Gowrisankaran estimates that 50% of Ms. Ahern's amount would be passed through to payors.  Tr. at 1529:24-15.  While Gowrisankaran estimates that payers would see cost savings, there is no evidence that these cost savings will be realized.  *Id.* ¶ 150.  Critically, HMH has acquired other hospitals in New Jersey, including Palisades in 2016 and JFK in 2018, and Defendants provide no evidence that the cost-savings from service optimization between the prior merger entities was passed through to payors.  Therefore, with history as a guide, the Court doubts that any costs savings HMH realizes will be passed through to payors.

### d.  Quality Improvements

Finally, the Court briefly addresses the alleged quality improvements that Defendants submit will be achieved at Englewood and HUMC after the merger.  Dr. Meyer, Defendants' healthcare quality expert, testified that HMH has a history of being a leader in healthcare quality and a track record of improving the quality of care with its merger partners.[39]  *Id.* ¶ 154.  The Court

---

[38] The Court is also concerned that neither Ms. Ahern nor anyone from her team, produced any notes, despite the fact that she interviewed more than 100 Englewood and HMH employees, because, according to Ahern, her team is well versed in the field of healthcare organizations and operations.  Tr. at 140:6-1402:11.  Yet, neither Ms. Ahern nor any of her team members claimed to have an eidetic memory.  Further, no explanation was provided as to how Ms. Ahern was able to effectively incorporate her team's verbal work product into her final report.  Absent an extraordinary and credible explanation, the Court cannot fathom how Ms. Ahern and her team were able to accurately synthesize over 100 interviews from memory alone.

[39] The FTC seeks to preclude Defendants from relying on certain portions of Dr. Meyer's report because Dr. Meyer destroyed notes from interviews that were incorporated into his report, in contravention of the Case Management Order.  D.E. 248.  The FTC seeks to exclude those portions

also agrees that HMH's capital commitment will certainly permit Englewood to upgrade and expand its facilities and equipment.  This is a quality improvement.  At the same time, Englewood is also a high-quality hospital.  Tr. at 846:4-16.  In fact, Dr. Romano, the FTC's expert on healthcare quality opined that "Englewood performs better than HUMC on some important measures."  Tr. at 1435:22-23.  In other words, even without HMH's capital infusion, Englewood still outperforms HUMC in certain areas.  Consequently, although both hospitals (particularly Englewood) will likely see certain improvements in quality due to the merger, this merger is fundamentally different than, for example, a merger where a large successful health system acquires a small, failing hospital.  Because Englewood and HUMC consistently perform well in multiple quality assessments, Defendants also fail to establish that any improvements in quality at either entity will be a sufficient procompetitive benefit.

In sum, Defendants do establish that improvements at Englewood will result in an adequate procompetitive benefit.  In addition to a limited benefit of HUMC recapturing a small number of outmigration patients, Englewood should be able to expand and upgrade its physical plant, equipment, and services.  But these benefits do not amount to extraordinary efficiencies that offsets the likely anticompetitive effect of the merger.  Consequently, Defendants fail to rebut the FTC's *prima facie* case and the Court concludes that the FTC establishes a likelihood of success in demonstrating that the merger violates Section 7 of the Clayton Act, or in other words, that "there

---

of the report that relied on the destroyed notes under Federal Rule of Evidence 37(b)(2)(A).  A court has broad discretion when imposing sanctions pursuant to Rule 37(b).  *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006).  In this instance, although Dr. Meyer intentionally destroyed his notes, there is no evidence of bad faith.  Accordingly, the Court denies the FTC's request.

is a reasonable probability that the challenged transaction will substantially impair competition." *Sysco Corp.*, 113 F. Supp. 3d at 22 (quoting *Staples*, 970 F. Supp. at 1072)).[40]

### B. Weighing the Equities

"Although the Government's showing of likelihood of success creates a presumption in favor of preliminary injunctive relief, we must still weigh the equities in order to decide whether the merger would be in the public interest." *Penn State Hersey Med. Ctr.*, 838 F.3d at 352 (quoting *H.J. Heinz Co.*, 246 F.3d at 726). The Court must determine whether the harm Defendants "will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Id.* In addition, the Third Circuit has explained that although a court may consider the private equities, "they are not to be afforded great weight." *Id.* at 352.

The FTC contends that "[t]he principal equity in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws." Plf. FOF ¶ 50. If Defendants are allowed to proceed with the transaction, and then the administrative proceeding finds that the merger is unlawful, it will be difficult to unscramble the proverbial egg. *See id.* ¶ 50. Defendants argue that if the merger is enjoined it will "derail the Merger" and "deny[] the community of [the] significant healthcare benefits" of the expanded complex care at HUMC and tertiary care at Englewood. Defs. FOF ¶ 31. In arguing that the community will be denied the benefits of the changes to care, Defendants incorrectly focus on whether the merger is in the public interest. At this stage, the Court must determine whether the *injunction* is in the public interest. *Penn State Hershey Med. Ctr.*, 838 F.3d at 353. As for Defendants' argument that the injunction will derail

---

[40] Even if the Court were to conclude that Defendants rebutted the FTC's *prima facie* case that the merger will be anticompetitive, the Court would conclude that the FTC appropriately meets its burden of persuasion to demonstrate a likelihood of success in establishing that the merger violates Section 7.

the merger, it is not a consideration endorsed by the Third Circuit.  "We see no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful."  *Id.*  Accordingly, on balance the equities favor granting the injunction.

## VI.    CONCLUSION

In sum, the FTC demonstrates a likelihood of success on the merits and the equities favor granting the injunction.  Therefore, the Court preliminarily enjoins the proposed acquisition pending the outcome of the administrative proceeding.  An appropriate Order accompanies this Opinion.

Dated:          August 4, 2021

**JOHN MICHAEL VAZQUEZ, U.S.D.J.**